```
                                                                    1
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4   ----------------------------------------
 5   DOUGLAS W. BAILLIE,                     :
 6            Plaintiff,                     :
 7       vs.                                 :   CASE NO.
                                                 C-1-02-062
 8   CHUBB & SON INSURANCE,                  :
 9            Defendant.                     :
10   ----------------------------------------
11        DEPOSITION OF:    DOUGLAS W. BAILLIE
12        TAKEN:            By the Defendant
13                          Pursuant to Agreement
14        DATE:             May 9, 2002
15        TIME:             Commencing at 9:35 a.m.
16        PLACE:            Frost Brown Todd LLC
                            2200 PNC Center
17                          201 East Fifth Street
                            Cincinnati, Ohio  45202
18
          BEFORE:           Karen Volk, CSR, RPR
19                          Notary Public - State of Ohio
20
21
22
23
24
```

```
                                                                    2
 1   APPEARANCES:
 2
 3        On behalf of the plaintiff:
 4            Randolph H. Freking, Esq.
                     and
 5            Mark W. Napier, Esq.
                     of
 6            Freking & Betz
              215 East Ninth Street
 7            Fifth Floor
              Cincinnati, Ohio  45202
 8
 9        On behalf of the defendant:
10            David T. Croall, Esq.
                     of
11            Frost Brown Todd LLC
              2200 PNC Center
12            201 East Fifth Street
              Cincinnati, Ohio  45202-4182
13
14        Also present:
15            Tim Szerlong
              Leonard C. Sherer
16
17                      - - -
```

```
                                                                    3
 1                         I N D E X
 2   DOUGLAS W. BAILLIE                            PAGE
 3      Cross-Examination by Mr. Croall              4
 4
     EXHIBITS                         MARKED     REFERENCED
 5
        Baillie Exhibit  1              61            61
 6      Baillie Exhibit  2              78            78
        Baillie Exhibit  3              78            78
 7      Baillie Exhibit  4             134           134
        Baillie Exhibit  5             136           137
 8      Baillie Exhibit  6             141           141
        Baillie Exhibit  7             142           142
 9      Baillie Exhibit  8             147           147
        Baillie Exhibit  9             153           153
10      Baillie Exhibit 10             153           153
11      Baillie Exhibit 11             159           160
        Baillie Exhibit 12             164           164
12      Baillie Exhibit 13             167           167
        Baillie Exhibit 14             168           168
13      Baillie Exhibit 15             169           169
        Baillie Exhibit 16             172           172
14      Baillie Exhibit 17             173           174
        Baillie Exhibit 18             173           174
15      Baillie Exhibit 19             177           177
        Baillie Exhibit 20             177           177
16
        Baillie Exhibit 21             179           179
17      Baillie Exhibit 22             190           190
        Baillie Exhibit 23             190           190
18      Baillie Exhibit 24             194           194
        Baillie Exhibit 25             194           195
19      Baillie Exhibit 26             197           197
        Baillie Exhibit 27             197           197
20      Baillie Exhibit 28             200           200
        Baillie Exhibit 29             201           201
21      Baillie Exhibit 30             202           202
22      Baillie Exhibit 31             212           212
        Baillie Exhibit 32             213           213
23      Baillie Exhibit 33             216           216
                                   - - -
24
```

```
                                                                    4
 1                    DOUGLAS W. BAILLIE
 2   of lawful age, a witness herein, being first duly sworn as
 3   hereinafter certified, was examined and deposed as follows:
 4                     CROSS-EXAMINATION
 5   BY MR. CROALL:
 6        Q.   Good morning, Mr. Baillie.
 7        A.   Good morning.
 8        Q.   We just met a minute ago.  My name is David
 9   Croall and I'm one of the attorneys working on the lawsuit
10   that you filed against Chubb.
11             The reason we're together this morning is so
12   that I can ask you some questions about what led up to the
13   filing of that lawsuit.
14             If you would answer those questions to the best
15   you can.  It's not my purpose to try to trick you, to get
16   you to say things you don't mean to say.
17             I want you to be comfortable that you
18   understand my questions.  If you don't understand my
19   question, I want you to tell me that and I'll try to restate
20   it.
21             Any time you want to take a break, just say so.
22   Although, if there's a question, I'll ask you to answer the
23   question before you take a break.
24             Any time you want to consult with Mr. Freking
```

ORIGINAL

Exhibit B

29

1  Q. What were your responsibilities in that
2  position?
3  A. In charge of the marketing organization of
4  north Jersey.
5  Q. How big a group is that?
6  A. It was the largest branch at the time. We had
7  about 150 agents. I think it was up to about 150 million
8  but I wouldn't quote me on that.
9  Q. Who did you report to in the marketing job?
10  A. Terry Cavanaugh.
11  Q. What was his title at that point?
12  A. He was branch manager.
13  Q. How long were you in the marketing position?
14  A. Three years about.
15  Q. Then was it moved to Harrisburg or are we not
16  there?
17  A. Yes, then we moved to Harrisburg.
18  Q. How did it happen that you got that position?
19  Who hired you for it?
20  A. Ed Dunlop.
21  Q. What was his title?
22  A. He was the zone manager.
23  Q. Eastern zone?
24  A. Uh-huh.

30

1  Q. Yes?
2  A. Yes.
3  Q. Tell me what -- your job in Harrisburg was
4  branch manager?
5  A. Yes.
6  Q. What were the responsibilities for that
7  position?
8  A. Managing the underwriting, marketing, claims,
9  loss control, all the departments that comprise the Chubb
10  system for that territory. The job was to start a new
11  office and grow the territory.
12  Q. So there was not a Harrisburg office before
13  that?
14  A. No.
15  Q. So were you responsible for hiring staff from
16  the ground up?
17  A. From the ground up.
18  Q. How big an office did it start out as?
19  A. 25 people, it started off at about 14 million.
20  Q. We're in 1991?
21  A. Yes.
22  Q. '91, '92?
23  A. '91.
24  Q. How long were you in the Harrisburg job, until

31

1  '98; is that right?
2  A. Until 1998.
3  Q. I take it the basic job responsibilities stayed
4  the same, the office grew?
5  A. Yes.
6  Q. How much did it grow during the --
7  A. Grew to about 50 million.
8  Q. How many employees?
9  A. We still kept it at 25.
10  Q. Was the Harrisburg branch profitable during the
11  years you were there?
12  A. They were profitable five of the seven, yeah.
13  Q. Do you remember which two years weren't
14  profitable?
15  A. Yes. '96, there was a huge snowstorm that came
16  through where we had huge cat losses.
17  Q. Cat losses?
18  A. Catastrophe losses. Then '98, we had the
19  residual -- some umbrella losses as a result of the snow and
20  some other umbrella losses, and that wasn't profitable. But
21  the other years were extremely profitable.
22  Q. You said '96 and '98?
23  A. I believe.
24  Q. You're not talking to an insurance guy. Help

32

1  me out with the umbrella losses.
2  A. The umbrella was --
3  MR. FREKING: You should get some, Dave.
4  MR. CROALL: I may have one, that doesn't mean
5  I know what it is.
6  A. I think you do. The umbrella would be over a
7  million dollars. So if you --
8  Q. So --
9  A. When you get a loss over a million, the
10  umbrella kicks in, so they tend to be bigger losses.
11  Q. So you've got the excess loss over either --
12  A. Right.
13  Q. -- another Chubb policy or some other insurance
14  policy --
15  A. Right.
16  Q. -- which has reached its limit of liability?
17  When you were the Harrisburg branch manager, say the last
18  couple of years, who were your direct reports? What kinds
19  of positions reported to you?
20  A. Personal lines manager, commercial lines
21  manager, loss control manager, claims manager, operations
22  manager, executive protection manager, and umbrella manager.
23  Q. How big a territory was covered by Harrisburg?
24  Is it pretty much central and eastern Pennsylvania or --

37

1  time on.
2  Q. Any other organizations you're a member of?
3  Are you a member of a church?
4  A. No. I belong to Mensa, but only, really, as a
5  paying member.
6  Q. No activities? No meetings?
7  A. I didn't get involved. I used to read the
8  newsletter, look for things, but I didn't really get
9  involved.
10 Q. How long have you been a member of Mensa?
11 A. 1990.
12 Q. Any professional organizations you're active
13 in? Any insurance industry groups?
14 A. Yeah. I was active in the technology local
15 group here. I would attend the meetings.
16 Q. What's the name of the group?
17 A. Boy, they changed it. It was the software
18 association. I was also active in RIMS, which is Risk
19 Insurance Management Service, up in the Columbus office,
20 attended some of the meetings down in Cincinnati, also.
21     And spoke at and attended the Risk Insurance
22 Services Organization. That may be wrong, the name I gave
23 you. It's a local group that puts on educational --
24 Q. Here in Cincinnati?

38

1  A. Here in Cincinnati.
2  Q. Once you get settled in Jacksonville you'll
3  look for some opportunities --
4  A. Yes.
5  Q. -- to get similarly involved in those kinds of
6  groups?
7  A. I'll try.
8  Q. How much travel is there in connection with
9  your new job?
10 A. Substantial.
11 Q. Can you put a percentage on it? Is it
12 half-time travel?
13 A. I would say 40 percent would be a good
14 percentage. It's early yet but that seems to be what it is,
15 yeah.
16 Q. Nationwide or eastern?
17 A. East companies.
18 Q. Eastern Mississippi?
19 A. East companies.
20 Q. Tell me about the Cincinnati regional job when
21 you started, say the first six months, what was your take on
22 the Cincinnati regional job?
23 A. Well, they had some real morale problems. They
24 just lost three of their big executives, their branch

39

1  manager, marketing manager and the commercial lines manager.
2  Q. Reynolds was the branch manager?
3  A. Yes.
4  Q. Who were the other two?
5  A. Joe Beneducci was the marketing manager and
6  Jeff Kapp was the commercial lines manager. They had all
7  left the company for other jobs.
8      At the same time they had just deregionalized
9  or I should say they regionalized Louisville and Columbus,
10 collapsed those branches, took away the infrastructure of
11 those branches and moved it all into Cincinnati. There
12 was --
13 Q. When did that happen, before you got here?
14 A. Just before I got there.
15 Q. So those had been separate branches before?
16 A. Right.
17 Q. Now they were sort of satellites of the
18 Cincinnati --
19 A. Yeah, and there was some displacement of people
20 and layoffs there. The tone was pretty negative. The
21 service was awful. There was about 1300 outstanding
22 endorsements and we were just not servicing the book, our
23 customers.
24     We also had -- I was amazed that less than 30

40

1  percent of the employees had performance appraisals in
2  place.
3  Q. How many employees were there that you were
4  ultimately responsible for in the regional job?
5  A. There was approximately 80 in Cincinnati,
6  Columbus and Louisville. And there was maybe another 70 in
7  Cleveland and Indianapolis.
8  Q. Cleveland and Indianapolis also were part of
9  the Cincinnati region?
10 A. Yeah.
11 Q. They were kind of a notch up from Columbus and
12 Louisville?
13 A. They were full service branches. Columbus and
14 Louisville were part of the Cincinnati branch now.
15 Q. So there were branch managers in Cleveland and
16 Indianapolis?
17 A. Right.
18 Q. Not in Louisville and Columbus. Who is the top
19 guy in Louisville or Columbus, what job title is that?
20 A. Andy Bryant would be the top guy, he would be
21 called the production branch leader. And at the time it
22 was -- Anthony Washington was the production branch manager
23 of Columbus.
24 Q. How was the Cincinnati job different than the

41

1 Harrisburg job?
2     A.   It was much wider in scope. You know, same
3 basic principles but you just have more people. You also
4 had -- you were managing branch managers at the time.
5     Q.   You were managing guys who were in the position
6 you had held in Harrisburg?
7     A.   That's correct, in addition to managing my own
8 branch.
9     Q.   When you started in Cincinnati, who was your
10 immediate report?
11    A.   Terry Cavanaugh.
12    Q.   What was his position?
13    A.   Northern zone manager.
14    Q.   So he had moved from eastern zone at some point
15 to northern zone?
16    A.   Uh-huh.
17    Q.   Yes?
18    A.   Yes.
19    Q.   I take it you had a good working relationship
20 with Mr. Cavanaugh --
21    A.   Yes.
22    Q.   -- throughout your career?
23    A.   Yes.
24    Q.   Again, within that first kind of six month time

42

1 frame after you took the Cincinnati regional job, what was
2 your assessment of the people who were in place?
3     A.   I thought we had good people but no systems in
4 place to implement the profit and growth that we would need.
5          There were, like I said, no performance
6 appraisal processes. There was no documentation of the
7 files. There was poor service. There was basically no
8 marketing systems in place at the time. It was kind of
9 catch-as-catch-can, go out and get the business and bring it
10 in.
11         And we were writing in all three branches some
12 very very unusual business that Chubb normally doesn't
13 write.
14    Q.   Why was that happening, do you know?
15    A.   I don't know. Louisville, I think the reason
16 was they started writing a lot of truckers because they had
17 tapped out the market. That was a full service branch
18 starting in about 1990.
19    Q.   Did you have to hire a marketing manager and a
20 commercial lines manager right away in the Cincinnati job or
21 had those jobs filled before you got there?
22    A.   The marketing role had been filled. I had to
23 hire a commercial lines manager.
24    Q.   Who was in the marketing manager job?

43

1     A.   Jeff Barton.
2     Q.   Had you known Jeff before?
3     A.   No.
4     Q.   And you hired the commercial lines manager?
5     A.   Yes.
6     Q.   Who did you hire?
7     A.   Dieter Korte.
8     Q.   Was he from somewhere else in the Chubb
9 organization or did he come from outside?
10    A.   He was from the Illinois branch, that is what
11 they called it back then.
12    Q.   How many direct reports did you have in the
13 Cincinnati regional job?
14    A.   About 18, and then that was cut down to 16
15 later when we deregionalized.
16    Q.   When did that happen?
17    A.   January of 2001.
18    Q.   How did the deregionalization affect your
19 responsibilities?
20    A.   I no longer had the branch managers in
21 Indianapolis and Cleveland reporting to me, and my
22 performance was based upon the Cincinnati results.
23    Q.   Cincinnati, but including Louisville and
24 Columbus?

44

1     A.   Correct.
2     Q.   So the Indianapolis and Cleveland branch
3 managers at that point --
4     A.   Reported to from time to time --
5     Q.   Direct reports to zone?
6     A.   Right.
7     Q.   When did Mr. Szerlong become your immediate
8 superior?
9     A.   I'm going to get on this but --
10    Q.   As best you can remember.
11         MR. FREKING: Don't guess. If you don't know,
12    say you don't know.
13         MR. CROALL: I was waiting for Mr. Freking to
14    say, don't guess.
15         MR. FREKING: That's all right.
16    Q.   If you don't remember, that's fine. If you can
17 put a parameter on it, that's fine.
18         MR. FREKING: Objection. Dave, I've got a
19    feeling your client probably already knows the answer
20    to these questions.
21         MR. CROALL: He probably does.
22         MR. FREKING: Probably not really appropriate
23    discovery. This is kind of a device for you to
24    obtain stuff you don't already know. It's kind of a

45

1  waste of time to sit here and talk about things you
2  already know.
3        MR. CROALL: I can ask Mr. Baillie what his
4  recollection is. If you want to waste time making
5  speeches about it --
6   A.   I reported to Tim for about two years, I guess.
7   Q.   Okay. Your employment ended in late August of
8  '01, so roughly two years back from that, fall of '99?
9   A.   Give or take, yeah.
10  Q.   Had you known Mr. Szerlong before that?
11  A.   Yes.
12  Q.   How had you known him?
13  A.   I knew him through a position at the home
14 office that he had as sort of the body broker back then. So
15 I had interface with him then.
16       And I knew Tim from just branch manager
17 meetings. You know, most branch managers knew who each
18 other were and would say hi.
19  Q.   Did you have any opportunity to work closely
20 with Mr. Szerlong before he became your --
21  A.   No.
22  Q.   -- boss in the zone job?
23  A.   No.
24  Q.   So you didn't have really a working

46

1  relationship with him before then?
2   A.   No.
3   Q.   Within the first, say six months or so after he
4  was in the zone manager job, what kind of working
5  relationship did you establish with Mr. Szerlong?
6   A.   I think a very good one.
7   Q.   How often would you interact with him either on
8  the phone or face to face?
9   A.   I would try to give Tim a call every six
10 weeks. I would jot down notes of things that maybe I just
11 wanted to run by him, you know, basically to stay in touch
12 with him.
13       He's pretty busy and so just to make sure that
14 I initiated something every six weeks about. That was the
15 goal.
16  Q.   You usually would do that by phone?
17  A.   Yes.
18  Q.   He was based in Chicago?
19  A.   Yes.
20  Q.   Would you go up to Chicago periodically to have
21 a face to face with him?
22  A.   Occasionally.
23  Q.   Was that an annual thing? Couple times a year?
24  A.   If we had a meeting -- if he held a meeting

47

1  we'd go up there, or I would go up to see some zone
2  managers. I would touch base with them maybe twice a year.
3  Tim would come down to see me once a year.
4   Q.   You said before Mr. Szerlong was your zone
5  manager it would have been Mr. Cavanaugh?
6   A.   Yes.
7   Q.   Would he also come down once a year to visit
8  the Cincinnati branch?
9   A.   Yes. He would come maybe twice a year, maybe a
10 little more.
11  Q.   Did you go up to Chicago to see him?
12  A.   Yes.
13  Q.   Again, periodically?
14  A.   Under the same circumstances.
15  Q.   If there was a meeting. Would you ever make a
16 special trip to go meet with the zone manager in Chicago?
17  A.   When you say "special," what do you mean?
18  Q.   Just to go up to have a face to face with a
19 zone manager, not in conjunction with some other already
20 scheduled meeting?
21  A.   Yes, I think.
22  Q.   Is there anything specific?
23  A.   Probably a performance, you know, review, or a
24 periodic thing of that nature.

48

1   Q.   Again, during the first six months or so that
2  Mr. Szerlong was your zone manager, any problems, concerns
3  about that relationship?
4   A.   No, none.
5   Q.   You didn't have any reason to think Mr.
6  Szerlong was a detractor of yours or was out to get you?
7   A.   No.
8   Q.   Was '99 your first full year as the Cincinnati
9  regional manager?
10  A.   Yes.
11  Q.   How was the region's performance in '99?
12  A.   Not good from a profitability standpoint.
13  Q.   Is one measure that you guys use the ratio?
14  A.   Yeah, loss ratio. Loss ratio was horrible.
15  Q.   Is that for like every dollar in premium you
16 take in is how much you pay out?
17  A.   Right.
18  Q.   Do you remember how much it was in '99?
19  A.   It was over 100.
20  Q.   Which is bad?
21  A.   Which is bad, right.
22  Q.   You were losing money?
23  A.   Yes.
24  Q.   You and Mr. Szerlong had conversations about

**53**

```
 1      A.   Yes.
 2      Q.   Would the same be true for Dieter Korte, would
 3 he have regionwide responsibilities within the commercial
 4 lines?
 5      A.   Yes.
 6      Q.   And, again, help me out, what does that mean in
 7 terms a lawyer can understand?
 8      A.   That would mean overseeing his managers and
 9 other branches to make sure that they're doing -- make sure
10 that they're writing the type of business that Chubb can
11 make a profit on. Mainly it would be authority levels.
12      Q.   Okay.
13      A.   And act again as the consultant for them.
14      Q.   So he's got to set the levels at which people
15 below him can approve business?
16      A.   Right.
17      Q.   Certain levels it would have to go to him?
18      A.   That's right.
19      Q.   Or up to you? I mean, were there certain --
20      A.   No, branch managers don't have underwriting
21 responsibility. If it gets above Dieter, it would have to
22 go to Tim's zone manager in that capacity.
23      Q.   So there's some commercial lines guy at the
24 zonal level --
```

**54**

```
 1      A.   Right.
 2      Q.   -- that could sign off on something that's too
 3 big for Dieter to approve?
 4      A.   That's right.
 5      Q.   And you said there were other direct reports.
 6 Help me out with who those folks and what those functions
 7 would be.
 8      A.   They would be the other underwriting office.
 9 Not the claims, they didn't report to me, but the service
10 departments, loss control departments. And that's probably
11 it. Mostly underwriting departments.
12      Q.   How did the region do in 2000? You said you
13 think there was like 8 or 9 percent growth?
14      A.   Yeah. They did very well, you know, in all the
15 marketing and growth initiatives, but the loss ratio was
16 just awful.
17      Q.   Do you remember what it was?
18      A.   No. But I think we lost about 37 million in
19 the branch and the region wasn't great either.
20      Q.   Loss ratio in the 135, 137 range?
21      A.   I could provide you with that. It wasn't good.
22 We were still hit with the tail of the business and we were
23 running off quite a bit of distress business still and
24 trying to also get more rate.
```

**55**

```
 1      Q.   During 2000 how was your relationship with Mr.
 2 Szerlong?
 3      A.   Very good.
 4      Q.   You continued to have the kind of every six
 5 week target for touching base with him?
 6      A.   Yeah. Yeah. It's kind of a rule of thumb that
 7 I used.
 8      Q.   Did he come down and visit once or twice?
 9      A.   I think he came down once.
10      Q.   Any particular problems or issues that led to
11 the lack of profitability in 2000?
12      A.   Oh, yes. You know, just bad business,
13 depressed.
14           MR. FREKING: Objection to the extent the
15      question has already been asked before.
16           MR. CROALL: I thought we talked about
17      before --
18           MR. FREKING: Same stuff.
19      Q.   Was there a major issue about uninsured
20 motorists coverage in Ohio at that point?
21      A.   Yes.
22      Q.   Explain to me what that issue was.
23      A.   What happened was that the Supreme Court of
24 Ohio made a ruling that if somebody got hurt in an
```

**56**

```
 1 automobile accident that was uninsured, that they could go
 2 against their employer, their employer's commercial
 3 liability policy, to recover damages.
 4      Q.   How did that affect Chubb's business?
 5      A.   It affected it significantly because -- it
 6 affected the entire insurance industry significantly because
 7 basically what they had, now, was exposure that they did not
 8 collect premium for.
 9      Q.   What, if anything, did you do to try and deal
10 with that problem?
11      A.   I worked with the home office auto --
12 commercial auto folks. We put together a solution that we
13 thought would work for the uninsured motorists. Also worked
14 very closely with claims on how we're going to manage this.
15 Worked closely with underwriting on how we would manage it.
16           And actually put together a strategy session in
17 the home office where we had claims, underwriting, and legal
18 together where we came up with a strategy on how we're going
19 to manage Ohio UM, and worked closely with our legal
20 counsel.
21      Q.   Legal counsel in the home office in New Jersey?
22      A.   Correct.
23      Q.   Would you say were you the leader in dealing
24 with that uninsured motorists issue or somebody else?
```

57

1     A.    I would say I was the leader in conjunction
2 with the home office automobile. I didn't have the
3 technical -- I was sort of the coordinator more than
4 anything else.
5     Q.    Who at the home office was primarily
6 responsible --
7     A.    That would be Michelle Middleton. Before her
8 was Kathy Langner. They had the ultimate responsibility for
9 making a profit.
10    Q.    At the start of 2001 you had a performance
11 review meeting with Mr. Szerlong?
12    A.    Yes.
13    Q.    Tell me what you remember about that meeting.
14    A.    I remember I was surprised of his evaluation on
15 some of my characteristics and sort of shocked and surprised
16 at some of the examples that he used.
17    Q.    Do you remember any of the specifics of it? I
18 know there's a memo that follows up on it, formal review
19 document.
20    A.    Yeah. He mentioned the financials which, you
21 know, were not good.
22        But, you know, as I explained to him and Tim
23 knew, it takes a long time to screw up a bulk of business,
24 it takes an awful long time to correct it, too. Can't come

58

1 in in '99, take some action, expect you to have a profit in
2 2000.
3        The zone didn't do it, Chicago didn't do it,
4 many, many other branches didn't do it either. So that was
5 one piece.
6        But, you know, I understood that we needed to
7 make a profit but actuarially it would have been impossible.
8        The second piece was, he talked about the
9 leadership style and he mentioned -- said that it was black
10 and white, and that he also mentioned an incident where I
11 did not properly explain to the staff.
12    Q.    Do you remember what incidents those were?
13    A.    Yeah, I do. There was conversation that we had
14 in -- I believe it was -- oh, come to me, it wasn't
15 Cleveland. Toledo. It was a conversation we had in Toledo.
16        I had it with Tim, Jeff Barton, and Gary
17 DeLong. He mentioned that my comments there were -- did not
18 serve me well. That was the quote that he made.
19    Q.    Do you remember what the conversation was
20 about?
21    A.    Tim didn't remember the conversation at all.
22 But the only thing I remember about it was the discussion
23 about that human resources and marketing are every manager's
24 responsibility, basically Marketing 101, I mean Management

59

1 101 type stuff. But Tim didn't remember the specifics.
2     Q.    What about the black and white? He said you
3 were a black and white thinker, you didn't appreciate
4 subtlety and didn't convey to your subordinates.
5     A.    Tim had no examples or any specifics on that.
6     Q.    Did you disagree with him on that? Did you
7 tell him you didn't think that was true?
8     A.    Yeah. I mean, I told him I think one of my
9 strengths was my ability to see both sides of an argument.
10    Q.    I think his overall rating -- I think this
11 meeting is in February of 2001?
12    A.    Right.
13    Q.    Was met most?
14    A.    Yes.
15    Q.    Right?
16    A.    Yes.
17    Q.    Chubb rating system, as I understand it, which
18 may not be correct, met most is just below met all?
19    A.    That is correct.
20    Q.    The next one up is exceeds some?
21    A.    Right.
22    Q.    Then clearly exceeds, I think?
23    A.    Uh-huh.
24    Q.    I forget what the very bottom one is. Not met?

60

1     A.    Right.
2     Q.    You recognize that met most was not a very good
3 rating for somebody in a regional manager position?
4     A.    Right.
5     Q.    You understood that Mr. Szerlong was conveying
6 to you a lack of satisfaction with your performance in that
7 regional manager role?
8     A.    Well, I did ask the question. I said, does this
9 mean that I'm failing in the job?
10    Q.    What did he say?
11    A.    He said no, no, you're not failing. Let's just
12 get through this and we'll all play golf.
13    Q.    How long was the meeting with Mr. Szerlong when
14 he went over your performance?
15    A.    I'd say it was about an hour and a half, two
16 hours.
17    Q.    Where was it?
18    A.    It was in Chicago.
19    Q.    So you went up there?
20    A.    Yes.
21    Q.    Specifically for the performance review?
22    A.    Specifically for that but also to see some
23 regional -- some zone managers.
24    Q.    Some of the product line zonal managers?

61

1    A.    Yes.
2    Q.    Were any of your regional managers with you,
3 any of your product line regional guys?
4    A.    No.
5    Q.    Who else did you meet with on that trip, do you
6 recall?
7    A.    I know I met with Dave Brosnan and I can't
8 recall the others but I do have it written down,
9 chicken-scratched down.
10        (Baillie Exhibit 1 was marked for
11         identification.)
12   Q.    Mr. Baillie, the court reporter has handed you
13 Exhibit 1 for your deposition. I ask you -- before I ask
14 you to look at that specifically, let me ask you a broader
15 question.
16        In order to prepare for today, other than
17 consulting with Mr. Freking and Mr. Napier, did you do
18 anything? Did you look at any documents, talk to anybody
19 else?
20   A.    I looked at documents such as these, yes.
21   Q.    You looked at the documents you produced to us
22 in discovery?
23   A.    Right.
24   Q.    Looked at that whole stack of 650 pages,

62

1 whatever it was?
2    A.    Not all of it, no.
3    Q.    Just some of the performance-related stuff?
4    A.    Yes.
5    Q.    Did you look at Exhibit 1?
6    A.    Uh-huh.
7    Q.    That's a copy of a memo that Mr. Szerlong sent
8 you shortly after your February performance review, correct?
9    A.    Right.
10   Q.    Did it accurately summarize the discussion that
11 Mr. Szerlong had had with you ten days earlier or so?
12        (The record was read.)
13   A.    It had a much harsher tone to it.
14   Q.    The memo had a harsher tone --
15   A.    Yes.
16   Q.    -- than the conversation did?
17   A.    Yes.
18   Q.    Can you give me any examples of where you think
19 the memo was harsher than the face-to-face conversation?
20   A.    It was just I came out of the meeting, you
21 know, again, asking him, well, you're giving me met most,
22 are you telling me I'm clearly failing? His reply back was
23 no.
24        And he said, you know, you just need to work on

63

1 some things. You're doing a great job in marketing and
2 you're doing a great job in growing the branch. These are
3 some things to work on. Then this memo was much harsher.
4    Q.    Okay. Well, during the conversation, did he
5 tell you, like he says in the second paragraph of the memo,
6 in the regional job as a senior vice president, you are
7 measured against a different and tougher standard than in
8 your prior positions?
9    A.    Uh-huh.
10   Q.    Yes?
11   A.    Yes.
12        MR. FREKING: Meaning did he say that in the
13        memo or the meeting?
14   Q.    Did he say that in the meeting?
15   A.    I think so.
16   Q.    Did he say to you in the meeting, as he did in
17 this same paragraph, that everybody is being measured
18 against a tougher standard and future expectations were only
19 going to increase?
20   A.    I believe so.
21   Q.    The four bullet points that are kind of at the
22 bottom of the first page, carried over onto the second page,
23 are all of those things that he covered with you in the
24 face-to-face meeting as well?

64

1    A.    Yes.
2    Q.    As a specific example, that very first bullet
3 point, "Performance Management/Standards, I would rate the
4 professional staff in the Ohio Valley Region as the weakest
5 in the Zone." Is that something he told you in your
6 face-to-face meeting?
7    A.    Yes.
8    Q.    Is that something that you agreed with him
9 about? Disagreed?
10   A.    I told him I had no way of measuring because I
11 don't know the staff of the other two regions, but if they
12 were the weakest, I must be a great manager to be able to
13 get the type of performance I get out of them.
14   Q.    Is that what you said to Mr. Szerlong?
15   A.    Yeah.
16   Q.    Did he respond to that?
17   A.    I can't recall.
18   Q.    Talk to me a little bit about -- the memo talks
19 about performance issues with a Michael Whitman. Who is he?
20   A.    Michael Whitman was my property marine manager.
21   Q.    He had a performance problem?
22   A.    Yes.
23   Q.    Inadequate performance?
24   A.    Yeah. He was unprofitable and growth was

65

1  lacking and really didn't show a lot of good signs of
2  leadership.
3      Q.   What had you done at the point of the February
4  meeting with Mr. Szerlong?
5      A.   I had put him, prior to the meeting, on a
6  performance appraisal -- I mean a performance improvement
7  plan for the year 2000.
8      Q.   As a result of his performance in the year 2000
9  or --
10     A.   As a result of his performance in the year
11 1999.
12     Q.   How had he done in the performance improvement
13 plan for 2000?
14     A.   He had double digit growth and made a profit. I
15 believe probably the only property marine manager in the
16 whole zone that both made a profit and grew.
17     Q.   Did you feel like he had turned it around?
18     A.   Yeah. He certainly turned it around, the
19 results, in Cincinnati.
20          The managers in Cleveland and Indianapolis were
21 more pleased with his performance but we were very leery
22 because he had problems with performance, because it would
23 go up and down.
24          So he worked him off the performance review

66

1  process and -- but basically by about April or May of 2001,
2  while he was doing well in the branch, he was again
3  neglecting his duties on the regional front, so I had to
4  take him out of the job.
5      Q.   So you moved him out of the regional job and
6  effectively demoted him?
7      A.   Yeah, put him in a technical job.
8      Q.   So within a few months of this memo where Mr.
9  Szerlong says Whitman is currently unable to perform the
10 regional aspect of his job, you reached that same
11 conclusion?
12     A.   Yes.
13     Q.   Says in -- the memo says in that same
14 paragraph, Mr. Szerlong reviewed with you a handful of
15 managers through the region that we simply must get a higher
16 level of performance from.
17          Do you remember him reviewing with you others
18 who he felt should be performing at a higher level?
19     A.   He mentioned a commercial manager up in
20 Cleveland.
21     Q.   Who was that?
22     A.   It will come to me. I can't recall at this
23 time but a commercial manager up in Cleveland.
24     Q.   Is he the only one you remember or were there

67

1  others?
2      A.   He's the only one I remember.
3      Q.   Were there others you just don't remember or
4  you think there was only one you and Mr. Szerlong discussed
5  in addition to Mr. Whitman?
6      A.   I don't recall.
7      Q.   I think you mentioned that Mr. Szerlong covered
8  with you in your face-to-face meeting your role as a
9  regional leader?
10     A.   Correct.
11     Q.   Not just a branch manager, right?
12     A.   Uh-huh.
13     Q.   Yes?
14     A.   Yes.
15     Q.   These issues about leadership, did he say to
16 you in the face-to-face meeting like he said in the memo,
17 that while leadership is difficult to measure it's critical
18 to your success?
19     A.   Yes.
20     Q.   Did he cover with you in the face-to-face
21 meeting his view that you had a tendency to argue an extreme
22 position on a point and that was perceived as inflexible?
23     A.   No, not to my recollection.
24     Q.   The next paragraph of the memo he says the

68

1  feedback he received on your management meetings in
2  Cincinnati has also sometimes been unfavorable.
3          Did he tell you that in the face-to-face
4  meeting?
5      A.   No. He did mention one meeting after our
6  national meeting that he thought I should have expounded
7  upon more.
8      Q.   Do you recall what meeting that was?
9      A.   Yes.
10     Q.   What was it?
11     A.   It was a meeting -- we had a national meeting
12 and they indicated that they were going to reregionalize the
13 branch, the regional managers' jobs, but they didn't know
14 what they were going to do with the regional managers'
15 positions at this time.
16     Q.   What did Mr. Szerlong say he thought you should
17 have done?
18     A.   He thought I should have discussed it more with
19 the group.
20     Q.   That would have affected a lot of your direct
21 reports, right?
22     A.   Right.
23     Q.   Did you agree with Mr. Szerlong, maybe you
24 should have talked about that more to --

85

```
1  upgrade the quality of the agency plans in Louisville?
2      A.   At the time of this memo, no. I would say that
3  is correct. Louisville had to upgrade it.
4      Q.   So did you make efforts after you got this memo
5  to upgrade?
6      A.   Made efforts before and after.
7      Q.   Okay. Help me out with what those efforts
8  were. Just getting Jeff and you involved?
9      A.   Yeah. Basically I went down, did a couple
10 myself of them over the years, reviewed the ones that they
11 did, gave them feedback on the performance review, basically
12 explained to them that this was a development area that he
13 had to do, and tried to coach him in how to do it. He was
14 struggling with it, though, I would say that.
15           And, you know, also on a semiannual review,
16 documented that was the area he had to concentrate the most
17 on.
18     Q.   Page 2 of Exhibit 2 is kind of a separate
19 memo. But as I understand, it was attached to the first
20 page, "Development/performance Priorities" that Mr. Szerlong
21 gave you.
22          Again, were those five items consistent with
23 what he told you in your face-to-face meeting in early May?
24     A.   The first three.
```

86

```
1      Q.   He covered each of the first three in your
2  face-to-face on May 2nd --
3      A.   Yes.
4      Q.   Not 4 and 5, is that your testimony?
5      A.   I can't recall.
6      Q.   But, again, you got a copy of this, correct?
7      A.   Yes. Yes, I did.
8      Q.   Okay. Do you remember following up with Mr.
9  Szerlong, other than what you've already said about asking
10 him about clarification with the Louisville and Columbus
11 issues after you got Exhibit 2?
12     A.   Yeah. I usually -- I can't recall if I did it
13 after this memo, but I usually would call him after I got
14 these two memos. Pretty sure I called him and asked for
15 clarification.
16     Q.   Do you recall anything specific about those
17 discussions?
18     A.   No. It was a lot more of, you know, this type
19 of communication, just verbally.
20     Q.   Paragraph 3 in Exhibit 2 references a brief
21 memo further discussing regional roles and I think that's
22 Exhibit 3?
23     A.   Exhibit 3.
24     Q.   Would you take a look at that?
```

87

```
1      A.   Sure.
2      Q.   Tell me if you got that around this same time.
3      A.   Yes, I did.
4      Q.   Did you have any discussion with Mr. Szerlong
5  about what his view was of the regional role?
6      A.   Yes. Yes, several.
7      Q.   Do you recall anything specific about those
8  follow-up discussions?
9      A.   No.
10     Q.   Do you recall anything, in general, about --
11 just generally talked about the same topics that are on this
12 memo?
13     A.   I would think, yeah.
14          (A recess was taken from 11:27 to 11:39.)
15     Q.   In May 2001, was there a national meeting of
16 some kind in Bermuda?
17     A.   Yeah, captivated meeting.
18     Q.   MVI meeting?
19     A.   Yes.
20     Q.   Where was it?
21     A.   Jamaica.
22     Q.   One of those islands. You attended that?
23     A.   Yes.
24     Q.   Was there some incident on the beach with you
```

88

```
1  getting in a shouting match with your wife?
2          MR. FREKING: Objection.
3      A.   Tim did mention that to me. The only thing I
4  can think of is I threw my money clip to her to catch in the
5  ocean. She dropped it, it fell in the ocean. We were
6  scrambling around to get it. As far as a shouting match --
7      Q.   Did you yell at her over that?
8          MR. FREKING: Objection to relevance again.
9      We'll object to this entire line of questioning.
10     Q.   You can go ahead and answer.
11         MR. FREKING: You can go ahead and answer.
12     A.   There was -- what was that?
13         MR. CROALL: You can answer. He's making his
14     objection for the record. There's no judge here to
15     rule on the objection.
16     A.   Sure, I'll answer. I told my wife, Tim called
17 and said there was a shouting match in the ocean. She said,
18 what? She said, it's kind of funny. I was blaming her for
19 it, it was obviously my fault.
20     Q.   My question to you --
21     A.   No.
22     Q.   -- was, did you shout at her?
23     A.   No.
24     Q.   So if there are other people that said you
```

93
1 business growth which was outstanding.
2    Q.    What contact did you have with Mr. Szerlong
3 between the conversations you already testified about when
4 you called him about these memos and his meeting with you
5 when you were terminated?
6    A.    I don't recall any specific conversations.
7    Q.    Any face-to-face meetings between the May 2nd
8 meeting and the late August meeting?
9    A.    Not that I recall.
10   Q.    Just phone contact periodically?
11   A.    Yeah. Basically we talked a couple times. He
12 set up the August meeting, so he called prior to the August
13 meeting.
14   Q.    How long before?
15   A.    Anywhere from two weeks to a month. I couldn't
16 tell you for sure.
17   Q.    He scheduled that, I think it's August 24th?
18   A.    That is correct.
19   Q.    He came to Cincinnati?
20   A.    Yes.
21   Q.    Met with you in the Cincinnati office? Yes?
22   A.    Yes.
23   Q.    Tell me what happened at that meeting.
24   A.    At the meeting in the Cincinnati office?

94
1    Q.    Yes.
2    A.    Or the meeting for the day?
3    Q.    Well, tell me for the day.
4    A.    We met with a couple agents for breakfast.
5 Then we met with a couple other agents for lunch. And then
6 he went to some of the various departments.
7          And then about maybe 2:30 -- well, I don't know
8 when it was, maybe 1:30, 2:00, came into the office and
9 said, your financials are great, you're one of the best guys
10 we have with agents and customers, but I need to make a
11 change.
12   Q.    What else did he say or what did you say?
13   A.    He said, I'm looking for better leadership. I
14 said, how is it possible that I'm not being an outstanding
15 leader given the financials that we have, given the fact
16 that all my goals and the balance scorecard are being
17 carried out superiorally, and feedback I've always gotten
18 from my folks have been 360, feedback has always been high,
19 and it's inconsistent with my evaluations over the last 26
20 years and my performance.
21   Q.    What did he say?
22   A.    Well, it's just my opinion.
23   Q.    Okay.
24   A.    I said, I guess I'm not going to talk you out

95
1 of this then. He said, no. Get a cab for him.
2    Q.    How long was the meeting?
3    A.    I would say it was about 20 minutes. Oh, I do
4 recall some other things he said.
5    Q.    What?
6    A.    He said, I am recommending the most aggressive
7 package for you because you deserve it, which he said, I
8 know that doesn't seem like a big thing right now in view of
9 being terminated.
10   Q.    You understood him to be talking about a
11 severance package?
12   A.    Right.
13   Q.    Anything else you remember about the
14 conversation with Mr. Szerlong in August?
15   A.    Not that I recall at this time.
16   Q.    Okay. He was professional and businesslike?
17   A.    Yes. Yes, he was.
18   Q.    And you were professional and businesslike as
19 well?
20   A.    Yes. We shook hands afterwards.
21   Q.    How long were you in the office after you
22 finished talking to Mr. Szerlong?
23   A.    I don't know, maybe half hour, hour.
24   Q.    You talked to a couple of your direct reports?

96
1    A.    Yes. I talked to --
2    Q.    Jeff Barton? Jim Lash?
3    A.    No. I talked to Diane Haggard and Becky
4 Emerson and Tim Dadik, I believe. Those would be the three.
5    Q.    What did you tell them?
6    A.    I had been terminated.
7    Q.    Did you give any explanation?
8    A.    Yeah. I gave the same explanation Tim said. I
9 discussed it a little with Diane Haggard. I said, he's -- I
10 said, I guess you know. I figured she knew. I guess you
11 know I've been terminated. She goes, no, I didn't know.
12 Tim said he was going to have a serious talk with you but I
13 didn't know that. Man, he said I wasn't performing well on
14 leadership. Is that true? She said no.
15   Q.    Where was this conversation with Miss Haggard?
16   A.    In her office.
17   Q.    How long did you talk to her?
18   A.    Not long. Couple minutes. Then with --
19   Q.    Anything else you remember about the
20 conversation with Miss Haggard?
21   A.    No, not that I recall right now.
22   Q.    Did you believe her when she said she didn't
23 know?
24         MR. FREKING: At that time?

105

```
 1  group. Then him and I went out to dinner.
 2      Q.  Do you recall anything about your discussion
 3  with him?
 4      A.  The only thing I can recall -- you know, we
 5  discussed a wide myriad of things over the night, but as my
 6  custom, I always ask, anything you think I can be doing
 7  better or should be doing differently.
 8      Q.  What did he say?
 9      A.  No, keep doing what you're doing, you got it on
10  track.
11      Q.  His first visit had you been --
12      A.  Wasn't that long.
13      Q.  -- Cincinnati manager for a year yet?
14      A.  No.
15      Q.  Less than a year?
16      A.  Yes, less than a year.  Much less than a year.
17      Q.  '98?
18      A.  Yeah.
19      Q.  Then did he make another visit in 2000?
20      A.  Yeah, that would be about right.
21      Q.  Do you remember anything about the 2000 visit?
22      A.  Yeah.  The only thing I remember about that is
23  we went to dinner with a client and an agent.
24      Q.  Who was that?
```

106

```
 1      A.  Went with folks from Schiff Kreidler-Shell and
 2  with a customer from Monarch Construction, outstanding
 3  meeting.  And Tom referred to it in subsequent presentations
 4  he gave to the zone.
 5      Q.  Referring to it in a positive way?
 6      A.  Yes.
 7      Q.  Did you ever hear Mr. Motamed say anything
 8  negative about you?
 9      A.  Never.
10      Q.  Other than the conversations you've already
11  testified about with Mr. Szerlong, did you ever hear
12  secondhand from anybody that Mr. Motamed had said anything
13  negative about you?
14      A.  Never.
15      Q.  Did you ever hear Mr. Szerlong say anything
16  negative about your age?
17      A.  No.
18      Q.  Did you ever see any document that had anything
19  negative or derogatory about your age?
20      A.  No.
21      Q.  Did you ever see any document at Chubb that had
22  anything negative or derogatory about any employee's age or
23  ages in general?
24      A.  No.
```

107

```
 1      Q.  Did you ever hear anybody in upper level
 2  management at Chubb, which I would define as anybody above
 3  you, say anything negative, either hear it yourself or hear
 4  secondhand, that somebody at that level in the company had
 5  said anything negative about any employee's age or
 6  employees' ages in general?
 7      A.  Not that I recall.
 8      Q.  Do you think your separation had something to
 9  do with your age?
10      A.  Yes.
11          MR. FREKING:  Objection.
12          MR. CROALL:  I assume you're going to let him
13  answer anyway.
14          MR. FREKING:  Uh-huh.
15      Q.  Why do you think that?
16      A.  I'm not a lawyer.
17      Q.  I understand.
18      A.  Having the best profit and second best growth
19  in the zone and being one of the oldest managers, having
20  performance better than the other managers, and being
21  replaced by a younger person, you know, leads me to believe.
22      Q.  When you're talking about having the best
23  profitability and growth, you're talking about 2001?
24      A.  Correct.
```

108

```
 1      Q.  Up until the time of your separation?
 2      A.  Right.
 3      Q.  I assume those numbers were circulated monthly
 4  or was it monthly or quarterly or --
 5      A.  Monthly.
 6      Q.  Everybody got everybody's numbers?
 7      A.  Yes.
 8      Q.  You could see premiums and profitability and --
 9      A.  Right.
10      Q.  -- all that stuff?
11      A.  Tim would share it with us.
12      Q.  You could see it for your own office and each
13  branch within your office, your region and everybody else's
14  regions.  Would it be broken down office by office for other
15  regions or just --
16      A.  No.  No.  Just really the zone.  I wouldn't
17  really see anybody else's.  You could look at it if you
18  wanted to.
19          I knew what the corporate numbers were.  But,
20  basically, the only thing that was given to me was the
21  zones' numbers.
22      Q.  Would it be broken down by region within the
23  zone?
24      A.  Sure.
```

109

1  Q. So that's how you knew you were, in your view,
2  the best in terms of profitability within the zone?
3  A. Yeah. Well, from a region, not a branch
4  standpoint.
5  Q. Any other reason you think your age had
6  something to do with your separation?
7      MR. FREKING: Objection to the extent it calls
8      for some kind of legal analysis.
9      MR. CROALL: I'm not asking for that.
10  Q. I'm asking why you think.
11  A. At this time I can't recall, just the fact that
12  I was either the oldest or one of the oldest and my
13  performance, you know, as Tim admitted to me, you're
14  financials are outstanding.
15  Q. As I understand your lawsuit, one of the claims
16  is your separation had something to do with keeping you from
17  vesting in further benefits. Is that consistent with your
18  understanding? I understand you're not a lawyer.
19  A. I don't remember the exact wording.
20  Q. Well, let me ask you this. In connection with
21  any of your discussions relating to your performance or your
22  separation, did Mr. Szerlong ever say anything about him or
23  the company not wanting you to vest in further benefits?
24  A. No.

110

1  Q. Did you ever see any document that said
2  anything about the company or any individual in upper level
3  management wanting to keep you from vesting in further
4  benefits?
5  A. No.
6  Q. Do you think that your separation had anything
7  to do with that, with keeping you from vesting in further
8  benefits?
9      MR. FREKING: Objection.
10  A. I couldn't read their mind. I wouldn't know.
11  Q. After your separation, as I understand it, you
12  already had a vacation scheduled?
13  A. Yes.
14  Q. Like the next week?
15  A. The next day.
16  Q. You left for Scotland, Europe, somewhere?
17  A. Scotland.
18  Q. How long were you there?
19  A. A week.
20  Q. You and your wife?
21  A. No, just myself.
22  Q. Just you. Golf trip?
23  A. Golf trip and kind of to spread my father's
24  ashes in his homeland.

111

1  Q. Anybody else travel with you or just literally
2  go by yourself?
3  A. It was with a group of I think seven. Eight,
4  eight in the group.
5  Q. Eight guys?
6  A. Uh-huh.
7  Q. Friends?
8  A. Some people I just met.
9  Q. Some of them you knew better than others?
10  A. Some I didn't know at all.
11  Q. Was it a group from Ivy Hills?
12  A. Yes.
13  Q. All members at Ivy Hills?
14  A. No.
15  Q. Some friends of members?
16  A. Right.
17  Q. You took the trip? Yes?
18  A. Yeah.
19  Q. Golfed every day?
20  A. Yes.
21  Q. Play a different course every day?
22  A. Yes.
23  Q. Some package put together by a travel agent?
24  A. Correct.

112

1  Q. Any contact with home during that week? Did
2  you call home every day, every couple days?
3  A. Yes.
4  Q. Any discussion with your wife about the
5  separation --
6  A. Yes.
7  Q. -- from Chubb? Tell me about those
8  discussions.
9  A. She would just ask me how I was doing, I would
10  ask her how she's doing.
11  Q. How were you both doing?
12  A. Not real well.
13  Q. Any contact with anybody from Chubb during that
14  time? Did you call anybody, anybody call you?
15  A. Not that I recall.
16  Q. Do you know whether your wife had any contact
17  with anybody from Chubb while you were gone?
18  A. She probably did but I don't know. I think she
19  probably did, yeah.
20  Q. Before you left, other than what you've already
21  testified about, did you have any other discussions with
22  anybody from Chubb?
23  A. Not that I recall.
24  Q. How about after you got back?

117

1 said, yes, Tim told us that, too.
2    I said, well, this doesn't sound like the most
3 aggressive package. I'm really getting hurt on my pension.
4 She said, well, it's not the most aggressive package but I'm
5 sure your lawyer will have other things that they want to
6 include in the package and we're certainly willing to
7 negotiate.
8    Q.   What else did you say?
9    A.   That was it. I understood they didn't want to
10 talk to me, they wanted to talk to a lawyer, so that ended
11 the conversation.
12   Q.   How long did you talk to Ms. Hurley?
13   A.   I couldn't tell you. Maybe 20 minutes, maybe
14 10 minutes, maybe 5 minutes, maybe a half an hour. I don't
15 recall.
16   Q.   Is that the only conversation you had with her?
17   A.   No. One of the things she said -- I had other
18 conversations with her.
19   Q.   Do you remember something else she said in that
20 first conversation?
21   A.   Well, I can't remember which conversation it
22 may have been. Oh, I did ask her, I said, as far as what do
23 you call it, the confidentiality statement or signing the
24 document, I said I would need more time on that because I

118

1 got a week's vacation and I got those two weeks at Wharton,
2 so could I have two extra weeks there. Then she said, well,
3 maybe we'll give you two extra weeks on your employment. I
4 said, well, that would be nice. She said, I'll okay it with
5 him. I'm sure Tim will say it's okay. We'll extend your
6 employment to October -- whatever, two weeks after October
7 1st.
8    Q.   You had understood from the beginning October
9 1st --
10   A.   Absolutely.
11   Q.   -- was going to be your last day?
12   A.   Absolutely.
13   Q.   This conversation you're testifying about with
14 Ms. Hurley would have been after you received the document
15 from her?
16   A.   I believe it was -- may have been before, may
17 have been after, I can't recall.
18   Q.   I guess my question was, if it was before, how
19 would you know you needed extra time?
20   A.   Either somebody communicated to me verbally or
21 I may have had the document. It's possible. It's possible.
22   Q.   I assume all these contacts with Ms. Hurley are
23 by telephone?
24   A.   Yes.

119

1    Q.   Never had a face-to-face?
2    A.   No.
3    Q.   How many telephone conversations did you
4 actually have with her?
5    A.   Two or three.
6    Q.   Do you recall anything else about any of the
7 phone conversations with Ms. Hurley?
8    A.   No. I was -- had some confusion because they
9 kept sending me documents that said my separation was like
10 October 15th or 18th, whatever, and some that said October
11 1st. So I needed to find out which one it was for, I guess,
12 health benefits and unemployment benefits.
13   Q.   Was she able to straighten that out?
14   A.   Yes.
15   Q.   What was --
16   A.   It was October 1st.
17   Q.   Final termination?
18   A.   There was some confusion, I guess the signals
19 got crossed. Our folks said it was two weeks later, the
20 people in the home office sent me correspondence that said
21 it was two weeks later, but I understood it was October 1st.
22   Q.   When you say "our people," you're talking about
23 Cincinnati local people?
24   A.   Cincinnati local people, yeah. Diane.

120

1    Q.   When you testified a few moments ago that
2 during your first conversation with Ms. Hurley you said it
3 doesn't sound like the most aggressive package, what basis
4 did you have for making a judgment about how aggressive the
5 package was?
6    A.   Well, I think it was pretty much known in Chubb
7 that they do some things on the side, particularly with
8 pension.
9    Q.   How did you have any knowledge of what had been
10 done with others in terms of separation packages?
11   A.   Well, a good friend, Brian Lynch, got offered a
12 separation package.
13   Q.   Did he talk to you about the details?
14   A.   No.
15   Q.   Do you know what his package was, how it
16 compared to the one you were offered?
17   A.   Yeah, I know that he got boosted up for
18 pension or something. But details, no, I wouldn't know the
19 details.
20          It was very widely known at Chubb, it wasn't a
21 secret or anything.
22   Q.   I guess I'm trying to find out how is it widely
23 known? Who had you heard it from?
24   A.   More hearsay than anything else.

125

1  Christmas party, where we would talk about how we should
2  handle that, let's limit it to two tickets per person.
3       Q.   Did you tell people it was not acceptable to
4  give tickets to other people or get tickets from other
5  people?
6       A.   No.
7       Q.   Did you designate anybody as having
8  responsibility for keeping an eye on if anybody got impaired
9  to make sure they didn't drive themselves?
10      A.   We made an announcement we would pay for any
11 cabs or hotel room if they think they had too much.
12      Q.   During the time you were Cincinnati regional
13 manager?
14      A.   Right.
15      Q.   Did that ever happen? Did anybody take
16 advantage of the offer to pay for a ride or a hotel room?
17      A.   Nobody took advantage of it to my knowledge.
18 They may have with the human resource manager.
19      Q.   Once you had had the conversations with Ms.
20 Hurley that you testified about before lunch, did you have
21 any further contact with anybody at Chubb about the content
22 of your severance package?
23           MR. FREKING:  You mean him individually, not
24      through his lawyer?

126

1            MR. CROALL:  Correct.
2       A.   Not that I recall.
3       Q.   That's really the question.
4       A.   Yeah.
5       Q.   From that point forward were all the
6  discussions that took place on your behalf through counsel?
7       A.   I assume.
8       Q.   You didn't have any yourself?
9       A.   With?
10      Q.   With anybody at Chubb about the severance
11 package?
12      A.   Not that I recall, no.
13      Q.   You didn't instruct anybody, other than
14 somebody from Mr. Freking's office, to contact Chubb on your
15 behalf, did you?
16      A.   Contact Chubb on my behalf. I don't understand
17 the question.
18      Q.   Did you ask your next door neighbor or your
19 wife or your best friend from college to call Chubb and talk
20 about your severance package?
21      A.   Oh, no.
22      Q.   Did you ask anybody other than --
23      A.   No.
24      Q.   -- somebody from Mr. Freking's office to talk

127

1  to Chubb about your severance package?
2       A.   No.
3       Q.   So as far as you know, from your last
4  conversation with Ms. Hurley up until now, the only
5  discussions that occurred were between either Mr. Freking or
6  somebody else from his office and counsel at Chubb?
7       A.   To the best of my recollection.
8       Q.   Okay. During your -- during the course of your
9  employment at Chubb, you got stock options from time to
10 time, correct?
11      A.   Correct.
12      Q.   And those stock options were pursuant to some
13 plan? There is a formal stock openings plan at Chubb; is
14 that right?
15      A.   That's correct.
16      Q.   You were awarded stock pursuant to that plan
17 and there was a vesting schedule?
18      A.   Correct.
19      Q.   And the stock options had a price attached to
20 them?
21      A.   Correct.
22      Q.   A per share option price?
23      A.   Right.
24      Q.   That would fluctuate depending on when the

128

1  options were issued?
2       A.   Correct.
3       Q.   I think you exercised your option on some
4  shares; is that right?
5       A.   Yes, over the years.
6       Q.   You had a lot of shares that you had vested
7  stock otpions that you didn't exercise, correct?
8       A.   Correct.
9       Q.   Why didn't you exercise those options before
10 your termination date?
11      A.   Didn't occur to me, with everything that was on
12 my mind. The stock was low.
13      Q.   Do you recall what the stock price was from
14 late August to October 1?
15      A.   No.
16      Q.   Because you had those options, did you kind of
17 routinely monitor the Chubb stock price?
18      A.   Oh, yeah.
19      Q.   Did you stop doing that after your last --
20      A.   No.
21      Q.   -- day of employment?
22      A.   No. Still do it, daily.
23      Q.   You did it daily from August until October?
24      A.   Oh, yeah.

153

```
 1    A.   I can't recall. He certainly talked about each
 2  one.
 3    Q.   Did you think that was a fair review by Mr.
 4  Cavanaugh?
 5    A.   Yeah, I think so.
 6    Q.   I guess this is on a 5 point scale, 5 being the
 7  best?
 8    A.   That's correct.
 9    Q.   0 or 1 being the low end?
10    A.   Right.
11         (A recess was taken from 2:10 to 2:15.)
12         (Baillie Exhibits 9 and 10 were marked for
13          identification.)
14    Q.   Mr. Baillie, you've got Exhibits 9 and 10 in
15  front of you.
16    A.   Correct.
17    Q.   Exhibit 9 is a letter from Sy Green to you, it
18  looks like after a visit.
19    A.   Uh-huh. Yes.
20    Q.   How often did he come in?
21    A.   That was the only time he had come in.
22    Q.   Okay. Help me out where he fits into the
23  structure. He's not a zone guy. He's higher than a zone
24  guy?
```

154

```
 1    A.   Yes. At the time I believe he was Tim's boss.
 2  He was in charge of field operations.
 3    Q.   If you look at that third paragraph where he
 4  says, "Thanks very much for arranging productive visits for
 5  me in Columbus, Cincinnati and Louisville."
 6         Then he references a discussion that you and he
 7  apparently had about continuing to push for very strong
 8  players and need to develop more world class performers and
 9  fewer average performers.
10         Did he talk with you about that?
11    A.   Not to my recollection. He was big on getting
12  maximum authority. He didn't think the field had enough
13  authority, so we need to continue to booster up the
14  technical ability of the field to get more authority at the
15  point of sale, underwriting positions.
16    Q.   When you're talking about authority --
17    A.   Underwriting.
18    Q.   The amount of dollars that somebody could
19  approve?
20    A.   That's right. Exposure in dollars.
21    Q.   Do you remember, in the last few years you were
22  with Chubb people at the highest executive levels in the
23  company talking about what Mr. Green says in this letter,
24  about pushing for getting the best people in the right
```

155

```
 1  positions and getting top performance and not settling for
 2  just average performance?
 3    A.   Oh, sure. Yes.
 4    Q.   Did you try to implement that in the Cincinnati
 5  region?
 6    A.   Yes.
 7    Q.   Did you terminate any employees' employment in
 8  the Cincinnati region during the time you were regional
 9  manager?
10         MR. FREKING: Objection as to relevance. You
11         can go ahead and answer.
12    A.   Yes.
13    Q.   Do you recall how many and what the
14  circumstances were?
15    A.   We terminated a loss control rep for falsifying
16  a report.
17    Q.   Was that here in Cincinnati?
18    A.   Yes. It was termination of some of the SCRs
19  that were on profit improvement plans. And we demoted a
20  couple of people and then some people just left.
21    Q.   Voluntarily left?
22    A.   Voluntarily left.
23    Q.   Knowing they were having some performance
24  issues?
```

156

```
 1    A.   Right.
 2    Q.   In any of the employment decisions you made as
 3  branch manager, did you ever consider age as a reason for
 4  taking some adverse employment action against somebody?
 5    A.   No.
 6    Q.   Did anybody higher than you at Chubb ever tell
 7  you to take some employment action based on somebody's age?
 8    A.   No.
 9    Q.   Take a look at Exhibit 10. Tell me what that
10  is.
11    A.   That's a pre-year business plan, sort of
12  summarizing what the focus should be for the year.
13    Q.   So it's in fourth quarter '99 looking forward
14  to the year 2000?
15    A.   Correct.
16    Q.   You say down there at the bottom of the first
17  page that returning to profitability is the number one
18  priority.
19    A.   Correct.
20    Q.   That's one that didn't happen, right?
21    A.   Correct. Well, it did happen but not in 2000.
22    Q.   Didn't happen till 2001?
23    A.   Well, actually it was happening at the second
24  part of the year. The numbers were starting to get real
```

157

1  good during the second half of the year.
2       Q.   Do you remember what they were for the full
3  year?
4       A.   Yeah. They weren't good.
5       Q.   Do you remember what they were?
6       A.   No. I remember we lost about 40 million.
7       Q.   Looking at the second page of Exhibit 10, under
8  "Staff Development," that last sentence, you wrote this
9  right? You wrote this document?
10      A.   Yes, I did.
11      Q.   Input from anybody else?
12      A.   Not direct input but obviously discussions with
13  a lot of people including Tim, including corporate
14  direction.
15           It was kind of, you take the corporate
16  direction, you take the zone direction, and then you take,
17  you know, what things you need to work on.
18      Q.   Apply it to your region?
19      A.   Yeah. That's right.
20      Q.   "Our managers' ability to develop staff will be
21  an even larger percentage of their performance rating in the
22  year 2000."
23           Is that something that came from corporate,
24  from zone, from yourself?

158

1       A.   No. That's a personal pet peeve and focus of
2  mine, staff development, always has been.
3       Q.   Was it your understanding that emphasis was
4  consistent with corporate direction as well?
5       A.   Yes.
6       Q.   Looking down at the "Summary" paragraph at the
7  very end, you said, "We have the best infrastructure, staff,
8  agency plant and account relationships in the industry."
9            First of all, help me out. What do you mean by
10  "agency plant"?
11      A.   Our independent agents that we do business
12  with.
13      Q.   Just the system of agents that you've got out
14  there --
15      A.   That's right.
16      Q.   -- selling Chubb product?
17      A.   Uh-huh. We were pretty much dominating the
18  marketplace back then.
19      Q.   In this region or nationally?
20      A.   Pretty much this region.
21      Q.   Who were the big competitors in this region?
22      A.   CNA, Travelers, Royal, Cincinnati Financial.
23      Q.   Do you keep track of market shares, is that
24  something you can estimate or --

159

1       A.   We have Best reports by state.
2       Q.   That's a company that does that?
3       A.   Right.
4       Q.   You don't do any internal measurement?
5       A.   No. Basically what you do is you take a look
6  at what the agents have and see when your penetration is
7  there and take a look at the incoming, because they pretty
8  much market their whole book, and then what you're
9  getting -- what you get -- what you want and what you get
10  based on what you want.
11      Q.   So you would ask the people you deal with at
12  Schiff Kreidler-Shell, just to take an example --
13      A.   Yeah.
14      Q.   -- of how much of your total business is Chubb
15  business?
16      A.   Right.
17      Q.   Get a sense for your market share from that?
18      A.   Yeah. It was more -- more from a new business
19  and retention standpoint where we were dominating the market
20  as opposed to market share. We have a very small niche.
21           (Baillie Exhibit 11 was marked for
22           identification.)
23      Q.   Mr. Baillie, take a look at Exhibit 11.
24  That's a performance review, looks like it started in

160

1  December of '99 and then the final approval is in early 2000
2  by you and Mr. Szerlong, right?
3       A.   Correct.
4       Q.   Now, is this the first performance review that
5  Mr. Szerlong would have done for you?
6       A.   Yes.
7       Q.   As I read it, the overall score is exceeds
8  some?
9       A.   Right.
10      Q.   Which I think you testified is the score you
11  usually got?
12      A.   Yes.
13      Q.   And just so I understand the process, I mean,
14  did you take the initial run at drafting this in terms of
15  the business goals and the learning goals and the
16  accomplishments and the disappointments, then Mr. Szerlong
17  would give you input and the document would get edited?
18      A.   Correct.
19      Q.   Then he did the rating section?
20      A.   Correct.
21      Q.   Then you both sign off on it, at least
22  electronically sign off on it?
23      A.   Correct.
24      Q.   Am I right that this is in the -- there's a