1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF OHIO

3          WESTERN DIVISION

4

5     ------------------------------------
                                        :
6     DOUGLAS W. BAILLIE,
                                        :
7              Plaintiff,
                                        :
8        vs.                            :    CASE NO.
                                        :    C-1-02-062
9     CHUBB & SON INSURANCE,            :
                                        :
      Defendant.                        :
10    ------------------------------------

11

12

13

14    DEPOSITION OF:     DIANE R. HAGGARD

15    TAKEN:             By The Plaintiff

16    DATE:              June 20, 2003

17    TIME:              Commencing at 1:59 p.m.

18    PLACE:             Offices of:
                         Freking & Betz
19                       215 East Ninth Street
                         Fifth Floor
20                       Cincinnati, Ohio  45202

21    BEFORE:            Theresa Lynn Westfelt
                         Court Reporter
22                       Notary Public - State of Ohio

23

24

**Annette McKeehan Schoch, RMR**
P.O. Box 58641 · Cincinnati, Ohio 45258-8641
(513) 941-9464

Exhibit G

1        Q.    Did he ever do anything that was as close in

2   seriousness in your view given your knowledge of human

3   resources and companies' policies and procedures?

4        A.    Yes.

5        Q.    What did he do that was comparable in

6   seriousness to what Chris did?

7        A.    Well, he had approximately 14 direct reports

8   to which he was responsible for their career growth and

9   the success of implementing a strategy and that was not

10  happening.

11       Q.    Okay.  Anything else?

12       A.    That's all I recall at this time.

13       Q.    Okay.  And when you say all you recall at

14  this time, did you review your notes prior to coming to

15  the deposition today?

16       A.    No.

17       Q.    Did you review any kind of documents even

18  when you met with Mr. Montgomery?

19       A.    Yeah.  Let me say that we talked about a few

20  things, but --

21       Q.    No, I don't want to know what you talked

22  about.  What we're entitled to know is what you actually

23  reviewed in terms of documents even if you were sitting in

24  the room with Mr. Montgomery.

1    meeting with Mr. Montgomery?

2         A.    No, I think that was all.

3         Q.    Okay.  Do you believe your notes contained

4    information about improprieties of Mr. Baillie?

5         A.    Yes.

6         Q.    And do you know of any improprieties by Mr.

7    Baillie that are somehow violations of Chubb policies that

8    are not reflected in your notes?

9         A.    Yes.

10        Q.    Okay.  What was that?  What are the things

11   that you think of that were not contained within your

12   notes that involved improprieties or violations of company

13   policy, or anything that Baillie did that was bad?

14        A.    I don't believe I have notes on what could

15   be viewed as sexist comments.

16        Q.    Uh-huh.

17        A.    (Continued)  I don't believe my notes

18   contain an incident in Jamaica, but they could, I don't

19   recall.

20              There were several issues that would come

21   up, in particular in my first maybe six months in HR,

22   where people would come in and talk to me about their

23   frustrations with Doug that I didn't record.

24        Q.    Do you recall anything specific about those

1  frustrations?

2          A.      From a general standpoint?

3          Q.      General or specific.

4          A.      There were --

5          Q.      Anything you can possibly recall.

6          A.      Okay.  They were condescending comments,

7   inappropriate comments toward an African-American female

8   employee.  Events where he was drinking heavily, driving

9   erratically, drunk, and confusion over the strategy and

10  his instructions to them.

11         Q.      Uh-huh.

12         A.      (Continued)  That's -- (witness did not

13  complete response).

14         Q.      That's what you can remember?

15         A.      There's probably more, but that's -- yeah.

16         Q.      What do you mean, you think "there's

17  probably more"?  Are there any notes or records that you

18  have that could refresh your recollection on that?

19         A.      No.

20         Q.      Is there anybody you can talk to, do you

21  think, that could refresh you recollection on that?

22         A.      Yes.

23         Q.      Who would that be?

24         A.      Dieter Korte, Tom Gates, Mike Zdinak,

```
 1    Z-D-I-N-A-K, Beth Hunter, Susan Audino, A-U-D-I-N-O, Greg

 2    Tazic, T-A-Z-I-C.  That's --

 3            Q.    That's the list?

 4            A.    Yeah, that's the capture.

 5            Q.    Okay.  Are they all still employed by Chubb,

 6    to your knowledge?

 7            A.    To my knowledge, yes.

 8            Q.    Are they all employed in Cincinnati?

 9            A.    No.

10            Q.    Is Tazic still in Cincinnati?

11            A.    No.

12            Q.    Where is he?

13            A.    He's in Itasca, Illinois.

14            Q.    How about Korte?

15            A.    He is still in Cincinnati.

16            Q.    Gates?

17            A.    Cincinnati.

18            Q.    Zdinak?

19            A.    Zdinak, yes, he's in Cincinnati.

20            Q.    Hunter?

21            A.    She's in Cincinnati.

22            Q.    Audino?

23            A.    Charlotte.  Do you want more names?  I'm

24    thinking of more names.
```

1    Q.    What was the nature of what you spoke to Mr.

2    Ekdahl in regards to Korte's comments or complaints?

3    A.    I wanted to make sure that we all looked out

4    for Dieter, because he was a valued member of our branch

5    and region, of the Commercial Lines Department and the

6    zone and he wanted to resign out of frustration over Doug

7    Baillie.

8    Q.    Okay.  He thought that Baillie put to much

9    emphasis on marketing?

10                MR. MONTGOMERY:  Objection.  Calls for

11        speculation.

12    Q.    (Continued)  Korte, did you know that?  He

13    disagreed with Baillie's business philosophy?

14    A.    Yes.

15    Q.    Okay.  Baillie was running the business,

16    correct?

17    A.    The branch?

18    Q.    Yes.

19    A.    Yes.

20    Q.    Normally -- and Korte reported to Baillie,

21    right?

22    A.    Dual accountability, his direct report was

23    Doug Baillie.

24    Q.    Right.  And as far as -- and Baillie, to

1    your knowledge had been given the responsibility by Chubb

2    to determine the management philosophy for that particular

3    branch; is that correct?

4        A.    The way they worked it with the dual

5    accountability, especially in an underwriting capacity, is

6    the Northern Zone Commercial Lines Manager looks at the

7    Commercial Lines product and profit, and Doug is concerned

8    with profit and growth for that specific area.

9            So to say that Doug exclusively is

10   responsible for the business, no.  There sometimes is

11   conflict.

12       Q.    Okay.  Did you make a judgment as to whether

13   or not Korte was correct in his disagreement with Baillie

14   or did you think that was a management difference of

15   opinion?

16       A.    I agreed with Dieter.

17       Q.    Oh, you agreed with Dieter.  Now, what did

18   Dieter tell you that you agreed with?

19       A.    The emphasis on growth and trip reports and

20   agency calls.

21       Q.    Dieter thought there was too much emphasis

22   on growth?

23       A.    Yes.

24       Q.    He thought there was too much emphasis on

1  trip reports?

2          A.    Oh, yes.

3          Q.    Too much emphasis on agency calls?

4          A.    Yes.

5          Q.    Now, did you get Mr. Baillie's opinion on --

6  or his explanation as to why he placed a greater emphasis

7  on growth than Korte believed he should?

8          A.    Yes, to -- again, this is to the best of my

9  knowledge.

10         Q.    No, did you meet with him and discuss

11  this --

12         A.    Yes.

13         Q.    -- or is this just speculation on your part?

14         A.    I spoke with Doug about this.

15         Q.    Okay.

16         A.    (Continued)  It was two-plus years ago,

17  so --

18         Q.    Yeah, what did Doug tell you about why he

19  placed more emphasis on growth than Dieter wanted to?

20         A.    To the best of my memory, it was the more

21  you're in front of the agent, he felt the more business

22  they would give you.

23         Q.    Uh-huh.

24         A.    (Continued)  And the more you grow, the

1    better your expense ratio -- the lower your expense

2    ratio --

3         Q.    Uh-huh.

4         A.    -- goes, which was important.

5         Q.    Uh-huh.

6         A.    (Continued)  And the likelihood of you

7    getting new business to the agency over your competitors,

8    if you're not there, they're there, so stay in front of

9    them.

10        Q.    And you disagreed with those explanations?

11        A.    As an exclusive practice, yes.

12        Q.    Well, Mr. Baillie didn't say that was his

13   exclusive practice was just to emphasize growth, right?

14   He said do it in combination with other matters, or did he

15   say "I'm going to exclusively focus on" --

16        A.    No, he said -- he said that in partnership

17   with other areas.

18        Q.    Right.  So what in your background with

19   Chubb gave you the ability to decide that Mr. Baillie --

20   or Mr. Korte was correct and Mr. Baillie was wrong?

21        A.    Doug would say in managers' meetings that if

22   you don't have a certain number of trip reports that he

23   was going to dock their merit increase or their bonuses.

24        Q.    No, I'm sorry, I'm talking about the

1  emphasis on growth.  How did you determine that Korte's

2  view was correct and Mr. Baillie's view was incorrect?

3      A.    Well, the Commercial Lines philosophy from

4  1999 on was "do not grow at the expense of profit," profit

5  is first and foremost, growth is secondary.  So both the

6  retentions of business were lowered on the budgets and the

7  rate was significantly increased in expectation, the rate

8  initiative.

9           So while we weren't turning away from

10 growth, it became a secondary initiative.

11     Q.    Anything else?

12     A.    From a growth standpoint?

13     Q.    Yeah, that you determined Korte -- any

14 reason why you determined Korte was correct and Baillie

15 was wrong?

16     A.    No, that's -- (witness did not complete

17 response).

18     Q.    Did he maintain this emphasis on growth

19 throughout his tenure, '98 through 2001?

20     A.    Yes.

21     Q.    Would you agree with me that the primary

22 financial goal of the branch during those years was to

23 make a profit?

24     A.    Yes.

1    Madness?

2        A.    I remember the department -- I remember it

3    was Commercial Lines employee, so it mind come to me, it's

4    been a couple of years.

5        Q.    Was the substance of his complaint that Mr.

6    Baillie drank too much?

7        A.    That he drank too much, that he wanted them

8    all to stay out with him, that no one wanted to be last

9    one there because he wouldn't let them leave -- and now I

10    remember who it was.  It was Janet Probst, P-R-O-B-S-T.

11        Q.    Janet.  The company sponsored this event?

12        A.    Yes.

13        Q.    At a bar?

14        A.    For "Insuring the Children."

15        Q.    Sponsored at the bar for "Insuring the

16    Children"?

17        A.    Yes.

18        Q.    And this was during basketball games?

19        A.    Yes.

20        Q.    Do you recall whether this was an all-night

21    thing or an all-day thing?

22        A.    It was during the day.

23        Q.    Did anybody raise any concerns about the

24    fact that the company was sponsoring an event at which

1   about how he was -- how he was doing with the city, he was

2   fairly new to the city, and how his wife, Dori, was doing

3   and he said that she was very lonely and she wanted him

4   home all the time, very needy.  And I suggested that he

5   have her join the golf league at Ivy Hills or a bridge

6   club, something like that to make some friends.  And he

7   said "no, no, no, I don't like her to go out without me

8   because women are known for being taken advantage of by

9   men and before you know it, she would end up in bed with

10  some guy, and I just don't want to put her that position,

11  because men are so manipulative and women are easily

12  manipulated."

13          Q.     That was in a bar?

14          A.     Yes.

15          Q.     Did you ever wonder whether or not he was

16  yanking your chain over that comment?  Do you know what I

17  mean by --

18          A.     I don't really care if he was yanking his

19  (sic) chain.  It was inappropriate in my opinion.

20          Q.     Inappropriate even if he was kind of just

21  joking around with you?

22          A.     Yes.

23          Q.     Okay.  Anything else?

24          A.     I've had -- Beth Hunter left the company

```
 1          A.    "I can listen and read the paper at the same

 2   time."

 3          Q.    He can multitask?

 4          A.    Yes.

 5          Q.    Did you have any reason to disbelieve him?

 6          A.    Like I said, that's irrelevant because the

 7   perception is that "this is not of interest to you or a

 8   priority for you."  I don't -- whether you're listening or

 9   not, it gives the impression to other people that they're

10   not as important as your newspaper.

11          Q.    Had other people complained to you about

12   this, or was this an impression you formed?

13          A.    Other people complained about it.

14          Q.    Who were they?

15          A.    Dieter, Kevin Murphy, Erin Pesce, P-E-S-C-E,

16   E-R-I-N.

17          Q.    What else were you involved in personally?

18   You said there were two things, I think.

19          A.    Yeah, the --

20          Q.    He read a newspaper and secondly --

21          A.    The other was -- after I had my second child

22   and came back to work, I had, during my FMLA, come into

23   the office and met with Jim Ekdahl and Doug Baillie about

24   a reduced work schedule, 30 hours a week.
```

111

1      drank too much, behaved improperly in front of agents and

2      others, who had a management philosophy that didn't make

3      any sense and otherwise didn't manage his people very

4      well?

5                    MR. MONTGOMERY:  Objection.  To some extent

6            it mischaracterizes the testimony.

7                    THE WITNESS:  Do I answer anyway?

8                    MR. MONTGOMERY:  Yeah.

9      A.      I never said them in those words.  I

10     reported what was reported to me.

11     Q.      Okay.  Let me ask you this question --

12     A.      (Continued)  And I didn't consider it

13     reporting as much as I would consider gaining advice from

14     Ekdahl on how to manage the situation.

15     Q.      As Human Resources Manager, did you form an

16     opinion that Mr. Baillie was a sexist?

17     A.      As a person or as a human resources manager?

18     Q.      I'm asking you whether you thought that a

19     human resource manager for Chubb Insurance Company.

20     A.      Yes.

21     Q.      Okay.  Did you think in your role as Human

22     Resource Manager that you had a guy in charge of a branch

23     that drank too much?

24     A.      Yes.

1      Q.      And you, as an HR Manager, thought he

2  violated the Chubb Code of Conduct?

3      A.      Yes.

4      Q.      He behaved improperly in front of agents,

5  employees, and others?

6      A.      Yes.

7      Q.      Did you ever --

8      A.      (Continued)  You missed one.

9      Q.      What was the other one then?

10     A.      The other one was clarity of a strategy and

11 communication.

12     Q.      I assume you weren't in all of his meetings

13 he had with his subordinates --

14     A.      That's right.

15     Q.      -- is that fair to say?

16     A.      Yes.

17     Q.      Now, you've reflected on this matter, I

18 suppose, since Baillie was terminated, right?

19     A.      Yes.

20     Q.      Would you have an opinion one way or the

21 other if you learned that Mr. Baillie was never

22 disciplined by Ekdahl or anyone else for being a sexist?

23     A.      Would I have an opinion as to whether that

24 happened or whether --

1      A.    There were a lot of instances where people

2   would come in and talk to me about their interactions with

3   Doug or what had happened, and if I were to make notes

4   when they were standing there, they would get very nervous

5   and clam up.  So when they would leave, I would just jot

6   things down, and that's what these are.  These are part of

7   that dinner that Gates had -- Tom Gates had with Doug and

8   Mapes & Company.  And Doug was saying that according to

9   Zerlong and Tom Otimed (phonetic), Gates is damaged goods,

10  he wasn't mobile, he wouldn't move to Chicago, it's only a

11  matter of time before they kick him out, just belittling

12  and making him think that his career wasn't long for the

13  company.

14         And I wrote it down because it's just not

15  something that you want your agents to hear, because then

16  you have confidence that their underwriters and their

17  managers are in good standing with the company.

18      Q.    Okay.  So these notes relate to that Gates'

19  dinner?

20      A.    Yes.

21      Q.    Okay.

22      A.    (Continued)  And this one below was after

23  I'd heard from a couple people about this picture that he

24  had in his top drawer with the torn-up Taurus and what

1   happened, allegedly, after he was driving home drunk.

2                And he constantly bragged about drinking and

3   driving.  He would come in and say that, you know, a cop

4   followed him all the way home and he kind of, you know, a

5   big sign of relief that he made it home or that, you know,

6   at times that he would pull over to a side street when he

7   would see that a cop was sort of tailing him and how he

8   got away with it, that kind of stuff.

9        Q.    Ill hand you an e-mail from you, this is

10  post his termination --

11       A.    Yes.

12       Q.    -- something to do with his -- is this the

13  only involvement -- you earlier testified that you didn't

14  remember any dealings with his separation package or

15  anything post-termination?

16       A.    Right.

17       Q.    Is this the extent of your involvement, just

18  talking about the effective date of his termination?

19       A.    Yeah.  Becky called me at home and said that

20  Doug had called and he wanted to make sure that the system

21  said 10/15 as his last day.  She didn't say why.  So it

22  had been my understanding up until that point that that

23  was his date.  So I said "yeah, go ahead and tell him

24  that."  But then subsequently, I think, I talked to Ekdahl

1    Q.    Yeah.  Does this have anything to do with

2    Baillie?

3    A.    Yeah, they all are items that were either

4    outstanding or that I needed to talk to him about, so I

5    would just, as things come up, keep them all documented on

6    that little slip of paper and open it up when we would

7    have meetings.

8    Q.    Anything reflected there that's either -- it

9    reflects inappropriate or improper or some kind of bad

10   behavior by Baillie or anything you would have discussed

11   with Jim Ekdahl?

12   A.    I would have talked to him about this area,

13   concern over branch and manager value of L&D, that's both

14   as a result of our employee survey and feedback that I

15   received from employees.

16         Whenever we would hold training events, I

17   would have a lot of people cancel or say that they

18   couldn't come and it's because they didn't feel that Doug

19   or their manager was really allowing them the time to take

20   away from their daily tasks to go to these training

21   events.

22   Q.    What does L&D stand for?

23   A.    Learning and Development.

24   Q.    All right.  Thank you.

1    A.    (Continued)  Let's hold on.  (Reviewing

2  document).  That's it.

3    Q.    Okay.  How about 1339, same question:

4  Anything reflected on there about Baillie, and if so,

5  anything that's negative about him whatsoever?

6    A.    The Steve Eck (phonetic) and Mike Zdinak in

7  the Regional Loss Control, that's a larger issue, which

8  notes are in there somewhere about Mike Zdinak's confusion

9  and frustration over directives made by Doug versus his

10  zonal, Steve Hernandez.

11    Q.    Did you come to any kind of resolution on

12  that as who was -- there was any kind of fault on the part

13  of Baillie?

14    A.    Well, he was advising Mike Zdinak to

15  prioritize and focus on things that were contrary to

16  current Loss Control directives.  He was -- it was

17  confusing for Mike Zdinak.  And so I took the notes and

18  talked to Doug about it and suggested that he get with

19  Mike.

20    Q.    How about the next page 1341?  Anything on

21  there about Baillie and, if so, anything that's critical

22  about Baillie to your belief?

23    A.    (Reviewing document).  Not that I recall.

24  It doesn't look like it.

1   A.  Yes.

2   Q.  And you agreed with the employees, with

3 their criticism?

4   A.  Yes.

5   Q.  Okay.

6   A.  Elinor Faulkner, F-A-U-L-K-N-E-R, she is the

7 Operations and HR Representative in Cleveland.  She asked

8 to have Gary DeLong, Branch Manager in Cleveland, be her

9 direct report because of Doug's perceived lack of respect

10 for the HR function.  She didn't feel she would get a fair

11 review.

12   Q.  And again you agreed with her?

13   A.  Yes.

14   Q.  Did you review either of those matters on

15 that page with Mr. Ekdahl or anyone else that you've aware

16 of?

17   A.  No.

18   Q.  Okay.

19   A.  (Continued)  Because -- no.  (Reviewing

20 document), okay, there's nothing on this page.

21   Q.  Was that your choice -- I'm going to

22 interrupt you for a second.  Was that your choice to go

23 into HR or someone else's choice?

24   A.  I expressed interest.

1    A.    Uh-huh (nodding head affirmatively).

2    Q.    Okay.

3    A.    (Continued)  This was on 4/30/01, I believe.

4  And this was -- my concern over career discussions and

5  coaching, lack of, with Doug, just my personal notes.

6    Q.    Personal note that you were concerned with

7  the quality of those or quantity?

8    A.    Quality.

9    Q.    This is April 30th of 2001?

10    A.    I believe so.

11    Q.    Did you think Mr. Baillie was satisfied or

12  dissatisfied with your overall performance?

13    A.    Satisfied.  (Continued)  This is -- an

14  employee reported -- actually this was -- Tom Gates

15  reported, this is 1383, that Tim Dietz, who at the time

16  was an Energy underwriter, went to a basketball game with

17  an agent and Doug, and that Doug was drinking excessively

18  and bragging about how much he drinks a day and pressuring

19  the agent and Tim to drink as well and they were

20  uncomfortable.

21    Q.    Did you report that to Ekdahl or anyone

22  else?

23    A.    Yes, I did, to Ekdahl.

24    Q.    Okay.  Now, when you reported things to

1      THE WITNESS:  Okay, but I answer, right?

2      MR. MONTGOMERY:  Yeah.

3      A.    Okay.  We were going through the incentive

4  -- we were talking about the incentive bonus and what

5  should be considered both in the ranking and inclusion for

6  who gets what bonus.  And I stated that Greg Tazic has

7  been running the Diversity Committee for the last

8  year-and-a-half and the results were very good, and Doug

9  didn't feel that that was worthy of being considered for

10  incentive bonus consideration.

11      Q.    Okay.  Were other committee leaders -- were

12  other committee positions rewarded with incentive

13  compensation to your knowledge?

14      A.    The Reach Committee was considered.  The

15  Reach Committee had --

16      Q.    Incentive compensation.  Were there some

17  committees that were considered for incentive compensation

18  and some committees that were not?

19      A.    I know that the Reach Committee had, which

20  is an activities committee, did received a bonus and that

21  was included as part of the justification for a bonus, but

22  I can't tell you whether -- yeah, whether that was the

23  only reason.

24      Q.    Were there a number of committees?