Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---

DOUGLAS W. BAILLIE,              :
        Plaintiff,               :
                                 :
vs.                              :   CASE NO.
                                 :   C-1-02-062
CHUBB & SON INSURANCE:           :
        Defendant                :
                                 :
---

DEPOSITION OF:   DIETER WILHELM WOLFGANG KORTE

TAKEN:           By the Plaintiff

DATE:            February 27, 2003

TIME:            Commencing at 9:00 a.m.

PLACE:           Offices of:
                 Freking & Betz
                 215 East Ninth Street
                 Fifth Floor
                 Cincinnati, Ohio  45202

BEFORE:          RAYMOND E. SIMONSON
                 Registered Merit Reporter
                 Notary Public - State of Ohio

Page 2

APPEARANCES:

On behalf of the Plaintiff:

    RANDOLPH H. FREKING, ESQ.
        of
    Freking & Betz
    215 East Ninth Street
    Fifth Floor
    Cincinnati, Ohio  45202

On behalf of the Defendant:

    DAVID T. CROALL, ESQ.,
        of
    Porter, Wright, Morris & Arthur
    250 East Fifth Street, Suite 2200
    Cincinnati, ohio  45202-5117

                S T I P U L A T I O N S

       It is stipulated by and between counsel for
the respective parties that the deposition of DIETER
WILHELM WOLFGANG KORTE, a witness herein, may be taken at
this time by Counsel for the Plaintiff as upon
cross-examination pursuant to the Federal Rules of Civil
Procedure; that the deposition may be taken in stenotypy
by the notary public-court reporter and transcribed by him
out of the presence of the witness; that the transcribed
deposition is to be submitted to the witness for his
examination and signature; and that signature may be
affixed out of the presence of the notary public-court
reporter.

Page 3

COPY

                    I N D E X

DIETER WILHELM WOLFGANG KORTE                PAGE

    CROSS-EXAMINATION BY MR. FREKING:          4

COMPUTER DISK

Page 4

1    DIETER WILHELM WOLFGANG KORTE
of lawful age, a witness herein, being first duly sworn as
hereinafter certified, was examined and testified as
follows:
            CROSS-EXAMINATION
BY MR. FREKING:
    Q.  Hi, Dieter.
    A.  Hi.
    Q.  How you are you?
    A.  Good.
    Q.  We just met, but my name is Randy Freking,
and I represent Doug Baillie in connection with the matter
he's brought here in Federal Court in Cincinnati, and
we're here today to conduct your deposition.
        Ray will take down your answers to various
questions. And we just ask you to consider, you know, the
questions as carefully as possible and take whatever time
you need to answer the questions. There's no time
deadline whatsoever. I know you've got to leave by 11:20,
but that doesn't mean we have to finish by that time.
    A.  Okay.
    Q.  We can always resume on another date. So
take whatever time you need to answer questions today.

Exhibit J

Page 5

1         Also, if I ask you any questions that you
2   don't understand, please feel free to ask for
3   clarification, a definition of terms, you know, anything
4   like that --
5     A.  Okay.
6     Q.  -- that makes it possible for you to answer
7   the question as honestly as possible.
8         Thirdly, Ray will not guess what you mean if
9   you shake your head or make some other gestures.  So all
10  your responses today have to be verbal.  Okay?
11    A.  Okay.
12    Q.  If you would like to consult with
13  Mr. Croall, I assume he's your attorney for purposes of
14  this deposition, so I think our custom and practices allow
15  you to do that, assuming, provided, there's not a question
16  on the floor.  We prefer you do that between questions
17  rather than during questions.
18        MR. CROALL:  Just so we're clear, I
19    represent the company, not Mr. Korte individually.
20    But, yeah, I'm here today to answer any questions
21    that he might have about the process.  And if he's
22    got a question, even if the question is pending, if
23    he's got a question about privilege or whether
24    there's some reason he should not answer it, he's

Page 6

1     certainly free to consult with me about that.
2     Q.  Okay.  And I think last, but not least, if
3   you want to take a break at any time, just let us know.
4   We're happy to accommodate that.  If you need some more
5   water, if you'd like a soft drink or coffee, let us know.
6         Would you like anything like that before we
7   start?
8     A.  No thanks.
9     Q.  All right.  Cool.  Dieter, can you basically
10  start the deposition after my diatribe there by stating
11  your full name and your current home address, your current
12  telephone number, your marital situation, your family
13  situation, et cetera, stuff like that?
14    A.  Dieter -- do you need the middle name?
15    Q.  Sure.
16    A.  Wilhelm Wolfgang Korte.
17    Q.  Okay.
18    A.  Address is 10355 Brentmoor Drive, Loveland,
19  Ohio, 45140.
20    Q.  Okay.  And what's your current home
21  telephone number?
22    A.  697-1671.
23    Q.  And are you married?  Do you have any
24  children?

Page 7

1     A.  Married, two children.
2     Q.  Do either your wife or your children have
3   anything to do with Chubb in terms of work?
4     A.  Other than my employment?
5     Q.  Right.
6     A.  No.
7     Q.  All right.  And, Dieter, how long have you
8   worked for Chubb?
9     A.  12 years and two days.
10    Q.  Okay.  Can you just give me kind of a
11  rundown of your career with Chubb?
12    A.  I started in the Detroit office as a
13  commercial underwriting trainee; stayed in the Detroit
14  office through various positions until June of '97.
15        In June of '97, I was promoted to become the
16  underwriting manager in our suburban Illinois office.  I
17  stayed there till October of '98, at which time I was
18  promoted to my current position as regional underwriting
19  manager in Cincinnati.
20    Q.  And as the regional underwriting manager, do
21  you deal with underwriting beyond commercial underwriting,
22  or are you limited to commercial underwriting?
23    A.  No; I'm limited to commercial underwriting.
24    Q.  All right.  And you've dealt with commercial

Page 8

1   underwriting matters, it sounds like, your entire career
2   with Chubb?
3     A.  That's correct.
4     Q.  All right.  And, Dieter, what is your date
5   of birth?
6     A.  April 11th, 1966.
7     Q.  And did you come to Chubb straight out of
8   college or something?
9     A.  Correct.
10    Q.  All right.  Where did you go to school?
11    A.  I graduated from Western Michigan University
12  in Kalamazoo, Michigan.
13    Q.  And where were you born?
14    A.  In Germany.
15    Q.  What city?
16    A.  Iserlohn.  Let me spell that for you.
17  I-s-e-r-l-o-h-n.
18    Q.  All right.  Was that in, I assume -- let me
19  ask you this, but I assume West Germany?
20    A.  Correct.
21    Q.  Back in the old days?
22    A.  Yeah.
23    Q.  How long have you been in the States?
24    A.  On and off, I spent different time frames

Page 25

1  Q  Sometimes you would have a business dinner?
2  A.  Yeah.
3  Q.  Or you would -- you might have socialized
4  together at business functions? Conventions?
5  A.  Correct.
6  Q.  Things like that, right?
7  A.  Correct.
8  Q.  Have you ever, like, played golf with him or
9  gone to a sporting event with Mr. Baillie?
10  A.  Both, yes.
11  Q.  Okay. But on a business-related purpose?
12  A.  Yes. Those would have been
13  business-related.
14  Q.  Okay. Now tell me, how did you find out Mr.
15  Baillie had been fired?
16  A.  Mr. Baillie called me at my home.
17  Q.  And what do you recall about that?
18  A.  It was a Friday evening, and I believe it
19  was the day that he had the discussions with Mr. Szerlong,
20  and he called me -- I think he was concerned just how I
21  would take, you know, his departure from the company,
22  whatever you want to call it, and he -- I'm trying to
23  recollect the entire conversation. Give me just a second.
24  Q.  Okay. Take whatever time.

Page 26

1  A.  He put it in the context of he had a
2  discussion with Mr. Szerlong and they agreed to disagree
3  and that he was no longer employed by Chubb. And he said
4  it had nothing to do with anything I had ever done, my
5  business results or performance. He said, "It's a great
6  company, that you'll have a great career with the
7  company," and, you know, he's going to -- that's pretty
8  much the extent of his conversation.
9  Q.  Okay.
10  A.  And he just said -- he re-emphasized -- he
11  wanted to make sure that I recognized that it had nothing
12  to do with anything that I had done or my performance
13  level.
14  Q.  Okay. Sounds like a fairly professional
15  conversation.
16  A.  Yes. It was very professional.
17  Q.  All right. Have you ever had any
18  conversations with Mr. Baillie since that you can recall?
19  A.  Yes.
20  Q.  Can you describe in any way the number of
21  conversations you've had with Mr. Baillie since then?
22  A.  I had one conversation face to face, and I
23  received an e-mail from him since then.
24  Q.  Okay. What was the context of your

Page 27

1  face-to-face meeting?
2  A.  It was a business convention in the late
3  fall of 2001 at the Hyatt here in Cincinnati, and he was
4  manning a booth for a charity organization that he had
5  been part of called Insuring the Children at an insurance
6  convention.
7  Q.  Okay. And do you remember anything from
8  that face-to-face conversation, other than you engaged in
9  some small talk?
10  A.  Yes. We had some conversations about Chubb,
11  about the state of the marketplace, conversations about
12  Mr. Szerlong, and about -- he made comments about his
13  termination.
14  Q.  Okay. This was in the late fall?
15  A.  Yeah. I -- my best guess was -- it was
16  getting pretty cold outside. It probably would have been
17  early November, late October, early November of 2001.
18  Q.  Okay.
19  A.  It was -- I think it's called Big I Day,
20  which is a CPU convention. It's a professional insurance
21  organization.
22  Q.  Big I Day, I standing for insurance?
23  A.  I believe that's what it stands for.
24  Q.  Okay. Is that like an annual meeting of

Page 28

1  some sort?
2  A.  Annual, by -- yeah. They bring in speakers,
3  talk about various topics.
4  Q.  All right. Now, prior to the day he spoke
5  with you at your home -- you said he was very professional
6  the day of his termination apparently. Had Mr. Baillie
7  ever engaged in any kind of conduct that you were aware of
8  that you thought was unprofessional or not in the interest
9  of Chubb, that you thought was wrong in some manner in
10  some way, shape, or form?
11  A.  That would be my personal judgment, right?
12  Q.  Right.
13  A.  That's what you're asking for?
14  Q.  Yeah.
15  A.  Yeah, I would say.
16  Q.  Okay. What would you -- can you describe
17  what you're thinking of?
18  A.  Again, this is my personal judgment. I
19  think there were events where Mr. Baillie was the only one
20  drinking alcohol.
21  Q.  Okay.
22  A.  There was at least one event where he
23  offended me personally at a meeting.
24     There was a department meeting that I held

Page 29

1 where he started reading a newspaper in the middle of a
2 department meeting that I was conducting.
3     Q. Okay.
4     A. Those are the ones that come to my mind
5 immediately.
6     Q. Well, do you have any notes or documents or
7 memos --
8     A. No.
9     Q. -- at home or the office that would refresh
10 your recollection some way?
11     A. No.
12     Q. Okay.
13     A. That wasn't my job to do.
14     Q. When do you think he read this newspaper
15 during one of your meetings?
16     A. You mean the date? The date?
17     Q. Yeah. Do you know the year? Can you put it
18 somewhere in relationship to his termination?
19     A. Probably 2000.
20     Q. Okay. Did you discuss this with anybody?
21     A. Yes.
22     Q. Who did you discuss it with?
23     A. Mr. Tazic and Ms. Haggard, those two.
24     Q. Okay. What did you tell them about it?

Page 30

1     A. In colorful language that I was upset and I
2 thought it was unacceptable.
3     Q. Okay. Why did you think it was
4 unacceptable?
5     A. Because I felt it was unprofessional.
6     Q. Okay.
7     A. And it was demeaning the intent of our
8 meeting.
9     Q. How many meetings did you have like that, do
10 you think, where Mr. Baillie would attend?
11     A. We -- that type of meeting is being held on
12 a monthly basis in our office.
13     Q. Okay.
14     A. He attended a fair amount. I couldn't tell
15 you the exact percentage of his attendance.
16     Q. Okay. Were there any other meetings that
17 you can recall in which you thought any conduct by Mr.
18 Baillie was unacceptable or unprofessional or demeaning?
19     A. Yes. He held a branch meeting where he
20 classified me as an overpaid employee.
21     Q. Tell me the context of that. How would that
22 come up?
23     A. Let me dig deep.
24        It was -- he was trying to put it in the

Page 31

1 context of saving money, and I had suggested for customer
2 service to get in a car and make a delivery to an agent in
3 Dayton. I believe it was a policy. It might have been a
4 form or something they needed from us.
5        And in front of the branch he used it as an
6 example where, instead -- he said, "Instead of using
7 Dieter's overpriced salary to drive up there and deliver
8 that, we used a courier for 10 or 20 dollars," whatever
9 the price tag might have been, "instead."
10        And he did that in front of the entire
11 branch, and I was very offended by that.
12     Q. So your interpretation of that was he was
13 saying you were paid too much, rather than it's kind of
14 silly to have -- how much do you make approximately?
15     A. Do I have to answer that?
16       MR. CROALL: It doesn't really have any
17       relevance. It's personally intrusive, and I'm
18       pretty comfortable instructing him not to answer
19       that. He makes more than a courier. I'll
20       stipulate to that.
21     Q. You didn't think that Mr. Baillie meant from
22 a cost standpoint, "Dieter, it's a heck of a lot cheaper
23 to get a courier to take something to Dayton than have you
24 drive it up there"?

Page 32

1     A. I would say that would have been the
2 appropriate way to say it, yes, but he chose -- he did not
3 choose those words.
4     Q. So your criticism -- what do you think was
5 his intent? Do you think his --
6     A. I don't want to speculate on that.
7     Q. Do you think he meant to insult you?
8     A. I don't know. I can't read his mind. I
9 know the words he used, and I was offended by it.
10     Q. You were offended. You didn't give -- you
11 were offended because you thought he was insulting you?
12     A. I was offended because of the words that he
13 used in front of the branch, correct.
14     Q. Okay. Did anybody tell you as a result of
15 that meeting that they thought it was insulting to you?
16     A. Yes.
17     Q. Who was that?
18     A. Both Mr. Tazik and Mr. Gates.
19     Q. Okay. Anybody else that you can recall
20 telling that to or discussing that with?
21     A. Not that I can recall.
22     Q. Okay. Any other meetings in which you
23 thought he said something that you thought was
24 inappropriate, unprofessional, insulting, demeaning?

Page 37

1  Q. Did anybody else tell you that they thought
2  it was inappropriate as well?
3  A. Did they use those words? No. Did people
4  snicker? Yes.
5  Q. Anybody in particular?
6  A. I don't recall now. It was a large group of
7  people.
8  Q. And was Mr. Szerlong in attendance?
9  A. No.
10 Q. Did you ever mention this to Mr. Szerlong,
11 to your recollection?
12 A. No.
13 Q. Okay. Anything else you ever you personally
14 observed during your tenure under Mr. Baillie that you
15 thought was inappropriate, unprofessional, demeaning,
16 insulting, or not in the best interest of Chubb?
17 A. Nothing stands out right now, no.
18 Q. Do you have any notes or records --
19 A. You mean during his employment, right?
20 Q. Right.
21 A. Is that what you're asking?
22 Q. Right.
23 A. Nothing that I can recall.
24 Q. And you don't have any notes or documents

Page 38

1  that would refresh your recollection?
2  A. No.
3  Q. Okay. Great. Tell me about the e-mail that
4  he sent you or you sent him. You said there was some
5  e-mail; there was some correspondence between you and him.
6  A. Oh, after his --
7  Q. Departure.
8  A. -- departure? Yeah. He sent me an e-mail.
9  It would have been after thanksgiving of 2001, and the
10 gist of the e-mail was -- I don't recall the entire
11 verbiage, but in essence, "I'm in Florida now close to
12 Disney World."
13     Basically, "If you want to stay with us," --
14 you know, he has an open invitation, and, you know, "Don't
15 take the loss too hard."
16     And he was referring to Michigan having lost
17 to Ohio State the prior weekend.
18 Q. Okay. Were you offended --
19 A. No.
20 Q. -- or insulted by that?
21 A. No. No. I didn't respond.
22 Q. You thought that was a friendly e-mail?
23 A. Yeah. Yeah.
24 Q. Was one of the reasons you didn't respond

Page 39

1  because you were instructed by Chubb not to communicate
2  with Mr. Baillie?
3  A. No.
4  Q. Have you ever been instructed by anybody at
5  Chubb not to communicate or talk to Mr. Baillie?
6  A. No.
7     MR. CROALL: Other than counsel.
8     Go ahead and answer.
9  A. Oh, no.
10 Q. No? No one other than counsel told you
11 that?
12    MR. CROALL: You're not asking about
13 conversations with counsel?
14    MR. FREKING: No.
15    MR. CROALL: And I'm instructing him not to
16 answer about conversations with counsel.
17    MR. FREKING: I'm just clarifying. He said
18 something about other than counsel, so I was
19 clarifying.
20 Q. Tell me about how Mr. Baillie was as a boss.
21 A. What do you mean by how he was?
22 Q. If someone said to you, "Was Baillie a good
23 boss?" how do you think you'd answer?
24    MR. CROALL: You're asking for his personal

Page 40

1  opinion?
2  Q. As of -- you know, if you can put yourself
3  back in your shoes --
4  A. Um-hmm (nodding head affirmatively).
5  Q. -- of when he was your boss?
6  A. Um-hmm (nodding head affirmatively).
7  Q. What was your belief while he was your boss
8  of how good a boss he was?
9  A. Well, I would classify Doug as having been a
10 nice guy, other than probably the two incidences that I
11 mentioned to you earlier.
12     I was disappointed about his lack of
13 engagement in my business issues. I -- what would be the
14 best way to characterize it?
15     I was looking for more. I was looking for
16 more probably leadership. I was looking for more maybe
17 ability to listen, patience to listen.
18     There were probably times where I would have
19 probably liked a little bit more support.
20     That's probably in a nutshell the best way I
21 can summarize it.
22 Q. Okay. Overall, it seems pretty negative.
23 All you mentioned was negative things about him. All I
24 asked you was how he was as a boss.

Page 65

1 -- his largest customer.
2    Q.   How about Barton?
3    A.   He's the marketing manager.
4    Q.   Haggard, we talked about?
5    A.   She's human resources.
6    Q.   Tazic?
7    A.   Claims.
8    Q.   And then Dan Krohn?  Do you recall who he
9 replaced?
10   A.   (No response.)
11   Q.   Still not in your mind?
12   A.   I told you I would get back to you.
13   Q.   Well, that's all right.
14   A.   Not yet.  Darn it.  This is really
15 irritating me, because I used to hang out with the guy.
16 Now I can't even remember his name.  He actually went to
17 our Illinois office where I came from.  God.  This is
18 ridiculous.
19        Tim Dadik.  Oh, finally.  It's D-a-d-i-k.
20   Q.   Okay.
21   A.   I should probably mention that Mr. Dadik
22 replaced another gentleman during Mr. Baillie's tenure.
23   Q.   Okay.
24   A.   And his name really does escape me.  He

Page 66

1 would have left at some point, I think, in '99.
2    Q.   Okay.  I can ask Doug.  Doug will probably
3 remember.
4    A.   Yeah.
5    Q.   What kind of familiarity did you have with
6 respect to, you know, how the other areas of business were
7 doing when you arrived?  You know, some of the operations
8 of your peers?
9    A.   When I arrived?
10   Q.   Yeah.  When you arrived, were they all real
11 healthy in terms, you know, financially?
12   A.   I honestly don't recall, no.  I know I had a
13 mess on my hands.  I thought that was enough work to do
14 for one person.
15   Q.   Okay.  You don't remember.  Have they -- did
16 you have like a feeling as to whether or not they were
17 profitable?
18   A.   I think it was okay.
19   Q.   Did you have a feeling as to -- your
20 business eventually turned around in 2001; is that fair to
21 say?
22   A.   2001 and 2002, yes.
23   Q.   Okay.  And you attribute that to the changes
24 that you were able to put in place?  Better decisions?

Page 67

1    A.   It's a variety of things.  It's -- I think
2 the quality of our staff is a lot better.  I would say
3 that the marketplace has helped tremendously in terms of
4 affirming the insurance market, our ability to obtain
5 higher prices for the same coverages.
6         We did what we call the calling of our book,
7 which means we non-renewed business that was no longer
8 desirable for us; had a little bit more luck.
9    Q.   Did Mr. Baillie -- you know, on the topic of
10 kind of getting rid of the bad business, did Mr. Baillie
11 support you in that regard or encourage you in that
12 regard?
13   A.   We probably had more instances where we
14 argued over it than agreed on it.
15   Q.   Okay.
16   A.   I think Doug's preference was to find a way
17 to retain clients versus non-renewing them.
18   Q.   Just correct me where I'm wrong on this.
19 Would you always try to retain customers by simply at
20 least trying -- first trying to raise their premiums?
21   A.   Personally?  No.
22   Q.   Okay.  Did Mr. Baillie think that that's
23 always kind -- that's sometimes -- rather than simply
24 non-renewing, would you agree with me that sometimes Mr.

Page 68

1 Baillie would say, "Well, let's first try to raise their
2 premium and make it a fairer risk in light of their" --
3 or, "make it a fairer price in light of their risk"?
4    A.   (No response.)
5    Q.   It was kind of a risk-assessment thing,
6 right?
7    A.   Well, he -- his preference would have been
8 to retain customers.  I would agree with that, yeah.
9    Q.   And --
10   A.   Him and I had conversations where he would
11 actually make the point of telling me that these are
12 paying customers and that I should look at them that way.
13   Q.   Okay.  Did he say things along the lines of
14 what I just suggested, that, "Dieter, let's first look at
15 just raising their premiums"?
16   A.   I don't know that he used specifically those
17 terms, but he did on occasion ask me to find a way, if
18 there was a way to retain a customer, yeah.
19   Q.   Okay.  And you -- you two just had kind --
20 would you describe it as kind of a professional
21 disagreement?
22   A.   Oh, yeah.  That's -- those conversations go
23 on consistently --
24   Q.   Okay.

### Page 69

1  A. -- between underwriting managers and branch
2  managers.
3  Q. Right, because there's almost an inherent
4  conflict, right? You're almost better off being able to
5  say you accurately predicted the risk a hundred percent of
6  the time and it's almost a cautious approach on your --
7  makes you -- I'm not saying you do this, but if somebody
8  wanted to be cautious and just make sure that they make
9  themselves look the best as an underwriter, they can be
10 pretty conservative in their view, because then there's no
11 great losses.
12 A. I -- if you ask me for my opinion, I
13 wouldn't agree with that.
14 Q. Some underwriters could be -- could make a
15 mistake that way?
16 A. Well, again, I don't know that it's a
17 mistake, if you are in the business of assuming risk, to
18 be conservative. You know, it has its pros and its cons.
19 Q. Right.
20 A. If you assume too much risk, you're going to
21 affect your revenues, but are you going to maintain profit
22 balances.
23 Q. You have to have a reasonable level --
24 A. You have to have a balance.

### Page 70

1  Q. -- of conservatism?
2  A. You have to have a balance of assuming risk
3  and also trying to grow your business, yeah.
4  Q. Okay. And that's the -- finding that
5  delicate balance is where people --
6  A. It's not easy.
7  Q. -- can disagree?
8  A. Yeah. Oh, yeah. I mean, I can play
9  Monday-morning quarterback on every single business
10 decision an underwriter has ever taken and come back with
11 a better way to do it.
12 Q. Okay. How would you describe the manner in
13 which the effort of the marketing area assisted you in
14 turning around the profitability of your area?
15 A. During Mr. Baillee's tenure?
16 Q. Well, during, while Mr. Baillie was there.
17 A. Insufficient.
18 Q. Okay. Explain to me why you thought it was
19 insufficient.
20 A. More often than not, the perception of
21 myself and the employees in my department was that the
22 difficult messages had to be delivered by us versus the
23 marketing group.
24 Q. Okay.

### Page 71

1  A. And we felt -- when I say we, I mean the
2  department and my -- the underwriters and myself felt
3  that, more often than not, it appeared that we had to
4  justify ourselves internally first before we could deliver
5  a message to our agents that we felt was the right
6  business decision and the right underwriting decision to
7  take.
8  Q. You had to justify things internally to
9  Chubb?
10 A. Yes, to the marketing area.
11 Q. To the marketing area?
12 A. That you were referring to, um-hmm (nodding
13 head affirmatively).
14 Q. Can you give me an example of that?
15 A (No response.)
16 Q. Just generally, maybe not a specific
17 example.
18 A. There were a lot of examples of that.
19 Q. Just give me one or two that you think are
20 fair.
21 A. Jeez. We had an account -- the name escapes
22 me -- where we had decided, because of unacceptable
23 conditions, to part ways with the risk, and we've had to
24 have several conversations in the branch explaining why we

### Page 72

1  were doing this, and, you know, justifying our business
2  decision, and we felt second-guessed.
3  Q. Okay. How does marketing interact with a
4  decision like that? That's what I'm trying to figure out.
5  A. Well, I guess marketing at that point more
6  or less takes the agent's view that, you know, "Why do we
7  have to do this? Why can't we stay on the risk?" And our
8  -- you know, we have the underwriting view that we should.
9  Q. When you're having these professional
10 disagreements with your colleagues over marketing, okay,
11 was there any role for Mr. Baillie to play?
12 A. In my opinion?
13 Q. Yes.
14 A. Again, I don't know. I did not have access
15 to his direct goals or mandates. In my opinion, I would
16 have liked -- personally, I would have liked to have seen
17 him support us in the underwriting area more in those
18 instances.
19 Q. And the marketing people probably would have
20 preferred if he supported them more?
21 A. I can't speak for them.
22 Q. When you're having these professional
23 disagreements with your colleagues over marketing, did you
24 ever see Mr. Baillie kind of interject himself into it and