Page 1

```
              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
                     WESTERN DIVISION


-----------------------------------
                                   :
DOUGLAS W. BAILLIE,                :
                                   :
           Plaintiff,              :
    vs.                            :   CASE NO.
                                   :   C-1-02-062
CHUBB & SON INSURANCE,             :
                                   :
           Defendant.              :
                                   :
-----------------------------------


     DEPOSITION OF:    ANDREW BRYANT

     TAKEN:            By The Plaintiff

     DATE:             March 17, 2003

     TIME:             Commencing at 9:50 a.m.

     PLACE:            Offices of:
                       Freking & Betz
                       215 East Ninth Street
                       Fifth Floor
                       Cincinnati, Ohio  45202

     BEFORE:           Theresa Lynn Westfelt
                       Court Reporter
                       Notary Public - State of Ohio
```

Page 2

```
APPEARANCES:

     On behalf of the Plaintiff:

           RANDOLPH H. FREKING, ESQ.
                     of
           Freking & Betz
           215 East Ninth Street
           Fifth Floor
           Cincinnati, Ohio  45202


     On behalf of the Defendant:

           DAVID T. CROALL, ESQ.
                     of
           Porter, Wright Morris & Arthur LLP
           250 East Fifth Street
           Suite 2200
           Cincinnati, Ohio  45202

                     - - -

              S T I P U L A T I O N S

        It is stipulated by and between counsel for
the respective parties that the deposition of ANDREW
BRYANT, a witness herein, may be taken at this time by
counsel for the Plaintiff as upon cross-examination
pursuant to the Federal Rules of Civil Procedure; that the
deposition may be taken in stenotypy by the notary
public-court reporter and transcribed by her out of the
presence of the witness; that the transcribed deposition
is to be submitted to the witness for his examination and
signature, and that signature may be affixed out of the
presence of the notary public-court reporter.
```

Page 3

```
                       I N D E X

ANDREW BRYANT                                    PAGE

CROSS-EXAMINATION BY MR. FREKING                   4

EXAMINATION BY MR. CROALL                          -



                       EXHIBITS

                    (No Exhibits).




                CONFIDENTIAL EXCERPTS

                     Page 14 - 15

                     Page 23 - 26

                     Page 32 - 39
```

Page 4

ANDREW BRYANT
of lawful age, a witness herein, being first duly sworn as
hereinafter certified, was examined and deposed as
follows:

CROSS-EXAMINATION

BY MR FREKING:

Q. Hi, Andy. My name is Randy Freking and I represent Doug Baillie in a case that's currently pending in Federal District Court in Cincinnati against Chubb. And we're here today to conduct your deposition to find out what you may or may not know about matters that may or may not be relevant to his case.

Could you please start the deposition by simply stating your full name, your family status, your current home address, and your current telephone number?

A. Andrew Broaddus Bryant, B-R-O-A-D-D-U-S. Married. I live at 1231 Southbuckeye, one word, Lane, Goshen, G-O-S-H-E-N, Kentucky, 40026.

Q. I'm sorry, what city do you live in?

A. Goshen.

Q. Ohio?

A. Kentucky.

Q. Oh. And what's your home telephone number?

A. (502) 228-3254.

Page 13

1 a large group, small group, medium size group, crispy
2 crust group?
3     A. Ten.
4     Q. Ten?
5     A. Ten, twelve.
6     Q. All right. How about -- and how would -- do
7 you recall anything -- what was Mr. Baillie's role with
8 respect to these marketing meetings? A fly on the wall?
9 Leader? Participant? Cocktail waitress?
10    A. Generally speaking, fly on the wall.
11    Q. Okay. Was that acceptable to you?
12    A. Yes.
13    Q. Do you recall any particular problems with
14 anything Mr. Baillie ever did during any of these monthly
15 marketing meetings that you can recall? Or did you
16 generally believe that he was fulfilling whatever role he
17 was supposed to fulfill?
18    A. Doug, in my mind, did not add much to the
19 meeting.
20    Q. And you thought that on a regular basis or
21 was that just an occasional fact?
22    A. More often.
23    Q. Okay. Did you expect him to add much to the
24 meetings?

Page 14

1     A. Yes.
2     Q. Okay. What did you expect him to add?
3     A. A sense of direction for his overall goals,
4 communicate to my staff and myself continued direction of
5 the corporation, and guidance from his experience as a
6 manager.
7     Q. Did he ever express to you his view that he
8 thought the Louisville office was doing just fine and
9 didn't need his particular guidance?
10    A. Not that I recall.
11    Q. How were your performance reviews during
12 this period of time?
13      MR. CROALL: Designate as confidential, but
14    you can answer.
15    A. Elaborate. How do you mean?
16    Q. How were they? Were they okay? Acceptable?
17 Did you need improvement? Were they critical?
18    A. Oh.
19    Q. (Continued) Were they positive?
20    A. Overall, positive.
21    Q. Okay. Do you believe that in this
22 three-year period or so that you worked under the
23 supervision of Mr. Baillie that he had a general positive
24 view of your performance?

Page 15

1     A. Overall.
2     Q. Okay. Do you recall any particular
3 constructive criticism Mr. Baillie had of your
4 performance?
5     A. He would have liked to see me go out more
6 with my agents.
7     Q. Okay.
8     A. (Continued) And overall, he had an idea he
9 would like me to better plan with my agents.
10    Q. Okay. Were you the direct supervisor of the
11 underwriting staff?
12    A. No.
13    Q. Who was?
14    A. The underwriting managers of the
15 underwriting staff.
16    Q. Okay. Would the underwriting managers
17 attend these monthly meetings?
18    A. Yes.
19    Q. Do you recall the names of the underwriting
20 managers?
21    A. Dieter, D-I-E-T-E-R, Korte, K-O-R-T-E.
22    Q. Okay. Anybody else?
23    A. Not consistently.
24    Q. What does that mean? Do you have

Page 16

1 underwriting managers come and go?
2     A. Those were the primary underwriters we had
3 at the meeting, were the Package Underwriters who reported
4 to Dieter.
5     Q. Oh, that's what I meant. Were there any
6 other underwriting managers besides Dieter during this
7 period of time?
8     A. For package business, no.
9     Q. For any -- anybody in --
10    A. Yes.
11    Q. You said there were monthly meetings with
12 the underwriting staff --
13    A. David Corry.
14    Q. Okay.
15    A. (Continued) Andrew Emery. Tim Dadick.
16    Q. Did Mr. Baillie, that you can recall, in
17 your performance appraisals ever criticize your
18 performance in any way with respect to these monthly
19 marketing meetings?
20    A. No.
21    Q. Okay. Do you have an opinion as to what Mr.
22 Baillie believed about the performance of your marketing
23 while you were head of the Kentucky operations?
24      MR. CROALL: You're asking him of his

Page 17

1  opinion of what Baillie thought?
2      MR. FREKING: Yes.
3  A.  I have no idea, other than what I told you.
4  Q.  Other than the constructive criticism you
5  received from Mr. Baillie regarding your performance with
6  vis-a-vis your agents?
7  A.  Correct.
8  Q.  Okay. Otherwise he thought you were doing
9  okay?
10 A.  That would be my opinion.
11 Q.  Yeah. Were these performance appraisals in
12 writing?
13 A.  Yes.
14 Q.  Okay. Were they done, like, on an annual
15 basis?
16 A.  Yes.
17 Q.  Do you think that the performance appraisals
18 you were given were timely?
19 A.  Yes.
20 Q.  Did you think they were fair and accurate?
21 A.  Yes.
22 Q.  What was your reaction to Mr. Baillie's
23 constructive criticism that you needed to go out more with
24 your agents? Did you agree or disagree with that?

Page 18

1  A.  Wasn't sure what he wanted to have
2  accomplished from those meetings.
3  Q.  Well, didn't he tell you he wanted you to
4  have a better plan for your agents?
5  A.  Those were different meetings.
6  Q.  Okay. So when he -- when -- you were
7  confused when -- what he wanted as a result of you going
8  out more with your agents?
9  A.  He wanted me to mix it up more, socialize
10 more.
11 Q.  Okay. He wanted you to establish a better
12 relationship with your agents; is that a fair reading of
13 that comment?
14 A.  That was what he was thinking, yes.
15 Q.  Okay. Did you attempt to do that?
16 A.  Yes, and Kentucky agents aren't big
17 socializers.
18 Q.  Okay. Did you report back to Mr. Baillie
19 that you tried to do it but Kentucky agents were not big
20 socializers?
21 A.  Yes.
22 Q.  And what was his response to that?
23 A.  I'm having a hard time recalling.
24 Q.  Okay. Did you take any action against any

Page 19

1  of the Kentucky agents as a result of their performance?
2  A.  Oh, you mean their business performance?
3  Q.  Right.
4  A.  Yes.
5  Q.  And isn't it true that Mr. Baillie
6  recommended that you take action with respect to their
7  business performance?
8  A.  Yes.
9  Q.  And isn't that it fair to say that that was
10 one of Mr. Baillie's responsibilities?
11 A.  Yes.
12 Q.  Did you agree with Mr. Baillie's
13 recommendation to take particular action with respect to
14 Kentucky agents?
15 A.  Yes.
16 Q.  Why in your view was it necessary for Mr.
17 Baillie to make that recommendation? Meaning, why had you
18 not earlier taken action against these same Kentucky
19 agents that Mr. Baillie recommended that you take action
20 against?
21 A.  I was not the state manager prior to that
22 point.
23 Q.  You mean, prior to June of '98?
24 A.  Correct.

Page 20

1  Q.  So Mr. Baillie recommended that you take
2  action against these guys for their business performance
3  that occurred prior to June of '98?
4  A.  I think his concerns were more during his
5  watch.
6  Q.  Right. And during his watch the performance
7  of the Kentucky agents improved, as a general rule?
8  A.  I'm not sure that's true.
9  Q.  Did they get worse? Did the performance of
10 Kentucky agents get worse under Mr. Baillie's watch?
11 A.  No, I can say that is not true.
12 Q.  Okay. Do you think they stayed about the
13 same?
14 A.  Overall.
15 Q.  As a general rule, do you think that the
16 performance of the Kentucky agents under your supervision
17 was acceptable during the time period that Mr. Baillie was
18 over you?
19 A.  Overall.
20 Q.  Okay. What was your reaction when Mr.
21 Baillie gave you the constructive criticism that you
22 should have a better plan with your agents?
23 A.  Confusion, and that it was never consistent
24 in what he was looking for in those plans.

Page 21

1  Q. Okay. Explain to me the inconsistencies, if
2  you recall.
3  A. Different points he wanted more of a
4  numerical plan.
5  Q. Meaning -- meaning what?
6  A. Set number of goals.
7  Q. Okay.
8  A. (Continued) To other times it would be more
9  verbal and the antidotal type planning.
10  Q. Did Mr. Baillie go back and forth between
11  these ideas or did he switch from one to the other during
12  his reign?
13  A. It seemed to switch around. I could not
14  tell you if it was back and forth.
15  Q. Okay. Did you complain to him about that?
16  A. Yes.
17  Q. And what was Mr. Baillie's reaction?
18  A. That he wanted what he wanted.
19  Q. Okay. Did you do what he wanted you to do?
20  A. I attempted to do so.
21  Q. Okay. Did you have success doing so?
22  A. Sometimes.
23  Q. And why -- on the occasions when you did not
24  have success, to what do you contribute that?

Page 22

1  A. That he wanted a different type of plan.
2  Q. Have you ever conveyed these disagreements
3  with Mr. Baillie to anyone at Chubb, that you can recall,
4  other than counsel in preparing for this deposition? Even
5  -- maybe you didn't, I'm just saying anything you told Mr.
6  Croall would be off limits here.
7  A. Diane Haggard, Human Resources Manager.
8  Q. Okay. Tell me what you believe you
9  discussed with Ms. Haggard?
10  A. That I was frustrated, Doug was not
11  communicating to me what he wanted. As a result, I felt
12  like I was constantly re-inventing the wheel on these
13  plans.
14  Q. Do you think you discussed this on one
15  occasion or more occasions than one with Ms. Haggard?
16  A. More than one.
17  Q. Okay.
18  A. (Continued) But not a great number of
19  times.
20  Q. Two, three or four?
21  A. Two, three, four.
22  Q. Okay. Do you recall when any of these
23  conversations with Ms. Haggard would have occurred? '98?
24  '99? 2000? 2001?

Page 23

1  A. 2000, 2001.
2  Q. Do you think all of them occurred in that
3  time frame?
4  A. Yes.
5  Q. Were these conversation with Ms. Haggard
6  generally in person or over the telephone?
7  A. Telephone.
8  Q. Were any of them in person?
9  A. Not that I recall.
10  Q. Okay. Did you express the same frustration
11  to Mr. Baillie before you expressed it to Ms. Haggard?
12  A. Yes.
13  Q. And Mr. Baillie told you just to do what he
14  was saying to do?
15  A. Yes.
16  Q. Now, how would you -- how was the
17  performance of your -- of the Kentucky -- your Kentucky
18  group measured by the company?
19  A. Growth and profit.
20  Q. Okay. And what do you mean by "growth"?
21  A. Written premium.
22  Q. Okay. And what is -- for example, what's
23  the current level of written premium?
24     MR. CROALL: Designate as confidential.

Page 24

1  A. $48,000,000.
2  Q. And how about the level of profit?
3     MR. FREKING: We'll designate this as
4  confidential, as well.
5  A. Prior year, approximately $65,000,000 -- 65
6  percent prior to expenses.
7  Q. You mean 65 percent of the $48,000,000?
8  A. Yes.
9  Q. Prior to expenses, wouldn't it be 100
10  percent before expenses?
11  A. Losses.
12  Q. 65 --
13  A. (Continued) I understood you were asking
14  about losses.
15  Q. I was asking about profit. What was the --
16  did you say last year's profit was 65 percent of
17  $48,000,000 prior to expenses?
18  A. Last year we did not make a profit.
19  Q. Meaning 2002?
20  A. Correct.
21  Q. Okay. And when you say no profit, you mean
22  after expenses, after payment of losses --
23  A. After losses and expenses.
24  Q. Okay. And when you say no profit, does that

Page 45

1    A.    The buck moves around a lot. I'd say the
2 first firm resting place would certainly be my plate, then
3 Doug's plate.
4    Q.    Okay. Did you ever have discussions with
5 Mr. Baillie about the fact that the financial results in
6 your territory that belonged on your plate were improving?
7    A.    Yes.
8    Q.    Did Mr. Baillie have any particular
9 reaction? Did he think that was good news? Did he think
10 this was bad news?
11    A.    He thought that was good news.
12    Q.    Okay. Did he ever express to you, you know,
13 compliments in that regard?
14    A.    On the profit piece, no.
15    Q.    How about on the premium piece?
16    A.    When it grew, yes.
17    Q.    Okay. Did it decline at some point?
18    A.    Pardon?
19    Q.    Did it decline ever?
20    A.    As part of that profit improvement piece, it
21 certainly declined.
22    Q.    Okay. And what do you recall Mr. Baillie
23 saying to you on those occasions?
24    A.    He would be frustrated.

Page 46

1    Q.    Okay. And was that a reaction you would
2 have expected?
3    A.    No.
4    Q.    What kind of reaction -- was that reaction
5 by Mr. Baillie frustration of the premium decreasing?
6    A.    Correct.
7    Q.    Did his frustration surprise -- it did not
8 surprise you?
9    A.    It surprised me in that the focus at that
10 point, I felt, was more profit improvement than premium
11 growth.
12    Q.    Okay. Did you ever express your frustration
13 on that subject to anyone?
14    A.    Yes.
15    Q.    To who?
16    A.    Dieter, Diane.
17    Q.    What do recall expressing to Dieter along
18 those lines?
19    A.    That we need to improve the profit before we
20 can make it bigger.
21    Q.    "We need to improve the profit before we can
22 make it bigger"?
23    A.    We need to make the book of business more
24 profitable before we can grow upon it, otherwise we're

Page 47

1 growing -- just growing in a nonprofitable book.
2    Q.    Right. Isn't it true that Mr. Baillie had
3 two objectives in mind; he wanted profit to grow and he
4 also want written premiums to grow?
5    A.    I would say Doug focused on growth a lot
6 more than written premium profit. My perception was
7 always more focused on the top number versus the bottom
8 number.
9    Q.    Okay. You do not think that Mr. Baillie had
10 a goal of increasing profit?
11    A.    I think Doug thought it would just happen if
12 you grew the book enough.
13    Q.    Okay. Well, regardless of the reason for
14 it, you would agree with me that he wanted profit to grow?
15    A.    Yes.
16    Q.    Okay. And he wanted premiums to grow?
17    A.    Yes.
18    Q.    And he would express frustration to you when
19 profit would grow, but premiums were not growing?
20    A.    No.
21    Q.    I thought you told me profit did grow?
22    A.    Doug focused on growth. Profit was
23 something -- my perception was Doug's feeling was profit
24 was something that just happened and that our job was to

Page 48

1 focus on just making it bigger, the premium volume.
2    Q.    Uh-huh. And he was not happy with the level
3 of your premium volume?
4    A.    He was frustrated.
5    Q.    Right. And he expressed that to you?
6    A.    Yes.
7    Q.    And that did not surprise you, right,
8 because one of your jobs was to make the premium grow in
9 the Kentucky territory?
10    A.    At the time -- at times where that was
11 expressed, it did surprise me in that there was a reality
12 of business we had to get off of to ultimately make it
13 more profitable that was going to be -- economic reality
14 was we would not grow given the amount of business we had
15 to get off of for underwriting reasons.
16    Q.    You had to get rid of some bad business?
17    A.    Correct.
18    Q.    Right. And Mr. Baillie wanted you to get
19 rid of that bad business?
20    A.    Mr. Baillie, in my mind, was more focused on
21 adding business then culling business.
22    Q.    Wasn't it true that Mr. Baillie wanted you
23 to do between 1998 and 2001 what you've been able to do in
24 2002, which is get new business?