**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

-----------------------------------

DOUGLAS W. BAILLIE,

    Plaintiff,

vs.    CASE NO. C-1-02-062

CHUBB & SON INSURANCE:

    Defendant

-----------------------------------

DEPOSITION OF: JEFFREY ALLEN BARTON
TAKEN: By the Plaintiff
DATE: February 28, 2003
TIME: Commencing at 9:00 a.m.
PLACE: Offices of:
Freking & Betz
215 East Ninth Street
Fifth Floor
Cincinnati, Ohio 45202

BEFORE: RAYMOND E. SIMONSON
Registered Merit Reporter
Notary Public - State of Ohio

**Page 2**

APPEARANCES:

On behalf of the Plaintiff:

    RANDOLPH H. FREKING, ESQ.
    of
    Freking & Betz
    215 East Ninth Street
    Fifth Floor
    Cincinnati, Ohio 45202

On behalf of the Defendant:

    DAVID T. CROALL, ESQ.,
    of
    Porter, Wright, Morris & Arthur
    250 East Fifth Street, Suite 2200
    Cincinnati, Ohio 45202-5117

S T I P U L A T I O N S

    It is stipulated by and between counsel for the respective parties that the deposition of JEFFREY ALLEN BARTON, a witness herein, may be taken at this time by Counsel for the Plaintiff as upon cross-examination pursuant to the Federal Rules of Civil Procedure; that the deposition may be taken in stenotypy by the notary public-court reporter and transcribed by him out of the presence of the witness; that the transcribed deposition is to be submitted to the witness for his examination and signature; and that signature may be affixed out of the presence of the notary public-court reporter.

**Page 3**

I N D E X

JEFFREY ALLEN BARTON    PAGE

CROSS-EXAMINATION BY MR. FREKING:    4

**Page 4**

1    JEFFREY ALLEN BARTON
2 of lawful age, a witness herein, being first duly sworn as
3 hereinafter certified, was examined and testified as
4 follows:
5    CROSS-EXAMINATION
6 BY MR. FREKING:
7    Q.  Hi, Jeff.
8    A.  Good morning.
9    Q.  We have met briefly. My name is Randy
10 Freking, and I represent Doug Baillie in connection with a
11 matter that is pending in the Federal District Court here
12 in Cincinnati, and we're here today to conduct your
13 deposition to find out what you may or may not know about
14 the facts which may or may not be relevant to Mr. Baillie's
15 case, and I apologize upfront for any inconvenience this
16 causes you, and, hopefully, this will not be too lengthy.
17 We'll certainly try to get you out of here by noon.
18    Could you start the deposition by just
19 stating your full name, your current address, and your
20 marital status, your family status, that kind of thing?
21    A.  Okay. Jeffrey Allen Barton, 8136 Hopper
22 Road, Cincinnati, Ohio, 45255. I'm married, have four
23 children.
24    Q.  That's in Anderson?

Exhibit L

Case 1:02-cv-00062-SAS    Document 37-13    Filed 09/15/2003    Page 2 of 5

Baillee v. Chubb                    Condenselt!                    Barton (2/28/03)

Page 17

1  he's going around talking to these people, a lot of these
2  people were the CSRs that he would talk to, and he would
3  talk to all the people in the branch.
4      Now, as far as profitability, I think what
5  you're getting there to is making decisions on pricing and
6  underwriting, terms and conditions, and whether you remain
7  on accounts.
8    Q.  How did you view Mr. Baillie in terms of his
9  ability to kind of lead?
10   A.  I think it worked for some people, but I
11 don't think it worked for everybody.
12   Q.  Did it work for you?
13   A.  It worked for me.
14   Q.  And what do you mean by that?  How did -- did
15 he ever, I guess, show his leadership abilities in
16 connection with you in particular?
17   A.  Well, as I mentioned earlier, I was new in
18 the job, so he taught me a lot of things about the job,
19 because he had a lot of experience in that area, and I'm
20 not sure that he could lend the same experiences to
21 everybody, just because of his experience --
22   Q.  All right.
23   A.  -- in the marketing.
24   Q.  Now, you said there were some people that

Page 18

1  maybe it didn't work for in terms of his leadership
2  abilities within the branch.  What do you mean by that?
3    A.  I just think there's some people that didn't
4  view him as a leader.  And why?  I can't answer that.
5    Q.  Okay.
6    A.  I mean, that's up to the individual person.
7    Q.  Do you have any -- do you have any particular
8  examples of people you can think of?  Or are you kind of
9  speculating?
10   A.  I'm just speaking in kind of generalities,
11 you know, various bits and pieces of information that have
12 come in that, you know, I can't necessarily account for
13 where they come from.
14   Q.  Okay.
15   A.  Just a general feeling.
16   Q.  Now, do you know a fellow by the name of Tim
17 Szerlong?
18   A.  Um-hmm (nodding head affirmatively).
19   Q.  How long have you known Mr. Szerlong, do you
20 think?
21   A.  I've known Tim probably since he took over
22 the zone manager's job.
23   Q.  And do you know approximately how long that's
24 been?

Page 19

1    A.  Three years, guessing.
2    Q.  Okay.  As zone manager, do you think he was
3  familiar with the fact that you were in charge of marketing
4  here in Cincinnati?
5    A.  Um-hmm (nodding head affirmatively).
6    Q.  Okay.  Do you -- how many times would you
7  estimate, you know, during the last three years or so he's
8  been zone manager, has he engaged in like business
9  discussions with you about how the branch is doing?
10   A.  Once or twice a year.
11   Q.  And what's the general -- were those
12 scheduled events?
13   A.  He would make -- he would make branch visits
14 and, you know, occasionally business would take him to
15 Chicago, where he's located, and I would have a discussion
16 with him.
17   Q.  Okay.
18   A.  I mean, much of the discussion would go
19 through the zone marketing manager, their evaluation of
20 marketing activity.
21   Q.  Right.  And who was that?  Is that
22 Mr. Hannon?
23   A.  It's been -- I had a number of different zone
24 marketing managers.  Originally, it was Larry Hannon, and

Page 20

1  then Kevin Smith took over for him.  And currently my
2  report is Zeline Camarek, Zeline; C-a-m-a-r-e-k,
3  Z-e-l-i-n-e.
4    Q.  Is that male or female?
5    A.  Female.
6    Q.  Kevin Smith, was he your zone report at any
7  time during Mr. Baillie's tenure?
8    A.  Yes.
9    Q.  Do you have any recollection as to when he
10 became your report?
11   A.  Probably about six months into my job Larry
12 moved on to a different job, and then Kevin was probably
13 there for about a year and a half, just rough guess.
14   Q.  Okay.  Did he leave -- did Mr. Smith move on
15 before Mr. Baillie moved on?
16   A.  Yes, I believe so.  The timing was fairly
17 close, so there could have been a little overlap.
18   Q.  Now, directing your attention to the time
19 that Mr. Baillie came -- from the time Mr. Baillie came
20 in as the branch or the regional manager and the day he
21 left -- okay, that time frame that you were in there -- can
22 you recall any conversations you ever had with
23 Mr. Szerlong, specifically regarding Mr. Baillie and his
24 performance?

**Page 25**

1 the host?
2  A. Yes.
3  Q. How have you -- what would be your opinion of
4 Mr. Baillie's ability to kind of host those kind of events?
5 Because I suppose they're marketing events, right?
6  A. Um-hmm (nodding head affirmatively).
7  Q. How do you view him as performing that
8 particular role?
9  A. I think he does fine.
10  Q. All right. Did you ever have any -- form any
11 kind of opinion that, you know, he drank too much alcohol
12 at the events or he drank alcohol at inappropriate times or
13 anything like that?
14  A. Doug did drink a lot. Whether I found it
15 inappropriate, I -- I don't know. I mean, only thing about
16 Doug, he could handle his alcohol, and, you know, I don't
17 recall anybody commenting to me about, you know, a negative
18 situation.
19  Q. All the agents kind of report to you in a
20 sense, correct?
21  A. Correct.
22  Q. All right. And are these golf outings
23 generally designed to entertain agents and such?
24  A. Agents and customers.

**Page 26**

1  Q. Agents and customers. So during Mr.
2 Baillie's tenure with the company, you never heard an agent
3 or a customer remark or complain to you that, "Hey, Baillie
4 is drinking too much or he's drinking at inappropriate
5 times," or anything like that, because this is -- these are
6 social outings, right?
7  A. Um-hmm (nodding head affirmatively). They
8 would comment and there would be some jokes about the
9 amount of alcohol he drinks.
10  Q. Okay. More along the lines of -- you know,
11 I've got a friend who is an executive with a company, and
12 this fellow just has the ability -- he can drink beer from
13 probably 7 a.m. until about 3 a.m., get about two and a
14 half hours of sleep, and be the first guy on the tee the
15 next morning and pop another beer at 7 a.m. and do the same
16 thing for three or four days and handles himself completely
17 fine.
18     In your experience -- and maybe Mr. Baillie
19 is not that well versed -- but would you say the comments
20 are kind of more in that regard?
21  A. I mean, they commented about how much he
22 drank, and most of the time it was jokingly. But, you
23 know, one of the things I find in my job is, because
24 they know I'm close to Doug, I don't always hear

**Page 27**

1 everything.
2  Q. Now, what did -- during your -- while Mr.
3 Baillie was at the Cincinnati location, did you ever hear
4 any particular criticism from other employees of Mr.
5 Baillie's performance as the branch manager?
6  A. There would be comments.
7  Q. Okay. What kind of comments can you recall
8 hearing?
9  A. I think one of the comments would be that
10 they would have conflicting goals.
11  Q. You mean sometimes there would be conflicting
12 goals between like marketing and underwriting?
13  A. Yes.
14  Q. Is that -- is that common for that kind of
15 criticism to be directed at a branch manager, in the sense
16 that underwriting kind of sides with him on issues?
17 Sometimes the goals in marketing and underwriting are at
18 odds with each other?
19  A. I think it can be typical, but there are
20 certain degrees.
21  Q. Okay.
22  A. I mean, the branch manager's job is to
23 balance both.
24  Q. Did you think this was unusually high? Or

**Page 28**

1 how would you describe the amount of criticism with respect
2 to --
3  A. I think there were probably a few more than I
4 would expect and the frustration level of some of the
5 employees, because it was repeated, was probably a little
6 bit on the high side.
7  Q. Okay. And to what do you attribute the
8 frustration?
9  A. I think it's a conflicting goal between, you
10 know, what Doug wanted them to do and what they -- they and
11 maybe the home office underwriting people felt they should
12 do on an individual account.
13  Q. So the frustration arose generally out of a
14 difference of opinion as to what to do with the business?
15 Mr. Baillie wanted -- made a particular decision and --
16  A. In this particular issue, yes.
17  Q. Underwriting?
18  A. Yes.
19  Q. Any other type of criticisms you heard with
20 regard to Mr. Baillie?
21  A. Some people have said that they weren't clear
22 on exactly what he wanted them -- wanted them to do, and
23 through dialogue they weren't able to come to that, "Okay,
24 now I know what you want," you know, "what my marching

Page 29

1 orders are."
2 Q. Do you know whether or not Mr. Baillie by the
3 end of his tenure was generally viewed as a successful
4 branch manager?
5 　　MR. CROALL: By whom? Generally viewed?
6 Within the Cincinnati branch?
7 Q. Within the office.
8 A. Some people, probably yes; some people,
9 probably no. I think there were different opinions.
10 Q. Tell me a little bit about Jerry Butler.
11 What do you know about Mr. Butler?
12 A. As far as?
13 Q. You know, what's his background? Is he
14 coming from a marketing background? Underwriting
15 background?
16 A. He's had -- I believe he started in the
17 business in a claims role with the company, and then he was
18 in a training and education role with the company. And
19 with Chubb he's been in human resources, marketing, and
20 branch management.
21 Q. And is he still in the branch manager role
22 here locally?
23 A. Yes.
24 Q. Now, how would you describe his level of

Page 30

1 experience with the level of experience that Mr. Baillie
2 had?
3 A. His number of years?
4 Q. Yeah, however you feel comfortable.
5 A. I mean, I don't know how to answer that one.
6 Q. All right.
7 A. I mean, I -- I don't know all of Doug's
8 experiences or all of Jerry's experiences.
9 Q. And how would you describe -- is there
10 a difference in management style between the two of
11 them?
12 A. I think there is.
13 Q. How would you describe the difference in
14 management style?
15 A. I think Jerry's goals and strategies for the
16 future are much more defined and communicated. I think
17 there's probably an increased level of accountability with
18 employees and with the overall numbers in the branch and
19 people's -- you know, meeting their goals.
20 Q. Now, were you -- you obviously were not
21 consulted about Mr. -- or were you consulted at all about
22 Mr. Baillie's termination?
23 A. No.
24 Q. Were you aware of any performance concerns

Page 31

1 directed at Mr. Baillie prior to his termination?
2 A. I mean, I was surprised.
3 Q. You were surprised by his termination?
4 A. Correct.
5 Q. Now, why were you surprised by his
6 termination?
7 A. I just -- I mean, I assume there was some
8 kind of process that they went through to come to this
9 result, and Doug was a pretty good poker player, and for
10 some reason he chose not to bring me into that.
11 Q. Meaning that, prior to learning of his
12 termination, he did not --
13 A. He did not confide in me.
14 Q. That there were any kind of performance
15 issues?
16 A. That there were any kind of performance
17 issues.
18 Q. And the two of you were relatively good
19 friends; is that correct?
20 A. Um-hmm (nodding head affirmatively).
21 Q. And would you have expected him to confide in
22 you if he thought he was in serious jeopardy of losing his
23 job?
24 A. I think that's a personal decision that he

Page 32

1 would make.
2 Q. All right. Do you know now whether or not he
3 was given any kind of warnings or anything like that?
4 A. I don't know.
5 Q. All right. Because you've stayed in contact
6 with him to some degree?
7 A. I probably haven't talked to him for a year.
8 Q. Okay. Now, did you have after -- how did you
9 learn he had been terminated?
10 A. I was out of the office. Our son Peter was
11 born on the Thursday before his termination, so I was back
12 and forth at the hospital, and he called me at home that
13 night.
14 Q. And what do you recall about that
15 conversation?
16 A. I was surprised.
17 Q. Did Mr. Baillie relay to you what had
18 happened?
19 A. He said he was terminated.
20 Q. Did he -- do you recall whether he was
21 professional during that conversation?
22 A. He was very -- yes, he was professional.
23 Q. All right. So, at least prior to receiving
24 this telephone call, you had no suspicion or inkling that

Page 37

1 A. I assume there was some kind of offer, but
2 that's -- that's just as much --
3 Q. You don't know the wheres and wherefors?
4 A. I'm not instructed on that.
5 Q. Nothing that happened about that?
6 A. No.
7 Q. Have you ever been in a position, Jeff, of
8 having to offer a departing employee severance?
9 A. No.
10 Q. Do you know anybody -- do you have any
11 familiarity with anybody who has ever received severance
12 from Chubb?
13 A. No specifics.
14 Q. All right. And other than counsel, nobody
15 has come to you since Mr. Baillie's departure and tried to
16 get information from you as to his performance, anything
17 like that?
18 A. No.
19 Q. All right. How did you view Mr. Baillie with
20 respect to kind of develop -- developing you in the
21 marketing area?
22 A. I think he helped me a lot. I mean, I was
23 new into the job and, you know, he had experience in that
24 area, so he was helpful to me.

Page 38

1 Q. Did he share his prior expertise or his level
2 of expertise with you and kind of give you suggestions
3 along those lines?
4 A. Yeah. He shared some of the things he's done
5 in the past and how they've worked for him, and helped me
6 work through a number of different issues in the marketing
7 department.
8 Q. Did he provide constructive feedback to you
9 from time to time?
10 A. Um-hmm (nodding head affirmatively).
11 Q. And did he give you encouragement along the
12 way to kind of help you handle your tasks?
13 A. Yes.
14 Q. Do you think -- did Mr. Baillie help you at
15 all in trying to develop your confidence in handling your
16 job?
17 A. Yes.
18 Q. Did Mr. Baillie assist you in kind of
19 delivering the necessary results in marketing?
20 A. Yes.
21 Q. How about -- any kind of particular issues
22 along the lines of diversity or diversity initiatives
23 within Chubb that you observed with Mr. Baillie?
24 A. In my part of diversity, in addition to

Page 39

1 supporting it as a goal of the corporation, would be trying
2 to find some minority vendors.
3 Q. Did Mr. Baillie encourage you to do that,
4 support you in that regard?
5 A. Yes.
6 Q. How about the -- would you describe Mr.
7 Baillie's management style as kind of a strong management
8 style?
9 A. (No response.)
10 Q. Or would you describe it in another manner?
11 A. I'm not sure strong is the right word. I'm
12 trying to look for the right word.
13 Q. Okay. Well, let me -- while you're thinking
14 about that, maybe we can jump to another subject and maybe
15 come back to that. Maybe this will help.
16 Did you ever think that Mr. Baillie took like
17 too many extreme positions on issues and somehow that
18 alienated managers or staff? Or did he seem open to
19 suggestions from you and others?
20 A. I think that some people thought that he was
21 too process-driven, numbers-driven; for example, you know,
22 "I want everybody to make 15 agency calls," or, "I want you
23 to do this." And, you know, one size doesn't always fit
24 all, depending on what your job responsibilities are.

Page 40

1 Q. Okay.
2 A. And I think that, you know, could be an issue
3 for some people. One issue that came up, in order to get
4 casual during the summer, he set very specific goals, and I
5 think that alienated some people.
6 Q. Okay. Is that all that unexpected in a large
7 organization, that a manager is going to alienate some
8 people and please others?
9 A. I don't know.
10 Q. How about his ability to kind of listen to
11 you and others that you observed during his tenure? Did he
12 seem to have good listening skills?
13 A. The attention span was a little bit short at
14 times, and I think sometimes he probably jumped to
15 conclusions on some issues.
16 Q. Okay. Now, other than what we've talked
17 about this morning, do you think -- well, do you think you
18 have any particular knowledge about why Mr. Baillie was let
19 go by Chubb?
20 A. Nobody's ever told me.
21 Q. All right. And you don't believe you
22 provided any input into that process at all?
23 A. No. Did Tim come and ask me specifically,
24 "Here's what I need to know about Doug?" No. But, you