UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

----------------------------------------

DOUGLAS W. BAILLIE,                     :

             Plaintiff,                :

      vs.                                :   CASE NO.
                                        :   C-1-02-062
CHUBB & SON INSURANCE,                  :

           Defendant.                   :

----------------------------------------

COPY

DEPOSITION OF:    MICHAEL ZDINAK

TAKEN:            By the Plaintiff

DATE:             August 20, 2003

TIME:             Commencing at 1:05 p.m.

PLACE:            Offices of:
                  Keating Muething & Klekamp PLL
                  1400 Provident Tower
                  One East Fourth Street
                  Cincinnati, Ohio    45202

BEFORE:           RAYMOND E. SIMONSON
                  Registered Merit Reporter
                  Notary Public - State of Ohio

Exhibit M

1    called it at that time Boiler Machinery Department

2    Supervisor in Pittsburgh.

3            I was then promoted to the Zone Boiler

4    Machinery Manager in the Boiler Machinery Department.  I

5    don't recall what year that was.

6        Q.    Okay.  Still Pittsburgh?

7        A.    Still Pittsburgh, right.  About nine to ten

8    years ago, we combined the risk consultants into Loss

9    Control from the Boiler Machinery Department.  At that time

10    I was then attached to Loss Control as the Northern Zone

11    Risk Consultant Manager, still in Pittsburgh.

12        Q.    All right.  And that took us up, then, to

13    '99?

14        A.    Right.

15        Q.    In '99, you came to Cincinnati as the

16    Regional Loss Control Manager?

17        A.    That's correct.

18        Q.    What was the reason for your change from the

19    Northern Zone Manager to the Regional Manager in November

20    of '99?

21        A.    The current Regional Manager had resigned,

22    and I applied for the position as a career change.

23        Q.    Would that have been considered a lateral

24    move, a demotion, or promotion?

1    Q.    Are you saying that at times you felt that he

2    interfered in your duties?

3    A.    He interfered and overrode.

4    Q.    Can you give an example?

5    A.    I would -- if I had problems with a staff

6    person as far as maybe reports and needing to get reports a

7    certain way and I was trying to have them understand the

8    current outstanding instructions on how we did reports,

9    Doug would say, "Well, I need you to bring me some of those

10   reports so I can look at them."

11        He would critique them and he would say, "No,

12   they need to do it this way or that way."

13        And I would say, "Doug, no, that's not the

14   current outstanding instructions."

15        And he would say, "Well, back when I was in

16   Loss Control, this is how we did it."

17        And I would try to explain to him that that's

18   not the way we do it now.  So at times that was

19   interfering.  And at other times staff members would come

20   to me and say, "Doug was over and talked to me and told me

21   he wanted me to do this, and I should do this this way or

22   that way," and they would come to me because they knew that

23   was not the current way we were doing things.

24   Q.    Did it appear to you that his intentions were

1  good?

2      A.    His -- his intentions were to get the job

3  done.

4      Q.    And he apparently had a loss control

5  background?

6      A.    Yes.

7      Q.    And it appeared to you that he felt that

8  could be useful in trying to help you accomplish your

9  goals?

10      A.    He felt that he -- I could use him as a

11  sounding board.

12      Q.    As a resource?

13      A.    As a resource.

14      Q.    When you would bring to his attention, then,

15  that processes or the way we do things in Loss Control had

16  changed, would he appear generally to be open to your

17  suggestions and your corrections?

18      A.    Not always.

19      Q.    Sometimes?

20      A.    Sometimes.

21      Q.    But there was other times where he apparently

22  used his own judgment and went with his judgment?

23      A.    What he did was, he went back to his

24  experience and said, "When I was in Loss Control, we did it

1    There were questions on product.  There were questions on

2    productivity.  There were questions on relationships with

3    the underwriting departments.

4        Q.    Those relationships being poor, apparently?

5        A.    Yes.

6        Q.    During the period that you served under Mr.

7    Baillie, would you say that productivity of your department

8    improved?

9        A.    Yes.

10        Q.    Would you say that the quality of reports

11    improved?

12        A.    Yes.

13        Q.    Would you say the involvement in branch

14    activities improved?

15        A.    Yes.

16        Q.    And would you say that the relationships with

17    underwriting activities or underwriting improved?

18        A.    Yes.

19        Q.    You described earlier that Mr. Baillie was

20    different than other managers.  And you talked about this

21    issue of him being accessible, sometimes that was good,

22    sometimes not so good, because you felt he maybe

23    interfered.  Did his interference as you've described it in

24    your opinion ever impact the -- ever impact productivity?

1       A.     Yeah.

2       Q.     In what way?

3       A.     He would change schedules or ask people to do

4 something different than what they were already scheduled

5 unbeknownst to me.  There were instances where he actually

6 told me he did the loss control while he was on the visit,

7 yet never wrote the report.  So that affected the

8 productivity, because I was trying to manage those -- those

9 survey requests that came in, and I was giving them to

10 other members of the staff.  So I had to say, "Okay, if you

11 made this appointment, you need to cancel it now."  So it

12 did affect me, yes.

13      Q      Somebody might have an appointment?

14      A.     Somebody may have already set something up.

15      Q.     And he said he took care of it, to save

16 someone making an extra trip to that location?

17      A.     I wouldn't say -- no.  I won't say not

18 because of making an extra trip; it was -- I'm not sure why

19 he did it.

20      Q.     But he may have performed the loss control

21 function instead of someone having to do it in place of his

22 completing that task?

23      A.     I would say he felt he fulfilled the loss

24 control function.

1          A.      Yeah.

2          Q.      You don't -- did that make you uncomfortable,

3     expressing those things, to the extent that you wish he

4     hadn't asked?

5          A.      Yes.

6          Q.      How would you otherwise have expressed to him

7     your concerns about the way he, as you say, at times may

8     have interfered?

9          A.      Before he ever asked me that, if something

10    like that would happen, I would go into his office and say,

11    "I understand this is going on."  And he'd say, "Yeah."

12              And I'd say, "Well, can we discuss it?"  And

13    I'd explain to him what I was trying to accomplish.  But I

14    would never say to him, "Well, I think you're interfering

15    with what I do," et cetera.

16         Q.      You wouldn't be that direct, but you would

17    express to him your concerns?

18         A.      Yeah.

19         Q.      And he would listen?

20         A.      He would listen, and then he would explain

21    why he did what he did, and, again, he would explain -- a

22    number of times he would say, "When I was in Loss Control,

23    this is how we did it."

24              There was quite a bit of interference as to

1    his days in Loss Control, which were probably 10, 15 years

2    prior.  We had a totally different way of doing things.  We

3    were electronic.  When Doug was in Loss Control, everything

4    was handwritten.  We changed coverages.  We changed

5    reports.  We changed the way we did things.

6              Doug readily voiced that he didn't agree with

7    that, and he didn't -- you know, in my opinion, he voiced

8    that he did not agree with the way Loss Control was being

9    run at that time; not just me, but in general, and what I

10   was doing, as a person that had a dual accountability,

11   trying to understand what Doug needed as the Regional

12   Branch Manager versus what I needed to do from the Loss

13   Control standpoint; a balance, if you will.

14        Q.   Did you ever go to anyone, such as Mr. Neary,

15   with what you complained about, what you described as

16   Doug's interference?

17        A.   Yes.

18        Q.   Who did you explain that to?

19        A.   I mentioned it to Kevin Neary, and I had

20   discussions with Diane Haggard, the HR manager, and also

21   with Steve Hernandez, who replaced Kevin Neary.

22        Q.   Did you ever talk to Tim Szerlong?

23        A.   No, I didn't.

24        Q.   When did you have discussions with Kevin

1    best of your recollection, there was no other times you

2    talked with Mr. Neary about your concerns regarding Mr.

3    Baillie?

4          A.    To the best of my knowledge.

5          Q.    And during this period of time, the

6    performance indicators for your department improved?

7          A.    Yes.

8          Q.    You also indicated that you mentioned this to

9    Diane Haggard.  For the record, who is Diane Haggard?

10         A.    Diane Haggard is the Human Resources Manager

11   in the Cincinnati branch.

12         Q.    Was she in that capacity or position when you

13   arrived in November of '99?

14         A.    Yes.

15         Q.    Do you know when you first mentioned to Diane

16   Haggard your concerns regarding Doug Baillie?

17         A.    I would say in the same time frame, early in

18   that first six months.

19         Q.    Other than that first six months, is that the

20   last time, then, that you would have mentioned anything to

21   Ms. Haggard regarding your concerns of Doug Baillie?

22         A.    No.

23         Q.    There were other times?

24         A.    There were other times.

1    Q.    Let's talk about that first six months.  What

2  did you and Ms. Haggard discuss about Mr. Baillie during

3  that first six months?

4    A.    Again, my frustrations that Doug was

5  interfering with my ability to manage the group and

6  countermanding things that I had done with individuals and

7  was directing things.  I would have some of the staff come

8  to me and say, "Well, Doug called me in his office and told

9  me he wanted to do this."

10    My experience in the past has always been, if

11  someone within a manager's staff -- if someone within my

12  staff, the branch manager or superior of mine, wanted them

13  to do something, that they would come through me as the

14  manager and say, "Here's what I'd like to do.  Who do you

15  suggest?  Or, "Can we use so and so to do this?"  Doug

16  didn't do that.  He went directly to them and bypassed me,

17  and I voiced that to Diane.

18    Q.    What was her reaction to what you told her?

19    A.    She would, again, kind of counsel me as to,

20  you know, making sure that I -- that I, you know, took care

21  of that with my staff myself.  And I know, on a number of

22  occasions, she talked to Doug about voicing my concerns to

23  her.

24    Q.    Did things seem to improve after you spoke

1    with Ms. Haggard?

2         A.    I would say they stayed the same.  I wouldn't

3    say they improved.

4         Q.    No worse?

5         A.    No.

6         Q.    How frequently would you -- how frequently

7    would you assess that Mr. Baillie somehow interfered in

8    your duties as Loss Control manager?  Once a month?  Twice

9    a month?

10        A.    I think it varied.  There would be times that

11   it would be more often than not.  I couldn't say, "Oh, it's

12   once a month or twice a month."  There were times when, for

13   weeks at a time, it was very frustrating, and then I can

14   tell you there were times that, for a month, there was

15   nothing.

16        Q.    Okay.

17        A.    So there's not a frequency that you can say

18   it happened every other week or something.

19        Q.    There's no average that you could state?

20        A.    Oh, sure.  I'll say -- at least every other

21   week, I would say.  It would depend on the activity.

22        Q.    Was that during -- was that throughout the

23   entire period of time that Doug served as your regional

24   branch manager?

COPY

1        A.        Yes, I would say so.

2        Q.        You indicated you talked to Ms. Haggard

3   during this first six months.  How many conversations did

4   you have with her during the first six months regarding

5   your concerns over Doug Baillie?

6        A.        I don't recall the specific number.

7        Q.        After the six months, did you have further

8   conversations with Ms. Haggard regarding concerns you had

9   about Doug Baillie?

10       A.        Yes.

11       Q.        Tell me when those occurred.

12       A.        Again, periodically, when a frustration

13   reached, or Doug had done something that was just, you

14   know, in my mind totally off base and I didn't know who to

15   go to, I would always look at Human Resources as a

16   resource, again, to go to explain these things and get

17   counsel, et cetera.

18       Q.        Give me some specific complaints that you

19   made to Ms. Haggard about Doug Baillie.

20       A.        I went to Diane about an incident where he,

21   Doug, had gone to an insured meeting with an underwriter

22   and made commitments for me and my staff that we couldn't

23   keep because they were -- they weren't what we were

24   currently doing in Loss Control.  And I found out after the

1    Q.    Do you recall what the underwriter told you?

2    A.    Yeah.  They came over and told me that Doug

3   had, or that we -- they went to this meeting with this

4   insured, and that commitments were made for -- again, I

5   don't know the specific services, that we had to perform

6   these specific services, and they wanted to know who was

7   going to do it and when we were going to do it.

8         And I looked at them and said, "I have no

9   idea what you're talking about.  What happened?  What are

10  you talking about?  And they said, "Well, we were at the

11  meeting and Doug told so and so," again, whoever it was,

12  "that you guys would do this, this, and this."

13        And I said, "I'm going to have to go ask

14  Doug," I said, "because I don't know anything about it.

15  Oh, by the way, no, we didn't do that."

16    Q.    Did you go talk to Doug?

17    A.    I did.

18    Q.    What was his -- what was the comments he

19  made?  What was your discussions?

20    A.    I told him that the underwriter had come to

21  me and mentioned that at this meeting this was discussed

22  and these were things that were committed to, and he said

23  yes.  And I said, "Doug, we don't do that," and I explained

24  to him why and what to do, again what the rules and

1    outstanding procedures were in Loss Control.

2            And he said, "Well, back when I was in Loss

3    Control, we did those kind of things."  He would always go

4    back to, "When I was in Loss Control," and, "That's what's

5    wrong with Loss Control today."

6            And I'd say, "Doug, I hear you, but -- I did

7    say to him a couple of times, "Doug, Loss Control is

8    different today than when you were in Loss Control and we

9    can't do everything that way.  It's changed and I have

10   obligations and commitments and requirements to Kevin Neary

11   or Steve Hernandez or other people," or, "I don't have the

12   resources or the people to be able to do those things, and

13   we don't do those things anymore."

14            I never felt that I got a -- he never -- I

15   don't recall him ever saying to me, "Okay, Mike, I

16   understand."  It was always, "Well, that's what's wrong

17   with Loss Control."

18       Q.    Did he require that you make these

19   commitments or fulfill the commitments anyway?

20       A.    He wanted us to do the best we can --

21       Q.    Okay.

22       A.    -- to try and do some of it.  I think --

23       Q.    Were you able to accomplish some of the -- or

24   meet some of the customer's expectations?

**Annette McKeehan Schoch, RMR**
P.O. Box 58641 • Cincinnati, Ohio 45258-8641
(513) 941-9464

1    you know, I don't recall anything specific.

2          Q.      You don't recall her ever coming back to you

3    and giving you any feedback about what she may have done?

4          A.      I don't recall, no.

5          Q.      Okay.  Other than this one complaint, were

6    there any other complaints that you made to Ms. Haggard

7    about Mr. Baillie?

8          A.      Again, I think over the two-year period,

9    whatever it was, I would say probably on a quarterly basis

10   I would go in, yeah, and voice my frustrations on Doug's

11   what I perceived as interference and my being able to do my

12   day-to-day work.

13         Q.      Do you remember any specific complaints or

14   incidents, other than just this kind of general frustration

15   you've expressed?

16         A.      Yeah.  I mean, frustration with him coming

17   over and coming to one of my staff members and saying,

18   "Okay, I want you to do this and you do this survey at such

19   and such time," or asking a staff person to do a project or

20   get him some information, unbeknownst to me.  Yeah, those

21   are some of the specific things I went to her about."

22         Q.      So he utilized your staff on occasions when

23   you felt he should have gone through you?

24         A.      Yes.

1    into the record --

2            A.      Not that I can recall.

3            Q.      Let me finish the question.

4            A.      I'm sorry.  I thought you were done.

5            Q.      I think you knew what I was going to ask, but

6    let me just put it in the record.  Are there any other

7    incidents that you can recall, other than what you've

8    already stated for the record, in which you may have

9    complained to Diane Haggard regarding concerns you had

10   about Doug Baillie?

11           A.      Not that I can recall.

12           Q.      You also indicated Steve Hernandez, that you

13   may have mentioned concerns you had about Doug Baillie to

14   Mr. Hernandez.  Is that correct?

15           A.      That's correct.

16           Q.      And Mr. Hernandez was the Northern Zone Loss

17   Control Manager after Kevin Neary?

18           A.      That's correct.

19           Q.      What concerns or incidents did you express to

20   Mr. Hernandez regarding Doug Baillie?

21           A.      The same concerns that I did to Kevin, that

22   he was interfering, and at times I felt that he was

23   controlling the department and not me.

24           Q.      What was Mr. Hernandez' reaction to your

1    comments?

2         A.    He listened.  He said that -- again, he gave

3    me some ideas of doing things and making sure that -- how

4    to keep Doug out of there and said that he would discuss

5    with Doug my concerns, which he did.

6         Q.    Did you notice any change after what you

7    understood -- after you understood that Mr. Hernandez had

8    talked to Mr. Baillie?

9         A.    Not really.

10        Q.    Didn't get worse?

11        A.    Didn't get worse.  Didn't get better.  My

12   opinion is that Doug listened, and then Doug continued to

13   do what Doug did.

14        Q.    Doug would listen, but apparently continued

15   to use his own judgment?

16        A.    Yes.

17        Q.    Are there any incidents or complaints

18   specifically that you haven't already expressed that you

19   can recall that you made to Mr. Hernandez, other than this

20   kind of general complaint about interference?

21        A.    Not that I can recall.

22        Q.    I think I asked you this earlier.  You never

23   had any discussions or expressed any concerns about Doug

24   Baillie to Mr. Szerlong, did you?

1          MR. NAPIER:  All right.  Why don't we go back

2     on the record.

3          Q.    We talked earlier about whether or not you

4     made any complaints or expressed any concerns about Doug

5     Baillie, and you mentioned Mr. Neary, Ms. Haggard,

6     Mr. Hernandez, never to Mr. Szerlong.  Did you also

7     complain or express concerns to Mr. Ekdahl?

8          A.    Yeah.  I recall talking to Jim Ekdahl.

9          Q.    Who is Jim Ekdahl?

10         A.    Jim Ekdahl is the Zone Human Resources

11    Manager.

12         Q.    When did you talk to Mr. Ekdahl regarding

13    Doug Baillie?

14         A.    When he made a branch visit.  Periodically,

15    he would make branch visits to the branches in the zone.

16    And I don't recall the specific month or time, but I know

17    it was during one of his branch visits to the zone.  He

18    would come to each manager and discuss with each manager

19    what was going on, did they have any, you know, problems,

20    complaints, anything they needed to talk to him about,

21    whatever.  And I believe what I expressed to him was that I

22    had been talking to Diane about my concerns with Doug.

23         Q.    Did you elaborate on what those concerns

24    were?