|  |  |
|---|---|
| 1 | IN THE CIRCUIT COURT, FOURTH |
|  | JUDICIAL CIRCUIT, IN AND |
| 2 | FOR DUVAL COUNTY, FLORIDA |

3        CASE NO. C-1-02-062

4

5

6 DOUGLAS BAILLIE,

           Plaintiff,       **CERTIFIED COPY**

7

8 VS.

9 CHUBB & SON INSURANCE,
           Defendant.
-----------------------------------------------

10 STATE OF FLORIDA   )

11 COUNTY OF DUVAL    )

12      The deposition of **DOUGLAS BAILLIE** was taken pursuant to

13 Notice of Taking Deposition, on behalf of the Defendant

14 herein, on August 27, 2003, at the office of Executive

15 Reporters, 1113 Blackstone Building, 233 East Bay Street,

16 Jacksonville, Florida; commencing at approximately 10:00

17 a.m., before Candace Fleming, Certified Court Reporter and

18 Notary Public in and for the State of Florida.

19

20

21

22

23         **EXECUTIVE REPORTERS, INC.**

24         **1113 BLACKSTONE BUILDING**
         **233 EAST BAY STREET**

25         **JACKSONVILLE, FLORIDA  32202**
         **(904) 355-7801**

Exhibit O

1   I haven't done it word for word, but they seem to be.

2   A.   (Witness complies.)  Uh-huh.

3   Q.   Let's try in the broad way.  What is your

4   complaint about the way your settlement discussions were

5   handled?

6      MR. FREKING:  Objection to the complaints.

7   It speaks for itself.

8      Go ahead and answer.

9      MR. MONTGOMERY:  Okay.

10      THE WITNESS:  Just what it says.  Basically,

11   I was told I -- that Tim had asked for the most

12   aggressive package, and that I deserved it.  When I

13   talked to human resources, they didn't want to

14   discuss it with me.

15      They said, well, your lawyer said, you know,

16   we're certainly going to negotiate, and your lawyer

17   will have other things, probably, he wants to -- so

18   when my lawyer contacted them, there were long, long

19   periods of time before they would respond.  So,

20   those are --

21   Q.   Okay.  What settlement discussions did you

22   personally have with anybody from Chubb?

23   A.   The only person was Pat Hurley.

24   Q.   This was a telephone call?

25   A.   Correct.

1      Q.    Okay.  Does most aggressive -- quote, 'most

2  aggressive', unquote -- that have some specific meaning

3  to you?

4      A.    To me, I -- I thought it was going to mean,

5  you know, doing something with the pension.

6      Q.    Okay.  That's just your -- your supposition

7  basically?

8      A.    Yeah.  I mean, they've done it to other

9  people with the pensions when they had the reduction in

10  staff back in -- several years earlier, maybe three

11  years earlier.

12      Q.    And who, specifically, are you referring to?

13      A.    There was a whole group of -- of people.

14      Q.    Can you name any?

15      A.    I could name a lot if I thought about it.

16      Q.    Well, I'm not asking you to just name people

17  who were let go.  I'm asking you to name people that

18  you're sure got this --

19      A.    Oh, all of them.

20      Q.    Okay.

21      A.    All of them.

22      Q.    Whoever it was, they all got it.

23      A.    Yeah.  That was part of it.  I forget what HR

24  term it was.

25      Q.    Okay.  Now, at the time when you had these

1      Q.    Actually, if you look down at the bottom of

2  36, you'll see a revised --

3      A.    Okay.

4      Q.    -- 2/99.

5      A.    Uh-huh.

6      Q.    And your understanding is that that means it

7  was revised in February of '99?

8      A.    Correct.

9      Q.    And in 37, it says revised 6-96?

10     A.    Correct.

11     Q.    Okay.  But in any event, looking at all of

12  those different separation pay policies, you would agree

13  with me that in all of them, Chubb did specifically

14  reserve the right to handle separation pay as it saw

15  fit, correct?  Right at the beginning of each policy?

16           MR. FREKING:  We'll stipulate to that.

17           MR. MONTGOMERY:  Okay.

18  BY MR. MONTGOMERY:

19     Q.    And you would also agree that --

20     A.    Yeah, yeah.

21     Q.    -- in each of the policies that are

22  referenced in those exhibits that the policy provided

23  that an employee would be eligible for the special

24  separation pay only if they signed a separation

25  agreement acceptable to the company?  All policies

1           MR. FREKING:  Objection.  If doesn't say

2      that.  It says what it say.

3  BY MR. MONTGOMERY:

4      Q.    Do you agree with that, sir?

5      A.    No --

6           MR. FREKING:  Dave, it says what it says.

7           MR. MONTGOMERY:  You made your objection.

8           THE WITNESS:  It says, you may be eligible

9      for the following special separation pay only if you

10     sign a separation agreement acceptable to the

11     company.

12  BY MR. MONTGOMERY:

13     Q.    And each of the policies that we've looked at

14  this morning all say that, correct?

15          Take time to look through it if you need to.

16  It says that in Exhibit 35, 36, and 37.

17     A.    (Reviewing documents.)  Correct.

18          MR. MONTGOMERY:  Just let the record reflect

19     Mr. Freking is writing on the document and coaching

20     the witness.

21          Go ahead and answer when you're ready.

22          MR. FREKING:  Where is it?  36?

23          THE WITNESS:  (Reviewing documents.)  You're

24     asking -- 36.  I don't see it on 36.  Can you help

25     me?

1    MR. FREKING:  On Page 1-19, middle of the

2    first column --

3        THE WITNESS:  All right.

4        MR. FREKING:  -- I think.

5        THE WITNESS:  37.  (Reviewing documents.)

6    Oh, my God.  I'm sorry.  I apologize; I can't find

7    it on the 37 one.

8        MR. MONTGOMERY:  Let me see.  (Reviewing

9    documents.)

10       THE WITNESS:  Okay, yes.  It says the same

11   thing on all of them.

12   BY MR. MONTGOMERY:

13       Q.    It's showing you what was marked as Exhibit

14   27 in your previous deposition.

15       A.    Okay.

16       Q.    Let me go ahead and keep those all

17   together --

18       A.    Yeah.

19       Q.    -- and give those to the court reporter.

20       A.    Yeah.  (Witness complies.)

21       Q.    I'd say a letter dated September 5th, 2001,

22   that was sent to you by overnight mail to Pat Hurley --

23   and that was the first draft settlement agreement that

24   you received, correct?

25       A.    Looks like it.

1    Q.    Okay.  And just briefly, if you would, look

2    at the agreement in Paragraph 3.  That's where it

3    describes the various things you're being offered,

4    correct?

5    A.    (Reviewing documents.)

6         MR. FREKING:  Again, it says what it says,

7    but --

8         MR. MONTGOMERY:  We can preserve that

9    throughout the deposition if it will help you.

10        MR. FREKING:  Well, no.  You know, the

11   original agreement was --

12        MR. MONTGOMERY:  No, no --

13        MR. FREKING:  Hold on a minute.  You asked

14   for additional time to conduct Mr. Baillie's

15   condition, and the express agreement was that you

16   would not cover what was already covered in the

17   first deposition.  And you've already shown him

18   deposition exhibits from the first deposition --

19        MR. MONTGOMERY:  I'm just setting the stage.

20        MR. FREKING -- which would seem that you're

21   covering the same ground that you covered -- that

22   Mr. Crole covered in the same deposition, you know.

23        THE WITNESS:  What's the question, Dave?

24   BY MR. MONTGOMERY:

25   Q.    The question is, would you agree with me that

1     A.    (Reviewing documents.)  Okay.

2     Q.    You did understand that on or about October

3  3rd, 2001, that the company did agree to amend your

4  settlement agreement to include a prorated share of the

5  restricted stock; correct?

6     A.    Correct.

7     Q.    And Doug, do you -- as you sit here today, do

8  you have an idea of how many shares that would have been

9  and what that was worth?  Just a ballpark even.

10    A.    The number that comes to mind -- I have to,

11  you know -- I'd have to do the math, but $90,000.

12    Q.    Okay.  So, your ballpark estimation is that

13  this change would have increased your package in the

14  neighborhood of $90,000 in value?

15    A.    Correct.

16    Q.    Okay.  And that change was made to the

17  agreement after you hired Randy, correct?  Obviously,

18  from the letter.

19    A.    Well, it was discussed before --

20    Q.    Discussed before?  In writing, you mean?  The

21  change was made to the agreement after you hired Randy,

22  correct?

23    A.    I can't recall if it was made after or

24  before --

25    Q.    This --

1    (Indicating.)

2         A.    True.

3         Q.    Okay.  Now, I'm going to show you Exhibit 40.

4         A.    (Reviewing documents.)

5         Q.    Exhibit 40 is a letter to Suzanne Johnson,

6    dated October 9th, 2001.  And I think, even if you look

7    at last page, you were copied on this letter, correct?

8         A.    Correct.  Yes.

9         Q.    And so, you received this -- a copy of this

10   letter on or about October 9th, 2001?

11        A.    That would be according to this, yes.

12   (Indicating.)

13        Q.    Okay.  And if you turn to the last page of

14   that letter, there's some lettered paragraphs B, C, and

15   D. Do you see those?

16        A.    Yes, sir.

17        Q.    And right after that, it says, as a result of

18   the above analysis?

19        A.    Yes.

20        Q.    Okay.  And then it says, the termination will

21   have a substantial impact on his life.  We propose that

22   the separation offer be improved as follows.  And then,

23   your attorney laid out three specific proposals.

24              One, that you would be treated as if you had

25   worked another five years for pension purposes; that you

1  would be covered under Chubb's health insurance until

2  you were eligible are for similar health insurance

3  coverage --

4      A.    Correct.

5      Q.    -- and that you would be vested in all

6  restricted stock that would vest within five years.

7            And Mr. Freking was authorized to make that

8  proposal on your behalf, correct?

9      A.    Correct.

10     Q.    And you were aware that was being proposed,

11 correct?

12     A.    Correct.

13     Q.    And then also in there, he said after that,

14 please consider these facts and circumstances in your

15 revaluation of Chubb's current proposal to Mr. Baillie.

16            And then it says, the compensation offered to

17 him is inadequate, and the further requested

18 compensation is warranted.

19            And he obviously was authorized to make that

20 statement as well, correct?

21     A.    Correct.

22     Q.    Okay.  You understood that Exhibit 40 was the

23 response by you, through your attorney, to the proposal

24 that's outlined in Exhibit 39, correct?

25     A.    Yes.

1    Q.    I'll show you we've marked Exhibit 41.

2    A.    (Reviewing documents.)

3    Q.    Take a moment to look at that.  It does have

4   some fax transmittal information at the end, but I'm

5   mainly concerned about the first page.  It's a letter

6   dated October 11th, 2001, to your attorney from Suzanne

7   Johnson.

8    A.    This from Suzanne Johnson?

9    Q.    Right.  And did you see that on or about --

10   when I say on or about, I mean within a day or two after

11   October 11th, 2001.

12    A.    I can't recall.

13    Q.    You were aware, weren't you, that Chubb had

14   implemented a deadline of October 18th, 2001, for you to

15   sign your release and settlement agreement, after which

16   the offer would be withdrawn?

17    A.    Yes.

18    Q.    And you were aware of that back in this

19   timeframe of October 11th, 2001; correct?

20    A.    I believe so.

21    Q.    Okay.  Did --

22    A.    Can I go to the restroom?

23    Q.    Absolutely.

24    A.    Thanks.

25         (Whereupon, a brief recess was had off the

1    record.)

2         MR. MONTGOMERY:  Again, we're looking at

3    Exhibit 41, which is one that has the deadline in

4    it.

5  BY MR. MONTGOMERY:

6         Q.    Now, nobody from Chubb ever communicated any

7  extension of that deadline to you, did they?

8         A.    To October 18th?

9         Q.    Yeah.  You never spoke to anyone at Chubb who

10  gave you a different deadline other than on the October

11  18th deadline, did you?

12         A.    At Chubb?  No.

13         Q.    Did you speak to anyone that gave you a

14  different deadline?

15         A.    Well --

16         Q.    Yes or no?

17         A.    There was -- Chubb put me up with

18  out-placement service and as part of, you know -- they

19  obviously give you counseling, but my counselor

20  indicated that those dates aren't binding and that

21  typically they'll go beyond those dates.

22         Q.    Who's your counselor?

23         A.    Lee Hecht Harrison.

24         Q.    So, he --

25         A.    And it was Joe -- that's the company; Joe

1      Q.      Not Mr. --

2      A.      Harrison.

3      Q.      -- Harrison, correct?

4      A.      Uh-huh.

5      Q.      That's correct?

6      A.      Yes, sir.  In retrospect, I'd probably be

7   looking for legal advice from anybody.

8      Q.      Now, were you unhappy with the legal advice

9   that you were getting?  Is that why you say that?

10      A.      No, just more is better.

11      Q.      Okay.

12      A.      Can't have too much advice.

13      Q.      Now, I'd like to now show you Exhibit 42.

14   Exhibit 42 has the fax sheet on the cover to Suzanne

15   Johnson from your attorney.  The letter is dated October

16   21st, 2001.

17      A.      (Reviewing documents.)

18      Q.      Take a moment to look through that letter and

19   please confirm that is a letter you authorized your

20   attorney to send on or about October 31st, 2001 to

21   Chubb; correct?

22      A.      (Witness complies.)  Yes.

23      Q.      As you look at the second paragraph in that

24   letter, you stated, through your attorney, Mr. Baillie,

25   acknowledges that the separation package that has been

1  offered to him is consistent with company policy.

2  Correct?

3        A.    Yes.

4        Q.    And you agree with that, right?

5        A.    Yes.

6        Q.    Okay.  And then, it is says, if Mr. Baillie

7  believed that the package offered was fair in light of

8  the claims that he is required to release in order to

9  receive the package, Mr. Baillie would sign the

10  agreement and move on.  Correct?

11       A.    Uh-huh.

12       Q.    Is that correct?

13       A.    Correct.

14       Q.    That's the message that you and your attorney

15  communicate to Chubb on October 31st, 2001?

16       A.    Apparently.

17       Q.    Okay.  And you understood that this letter,

18  the one to Chubb on October 31st, 2001, was after the

19  deadline referenced in Mr. Johnson's letter of October

20  11th, 2001, which is Exhibit 41?

21       A.    What was the question, Dave?

22       Q.    You made this statement -- you and your

23  attorney made this statement in Exhibit 42 after the

24  October 18th deadline referenced in 41?

25       A.    (Reviewing documents.)  Yes.

1    can read the paragraph in between if you want, but I

2    want to direct you to the one that starts out, Mr.

3    Baillie has authorized us.  Do you see that?

4        A.    Yes, I see it.

5        Q.    You're basically saying that the amount you

6    offered us is not fair.  If you don't offer us more,

7    we're going to sue.  Correct?

8              Isn't that what you were conveying to Chubb?

9        A.    Potential to sue, yes.

10       Q.    Okay.  And even included a -- a draft

11   complaint attached to that letter?

12       A.    (Reviewing documents.)  Yes.

13       Q.    Okay.  Doug, are you aware of any writing or

14   documents from Chubb extending the October 18th deadline

15   referenced in Exhibit 41?

16       A.    Any writings?  I can't recall any at this

17   time, no.

18       Q.    Okay.

19       A.    I'd have to go back.

20       Q.    And you covered a conversation with somebody

21   from Lee Hecht Harrison, but nobody from Chubb ever

22   directly told you that the October 18th would be

23   extended, did they?

24       A.    October 18th for signing?  Correct.

25       Q.    Nobody from Chubb --

```
 1              THE WITNESS:  -- no.
 2              MR. MONTGOMERY:  Okay.
 3   BY MR. MONTGOMERY:
 4       Q.    Again, referring to this --
 5       A.    Right.
 6       Q.    -- Exhibit 44.
 7       A.    Uh-huh.
 8       Q.    Now, these conversations that your attorney
 9   is referring to in the second paragraph --
10       A.    Correct.
11       Q.    -- your understanding is that these are
12   conversations between your attorney and Chubb's
13   attorney, correct?
14       A.    Yes, David Croall.
15       Q.    And you did not witness any of these
16   conversations?
17       A.    Correct.  Only received this letter.
18       Q.    Okay.  But let me ask you this:  So, this
19   letter was December 21st, 2001.  To your knowledge,
20   prior to that date, December 21, 2001, was anybody at
21   Chubb ever made aware that your intention was to accept
22   Chubb's settlement proposal?
23       A.    Prior to this date?
24       Q.    Right.
25       A.    I think it was prior to that date.
```

1    Tuesday was or -- yesterday, obviously, is December

2    20th --

3        A.    Yes.

4        Q.    But whatever that week was in December,

5    that's when you first made your decision to accept

6    Chubb's package or settlement proposal --

7        A.    I --

8        Q.    -- is that correct?

9        A.    -- I was pre-inclined to accept it before

10   that just in terms --

11       Q.    I'm not asking --

12       A.    Well, it was --

13       Q.    -- what exact time --

14           MR. FREKING:  Well, just let him answer his

15       question.  Answer -- state your answer.  Don't be

16       interrupted.

17           THE WITNESS:  I was committed emotionally and

18       mentally to accept it on October 18th, but we were

19       waiting for the negotiations to finish.

20   BY MR. MONTGOMERY:

21       Q.    What -- when you -- let me address it a

22   different way.

23       A.    Okay.

24       Q.    I want to find out when was it your intention

25   that Chubb first be notified that you were accepting

1      A.    No, my -- say that again.  Can you repeat

2  that sentence?

3      Q.    Well, it worked like this.  Your testimony is

4  that you signed that document on December 18th, 2001?

5          MR. FREKING:  No, no.  October 18th.

6          THE WITNESS:  October 18th.

7          MR. MONTGOMERY:  October 18th, I'm sorry.

8  Thank you.

9  BY MR. MONTGOMERY:

10     Q.    Let's start over.  Your testimony is that you

11  signed the document on October 18th --

12     A.    Correct.

13     Q.    -- 2001?

14     A.    Correct.

15     Q.    But that you made a conscious decision that

16  Chubb would not be made aware of that signature while

17  you continued to negotiate further; isn't that correct?

18     A.    I believe so, yes.

19     Q.    Okay.  And then, the first time that you --

20  that you're aware of that any indication was made to

21  Chubb that you were accepting the package was in

22  December 2001; correct?

23     A.    Correct.

24     Q.    And that it -- your intention to accept the

25  package was verbal, as referred to in Exhibit 44?

1          A.     Verbal and written in the signed contract.

2          Q.     Well, just that it was -- the signed contract

3    was then delivered to Chubb?

4          A.     Correct.  It was in verbal and in writing.

5          Q.     Okay.  So, as you sit here today, it's your

6    belief that you had a contract with Chubb?

7          A.     Correct.

8          Q.     And that Chubb has breached the agreement by

9    not --

10         A.     Accepting.

11         Q.     And why haven't you sued for breach of

12   contract?  And again, I'm not asking Randy.  He can

13   object to a leading conclusion, but --

14         A.     I believe we have.

15         Q.     Let's take a look at the complaint.  This is

16   -- by the way, this has been --

17              MR. FREKING:  Yeah.  There's no breach of

18         contract claim; it's a retaliation claim.  A breach

19         of contract claim is essentially -- it's a

20         retaliation.  It's an element of a retaliation

21         claim, but that's fine.  We've been through this

22         before, Dave.  We --

23              MR. MONTGOMERY:  No, no.  We've been through

24         this.

25              MR. FREKING:  It says what it says.

1          MR. MONTGOMERY:  We've been though it.  And

2     you've made it clear to the judge that it's not a

3     breach of contract.  I made that clear to the judge.

4     He said there's not going to be any opportunity to

5     amend and --

6          MR. FREKING:  Right.

7          MR. MONTGOMERY:  Okay.

8  BY MR. MONTGOMERY:

9     Q.    Doug, you never -- you never personally

10 witnessed any conversations between Randy and David

11 Croall, did you?

12    A.    Prior to my deposition, no.

13    Q.    Well, obviously you saw them discussing it at

14 the deposition, but --

15    A.    Right.

16    Q.    -- you've never -- like, for example, you've

17 never been in Randy's office listening to one side of

18 the conversation on the telephone with David, have you?

19    A.    That is correct.  No --

20    Q.    You never have.

21    A.    -- I have not.

22    Q.    Okay.  Was it your understanding that you

23 could sign the agreement on October 18th, 2001, not make

24 Chubb aware that you had signed it, and then, that, you

25 know -- that you could wait for an indefinite amount of

1       Q.    You don't know.

2       A.    I just can't recall that.  It was definitely

3  that day, because there was a sense of urgency --

4       Q.    Okay.

5       A.    -- obviously with that 18th deadline.

6       Q.    Okay.  And you're aware that some time after

7  December 2001, the company did put that settlement

8  proposal back on the table?

9            MR. FREKING:  Now, just for -- he can answer

10       the question, but just for the record, I'm going to

11       object to the admissibility of any of these

12       settlement discussions following 2001.

13            MR. MONTGOMERY:  Your point being some

14       settlement discussions will be in and not others.

15            MR. FREKING:  Right.  Some form the basis for

16       a legal claim, and some don't.  Some are just --

17            MR. MONTGOMERY:  Okay.

18            MR. FREKING:  Once a lawsuit is filed,

19       they're out.

20  BY MR. MONTGOMERY:

21       Q.    Are you aware of that, sir?

22       A.    Aware of that?  As much as I can -- just

23  repeat -- repeat the question please.

24       Q.    You're aware, aren't you, that some time

25  after December 2001, the settlement proposal -- Chubb's

1    settlement proposal that included the year's pay, the --

2    some of the group health coverage, out-placement

3    assistance, which you already had by the way, and the

4    restricted stock and the extension of the option

5    exercise deadline?  That that was put back on the table

6    some time after December 2001?

7         A.    Yes.  When the stock went considerably down,

8    yes, they did throw it back the table.  When the value

9    of the package was considerably less.

10        Q.    Right.

11        A.    Right.

12        Q.    Okay.  Do you have any recollection of when

13    that was?

14        A.    Sometime after my deposition, I believe,

15    which was --

16        Q.    That's close enough.  That's fine.

17        A.    Yeah.

18        Q.    Okay.

19        A.    Yeah, I'd be guessing.

20        Q.    In any event, for whatever reason, you

21    rejected that proposal?

22        A.    Would you like to know the reason?

23        Q.    I think you tried to mention that before --

24        A.    Okay.

25        Q.    -- when you were answering the last question.

1    the complaint if you want, but there's a claim in there

2    for defamation.  Are you aware of that?

3        A.    It's not fresh on my memory right now.

4        Q.    Well, let me just ask you this:  As you sit

5    here today, are you aware of any specific untrue

6    statements made about you by any Chubb employee?

7            MR. FREKING:  Hold.  I think I'm going to

8        instruct him not it answer.  That's way beyond --

9            MR. MONTGOMERY:  Yeah --

10           MR. FREKING:  -- what we agree to cover.

11           MR. MONTGOMERY:  -- down the line.

12           MR. FREKING:  You said you wanted to come

13       down, take a deposition for breach of contract.  I

14       think we're down here just for breach of contract

15       claim.

16           MR. MONTGOMERY:  I thought you said if it was

17       not covered in deposition, then we could cover it.

18           MR. FREKING:  No.

19           MR. MONTGOMERY:  We'll just skip --

20           MR. FREKING:  No.

21           MR. MONTGOMERY:  If you instruct him not to

22       answer --

23           MR. FREKING:  I'm going to instruct him not

24       to answer.

25           MR. MONTGOMERY:  Are you going to follow his

1    instructions?

2          THE WITNESS:  I'll follow my lawyer's

3    instructions.

4          MR. MONTGOMERY:  Okay.  Let's take about a

5    five-minute break.  I may be done.  I may have a

6    couple more question.

7          MR. FREKING:  Sure.

8          (Whereupon, a brief recess was had.)

9    BY MR. MONTGOMERY:

10    Q.    Are you aware of any untrue statements made

11    by anybody at Chubb about you?

12    A.    I'm obviously getting a lot of it secondhand,

13    but, yeah, there were comments about my leadership.

14    After twenty-five years of strong grades in leadership

15    and after turning around the Cincinnati branch --

16    Q.    Doug, before we get too far down the road on

17    the substance of the comments, I'm asking specifically

18    for who and where and to whom they were made?

19    A.    Okay.  Tim would have made that to the

20    office, telling them that a change in leadership was

21    needed.

22    Q.    You're talking about the -- the announcement

23    of your departure?

24    A.    Uh-huh.

25    Q.    Is that correct?

1    A.    Correct.

2    Q.    And who relayed that to you?  You went there,

3  correct?

4    A.    No, I was not there.

5    Q.    So, you're saying that somebody relayed to

6  you some false statement that Tim made?  Is that -- is

7  that what you're saying?

8    A.    Yeah, but I can't remember who.

9    Q.    Do you remember specifically what they said

10  Tim said?

11    A.    Specifically, no, on that case.

12    Q.    And as you sit here today, you think it

13  related something about your -- your leadership skills

14  or the need for a change --

15    A.    Right.

16    Q.    -- but don't have any specific statement in

17  mind; is that correct?

18    A.    Correct.

19    Q.    All right.  What other untrue statements do

20  you believe were made by anyone at Chubb?

21    A.    Obviously, the statements about having a

22  shouting match with my wife and passing that on to other

23  employees.

24    Q.    Okay.  One second on that, Doug.  I want to

25  separate out here for a second.

1          MR. MONTGOMERY:  Well, I think it's beyond

2     the time for you to do that, but let's --

3  BY MR. MONTGOMERY:

4     Q.     Instead of addressing it in terms of what

5  false statements she made during -- you believe she made

6  during the deposition.  I want to know, as you sit here

7  today, what false statements do you believe were made by

8  people at Chubb about you?

9     A.     Well, I think the memos that certainly --

10  that Tim had given to me were often untrue.

11     Q.     Okay.

12     A.     And --

13     Q.     I don't need to go into it any further about

14  those --

15     A.     That's fine.

16     Q.     -- okay?  What other untrue statements?

17     A.     I can't recall.  I can't believe -- boy, I

18  can't recall the dates on them, but Jerry Butler made

19  some comments about being an alcoholic to, I'm going to

20  say Deter.

21     Q.     Well, let me just stop you.  You believe, as

22  you sit here today, that Jerry Butler made statements to

23  Deter to the effect that you were an alcoholic.

24     A.     Yeah.

25     Q.     And how did you find that out?

1      A.      I can't remember if that was a deposition or

2   hearsay.

3      Q.      Forget about hearsay.  Who do you think you

4   heard it from?

5      A.      Good question.  I can't recall, Dave.  Sorry.

6      Q.      And as you sit here today, you don't know

7   when, where, or under what circumstances this statement

8   was made.  All you know is that you believe that it was

9   made and you heard it from somebody, but you don't know

10  who it is; is that correct -- all correct?

11     A.      Yeah.

12     Q.      Okay.  Any other untrue statements?

13          MR. FREKING:  And I don't want --

14          THE WITNESS:  I'm trying --

15          MR. FREKING:  -- want to --

16          THE WITNESS:  -- trying to think.

17          MR. FREKING:  You specifically --

18          THE WITNESS:  I don't want you to think --

19          MR. FREKING:  You --

20          THE WITNESS:  -- I'm trying to avoid the

21       question.  I'm trying to --

22          MR. FREKING:  You're specifically excluding

23       the things he has read or seen in depositions?

24          MR. MONTGOMERY:  I don't want him to just

25       tell me that he thought that some statement that

```
 1          Q.    Well, who?  Tell me who and when --

 2          A.    Well, on --

 3          Q.    -- when and where?

 4          A.    I can't -- I can't pin it down.

 5          Q.    Who did you hear it from?

 6          A.    Yeah.  That's what I'm trying to recollect.

 7  Certainly made comments to Beezal and Bryant about the

 8  lack of marketing effort -- lack of sales effort in

 9  those branches despite the fact that they were one of

10  the few branches that were on target for their sales --

11  the fact that their new business was right on target.

12  That's one.

13          Q.    I'm really interested in statements that he

14  made directly about you, your character --

15          A.    Oh, my character.

16          Q.    -- your personal habits, your -- you, Doug

17  Baillie.

18          A.    I can't recall at this time.

19          Q.    Okay.

20          MR. MONTGOMERY:  Thirty seconds.  Let me

21      speak to Leonard.  I think we're done.

22          (Whereupon, a brief recess was had off the

23      record.)

24          MR. MONTGOMERY:  Okay.  We're done.

25          (Witness excused.)
```