Slip Copy  
(Cite as: 2003 WL 21580406 (6th Cir.(Ohio)))

Page 1

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule 28.)

United States Court of Appeals, Sixth Circuit.

Gregory A. BOWIE and Gilbert Camargo, Jr., Plaintiffs-Appellants,  
v.  
ADVANCED CERAMICS CORPORATION, Defendant-Appellee.

No. 02-3012.

July 8, 2003.

Employees sued their common employer, asserting separate Title VII claims. The United States District Court for the Northern District of Ohio, Matia, J., granted a defense motion for summary judgment, and the employees appealed. The Court of Appeals, Per Curiam, held that: (1) employee failed to rebut legitimate, non-discriminatory reasons cited by employer as the basis for the employee's demotion; (2) incident involving an offensive e-mail was insufficient to establish a hostile work environment; and (3) employee failed to prove that his termination was motivated by race or national origin discrimination.

Affirmed.

[1] Civil Rights ⚖ 1135  
78k1135 Most Cited Cases

[1] Civil Rights ⚖ 1137  
78k1137 Most Cited Cases

Employee asserting race discrimination claim under Title VII failed to rebut legitimate, non-discriminatory reasons cited by employer as the basis for the employee's demotion, i.e., his demonstrated lack of leadership and his apparent sleeping on the job; the employer's good-faith ground for its employment decision did not equate to pretext, even if the employee was not sleeping but only appeared to be asleep. 42 U.C.C.A. § 2000e-5.

[2] Civil Rights ⚖ 1147  
78k1147 Most Cited Cases

Single incident involving an offensive e-mail sent by a co-worker to an employee claiming race discrimination, even when combined with other incidents in the employee's complaint, was insufficient to establish a hostile work environment under Title VII; even if the e-mail involved were itself actionable harassment, the employee had not demonstrated that liability was attributable to the employer. 42 U.C.C.A. § 2000e-5.

[3] Civil Rights ⚖ 1122  
78k1122 Most Cited Cases

Hispanic former employee failed to prove that his termination was motivated by race or national origin discrimination; his record failed to establish that he met his employer's expectations at virtually any point during his 15 months of employment, and in any event, his employer gave a legitimate, non-discriminatory reason for the termination, i.e., his lying about needing to file a police-report. 42 U.C.C.A. § 2000e-5.

On Appeal from the United States District Court for the Northern District of Ohio.

Before BOGGS and DAUGHTREY, Circuit Judges, and OBERDORFER, [FN*] District Judge.

PER CURIAM.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Exhibit Z

Slip Copy                                                                                                     Page 2
(Cite as: 2003 WL 21580406, *1 (6th Cir.(Ohio)))

*1 The plaintiffs, Gregory Bowie and Gilbert Camargo, filed suit against their common employer, Advanced Ceramics Corporation, asserting separate Title VII claims. *See* 42 USC § 2000e-5. Bowie alleged that he was demoted based on his race (African-American); Camargo alleged that he was discharged based on his race and national origin (Puerto Rican). Both also alleged harassment resulting from a hostile work environment and various state law claims. The district court granted Advanced Ceramics's motion for summary judgment as to the race and national origin discrimination and hostile work environment claims, and it dismissed without prejudice the pendant state law claims. The only issues clearly raised on appeal involve Bowie's race discrimination claim, his hostile work environment claim, and Camargo's race and national origin discrimination claim. For the reasons that follow, we conclude that the judgment of the district court must be affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Advanced Ceramics produces industrial ceramic products and the chemicals that comprise those products at its plants in both Lakewood and Strongsville, Ohio. Plaintiff Gregory Bowie initially worked at the Lakewood plant and was transferred to the Strongsville plant. Plaintiff Gilbert Camargo worked only at the Lakewood plant.

Bowie's Claims

Bowie is a 44-year-old African-American man who has worked for Advanced Ceramics and its predecessor, Union Carbide Corporation, since 1979. He continues to be employed by the company to the present day. Bowie has held multiple positions with the company, but from October 1991 to January 2000 he worked as a "hot press coordinator," a quasi-supervisory position. The decision to promote Bowie to this position was made by Cliff Koppmann, then production manager, and Steven Hurst, then maintenance supervisor. As a hot press coordinator, Bowie was expected to oversee production schedules, equipment, and other employees, and to coordinate the overall activity of the pressroom.

Bowie performed well as a coordinator for several years before he began to have problems. In March 1994, he received a written warning from Hurst, his immediate supervisor, for failure to complete assigned work. In 1997, his supervisors became concerned with apparent changes in Bowie's work attitude, perhaps attributable to a serious workplace-related accident and his hospitalization in 1996-97 and a co-worker's alleged insensitive response to his return to work. In January 1998, Hurst (his supervisor), Koppmann (operations manager), and Rich Harrison (human resources manager) met with Bowie to discuss their perception of his negative attitude. This meeting was a non-disciplinary intervention to address Bowie's negativism, cynicism, and mind set, all of which the supervisors felt were inconsistent with leading a crew as a coordinator.

Despite their efforts, a series of incidents occurred following the meeting that culminated in Bowie's demotion from his position as a coordinator. At the end of January 1998, Koppmann circulated a memorandum on an important issue regarding the functioning of the presses. Although Bowie told Koppmann that he did not have access to the memo and had not read it, Koppmann felt Bowie was simply indifferent to the whole issue. In May 1998, Bowie and three other members of his crew were caught showering ten minutes prior to the end of their shift, in violation of company policy. They explained that the next press crew had relieved them early, but acknowledged that they had violated company policy. Even though Bowie was the coordinator, all four employees, including the two Caucasian employees and the Hispanic employee, received a disciplinary letters in lieu of suspension. Then, in January 1999, Koppmann found Bowie and two hot press operators "resting comfortably" in the control room during their shift. In documenting the incident, Hurst noted that Bowie, as coordinator, "is responsible so he should assume the blame for his crew and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Slip Copy
(Cite as: 2003 WL 21580406, *1 (6th Cir.(Ohio)))

Page 3

himself." In March of the same year, an engineer surveying production operations again found Bowie and two crew members "lounging" in the control room while material was running without being screened.

*2 Then, on December 17, 1999, supervisor Dan Strichko found Bowie and his entire crew except for one member in the cafeteria while material was overflowing out of a multi-press drum because no one was attending to the press operations. Koppmann spoke with Bowie about the incident and then discussed it with Hurst. They agreed that "Bowie is ineffective as a coordinator." Hurst and Koppmann both met with Bowie to discuss "why he needed to take charge of his crew and lead by example." According to Hurst's documentation of the meeting, "it was reemphasized that the level and quality of his leadership was not was acceptable for [the department], now or in the future, and that he was the only one who could make the necessary changes." Hurst "believe[d] we all left the meeting with the same understanding that Greg knew what was expected and would do what was needed to prove he could handle the Coordinator position."

In January 2000, however, Advanced Ceramics instituted a "spot check" inspection procedure, involving random checks by supervisors during the weekend shifts to ensure employees were performing adequately. Around 6:00 a.m. on Saturday, January 15, 2000, Koppmann performed a spot check of the hot press control room. He found Bowie, apparently asleep, slouched in a chair with his hand over his face. Two other employees were playing cards at a desk. One of those two employees was on Bowie's crew; the other was not. Bowie testified that he was not sleeping, had completed his other job quties for the shift, and was monitoring the presses. Sleeping on the job is listed in the company handbook as grounds for "disciplinary action, which may include suspension or discharge if warranted." Koppmann and Hurst discussed the situation and decided to disqualify Bowie from the coordinator position. He received a two-day suspension and was reassigned to a hot press

operator position. The demotion involved a loss of pay of $.77 per hour. A Caucasian employee replaced Bowie in the coordinator position.

Bowie contends that throughout his tenure at Advanced Ceramics he was subjected to racial harassment constituting a hostile work environment. Bowie points to three specific examples. First, on one occasion, he alleges that Koppmann watched him check on a seal pan and said, "That's too much air, boy." Second, he alleges that Koppmann said to him, "Hey, fat boy." Third, he points to an e-mail sent by an Advanced Cerarnics' secretary to all employees that he perceived as racially derogatory. The e-mail jokingly referred to a surplus of cheap hands-free cell phone adaptors, accompanied by a photo of an African- American man with a cell phone rubber-banded to his head.

The district court granted summary judgment to Advanced Ceramics on the race discrimination claim, finding that Bowie had not established a *prima facie* case of discrimination because Bowie was not qualified for the coordinator position. The court further found that even if Bowie had established a *prima facie* case, summary judgment for Advanced Ceramics was appropriate because the company had articulated a legitimate, non-discriminatory reason for its demotion of Bowie, and Bowie had presented no evidence of pretext. In addition, on the harassment claim, the court found that Bowie's allegations of three incidents of harassment fell far short of the "severe and pervasive" standard and that Advanced Ceramics was therefore entitled to summary judgment on Bowie's hostile work environment claim.

Camargo's Claim

*3 Camargo, who is of Hispanic origin, worked for Advanced Ceramics from October 21, 1998, to January 13, 2000. Initially, he was a processor in the titanium diboride department, but he was soon transferred to the position of "primary processor." His supervisors were Hurst and Strichko, both of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Slip Copy  Page 4
(Cite as: 2003 WL 21580406, *3 (6th Cir.(Ohio)))

whom reported to Koppmann.

Camargo had serious attendance problems almost from the very beginning of his employment with Advanced Ceramics. He was referred to the company's program for employees with attendance problems, which utilized progressive disciplinary action. An employee entered the program after accumulating three or more absences within any three-month period. Progressive action was thereafter taken if the employee was absent or tardy once within the next 30 days, twice within the next 60 days, or three times within the next 90 days. The first progressive action was a written warning, followed by a second written warning, a termination warning and, finally, termination. If the employee worked two consecutive months with no attendance problems, the employee decreased one level of discipline.

On December 17, 1998, after accruing three attendance incidents within 90 days, Camargo entered Advanced Ceramics's attendance program. By January 15, 1999, he had accumulated three more absences, which put him on the verge of termination.

Besides attendance problems, Camargo had performance and safety problems from early on in his employment. He had work-related accidents on January 9, 1999, and February 17, 1999, from engaging in unsafe work practices. On March 3, 1999, Hurst counseled Camargo for unsafe practices relating to the lifting of pallets of materials. On March 8, 1999, Hurst spoke to Camargo about his repeated failure to punch in and out as required. On March 10, 1999, Hurst spoke to Camargo about paperwork that Camargo filled out improperly. Five months into Camargo's tenure with Advanced Ceramics, Hurst documented his overall concerns about Camargo's substandard performance, including concerns about his inattention to detail, tendency to wander away from his work area, and attendance problems, and discussed them with Camargo. When Camargo's performance did not improve, Koppmann met with Camargo on July 15, 1999, to address his continued poor job performance.

In addition, Camargo was experiencing difficulty with his employer's annual testing program, which included a written examination and a performance score intended to evaluate the knowledge of each employee on a periodic basis. Camargo was evaluated in early June 1999, at which time his performance was below the acceptable level. As a result, during Camargo's semi-annual performance appraisal, Koppmann and Strichko informed him that he would have to be retested and receive an improved score by August 9, 1999, or his employment would be terminated. In addition, Koppmann also addressed a number of job related issues relating to Camargo's workplace conduct, such as Camargo's use of vulgarity, his need to improve his communication skills, his poor housekeeping skills, and his failure to read required job testing standards. At Camargo's request, Koppmann postponed the retest for a month until September 16, 1999. On the September 16 retest, Camargo again did very poorly, with Koppmann documenting that his answers were "totally inaccurate, show[ed] high levels of sarcasm and a definite problem with his attitude." On September 21, 1999, Koppmann prepared a handwritten chronology of Camargo's performance problems as a "letter in lieu of termination." On September 27, 1999, Camargo was placed on a three-month probation, subject to immediate termination, and required to retest within 30 days. He finally achieved an acceptable score on the retest on November 19.

*4 The incident that led directly to Camargo's discharge occurred on December 24, 1999. Camargo, still on probation, requested permission to leave a ten-hour shift two hours early because, he said, his car had been stolen and he needed to file a police report. Strichko granted Camargo permission to leave, but informed Camargo that he had to provide written documentation (*i.e.,* the police report) upon his return to work. However, Camargo did not provide the requested police report until January 6, 2000, and it was dated December 27, 1999. His explanation was that he was turned away from the police station on

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Slip Copy                                                                                                      Page   5
(Cite as: 2003 WL 21580406, *4 (6th Cir.(Ohio)))

December 24 because the police believed his car had been repossessed rather than stolen. Roy Mitchell, Advanced Ceramics's manufacturing manager, telephoned and visited the police department to investigate this explanation. Mitchell was told that individuals wishing to file police reports were never turned away.

Based on that information, company officials concluded that Camargo had lied to his supervisors in violation of his probationary status. Because he was at the termination-warning level of the remedial attendance program, it was decided that this incident justified termination, and Camargo was discharged on January 13, 2000. The company hired a Caucasian to replace Camargo.

The district court granted summary judgment to Advanced Ceramics on the race and national origin discrimination claim, finding that Camargo had not established a *prima facie* case of discrimination because Camargo was not qualified for the position of primary processor. The court further found that even if Camargo had established a *prima facie* case, summary judgment for Advanced Ceramics was appropriate because the company had articulated two legitimate, non-discriminatory reasons for its termination of Camargo, and Camargo had presented no evidence of pretext.

## DISCUSSION

We review a district court's grant of summary judgment *de novo* and may affirm the decision below only if the court determines that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Trustees of Michigan Laborers' Health Care Fund v. Gibbons,* 209 F.3d 587, 590-91 (6th Cir.2000). The non-moving party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A mere "scintilla" of evidence is insufficient. *Id.* at 252. The non- moving party must present

"significant probative evidence" in support of its complaint. *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 340 (6th Cir.1993). The evidence is considered in the light most favorable to the non-movant, and summary judgment is denied if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Gibbons.* 209 F.3d at 590-91.

### Bowie's Claims

*5 [1] Bowie's initial argument is that the district court erred in finding that he had failed to establish a *prima facie* case of race discrimination, because the court relied on the defendant's proffered "legitimate, non-discriminatory reason" for termination to establish that he was not qualified for the coordinator position under the four-prong *prima facie* test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in violation of our ruling in *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651 (6th Cir.2000). Although that appears to be the case, it does not change the fact that the legitimate, non-discriminatory reasons cited by Advanced Ceramics as the basis for demotion stand unrebutted by Bowie.

Advanced Ceramics asserts that its legitimate, non-discriminatory reasons for demoting Bowie were his demonstrated lack of leadership and his apparent sleeping on the job. A legitimate, non-discriminatory reason is one "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The district court found, correctly, that the company's reasons were sufficient to shift the burden back to Bowie to demonstrate pretext.

Bowie could have refuted the company's articulated reason "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000). Quite simply, Bowie has presented no

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Slip Copy                                                                 Page   6
(Cite as: 2003 WL 21580406, *5 (6th Cir.(Ohio)))

evidence of pretext. He argues that he was not actually sleeping on January 15, 2000, when Koppmann found him during a spot check. However, even if Bowie were not actually asleep and only appeared to be sleeping, under Sixth Circuit case law, the company is required only to have a good faith belief, formulated through a reasonable reliance on particularized facts, for its employment decision. *See Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir.1998). We conclude that Advanced Ceramics has met this standard. Unless Bowie can provide "proof to the contrary," the company's good-faith ground for its employment decision does not equate to pretext, even if Bowie was not sleeping but only appeared to be asleep. *See id.*

Furthermore, Bowie has not demonstrated that the articulated reason was not the actual motive for the demotion or that the series of incidents involving a lack of leadership and supervision would be an insufficient basis for his demotion. Bowie's argument for pretext is based on a blanket denial that the company's reason was the "honest" motivation and that he was asleep, and these denials are not supported by any admissible evidence. It clearly fails to form a basis on which to overturn the district court's entry of summary judgment in favor of the employer.

[2] Nor do we find any error in connection with the district court's ruling on Bowie's claim that he had been subjected to a hostile work environment. On appeal, he focuses on the single incident involving the offensive e-mail. We conclude that this incident, even when combined with the other incidents in the complaint, is insufficient to carry this case to the jury. In order to support a claim of hostile work environment, the alleged harassment must be shown to be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quotation omitted). In other words, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

In determining whether there was a hostile or abusive workplace environment, the district court is required to consider the totality of the circumstances. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

*6 Given the need for a "totality" review, we have recognized that an isolated incident is generally not actionable. *See Highlander v.. K.F.C. Nat'l. Mgmt. Co.,* 805 F.2d 644, 649-50 (6th Cir.1986) (stating that in hostile work environment claim, injury must result from more than a single isolated or offensive incident, comment, or conduct). Likewise, the Supreme Court has consistently held that "simple teasing, offhand comments, and *isolated incidents (unless extremely serious)* will not amount to discriminatory changes in the 'terms and conditions of employment." ' *Faragher,* 524 U.S. at 788 (emphasis added). The isolated comments in this case do not meet that standard.

Moreover, even if the e-mail involved in this case were itself actionable harassment, Bowie has not demonstrated that liability is attributable to the company. Advanced Ceramics immediately disciplined the secretary who sent the e-mail, and there is no evidence the company condoned or tolerated the situation. *See Courtney v. Landair Transport, Inc.,* 227 F.3d 559, 564-65 (6th Cir.2000) (discussing negligence standard for imputing liability for co- worker harassment to employer).

In sum, the e-mail in question may have been the result of poor judgment by a co-worker but is insufficient to create an actionable claim of hostile work environment. We thus conclude that the district court properly granted summary judgment to Advanced Ceramics on Bowie's hostile work environment claim.

### Camargo's Claim

[3] The district court's finding that Camargo had failed to establish a *prima facie* case under *McDonnell Douglas* is less open to question than the parallel ruling as to Bowie Unlike Bowie, who had numerous positive evaluations and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




comments from his supervisors about his qualifications, a supervisor who recommended him for a promotion, and a 22-year tenure with the company, including eight years in a quasi-supervisory role, Camargo's record fails to establish that he met his employer's expectations at virtually any point during his 15 months of employment. The only evidence to support his claim that he was "qualified" under *McDonnell Douglas* is a statement by Camargo's supervisor, Hurst, who was asked whether Camargo was a competent employee and replied, "As far as knowing how to do his job, yes." However, when asked as a follow-up question whether Camargo had "come in and do[ne] his job," Hurst answered, "No." Indeed, it appears that Camargo simply cannot point to anything in the record indicating that he ever met Advanced Ceramics's legitimate expectations for employment--except possibly the fact that he finally passed the retest on his third attempt. There are no positive performance evaluations, no promotions, no recommendations for promotion, and no history of employer satisfaction with his work. Hence, even applying a lenient standard for establishing the qualification prong of a *prima facie* case, Camargo cannot show that he performed his job in a way that met Advanced Ceramics's legitimate expectations.

*7 In any event, Advanced Ceramics gave a legitimate, non-discriminatory reason for Camargo's termination and, as the district court found, Camargo offered no evidence to establish pretext, beyond his own denial that he lied about the police-report incident that proved to be the final negative mark on his record and the ultimate reason for his discharge. Finally, his original claim of hostile work environment was not pressed on appeal and therefore is not subject to review.

CONCLUSION

For the reasons stated above, we affirm the grant of summary judgment to Advanced Ceramics on the claims of both plaintiffs.

FN* The Hon. Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

2003 WL 21580406 (6th Cir.(Ohio))

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works


