Not Reported in F.Supp.2d
(Cite as: **2002 WL 31951256 (S.D.Ohio)**)

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

**J. Roger HIGH, Plaintiff,**
v.
**GENTING/CASTLE, INC., et al., Defendants.**

No. 2:01-CV-157.

Nov. 13, 2002.

*OPINION AND ORDER*

SARGUS, J.

*1 This matter is before the Court for consideration of the Defendants' Motion for Summary Judgment. (Doc. # 32). For the reasons that follow, the motion is granted in part and denied in part.

I.

Plaintiff, J. Roger High, ["Plaintiff"] brings this action against his former employer, Genting/Castle, Inc. ["Genting"] alleging that he was terminated from employment on account of his age. Also named as Defendants are Plaintiff's former supervisor, Brad Hite, and Mr. Hite's supervisor, Roger Beebe. Plaintiff's age discrimination claim is brought under O.R.C. § 4112.01, *et seq.* Plaintiff also asserts a claims for retaliation and promissory estoppel under Ohio law. [FN1] The Plaintiff is a resident of the State of Ohio. Defendant Genting is a Delaware corporation with its principal place of business in the State of New York. Defendant Hite is a resident of the State of Illinois and Defendant Beebe is a resident of the State of New York. The Court entertains this action under 28 U.S.C. § 1332.

> FN1. Plaintiff's complaint also presents a claim under the Employee Retirement Income Security Act of 1974 ["ERISA"], 29 U.S.C. § 1140, for wrongful denial of benefits. Plaintiff has voluntarily dismissed this claim with prejudice. (Doc. # 38).

II.

Plaintiff commenced employment with Castle, Inc., the predecessor to Genting, in February 1973 as a sales representative. Genting sells a variety of medical equipment, including autoclaves, sterilizers, surgical tables and lights to hospitals and surgery centers. (*Complaint* at ¶ 9). Genting's sales representatives are assigned to certain territories. Plaintiff left employment with Genting sometime in 1976 but returned sometime in 1979. Plaintiff remained employed by Genting as a sales representative from 1979 until his termination in November 2000. Plaintiff was sixty-three (63) years old at the time he was terminated.

During his employment, Plaintiff received both good and poor performance reviews. Plaintiff received the lowest possible rating on his first review in 1973. (Exhibit 4 attached to *Deposition of Roger High,* hereinafter *"High Depo."* ). By the time of his second review, in August 1974, Plaintiff had improved his sales volume and exceeded his sales quota. (Exhibit 7, *Id.*). Plaintiff again exceeded his sales quota the following year and received an excellent review in August 1975. (Exhibit 10, *Id.*). Plaintiff left employment with Genting in 1976 but returned in 1979.

Upon his return, Plaintiff was assigned to the sales territory comprised of Pennsylvania, Northeast Ohio and West Virginia. (*High Depo.* at 40-43). Defendant Beebe was Plaintiff's supervisor. Plaintiff's first performance review after returning to employment was characterized as commensurate to the requirements of the job. (Exhibit 21, *Id.*). In 1981, High was promoted to the position of Senior Sales Representative. (Exhibit 24, *Id.*).

In January 1982, Plaintiff received a positive review stating that he had demonstrated "exceptional efforts over an extended period of time." (Exhibit 27, *Id.*). Plaintiff again received a positive review in January 1983. (Exhibit 31, *Id.*). In August 1983, Beebe notified Plaintiff that he was "not at all satisfied with [Plaintiff's] efforts in the realm of unit sales." Beebe stated that "[i]n the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Exhibit AA

closing months of the year, I expect a more concerted effort in this area and dramatic improvement." (Exhibit 34, *Id.*). In January 1984, Plaintiff was praised for his success in a contract sale to one particular hospital but was criticized in the area of "unit sales and business development." (Exhibit 36, *Id.*). Plaintiff's unit sales were characterized as "simply unacceptable." (*Id.*). Plaintiff's performance was reviewed again in October 1984. At that time, Plaintiff was placed on a six month probationary period. (Exhibit 38, *Id.*). Plaintiff was removed from the probationary period in May 1985. (Exhibit 45, *Id.*).

**\*2** In January 1986, Plaintiff was again placed on probation. Beebe noted that, although the unit sales exceeded expectations, the contract sales did not. Beebe characterized Plaintiff's overall performance as "less than I feel is acceptable." (Exhibit 49, *Id* .). Beebe established specific goals for Plaintiff [FN2] and noted that Plaintiff's performance would again be reviewed in June 1986.

> FN2. Specifically, Beebe noted that he would like to have Plaintiff achieve six sales proposals per month; he would like to see some "successes" in the Pennsylvania market; he would like to have Plaintiff "demonstrate specification control of a project;" and he expected Plaintiff to take fewer overnight trips. (Exhibit 49 attached to *High Depo.*).

In March 1986, Plaintiff requested a transfer of sales territories due to his perception that Beebe was not fairly evaluating Plaintiff's sales. (Exhibit 38 attached to *Beebe Depo.*). Plaintiff was removed from probation and was transferred to a sales territory covering northeastern Ohio. Plaintiff's supervisor in this position was Ron Gall. (*High Depo.* at 97-98).

Plaintiff received a satisfactory performance evaluation in January 1987; in 1988 and 1989, Plaintiff's evaluations were somewhat higher. In 1990, Plaintiff's performance rating fell slightly. Plaintiff's overall performance remained satisfactory, however. (Exhibit 63 attached to *High Depo.*). Plaintiff received similar performance evaluations in the following three years.

Plaintiff improved his performance during the years 1994 and 1995. In January 1997, Gall placed Plaintiff on a ninety day probationary period. According to Gall, Plaintiff's "year to date and past performance relative to the categorical sales objectives [are] far below what [Gall] regard[s] as minimum acceptable standards for a sales representative with [Plaintiff's] tenure." (Exhibit 76, *Id.*). Gall provided Plaintiff with an outline of objectives but noted that further negative trends could result in termination. (*Id.*). Plaintiff worked "the hardest [he] could" to improve his performance. (*High Depo.* at 142). Plaintiff's work proved successful as he received excellent reviews as the year progressed. Plaintiff was congratulated by Defendant Beebe, who had then become a National Sales Manager. (Exhibit 79, *Id.*). Plaintiff's high sales resulted in his inclusion in the President's Club in 1997 and 1998. (Exhibits 83 and 84, *Id.*).

In 1999, Plaintiff achieved only sixty-six percent of his sales quota and was ranked twentieth out of a total of twenty-two sales representatives. (Exhibit 86, *Id.*). Gall was demoted at some point and no longer supervised Plaintiff. Defendant Beebe became Plaintiff's supervisor. Beebe set Plaintiffs' sales objective [FN3] for the year 2000 at $1,615,000. [FN4] (Exhibit 87, *Id.*).

> FN3. A sales representative's yearly sales objective is based upon a combination of three factors: the employee's historical sales; the employee's own projections for the year; and an assessment of the opportunity for future sales. (*Knapp Depo.* at 172; *Hite Depo.* at 17).

> FN4. In 1997, Plaintiff had a sales objective of $1,616,000, which he exceeded. (*High Depo.* at 30) Similarly, in 1998, Plaintiff exceeded his sales objective of $1,907,000. (*Id.*).

In February 2000, Defendant Brad Hite became Plaintiff's supervisor. Hite was supervised by Roger Beebe. Hite was thirty years old at the time he became supervisor. In assuming his duties, Hite spoke with Beebe about Plaintiff and other sales representatives. According to Hite, Beebe told

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d
(Cite as: 2002 WL 31951256, *2 (S.D.Ohio))

Page 3

him that Plaintiff was a spotty performer, not very bright, and that Gall carried Plaintiff. (*Hite Depo.* at 44).

Plaintiff claims that Hite was displeased with his performance at the outset. According to Hite, Plaintiff submitted untimely, unorganized and inaccurate sales reports. (*Id.* at 45-46). Hite believed that Plaintiff was unprofessional as manifested in overly optimistic and unrealistic sales projections. (*Id.* at 90). In addition, Hite disliked Plaintiff's note-taking method because it was not computerized. (*Id.* at 82-83). Hite testified on deposition that "[t]imes have changed. It is not 30 years ago. We do it differently now." (*Id.* at 83). According to Hite, Plaintiff was a good salesman "at one point." (*Id.* at 101).

*3 Plaintiff further claims that in March or April 2000, Hite contacted Shelly Knapp, head of Human Resources, to talk about "options" regarding Plaintiff. (*Knapp Depo.* at 72-73). Plaintiff claims that Hite did not make such inquiry regarding other sales representatives who were also below their quota. (*Id.* at 102).

In May 2000, Hite requested that all sales representatives prepare a six month sales projection and present the same at a June 2000 meeting. (*Hite Depo.* at 42). According to Hite, Plaintiff's presentation was deficient because it was handwritten and had "very little thought put into it." (*Id.*). Further, as of June 2000, Plaintiff had met only 11% of his sales objective for the year. (*High Depo.* at 176).

In June 2000, Hite placed Plaintiff on probation due to his "lack of performance" in the first two quarters of the year 2000. (*Hite Depo.* at 43). Hite instituted specific terms for the probationary period. Specifically, Plaintiff was to: (1) provide Hite with a sales call action plan each week; (2) submit a minimum of ten new proposals each month; (3) follow-up on specifically identified projects; and (4) generate at least $241,000 per month in sales. (Exhibit 92 attached to *Hite Depo.*). The latter figure was based upon Plaintiff's projections at the June 2000 meeting combined with what Hite deemed an acceptable monthly objective.

(*Hite Depo.* at 56-57). According to Hite, the $241,000 monthly objective was very realistic. (*Id.* at 93).

Plaintiff claims that the objective was excessively high. (*High Depo.* at 193). According to Plaintiff, since 1995, only seven employees had been placed on monthly quota requirements. Of the seven, only one had a quota of $200,000. The remainder had quotas of between $100,000 to $167,917 per month. (Exhibit B attached to *Plaintiff's Memorandum contra*). Further, Plaintiff claims that in 1997, only one sales representative had sold $241,000 for three consecutive months. (*Id.*). in 1998, no salesman achieved such a figure. In 1999, six sales representatives achieved the figure. Finally, in 2000, three had achieved the figure. (*Id.*). Nonetheless, Plaintiff prepared an outline to achieve the objective for July 2000. (*Id.* at 196; 200).

Plaintiff was on vacation for one week in July 2000, which had allegedly been scheduled prior to the institution of probation. (*High Depo.* at 109-110). On July 27, 2000, Plaintiff met with Hite to review the July sales objective. At that time, Plaintiff had made only $74,403 in sales. (Exhibit 93 attached to *High Depo.*). Hite told High that the figure was not acceptable. (*Id.*). On July 28, 2000, Hite met with Gall, the project manager for the region at issue. Gall told Hite that many projects in the region would not come to fruition in 2000. (*Hite Depo.* at 58-59). Consequently, sometime thereafter, Hite informed Plaintiff that he should make a "more realistic" business plan to meet the year end sales quota. (*Hite Depo.* at 61). Gall testified on deposition that the Defendant's business is cyclical and varies with economic conditions in the particular territory. (*Gall Depo.* at 25).

*4 Plaintiff was on vacation for one week in August 2000 and met with Hite on August 31, 2000. At the meeting, Plaintiff failed to present Hite with a business plan. Plaintiff had a single sale in the month of August totaling $20,544. (*Id.* at 97). Hite considered Plaintiff's failure to provide a business plan as insubordinate and concluded that it was

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




"pretty much over" for Plaintiff. (*Hite Depo.* at 77). In September 2000, Hite met with Roger Beebe, National Sales Manager; Shelly Knapp, Director of Human Resources; and Robert VonKaenel, Vice President of Marketing, regarding Plaintiff's status. (*Id.* at 120). It was the unanimous decision of the four to terminate Plaintiff's employment. (*Knapp Affidavit* at ¶ 4). Hite and Beebe testified on deposition that decisions to place employees on probation and decisions to terminate are within the discretion of the supervisor. (*Beebe Depo.* at 103; *Hite Depo.* at 23).

On September 25, 2000, Hite and Beebe met with Plaintiff to present a severance agreement. (*High Depo.* at 219; *Hite Depo.* at 127). Plaintiff's last day of employment was set for November 1, 2000. Plaintiff was offered four weeks severance pay, pay for all unused vacation, together with the vacation time he would have earned for the remainder of the year, a two-month continuation of a vehicle lease, and outplacement services. (*High Depo.* at 102). According to Knapp, such a package was above normal and was conditioned on the signing of a release. (*Knapp Depo.* at 206-07). Plaintiff declined to sign the release and retained a lawyer. (*High Depo.* at 221).

On October 26, 2000, Defendant's counsel offered Plaintiff twenty-six weeks of severance pay conditioned on signing a release. Plaintiff was officially terminated on November 1, 2000. Plaintiff refused the offer of severance pay two days later. (Exhibit 15 attached to *Knapp Depo.*). During the discussions on severance, Hite told Gall that firing Plaintiff was a difficult as firing his father. (*Gall Depo.* at 160). Hite also told Gall that if Plaintiff planned his money properly and waited for social security benefits, Plaintiff would be able to get by. (*Id.*).

Plaintiff contends that he was terminated from employment on account of his age. In support of his argument, Plaintiff relies on, *inter alia,* the testimony of Gall. According to Gall, "[t]he work force was becoming extremely younger (*sic* )." (*Gall Depo.* at 86). Gall went on to state that he perceived "a thrust on the part of upper management to hire younger people. There was a thrust on the part of upper managers to hire from our competitor, mainly because our upper managers came from our competitors." (*Id* .).

Plaintiff commenced the instant action on February 23, 2001. On March 9, 2001, Defendant tendered to Plaintiff a check for twenty-six weeks severance pay at 75% of his base salary. (Exhibit 18, *Id.*). Plaintiff cashed the check and concedes that he has received payment in full under Defendant's policy. ( *High Depo.* at 239).

II.

*5 The procedure for considering whether summary judgment is appropriate, is found in Fed.R.Civ.P. 56(c); this section provides:
> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.,* 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts." ' *Id.* (quoting *Matsushita,* 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

III.

Defendants move for summary judgment on Plaintiffs' claims for age discrimination, retaliation and promissory estoppel. The Court will consider the merits of the motion with respect to each claim.

A. Age Discrimination

*6 In Ohio, employers are prohibited from discriminating against employees because of age. Age discrimination claims under O.R.C. § § 4112.02 and 4112.99 are analyzed using the same standards applied to federal age discrimination claims. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St .2d 192, 196 (1981). Under Ohio law, however, supervisors can be individually liable for unlawful discrimination against an employee. *Genaro v. Central Transport, Inc.,* 84 Ohio St.3d 293 (1999)

.

A Plaintiff can establish a claim of age discrimination by providing either direct or indirect evidence of such discrimination. With respect to direct evidence, the Plaintiff may present evidence "of any nature, to show that the employer more likely than not was motivated by discriminatory animus." *Mauzy v. Kelly Services, Inc .,* 75 Ohio St.3d 578 (1996). In the absence of direct evidence, a claim for age discrimination may be supported by an indirect method of proof utilizing the burden shifting framework applied in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Under this framework, the Plaintiff must first establish a *prima facie* case of discrimination by showing: (1) that he or she is a member of a protected class; (2) that he or she was qualified for the position; (3) that he or she suffered an adverse employment action; and (4) that he or she was replaced by or was treated less favorably than a person outside the protected class. *Skalka v. Fernald Environmental Restoration Management Corp.,* 178 F.3d 414, 420 (6th Cir.1999). If the Plaintiff makes such a showing, the burden of production shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1390 (6th Cir.1993), citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981).

If the Defendant employer comes forward with evidence of a legitimate nondiscriminatory reason for the adverse action, then the burden of production shifts back to the Plaintiff to show that the employer's reason is merely pretext for unlawful discrimination. *Id.* When the burdens shifts back to the Plaintiff, he or she must come forward with evidence that the reason for the adverse action is false or not worthy of credence; the Plaintiff need not present independent evidence that the proffered reason is pretext for racial discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000). ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d  
(Cite as: 2002 WL 31951256, *6 (S.D.Ohio))

Page 6

justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

1. Direct Evidence of Age Discrimination

In this case, Plaintiff contends that certain evidence directly establishes his claim for age discrimination under Ohio law. In particular, Plaintiff relies upon several comments made by his former supervisor, Defendant Hite, who allegedly said: (a) "Times have changed. It is not 30 years ago. We do it differently now." (*Hite Depo.* at 83); (b) Plaintiff was a good salesman "at one point ....." (*Id.* at 101); (c) terminating Plaintiff was "like terminating my father." (*Gall Depo.* at 160); and (d) that if Plaintiff "planned his money appropriately and waited until he could collect Social Security, [Plaintiff] may get by." (*Id.*). Plaintiff also claims that Hite's inquiry to Human Resources Director Shelly Knapp regarding Hite's "options" with respect to Plaintiff constitutes direct evidence of discrimination.

*7 According to Plaintiff, the foregoing constitutes direct evidence of discrimination against Plaintiff on account of his age. Defendants dispute this theory and contend that Hite's comments are too isolated, abstract and ambiguous to support a claim of age discrimination.

In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir.1998), the Sixth Circuit held that, in assessing the relevancy of purported discriminatory remarks, the Court first looks at the identity of the speaker. It is clear here that the remarks were made by one with authority to terminate Plaintiff's position. The Court is also to examine the substance of the remark in determining its relevance to Plaintiff's claim that his termination was motivated on account of his age. *Id.* at 355. " 'Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.' " *Id.*, quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.1993).

In determining whether a comment is isolated or is evidence of unlawful discrimination, courts must carefully consider the totality of circumstances-- the declarant's position in the corporate hierarchy; the purpose and content of the statement; and the temporal connection between the statement and the challenged action. *Id.* at 356. Further, the court should consider whether the statement buttresses other evidence of discrimination in the corporate environment. *Id.* In *Ercegovich*, the court held that "[c]ircumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace ... may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Id.* at 356.

In this case, two of Hite's statements were never made to the Plaintiff but rather, were elicited on deposition. First, the statement that "[t]imes have changed. It is not 30 years ago. We do it differently now" was made in response to questions by Plaintiff's counsel regarding why Hite perceived Plaintiff's handwritten notes as unprofessional. As Hite testified, Genting had purchased a "Sales Force Automation" ["SFA"] computer system for sales representatives to maintain notes that could be accessed by all. (Hite Depo. at 83). Hite was concerned that Plaintiff's handwritten notes would appear too disorganized in comparison. (Hite Depo. at 83-86). In light of the context in which the statement was made, the Court finds the statement does not constitute direct evidence of discrimination.

Second, Hite's statement that Plaintiff was a good salesman "at one point" was also elicited on deposition and was never made to Plaintiff or to anyone at Genting. Plaintiff's counsel questioned Hite, who holds an MBA degree in marketing, about his background in sales. (*Hite Depo.* at 100). Plaintiff's counsel questioned Hite about whether sales was taught in business school; Hite conceded that there was no "Sales 101" course. (*Id.*). The following exchange occurred:

*8 Q: You are trained on the job by old guys that have been doing it for 50 years and know how to do it, right?  
A: Right.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d  
(Cite as: 2002 WL 31951256, *8 (S.D.Ohio))

Page 7

Q: I mean, isn't that how the kid salesman comes on the territory and learns how to do it?
A: The majority of them are the school of hard knocks.
Q: Would you agree that Roger High has been out there doing the school of hard knocks for thirty years?
A: I would agree that he was probably good at one point and his performance has been suffering since.
(*Hite Depo.* at 101).

From the foregoing, it is clear that Hite's comment about Plaintiff having been a good salesman "at one point" is not direct evidence of discrimination. The statement "at one point" could be reflective of Plaintiff's decline in performance since the *entire* statement concludes by stating that Plaintiff's performance was suffering, which fact is undisputed. In sum, the Court finds that the statement does not constitute direct evidence of age discrimination.

The third and fourth statements which Plaintiff claims constitute direct evidence of discrimination are statements which Hite made to Gall. On deposition, Gall was asked whether he ever talked to Hite about the possibility of terminating Plaintiff's employment. Gall testified that he did not but stated as follows:
[I] talked to Brad Hite about some other issues with regard to personnel and what he was experiencing, and I think his commentary with regard to Roger High was this, it's like terminating my father. Those were his words, quote unquote. He also said to me that he felt that Roger High was not liked in Rochester at the corporate level and that the separation package that was given him, if he planned his money appropriately and waited until he could collect Social Security, he may get by.
(*Gall Depo.* at 160).

Hite's statement to Gall that terminating Plaintiff is "like terminating my father" could simply demonstrate that Hite's decision was not an easy one. The comment does not necessarily evince a discriminatory animus.

Instead, the statement indicates a disinclination to fire an older worker, since virtually no one, presumably, would wish to fire his or her father. The Court does not conclude, nor could a reasonable factfinder, that a supervisor would find firing his father an easy task.

In addition to Hite's statements, Plaintiff cites to Hite's inquiry to Shelly Knapp regarding his "options" with respect to Plaintiff as direct evidence of discrimination. Hite testified on deposition that he made the inquiry based on "what Roger Beebe had told me about [Plaintiff's] spotty performance." (*Hite Depo.* at 184). Hite inquired about the possibility of Plaintiff retiring but remaining as a consultant to train a new hire. According to Hite, such an arrangement would be a way "for Roger to leave the organization with dignity and actually give something back to the organization." (*Id.* at 186). The option was rejected, however, and Plaintiff was given the opportunity to improve his performance. (*Id.*).

*9 The Court does not find the inquiry by Hite to constitute direct evidence of discrimination. It is undisputed that Plaintiff was performing poorly at the time. Moreover, Plaintiff was not terminated until six months after Hite's inquiry was made. It was clear at that juncture that Plaintiff's performance had not improved.

Finally, the Court notes Plaintiff's reliance on Gall's observation that the corporate hierarchy at Defendant Genting was "getting younger." Gall testified on deposition that this observation was made in connection with a voluntary reduction in force program which Genting initiated in February 1999. (*Gall Depo*. at 83). The program was initiated to further Defendant's goal to "reduce costs and improve our competitive position." (Exhibit 26 attached to *Gall Depo.*). Those eligible to participate were "employees age 61 or over as of April 1, 1999, in all job titles of GENTINGE/Castle, Inc., USA." (*Id.*). The Fact Sheet issued by Defendant to its employees states that the decision to participate "is solely yours." (*Id.*). Gall conceded on deposition that the rationale behind the voluntary reduction in force

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d  
(Cite as: 2002 WL 31951256, *9 (S.D.Ohio))

Page 8

initiative was to "reduce the ranks of the highly compensated employees." (*Gall Depo.* at 84).

In view of the context in which Gall's observation of the corporate hierarchy "getting younger" was made, the Court cannot conclude that the same demonstrates direct evidence of a discriminatory animus sufficient to prevent summary judgment. As the Defendant points out, a corporate decision to offer voluntary early retirement plans does not equate with a discriminatory age-based animus. *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66 (6th Cir.1982). Further, purely voluntary early retirement plans do not constitute a policy of discrimination on the part of the company. *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510 (6th Cir.1991). In sum, Gall's observations do not support a finding of direct evidence of age discrimination. [FN5]

> FN5. The fact that the evidence relied on by Plaintiff does not constitute direct evidence of discrimination does not necessarily preclude Plaintiff from introducing the evidence at trial. The Court will consider issues of admissibility with respect to particular statements *etc.,* at a later date.

2. Indirect Evidence of Age Discrimination

Plaintiff argues that his age discrimination claim is supported using the indirect method of proof. With respect to a *prima facie* showing of discrimination, it is undisputed that Plaintiff is a member of protected class who suffered an adverse employment action and who was replaced by a person from outside his protected class. The issue before the Court at the *prima facie* stage of the analysis is whether Plaintiff was qualified for the position.

Defendant argues that Plaintiff was not qualified for the position because he was not performing the job satisfactorily. Defendant cites the Sixth Circuit decision in *Kahl v. The Mueller Co.,* No. 98-1176, 1999 WL 196556 (6th Cir. April 1, 1999) for the standard in this regard. In *Kahl,* the Sixth Circuit held that "[a]n employee may establish that he was 'qualified' by proving that he was performing the job at a level that met the employer's legitimate expectations and that 'he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance.' " *Id.* at *5, quoting *Town v. Michigan Bell Telephone Co.,* 568 N.W.2d 64, 69-70 (Mich.1997). In *Kahl,* the Plaintiff performed his job as a sales representative satisfactorily for a number of years. In the four years preceding his termination, the Plaintiff's performance began to decline and he was placed on probation. Plaintiff performed poorly on probation and was ultimately terminated for poor performance and failure to respond to the terms of probation. The Sixth Circuit concluded that Plaintiff did not prove he was "qualified" for the position because of his poor job performance. *Id.*

*10 Plaintiff disputes the standard for "qualified" relied on by Defendants. Plaintiff cites *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651 (6th Cir.1999), for the proposition that the Court should not consider evidence of the nondiscriminatory reason for discharging Plaintiff when assessing whether a Plaintiff is performing to the employer's legitimate expectations.

In *Cline,* the Plaintiff sued the Catholic Diocese of Toledo under Title VII and the Ohio Civil Rights Act for discrimination on the basis of pregnancy. Plaintiff was a second grade teacher at a Catholic school. The school chose not to renew Plaintiff's contract when Plaintiff became visibly pregnant only a short time after marrying. In considering whether Plaintiff established a *prima facie* case for discrimination, the Sixth Circuit discussed the "qualified" prong of the analysis, at length. The district court had concluded that Plaintiff failed to show she was qualified since at the time of her termination, Plaintiff was in violation of a policy of the school that teachers not engage in premarital sex. The legitimate non-discriminatory reason proffered for Plaintiff's termination was her violation of the policy against premarital sex.

The Sixth Circuit held that the district court "improperly imported the later stages of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d
(Cite as: 2002 WL 31951256, *10 (S.D.Ohio))

Page 9

*McDonnell Douglas* inquiry into the initial prima facie stage." *Id.* at 660. The Court concluded that Plaintiff was qualified for the position in light of her positive performance reviews prior to the termination. The court stated that, "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Id.* at 660-61. "[W]hether or not a plaintiff makes a prima facie case must be ascertained by weighing the plaintiff's evidence that she was meeting her employer's legitimate expectations, not by considering the nondiscriminatory reasons produced by the defendant as its reason for terminating [plaintiff]." *Id.* at 662-63. The Sixth Circuit went on to state that "this determination will often involve assessing whether the plaintiff was meeting the employer's expectations *prior to* the onset of the events that the employer cites as its reason for the termination, because weighing the litigants' evidence on the veracity and propriety of that nondiscriminatory explanation compromises the 'ultimate issue' of the case." *Id.* at 663 (emphasis in original).

The Sixth Circuit had occasion to apply these principles again in *Strickland v. Federal Express Corp.,* No. 00-6582, 2002 WL 2026385 (6th Cir. Aug. 29, 2002). The Sixth Circuit stated that the "test for determining whether an employee is otherwise qualified is whether 'he was doing his job well enough to meet his employer's legitimate expectations.' " *Id.,* citing *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1023 (6th Cir.2000) and *Chappell v. GTE Products Corp.,* 803 F.2d 261, 266 (6th Cir.1986). "To establish [the] prima facie element of being otherwise qualified, [Plaintiff] must show that [he or] she was qualified at the time of ... termination." *Id.* Further, to prevail on this prong, Plaintiff "must present evidence at least contesting [Defendant's] claims regarding [Plaintiff's] inadequacy, reasonably contemporaneous with the adverse employment action." *Id.*

*11 It is clear that the Court must be careful not to conflate the "qualified" prong of the *prima facie* case for discrimination with the Defendants' evidence of independent non-discriminatory reason for discharging Plaintiff. *Cicero v. Borg-Warner Automotive, Inc.,* 280 F.3d 579, 585 (6th Cir.2002). "A court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." *Id.* (citation omitted). Prior work history is not necessarily probative of the second and third parts of the *prima facie* case, but it can be considered since "[e]mployers regularly consider a potential employee's prior work experience to decide whether that individual is qualified for the position. *Id.* at 586.

In this case, Plaintiff argues that he was qualified because he had the requisite training, education and experience for the job and since his long-term record indicates that he performed well. Defendant argues that, while Plaintiff may have been objectively qualified for the position, his performance was poor in the eighteen months before he was placed on probation. Plaintiff satisfied only 66% of his sales objective in 1999 and only 11% in the first half of 2000. For almost two years prior to his termination, Plaintiff ranked near the bottom of Defendant's sales rankings.

The Court concludes that Plaintiff satisfies the "qualified" portion of the *prima facie* case for discrimination. While Defendant contends that Plaintiff's work performance in the 18 months prior to termination was poor, his general performance before that time was satisfactory. Indeed, in 1997 and 1998, Plaintiff exceeded his sales objectives. ( *Plaintiff's Depo.* at 809-84). To consider Plaintiff's poor performance in 1999 and the first six months of 2000 in connection with determining whether Plaintiff is "qualified" would, in the Court's view, improperly conflate the analysis at the *prima facie* stage with the employer's rebuttal evidence in the second phase of the *McDonnell Douglas* analysis. Thus, the Court looks to Plaintiff's record prior to the time of events leading to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d  
(Cite as: 2002 WL 31951256, *11 (S.D.Ohio))

Page 10

his termination in determining whether he was qualified. In view of this evidence, the Court concludes that Plaintiff was "qualified" for the position for purposes of establishing a *prima facie* case using indirect evidence.

*Defendant's Non-Discriminatory Reason for Discharge*

Defendant argues that, even if Plaintiff establishes a *prima facie* case for age discrimination, it had a legitimate, non-discriminatory reason for Plaintiff's discharge. Specifically, Defendant contends that Plaintiff's poor performance for 18 months coupled with his inability to improve while on the 90 day probationary period, is a legitimate reason for discharge. The evidence is, indeed, undisputed that Plaintiff was performing poorly during this time period. The evidence further reveals that it was within Defendants' discretion to terminate an employee for such poor performance. Based on the evidence, the Court finds that Defendants have come forward with evidence sufficient to support a legitimate nondiscriminatory reason for the termination.

*12 The Court next considers Plaintiff's contention that the stated reasons for his discharge are merely pretext for unlawful discrimination.

*Pretext*

The Sixth Circuit has recognized three primary ways for a Plaintiff to show that the Defendant's proffered reason for the adverse employment action is merely a pretext for discrimination. The Plaintiff may show " 'either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate his [or her] discharge; or (3) that they were insufficient to motivate discharge." ' *Weigel v. Baptist Hospital of East Tennessee,* 302 F.3d 367, 377 (6th Cir.2002), quoting *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994).

In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147-49 (2000), the Court outlined the Plaintiff's burden as to pretext:

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.... In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred ..... Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.... It suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.


Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d  
(Cite as: 2002 WL 31951256, *13 (S.D.Ohio))

Page 11

*13 (internal citations omitted).

In this case, Plaintiff contends that pretext is satisfied by evidence that he was treated less favorably than other sales representatives who allegedly performed more poorly than Plaintiff but were not terminated. In particular, Plaintiff claims that sales representatives Greg Houser, Michael Kelly, Charles Hannigan and Kathy Watkins all performed poorly but are still employed. Sales representative Matt Gibbs failed to meet his quota but was allegedly promoted.

Employees may be considered "similarly situated" to the Plaintiff if all of the relevant aspects are nearly identical. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6 th Cir.1994). In *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992), the Sixth Circuit held that "the individuals with whom the plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct." The Plaintiff need not, however, demonstrate "an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated.' " *Ercegovich,* 154 F.3d at 352. Rather, Plaintiff must show "relevant similarity." *Clayton v. Meijer, Inc.,* 281 F.3d 605, 611 (6th Cir.2002), quoting *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000).

Greg Houser was hired in 1992. In 2000, Houser was forty years old. Houser sold in a different territory and reported to a different supervisor than Plaintiff. Houser was placed on probation for failure to meet his sales objectives in 1997 and 1998. By mid-year 1999, Houser achieved 110% of his sales objective. (Exhibit A attached to *Knapp Affidavit* ).

Michael Kelly was hired as an Architectural Drafter in 1980. Kelly worked as a sales representative in 1998 and 1999 in a different region than Plaintiff. (*Id.*). In 2000, at age 42, Kelly left the sales division and became a Facilities Design Analyst. (*Id.*).

Charles Hannigan was 41 years old in 2000. He failed to meet his sales objectives in 1997 and 1998. In 1999, Hannigan met 147% of his objective and in 2000, he satisfied 182% of his objective. (*Id.*).

Kathy Watkins was hired in 1997 and was assigned to a different territory than Plaintiff. She was age 50 in 2000. Watkins failed to meet her objective in 1997 but in 1998, she satisfied 141% of her objective. In 1999, she satisfied only 78% of her objective but in 2000, she satisfied 136% of her objective. (*Id.*).

Matt Gibbs was hired by Defendant in 1997. He was age 30 in 2000. He failed to meet his sales objective in 1997 and 1998. In 1999 and 2000, his sales territory was incorporated into another territory. Gibbs was transferred to the position of Project Manager, but was later terminated in 2001 as part of an economic reduction in force. Defendant disputes Plaintiff's characterization that the Project Manager transfer was a promotion.

*14 Defendant contends that the foregoing employees cannot be similarly situated to Plaintiff because they all sold in different sales territories and were under the authority of different supervisors. While the foregoing is true, the Court cannot necessarily conclude that the employees are not similarly situated to Plaintiff. It is unclear from the record if more than one sales representative was assigned to a particular territory. If there were only one sales representative in a particular territory, then the fact that each employee has different territories and supervisors would not defeat a comparison with Plaintiff.

It is undisputed in this case that Plaintiff was terminated after failing to meet his sales objective for eighteen months. As Plaintiff points out, Greg Houser did not meet his objective for two years but was not terminated; Michael Kelly did not meet his objective for three years but was not terminated; and Charles Hannigan and Matt Gibbs did not meet their objectives for two years but were not terminated. [FN6] Based on this evidence, the Court concludes that there is at least a genuine issue of material

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d
(Cite as: 2002 WL 31951256, *14 (S.D.Ohio))

Page 12

fact that Plaintiff was treated less favorably than similarly situated employees. Thus, Plaintiff has satisfied his burden of establishing an issue for a factfinder as to pretext.

> FN6. The Court cannot conclude that Kathy Watkins was treated more favorably than Plaintiff because she only failed to satisfy her objective for one year.

Plaintiff also contends that pretext is supported by the alleged unreasonableness of the $241,000 monthly sales requirement Plaintiff was subject to while he was on probation in 2000. As stated above, Plaintiff was placed on probation in June 2000 and was required to: (1) provide his supervisor, Brad Hite, with a sales call action plan each week; (2) submit a minimum of ten new proposals each month; (3) follow-up on specifically identified projects; and (4) generate at least $241,000 per month in sales. (Exhibit 92 attached to *Hite Depo.*). The latter figure was based upon Plaintiff's projections at the June 2000 meeting combined with what Hite deemed an acceptable monthly objective. (*Hite Depo.* at 56-57).

Plaintiff argues that the objective was excessively high. Since 1995, only seven employees had been placed on monthly quota requirements. Of the seven, one had a quota of $200,000. The remainder had quotas of between $100,000 to $167,917 per month. (Exhibit B attached to *Plaintiff's Memorandum contra* ). Further, Plaintiff claims that in 1997, only one sales representative had sold $241,000 for three consecutive months. (*Id.*). In 1998, no salesman achieved such a figure. In 1999, six sales representatives out of twenty-three achieved the figure and in 2000, three out of twenty-five had achieved the figure. (*Id.* ).

On July 27, 2000, Plaintiff met with Hite to review his July 2000 sales objective. At that time, Plaintiff had made $74,403 in sales during the month. (Exhibit 93 attached to *High Depo.*). Hite told High that the figure was not acceptable. (*Id.*). On July 28, 2000, Hite met with Gall, the Project Manager for the region at issue. Gall told Hite that many projects in the region would not come to fruition in 2000. (*Hite Depo.* at 58-59). Consequently, Hite informed Plaintiff that he should make a "more realistic" business plan to meet the year end sales quota. (*High Depo.* at 96). Plaintiff failed to make such a revised plan. Plaintiff achieved only one sale in August 2000, totaling $20,544.

*15 Gall testified on deposition that "[i]t is a well known fact that our business is cyclical." ( *Gall Depo.* at 25). Further, according to Gall:
[M]ost people in our business ... find a cyclical nature to their performance, at least quantitatively. That was what I thought was very progressive about our company, in that we didn't totally judge performance on quantitative numbers. We at least at the time, felt that our business is cyclical and there will be times when a person will underperform with regard to the quantitative results.
(*Id.* at 26).

Given the nature of the business at issue in this case, and Gall's statement that it was unlikely that Plaintiff could achieve the $241,000 monthly goal for the remainder of 2000, it is arguable that the quota was unreasonable. While it is undisputed that Plaintiff was given the opportunity to revise the goal but failed to do so, the evidence presented at least raises a genuine issue of fact as to whether the requirement was pretext for discrimination.

In sum, Defendants' Motion for Summary Judgment on Plaintiff's age discrimination claim is denied.

3. Liability of Individually Named Defendants Hite and Beebe

Defendants Hite and Beebe contend that even if Plaintiff's claim for age discrimination survives, they should be dismissed because Plaintiff cannot satisfy the standard for individual liability under Ohio law.

In *Genaro v. Central Transport, Inc.*, 84 Ohio St.3d 293, 300 (1999), the Ohio Supreme Court held that "the clear and unambiguous

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




language of R.C. 4112.01(A)(1) and (A)(2), [FN7] as well as the salutary antidiscrimination purposes of R.C. Chapter 4112, and this court's pronouncements in cases involving workplace discrimination, all evidence that individual supervisors and managers are accountable for their own discriminatory conduct occurring in the workplace environment." Further, individual employees are liable for their own discriminatory acts as well. *Cheek v. Industrial Power Coatings, Inc.*, 84 Ohio St.3d 534 (1999). In *McCormick v. Kmart Distribution Center*, 163 F.Supp.2d 807, 823 (N.D.Ohio 2001), the court held that the standard for individual liability under R.C. § 4112 depends on whether the employee "misused" his authority in any way to influence or harass the Plaintiff.

> FN7. The statute provides:
> "Employer" includes that state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of the employer.
> R.C. § 4112.01(A)(2).

Defendants Hite and Beebe in the case at bar argue that the evidence does not support such a finding. Plaintiff disagrees. Plaintiff claims that Beebe harbored a personal animosity toward Plaintiff. Plaintiff further claims that Beebe misused his authority by placing Plaintiff on probation twice during the 1980s. Plaintiff also claims that Beebe misused his authority by concluding that Plaintiff should only receive four weeks severance pay upon his termination. [FN8] Defendant Beebe points out that, although there were times when he criticized Plaintiff's work, he also congratulated Plaintiff on his high performance in 1997 and 1998. (Exhibits 83 and 84 attached to *Plaintiff's Depo.*).

> FN8. This allegation is not probative of age discrimination since the decision to terminate Plaintiff had already been made.

*16 As Defendant Beebe points out, a personality conflict alone cannot support a claim for age discrimination. *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir.1982). Although it is clear that Beebe was pleased with Plaintiff's performance in 1997 and 1998, Plaintiff claims that Beebe spoke negatively to Hite when Beebe became Plaintiff's supervisor in February 2000. (*Hite Depo.* at 44). The Court finds that there is a genuine issue of fact as to whether the evidence presented goes beyond a mere personality conflict and amounts to a personal act of discrimination. Thus, the Court cannot conclude, as a matter of law, that Beebe cannot be held individually liable under § 4112. The issue must be resolved by the trier of fact.

The Court reaches the same conclusion with respect to Defendant Hite. While the Court concluded *supra*, that Hite's statements are not direct evidence of age discrimination, a genuine issue of material fact exists as to whether the events in which Hite was involved--specifically, the requirements which Hite implemented for Plaintiff while he was on probation in 2000, are sufficient to hold Hite individually liable for discrimination under § 4112.

In sum, as it pertains to Plaintiff's claims for individual liability against Defendants Hite and Beebe, the Motion for Summary Judgment is denied.

B. Retaliation

Defendants move for summary judgment on Plaintiff's claim that Defendant Genting retaliated against him by not paying him a full severance package at the outset of his termination. As stated above, prior to his termination, Plaintiff was offered severance pay of four weeks, pay for all unused vacation, together with the vacation time he would have earned for the remainder of 2000, a two-month continuation of a vehicle lease, and outplacement services. (*High Depo.* at 102). It is undisputed, however, that the Defendant's severance policy provided that High would receive outplacement services and 75% of the continuation of pay on a scale for years of service. (Exhibit K attached to *Plaintiff's Memorandum contra* ). For Plaintiff, the scale resulted in 26 weeks severance pay.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d  
(Cite as: 2002 WL 31951256, *16 (S.D.Ohio))

Page 14

Plaintiff rejected the initial offer and retained a lawyer. On October 26, 2000, counsel for the Defendant proposed offering Plaintiff twenty-six weeks severance pay conditioned on Plaintiff signing a release. Plaintiff refused the offer. Plaintiff commenced this case on February 23, 2001. On March 9, 2001, Defendant tendered Plaintiff a check for 26 weeks severance pay at 75% of his base salary. Plaintiff cashed the check and concedes he has received payment in full under the Defendant's policy. (*High Depo.* at 239). Plaintiff nonetheless contends that the Defendant retaliated against him by not paying him the full severance pay at the outset.

Under Ohio law, it an unlawful discriminatory practice:
> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or heading under sections 4112.01 to 4112 .07 of the Revised Code.

*17 R.C. § 4112.02(I). In order to state a claim for retaliation, the Plaintiff must show: (1) that he or she is a member of a protected class or engaged in protected activity under Ohio law; (2) that the protected status or activity was known to the defendant; (3) that the defendant took an adverse employment action against Plaintiff; and (4) that there was a causal connection between the protected activity and the adverse action. *Peterson v. Buckeye Steel Casings,* 133 Ohio App.3d 715, 727 (1999).

In this case, Plaintiff's allegations that he was retaliated against because he retained a lawyer is not causally supported by the evidence. Plaintiff was offered a lower severance pay prior to retaining counsel. Thus, to this extent, the motion for summary judgment is meritorious.

In his memorandum *contra,* Plaintiff also contends that he was retaliated against for not having participated in the voluntary reduction in force which Genting offered in February 1999. Plaintiff claims that "shortly thereafter, [Plaintiff] was wrongfully terminated and offered only part of his earned severance." (*Memorandum contra* at 35). In order to establish a causal connection between the two events, Plaintiff must proffer evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Burns v. Jacor Broadcasting Corp.,* 128 F.Supp.2d 497, 514 (S.D.Ohio 2001).

In this case, Plaintiff relies solely on the timing of the two events in support of his claim. Plaintiff's termination in November 2000 is, however, too remote from the offering of voluntary severance in February 1999 to give rise to an inference of retaliation. In the absence of other evidence to support an inference of retaliation, the Court concludes that the timing of the two events alone is insufficient to give rise to a genuine issue of material fact. [FN9] Therefore, Defendants' motion for summary judgment on Plaintiff's retaliation claim is granted.

> FN9. The evidence could, if appropriate, be used to support the underlying age discrimination claim.

C. Promissory Estoppel

Defendants move for summary judgment on Plaintiff's promissory estoppel claim arising from Genting's initial failure to tender to Plaintiff severance pay in accord with the Defendant's policy. Defendants contend that since it is undisputed that Plaintiff has received the pay under the policy, Plaintiff's claim is moot. Plaintiff contends that he is "still suffering damages as a result of Genting's failure to pay him interest on the four months and nine days [Plaintiff] had to wait to receive his severance payment." (*Memorandum contra* at 37).

A claim for promissory estoppel under Ohio law requires the existence of: (1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance was reasonable and foreseeable; and (4) injury as a result of the reliance. *Weiper v. W.A. Hill and Assoc.,* 104 Ohio App.3d 250 (1999).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




Not Reported in F.Supp.2d
(Cite as: 2002 WL 31951256, *17 (S.D.Ohio))

Page 15

In this case, Plaintiff concedes that he has been paid in full pursuant to the Defendants' severance policy. (*High Depo.* at 239). Under the Ohio prejudgment interest statute, R.C. § 1343.03(A), (C), a settlement does not preclude Plaintiff from recovering interest on a claim from the date the sum became due and owing, assuming that the amount owing is clear. *Outdoor Fitters, Inc. v. Fireman's Fund Ins. Co.*, 98 Ohio App.3d 733, 736 (Hamilton Co.1994). In this case, there is no dispute that the amount owed Plaintiff under the severance agreement was clear. Thus, Plaintiff's claim that he has been injured by Defendant's failure to make the interest payment for four months and nine days is meritorious. Defendants' Motion for Summary Judgment on the promissory estoppel claim is denied.

IV.

*18 In light of the foregoing, Defendants' Motion for Summary Judgment (Doc. # 32) is GRANTED in part and DENIED in part.
IT IS SO ORDERED.

2002 WL 31951256 (S.D.Ohio)

END OF DOCUMENT



Copr. © West 2003 No Claim to Orig. U.S. Govt. Works