**Page 1**

```
            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF OHIO
                  WESTERN DIVISION

-----------------------------------
                                   :
DOUGLAS W. BAILLIE,                :
                                   :
         Plaintiff,                :
      vs.                          :    CASE NO.
                                   :    C-1-02-062
CHUBB & SON INSURANCE,             :
                                   :
         Defendant.                :
                                   :
-----------------------------------



     DEPOSITION OF:      ANDREW BRYANT
     TAKEN:              By The Plaintiff
     DATE:               March 17, 2003
     TIME:               Commencing at 9:50 a.m.
     PLACE:              Offices of:
                         Freking & Betz
                         215 East Ninth Street
                         Fifth Floor
                         Cincinnati, Ohio  45202
     BEFORE:             Theresa Lynn Westfelt
                         Court Reporter
                         Notary Public - State of Ohio
```

**Page 2**

```
APPEARANCES:

    On behalf of the Plaintiff:

        RANDOLPH H. FREKING, ESQ.
           of
        Freking & Betz
        215 East Ninth Street
        Fifth Floor
        Cincinnati, Ohio  45202

    On behalf of the Defendant:

        DAVID T. CROALL, ESQ.
           of
        Porter, Wright Morris & Arthur LLP
        250 East Fifth Street
        Suite 2200
        Cincinnati, Ohio  45202

                    - - -

            S T I P U L A T I O N S

        It is stipulated by and between counsel for
the respective parties that the deposition of ANDREW
BRYANT, a witness herein, may be taken at this time by
Counsel for the Plaintiff as upon cross-examination
pursuant to the Federal Rules of Civil Procedure; that the
deposition may be taken in stenotypy by the notary
public-court reporter and transcribed by her out of the
presence of the witness; that the transcribed deposition
is to be submitted to the witness for his examination and
signature, and that signature may be affixed out of the
presence of the notary public-court reporter.
```

**Page 3**

```
                    I N D E X

ANDREW BRYANT                                  PAGE

CROSS-EXAMINATION BY MR. FREKING                 4

EXAMINATION BY MR. CROALL                        -


                    EXHIBITS

                  (No Exhibits).



               CONFIDENTIAL EXCERPTS

                  Page 14 - 15

                  Page 23 - 26

                  Page 32 - 39
```

**Page 4**

         ANDREW BRYANT
of lawful age, a witness herein, being first duly sworn as
hereinafter certified, was examined and deposed as
follows:
         CROSS-EXAMINATION
BY MR FREKING:
    Q.  Hi, Andy.  My name is Randy Freking and I
represent Doug Baillie in a case that's currently pending
in Federal District Court in Cincinnati against Chubb.
And we're here today to conduct your deposition to find
out what you may or may not know about matters that may or
may not be relevant to his case.
         Could you please start the deposition by
simply stating your full name, your family status, your
current home address, and your current telephone number?
    A.  Andrew Broaddus Bryant, B-R-O-A-D-D-U-S.
Married.  I live at [REDACTED],
[REDACTED]
    Q.  I'm sorry, what city do you live in?
    A.  Goshen.
    Q.  Ohio?
    A.  Kentucky.
    Q.  Oh.  And what's your home telephone number?
    A.  [REDACTED]

### Page 5

1    Q. Okay. Do you have any children?
2    A. One.
3    Q. How old?
4    A. Four.
5    Q. I assume he doesn't have anything to do with
6 -- he or she doesn't have anything to do with Chubb
7 Insurance?
8    A. Not much, as little as possible.
9    Q. Yeah. Does your spouse work outside of the
10 home?
11    A. She's a physician.
12    Q. Okay. I assume she doesn't have anything to
13 do with Chubb Insurance; is that correct, other than being
14 married to someone who works for Chubb?
15    A. Correct.
16    Q. Have you ever had your deposition taken
17 before?
18    A. Yes.
19    Q. Tell me a little bit about that.
20    A. It was a coverage position on an insured.
21    Q. You mean your deposition was taken by
22 someone who was claiming they were covered under a Chubb
23 Insurance policy?
24    A. Yes.

### Page 6

1    Q. That reminds me, there's a few rules today;
2 Andy, any response you have to give has to be verbal. The
3 court reporter won't guess what you mean if you shake your
4 head or make some other gesture.
5    Secondly, if I ask you a question today and
6 you don't understand the question, please let us know,
7 otherwise we will assume that you understood the question
8 and the terms I used, although, I will try to be as simple
9 as I possibly can.
10    Thirdly, if you'd like to take a break at
11 any time, this is your deposition, not mine, not Mr.
12 Croall's, so you can take a break whenever you want to.
13 The only question we ask is that you don't do it while
14 there's a question pending.
15    A. Understood.
16    Q. Fourthly, you can consult with Dave at any
17 time you like, same caveat, and he may --
18    MR. CROALL: Disagree.
19    Q. -- disagree.
20    MR. CROALL: Even though there's a question
21    pending, if you feel like you need to ask me
22    something, you can.
23    Q. And fifthly, Dave may make an objection now
24 and again to a question and unless he would direct you not

### Page 7

1 to answer, you still answer the question despite the
2 objection because there's no judge here to rule on it.
3 The judge can rule on the objection later on. That's the
4 procedure, unless we anoint Theresa here as a Federal
5 District judge or magistrate.
6    MR. CROALL: I don't think we're allowed to
7    do that.
8    MR. FREKING: I don't think we're allowed to
9    do that.
10    Q. I think that's about it, okay?
11    A. Understood.
12    Q. Great. Tell me a little bit about your --
13 can you just outline maybe your career with Chubb.
14    A. I stated with Chubb in 1985 as a trainee in
15 Cincinnati. Approximately six months later I moved to
16 Cleveland, Ohio as an underwriter. Worked in Cleveland,
17 Ohio for a year-and-a-half.
18    Transferred to Houston, Texas for seven
19 years. Worked as an underwriter, then department manager
20 in Houston. Transferred to Louisville, Kentucky. Worked
21 there for three years, then became the Marketing Head for
22 the Kentucky territory, still with Chubb. Been in that
23 position since then.
24    Q. Okay. When did you become the Marketing

### Page 8

1 Head, approximately?
2    A. Approximately June of '98.
3    Q. Prior to June of 1998, did you even know
4 Doug Baillie?
5    A. No, I did not.
6    Q. And when do you believe you met Doug
7 Baillie, approximately?
8    A. August or September of '98.
9    Q. All right. And why do you say August or
10 September of 1998?
11    A. That's when I believe I met Doug.
12    Q. Is there some particular reason why you met
13 him at that time?
14    A. Bill Reynolds left the company, I believe,
15 in June of '98 and Doug replaced Bill.
16    Q. Okay. And did you report to Mr. Reynolds?
17    A. Yes.
18    Q. Did you report to him while you worked in
19 Louisville?
20    A. Yes.
21    Q. Had you ever -- did you report to him at any
22 other time?
23    A. No.
24    Q. Okay. How was your relationship with Mr.

Page 9

1 Reynolds?
2    A. Short-lived.
3    Q. How long was the reporting relationship with
4 Mr. Reynolds?
5    A. Approximately one month, maybe six weeks.
6    Q. Do you believe you played any role
7 whatsoever in Mr. Reynolds leaving his position?
8    A. None.
9    Q. You weren't consulted on it, you did not
10 provide any kind of input whatsoever to anybody --
11    A. No.
12    Q. -- regarding Mr. Reynolds?
13      How about Mr. Baillie, do you believe you
14 played any sort of -- any role whatsoever in the decision
15 to terminate Mr. Baillie?
16    A. No.
17    Q. Did you ever discuss Mr. Baillie with any
18 official at Chubb that you can recall?
19    A. Not that I can recall.
20    Q. Okay. Did you ever have any discussions
21 with Tim Zerlong regarding Mr. Baillie?
22    A. No.
23    Q. Do you think you had any discussions with
24 anybody regarding Mr. Baillie that you can recall?

Page 10

1    A. I'm not sure I understand the question.
2    Q. Do you recall having any discussions with
3 anybody about Mr. Baillie?
4    A. "Any discussions"?
5    Q. Uh-huh.
6    A. Yes.
7    Q. Okay. Tell me about any discussions you can
8 recall that you had regarding Mr. Baillie with anyone.
9    A. Preparation for meetings, just general
10 background information on what would happen at meetings,
11 you know, how to prepare for them with Doug, those sorts
12 of conversations.
13    Q. Okay. What types of meetings would you have
14 with Mr. Baillie?
15    A. We would have marketing meetings. We would
16 meet with agents. I would have my annual review. That
17 would be the bulk of our meetings.
18    Q. Can you think of any other meetings you
19 would have with him besides marketing meetings, meetings
20 with agents, and your personal annual review?
21    A. And we got agency calls.
22    Q. That's the same as meeting with agents?
23    A. Yes, yes.
24    Q. Okay.

Page 11

1    A. (Continued) That's the lion's share of what
2 we did. I'm not -- nothing else is jumping to my head.
3    Q. Okay, great. Do you have any notes or
4 documents or pieces of paper or any other record of your
5 meetings over the two or three-year period with Mr.
6 Baillie?
7    A. No, I'm not a paper person.
8    Q. Okay. How often do you think you had
9 marketing meetings with Mr. Baillie during the three years
10 or so you reported to him?
11    A. Monthly.
12    Q. And where were those typically held?
13    A. Louisville.
14    Q. And who all, Andy, would attend those
15 meetings as a general rule?
16    A. The underwriting staff that handled the
17 Kentucky territory.
18    Q. And yourself?
19    A. And myself.
20    Q. And Mr. Baillie?
21    A. Not always.
22    Q. Would he participate in the meeting in any
23 other way? If he was not physically there, would he --
24    A. No.

Page 12

1    Q. Okay. So meetings with Baillie, obviously,
2 would include him, you, and members of the underwriting
3 staff?
4    A. Yes.
5    Q. But sometimes you had underwriting -- you
6 had these marketing meetings without Mr. Baillie present?
7    A. Correct.
8    Q. Can you remember any particular reason why
9 Mr. Baillie would miss one or more of these marketing
10 meetings?
11    A. He didn't think it was necessary to have him
12 there.
13    Q. Okay. Did you have any particular
14 disagreement with Mr. Baillie's opinion on that that can
15 you recall?
16    A. His attending?
17    Q. Uh-huh.
18    A. No.
19    Q. You know, he would tell you "I don't think
20 it's necessary for me to attend this month," did you ever
21 think "God, Doug, that's not a good idea"?
22    A. That would be fine with me.
23    Q. Okay. And how many members, generally,
24 would be on the underwriting staff? Are you talking about

Page 13

1 a large group, small group, medium size group, crispy
2 crust group?
3    A.  Ten.
4    Q.  Ten?
5    A.  Ten, twelve.
6    Q.  All right. How about -- and how would -- do
7 you recall anything -- what was Mr. Baillie's role with
8 respect to these marketing meetings? A fly on the wall?
9 Leader? Participant? Cocktail waitress?
10   A.  Generally speaking, fly on the wall.
11   Q.  Okay. Was that acceptable to you?
12   A.  Yes.
13   Q.  Do you recall any particular problems with
14 anything Mr. Baillie ever did during any of these monthly
15 marketing meetings that you can recall? Or did you
16 generally believe that he was fulfilling whatever role he
17 was supposed to fulfill?
18   A.  Doug, in my mind, did not add much to the
19 meeting.
20   Q.  And you thought that on a regular basis or
21 was that just an occasional fact?
22   A.  More often.
23   Q.  Okay. Did you expect him to add much to the
24 meetings?

Page 14

1    A.  Yes.
2    Q.  Okay. What did you expect him to add?
3    A.  A sense of direction for his overall goals,
4 communicate to my staff and myself continued direction of
5 the corporation, and guidance from his experience as a
6 manager.
7    Q.  Did he ever express to you his view that he
8 thought the Louisville office was doing just fine and
9 didn't need his particular guidance?
10   A.  Not that I recall.
11   Q.  How were your performance reviews during
12 this period of time?
13       MR. CROALL: Designate as confidential, but
14   you can answer.
15   A.  Elaborate. How do you mean?
16   Q.  How were they? Were they okay? Acceptable?
17 Did you need improvement? Were they critical?
18   A.  Oh.
19   Q.  (Continued) Were they positive?
20   A.  Overall, positive.
21   Q.  Okay. Do you believe that in this
22 three-year period or so that you worked under the
23 supervision of Mr. Baillie that he had a general positive
24 view of your performance?

Page 15

1    A.  Overall.
2    Q.  Okay. Do you recall any particular
3 constructive criticism Mr. Baillie had of your
4 performance?
5    A.  He would have liked to see me go out more
6 with my agents.
7    Q.  Okay.
8    A.  (Continued) And overall, he had an idea he
9 would like me to better plan with my agents.
10   Q.  Okay. Were you the direct supervisor of the
11 underwriting staff?
12   A.  No.
13   Q.  Who was?
14   A.  The underwriting managers of the
15 underwriting staff.
16   Q.  Okay. Would the underwriting managers
17 attend these monthly meetings?
18   A.  Yes.
19   Q.  Do you recall the names of the underwriting
20 managers?
21   A.  Dieter, D-I-E-T-E-R, Korte, K-O-R-T-E.
22   Q.  Okay. Anybody else?
23   A.  Not consistently.
24   Q.  What does that mean? Do you have

Page 16

1 underwriting managers come and go?
2    A.  Those were the primary underwriters we had
3 at the meeting, were the Package Underwriters who reported
4 to Dieter.
5    Q.  Oh, that's what I meant. Were there any
6 other underwriting managers besides Dieter during this
7 period of time?
8    A.  For package business, no.
9    Q.  For any -- anybody in --
10   A.  Yes.
11   Q.  You said there were monthly meetings with
12 the underwriting staff --
13   A.  David Corry.
14   Q.  Okay.
15   A.  (Continued) Andrew Emery. Tim Dadick.
16   Q.  Did Mr. Baillie, that you can recall, in
17 your performance appraisals ever criticize your
18 performance in any way with respect to these monthly
19 marketing meetings?
20   A.  No.
21   Q.  Okay. Do you have an opinion as to what Mr.
22 Baillie believed about the performance of your marketing
23 while you were head of the Kentucky operations?
24       MR. CROALL: You're asking him of his

Page 17

1  opinion of what Baillie thought?
2      MR. FREKING: Yes.
3  A.  I have no idea, other than what I told you.
4  Q.  Other than the constructive criticism you
5  received from Mr. Baillie regarding your performance with
6  vis-a-vis your agents?
7  A.  Correct.
8  Q.  Okay. Otherwise he thought you were doing
9  okay?
10 A.  That would be my opinion.
11 Q.  Yeah. Were these performance appraisals in
12 writing?
13 A.  Yes.
14 Q.  Okay. Were they done, like, on an annual
15 basis?
16 A.  Yes.
17 Q.  Do you think that the performance appraisals
18 you were given were timely?
19 A.  Yes.
20 Q.  Did you think they were fair and accurate?
21 A.  Yes.
22 Q.  What was your reaction to Mr. Baillie's
23 constructive criticism that you needed to go out more with
24 your agents? Did you agree or disagree with that?

Page 18

1  A.  Wasn't sure what he wanted to have
2  accomplished from those meetings.
3  Q.  Well, didn't he tell you he wanted you to
4  have a better plan for your agents?
5  A.  Those were different meetings.
6  Q.  Okay. So when he -- when -- you were
7  confused when -- what he wanted as a result of you going
8  out more with your agents?
9  A.  He wanted me to mix it up more, socialize
10 more.
11 Q.  Okay. He wanted you to establish a better
12 relationship with your agents; is that a fair reading of
13 that comment?
14 A.  That was what he was thinking, yes.
15 Q.  Okay. Did you attempt to do that?
16 A.  Yes, and Kentucky agents aren't big
17 socializers.
18 Q.  Okay. Did you report back to Mr. Baillie
19 that you tried to do it but Kentucky agents were not big
20 socializers?
21 A.  Yes.
22 Q.  And what was his response to that?
23 A.  I'm having a hard time recalling.
24 Q.  Okay. Did you take any action against any

Page 19

1  of the Kentucky agents as a result of their performance?
2  A.  Oh, you mean their business performance?
3  Q.  Right.
4  A.  Yes.
5  Q.  And isn't it true that Mr. Baillie
6  recommended that you take action with respect to their
7  business performance?
8  A.  Yes.
9  Q.  And isn't that it fair to say that that was
10 one of Mr. Baillie's responsibilities?
11 A.  Yes.
12 Q.  Did you agree with Mr. Baillie's
13 recommendation to take particular action with respect to
14 Kentucky agents?
15 A.  Yes.
16 Q.  Why in your view was it necessary for Mr.
17 Baillie to make that recommendation? Meaning, why had you
18 not earlier taken action against these same Kentucky
19 agents that Mr. Baillie recommended that you take action
20 against?
21 A.  I was not the state manager prior to that
22 point.
23 Q.  You mean, prior to June of '98?
24 A.  Correct.

Page 20

1  Q.  So Mr. Baillie recommended that you take
2  action against these guys for their business performance
3  that occurred prior to June of '98?
4  A.  I think his concerns were more during his
5  watch.
6  Q.  Right. And during his watch the performance
7  of the Kentucky agents improved, as a general rule?
8  A.  I'm not sure that's true.
9  Q.  Did they get worse? Did the performance of
10 Kentucky agents get worse under Mr. Baillie's watch?
11 A.  No, I can say that is not true.
12 Q.  Okay. Do you think they stayed about the
13 same?
14 A.  Overall.
15 Q.  As a general rule, do you think that the
16 performance of the Kentucky agents under your supervision
17 was acceptable during the time period that Mr. Baillie was
18 over you?
19 A.  Overall.
20 Q.  Okay. What was your reaction when Mr.
21 Baillie gave you the constructive criticism that you
22 should have a better plan with your agents?
23 A.  Confusion, and that it was never consistent
24 in what he was looking for in those plans.

Page 21

1  Q. Okay. Explain to me the inconsistencies, if
2  you recall.
3  A. Different points he wanted more of a
4  numerical plan.
5  Q. Meaning -- meaning what?
6  A. Set number of goals.
7  Q. Okay.
8  A. (Continued) To other times it would be more
9  verbal and the antidotal type planning.
10 Q. Did Mr. Baillie go back and forth between
11 these ideas or did he switch from one to the other during
12 his reign?
13 A. It seemed to switch around. I could not
14 tell you if it was back and forth.
15 Q. Okay. Did you complain to him about that?
16 A. Yes.
17 Q. And what was Mr. Baillie's reaction?
18 A. That he wanted what he wanted.
19 Q. Okay. Did you do what he wanted you to do?
20 A. I attempted to do so.
21 Q. Okay. Did you have success doing so?
22 A. Sometimes.
23 Q. And why -- on the occasions when you did not
24 have success, to what do you contribute that?

Page 22

1  A. That he wanted a different type of plan.
2  Q. Have you ever conveyed these disagreements
3  with Mr. Baillie to anyone at Chubb, that you can recall,
4  other than counsel in preparing for this deposition? Even
5  -- maybe you didn't, I'm just saying anything you told Mr.
6  Croall would be off limits here.
7  A. Diane Haggard, Human Resources Manager.
8  Q. Okay. Tell me what you believe you
9  discussed with Ms. Haggard?
10 A. That I was frustrated, Doug was not
11 communicating to me what he wanted. As a result, I felt
12 like I was constantly re-inventing the wheel on these
13 plans.
14 Q. Do you think you discussed this on one
15 occasion or more occasions than one with Ms. Haggard?
16 A. More than one.
17 Q. Okay.
18 A. (Continued) But not a great number of
19 times.
20 Q. Two, three or four?
21 A. Two, three, four.
22 Q. Okay. Do you recall when any of these
23 conversations with Ms. Haggard would have occurred? '98?
24 '99? 2000? 2001?

Page 23

1  A. 2000, 2001.
2  Q. Do you think all of them occurred in that
3  time frame?
4  A. Yes.
5  Q. Were these conversation with Ms. Haggard
6  generally in person or over the telephone?
7  A. Telephone.
8  Q. Were any of them in person?
9  A. Not that I recall.
10 Q. Okay. Did you express the same frustration
11 to Mr. Baillie before you expressed it to Ms. Haggard?
12 A. Yes.
13 Q. And Mr. Baillie told you just to do what he
14 was saying to do?
15 A. Yes.
16 Q. Now, how would you -- how was the
17 performance of your -- of the Kentucky -- your Kentucky
18 group measured by the company?
19 A. Growth and profit.
20 Q. Okay. And what do you mean by "growth"?
21 A. Written premium.
22 Q. Okay. And what is -- for example, what's
23 the current level of written premium?
24     MR. CROALL: Designate as confidential.

Page 24

1  A. $48,000,000.
2  Q. And how about the level of profit?
3     MR. FREKING: We'll designate this as
4  confidential, as well.
5  A. Prior year, approximately $65,000,000 -- 65
6  percent prior to expenses.
7  Q. You mean 65 percent of the $48,000,000?
8  A. Yes.
9  Q. Prior to expenses, wouldn't it be 100
10 percent before expenses?
11 A. Losses.
12 Q. 65 --
13 A. (Continued) I understood you were asking
14 about losses.
15 Q. I was asking about profit. What was the --
16 did you say last year's profit was 65 percent of
17 $48,000,000 prior to expenses?
18 A. Last year we did not make a profit.
19 Q. Meaning 2002?
20 A. Correct.
21 Q. Okay. And when you say no profit, you mean
22 after expenses, after payment of losses --
23 A. After losses and expenses.
24 Q. Okay. And when you say no profit, does that

Baillie v. Chubb & Son Ins.     Condenseit!     Bryant (3-17-03)

Case 1:02-cv-00062-SAS    Document 38-2    Filed 09/15/2003    Page 7 of 15

Page 25

1 mean you're in the red or does that mean you just break
2 even?
3     A. It was close to break even, but most likely
4 in the red.
5     Q. Okay. Do you get monthly reports on profit
6 levels?
7     A. Yes.
8     Q. Are those documents readily available to
9 you?
10     A. Yes.
11     Q. Do you keep them in a file or something in
12 your office?
13     A. They're electronic.
14     Q. Okay. So, it's real easy -- if you wanted
15 one of those reports, it would be very easy for the
16 company to produce it?
17     A. Correct.
18     Q. Now, what was that figure that you threw out
19 before when you said 60 -- when you answered some question
20 and said 65 percent prior to expenses, what was that a
21 reference to?
22     A. 65 percent of my written premium was losses
23 prior to expenses.
24     Q. Last year?

Page 26

1     A. Last year.
2     Q. So expenses were either 35 percent or
3 greater than 35 percent of your --
4     A. Correct.
5     Q. -- written premium?
6     Okay. Now, who do you report o now?
7     A. Jerry Butler.
8     Q. Did you know Mr. Butler prior to him taking
9 over for Mr. Baillie?
10     A. Had met him.
11     Q. Do you recall where you had met him?
12     A. He was Human Resources Manager for the
13 northern zone.
14     Q. Immediately prior to him taking over or some
15 previous time?
16     A. Some previous time.
17     Q. Do you know when that was?
18     A. '98 -- I mean, '94, '95.
19     Q. Okay. Have you ever heard any comments from
20 Mr. Butler regarding Mr. Baillie?
21     A. No.
22     Q. Has he ever told you or stated anything
23 about what he thought about Mr. Baillie's performance
24 either in Cincinnati or when he was in Harrisburg?

Page 27

1     A. No.
2     Q. Have you ever heard any comments or reports
3 or statements either in any way related to Mr. Baillie in
4 either his drinking or his driving habits?
5     A. Drinking, yes; driving, no.
6     Q. Okay. Tell me what you have heard about Mr.
7 Baillie's drinking.
8     A. Mr. Baillie is not afraid of a drink.
9     Q. Okay. And who have you heard that from?
10     A. I've been with him.
11     Q. Have you heard any statements from anybody
12 else with Chubb or outside of Chubb regarding Mr.
13 Baillie's drinking?
14     A. Yes.
15     Q. Okay. Who do you recall those comments
16 coming from?
17     A. David Walker.
18     Q. Uh-huh.
19     A. That's the name that jumps out at me.
20     Q. Okay. Who is David Walker?
21     A. He's an agent.
22     Q. An agent --
23     A. He sells insurance for Chubb.
24     Q. Any particular region or territory?

Page 28

1     A. Louisville.
2     Q. Okay. And what do you recall Mr. Walker
3 saying about Mr. Baillie's drinking?
4     A. That Doug drank a lot and David did not want
5 to be associated as a heavy drinker by going out with Doug
6 too often.
7     Q. In other words, Mr. Walker told you he
8 thought Mr. Baillie drank a lot and that if he was, like,
9 in Mr. Baillie's presence, that somehow he would be given
10 a stigma of being a heavy drinker, Walker would?
11     A. No. Mr. Baillie tended to call David to see
12 if he wanted to socialize when Mr. Baillie stayed
13 overnight in Louisville.
14     Q. Okay. And Mr. Walker commented to you that
15 he would prefer not to do that?
16     A. Certainly not every time.
17     Q. Okay. And does Mr. Walker drink, to your
18 knowledge?
19     A. Yes.
20     Q. Did Mr. Walker ever tell you that he thought
21 Mr. Baillie's drinking was excessive or was it just simply
22 a matter of Mr. Baillie drinking more than Mr. Walker
23 liked to drink?
24     A. Can't recall.

### Page 29

1  Q. Okay. You don't have any notes or any
2  documents concerning these conversations?
3  A. No.
4  Q. And you never relayed this comment from Mr.
5  Walker to anybody at Chubb that you can recall?
6  A. No.
7  Q. Have you ever been to any kind of golf
8  outing sponsored by Chubb?
9  A. Yes.
10 Q. Are people allowed to drink at those events?
11 A. Yes.
12 Q. Who purchases the alcohol for the
13 individuals who attend those events? Is it a cash bar or
14 is that something provided by Chubb, generally?
15 A. Generally speaking, Chubb.
16 Q. Do you have any particular problem with
17 individuals who attend golf outings partaking in alcoholic
18 beverages provided by and paid by Chubb?
19 A. No.
20 Q. Have you ever seen anybody at a golf outing
21 sponsored by Chubb get drunk?
22 A. No.
23 Q. Have you ever heard -- have you ever been at
24 a golf outing where Chubb --

### Page 30

1  A. Can I stop?
2  Q. Yeah.
3     THE WITNESS: (Addressing Mr. Croall) I've
4  golfed twice in the last four-and-a-half years.
5     MR. CROALL: Okay.
6  A. I've played golf twice in the last
7  four-and-a-half years.
8  Q. Okay. Are there a lot of golf outings or
9  something sponsored by Chubb, to your knowledge, or have
10 there just been two?
11 A. I don't golf --
12 Q. Okay.
13 A. -- particularly.
14 Q. Okay. Do you know whether or not there have
15 been more golf outings that you have not attended?
16 A. Yes.
17 Q. Okay. Have you ever heard any stories or
18 rumors or innuendos, suggestions, implications, anything
19 like that, that anybody at these golf outings has ever
20 gotten out of control?
21 A. No.
22 Q. Where are the two golf outings been where
23 you've attended, if you recall?
24 A. One was here up North I-75, a public course,

### Page 31

1  not sponsored by Chubb.
2  Q. Okay. Was Mr. Baillie in attendance?
3  A. No.
4  Q. Okay. Where was the other one?
5  A. I'm not sure.
6  Q. Okay. Do you think it was someplace either
7  in Ohio or Kentucky?
8  A. Kentucky.
9  Q. Do you think it was down in the Louisville
10 area?
11 A. Louisville area; myself and a couple of
12 agents, not a golf-sponsored big event.
13 Q. Okay. Mr. Baillie was not present?
14 A. No.
15 Q. All right. Now, when you took over the
16 Kentucky territory, how would you describe the level of
17 growth in terms of written premiums?
18 A. Moderate.
19 Q. And how would you describe it by the end of
20 three years later, 2001?
21 A. Stagnant.
22 Q. Now, how would somebody go and look at those
23 -- how would somebody confirm that opinion, would they
24 simply request the written premium figures for the

### Page 32

1  Kentucky territories?
2  A. Yes.
3  Q. Was the level of written premium in 2001 at
4  or around $48,000,000?
5  A. No.
6  Q. What was it, do you recall?
7  A. $42,000,000.
8     MR. CROALL: Randy, just continuing
9  designation of business --
10    MR. FREKING: Yeah.
11    MR. CROALL: -- information as confidential.
12    MR. FREKING: Okay.
13 Q. $42,000,000?
14 A. We grew it approximately 24 percent in 2002.
15 Q. Okay. Is that a function of -- is it fair
16 to say that the Chubb Insurance, like other insurance
17 companies, have raised their premiums in 2002 as a result
18 of 9/11?
19 A. It's not as a result of 9/11 in and of
20 itself. We raised premiums last year.
21 Q. Do you have any idea of -- a rough idea of
22 how much premiums have been raised?
23 A. Premiums have been raised approximately 15
24 percent.

Page 33

1  Q. Is most of that increase in the level of
2 written premiums due to the fact that the company has
3 raised premiums?
4  A. No. We wrote a great deal of new business.
5  Q. Which means you lost other business?
6  A. We lost some business.
7  Q. So you got new business, you lost some
8 business, and you've raised premiums by 15 percent?
9  A. Correct.
10 Q. Okay. How about the level of profitability
11 when you arrived in '98?
12 A. Low.
13 Q. But there was profit?
14 A. No.
15 Q. No profit?
16 A. No profit.
17 Q. Has there ever been profit in the Kentucky
18 territory since you've arrived?
19 A. Yes.
20 Q. And when was that level of profit?
21 A. 2001.
22 Q. Do you recall the amount of profit?
23 A. Not precisely, but it was strong, a very
24 good profit year.

Page 34

1  Q. Very good profit year. More than -- can you
2 give, like, a ballpark? $10,000,000? $80,000,000?
3  A. With the office structure that I have, you
4 don't get a final profit number. Our expenses are passed
5 through to a larger branch so we don't have an expense
6 breakdown, so it would be hard to give you a firm number.
7  Q. But what --
8  A. But a keypunch loss ratio would have been
9 approximately 50 percent.
10 Q. Meaning, if you're written premiums are
11 $42,000,000, your keypunch loss -- I mean, your keypunch
12 profit would have been $21,000,000?
13 A. Prior to expenses.
14 Q. Right. Okay. So the profit was somewhere
15 between 0 and $21,000,000?
16 A. Yes.
17 Q. And how about the calendar year 2002, are
18 you -- I'm sorry, are you on a calendar year or fiscal
19 year?
20 A. Calendar year.
21 Q. How about calendar year 2002?
22    MR. CROALL: Didn't we already cover that
23 earlier?
24 A. We discussed that earlier. We --

Page 35

1  Q. Oh, no profit.
2  A. No profit.
3  Q. So it's gotten worse?
4  A. Yes.
5  Q. You've increased written premiums by 24
6 percent, you've gotten new customers, and your profit has
7 gotten worse?
8  A. For that year.
9  Q. Is that regardless of successful year or
10 unsuccessful year? It sounds like an unsuccessful year to
11 me. Sounds like it's worse under Butler than it was under
12 Baillie in 2001?
13    MR. CROALL: Are you asking him if the 2002
14 results are worse than the 2001 results?
15    MR. FREKING: Well, yeah. And Butler was in
16 charge of --
17 A. The --
18    MR. FREKING: -- of 2002 and Baillie --
19 A. -- numerical result we got was worse.
20 Q. Would you agree with me that as a public
21 company the shareholders of Chubb care a great deal about
22 the numerical results?
23 A. Yes.
24 Q. Would you say it was a successful year in

Page 36

1 some other sense?
2  A. Yes.
3  Q. Explain to me how it was a successful year
4 in some other sense.
5  A. The losses that drove our poor loss ratio
6 were driven by some accounts in our Energy Division that
7 we feel very strongly we understand what drove those
8 losses, we have gotten off those accounts. Excluding
9 those accounts, we had an extremely profitable year in all
10 divisions.
11 Q. Were those new or old accounts?
12 A. Those were accounts that were written in --
13 the big loss was an account that was written in July of
14 2001.
15 Q. And when were the smaller Energy Division
16 losses, those policies written?
17 A. I'm not sure.
18 Q. Do have you an opinion as to whether they
19 were written before or after July of 2001?
20 A. Before.
21 Q. What was the big Energy loss that was
22 written in July of 2001?
23 A. It was a mine fire, which caused our insurer
24 to have to seal their mine because of the development of

Page 37

1 methane gasses with mining equipment underground and
2 therefore no longer accessible; we had to pay for the loss
3 of that equipment.
4  Q. What was the name of that company?
5  A. Sugar Camp Coal.
6  Q. Do you recall that Mr. Baillie had some
7 concerns regarding that particular policy that had been
8 written for Sugar Camp Coal?
9  A. No.
10  Q. Do you recall who the agent was that wrote
11 that --
12  A. Underwriter of Safety and Claims.
13  Q. Do you recall any particular discussions
14 with Mr. Baillie regarding Sugar Camp Coal?
15  A. Other than we wrote it?
16  Q. Uh-huh.
17  A. No.
18  Q. Do you think you told Mr. Baillie you wrote
19 it?
20  A. Yes.
21  Q. Do you recall any particular reaction from
22 Mr. Baillie one way or the other?
23  A. No.
24  Q. How about Mr. Butler, what kind of -- have

Page 38

1 you had any performance appraisals from Mr. Butler?
2  A. Yes.
3  Q. Has -- do you recall how many you've had
4 with Mr. Butler?
5  A. Two.
6  Q. He's been your boss for less than two years;
7 is that correct?
8  A. Correct.
9  Q. Do you recall when those -- was that for the
10 end of 2001 and 2002?
11  A. Correct.
12  Q. And how would you view your most recent
13 appraisal?
14     MR. CROALL: Again, designate as
15  confidential.
16  A. Good, lengthy, two-and-a-half hours.
17  Q. In two-and-a-half hours did Mr. Butler give
18 you a lot of positive comments?
19  A. He gave me positive comments, he gave me
20 negative comments.
21  Q. What were some of his negative comments?
22  A. Negative comments, he would like to see me
23 provide more paper tangible prospects to encourage
24 underwriting staff to go forth and pursue those accounts.

Page 39

1  Q. Anything else that can recall?
2  A. Of negatives?
3  Q. Yes.
4  A. No.
5  Q. And, again, that review was in writing
6 someplace?
7  A. Yes.
8  Q. Same with your 2001 review?
9  A. Yes.
10  Q. Did Mr. Butler have much to go on with
11 respect to your 2001 performance?
12  A. Written -- written premium results,
13 interactions on agency calls, attendance at marketing
14 meetings.
15  Q. Have you ever had to terminate anybody while
16 working for Chubb?
17  A. No.
18  Q. Have you ever -- strike that. Did you -- at
19 some point you learned that Mr. Baillie had been
20 terminated?
21  A. Pardon?
22  Q. At some point you learned that Mr. Baillie
23 was fired by Chubb?
24  A. I'm not sure I've ever heard that expressed

Page 40

1 clearly.
2  Q. Okay. So was it your belief that Mr.
3 Baillie left the company involuntarily?
4  A. Yes.
5  Q. Okay. Now, why did you form a belief that
6 he had left the company involuntarily?
7  A. Doug Baillie.
8  Q. He told you?
9  A. Yes.
10  Q. Okay. And do you have any idea in relation
11 to maybe his final day at Chubb when that conversation
12 might have occurred?
13  A. No idea.
14  Q. Do you think it was sometime close to his
15 departure from Chubb? He left Chubb in late August or
16 early September of 2001.
17  A. I would be presuming that.
18  Q. In other words, it was before Mr. Butler --
19 he had a conversation with you before you found out that
20 Butler was your boss?
21  A. Yes.
22  Q. Okay. And do you recall anything in
23 particular from that conversation with Mr. Baillie other
24 than him telling you that he was no longer working for

### Page 41

1 Chubb?
2    A. Not really.
3    Q. Okay. Did you regard -- did you -- was this
4 a telephone conversation?
5    A. Yes.
6    Q. Did Mr. Baillie say anything during that
7 telephone conversation that was a surprise to you in the
8 sense of, you know, how he was saying it or anything like
9 that?
10    A. No.
11    Q. Was he professional to the best of your
12 recollection?
13    A. Yes.
14    Q. Okay. Do you recall what reaction you had,
15 if any, to this news from Mr. Baillie?
16    A. No.
17    Q. Okay. And you don't even recall whether he
18 told you whether it was his decision or Chubb's decision?
19    A. I'm not sure it was that specific.
20    Q. And -- okay. Do you recall anything else
21 about that conversation that I haven't covered?
22    A. It was brief.
23    Q. Okay. Now, after that brief conversation,
24 have you had any other conversations with Mr. Baillie?

### Page 42

1    A. He attended a wedding of a Chubb underwriter
2 that worked in the Louisville office. I talked to him
3 briefly at the reception.
4    Q. Okay. Do you remember what calendar year
5 that was in?
6    A. 2001.
7    Q. Okay. Did -- were you happy to see Mr.
8 Baillie in attendance?
9    A. No real feelings one way or the other.
10    Q. Okay.
11    A. (Continued) It was a social event.
12    Q. Okay. Did Mr. Baillie say or do anything at
13 that wedding reception that was somehow contrary to
14 Chubb's interest? Did he say anything bad about Chubb --
15 or bad about Chubb, or bad about --
16    A. No.
17    Q. -- anybody else? He acted the way you would
18 expect a guest at a wedding to act?
19    A. I did not interact with him that much.
20    Q. Okay. Have you heard any stories about Mr.
21 Baillie since his departure of from Chubb, anything along
22 the lines of Mr. Baillie allegedly saying anything bad
23 about Chubb or anything like that?
24    A. No.

### Page 43

1    Q. Do you have any knowledge as to what Mr.
2 Baillie is doing today?
3    A. Marketing field rep, I believe, for Grange
4 Insurance.
5    Q. Okay.
6    A. (Continued) Florida.
7    Q. Are you familiar at all with the fact --
8 well, strike that.
9      Are you familiar with Chubb's policy at all
10 with respect to providing severance pay?
11    A. No.
12    Q. So you've never, during your career with
13 Chubb, had occasion to know whether or not Chubb offered
14 severance pay to people that they terminate?
15    A. It would be rumors.
16    Q. It would just be rumors. What sort of
17 rumors have you heard?
18    A. I couldn't get specific, just that --
19    Q. So-and-so got such-and-such severance?
20    A. Not specifically like that.
21    Q. Just --
22    A. (Continued) No numbers.
23    Q. Yeah.
24    A. (Continued) If it's not my money, I don't

### Page 44

1 care.
2    Q. Okay. That's probably a good philosophy.
3      How would you describe your personal
4 relationship with Mr. Baillie?
5    A. We didn't have much of a personal
6 relationship. It was pretty much work.
7    Q. Okay. How would you describe that work
8 relationship? I mean, was it okay?
9    A. It was okay.
10    Q. Was Mr. Baillie generally professional in
11 his dealings?
12    A. I wouldn't call it unprofessional.
13    Q. Okay. You would agree with me that the
14 financial results of the Kentucky territory improved
15 during Mr. Baillie's tenure?
16    A. Yes.
17    Q. Do you attribute that to anything in
18 particular?
19    A. A lot of hard work by a lot of people; I
20 would say Dieter Korte in particular.
21    Q. Where does the buck stop, in your opinion,
22 with respect to those financial results?
23    A. Within a given territory for Kentucky?
24    Q. Uh-huh.

**Page 45**

1    A.   The buck moves around a lot. I'd say the
2 first firm resting place would certainly be my plate, then
3 Doug's plate.
4    Q.   Okay. Did you ever have discussions with
5 Mr. Baillie about the fact that the financial results in
6 your territory that belonged on your plate were improving?
7    A.   Yes.
8    Q.   Did Mr. Baillie have any particular
9 reaction? Did he think that was good news? Did he think
10 this was bad news?
11    A.   He thought that was good news.
12    Q.   Okay. Did he ever express to you, you know,
13 compliments in that regard?
14    A.   On the profit piece, no.
15    Q.   How about on the premium piece?
16    A.   When it grew, yes.
17    Q.   Okay. Did it decline at some point?
18    A.   Pardon?
19    Q.   Did it decline ever?
20    A.   As part of that profit improvement piece, it
21 certainly declined.
22    Q.   Okay. And what do you recall Mr. Baillie
23 saying to you on those occasions?
24    A.   He would be frustrated.

**Page 46**

1    Q.   Okay. And was that a reaction you would
2 have expected?
3    A.   No.
4    Q.   What kind of reaction -- was that reaction
5 by Mr. Baillie frustration of the premium decreasing?
6    A.   Correct.
7    Q.   Did his frustration surprise -- it did not
8 surprise you?
9    A.   It surprised me in that the focus at that
10 point, I felt, was more profit improvement than premium
11 growth.
12    Q.   Okay. Did you ever express your frustration
13 on that subject to anyone?
14    A.   Yes.
15    Q.   To who?
16    A.   Dieter, Diane.
17    Q.   What do recall expressing to Dieter along
18 those lines?
19    A.   That we need to improve the profit before we
20 can make it bigger.
21    Q.   "We need to improve the profit before we can
22 make it bigger"?
23    A.   We need to make the book of business more
24 profitable before we can grow upon it, otherwise we're

**Page 47**

1 growing -- just growing in a nonprofitable book.
2    Q.   Right. Isn't it true that Mr. Baillie had
3 two objectives in mind; he wanted profit to grow and he
4 also want written premiums to grow?
5    A.   I would say Doug focused on growth a lot
6 more than written premium profit. My perception was
7 always more focused on the top number versus the bottom
8 number.
9    Q.   Okay. You do not think that Mr. Baillie had
10 a goal of increasing profit?
11    A.   I think Doug thought it would just happen if
12 you grew the book enough.
13    Q.   Okay. Well, regardless of the reason for
14 it, you would agree with me that he wanted profit to grow?
15    A.   Yes.
16    Q.   Okay. And he wanted premiums to grow?
17    A.   Yes.
18    Q.   And he would express frustration to you when
19 profit would grow, but premiums were not growing?
20    A.   No.
21    Q.   I thought you told me profit did grow?
22    A.   Doug focused on growth. Profit was
23 something -- my perception was Doug's feeling was profit
24 was something that just happened and that our job was to

**Page 48**

1 focus on just making it bigger, the premium volume.
2    Q.   Uh-huh. And he was not happy with the level
3 of your premium volume?
4    A.   He was frustrated.
5    Q.   Right. And he expressed that to you?
6    A.   Yes.
7    Q.   And that did not surprise you, right,
8 because one of your jobs was to make the premium grow in
9 the Kentucky territory?
10    A.   At the time -- at times where that was
11 expressed, it did surprise me in that there was a reality
12 of business we had to get off of to ultimately make it
13 more profitable that was going to be -- economic reality
14 was we would not grow given the amount of business we had
15 to get off of for underwriting reasons.
16    Q.   You had to get rid of some bad business?
17    A.   Correct.
18    Q.   Right. And Mr. Baillie wanted you to get
19 rid of that bad business?
20    A.   Mr. Baillie, in my mind, was more focused on
21 adding business then culling business.
22    Q.   Wasn't it true that Mr. Baillie wanted you
23 to do between 1998 and 2001 what you've been able to do in
24 2002, which is get new business?

Page 49

1    A. Correct.
2    Q. All right. And he wanted you to get new
3 business and maintain a level of profitability?
4    A. Correct.
5    Q. All right. And by 2001 you had obtained a
6 level of profitability, correct?
7    A. Correct.
8    Q. All right.
9        MR. CROALL: Is this a decent spot for a
10 bathroom break?
11        MR. FREKING: Okay, that's fine.
12        (A recess was taken from 10:52 a.m. to
13        10:56 a.m.)
14    Q. Earlier, Andy, you told us that you
15 expressed some frustration to Diane Haggard in the nature
16 that Doug was not communicating to Andy -- to you what he
17 wanted, and you thought you were constantly re-inventing
18 the wheel, do you recall --
19    A. Correct.
20    Q. -- generally that testimony? Do you recall
21 anything else that you ever expressed to Diane Haggard
22 about Mr. Baillie?
23    A. No.
24    Q. And the only other individual you've

Page 50

1 identified, I think, now is maybe you've spoken to Dieter
2 Korte --
3    A. Maybe.
4    Q. -- about Baillie?
5    A. I would have a hard time getting specific,
6 but given the nature --
7    Q. You think it is something to do with Doug
8 saying "I want you to grow premium," while at the same
9 time you needing to get rid of some of the bad business?
10    A. Correct.
11    Q. Do you recall anything that Mr. Korte said
12 to you in response to those comments?
13    A. No.
14    Q. Do you recall any criticism by Mr. Korte of
15 Mr. Baillie?
16    A. No.
17    Q. Do you recall any criticism of Mr. Baillie
18 by Ms. Haggard?
19    A. No.
20    Q. Do you recall -- you don't recall whether
21 you were surprised or not surprised by Mr. Baillie's news
22 to you that he was leaving Chubb?
23    A. The news that Mr. Baillie was leaving Chubb,
24 I heard prior to Doug.

Page 51

1    Q. Oh. Who did you hear that from?
2    A. Tim Zerlong.
3    Q. So Mr. Zerlong called you?
4    A. Mr. Zerlong had what managers were available
5 on a conference call.
6    Q. Okay. What do you recall about that
7 conference call?
8    A. That Doug Baillie was no longer with Chubb
9 and he had confidence in the managerial team to continue
10 to focus on business issues while a successor was
11 selected.
12    Q. Now, were you in Louisville at the time?
13    A. Yes.
14    Q. That's where your office is?
15    A. Yes.
16    Q. How long would you estimate this conference
17 call took?
18    A. Maybe 10 minutes.
19    Q. Was it in a question-and-answer format at
20 all or was it basically Zerlong talking?
21    A. There were questions and answers on
22 conducting business, it was not just Tim speaking.
23    Q. Okay. Kind of like "how should we handle
24 this" when you're talking to policyholders, things like

Page 52

1 that?
2    A. Yes.
3    Q. Was there any statement by Mr. Zerlong that
4 gave you an impression one way or the other whether Mr.
5 Baillie's departure was voluntary?
6    A. No.
7    Q. Were there any questions regarding the
8 reasons why Mr. Baillie was let go or related to why Mr.
9 Baillie was leaving that you can recall?
10    A. Not that I recall.
11    Q. Was there any information along those lines
12 provided by Mr. Zerlong other than the fact that Mr.
13 Baillie was leaving?
14    A. Not that I recall.
15    Q. Okay. And you've been with Chubb for, I
16 think, almost 20 years?
17    A. Going on 18.
18    Q. Okay. Did Mr. Zerlong make it clear that
19 there wasn't a transition period -- in other words, he
20 made it clear to you that Mr. Baillie was -- had been
21 there one day and was gone the next? No notice in the
22 sense --
23    A. No notice.
24    Q. Okay. Did you have any particular reaction

Baillie v. Chubb & Son Ins.      Condenselt!      Bryant (5-17-03)

Case 1:02-cv-00062-SAS    Document 38-2    Filed 09/15/2003    Page 14 of 15

Page 53

1 to that at all? Did you think it was unusual? Did you
2 think it was common?
3     A. It's not unusual, it's not uncommon. It
4 happens both ways all the time.
5     Q. Okay. And you don't recall -- were you
6 surprised at this news at all -- strike that.
7         Had you known that Mr. Baillie had worked
8 for the company for about 25 years?
9     A. I would have known approximately that. I
10 couldn't have told you if it was more than 25 or less than
11 25.
12     Q. Okay. Did the news of his departure
13 surprise you at all?
14     A. Not a whole lot, surprises, people come and
15 go.
16     Q. You just --
17     A. I've gotten used to people coming and going.
18     Q. Okay. Who are some of the higher level
19 people that you can recall coming and going in the last
20 five or six years --
21     A. Through the office?
22     Q. -- other than Mr. Baillie?
23     A. Through the office, visiting?
24     Q. Anywhere in Chubb.

Page 54

1     A. Visiting?
2     Q. No. I mean, going.
3     A. Oh, okay.
4     Q. You said there's a lot -- you weren't
5 surprised because a lot of people come and go.
6     A. Oh.
7     Q. And I want to focus on --
8     A. There's a gentleman named Gary Tully?
9     Q. Okay.
10     A. (Continued) A gentleman by the name of Mike
11 Ferguson. A gentleman by the Jack Kuhn, K-U-H-N, are some
12 off the top of my head.
13     Q. What role did Mr. Tully serve?
14     A. He ran Executive Protection nationally. The
15 three of them left together one day.
16     Q. Do you think they quit?
17     A. I -- yes, they quit.
18     Q. Okay. Can you remember anybody in the last
19 five or six years at a high level leaving Chubb
20 involuntary other than Mr. Baillie?
21     MR. CROALL: Objection. Mr. Bryant's
22 testimony has been he's not sure --
23     THE WITNESS: Yeah.
24     Q. I'll tell you that Mr. Baillie was

Page 55

1 terminated involuntarily. Do you recall anybody else?
2     A. I could not tell you specifically who's been
3 fired at Chubb at a high level and who had just left of
4 their own accord.
5     Q. Right. Do you have any reason to believe
6 that anybody -- I mean, do you have any knowledge of
7 anybody leaving involuntarily in the last five or six
8 years at a high level?
9     A. I'm sure they have, but do I have knowledge,
10 no.
11     Q. Okay. After this conference call, did you
12 have any conversations that you can recall about Mr.
13 Baillie with other participants in the conference call,
14 discussing like "boy, how did this happen," or "what's
15 up," or anything like that?
16     A. Nothing's jumping out at me.
17     Q. Do have you any way to refresh that
18 recollection through notes or --
19     A. As I recall, 9/11 happened real quick after
20 that and that kind of took over.
21     Q. Yeah.
22     MR. FREKING: Okay, great. I don't
23 think I have any other questions. Do you have any
24 questions?

Page 56

1     MR. CROALL: Nope.
2     MR. FREKING: Okay.
3         ---
4
5
6         ANDREW BRYANT
7
8         ---
9     DEPOSITION CONCLUDED AT 11:03 a.m.
10         ---

Page 57

1              CERTIFICATE
2  STATE OF OHIO          :
3                         : SS
4  COUNTY OF HAMILTON     :
5
6          I, Theresa Lynn Westfelt, Court Reporter,
7  the undersigned, a duly qualified and commissioned notary
8  public within and for the State of Ohio, do hereby certify
9  that before the giving of his aforesaid deposition, ANDREW
10 BRYANT was by me first duly sworn to depose the truth, the
11 whole truth and nothing but the truth; that the foregoing
12 is the deposition given at said time and place by ANDREW
13 BRYANT; that said deposition was taken in all respects
14 pursuant to stipulations of counsel hereinbefore set
15 forth; that I am neither a relative of nor employee of any
16 of their counsel, and have no interest whatever in the
17 result of the action.
18         IN WITNESS WHEREOF, I hereunto set my hand
19 and official seal of office at Cincinnati, Ohio, this
20 _____day of _____, 2003.
21
22 My Commission expires:    THERESA LYNN WESTFELT
23 January 9, 2005.          Notary Public - State of Ohio
24