Page 1

```
                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
                      WESTERN DIVISION
---------------------------------
                                  :
DOUGLAS W. BAILLIE,               :
                                  :
        Plaintiff,                :
                                  :
    vs.                           :   CASE NO.
                                  :   C-1-02-062
CHUBB & SON INSURANCE,            :
                                  :
        Defendant,                :
                                  :
---------------------------------

        DEPOSITION OF:    JIM LASH

        TAKEN:            By the Plaintiff

        DATE:             March 25, 2003

        TIME:             Commencing at 10:42 a.m.

        PLACE:            Offices of:
                          Freking & Betz
                          215 East Ninth Street
                          Fifth Floor
                          Cincinnati, Ohio  45202

        BEFORE:           RAYMOND E. SIMONSON
                          Registered Merit Reporter
                          Notary Public - State of Ohio
```

Page 2

```
APPEARANCES:

    On behalf of the Plaintiff:

        RANDOLPH H. FREKING, ESQ.
            of
        Freking & Betz
        215 East Ninth Street
        Fifth Floor
        Cincinnati, Ohio  45202

    On behalf of the Defendant:

        DAVID T. CROALL, ESQ.,
            of
        Porter, Wright, Morris & Arthur
        250 East Fifth Street, Suite 2200
        Cincinnati, Ohio  45202-5117


            S T I P U L A T I O N S

        It is stipulated by and between counsel for
the respective parties that the deposition of JIM LASH, a
witness herein, may be taken at this time by Counsel for
the Plaintiff as upon cross-examination pursuant to the
Federal Rules of Civil Procedure; that the deposition may
be taken in stenotypy by the notary public-court reporter
and transcribed by him out of the presence of the witness;
that the transcribed deposition is to be submitted to the
witness for his examination and signature; and that
signature may be affixed out of the presence of the notary
public-court reporter.
```

Page 3

COPY

I N D E X

JIM LASH                                              PAGE

    CROSS-EXAMINATION BY MR. FREKING:                   4


Redacted

Page 4

                    JIM LASH
of lawful age, a witness herein, being first duly sworn as
hereinafter certified, was examined and testified as
follows:
                CROSS-EXAMINATION
BY MR. FREKING:
    Q.  Hi, Jim. We briefly met, but my name is
Randy Freking. And I represent Doug Baillie in connection
with a matter he has filed in Federal District Court here
in Cincinnati, and we're here today to conduct your
deposition, to find out what you may or may not know about
facts which may or may not be relevant --
    A.  Okay.
    Q.  -- to his case. You've been sworn in. Could
you state your address?
    A.  █████████████████████████████
        MR. CROALL: Why don't you go ahead and state
your name, too?
    A.  Jim Lash.
    Q.  There we go. And what is your date of birth,
Jim?
    A.  ████████████
    Q.  And how long have you been with Chubb?
    A.  Coming up on nine years.

## Page 5

1  Q. So you began there in 1994 with Chubb?
2  A. That's correct.
3  Q. Was that out of college or something?
4  A. No. Part of that I was with Aetna, Aetna
5  Surety, for about four years.
6  Q. And what is your educational background?
7  A. I majored in accounting. I've got a BS
8  degree from Wesleyan college in West Virginia, with a major
9  in accounting and a minor in economics.
10  Q. And of you graduated from West Virginia
11  Wesleyan and you went to Aetna?
12  A. Yes, in 1990.
13  Q. And then you came with Chubb. Do you
14  remember what your date of hire was?
15  A. September 18th, I believe.
16  Q. How was it you came to Chubb?
17  A. Actually, I had known a pretty good friend at
18  Marsh Brokerage in Stanford, Connecticut, and he had lined
19  me up with Lisa McGee, who he had known in college, I
20  believe, and she was ultimately my first contact with
21  Chubb. She had called -- actually, I had sent my resume to
22  her.
23       She had called me back and said there was an
24  opportunity in Harrisburg, which is the same area which I

## Page 6

1  trained at with Aetna. So I knew the agents and whatnot.
2  So it made a good fit. And I was looking to make a move
3  out of Aetna, mainly from a geographical standpoint; I just
4  could not get out of the Northeastern Territory, and I did
5  not want to spend the majority of my career there.
6       So I took an opportunity with Chubb. And it
7  was in management, which was a promotion for me, more
8  responsibility. And that's kind of how I came to Chubb.
9  Q. Okay. Which office did you come to?
10  A. I'm sorry?
11  Q. Which office of Chubb did you come to?
12  A. Harrisburg, Pennsylvania.
13  Q. What was the management job you were offered?
14  A. Executive protection practice leader job, or
15  at the time was department manager, I guess.
16  Q. I'm sorry, what's that called?
17  A. Executive protection department manager job.
18  Q. Okay. And how long did you hold that job?
19  A. I was in Harrisburg for four years.
20  Q. Did you hold the same job the entire time?
21  A. Yes. Yes.
22  Q. And then you came to Cincinnati?
23  A. Then I came to Cincinnati. And I took the
24  same job, type of job, but in a larger branch in

## Page 7

1  Cincinnati. And I guess that job -- I got that job in
2  October of '98.
3  Q. Okay. And who did you report to in
4  Harrisburg?
5  A. Doug Baillie.
6  Q. For the entire time?
7  A. Yes.
8  Q. Okay. And then when you came to Cincinnati,
9  who did you report to?
10  A. Doug Baillie.
11  Q. Did Mr. Baillie have a role in bringing you
12  to Cincinnati?
13  A. From what I recall, I contacted him. He did
14  not contact me. As far as the opportunity, I found out
15  there was an opportunity in Cincinnati when my predecessor,
16  Jeff Barton, was moving from the executive protection
17  practice leader job to the marketing job, and so I called
18  and found out what the opportunity was.
19  Q. Okay.
20  A. And then, yes, I had discussion with Doug on
21  it.
22  Q. So you found out there was an opening in
23  Cincinnati essentially for your same job in a larger
24  branch?

## Page 8

1  A. Correct.
2  Q. Now, explain to me what your job
3  responsibilities were in Harrisburg, generally.
4  A. As a manager, I had at the time one person
5  reporting to me as an assistant, and managing a book of
6  business of four and a half to five million dollars in
7  premium, agency relationships, various committees within
8  the branch, diversity committee, and different marketing
9  functions.
10      I was on point for looking at new
11  appointments for agents and whatnot also. So I was wearing
12  different hats at the time. In a smaller branch, you end
13  up doing a lot of that.
14  Q. Okay. And explain to me exactly what
15  executive protection means. What type -- can you describe
16  that type of insurance?
17  A. Sure. Executive protection is kind of the
18  specialty lines of insurance, the nonstandard insurance
19  lines, like directors and officers liability, employment
20  practices liability, fiduciary liability crime, kidnap and
21  ransom, errors and omissions, which actually is a defined
22  role of Chubb's purchase of risks in '89. It was defined
23  as a result of our acquisition, Chubb's acquisition of
24  executive risk back in -- late '88, early '89, those new

Page 9

1 products lines came into our department.
2 Q. Now, how is your performance measured -- when
3 you were in Harrisburg, how was your performance measured
4 from a financial standpoint level? Premium?
5 A. The majority of it was driven by new business
6 production as well as just the numbers component, the
7 growth, profitability of the book, different numeric
8 measurements, quantitative, new business, lost business,
9 managing your expense, budget, whatnot. That was a large
10 portion of the competency, and there was also developmental
11 learning and developmental competency, things that I was
12 able to obtain.
13     As far as training, at first, when I started
14 with Chubb, there was a lot of training, and I spent some
15 time in Philadelphia doing that on and off. So it was --
16 but it was, by and large, production-driven results.
17 Q. Okay. And you were a direct report of Mr.
18 Baillie's?
19 A. Yes, I was.
20 Q. Were there other direct reports up in
21 Harrisburg of Mr. Baillie's?
22 A. Yes.
23 Q. Do you recall approximately how many and who
24 they were?

Page 10

1 A. Well, let's see. We had a casualty manager
2 -- actually, he was the umbrella manager at the time --
3 Boynton Weekes. There was a personalized manager, Will
4 Vandenhuevil. There was a commercial department manager,
5 which varied -- actually, there was a couple different ones
6 that came in and out of Harrisburg during Doug's tenure.
7 It was Jeffrey Brown and Andrea Wanner. I think it's
8 W-a-n-n-e-r.
9     I'm trying to think who else in our other
10 departments were presented. Then there was an operations
11 manager, and I can't remember her name.
12 Q. Okay.
13 A. Oh, and there was a human resource admin that
14 was kind of his direct assistant, Don Bugey, B-u-g-e-y.
15 Q. Same kind of role Diane Haggard has in the
16 Cincinnati, but in a smaller branch?
17 A. Smaller branch, but she wasn't involved in
18 the HR function. She did some of it, but she was more
19 administrative, trying to set things up for Doug, kind of
20 his assistant.
21 Q. Were you aware of the results of that office
22 during your tenure?
23 A. In Harrisburg?
24 Q. Yes.

Page 11

1 A. Yes. I couldn't recall the numbers off the
2 top of my head, but we were always informed as to how the
3 branch did from year to year. And, certainly, on quarterly
4 updates, on your quarterly meters, he would benchmark where
5 we are in terms of quarterly results. So, yeah, we were
6 familiar with the numbers component.
7 Q. How would you describe the numbers component
8 generally over that period of time, without knowing,
9 without having to recall specific numbers?
10 A. Sure. From what I remember, it seemed like
11 -- I believe Doug started that branch, and the growth moved
12 pretty aggressively. I think the branch got to the
13 neighborhood of 50 million dollars in premium by the time
14 he had left Harrisburg. So I think, from the growth
15 component -- which I think is what most of us were paid to
16 do, is grow the book of business -- I think the branch did
17 pretty well.
18 Q. Explain what you just said when you said,
19 "That's what most of us were paid to do, is grow the book
20 of business."
21 A. I think the message differs from year to year
22 in terms of -- in Chubb, you know. And by discipline, by
23 my discipline as executive protection, and depending on
24 what market cycle we're in, there may be more of a push for

Page 12

1 growth, in getting top-line growth, trying to manage
2 profitability, but it may be more of an aggressive message
3 in a market than in another market.
4     Right now we're in a hard market, and the
5 message is profitable growth. But more or less we want to
6 look to manage our exposure first. And in a soft market,
7 it's probably more of a push towards growth.
8 Q. Okay. And was it a soft market in the mid
9 '90s there in Harrisburg?
10 A. (Nodding head affirmatively).
11 Q. You think the primary drive was towards
12 growth?
13 A. Yes.
14 Q. How about --
15 A. Growth and profit.
16 Q. How about when you came to Cincinnati? What
17 were you being paid primarily to do there?
18 A. What I was being paid to do in Cincinnati?
19 Q. You said -- yeah. When you were in
20 Harrisburg, your phrase was something like, "We were
21 getting paid to grow the business primarily."
22 A. Cincinnati is just a bigger book of business.
23 People management became an additional part of my goals as
24 well as leadership, a bigger book. So I had some of the

Page 13

1 same responsibilities I did in Harrisburg, managing a book
2 of, like I said, profitability, growing that book
3 profitably, making sure that the quantative piece, again,
4 was in line with what the SBU department was wanting. And,
5 like I said, I had some development goals as well in
6 addition to the leadership and the people management.
7  Q. Now, how would you describe Mr. Baillie's
8 role in Harrisburg?
9  A. He was the commander in chief of the branch.
10 He was responsible for, at the high level, agency
11 relationships and marketing.
12   We didn't have a separate marketing manager
13 per se. It was usually a job that was sometimes shared,
14 because it was a smaller branch from -- you know, the
15 personalized managers also did the marketing job half and
16 half, but Doug was primarily responsible for that function
17 and that administration and people management.
18  Q. Okay. And what did you observe about his job
19 performance as the commander in chief in Harrisburg between
20 '94 and '98? In other words, did you have any particular
21 problems with him?
22  A. No. I did -- I mean, from just a personal
23 standpoint, Doug and I had some head-butting at the early
24 stages, because of, I guess, differences in opinion on how

Page 14

1 performance should be judged and whatnot.
2   But, by and large, I think that our
3 relationship had grown to be -- to be pretty good. We were
4 opposite personalities, so we always had kind of
5 disagreements and butted heads on certain things. And over
6 the years, it kind of became more of a joking thing. But I
7 think, overall, from what I could see as an out -- I was an
8 insider, but not knowing his job on a daily basis, he
9 seemed to be acceptable in terms of his results.
10  Q. Okay. What do you mean by you had opposite
11 personalities? How would you describe each other's
12 personality?
13  A. I would use the Myers-Briggs standard. We
14 were different in terms of our personality traits, how we
15 engaged people in conversation, what makes people tick in
16 terms of how they perceive data.
17   And I'm very much an introvert. I'm very
18 much someone who analyzes a lot of detail. But Doug was
19 one of those people that was the opposite of that. He
20 didn't want a lot of detail. He was big picture; very
21 intelligent guy, but he didn't want the detail.
22   And he was always on the run, running to the
23 next thing. So he didn't really want -- I was one of those
24 guys that wanted to spend a lot of time giving him detail,

Page 15

1 laying out the issues from A to Z. So we kind of butted
2 heads sometimes on that.
3  Q. Right.
4  A. Because he -- the perception was that he
5 didn't have the time for me because he just wanted me to
6 get to it and move on. But I think that was just his way
7 -- the way his personality was. It was more of a
8 frustration for him, is what I would say.
9  Q. Yeah.
10  A. So that's kind of where we had head-butting a
11 little bit.
12  Q. Okay. Have you ever heard the phrase
13 "management by walking around"? Or words to that effect?
14  A. Not really. What's that?
15  Q. Did you ever observe how Mr. Baillie
16 demonstrated his leadership abilities in Harrisburg?
17  A. I think Doug's leadership was largely driven
18 by his marketing and agency relationship skills, and I
19 think --
20  Q. That's kind of where his strengths were?
21  A. In addition to being kind of good at
22 problem-solving. Again, he's a very intelligent person,
23 and he would come to conclusions quickly on
24 problem-solving. He was good at that. But, by and large,

Page 16

1 his strengths were agency relationships, managing the
2 agency plan, empowering his folks to do the job, and I'd
3 say those were kind of his leadership qualities. Those
4 would be his strong points, I would say.
5  Q. How do you recall that he was able to empower
6 the people that reported to him?
7  A. I think he was an advocate for his people.
8 And I think that if something needed to be addressed and
9 you went in to him and said, "Look, I'm not getting the
10 result I want here, can you get involved?" he would support
11 you in those decisions, as long as it was good business
12 sense and good business decision on the part of a
13 department manager or an underwriter.
14   But at the end of the day he kind of let you
15 do your own thing for the most part, unless he felt that,
16 based on feedback, there was something that wasn't going
17 appropriately or you should be doing something differently.
18 So he would empower you, kind of -- I mean, he wasn't
19 someone who looked over your shoulder all the time, I guess
20 is the way I would put it.
21  Q. Yeah. How would you describe his
22 communication skills?
23  A. I think Doug's communication skills -- I
24 think it was probably mixed. I think the perception on the

Page 17

1 floor was that maybe he didn't have as good a relationship
2 with everyone. And maybe at that level, you can't. But I
3 think he had good communication skills with his leadership
4 team for the most part. I mean, I would say he did.
5     And he would spend a lot of time in going and
6 meeting with these different department managers and things
7 and making the rounds and sitting in and talking and
8 asking, "What are you working on? Is there anything I can
9 do?"
10    But as far as beyond that, below that level,
11 I would say that the perception probably was to a degree
12 that he was not as good at communication with the people
13 below the management team. That's just -- I think that was
14 Doug -- to be quite honest, I think part of Doug's
15 personality. He's somewhat of an extrovert.
16    I think he was somewhat intimidated, too, by
17 people to a degree sometimes, and he wouldn't let that
18 show, but I think that was part of his personality a little
19 bit too.
20  Q.  One of the reasons you came to Cincinnati was
21 because he had assumed that role, or at least you knew he
22 was in charge of the branch when you tried to come to
23 Cincinnati?
24  A.  I mean, certainly, when I saw the posting --

Page 18

1 and I'm basing this off of kind of a shattered memory, but
2 I think the way it worked is I saw the posting. And when I
3 knew it was in Cincinnati, he had just gone there. So, of
4 course, the first one I'm going to call -- and I'd have to
5 call him anyway -- or, actually, the proper channel would
6 probably go through the existing branch manager, which is
7 actually my branch manager now, and he --
8  Q.  Who is that?
9  A.  Jerry Butler, who came in after Doug. But he
10 was in Harrisburg for a short time, and I worked for him
11 for just a short period, like a month, and -- but in this
12 case, because I knew Doug, I just called him directly and
13 said, "What's going on with this opportunity?"
14    And then he told me about it. And I got on
15 the phone with my predecessor, Jeff Barton, who is now in
16 marketing, and he told me about the job, because I had some
17 real questions about, you know, what was the -- is there
18 any management issues right now I'm going to have to kind
19 of jump into? That are going to be problematic? Is the
20 book good? Are there issues with the book that I would
21 have to come in and fix?
22    So that's the kind of conversation I had with
23 the two of them on a conference call. And then I came out
24 to interview; actually, in less of a formal interview, I

Page 19

1 came out and met Doug.
2  Q.  Because Doug knew you pretty well?
3  A.  Yeah.
4  Q.  And you knew Doug pretty well?
5  A.  Yeah, I knew Doug pretty well.
6  Q.  You wouldn't have come to Cincinnati if you
7 would have had substantial problems with Doug in Harrisburg
8 as the commander in chief?
9  A.  Yeah.
10 Q.  Right? Did you ever, while -- and I want to
11 get back to Harrisburg for a minute. Did you ever hear of
12 or know of anything that Mr. Baillie did that was -- that
13 you deemed inappropriate while he was the commander in
14 chief in Harrisburg?
15 A.  Anything that he did?
16 Q.  Either at work or at some social activity?
17 Anything like that that you can recall?
18 A.  On a business note, I don't think there was
19 that I can recall. I think that there's some rumors and
20 things that get around to people, and there was a rumor
21 that at some of these off-site functions that the branch
22 managers would attend, golfing or -- I can't remember if it
23 was actually business-related or just a bunch of managers
24 getting together on a social down South -- that there was

Page 20

1 pretty heavy drinking going on, and he had fallen out of a
2 car and hit his head or something to that effect. But,
3 again, I don't -- I don't know if that was really a
4 business function per se. It was probably more of a
5 social. But --
6  Q.  Do you recall whether you've heard that from
7 Jerry Butler?
8  A.  From Jerry Butler?
9  Q.  Yes.
10 A.  No, I don't think I did get that from Jerry
11 Butler. I'm trying to think who I did. This is awhile ago
12 from what I can recall, and it may just have been said -- I
13 can't remember who said it. It may have been said in the
14 context of, you know, kind of a joking thing, you know, "I
15 heard this happened to Doug down there," and dah-dah-dah.
16 And I don't recall who had said it, to be honest with you.
17 Q.  Okay. Since Mr. Butler has taken over the
18 branch in Cincinnati, have you ever heard him say anything
19 negative or critical regarding Mr. Baillie?
20 A.  No. Actually, Jerry didn't know Doug, I
21 don't think, well enough to say anything negative or
22 derogatory against Doug. I don't -- I don't recall
23 anything being brought up.
24    As a matter of fact, I think he was kind of

### Page 21

1  in the clouds as well as to what was going on, but he was
2  in a position of taking over the role and had to kind of
3  move on.
4       Q.  Yeah.
5       A.  And he didn't have any -- you know, he didn't
6  have any negative things to say about Doug. I don't think
7  he knew him well enough.
8       Q.  Had you ever heard Mr. Butler speak of the
9  financial results in Harrisburg in any derogatory manner,
10 meaning along the lines of, "Hey, Baillie didn't do as well
11 in Harrisburg as he led people to believe," or anything
12 along those lines?
13      A.  No. I've never heard him say anything like
14 that. I think the only thing he commented on is, when he
15 got there, the umbrella book of business needed to be
16 adjusted because of the time of the marketplace. He felt
17 that was an area that wasn't making money, so he shifted
18 around. But he never made the correlation that that was,
19 you know, "Because of Doug, this is a problem and I had to
20 go fix it." I think it was just one of his challenges as a
21 new branch manager, and the cycle was changing.
22      Q.  Okay. And how would you describe your
23 relationship with Doug while he was your boss in
24 Cincinnati?

### Page 22

1       A.  As I mentioned earlier, I think we butted
2  heads at first. We ended up developing a pretty good
3  relationship.
4       Q.  And that continued?
5       A.  We were on a friendly basis. I mean, we were
6  friends to a degree, and -- outside of work, and that
7  continued through. We just disagreed on some things, but
8  other than that we --
9       Q.  You had professional disagreements?
10      A.  We had some professional disagreements. Not
11 a ton of those; more on just sidebar, you know, arguing a
12 point. Doug is very argumentive. He likes to get into a
13 heated debate. So sometimes I think he would do it just to
14 get my goat.
15         But he knew that about me. So that's what I
16 mean when I said we kind of knew each other's weaknesses
17 and strengths. And we were kind of opposite in respects.
18      Q.  Do you know who Mr. Baillie reported to while
19 he was in Harrisburg?
20      A.  He reported to, I believe, John Swords.
21 Philadelphia is the region.
22      Q.  Do you know who he reported to when he was in
23 Cincinnati?
24      A.  Yeah. He reported to Terry Cavanaugh for a

### Page 23

1  while, and Terry moved on to do a job in Warren, I believe,
2  marketing or something. Maybe that was in Florham Park.
3  It might have been Florham Park. I think it was in Warren,
4  New Jersey, as head of marketing for the company.
5  And then Tim Szerlong took the job as zone manager, and he
6  reported to Tim for a while.
7       Q.  Do you know whether Mr. Cavanaugh is still
8  with the company?
9       A.  I think he is. He's handling the surety book
10 now, the whole surety for Chubb.
11      Q.  You think he's in New Jersey?
12      A.  Yes, I believe he is.
13      Q.  Mr. Bezold, is he still with the company?
14 Jeff Bezold?
15      A.  Yes.
16      Q.  Is he in Columbus?
17      A.  Yes, he is.
18      Q.  Do you know Mike Marinaro?
19      A.  I heard the name, but I don't know who he is.
20      Q.  Did you ever -- can you recall ever providing
21 Terry Cavanaugh any input, either pro or con, on Doug
22 Baillie's performance?
23      A.  No. I never had hardly any conversations
24 with Terry Cavanaugh at all.

### Page 24

1       Q.  How about -- Tim Szerlong preceded Terry
2  Cavanaugh; is that correct?
3       A.  That's correct.
4       Q.  Do you recall any conversations you ever had
5  with Tim Szerlong, either pro or con, about Doug Baillie?
6       A.  I think -- I think I may have had one
7  conversation with Tim when he would come out to do his
8  visits, which was pretty much infrequent. But when he'd
9  come out, I think he tried to spend some time with the
10 different department managers and get a feel for just how
11 things were going.
12         And I can't remember if he asked specifically
13 about, you know, "Is Doug helping you? or, "Is Doug doing
14 this or doing that?" I think he just wanted to know how
15 things were going and could they be going better or what
16 have you.
17      Q.  Okay.
18      A.  But I never probably had -- my comment to him
19 was probably, you know, "Things are just going as well as
20 expected, given we're all new."
21         Well, myself was new. Doug was new. We had
22 some people in new positions then at that point.
23      Q.  Because when you all arrived, the branch was
24 not in the best financial shape, was it?

Page 25

1   A.  In Cincinnati?
2   Q.  In Cincinnati.
3   A.  I don't think it was. I think there was a
4  lot of management turnover as well, and it wasn't as a
5  result of leadership or anything. People were just moving
6  on to promotions and whatnot. But we had, I think, three
7  or four new managers in Cincinnati, and Doug on top of
8  that.
9   Q.  Are you familiar with the fact that the
10 branch turned around in terms of profitability between the
11 time you and/or Baillie arrived and the time, you know, in
12 2002?
13  A.  Yeah.
14  Q.  Financial results improved?
15  A.  Yeah, it did, toward the very end of his
16 tenure, but it was a struggle for a little -- for a few
17 years, we had some tough times.
18  Q.  Right. To what do you attribute the
19 turnaround in the Cincinnati branch?
20  A.  Good question.
21  Q.  I think at the time part of it was the market
22 was beginning to change. I think that -- I can't say it
23 was Doug's -- completely Doug's doing.
24      I would say that a lot of it had to do with

Page 26

1  the edicts that are taking place in our home office in
2  certain disciplines, because they drive a lot of the
3  direction of, you know, starting to cut limits, starting to
4  raise rates. The market supported it, and so a lot of it
5  was the market turning around, and the timing was good.
6       Now, where Doug, I think, took the bull by
7  the horns on that is that he saw the turnaround. Although
8  he's a heavy marketer, I think he realized, too, that now
9  is the time to leverage the other way, meaning don't
10 leverage -- let's not be leveraging for new business; let's
11 leverage our capabilities as an organization and try to
12 keep business, keep the stuff we want, get off the stuff we
13 don't.
14      And I think he grappled with that, because,
15 as a marketing guy, a heavy marketing guy, it's always
16 about cutting the deal usually. So I think when the market
17 changes, that's something you tend to grapple with if
18 you're a heavy marketing guy. If you're someone that's
19 more technical, you hate the soft market and love the hard
20 market, because you're cutting deals that you would be more
21 comfortable with.
22  Q.  You think the success was he realized he
23 needed to make the change because of the way the market was
24 turning?

Page 27

1   A.  Yeah, I think so. He may have pushed some
2  issues at the very beginning of the market change with some
3  of the practices, some of the departments, because what you
4  have in Chubb is a dual accountability, and I don't have to
5  report just to Doug at the time; I also have to report
6  within my practice, our discipline.
7       And so I think that what happens is you get a
8  little bit of shoving and pushing going on, because if
9  you're a marketing guy, driving the new business and the
10 growth and cutting the deal, then if the market changes and
11 the disciplines are saying, "We've got to stop this and
12 change this and change that," I think there's a little bit
13 of a rub a first.
14      But then, once you see what's going on, you
15 know, you've got to turn the book around, and you kind of
16 say, "Well, okay, I've got to change my attitude, my
17 posture."
18      And, you know, Doug and Jeff Barton did a lot
19 of that, trying to manage that, leverage the agents in a
20 little different way, that's all, in the hard market versus
21 the soft market.
22  Q.  Now, Jerry Butler is in charge of the branch
23 now?
24  A.  Yes, he is.

Page 28

1   Q.  What are some of the leadership traits you
2  look for in a guy like Butler?
3   A.  How would I describe him as a leader?
4   Q.  Yeah.
5   A.  I think Jerry is very -- what I would call
6  very well balanced. He's probably -- and, again,
7  understanding that I've only had one manager at Chubb up
8  until Jerry, I see Jerry as a very well balanced leader and
9  manager. He -- because of the time that he spent in
10 various disciplines -- marketing, human resources, claims
11 -- he has a lot different perspective, I think, on things.
12 And he can balance, I guess, multiple issues and multiple
13 disciplines, I guess, and the directive from different
14 disciplines. And he's just very well balanced. He's got
15 very good people management skills, and he's got good
16 marketing skills.
17  Q.  That's important for a leader, to have good
18 management skills?
19  A.  Yeah.
20  Q.  What other traits have you observed in your
21 career with Chubb that's important to saying whether
22 someone is a good leader, in addition to people management
23 skills?
24  A.  Certainly their production and how big -- I

Page 29

1 think from a leadership standpoint you look at, you know,
2 where have they been, how many offices they've been in,
3 what roles they've taken on, bigger jobs in terms of the
4 size of the office, and then, really, the following --
5   Q.  The results?
6   A.  The results, and then also --
7   Q.  What does he bring to the people?
8   A.  Right.
9   Q.  Okay.
10  A.  And part of it, there is a component that's
11 always -- there's a political component as well. So,
12 there's some of that always, but there's overwhelmingly --
13 you typically can't survive; you're not going to be able to
14 survive if your results are bad. But if you have good
15 political components -- I would think it's very difficult
16 to do that, but I certainly think when you get to that
17 level, political component becomes a little bit more
18 severe.
19  Q.  What do you mean by the political component?
20  A.  I think being in a group and knowing -- I
21 guess buying into whatever way the group is going. If
22 you're -- if you're buying into it, then you're part of it.
23 If you're not, then maybe you're kind of rubbing the group.
24  Q.  Okay.

Page 30

1   A.  And there's a smaller group, as you know, as
2 you get further to the top. And so if you're out of sorts
3 with the group, you're probably going to be, at least maybe
4 that's one strike against you.
5   Q.  Now, what did you observe about Doug Baillie
6 when you were in Cincinnati about his people management
7 skills?
8   A.  I think Doug, from a skill-based standpoint
9 -- I'm not so sure his people management skills were the
10 strength that he had. He was the kind of guy that --
11 again, it was a numbers-driven game for the most part, by
12 and large. He gave some advice on development, coaching to
13 a degree, but -- and I'm commenting on this based upon also
14 some commentary from some of my peers, that they didn't
15 feel they were being coached properly or coached enough for
16 -- because I think, again, Doug kind of used the
17 empowerment piece, and if it isn't broke, then let's -- you
18 know, let's just keep it going and keep getting the growth
19 and keep what we need to get as far as new business and
20 writing new accounts.
21       And I think ultimately his goal was to keep
22 moving on to bigger jobs and bigger offices and continuing
23 that theme. You know, he liked to be involved in -- he
24 wasn't so far relocated, removed that he looked at it as a

Page 31

1 job where he didn't want to get his hands dirty. He was
2 always into deals and trying to get -- you know, if an
3 underwriter would come to him and say, "Well, it doesn't
4 seem like we're going to get this opportunity because such
5 and such is coming in," or, "The agent is not treating us
6 fairly," he would get right in on that.
7       That's where Doug was good. He managed
8 relationships very well. He levied the agency
9 relationships. His marketing side was pretty strong. He
10 always pushed for heavy travel, knowing your products,
11 getting your products in the marketplace. But I'm not so
12 sure he was good at people management. It just wasn't a
13 skill that I think was one of his strengths.
14  Q.  And you say that's largely in terms of other
15 people criticizing his -- the degree to which he coached
16 them?
17      MR. CROALL:  Objection as mischaracterizing
18   the testimony.
19  Q.  How would you describe the weakness in Mr.
20 Baillie's people management skills?
21  A.  Again, I think that as a good people manager
22 you have to kind of coach them along through the course of
23 -- you know, in their current job as well as what you would
24 expect from them in a new job or a bigger job, and really

Page 32

1 sit down with them and kind of spell out what you see as
2 far as development goals or development challenges for an
3 individual. And I think that Doug did some of that, but
4 not to the extent that I think a lot of people would have
5 wanted, and then also to make sure that you're coaching
6 those people all year long and staying engaged with them to
7 coach them in the area of development that you'd want to
8 get them to the next level.
9       I think maybe the sense sometimes is that,
10 since that wasn't a strength, he would do it to a degree,
11 but it would kind of get lost until the next review date.
12 And I think some people got frustrated by that.
13  Q.  Were you aware of a 360-degree feedback that
14 Mr. Baillie conducted?
15  A.  I'm aware of the 360-degree feedback. I know
16 it was a thing that was a hot item a few years, ago. I
17 don't know. Maybe it was in Harrisburg, and it was
18 actually, I think, even -- even the management team had to
19 use the 360-degree feedback to be evaluated. But I don't
20 know specifically about his or what he --
21  Q.  Were you asked to provide any kind of
22 feedback concerning Mr. Baillie's performance during the
23 course of your tenure, other than Harrisburg or Cincinnati?
24  A.  I think Doug asked for that information. I

### Page 33

1 know he did in Harrisburg. He -- actually, I'm not so sure
2 it was.
3   Q. Doug would send out a piece of paper that you
4 would fill out anonymously, and it would ask about things
5 that I think he could do better or things from a leadership
6 standpoint. And I think I may have filled out something
7 like that. I may have also filled out a 360-degree
8 feedback, but I do not recall that.
9   Q. When you were asked to fill out a 360-degree
10 feedback form or whatever, did you do so on an anonymous
11 basis? Do you recall that?
12   A. Yes.
13   Q. Do you recall, were you at all reluctant to
14 answer questions in 360-degree feedback? Or do you believe
15 that you and others responded to them as best you could?
16   A. I think you're always reluctant at that
17 particular time at first. I mean, you always have that
18 bird on your shoulder chirping at you: "Is there any way
19 anybody can see this feedback if it's negative?"
20     So I think everybody is reluctant, but I
21 think the 360-degree feedback -- as I recall, it was a
22 process where it was anonymous. It went out to an outside
23 vendor to be populated in terms of the feedback. So I
24 think people were, for the most part, honest in terms of

### Page 34

1 what they were putting down on the feedback.
2     I got more comfortable with Doug on the ones
3 even that I submitted by hand to him, because I just got
4 comfortable with him as a friend and someone that I could
5 joke with and be very candid with in terms of what I felt
6 that I wasn't getting from him from a leadership
7 standpoint.
8   Q. Okay. Now, you talked before about other
9 individuals in the office there who sometimes criticized
10 Mr. Baillie relating to his coaching of them. Do you
11 recall that testimony?
12   A. I can't recall -- I can't recall individuals,
13 but I know that there was things in passing, frustrations
14 that you would sense from individuals, and I think it was
15 tougher for me -- or tougher for them, rather, to comment
16 specifically to me about negatives with Doug because they
17 knew I was pretty close to him.
18   Q. Okay.
19   A. But you would -- you would get some side
20 commentary and you could just tell there was frustration
21 with some of the department managers in Cincinnati with his
22 approach on things.
23   Q. Was that a great shock to you, that there
24 would be sometimes interpersonal difficulties between

### Page 35

1 people in a large office?
2   A. No. I mean, that's -- you're going to have
3 that.
4   Q. Isn't that kind of the nature of the beast?
5   A. Yeah. I think it is. I think you're going
6 to have that from time to time, although I think that when
7 you're in charge of disciplines that are changing their
8 posture in terms of more of a technical function, I think
9 that's where there was a rub, because I think, again,
10 Doug's strength and what he really pushed was the marketing
11 side.
12     So if there was a practice leader that was
13 more of a technician that wanted to get his book under
14 control or, you know, he wasn't willing to cut a deal for
15 this agent because he didn't think it was a good write,
16 Doug in the bigger picture thought, "Well, we have all this
17 business with them," then, you know, that would be a rub,
18 and there would be some frustration there.
19     Certainly, there's -- you know, the marketing
20 role gets a bad rap in Chubb in a lot of the branch offices
21 because it's looked at as a social role. Everyone else is
22 cranking out work and doing deals and doing the technical
23 stuff, and the marketing role is looked at sometimes as the
24 fun job, so it gets some criticism. But certain people are

### Page 36

1 very good at it, and that's the role that they end up
2 evolving into. And I think that's the case with Doug. I
3 think that's what he was good at.
4   Q. Yeah.
5   A. The problem with it is, if there was a
6 problem that comes with that, is the management and
7 development piece of people, which I'm not so sure was a
8 strength.
9   Q. Did you think that Mr. Baillie changed in the
10 way he operated between Harrisburg and Cincinnati? Or was
11 he largely the same kind of leader in both cities?
12   A. I think it was about the same. I mean, I
13 think it was very similar in terms of his style. He tried
14 to -- I mean, he'd jump right in as soon as he got there,
15 worked long hours trying to understand the territory and
16 the marketplace, but I think his management style pretty
17 much stayed true to form. I'm not so sure it changed much.
18   Q. Now, how did you learn of Mr. Baillie's
19 termination?
20   A. He told me. I was the first one he told. I
21 was walking -- he called me down to his office. I think I
22 may have been the second one.
23   Q. What did he tell you about it?
24   A. He said, "Good luck to you." I think

Page 37

1 something to the effect that "I'm" -- "I'm out of here.
2 I'm no longer working for Chubb."
3     And I thought it was a joke. He's a
4 long-term veteran at Chubb, and I just thought it was --
5 you know, he was pulling my leg. And he said, "Yeah, I
6 just got the word that I'm no longer employed here."
7     So that's how he told me.
8  Q. As a friend of his, did he ever give you any
9 indication prior to that that he thought he was going to be
10 terminated or anything like that?
11  A. No.
12  Q. Did he say or do anything when -- when he
13 advised you, did he tell you that he had just been
14 terminated by Mr. Szerlong?
15  A. Yes.
16  Q. Okay. During that conversation, did he say
17 or do anything that you regarded as unprofessional or
18 anything like that? Or did he largely take the high road?
19  A. He took the high -- I mean, Doug's a -- I
20 think he was upset, probably the most upset I'd seen him.
21 But -- and confused. I think he was just confused. And I
22 think he knew what hit him, because that's what was
23 apparent to me. He wasn't -- it was apparent to me that he
24 wasn't prepared for something like that. But, again, that

Page 38

1 was my outside opinion.
2  Q. Now describe to me how upset he appeared to
3 be or how you knew he was more upset than you had seen him
4 in the past.
5  A. Just emotionally, his facial expression.
6 Doug's not the crying type, but I'd say that's as close to
7 him crying as I'd seen him, kind of welling up a little bit
8 and kind -- I think he certainly was angry at the same
9 time. So he's --
10  Q. You could tell he was trying to kind of hold
11 himself together?
12  A. Yeah. He was just like -- you know, "They
13 don't want me around, so I'm getting my stuff now and I'm
14 just going to head out."
15  Q. After that, did you ever hear anything, I
16 guess, bad about Doug Baillie after the termination date?
17 Anybody else in the office tell you that they saw Mr.
18 Baillie do anything wrong or say anything inappropriate,
19 like at a trade show or anything like that, since his
20 termination?
21  A. No.
22  Q. You haven't become aware of any allegations
23 that he engaged in any kind of inappropriate conduct after
24 his termination, like from Mr. Korte or any of your other

Page 39

1 cohorts at the office?
2  A. Not that I can recall.
3  Q. Okay. Did -- prior to Mr. Baillie's
4 termination, did Mr. Szerlong -- other than what you
5 testified to earlier -- you said you had one conversation
6 with Mr. Szerlong you can recall. You didn't have any
7 other conversations with Mr. Szerlong about Mr. Baillie
8 other than what you talked about earlier?
9  A. No. I think that -- I'm trying to remember.
10 He actually -- the conversation I think I had with him was
11 the day he was in. The day he was going to, I guess,
12 terminate Doug, was the day he had met with the management,
13 managers individually. And then after that it was just a
14 conference call to the management team that Doug was no
15 longer employed and "we're in the process of trying to find
16 his replacement," that type of discussion.
17  Q. Okay. So when you talked earlier about
18 having a conversation with Szerlong on one occasion, you
19 think it was on the day that Mr. Baillie was actually
20 terminated?
21  A. I think it was that day. I think it was the
22 morning -- I think, from what I recall, that he was in that
23 morning -- or it may have been late afternoon when he was
24 making rounds with the group, and I think he also had some

Page 40

1 agency breakfasts and lunch and that type of thing with
2 Doug as well that day.
3  Q. You don't recall in any way any conversation
4 prior to that last day you ever had with Mr. Szerlong?
5  A. To be honest, I don't recall if I had another
6 conversation with Tim prior to that.
7  Q. It sounds like, if someone asked you whether
8 you have any knowledge concerning the facts and
9 circumstances surrounding Mr. Baillie's termination, you
10 would say no, you were not involved in any way, shape, or
11 form with the decision to terminate Mr. Baillie's
12 employment?
13  A. Right. That's correct. I had no
14 involvement.
15  Q. All right. Do you recall any conversations
16 that Diane Haggart ever had with you regarding Mr. Baillie?
17 Did she ever come to you and solicit any kind of input from
18 you concerning Mr. Baillie?
19  A. No.
20  Q. And how would you describe the financial
21 performance of your particular group during Mr. Baillie's
22 tenure in Cincinnati, the executive protection part?
23  A. Sporadic. We had -- we had a couple of
24 pretty good years. 2000 was the worst year on record. We

Page 41

1 had lost a bunch of money on a couple of big class action
2 cases, and then we picked back up in 2001 and 2002.
3    Q.  Do you know whether Chubb has insurance for
4 itself for employment practices?
5    A.  No, I don't.
6    Q.  Are you aware of anything regarding Chubb's
7 practices regarding severance pay for people that are
8 terminated by Chubb?
9    A.  No.
10    Q.  Have you ever heard of anyone who received
11 severance pay from Chubb that you can recall?
12    A.  Not that I can recall. My assumption is we
13 have a severance package, but I never knew any one person
14 that got it.
15    Q.  And you don't know -- strike that. After Mr.
16 Baillie's termination, after his termination, has anybody
17 ever come to you, other than in preparation for today's
18 deposition, and solicited any kind of feedback from you
19 concerning Mr. Baillie?
20    A.  No.
21    Q.  In other words, to your knowledge, you don't
22 think you've been interviewed by anybody for Chubb
23 concerning Mr. Baillie, other than --
24        MR. CROALL: Other than counsel.

Page 42

1    Q.  Other than counsel?
2    A.  Right.
3    Q.  Other than presenting for the deposition?
4    A.  That's correct.
5        MR. FREKING: Okay. Can we take a short
6    break? I think I'm just about done.
7        MR. CROALL: Sure.
8        (At which time, a brief recess was taken from
9        11:36 a.m. until 11:46 a.m.)
10    Q.  I think that's all I have. Thank you very
11 much, Jim. When this transcript gets typed up, you'll have
12 an opportunity to review it and make sure it's been
13 transcribed accurately.
14    A.  Okay.
15    Q.  And make any corrections you deem are
16 appropriate.
17
18
19
20        Jim Lash
21
22            - - -
23        DEPOSITION CONCLUDED AT 11:47 A.M.
24            - - -

Page 43

1            C E R T I F I C A T E
   STATE OF OHIO    :
2                   : ss
3  COUNTY OF HAMILTON :
4        I, Raymond E. Simonson, RMR, CRR, the
5 undersigned, a duly qualified and commissioned notary
6 public within and for the State of Ohio, do hereby certify
7 that, before the giving of his aforesaid deposition, JIM
8 LASH was by me first duly sworn to depose the truth, the
9 whole truth, and nothing but the truth; that the foregoing
10 is the deposition given at said time and place by JIM LASH;
11 that said deposition was taken in all respects pursuant to
12 stipulations of counsel hereinbefore set forth; that I am
13 neither a relative of nor employee of any of their counsel,
14 and have no interest whatever in the result of the action.
15        IN WITNESS WHEREOF, I hereunto set my hand
16 and official seal of office at Cincinnati, Ohio, this
17        day of         2003.
18
19 My commission expires:   Raymond E. Simonson, RMR, CRR
20 June 23, 2003           Notary Public - State of Ohio