Page 1

```
                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
                     WESTERN DIVISION
-----------------------------------
                                    :
DOUGLAS W. BAILLIE,                 :
                                    :
        Plaintiff,                  :
                                    :
    vs.                             :   CASE NO.
                                    :   C-1-02-062
CHUBB & SON INSURANCE               :
                                    :
        Defendant                   :
                                    :
-----------------------------------

    DEPOSITION OF:    JEFFREY ALLEN BARTON

    TAKEN:            By the Plaintiff

    DATE:             February 28, 2003

    TIME:             Commencing at 9:00 a.m.

    PLACE:            Offices of:
                      Freking & Betz
                      215 East Ninth Street
                      Fifth Floor
                      Cincinnati, Ohio  45202

    BEFORE:           RAYMOND E. SIMONSON
                      Registered Merit Reporter
                      Notary Public - State of Ohio
```

Page 2

```
APPEARANCES:

    On behalf of the Plaintiff:

        RANDOLPH H. FREKING, ESQ.
            of
        Freking & Betz
        215 East Ninth Street
        Fifth Floor
        Cincinnati, Ohio  45202

    On behalf of the Defendant:

        DAVID T. CROALL, ESQ.,
            of
        Porter, Wright, Morris & Arthur
        250 East Fifth Street, Suite 2200
        Cincinnati, Ohio  45202-5117


            S T I P U L A T I O N S

        It is stipulated by and between counsel for
the respective parties that the deposition of JEFFREY ALLEN
BARTON, a witness herein, may be taken at this time by
Counsel for the Plaintiff as upon cross-examination
pursuant to the Federal Rules of Civil Procedure; that the
deposition may be taken in stenotypy by the notary
public-court reporter and transcribed by him out of the
presence of the witness; that the transcribed deposition is
to be submitted to the witness for his examination and
signature; and that signature may be affixed out of the
presence of the notary public-court reporter.
```

Page 3

```
                      I N D E X

JEFFREY ALLEN BARTON                              PAGE

    CROSS-EXAMINATION BY MR. FREKING:               4
```

Page 4

JEFFREY ALLEN BARTON
of lawful age, a witness herein, being first duly sworn as
hereinafter certified, was examined and testified as
follows:

CROSS-EXAMINATION
BY MR. FREKING:
    Q.  Hi, Jeff.
    A.  Good morning.
    Q.  We have met briefly. My name is Randy
Freking, and I represent Doug Baillie in connection with a
matter that is pending in the Federal District Court here
in Cincinnati, and we're here today to conduct your
deposition to find out what you may or may not know about
the facts which may or may not be relevant to Mr. Baillie's
case, and I apologize upfront for any inconvenience this
causes you, and, hopefully, this will not be too lengthy.
We'll certainly try to get you out of here by noon.
        Could you start the deposition by just
stating your full name, your current address, and your
marital status, your family status, that kind of thing?
    A.  Okay. Jeffrey Allen Barton, ▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ I'm married, have four
children.
    Q.  That's in Anderson?

Page 5

1  A. Yes.
2  Q. And you're currently employed by Chubb?
3  A. I am.
4  Q. And you've been employed by Chubb for how
5 long?
6  A. It will be 16 years in March.
7  Q. Okay. Great. Can you kind of just briefly
8 take me through your career with maybe post -- I assume you
9 went to college?
10  A. Yes, I went to college, graduated from the
11 University of Cincinnati with a degree in finance, started
12 -- recruited on campus, worked for Aetna Casualty and
13 Insurance Company in the claims department for about nine
14 months.
15      Then I worked -- in March of '87, moved to
16 work for Chubb in the executive protection department; was
17 there about -- in that department about four or five years;
18 went on to manage the casualty department; back to manage
19 the executive protection department, then their regional
20 manager of that; and then my current position as regional
21 marketing manager.
22  Q. Okay. Have you ever been deposed before?
23  A. I have not.
24  Q. All right. I'll ask you a bunch of questions

Page 6

1 today. Take your time in answering the questions. You can
2 take as much time as you like. Ray, who is a wonderful
3 court reporter, does not -- you know, if you take 15
4 minutes to answer a question, there's no notations like,
5 you know, "Witness thought about the answer for 15
6 minutes," anything like that. It looks like you answered
7 it right away. So take whatever time you need.
8      If I ask a question that's confusing or
9 screwed up in some manner, just tell me. I'll be happy to
10 rephrase it. We want to make sure you understand the
11 question. If you answer it, we're going to presume you do.
12 If you provide the answers, you should be as careful as
13 possible.
14      If you need to take a break at any time, or
15 if you want a soft drink, let us know, and we can take a
16 break at any time if you need to make a phone call or
17 something like that.
18      And Ray will not guess what you mean if you
19 give a nonaudible response, like a shake of the head --
20 that would normally be yes or no -- or make some other kind
21 of gesture. He will not translate any gesture.
22      MR. CROALL: I'll try to keep my gestures to
23  a minimum as well.
24  Q. Try to keep your gestures to a minimum.

Page 7

1 I think that's about it. So the main thing
2 is just make sure you answer -- make sure you understand
3 the questions and give the best answers you can.
4      MR. CROALL: And you should feel free to
5  consult with me at any time you feel a need to.
6      THE WITNESS: Okay.
7      MR. CROALL: Sometimes Mr. Freking includes
8  that, but he forgot that this morning.
9  Q. Sometimes Mr. Croall will make objections.
10  A. He will?
11  Q. He will make objections from time to time,
12 and the procedure is, since there's not a judge here to
13 rule on the objection, you still answer the question,
14 unless he would direct you not to answer. And we can argue
15 about that for a little while.
16      Okay. Tell me a little bit about this
17 executive protection job you have had. What exactly does
18 that line of business entail?
19  A. There are, I believe, eight categories:
20 Transfers and officers liability, employment practices
21 liability, fiduciary liability, commercial crime,
22 kidnap/ransom, miscellaneous professional, Internet
23 security, liability coverage, and -- that would be the
24 seven.

Page 8

1  Q. One, two, three --
2  A. I may be leaving one out.
3  Q. I think you got them all.
4      MR. CROALL: I thought he said seven.
5  A. I thought I said seven.
6  Q. Do you know how long you were in that role?
7 I know you were in two different times.
8  A. I believe when I first started with Chubb, I
9 was in that role as an underwriter for four or five years,
10 and then I went to manage the casualty department for a
11 couple of years, and now I'm back about a year and a half
12 managing that department.
13  Q. What time frame was that second stint?
14  A. I've been in the marketing job for about four
15 years, so that would have been probably '90 -- what? '97
16 to '99.
17  Q. Okay. Approximately?
18  A. Approximately.
19  Q. Were you in marketing when
20 Mr. Baillie first arrived?
21  A. Yes.
22  Q. He --
23  A. I started that -- his predecessor put me in
24 that job, and shortly thereafter I left.

Page 9

1  Q. And his predecessor's name was?
2  A. Bill Reynolds.
3  Q. Does -- are you familiar with whether or not
4  Chubb Insurance has employment liability --
5  A. No, I don't.
6  Q. -- insurance for itself?
7  A. I have no idea.
8  Q. All right. Describe for me, Jeff -- or
9  strike that. How long were you in the Cincinnati office?
10 A. My entire tenure with Chubb.
11 Q. How would you describe the state of the
12 business at the time Mr. Reynolds departed and Mr. Baillie
13 was arriving?
14 A. The state of the business as far as?
15 Q. Just how would you describe how the branch
16 was doing financially, from a profit standpoint, from a
17 morale standpoint, these kind of issues.
18      MR. CROALL: As we did yesterday, I'll just
19      designate in advance all the financial and business
20      stuff is confidential. Any personnel matters,
21      whether it involves Mr. Barton or some other
22      employee, is confidential.
23      But, given that, you can go ahead and answer.
24 A. I believe within the last year that Bill was

Page 10

1  there -- and I don't remember the numbers to be exact --
2  that we -- we had some growth in our premium, and we did
3  make an underwriting profit. The amount of the growth in
4  the underwriting profit, I'm not really sure. This is just
5  a guess at this point. A lot of numbers have passed since
6  then.
7  Q. Okay. How would you describe the -- kind of
8  the general morale of the office around that time frame?
9  A. I think it was okay.
10 Q. Was the move to the marketing position a
11 promotion for you at all?
12 A. It was more of a lateral move.
13 Q. Okay.
14 A. And, you know, it was an opportunity for me
15 to learn some new things.
16 Q. Now, what exactly was your -- how would you
17 describe your job duties in your marketing position?
18 A. Basically, my title is regional marketing
19 manager, and my job responsibilities would be to oversee
20 marketing for the Ohio Valley region, which is Ohio,
21 Kentucky, and Indiana; a great deal of involvement directly
22 in Cincinnati; a little less involvement in the Louisville
23 and Columbus offices; and even less involvement -- more
24 kind of a consulting role on a number of topics in the

Page 11

1  Cleveland and Indianapolis offices.
2  Q. Is that because those more distant offices
3  have people you delegate a responsibility to there? Or do
4  they report to somebody else as well? Why is that?
5  A. Well, the Indianapolis and Cleveland office
6  would have a full branch manager and a more built-out staff
7  of a number of different departments.
8  Q. Those are bigger offices --
9  A. Yeah, bigger offices.
10 Q. -- than Columbus?
11 A. Indianapolis -- I'm just guessing on the
12 numbers -- might have 30 or 40 people in it. Cleveland
13 might have 50 or 60. My involvement in Louisville and
14 Columbus is a little bit more involved because we have
15 fewer people there. We have three in Columbus and
16 approximately ten in Louisville.
17 Q. And when you say you do marketing, who are
18 you marketing to?
19 A. The responsibilities of my job are to manage
20 -- the biggest responsibility is to manage the independent
21 agency system, along -- in addition would be, you know,
22 account prospecting, key account retention, sales training,
23 managing Mountain View Indemnity, which is our captive,
24 agent-owned captive.

Page 12

1  Q. What do you mean by that, which is an
2  agent-owned, captive agency?
3  A. We have -- we formed a captive for agents
4  where they buy -- they buy a share in this captive we set
5  out, and then they share in 20 percent of the profits,
6  losses, investment income --
7  Q. Okay.
8  A. -- as an investment.
9  Q. Okay. Now, through your independent agency
10 system, are agents free to sell other companies' insurance?
11 A. Yes. They would typically have a number of
12 different companies they're contracted with to sell their
13 products.
14 Q. You don't have exclusive --
15 A. Correct.
16 Q. -- agents?
17 A. Correct.
18 Q. All right. So your marketing efforts are not
19 geared directly to the public as much as they are geared to
20 convincing the agents to sell Chubb Insurance?
21 A. They're our sales staff. I'm not a licensed
22 agent.
23 Q. Okay. Now, who did you report to directly
24 once Mr. Baillie arrived on the scene?

Page 13

1  A. I had dual accountability, and it would
2 have been Doug Baillie, and I believe at the time Larry
3 Hannon was the northern executive manager. That's
4 H-a-n-n-o-n.
5  Q. Thank you. Now, how would you describe your
6 working relationship with Mr. Baillie?
7  A. Well, the two major responsibilities in my
8 mind that a branch manager has would be human resource --
9 human resource activity and then marketing activities. So
10 I basically assisted Doug in the marketing activities
11 within Chubb.
12  Q. Okay. And what do you mean by one of his
13 major responsibilities being in the area of human
14 resources?
15  A. Managing people.
16  Q. Okay. What role did you view him playing
17 with respect to the underwriting part of the branch?
18  A. My view of his role?
19  Q. Of Mr. Baillie's role, yes.
20  A. He did the performance reviews, so he's
21 responsible for performance, personnel development,
22 developing people into better employees, and then one of
23 his goals was to grow those departments as well as make an
24 underwriting profit.

Page 14

1  Q. And are there other departments within the
2 branch? Or do you lump departments either on an
3 underwriting side or a marketing side?
4  A. I am the marketing department.
5  Q. Right.
6  A. And, no, we have a loss control department,
7 kind of more the service departments, loss control,
8 operations, services, claims. Claims did not report into
9 the branch manager.
10  Q. Well, be that as it may, what do you see Mr.
11 Baillie's role with respect to these other departments? Or
12 do you see his role similar to his role --
13  A. Similar.
14  Q. -- to underwriting?
15  A. They reported to him. He was responsible
16 for, you know, helping them obtain their goals and
17 ultimately responsible for that goal.
18  Q. Now, how many employees did you have under
19 your supervision?
20  A. I have --
21  Q. Generally.
22  A. Directly reporting to me?
23  Q. Yes.
24  A. I have one, and that would be Becky Emerson,

Page 15

1 who is the administrative assistant for marketing manager
2 and human resources.
3  Q. And how many people did you have indirectly
4 reporting to you, approximately?
5  A. Are you talking on a dotted-line basis?
6  Q. Any kind of basis that you're comfortable
7 with.
8  A. I'm responsible for, you know, getting the
9 branch results. So I would interact perhaps with the
10 majority of the underwriting staff.
11  Q. Okay. And how did you -- how did you view
12 Mr. Baillie's, I guess, performance, so to speak, with
13 respect to the side of managing people, the human resource
14 activity side?
15  A. I think he was probably average at it.
16  Q. Did he have some good traits and some bad
17 traits along those lines?
18  A. Yeah.
19  Q. What were some of the good traits you would
20 say of Doug Baillie in connection with the human resource
21 activities?
22  A. I think -- I mean, speaking personally, he
23 helped -- me being new in the marketing job and him having
24 a vast amount of experience in there, he helped me get

Page 16

1 started in the job and develop my skills and what that job
2 was all about. I suspect he did that for some of the
3 others.
4  Q. Okay. Did you see -- do you view Mr. Baillie
5 as sort of a mentor in that regard?
6  A. Yeah. I was doing the job, and, you know, he
7 helped me get started and, you know, answered any
8 questions, so, yeah, I would say yes.
9  Q. Okay. What other kind of positive attributes
10 did you notice of Mr. Baillie in regard to the management
11 of people?
12  A. I think, because of Doug's personality, he --
13 he was involved with all the staff. He would walk around
14 and, you know, say hi to people. I think that probably
15 made some people feel good.
16  Q. Is that an attribute you've witnessed over
17 the years that's good for somebody who is charged with
18 leading a particular group of people?
19  A. I think some people see it as important.
20  Q. Do you view that as important, as kind of
21 being accessible to the folks in the branch, in terms of,
22 you know, leadership and leading the branch, I think
23 turning around some elements of profitability?
24  A. I mean, when I talk -- when I mentioned that

Page 17

1  he's going around talking to these people, a lot of these
2  people were the CSRs that he would talk to, and he would
3  talk to all the people in the branch.
4      Now, as far as profitability, I think what
5  you're getting there to is making decisions on pricing and
6  underwriting, terms and conditions, and whether you remain
7  on accounts.
8   Q.  How did you view Mr. Baillie in terms of his
9  ability to kind of lead?
10  A.  I think it worked for some people, but I
11  don't think it worked for everybody.
12  Q.  Did it work for you?
13  A.  It worked for me.
14  Q.  And what do you mean by that? How did -- did
15  he ever, I guess, show his leadership abilities in
16  connection with you in particular?
17  A.  Well, as I mentioned earlier, I was new in
18  the job, so he taught me a lot of things about the job,
19  because he had a lot of experience in that area, and I'm
20  not sure that he could lend the same experiences to
21  everybody, just because of his experience --
22  Q.  All right.
23  A.  -- in the marketing.
24  Q.  Now, you said there were some people that

Page 18

1  maybe it didn't work for in terms of his leadership
2  abilities within the branch. What do you mean by that?
3   A.  I just think there's some people that didn't
4  view him as a leader. And why? I can't answer that.
5   Q.  Okay.
6   A.  I mean, that's up to the individual person.
7   Q.  Do you have any -- do you have any particular
8  examples of people you can think of? Or are you kind of
9  speculating?
10  A.  I'm just speaking in kind of generalities,
11  you know, various bits and pieces of information that have
12  come in that, you know, I can't necessarily account for
13  where they come from.
14  Q.  Okay.
15  A.  Just a general feeling.
16  Q.  Now, do you know a fellow by the name of Tim
17 Szerlong?
18  A.  Um-hmm (nodding head affirmatively).
19  Q.  How long have you known Mr. Szerlong, do you
20 think?
21  A.  I've known Tim probably since he took over
22  the zone manager's job.
23  Q.  And do you know approximately how long that's
24  been?

Page 19

1   A.  Three years, guessing.
2   Q.  Okay. As zone manager, do you think he was
3  familiar with the fact that you were in charge of marketing
4  here in Cincinnati?
5   A.  Um-hmm (nodding head affirmatively).
6   Q.  Okay. Do you -- how many times would you
7  estimate, you know, during the last three years or so he's
8  been zone manager, has he engaged in like business
9  discussions with you about how the branch is doing?
10  A.  Once or twice a year.
11  Q.  And what's the general -- were those
12  scheduled events?
13  A.  He would make -- he would make branch visits
14  and, you know, occasionally business would take him to
15  Chicago, where he's located, and I would have a discussion
16  with him.
17  Q.  Okay.
18  A.  I mean, much of the discussion would go
19  through the zone marketing manager, their evaluation of
20  marketing activity.
21  Q.  Right. And who was that? Is that
22  Mr. Hannon?
23  A.  It's been -- I had a number of different zone
24  marketing managers. Originally, it was Larry Hannon, and

Page 20

1  then Kevin Smith took over for him. And currently my
2  report is Zeline Camarek, Zeline; C-a-m-a-r-e-k,
3  Z-e-l-i-n-e.
4   Q.  Is that male or female?
5   A.  Female.
6   Q.  Kevin Smith, was he your zone report at any
7  time during Mr. Baillie's tenure?
8   A.  Yes.
9   Q.  Do you have any recollection as to when he
10  became your report?
11  A.  Probably about six months into my job Larry
12  moved on to a different job, and then Kevin was probably
13  there for about a year and a half, just rough guess.
14  Q.  Okay. Did he leave -- did Mr. Smith move on
15  before Mr. Baillie moved on?
16  A.  Yes, I believe so. The timing was fairly
17  close, so there could have been a little overlap.
18  Q.  Now, directing your attention to the time
19  that Mr. Baillie came -- from the time Mr. Baillie came
20  in as the branch or the regional manager and the day he
21  left -- okay, that time frame that you were in there -- can
22  you recall any conversations you ever had with
23  Mr. Szerlong, specifically regarding Mr. Baillie and his
24  performance?

Page 21

1  A. No. I mean, we talked about marketing
2  issues, but --
3  Q. Did Mr. Szerlong ever come and quiz you about
4  how good a leader Mr. Baillie was? Anything like that?
5  A. Not that I can recall.
6  Q. Okay. Are you aware, within the branch -- or
7  within the branch itself, are you aware of any complaints
8  that were made by anybody you supervised, anybody you
9  indirectly supervised, any kind of rumors or innuendos you
10 heard of people complaining about Mr. Baillie's leadership
11 abilities?
12 A. No.
13 Q. Now, Mr. Korte testified yesterday that
14 he observed a 180-degree turnaround in the branch between
15 Mr. Baillie's arrival and Mr. Baillie's departure or
16 shortly after his departure in terms of the financial
17 results.
18 A. Can you say that again?
19 Q. Yeah. Mr. Korte testified yesterday that he
20 observed a 180-degree turnaround between the time Mr.
21 Baillie arrived and Mr. Baillie's departure, shortly
22 thereafter, the results between like '99 -- the '98 to 2001
23 time frame.
24 A. So you mean when Doug was there?

Page 22

1  Q. Yes.
2  A. Okay.
3  Q. Do you have any particular view of whether or
4  not the branch or region turned around during Mr. Baillie's
5  tenure, in terms of financial results?
6  A. I believe that, in those couple of years,
7  that we did not make money.
8  Q. Right. In the '99/2000 time frame?
9  A. Um-hmm (nodding head affirmatively).
10 Q. Do you have any opinion as to what was the
11 cause of that?
12 A. No. We had a number of large losses, and
13 just the loss activity picked up.
14 Q. Did that have anything to do with decisions
15 that had been made prior to Mr. Baillie's arrival in terms
16 of underwriting and those kind of things?
17 A. It could have. I mean, I don't recall what
18 the losses were or how long we had underwritten the
19 account.
20 Q. Do you have any understanding as to how the
21 business in calendar year 2001 did?
22 A. In calendar year 2001, I believe we made a
23 profit.
24 Q. Do you know whether or not the underwriting

Page 23

1  profit in calendar year 2002 was better or worse than the
2  underwriting profit in 2001?
3  A. In calendar year 2002 compared to 2001? I
4  believe it was similar.
5  Q. Okay. Are the financial results in this
6  industry kind of dependent -- are they long-term in measure
7  in the sense that what you do today may not have an impact
8  on the books for some time?
9  A. It can.
10 Q. All right. What about Mr. Baillie and the
11 feedback that he provided to you regarding your
12 performance? Did you view his feedback as helpful,
13 constructive?
14 A. Yes.
15 Q. Now, did you ever observe in your -- how much
16 interaction would you have with Mr. Baillie in a typical
17 week or a typical month?
18 A. A lot of interaction.
19 Q. Did you ever observe Mr. Baillie do anything
20 that you thought was not in the best interest of Chubb or
21 somehow insulting or demeaning or, you know, totally
22 inappropriate, anything like that?
23 A. To?
24 Q. Just generally, in the performance of his

Page 24

1  job, did you ever see him do anything you thought just,
2  "Wow," you know, "a guy in Baillie's position should not be
3  doing that"?
4  A. Not that I can recall.
5  Q. Now, Dieter Korte told us yesterday about an
6  incident in which he was in a meeting in which Mr. Baillie
7  allegedly criticized Mr. Korte in front of other people,
8  something to do with whether Mr. Korte himself should
9  deliver something to somebody in Dayton, Ohio, rather than
10 have a courier service do it. Are you at all familiar with
11 that incident?
12 A. No.
13 Q. Does that ring a bell with you at all?
14 A. I may not have been a part of that meeting.
15 I have no recollection of that happening.
16 Q. Does the company ever arrange for courier
17 services to deliver documents from one location to another?
18 A. We use overnight mail and other courier
19 services.
20 Q. All right. Have you ever been to any company
21 golf outings with Mr. Baillie?
22 A. Yes.
23 Q. All right. Has Mr. Baillie been in charge of
24 some of these golf outings in the sense of kind of being

Page 25

1 the host?
2   A.  Yes.
3   Q.  How have you -- what would be your opinion of
4 Mr. Baillie's ability to kind of host those kind of events?
5 Because I suppose they're marketing events, right?
6   A.  Um-hmm (nodding head affirmatively).
7   Q.  How do you view him as performing that
8 particular role?
9   A.  I think he does fine.
10  Q.  All right. Did you ever have any -- form any
11 kind of opinion that, you know, he drank too much alcohol
12 at the events or he drank alcohol at inappropriate times or
13 anything like that?
14  A.  Doug did drink a lot. Whether I found it
15 inappropriate, I -- I don't know. I mean, only thing about
16 Doug, he could handle his alcohol, and, you know, I don't
17 recall anybody commenting to me about, you know, a negative
18 situation.
19  Q.  All the agents kind of report to you in a
20 sense, correct?
21  A.  Correct.
22  Q.  All right. And are these golf outings
23 generally designed to entertain agents and such?
24  A.  Agents and customers.

Page 26

1   Q.  Agents and customers. So during Mr.
2 Baillie's tenure with the company, you never heard an agent
3 or a customer remark or complain to you that, "Hey, Baillie
4 is drinking too much or he's drinking at inappropriate
5 times," or anything like that, because this is -- these are
6 social outings, right?
7   A.  Um-hmm (nodding head affirmatively). They
8 would comment and there would be some jokes about the
9 amount of alcohol he drinks.
10  Q.  Okay. More along the lines of -- you know,
11 I've got a friend who is an executive with a company, and
12 this fellow just has the ability -- he can drink beer from
13 probably 7 a.m. until about 3 a.m., get about two and a
14 half hours of sleep, and be the first guy on the tee the
15 next morning and pop another beer at 7 a.m. and do the same
16 thing for three or four days and handles himself completely
17 fine.
18      In your experience -- and maybe Mr. Baillie
19 is not that well versed -- but would you say the comments
20 are kind of more in that regard?
21  A.  I mean, they commented about how much he
22 drank, and most of the time it was jokingly. But, you
23 know, one of the things I find in my job is, because
24 they know I'm close to Doug, I don't always hear

Page 27

1 everything.
2   Q.  Now, what did -- during your -- while Mr.
3 Baillie was at the Cincinnati location, did you ever hear
4 any particular criticism from other employees of Mr.
5 Baillie's performance as the branch manager?
6   A.  There would be comments.
7   Q.  Okay. What kind of comments can you recall
8 hearing?
9   A.  I think one of the comments would be that
10 they would have conflicting goals.
11  Q.  You mean sometimes there would be conflicting
12 goals between like marketing and underwriting?
13  A.  Yes.
14  Q.  Is that -- is that common for that kind of
15 criticism to be directed at a branch manager, in the sense
16 that underwriting kind of sides with him on issues?
17 Sometimes the goals in marketing and underwriting are at
18 odds with each other?
19  A.  I think it can be typical, but there are
20 certain degrees.
21  Q.  Okay.
22  A.  I mean, the branch manager's job is to
23 balance both.
24  Q.  Did you think this was unusually high? Or

Page 28

1 how would you describe the amount of criticism with respect
2 to --
3   A.  I think there were probably a few more than I
4 would expect and the frustration level of some of the
5 employees, because it was repeated, was probably a little
6 bit on the high side.
7   Q.  Okay. And to what do you attribute the
8 frustration?
9   A.  I think it's a conflicting goal between, you
10 know, what Doug wanted them to do and what they -- they and
11 maybe the home office underwriting people felt they should
12 do on an individual account.
13  Q.  So the frustration arose generally out of a
14 difference of opinion as to what to do with the business?
15 Mr. Baillie wanted -- made a particular decision and --
16  A.  In this particular issue, yes.
17  Q.  Underwriting?
18  A.  Yes.
19  Q.  Any other type of criticisms you heard with
20 regard to Mr. Baillie?
21  A.  Some people have said that they weren't clear
22 on exactly what he wanted them -- wanted them to do, and
23 through dialogue they weren't able to come to that, "Okay,
24 now I know what you want," you know, "what my marching

## Page 29

1 orders are."
2  Q. Do you know whether or not Mr. Baillie by the
3 end of his tenure was generally viewed as a successful
4 branch manager?
5     MR. CROALL: By whom? Generally viewed?
6  Within the Cincinnati branch?
7  Q. Within the office.
8  A. Some people, probably yes; some people,
9 probably no. I think there were different opinions.
10  Q. Tell me a little bit about Jerry Butler.
11 What do you know about Mr. Butler?
12  A. As far as?
13  Q. You know, what's his background? Is he
14 coming from a marketing background? Underwriting
15 background?
16  A. He's had -- I believe he started in the
17 business in a claims role with the company, and then he was
18 in a training and education role with the company. And
19 with Chubb he's been in human resources, marketing, and
20 branch management.
21  Q. And is he still in the branch manager role
22 here locally?
23  A. Yes.
24  Q. Now, how would you describe his level of

## Page 30

1 experience with the level of experience that Mr. Baillie
2 had?
3  A. His number of years?
4  Q. Yeah, however you feel comfortable.
5  A. I mean, I don't know how to answer that one.
6  Q. All right.
7  A. I mean, I -- I don't know all of Doug's
8 experiences or all of Jerry's experiences.
9  Q. And how would you describe -- is there
10 a difference in management style between the two of
11 them?
12  A. I think there is.
13  Q. How would you describe the difference in
14 management style?
15  A. I think Jerry's goals and strategies for the
16 future are much more defined and communicated. I think
17 there's probably an increased level of accountability with
18 employees and with the overall numbers in the branch and
19 people's -- you know, meeting their goals.
20  Q. Now, were you -- you obviously were not
21 consulted about Mr. -- or were you consulted at all about
22 Mr. Baillie's termination?
23  A. No.
24  Q. Were you aware of any performance concerns

## Page 31

1 directed at Mr. Baillie prior to his termination?
2  A. I mean, I was surprised.
3  Q. You were surprised by his termination?
4  A. Correct.
5  Q. Now, why were you surprised by his
6 termination?
7  A. I just -- I mean, I assume there was some
8 kind of process that they went through to come to this
9 result, and Doug was a pretty good poker player, and for
10 some reason he chose not to bring me into that.
11  Q. Meaning that, prior to learning of his
12 termination, he did not --
13  A. He did not confide in me.
14  Q. That there were any kind of performance
15 issues?
16  A. That there were any kind of performance
17 issues.
18  Q. And the two of you were relatively good
19 friends; is that correct?
20  A. Um-hmm (nodding head affirmatively).
21  Q. And would you have expected him to confide in
22 you if he thought he was in serious jeopardy of losing his
23 job?
24  A. I think that's a personal decision that he

## Page 32

1 would make.
2  Q. All right. Do you know now whether or not he
3 was given any kind of warnings or anything like that?
4  A. I don't know.
5  Q. All right. Because you've stayed in contact
6 with him to some degree?
7  A. I probably haven't talked to him for a year.
8  Q. Okay. Now, did you have after -- how did you
9 learn he had been terminated?
10  A. I was out of the office. Our son Peter was
11 born on the Thursday before his termination, so I was back
12 and forth at the hospital, and he called me at home that
13 night.
14  Q. And what do you recall about that
15 conversation?
16  A. I was surprised.
17  Q. Did Mr. Baillie relay to you what had
18 happened?
19  A. He said he was terminated.
20  Q. Did he -- do you recall whether he was
21 professional during that conversation?
22  A. He was very -- yes, he was professional.
23  Q. All right. So, at least prior to receiving
24 this telephone call, you had no suspicion or inkling that

Page 33

1  he was kind of in jeopardy of losing his job?
2      A.  I knew there were probably some issues, but,
3  you know, to this extent, no.
4      Q.  How do you know there were some issues?
5      A.  You know, conversations I had with Tim asking
6  me about certain things from a marketing standpoint.
7      Q.  What kind of conversations would you have
8  with Tim that you can think of regarding that?
9      A.  I mean, a lot of it revolved around, you
10 know, what was going on in our production offices in
11 Columbus and Louisville.
12     Q.  You mean from like a financial standpoint?
13     A.  More of a strategy standpoint, you know:
14 Who's doing what? Who's responsible for what?
15     Q.  Do you recall any particular criticisms he
16 had in that regard, of either your performance or Mr.
17 Baillie's performance?
18     A.  Particular criticisms?
19     Q.  Yeah. Anything more specific than what you
20 just said, that it seemed like general?
21     A.  I think the general focus of that discussion
22 -- I don't remember particular statements -- was, you know,
23 he was trying to figure out how we were managing those
24 offices.

Page 34

1      Q.  Okay. All right. Whose responsibility was
2  it to manage those offices?
3      A.  They reported to Doug.
4      Q.  And what type of general feedback do you
5  think you gave him on that particular subject?
6      A.  Gave Tim?
7      Q.  Yes.
8      A.  I basically told him what we were doing, how
9  it was being managed, and he had questions, and I don't
10 remember the specific questions, but I answered them.
11     Q.  Okay. Did you have a particular view about
12 how those offices were being managed that you would have
13 shared with Mr. Szerlong?
14     A.  I don't recall, you know. I mean, that's a
15 couple years ago at least. I don't recall.
16     Q.  Did you ever have occasion -- since Mr.
17 Baillie's termination, have you ever heard of anything that
18 Mr. Baillie has done since his termination that was somehow
19 viewed by whoever related it to you as being inappropriate
20 or wrong or unprofessional or not in the best interest of
21 Chubb?
22     A.  No.
23     Q.  You've never -- have you ever heard about
24 some convention at which Mr. Baillie was manning some booth

Page 35

1  for a charity he supported and he allegedly bad-mouthed, I
2  guess, Chubb in some manner?
3      A.  I can think of -- I think I know the event.
4  It was probably a play at a charity for Insuring the
5  Children. I had a couple of children that were sick and I
6  went home before the play started.
7      Q.  Was this something called like a Big I
8  Convention? Do you remember like the Big I Convention?
9      A.  No. I wasn't at that.
10     Q.  You weren't at that. And you haven't heard
11 anything that happened there? Mr. Korte running into Doug
12 Baillie or anything like that?
13     A.  I recall people talking about that he was
14 there.
15     Q.  Okay. But no either positive or negative
16 thing?
17     A.  No. They were just surprised to see him.
18     Q.  Okay. Do you know why they would be
19 surprised to see him at some place like that?
20     A.  Well, I mean, I think just because he was no
21 longer working for Chubb and didn't have a job in the
22 insurance, the local insurance industry.
23     Q.  Do you know anything about Mr. Baillie's
24 efforts to find employment, other than the fact that he did

Page 36

1  find employment?
2      A.  I knew he was -- I believe they set him up
3  with an out-placement service and he had a number of
4  different interviews.
5      Q.  Okay. Did he say anything -- do you recall
6  him ever saying anything to you that was particularly
7  negative about Chubb since his departure?
8      A.  No.
9      Q.  Okay. Have you been -- other than whatever
10 you've talked about with Mr. Croall, have you been -- have
11 you spoken to anybody else within Chubb about Mr. Baillie's
12 termination?
13     A.  From time to time, it will be kind of like
14 watercooler talk, and I don't know that we really discussed
15 specifics. I think the -- what it comes down to most of
16 the time, we'd just prefer that this come to some kind of
17 settlement and move on.
18     Q.  Have you heard from anybody within Chubb as
19 to Mr. Baillie's severance offer? Have you heard anything
20 about that other than from counsel?
21         MR. CROALL:  And that would include inside
22     counsel in that exclusion.
23     A.  Nobody's mentioned anything about severance.
24     Q.  Okay.

### Page 37

1  A. I assume there was some kind of offer, but
2  that's -- that's just as much --
3  Q. You don't know the wheres and wherefors?
4  A. I'm not instructed on that.
5  Q. Nothing that happened about that?
6  A. No.
7  Q. Have you ever been in a position, Jeff, of
8  having to offer a departing employee severance?
9  A. No.
10 Q. Do you know anybody -- do you have any
11 familiarity with anybody who has ever received severance
12 from Chubb?
13 A. No specifics.
14 Q. All right. And other than counsel, nobody
15 has come to you since Mr. Baillie's departure and tried to
16 get information from you as to his performance, anything
17 like that?
18 A. No.
19 Q. All right. How did you view Mr. Baillie with
20 respect to kind of develop -- developing you in the
21 marketing area?
22 A. I think he helped me a lot. I mean, I was
23 new into the job and, you know, he had experience in that
24 area, so he was helpful to me.

### Page 38

1  Q. Did he share his prior expertise or his level
2  of expertise with you and kind of give you suggestions
3  along those lines?
4  A. Yeah. He shared some of the things he's done
5  in the past and how they've worked for him, and helped me
6  work through a number of different issues in the marketing
7  department.
8  Q. Did he provide constructive feedback to you
9  from time to time?
10 A. Um-hmm (nodding head affirmatively).
11 Q. And did he give you encouragement along the
12 way to kind of help you handle your tasks?
13 A. Yes.
14 Q. Do you think -- did Mr. Baillie help you at
15 all in trying to develop your confidence in handling your
16 job?
17 A. Yes.
18 Q. Did Mr. Baillie assist you in kind of
19 delivering the necessary results in marketing?
20 A. Yes.
21 Q. How about -- any kind of particular issues
22 along the lines of diversity or diversity initiatives
23 within Chubb that you observed with Mr. Baillie?
24 A. In my part of diversity, in addition to

### Page 39

1  supporting it as a goal of the corporation, would be trying
2  to find some minority vendors.
3  Q. Did Mr. Baillie encourage you to do that,
4  support you in that regard?
5  A. Yes.
6  Q. How about the -- would you describe Mr.
7  Baillie's management style as kind of a strong management
8  style?
9  A. (No response.)
10 Q. Or would you describe it in another manner?
11 A. I'm not sure strong is the right word. I'm
12 trying to look for the right word.
13 Q. Okay. Well, let me -- while you're thinking
14 about that, maybe we can jump to another subject and maybe
15 come back to that. Maybe this will help.
16    Did you ever think that Mr. Baillie took like
17 too many extreme positions on issues and somehow that
18 alienated managers or staff? Or did he seem open to
19 suggestions from you and others?
20 A. I think that some people thought that he was
21 too process-driven, numbers-driven; for example, you know,
22 "I want everybody to make 15 agency calls," or, "I want you
23 to do this." And, you know, one size doesn't always fit
24 all, depending on what your job responsibilities are.

### Page 40

1  Q. Okay.
2  A. And I think that, you know, could be an issue
3  for some people. One issue that came up, in order to get
4  casual during the summer, he set very specific goals, and I
5  think that alienated some people.
6  Q. Okay. Is that all that unexpected in a large
7  organization, that a manager is going to alienate some
8  people and please others?
9  A. I don't know.
10 Q. How about his ability to kind of listen to
11 you and others that you observed during his tenure? Did he
12 seem to have good listening skills?
13 A. The attention span was a little bit short at
14 times, and I think sometimes he probably jumped to
15 conclusions on some issues.
16 Q. Okay. Now, other than what we've talked
17 about this morning, do you think -- well, do you think you
18 have any particular knowledge about why Mr. Baillie was let
19 go by Chubb?
20 A. Nobody's ever told me.
21 Q. All right. And you don't believe you
22 provided any input into that process at all?
23 A. No. Did Tim come and ask me specifically,
24 "Here's what I need to know about Doug?" No. But, you

| Page 41 | Page 43 |
|---|---|
| 1 know, between conversations I would have with Tim | 1 talked a little bit about diversity before. Do you have |
| 2 occasionally and with the zone marketing manager, there | 2 any observation about the level of diversity, hiring in the |
| 3 could have been input that got back to Tim based on that. | 3 branch, the hiring of minorities during Mr. Baillie's |
| 4    Q.  Have you had any conversations with Diane | 4 tenure? |
| 5 Haggard that you can recall about Doug Baillie? | 5    A.  Specific numbers -- I know that we try and |
| 6    A.  You know, the same conversations we probably | 6 find, you know, high quality minorities as part of our |
| 7 had with others. You know, we just kind of wished we could | 7 recruiting, career recruiting goals. |
| 8 kind of magically make this go away. | 8    Q.  Okay. How about with respect to females in |
| 9    Q.  Have you ever had any conversations with | 9 your organization? Did you notice one way or the other |
| 10 anybody at Chubb regarding the subject, the generalized | 10 whether or not there were more females in management over |
| 11 subject of age discrimination, or whether or not more older | 11 the tenure of Mr. Baillie's employment? |
| 12 people have left the organization than younger people or | 12    A.  Specifically in the Cincinnati branch? I'm |
| 13 anything like that? | 13 kind of going around the office. |
| 14       MR. CROALL:  Again, excluding counsel. | 14       He would have put Diane Haggard in that |
| 15    Q.  Excluding counsel. | 15 job, in the human resources job. That's the only female I |
| 16    A.  No. | 16 can think of that he promoted to a management level |
| 17    Q.  You never had any conversations? Or you | 17 position. |
| 18 never heard Mr. Tazik make any kind of remarks along those | 18    Q.  Okay. Do you know anything about the level |
| 19 lines like -- something along the lines of, you know, "He's | 19 of friendship between Mr. Szerlong and Ms. Haggard? |
| 20 seen his fair share of older persons disappear from Chubb," | 20    A.  The level of friendship? The only thing I |
| 21 or anything along those lines? | 21 know is Diane did work in the Chicago office. |
| 22    A.  Not that I can recall. | 22    Q.  At one time? |
| 23    Q.  Aside from maybe a difference in style, do | 23    A.  At one time. She's probably been in |
| 24 you think you're in any kind of position to know whether or | 24 Cincinnati for eight plus, around eight years, give or |

| Page 42 | Page 44 |
|---|---|
| 1 not Mr. Butler was more or less qualified than Mr. Baillie | 1 take. But as far as a friendship, I'm not familiar with |
| 2 at the time of Mr. Baillie's departure? | 2 what their relationship is. |
| 3    A.  Say that again. | 3    Q.  Do you know anything about Mr. Baillie's role |
| 4    Q.  Aside from -- well, do you think you're in | 4 with respect to what some people described as the uninsured |
| 5 any kind of position to know whether Mr. Butler was more or | 5 motorist crisis? |
| 6 less qualified than Mr. Baillie at the time of Mr. | 6    A.  Say first part again. |
| 7 Baillie's departure? | 7    Q.  Do you know anything about Mr. Baillie's role |
| 8    A.  No. | 8 in connection with -- |
| 9       MR. FREKING:  All right. Give me a second. | 9    A.  I know he had involvement, and it was a big |
| 10    I'm going to go into the other room and review | 10 topic where a lot of people were involved, and I know that |
| 11    something quickly. | 11 they had a number of conversations with different |
| 12       (At which time, a brief recess was taken from | 12 underwriting groups to try to figure out what our strategy |
| 13    10:11 a.m. until 10:24 a.m.) | 13 should be on this. I know he was at a meeting in New |
| 14    Q.  Do you have any knowledge or information on | 14 Jersey. |
| 15 Mr. Baillie's role with the performance review process? | 15    Q.  Okay. |
| 16 Any -- you know, whether or not he improved that process | 16    A.  I was not directly involved in any of those |
| 17 while he was in the branch? | 17 meetings. |
| 18    A.  You know, I'm not involved in other people's | 18    Q.  You're not in a position to say one way or |
| 19 reviews, so, I mean -- | 19 the other whether he did his job well or did his job lousy? |
| 20    Q.  Okay. | 20    A.  I was kind of on the outskirts of that. I |
| 21    A.  I think I've answered that question from my | 21 knew it was industry issues, and I tried to stay in touch. |
| 22 personal standpoint, and that's the best perspective I can | 22 But that was more of an underwriting issue which I was not |
| 23 give. | 23 intimately involved with. |
| 24    Q.  Okay. Do you have any knowledge -- you | 24    Q.  Did you ever tell Mr. Szerlong or anybody |

Page 45

1 else with Chubb that you thought any interactions you
2 had with Mr. Baillie were inappropriate or anything like
3 that?
4      MR. CROALL: Again, other than counsel.
5   Q. Other than counsel.
6   A. Our personal interactions?
7   Q. Right. Personal business interactions,
8 right.
9   A. No.
10  Q. Okay.
11  A. Not that I can recall.
12  Q. I received an interrogatory response from
13 Chubb in which you were identified as a person who had
14 knowledge of the marketing function of the branch.
15  A. Um-hmm (nodding head affirmatively).
16  Q. Which is obviously true, and you also had
17 knowledge of your interactions with plaintiff, meaning Mr.
18 Baillie.
19      Okay. Do you think we've talked this morning
20 about everything that you can recall of any significance
21 regarding your interactions with Mr. Baillie, or certainly
22 all interactions that you would have related to Mr.
23 Szerlong? I mean, obviously, we haven't talked about every
24 interaction, but I just want to know is there anything?

Page 46

1   A. I'm searching.
2   Q. Yeah. Is there any interaction you had with
3 Mr. Baillie that you can possibly think of that could
4 somehow be related to a reason that he was fired or
5 terminated? I'm just looking to see if you know anything
6 that could possibly be used by Chubb against Mr. Baillie, I
7 suppose --
8      MR. CROALL: Objection.
9   Q. -- with regard to your interaction.
10     MR. CROALL: Objection to the extent it
11 calls for speculation and conclusion --
12     MR. FREKING: Right.
13     MR. CROALL: -- by Mr. Barton.
14  A. I'm trying to search the data banks here.
15 But, I mean, Doug and I had a number of different
16 interactions, and, I mean, none are coming to mind at this
17 point.
18  Q. Generally positive?
19  A. Yeah.
20  Q. Okay. That's all the questions I have.
21 The procedure is for the transcript to be typed up if
22 anybody orders it. We're not going to order that it be
23 typed up at this point. If it is, before it's ever used
24 either by Chubb or by Mr. Baillie, you'll have a chance to

Page 47

1 review it to make sure the transcript is accurate.
2   A. Okay.
3   Q. All right?
4   A. All right.
5   Q. Thanks a lot for coming down.
6
7
8              Jeffrey Allen Barton
9                    - - -
10        DEPOSITION CONCLUDED AT 10:30 A.M.
11                   - - -

Page 48

1
2              C E R T I F I C A T E
  STATE OF OHIO    :
3                  : ss
4 COUNTY OF HAMILTON :
5      I, Raymond E. Simonson, RMR, CRR, the
6 undersigned, a duly qualified and commissioned notary
7 public within and for the State of Ohio, do hereby certify
8 that, before the giving of his aforesaid deposition,
9 JEFFREY ALLEN BARTON was by me first duly sworn to depose
10 the truth, the whole truth, and nothing but the truth; that
11 the foregoing is the deposition given at said time and
12 place by JEFFREY ALLEN BARTON; that said deposition was
13 taken in all respects pursuant to stipulations of counsel
14 hereinbefore set forth; that I am neither a relative of nor
15 employee of any of their counsel, and have no interest
16 whatever in the result of the action.
17     IN WITNESS WHEREOF, I hereunto set my hand
18 and official seal of office at Cincinnati, Ohio, this
19          day of              2003.
20
21
22 My commission expires:  Raymond E. Simonson, RMR, CRR
   June 23, 2003           Notary Public - State of Ohio
23
24