DEPOSITION OF TIMOTHY DADIK - August 26, 2003

---

**1**

```
         UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF OHIO
               WESTERN DIVISION



DOUGLAS W. BAILLIE,

         Plaintiff,

    vs.                  No. C-1-02-062

CHUBB & SON INSURANCE,

         Defendant.






         The Discovery Deposition of TIMOTHY DADIK,
called by the Plaintiff for examination, taken pursuant
to notice, taken before MICHELE J. LOSURDO, CSR, a Notary
Public within and for the County of DuPage, State of
Illinois, and a Certified Shorthand Reporter of said
state, taken at 500 Park Boulevard, Suite 600, Itasca,
Illinois, at the hour of 1:30 p.m., on the 26th of
August, A.D., 2003.
```

---

**2**

```
              APPEARANCES:


    FREKING & BETZ
    BY: MR. MARK W. NAPIER
        215 East Ninth Street
        5th Floor
        Cincinnati, Ohio  45202
        (513) 721-1975
        Appeared telephonically on behalf
        of the Plaintiff;


    KEATING, MUETHING & KLEKAMP, P.L.L.
    BY: MR. DAVID K. MONTGOMERY
        1400 Provident Tower
        One East Fourth Street
        Cincinnati, Ohio  45202
        (513) 579-6400
        Appeared telephonically on behalf
        of the Defendant.
```

---

**3**

         DEPOSITION OF TIMOTHY DADIK
              AUGUST 26, 2003
         TIMOTHY DADIK, having
been first duly sworn, was examined
and testified as follows:
    EXAMINATION
    by Mr. Napier
    Q.  Sir, would you state your
name?
    A.  Tim Dadik.
    Q.  My name is Mark Napier and
we just met here on the telephone,
but to let you know, I am one of
several attorneys who represent Doug
Baillie in a lawsuit that has been
filed against Chubb and we've asked
you to appear today for this
telephone deposition for the purpose
of asking you questions about
information you may or may not have
related to that lawsuit and I would
start out by asking you have you ever
given a deposition before?
    A.  I have not.

---

**4**

    Q.  I'll give you a few
guidelines or suggestions that may
make the process go easier.
Particularly because we are on the
telephone, I would ask that when I
ask you a question, you make sure
that your response is one that is
verbal as opposed to a nod or a
gesture which, of course, I can't
see, okay?
    A.  Okay.
    Q.  It will also make it easier
for the court reporter in preparing a
transcript.  Also, I would ask that
you wait until I have finished my
complete question until you respond,
that way, again, we will not be
talking on top of each other, okay?
    A.  Okay.
    Q.  Thirdly, if at any time I
should ask you a question that you
don't understand, just let me know
and I'll try to rephrase it so you
do understand it.

---

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

**M & M REPORTING, INC.**
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters         Phone: (630) 775-1503
www.mmreporting.com            Fax:   (630) 775-0170
EXCELLENCE BUILT ON EXPERIENCE

**DEPOSITION OF TIMOTHY DADIK - August 26, 2003**

---

Page 5

1    My purpose today is not
2  to trick you in any manner but just
3  simply to find out what information
4  you know, so, as I say, if you
5  answer the question, I'll assume
6  you've understood it, okay?
7    A.  Okay.
8    Q.  And, finally, we probably
9  won't be that long, but if for any
10 reason you need to take a break, make
11 a phone call, go to the rest room,
12 get something to drink, whenever you
13 want to take a break, just let me
14 know and we could do so.
15    The only thing that I
16 would ask is that before you take a
17 break, just finish any question that's
18 pending.
19   A.  Will do.
20   Q.  Tim, why don't you start out
21 by giving us your current residence
22 address?
23   A.  [redacted]
24

---

Page 6

1    Q.  And how long have you lived
2  at that address?
3    A.  A year.
4    Q.  What was your address prior
5  to living at the Rockwell Avenue
6  address, what city?
7    A.  Glendale Heights, Illinois
8  for three months.
9    Q.  How long have you worked in
10 Chicago?
11   A.  Since January of 2002.
12   Q.  What is your current home
13 telephone number?
14   A.  [redacted]
15   Q.  And what is your date of
16 birth?
17   A.  [redacted]
18   Q.  Who is your current
19 employer?
20   A.  Chubb Insurance.
21   Q.  Do you recall your date of
22 hire with Chubb?
23   A.  June 13th, 1994.
24   Q.  And what's your current

---

Page 7

1  position with Chubb?
2    A.  I am the personal lines
3  manager for our Itasca, Illinois
4  office.
5    Q.  I'm going to ask you if you
6  would start beginning in 1994 and go
7  through your progression of positions
8  that you held with Chubb?
9    A.  I started June of 1994 as a
10 commercial lines underwriting trainee.
11 I held that position for roughly a
12 year, left the company for three
13 months, then came back as a personal
14 lines underwriter here in our Chicago
15 office.
16    I spent from that point
17 up until August 1998 as an
18 underwriter for various territories
19 and in August of 1998 was moved to
20 our Cincinnati, Ohio office as a
21 marketing specialist in personal
22 lines.
23    December of 1999 I was
24 promoted to the personal lines manager

---

Page 8

1  of the Cincinnati territory and then
2  January of 2002, I was promoted to
3  the current position that I'm in here
4  in Itasca.
5    Q.  Do you know Doug Baillie?
6    A.  I do.
7    Q.  How do you know Mr. Baillie?
8    A.  Doug was the branch manager
9  in Cincinnati.
10   Q.  At the time that you came
11 here in August of '98?
12   A.  Doug and I started at
13 approximately the same time.
14   Q.  Okay.  Now, in Cincinnati,
15 was that a regional position or just
16 for the Cincinnati branch area?
17   A.  My responsibilities included
18 the Cincinnati office as well as the
19 Columbus, Ohio office as well as the
20 Louisville, Kentucky office.
21   Q.  Were the Columbus and
22 Louisville offices what I've heard
23 referred to as production offices?
24   A.  That is correct.

---

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

**M & M REPORTING, INC.**
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters   Phone: (630) 775-1503
www.mmreporting.com      Fax:   (630) 775-0170
EXCELLENCE BUILT ON EXPERIENCE

Redacted

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

### 9

1  Q. It is correct to say
2  essentially they were satellite
3  offices of the Cincinnati office?
4  A. They were what we called
5  production offices.
6  Q. And the parent office was
7  Cincinnati?
8  A. Cincinnati was a branch
9  office for the company.
10  Q. You indicated that you began
11  as a marketing specialist in personal
12  lines.
13  Could you describe what
14  you did in that position as a
15  marketing specialist in personal
16  lines?
17  A. The marketing specialist
18  reported directly to the personal
19  lines manager and then that personal
20  lines manager, in turn, reported
21  directly to the branch manager and
22  what we refer to as a zonal, so my
23  responsibilities were the day-to-day
24  handling of the agencies that were

### 10

1  appointed to do business with Chubb.
2  Q. Who was the personal lines
3  manager when you began in August of
4  '98 at the Cincinnati branch?
5  A. Michael Kravchick.
6  Q. And then in December of '99,
7  you assumed his position?
8  A. No. Michael left three
9  months after I joined the branch and
10  then Byron Simpson replaced him. I,
11  in turn, replaced Byron.
12  Q. Why did Mr. Kravchick leave?
13  A. He went to go work for
14  another insurance company.
15  Q. Was he asked to leave to
16  your knowledge?
17  A. I don't know.
18  Q. And Mr. Simpson then took
19  over for Mr. Kravchick?
20  A. Correct.
21  Q. Where had Mr. Simpson been
22  employed prior to assuming the
23  position of personal lines manager?
24  A. Byron was a marketing

### 11

1  specialist for Chubb in our Chicago
2  office.
3  Q. And do you know why he left
4  that position as personal lines
5  manager after taking over for Mr.
6  Kravchick?
7  A. No, I don't know why he
8  left.
9  Q. Did he leave the company or
10  did he go to another position with
11  Chubb, if you know?
12  A. Byron left the company to go
13  work for an independent insurance
14  agency.
15  Q. Do you know what independent
16  insurance agency that was?
17  A. I believe it was AON.
18  Q. A-O-N?
19  A. Correct.
20  Q. Do you know is he still
21  employed there to your knowledge?
22  A. He is not.
23  Q. Do you know where he's
24  currently employed?

### 12

1  A. No, I don't know where he
2  is currently employed.
3  Q. It's your understanding that
4  he is no longer employed by A-O-N?
5  A. As far as I know, he is not
6  employed by AON any longer.
7  Q. When he left Chubb and went
8  to work for A-O-N, do you know what
9  location he was working for A-O-N?
10  A. Here in Chicago.
11  Q. And you assumed the position
12  of personal lines manager and took
13  over when Mr. Simpson left?
14  A. That is correct.
15  Q. And that would have been in
16  December of 1999?
17  A. Correct.
18  Q. How would you describe the
19  condition of the personal lines
20  department at the time that you took
21  it over?
22  A. In what manner?
23  Q. Just overall performance.
24  A. To the best that I can

ATLANTA   NEW YORK   WASHINGTON, DC   CHICAGO   LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters   Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE   www.mmreporting.com   Fax: (630) 775-0170

13

1 recall, the territory was growing
2 prior to me even arriving in
3 Cincinnati and it was profitable.
4   Q.  During the time that you
5 served as the personal lines manager,
6 did the growth continue?
7   A.  Yes, it did.
8   Q.  Can you give me any numbers?
9 Do you know what the overall sales
10 numbers were for, say, the end of
11 1999 and then for the successive
12 years?
13   A.  To the best that I can
14 recall, it was a $21 million
15 territory and we probably grew 10
16 percent per year.
17   Q.  When you give that figure of
18 21 million, are you indicating that's
19 your estimate at the end of 1999?
20   A.  Yes.
21   Q.  And during the time that you
22 served as a production lines manager,
23 it's your recollection that you grew
24 approximately on an average 10 percent

14

1 per year?
2   A.  That is correct. Right.
3   Q.  Now, once you became the
4 personal lines manager, who is your
5 direct supervisor?
6   A.  I had two direct reports.
7 I reported directly to Doug Baillie
8 as my branch manager and I reported
9 directly to my boss within personal
10 lines.
11   Q.  And who is that?
12   A.  James Hasley.
13   Q.  How do you spell his last
14 name?
15   A.  H-a-s-l-e-y.
16   Q.  Where was Mr. Hasley
17 located?
18   A.  He was in Chicago.
19   Q.  What was his title that he
20 held when he served as your
21 supervisor?
22   A.  Northern zone personal lines
23 manager.
24   Q.  During the period that you

15

1 served as the personal lines manager,
2 would Mr. Baillie conduct your
3 performance appraisals?
4   A.  I had an annual performance
5 review with Doug.
6   Q.  Did you find that Mr.
7 Baillie was fair in his performance
8 reviews?
9   A.  No.
10   Q.  What manner was he unfair?
11   A.  There was a lack of
12 preparation in planning for the
13 performance reviews and a lack of
14 recognition of the results and then
15 the corresponding salary increases.
16   Q.  When you say lack of
17 preparation, in what manner?
18   A.  I could tell from sitting in
19 front of Doug that he had not
20 prepared at all for that conversation.
21   Q.  On how many occasions did he
22 give you an annual performance review?
23   A.  Well, an annual performance
24 review would be once a year.

16

1   Q.  How many annual performance
2 reviews did you receive by Mr.
3 Baillie?
4   A.  I would have had a
5 discussion with him only in December
6 of '99, I believe.
7   Q.  But you had just started in
8 that position of performance lines
9 manager in December of '99, correct?
10   A.  Correct.
11   Q.  How did you feel he was
12 unprepared if you had just began in
13 your new position?
14   A.  As a person working in
15 Doug's branch, you know, he would
16 have some idea of skills, weaknesses,
17 strengths, I think, of his people and
18 when I say that he was ill-prepared,
19 you would agree with me that you've
20 probably sat in court many times
21 where you could tell that someone is
22 simply not prepared for a meeting or
23 to ask questions and that was my
24 perception of my annual performance

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters   Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE   www.mmreporting.com   Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

17

1  review with Doug.
2    Q.  To your knowledge, that's
3  the only one he ever gave you?
4    A.  Yeah, because December of
5  '99 was when I first started -- you
6  know what, I stand corrected. It
7  would have also been December of 2000
8  because I stayed in Cincinnati through
9  December of 2001.
10    Q.  And what was your perception
11  of his preparation in December of
12  2000?
13    A.  The same.
14    Q.  When you say that he was
15  unprepared, are you saying that you
16  felt that he had not made a
17  sufficient assessment of your skills,
18  weaknesses and strengths?
19         MR. MONTGOMERY:  Just
20  for the record, object. I think that
21  was asked and answered. And on all
22  these, Tim, you'll still go ahead and
23  answer. I just need to state for
24  the record.

18

1         THE WITNESS:  Okay.
2  BY THE WITNESS:
3    A.  If you would then repeat the
4  question.
5  BY MR. NAPIER:
6    Q.  Sure. When you say he was
7  unprepared, I'm trying to gain an
8  understanding of what you mean by
9  that.
10    A.  Well, as I had answered
11  before, he would shuffle through
12  papers, he would not have what I
13  would consider a logical thought
14  pattern and gave me feedback that I
15  didn't feel was accurate to my
16  performance in the branch.
17    Q.  What feedback do you recall
18  that he gave you in December of '99
19  that you felt to be inaccurate?
20    A.  At this point, I couldn't
21  recall.
22    Q.  Nothing sticks out in your
23  mind?
24    A.  No.

19

1    Q.  Did you feel that the
2  feedback he gave you in December of
3  2000 was inaccurate?
4    A.  I think it was inaccurate
5  for the same reasons I gave before,
6  yes.
7    Q.  You didn't give any reasons
8  if I could --
9    A.  No, that I said that I felt
10  he was ill-prepared for that. After
11  spending a year as one of his direct
12  reports, I think that he had more
13  specific knowledge about my strengths
14  and weaknesses, but I still don't
15  feel that he adequately addressed
16  those or accurately necessarily
17  addressed those.
18    Q.  Do you recall what advice he
19  gave you during your December of '99
20  performance review?
21    A.  No. I was very new at that
22  point and I don't recall. It was
23  three years ago.
24    Q.  Do you recall what advice or

20

1  counseling he gave you during your
2  December 2000 review?
3    A.  No.
4    Q.  But your overall impression
5  and what you recall was he appeared
6  to be less than well-prepared?
7         MR. MONTGOMERY:
8  Objection, asked and answered.
9  BY MR. NAPIER:
10    Q.  Is that correct?
11    A.  That is correct.
12    Q.  You also indicated, if I
13  understood you correctly, that in
14  addition to a lack of preparation as
15  you characterized it, there appeared
16  to a lack of recognition of results;
17  could you explain what you mean by
18  that?
19    A.  The monetary rewards that I
20  received for the position I don't
21  think reflected what should have been
22  given for that.
23    Q.  When you say monetary
24  awards, you're, of course, talking

**DEPOSITION OF TIMOTHY DADIK - August 26, 2003**

### 21

1  about the level of -- or the
2  compensation that you were paid?
3     A.  Correct.
4     Q.  In December of '99, what was
5  your compensation?
6     A.  If I had to guess, which I
7  am doing, it was probably 45,000.
8         MR. MONTGOMERY:  Tim,
9  let me just caution you, I don't mind
10 if you do want to guess, but just
11 make sure if you do that in the
12 future that you indicate that you are
13 guessing.
14         THE WITNESS:  Yes, I
15 will.
16    BY THE WITNESS:
17    A.  What sticks out in my mind
18 is when I was promoted, I received a
19 4 percent increase to go from a
20 marketing specialist to a personal
21 lines manager and that is well below
22 what I knew to be a percentage for
23 someone that was being promoted into
24 management.

### 22

1    BY MR. NAPIER:
2    Q.  Did you address this concern
3  or issue with Mr. Baillie?
4     A.  It was presented to me as a
5  take-it or leave-it opportunity.
6     Q.  So, again, did you discuss
7  it with Mr. Baillie that you felt
8  that the compensation offered was
9  inadequate?
10    A.  Yes.
11    Q.  What do you recall about
12 those discussions?
13    A.  It was a take-it or leave-it
14 opportunity.  He made it very clear.
15    Q.  Do you know if there was
16 other candidates for that position at
17 the time?
18    A.  I'm not privy to that
19 information and, no, I don't recall.
20    Q.  Do you recall whether or not
21 there was a salary range for that
22 position?
23    A.  I do not know if there was
24 or not.  I do know that six or nine

### 23

1  months later I did receive what the
2  company called a spot bonus which, in
3  essence, made up the differential
4  between what I knew should have been
5  my percentage increase.
6     Q.  Was that spot bonus based on
7  the favorable performance of your
8  department in that six- to nine-month
9  period?
10    A.  That spot bonus was given to
11 me by my zone manager for a job well
12 done for the first six or nine months
13 in the territory.
14    Q.  Do you know if Mr. Baillie
15 had to approve the awarding of the
16 spot bonus?
17    A.  As the local branch manager
18 responsible for controlling salaries,
19 yes, I do believe he had to approve
20 that.
21    Q.  Do you know whether or not
22 he complimented you or made any
23 comments at the time you were awarded
24 that bonus?

### 24

1     A.  Yes.
2     Q.  What did he do?
3     A.  It was just a very brief
4  conversation, congratulations, job
5  well done, keep it up.
6     Q.  It's fair to say he
7  recognized your achievements at that
8  time by approving the spot bonus?
9     A.  At that time, yes.
10    Q.  But when you say lack of
11 recognition of results, you're talking
12 about what you perceive as a lack of
13 recognition in December of '99 when
14 you were promoted?
15    A.  No.  I think that that
16 continued through my two performance
17 reviews.  I don't think my
18 compensation was ever an accurate
19 reflection of the effort that was put
20 forth as well as the results that
21 were there.
22    Q.  Do you know how your
23 compensation compared with other
24 managers in the Cincinnati office?

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

# M & M REPORTING, INC.
**LEGAL SERVICES**
One Pierce, Suite 295-E, Itasca, IL 60143



Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170

## 25

1   A.  No, I don't.
2   Q.  You don't know if you were
3   on the low end, the middle of or the
4   high end of compensation for
5   department managers within the
6   Cincinnati branch?
7   A.  That is correct.
8   Q.  While you served as the
9   personal lines manager in Cincinnati,
10  did you engage in marketing
11  activities?
12  A.  I did.
13  Q.  What kind of marketing
14  activities did you engage in?
15  A.  As the manager, I was
16  responsible for profit and growth in
17  the territory, so marketing activities
18  would be anything from supporting the
19  marketing specialists that worked in
20  conjunction with me to agency travel
21  to uncovering new business
22  opportunities for the company for the
23  department.
24  Q.  Did you try to implement

## 26

1   growth incentives for the agencies?
2   A.  We had a specific pot of
3   money every year that we could use
4   toward special incentives and, yes, I
5   did use those.
6   Q.  What type of growth
7   incentives did you utilize during this
8   period that Mr. Baillie was the
9   regional manager?
10  A.  They were typically new
11  business incentives.
12  Q.  Could you explain what those
13  are because I'm not familiar and also
14  for the record, what kind of new
15  business incentives did you try to
16  utilize?
17  A.  We would present an
18  incentive to an agency that if they
19  wrote a half million dollars of new
20  business, we would give them $25,000
21  just as an example.
22  Q.  So obviously these were
23  incentives to try to grow the
24  business?

## 27

1   A.  Correct.
2   Q.  Did you find Mr. Baillie to
3   be helpful and provide assistance in
4   your marketing activities?
5   A.  The majority of the
6   incentives that I did, I worked in
7   conjunction with our marketing manager
8   Jeff Barton to implement those
9   incentive agreements.
10  Q.  What role did Mr. Baillie
11  play in your marketing activities?
12  A.  He always had final sign-off
13  on whether or not we would do an
14  incentive.
15  Q.  Are you saying that he was
16  supportive when you would make a
17  recommendation for an incentive to be
18  utilized?
19  A.  Yes.
20  Q.  You did find him supportive?
21  A.  Yes.
22  Q.  Did he on occasion go out
23  with you when you were engaged in
24  marketing activities?

## 28

1   A.  I very infrequently traveled
2   with Doug.
3   Q.  Were there occasions when he
4   would make agency visits with you?
5   A.  There were occasions where
6   Doug was meeting with an agency
7   principal and personal lines was going
8   to be a topic of conversation and so
9   I attended those meetings with Doug.
10  Q.  Did you feel it was
11  necessary for Doug to go with you on
12  field visits or did you feel his
13  level of participation was
14  satisfactory?
15  A.  Doug was more than welcome
16  to travel with me on any agency
17  visitation he wanted to go on.  I
18  think that one of his shortcomings
19  was his lack of involvement in
20  personal lines.
21  Q.  How did his lack of
22  involvement manifest itself, are you
23  saying he did not make sufficient
24  number of agency visits in your

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

### 29

1 estimation?
2   A.  I think that Doug's
3 involvement in personal lines --
4 nonexistent is not a fair word,
5 that's too harsh, but he was simply
6 not involved with the visiting of key
7 agents and personnel to drive new
8 business opportunities.
9   Q.  So it is your testimony that
10 he was supportive in the incentives
11 that you tried to implement to growth
12 of profit?
13          MR. MONTGOMERY:
14 Objection, asked and answered twice.
15   BY MR. NAPIER:
16   Q.  Can you answer the question,
17 sir?
18   A.  Doug did approve the
19 incentive agreements that were placed
20 in front of him.
21   Q.  Did Mr. Baillie provide any
22 other assistance in your marketing
23 activities?
24   A.  If there were occasions

### 30

1 where a large existing customer was
2 in jeopardy of leaving Chubb, Doug
3 was involved at my request to get
4 involved.
5   Q.  Did that happen on more than
6 one occasion?
7   A.  Yes.
8   Q.  On those occasions, did you
9 find his involvement to be
10 satisfactory?
11   A.  I think his involvement was
12 required.  We retained the business,
13 but I don't credit Doug with that
14 business being retained with us.
15   Q.  Then why would you ask him
16 to get involved?
17   A.  As the local branch manager,
18 he was responsible for growth profit
19 retention of key accounts and if a
20 key account was in jeopardy of
21 leaving us, I feel it's my
22 responsibility to get him involved to
23 see if he can help.
24   Q.  During his tenure as the

### 31

1 regional manager, did the growth
2 profit and retention of key accounts
3 grow in the branch?
4   A.  As I had mentioned earlier,
5 we grew around 10 percent each year.
6 Retention was unchanged.  We were in
7 a marketplace where customers were not
8 aggressively leaving us, so that was
9 probably unchanged.
10          Profit, I believe, was
11 still satisfactory and, I'm sorry, I
12 don't remember the exact numbers for
13 the territory, but we did make an
14 underwriting profit.
15   Q.  Did you feel that you met
16 your department's business goals
17 during the period that Mr. Baillie
18 was your supervisor?
19   A.  To the best I can recall,
20 we came close to our premium growth
21 plans each year which were typically
22 aggressive and we did earn an
23 underwriting profit.
24   Q.  How were you first made

### 32

1 aware that Mr. Baillie's employment
2 was terminated by Chubb?
3   A.  I walked into his office
4 shortly after he had found out.
5   Q.  This would have been on the
6 same day?
7   A.  Correct.
8   Q.  What do you recall about the
9 situation or what occurred when you
10 walked in his office and learned
11 that?
12   A.  It was a very brief
13 encounter.  I was simply stopping
14 down to say hello.  He said that he
15 was unexpectedly leaving Chubb.  What
16 do you say at that point?
17   Q.  Right.  Was there anything
18 else said that you can recall?
19   A.  No.  It was a very brief
20 encounter.  I wished him well and
21 went on my way.
22   Q.  Did he say anything
23 derogatory regarding Chubb at that
24 time?

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

# M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone:  (630) 775-1503
www.mmreporting.com      Fax:    (630) 775-0170
EXCELLENCE BUILT ON EXPERIENCE


33

1  A. He did not.
2  Q. Did his conduct appear to be
3  professional?
4  A. Yes.
5  Q. Did he inform you or did --
6  well, did he inform you the reasons
7  why he was leaving Chubb?
8  A. No, he did not.
9  Q. Was there later any type of
10 more public announcement by him to
11 persons in the branch of his leaving?
12  A. I honestly don't remember if
13 he pulled the branch together to say
14 that he was leaving. I don't think
15 he did.
16  Q. Do you recall whether or not
17 you ever attended any conference call
18 or meeting by Tim Czerlong to
19 announce Mr. Baillie's departure?
20  A. No.
21  Q. During the time that you
22 were the personal lines manager and
23 Mr. Baillie was your supervisor in
24 Cincinnati, who was the HR manager

34

1  there?
2  A. Diane Haggard.
3  Q. Did you ever complain to Ms.
4  Haggard about any conduct by Mr.
5  Baillie?
6  A. I had had several
7  conversations with Diane about the
8  lack of attendance of Doug in the
9  branch. Doug was not around any time
10 it was nice outside.
11     Doug also, as you
12 mentioned earlier, had regional
13 responsibilities which required him to
14 travel to Columbus and to areas in
15 Kentucky.
16  Q. I think by your statement
17 you're saying you understood that as
18 a regional manager, he would be out
19 in the field on many occasions; is
20 that correct?
21  A. That is correct.
22  Q. You also understand as the
23 regional manager, he would engage in
24 marketing activities for other

35

1  departments; is that correct?
2  A. He would engage in marketing
3  opportunities for other departments to
4  a much higher percentage than what he
5  did for personal lines. I was a
6  third of that branch from a premium
7  volume standpoint and I did not have
8  a day and a third of his time each
9  week, but, yes, he was involved in
10 marketing opportunities for other
11 departments.
12  Q. Are you aware of the
13 performance of the other departments
14 within the branch?
15  A. I knew what they were, sure,
16 that's public knowledge in our
17 computer systems.
18  Q. Are you -- were you made
19 aware or were you kept informed of
20 his activities involving the other
21 departments?
22  A. On any given day, if I were
23 to ask where he was, I would know
24 that. Was I given an e-mail every

36

1  week that said here's Doug's travel
2  schedule, no.
3  Q. So on occasions when he was
4  out of the office, you don't have
5  necessarily personal knowledge of
6  where he was on those occasions;
7  isn't that correct?
8  A. Correct.
9  Q. But you indicated you
10 complained to Ms. Haggard about his
11 lack of attendance?
12  A. Correct.
13  Q. What was her response?
14  A. I don't recall. As an HR
15 representative, her job was simply to
16 listen.
17  Q. Well, did you express to Mr.
18 Baillie your apparent concern about
19 his lack of attendance in the branch?
20  A. My responsibilities did not
21 encompass managing Doug's travel
22 schedule.
23  Q. I'm going to ask you to
24 answer my questions when I give you a

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143



EXCELLENCE BUILT ON EXPERIENCE    Corporate Headquarters    Phone: (630) 775-1503
www.mmreporting.com    Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

---

**37**

1  question.
2          Again, regarding Ms.
3  Haggard, do you know on how many
4  occasions you complained to her about
5  Doug's lack of attendance?
6     A.  I would say several, three,
7  four.
8     Q.  And, again, did you ever
9  discuss it with Mr. Baillie?
10    A.  No, I did not.
11    Q.  In addition to your apparent
12  concerns about Mr. Baillie's lack of
13  attendance, did you ever complain to
14  Ms. Haggard about any other issues or
15  conduct regarding Mr. Baillie?
16    A.  I think on one or two of
17  the occasions that I spoke to Diane,
18  it was that Doug seemed to be out
19  entertaining more than he was what
20  you would call, I guess, doing
21  marketing visits, supporting other
22  departments.
23         He seemed to be out
24  golfing pretty frequently and that was

**38**

1  a source of concern for me.
2     Q.  That somehow irritated you
3  that he was out golfing more
4  frequently than what you felt to be
5  appropriate?
6         MR. MONTGOMERY:
7  Objection, argumentative.
8  BY MR. NAPIER:
9     Q.  I'm just trying to find out,
10  sir, were you irritated by that?
11    A.  It was irritating to me that
12  if I needed him, he was not around
13  and not doing something that I
14  perceived productive to supporting the
15  branch growth and profit goals.
16    Q.  Did you ever -- again, you
17  never expressed your concerns though
18  to Mr. Baillie about his -- what you
19  perceived as frequent golfing?
20    A.  Correct.
21    Q.  Now, you indicated he seemed
22  to be out entertaining. Were there
23  occasions where you accompanied him on
24  what you would describe as

**39**

1  entertaining?
2     A.  I golfed with Doug on
3  several occasions.
4     Q.  Was that at some type of
5  Chubb function?
6     A.  No, it was a one-over-one
7  planned golf outing with one of the
8  agents that we do business with.
9     Q.  So it was conducted with
10  Chubb business, was it not?
11    A.  Correct.
12    Q.  It was a marketing activity
13  in that sense, correct?
14    A.  Correct.
15    Q.  Other than this lack of
16  attendance or this frequent
17  entertaining complaint, did you ever
18  complain to Ms. Haggard about any
19  other concerns regarding Mr. Baillie's
20  conduct?
21    A.  As part of the those
22  conversations, I would mention that as
23  a first year manager, I didn't really
24  feel that I was being given the

**40**

1  development that I expected from a
2  branch manager.
3     Q.  This was your first year as
4  a manager for Chubb, correct?
5     A.  Yeah, 2000 was my first year
6  as a manager for Chubb, correct.
7     Q.  And you had complaints
8  regarding the level of development
9  that you felt your supervisor was
10  spending with you?
11        MR. MONTGOMERY:
12  Objection, asked and answered.
13  BY MR. NAPIER:
14    Q.  Is that true?
15    A.  I felt that my expectation
16  of what I wanted from a branch
17  manager was not being met given my
18  own development, yes.
19    Q.  Did you express your
20  concerns to Mr. Baillie?
21    A.  I did not.
22    Q.  But this is a concern,
23  again, that you expressed to Ms.
24  Haggard?

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
www.mmreporting.com       Fax:   (630) 775-0170
EXCELLENCE BUILT ON EXPERIENCE

### 41

1   A. Correct.
2   Q. Let me ask the question this
3 way in your discussions with Ms.
4 Haggard, was there any -- let me
5 start all over.
6       I'd like to know what
7 concerns you expressed to Ms. Haggard
8 regarding Mr. Baillie. I'd like to
9 know all of them. You've talked
10 about lack of attendance. You said
11 you thought he entertained too much.
12       Apparently you felt
13 also that the time that he spent with
14 you in development for a first year
15 manager was not adequate.
16       What other concerns did
17 you express to Ms. Haggard regarding
18 Mr. Baillie?
19   A. I think the only other topic
20 we really discussed was a lack of
21 technical skills on the part of Doug
22 to understand the personal lines
23 business.
24   Q. Well, that was the purpose

### 42

1 of your zonal manager, was it not?
2       MR. MONTGOMERY:
3 Objection, argumentative.
4   BY THE WITNESS:
5   A. As the local branch manager,
6 Doug has responsibility for knowing
7 all product lines.
8   BY MR. NAPIER:
9   Q. I understand he's to have
10 knowledge, but what's the purpose of
11 your zonal manager?
12   A. Purpose of the zonal manager
13 was to drive the initiatives of that
14 department down into the field.
15   Q. What was he -- what
16 functions would he perform that were
17 not performed by Mr. Baillie?
18   A. Doug was the one that was
19 involved with individual accounts that
20 could be leaving us. Doug would have
21 been involved with other larger
22 customers that we would be trying to
23 acquire as well.
24       Personal lines is a

### 43

1 very number-intensive department
2 within the company.
3   Q. That would require
4 aggressive marketing, would it not?
5   A. No. My comment was simply
6 that the majority of the customers in
7 personal lines are of a premium
8 volume that a branch manager would
9 not be involved relative to a
10 commercial policy that pays a
11 significantly more premium, so Doug's
12 involvement would have been typically
13 on the larger accounts.
14   Q. I'm still trying to
15 understand what was the purpose of
16 having a zonal manager?
17   A. Chubb has a dual
18 accountability structure where each
19 manager is responsible to their branch
20 manager for local results and to
21 their zone manager for results within
22 their own division.
23   Q. If you had a technical
24 question as you called it, would you

### 44

1 speak with your zonal manager
2 regarding that?
3   A. Typically.
4   Q. He would be a source for
5 you to go to should you have a
6 technical question or issue, correct?
7   A. I'm sorry. I missed the
8 first part of the question.
9   Q. He would be a resource --
10 the zonal manager would be a resource
11 that you could consult if you had a
12 technical question regarding a
13 product?
14   A. Correct, as would a local
15 underwriting center manager based out
16 of Chicago.
17   Q. Who would that have been?
18   A. At the time, Tom Botsford.
19   Q. So if you had a technical
20 question I think you indicated earlier
21 regarding a product, you could check
22 with your northern zone personal lines
23 manager Mr. Hasley and then also Mr.
24 Botsford?

ATLANTA   NEW YORK   WASHINGTON, DC   CHICAGO   LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
EXCELLENCE BUILT ON EXPERIENCE   Corporate Headquarters   Phone: (630) 775-1503
www.mmreporting.com   Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

### 45

1  A. Those were two of the
2  outlets that I could turn to, but I
3  certainly think that being an
4  effective branch manager, that should
5  have been a third resource and as the
6  person that was only 100 yards from
7  me, that would have been the person
8  that I would probably rely on.
9  Q. Are you indicating that it
10 was your expectation that Mr. Baillie
11 would have the same level of
12 knowledge regarding personal lines and
13 technical issues of those products as
14 would Mr. Hasley or Mr. Botsford?
15 A. I think that's an
16 unrealistic expectation.
17 Q. It would be unrealistic for
18 Mr. Baillie to have that same level
19 of knowledge; is that correct?
20 A. That is correct, but I would
21 expect him to be able to understand
22 the basics.
23 Q. Is it your testimony that
24 Mr. Baillie did not understand the

### 46

1  basics of personal lines?
2  A. It's my testimony that as a
3  company, Chubb focuses specifically on
4  larger more affluent customers and
5  Doug had a long-held belief that we
6  were better served as a company to
7  write smaller homes and we had that
8  debate many times.
9  Q. I apologize, but I'm
10 confused.
11     Are you saying that, in
12 your opinion, Doug did follow the
13 company's strategy or did not?
14 A. Doug followed the company's
15 strategy, but his view points on what
16 we should do were very different.
17 Q. Different than your own?
18 A. Different than the company's
19 appetite that had been
20 well-established.
21 Q. You indicated earlier that
22 Mr. Baillie would be active regarding
23 the larger personal lines account; is
24 that correct?

### 47

1  A. He would be involved when
2  asked.
3  Q. Are there any other concerns
4  that you expressed to Ms. Haggard --
5  A. No.
6  Q. Let me finish the question.
7     Are there any other
8  concerns that you expressed to Ms.
9  Haggard regarding Doug Baillie while
10 he served as the regional manager or
11 your direct supervisor?
12 A. No.
13 Q. Did you ever express any
14 concerns or complaints regarding Mr.
15 Baillie to Tim Czerlong?
16 A. No, I did not.
17 Q. That would include during
18 any phone conversations or any visits
19 that Mr. Czerlong may have made to
20 the branch?
21 A. Correct. I had very limited
22 involvement with Tim Czerlong, very
23 limited interaction.
24 Q. And it's your recollection,

### 48

1  at least prior to Mr. Baillie's
2  termination, that you had no
3  conversation, personal or by
4  telephone, to Mr. Czerlong regarding
5  Mr. Baillie?
6  A. That is correct.
7  Q. Prior to Mr. Baillie's
8  termination, do you recall ever having
9  any conversations with Jim Ekdahl
10 regarding Doug Baillie?
11 A. No. To the best of my
12 ability, I don't recall. Those
13 conversations took place with Diane
14 Haggard, again, because it was at the
15 local level.
16 Q. I understand.
17     Do you know from your
18 own personal knowledge whether or not
19 Ms. Haggard passed on your concerns
20 to anyone at the zonal level or to
21 higher HR level?
22     MR. MONTGOMERY:
23 Objection, calls for speculation.
24 BY THE WITNESS:

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
EXCELLENCE BUILT ON EXPERIENCE    Corporate Headquarters    Phone: (630) 775-1503
www.mmreporting.com    Fax:   (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

---

**49**

1  A. I am unaware of what Diane
2  would have done with that information.
3  BY MR. NAPIER:
4  Q. By that question, I guess
5  I'm asking did she ever express to
6  you that she communicated your
7  concerns to anyone at the zonal
8  level?
9  A. Not that I recall.
10  Q. Other than Ms. Haggard, was
11  there anyone at Chubb prior to Mr.
12  Baillie's termination that you
13  expressed concerns regarding Mr.
14  Baillie's performance or his conduct?
15  A. I would have had
16  conversations with James Hasley.
17  Q. What were your discussions
18  with Mr. Hasley regarding Doug
19  Baillie?
20  A. My conversations with James
21  would have reflected my conversations
22  with Diane Haggard in content.
23  Q. What was Mr. Hasley's
24  response or advice to you during

**50**

1  those discussions?
2  A. It was much the same as
3  Diane's. He was very much in a
4  listening position and hearing what I
5  had to say.
6  Q. Do you recall whether or not
7  Mr. Hasley recommended any particular
8  actions that you take?
9  A. To the best I can recall,
10  he would have said, you know, that's
11  the situation you're in, you need to
12  figure out how to best manage that.
13  Q. Is there anything else that
14  you recall that Mr. Hasley said to
15  you during discussions that --
16  concerning Doug Baillie?
17  A. No.
18  Q. Do you know whether or not
19  Mr. Hasley ever communicated your
20  concerns regarding Doug Baillie to
21  anyone else at Chubb?
22         MR. MONTGOMERY:
23  Objection, calls for speculation.
24  BY THE WITNESS:

**51**

1  A. I don't know what James
2  would have done with that information.
3  BY MR. NAPIER:
4  Q. My question is did he ever
5  indicate or make you aware that he
6  communicated your concerns to anyone
7  else at Chubb regarding Doug Baillie?
8  A. No, James never communicated
9  that to me.
10  Q. In preparation for your
11  deposition today, did you review any
12  documents?
13  A. Can you be more specific?
14  Q. Did you review any pieces of
15  paper?
16  A. No.
17  Q. Did you review any
18  deposition transcripts?
19  A. No.
20  Q. Did you review any
21  correspondence or e-mails?
22  A. No.
23  Q. Did you review any of your
24  own personal notes that you may have

**52**

1  made in the past?
2  A. No.
3  Q. In preparation for your
4  deposition today, did you have any
5  discussions with anyone at Chubb other
6  than with counsel?
7  A. No.
8  Q. Have you had any
9  communications with Doug Baillie since
10  his termination?
11         MR. MONTGOMERY: Other
12  than what you already covered?
13  BY MR. NAPIER:
14  Q. Other than on the day of
15  his termination.
16  A. The best I can recall, Doug
17  may have sent me one or two e-mails
18  just a hi, how are you, very brief,
19  nothing business related.
20  Q. Were they professional in
21  their tone?
22  A. Yes.
23  Q. Did he say anything
24  derogatory about Chubb?

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

**M & M REPORTING, INC.**
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170

## 53

1  A. No, he did not.
2  Q. Other than those e-mails,
3  have you had any occasions to come in
4  contact with Doug Baillie since his
5  termination?
6  A. I may have run into him
7  once and, again, it was a brief
8  encounter, hi, how are you, good to
9  see you.
10       There was no
11 conversation of Chubb, of results, of
12 anything.
13  Q. Do you know where that --
14 what the circumstances were of that
15 occasion?
16  A. I think we were at a golf
17 outing.
18  Q. Do you know what year?
19  A. It would have been at some
20 point in 2000 -- 2001, I'm sorry.
21  Q. It's my understanding he
22 would have been terminated the end of
23 August 2001?
24  A. Correct.

## 54

1  Q. You think it occurred after
2  that?
3  A. It did, yes.
4  Q. Were you present at an I-Day
5  event in 2001 when Mr. Baillie was
6  present in Cincinnati?
7  A. No.
8  Q. Were you told by others of
9  any communications they had with Mr.
10 Baillie at this I-Day event?
11  A. I vaguely remember some type
12 of incident at an I-Day event, but
13 the details of it, I couldn't even
14 begin to speculate.
15  Q. Do you recall who may have
16 talked to you about the I-Day event?
17  A. No. I don't recall.
18  Q. During the time that Mr.
19 Baillie served as regional manager in
20 Cincinnati, did you ever observe or
21 see him engage in any conduct that
22 you felt violated the Chubb code of
23 conduct?
24  A. No.

## 55

1  Q. Did you ever see Mr. Baillie
2  engage in any conduct that you felt
3  was unprofessional or offensive?
4  A. I think that there were
5  several occasions where I thought that
6  his behavior was not reflective of
7  what it should be for a man in his
8  position.
9  Q. What were those occasions?
10  A. We had a March Madness event
11 every year that was a party to
12 introduce the NCAA basketball
13 tournament.
14  Q. Was that a party that was
15 for just Chubb employees or was it
16 also for agents and customers?
17  A. That was an event that was
18 held at a bar downtown Cincinnati for
19 Chubb employees as well as for
20 independent agents that we worked
21 with.
22       To my knowledge, there
23 were no customers.
24  Q. About how many people would

## 56

1  have been in attendance?
2  A. One hundred fifty.
3  Q. I didn't quite hear that,
4  150?
5  A. One hundred fifty.
6  Q. During the time that Mr.
7  Baillie served as the regional
8  manager, did that occur on more than
9  one occasion, this March Madness
10 event?
11  A. That was an annual event.
12  Q. Would he serve as the host
13 of that event as the Cincinnati
14 manager?
15  A. As the Cincinnati branch
16 manager, yes, it was well-known that
17 he was the authority in the
18 Cincinnati area for Chubb.
19  Q. My question, sir, was he the
20 host of that event?
21  A. Chubb was the host of that
22 event.
23  Q. He was the most senior
24 person at the event for Chubb?

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
www.mmreporting.com    Fax: (630) 775-0170
EXCELLENCE BUILT ON EXPERIENCE

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

### 57

1  A. Correct.
2  Q. How did you perceive his
3  conduct to be less than professional
4  or less than what you felt was
5  appropriate?
6  A. I felt that there was
7  drinking to an excess that was not
8  appropriate for that type of an
9  event.
10 Q. You say drinking to excess,
11 are you talking about Mr. Baillie or
12 others or both?
13 A. I would say that it was
14 probably both.
15 Q. Did you consume alcoholic
16 beverages during the event?
17 A. I did.
18 Q. You did?
19 A. I did.
20 Q. What type of alcoholic
21 beverages were served there, was it
22 beer and mixed drinks?
23 A. I definitely can recall
24 beer. If mixed drinks were there, I

### 58

1  don't recall.
2  Q. Do you know specifically how
3  much alcohol was consumed by Mr.
4  Baillie?
5  A. No, I don't.
6  Q. Were you with him throughout
7  the course of the event?
8  A. The event itself was held in
9  a large room where everyone was in
10 the same room together for the
11 duration of the event.
12 Q. How long did the event --
13 how many hours did the event last?
14 A. I believe the event itself
15 started mid afternoon, 2:00 or 3:00
16 p.m., typically would wrap up for
17 most everyone in attendance around
18 6:00 or 7:00 and then those that
19 chose to would continue.
20 Q. Why do you believe that his
21 conduct was inappropriate?
22        MR. MONTGOMERY:
23 Objection, asked and answered.
24 BY THE WITNESS:

### 59

1  A. I think that he consumed too
2  much alcohol and his actions and
3  behaviors reflected that.
4  BY MR. NAPIER:
5  Q. You indicated earlier you
6  had no knowledge of the amount of
7  alcohol he consumed, correct?
8  A. Correct.
9  Q. Have you ever had any
10 training -- any kind of police
11 training or anything of that nature
12 regarding alcohol consumption and
13 determination of levels of
14 consumption?
15 A. No.
16 Q. What was his behavior that
17 led you to believe that he had
18 consumed an excessive amount of
19 alcohol?
20 A. Slurred speech.
21 Q. Anything else?
22 A. No. That is what I vividly
23 remember.
24 Q. You indicated speech was

### 60

1  slurred; was this in a conversation
2  that you had directly with him?
3  A. Both in conversations that I
4  would have with him as well as
5  standing around listening to him talk.
6  Q. Other than your impression
7  that he had slurred speech, did he
8  engage in any conduct in which he did
9  something you felt was against the
10 best interest of Chubb?
11 A. No.
12 Q. Do you recall him making any
13 offensive comments?
14 A. Not at that event, no.
15 Q. Do you recall him making
16 offensive comments at another March
17 Madness event?
18 A. No, not at March Madness
19 specifically, but as I had mentioned
20 before, the I-Day event and there may
21 have been one other occasion where I
22 had heard through a third party and,
23 again, I don't recall the details of
24 that.

ATLANTA   NEW YORK   WASHINGTON, DC   CHICAGO   LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters   Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE   www.mmreporting.com   Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

### 61

1  Q. You, yourself, have no -- I
2  asked you previously about the I-Day
3  event and you said you couldn't
4  remember any details, but is your
5  memory such that it's now been
6  refreshed, can you remember something
7  about --
8  A. No. As I just mentioned
9  that the I-Day event was another type
10 of event where I had heard that his
11 behavior was not reflective of what a
12 Chubb employee should have but that
13 those details I could not recall.
14  Q. I want to know about
15 anything personally overheard or
16 observed in terms of comments made by
17 Mr. Baillie that you felt were
18 inappropriate.
19  A. None.
20  Q. So I want to make sure I
21 understand this, your only concern
22 about Mr. Baillie in terms of his
23 conduct that you felt was not
24 reflective or adequately reflective of

### 62

1  an employee of Chubb was that at the
2  March Madness event, you observed or
3  came to the impression that his
4  speech was slurred; is that correct?
5            MR. MONTGOMERY:
6  Objection, that misstates his
7  testimony.
8  BY THE WITNESS:
9  A. We talked specifically about
10 Doug's behavior at the March Madness
11 event as what I would perceive to be
12 inappropriate behavior, but we've also
13 talked about a myriad of other
14 disappointments that I had with Doug
15 as his role as the branch manager
16 with Chubb.
17 BY MR. NAPIER:
18  Q. We've gone through your
19 disappointments with him as a branch
20 manager.
21            I want to concentrate
22 on the topic of whether or not he
23 engaged in any inappropriate conduct
24 at an event, okay?

### 63

1  A. Okay.
2  Q. You talked about the March
3  Madness event where you felt that he
4  consumed an excessive amount of
5  alcohol and if I understood it
6  correctly, that was based upon the
7  fact that his speech appeared to be
8  slurred; is that correct?
9  A. That is correct.
10  Q. You also indicated that you
11 do not recall any inappropriate
12 comments he made during the March
13 Madness event; is that correct?
14  A. That is correct.
15  Q. I'm trying to find out is
16 there any other basis that you had to
17 conclude that he engaged in excessive
18 alcohol consumption other than the
19 slurred speech?
20  A. Repeat that question for me.
21  Q. Any other basis that you
22 have to conclude that he engaged in
23 excessive alcohol consumption at the
24 March Madness event other than the

### 64

1  slurred speech?
2  A. No.
3  Q. Is that no?
4  A. That's a no.
5  Q. Did you ever express to
6  Diane Haggard that you felt that Mr.
7  Baillie consumed an excessive amount
8  of alcohol at the March Madness
9  event?
10  A. No.
11            As I had mentioned
12 before, I think that I gave to you
13 all the issues that I talked to Diane
14 Haggard about.
15  Q. Other than the March Madness
16 event, were there any other Chubb
17 functions during which you observed or
18 were of the opinion that Mr. Baillie
19 engaged in inappropriate conduct?
20  A. If you put a caveat in
21 there of anything that I witnessed
22 firsthand.
23  Q. Yes.
24  A. I think that there were

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

**M & M REPORTING, INC.**
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170

65

1 several golf outings that I attended
2 where I had the same perception as
3 March Madness that there was drinking
4 beyond what I would consider normal
5 at a business function.
6    Q. When you say drinking, are
7 you talking about Mr. Baillie or
8 others or both?
9    A. Both.
10    Q. Both?
11    A. There were multiple parties
12 drinking. My concern was specifically
13 for Doug in his level of drinking as
14 a Chubb employee.
15    Q. What did you base your
16 opinion on that he had consumed an
17 excessive amount of alcohol?
18    A. Much the same as the event
19 for March Madness, slurred speech. I
20 never witnessed Doug fall down, trip,
21 simply slurred speech.
22    Q. And on those occasions of
23 those golf outings, did you ever hear
24 Mr. Baillie make any inappropriate

66

1 comments?
2    A. I did not.
3    Q. At the golf outings, other
4 than your perception that he had
5 slurred speech, did he engage in any
6 type of conduct that you felt was
7 inappropriate?
8    A. No.
9    Q. Did you ever express to Ms.
10 Haggard or Mr. Czerlong or Mr. Ekdahl
11 your observations regarding Mr.
12 Baillie at any Chubb event where you
13 felt he consumed an excessive amount
14 of alcohol?
15    A. I did not.
16    Q. Mr. Dadik, let me take a
17 moment to look over my notes. I
18 think I'm about done.
19    A. Okay.
20    Q. During the time that Mr.
21 Baillie served as your regional
22 manager, were there any particular
23 strengths that you felt he had as a
24 manager?

67

1    A. There were some
2 conversations that I had had with
3 Doug where I took his input as
4 another person in the equation when
5 trying to make a decision, so to that
6 end, yes.
7    Q. I'm not sure I understand.
8       Are you saying that on
9 those occasions, his coaching you
10 found to be helpful?
11    A. I think that the input that
12 he offered was helpful. I guess I
13 wouldn't classify it as coaching. It
14 was simply his feedback on the given
15 issue.
16    Q. Would you classify it as
17 advice? I guess I'm trying to
18 understand when you mean input, are
19 you talking about observations or was
20 he --
21    A. We would deal with a given
22 situation and we may think that we
23 want to attack it one way and Doug's
24 comments would say, well, what about

68

1 looking at this this way. It was
2 simply another perspective that he
3 shared.
4    Q. My question to you is in
5 your opinion, did he have any
6 strengths as the regional manager?
7 Are you identifying what you just
8 described as one of his strengths?
9    A. Yes.
10    Q. Is there any other ways or
11 means by which you felt he exhibited
12 certain strengths as a branch manager?
13    A. No, I think that one would
14 be it.
15       MR. NAPIER: All right,
16 Mr. Dadik, thank you very much.
17       I have no further
18 questions.
19       MR. MONTGOMERY: Tim,
20 you'll have the opportunity to review
21 this and for the court reporter, if
22 the original is ordered, I would like
23 a copy and we'll handle signature for
24 Mr. Dadik.

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

## Page 69

1  (Witness excused.)
2  FURTHER DEPONENT SAITH NOT

## Page 70

DOUGLAS W. BAILLIE VS
CHUBB & SON INSURANCE

The Deposition of TIMOTHY DADIK, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

## Page 71

CERTIFICATE

STATE OF           :
COUNTY OF          :

Before me, this day, personally appeared, TIMOTHY DADIK, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

TIMOTHY DADIK

SUBSCRIBED and SWORN to before me this      day of        ,
_____ in the jurisdiction aforesaid.

My Commission Expires   Notary Public

## Page 72

DEPOSITION ERRATA SHEET

RE:        M & M REPORTING, INC.
File No.   7725
Case Caption: DOUGLAS W. BAILLIE VS CHUBB & SON INSURANCE
DEPONENT:   TIMOTHY DADIK
DEPOSITION DATE: AUGUST 26, 2003

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

_____
_____
_____
_____

ATLANTA   NEW YORK   WASHINGTON, DC   CHICAGO   LOS ANGELES

**M & M REPORTING, INC.**
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170

DEPOSITION OF TIMOTHY DADIK - August 26, 2003

```
                          73
 1  _____
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  .
23  SIGNATURE:_____ DATE:_____
24         TIMOTHY DADIK
```

```
                          74
 1              INDEX
 2  WITNESS              EXAMINATION
 3
 4  TIMOTHY DADIK
 5    EX-BY MR. NAPIER          3
 6
 7
 8            EXHIBITS
 9  NUMBER               MARKED FOR ID
10    NO EXHIBITS MARKED
11
...
24       * * *
```

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

# M & M REPORTING, INC.

LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143



Corporate Headquarters    Phone: (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Fax: (630) 775-0170