**DEPOSITION OF GREGORY W. TAZIC - September 5, 2003**

---

**1**

```
 1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
 2               WESTERN DIVISION
 3
 4
 5   DOUGLAS W. BAILLIE,
 6        Plaintiff,
 7   vs.              No. C-1-02-062
 8
     CHUBB & SON INSURANCE,
 9
10        Defendant.
11
12
13
14
15
16
17
18
19        The telephonic discovery deposition of GREGORY
20   W. TAZIC taken in the above-entitled cause, before LISA
21   A. MONDELLI, a notary public of DuPage County, Illinois,
22   on the 5th day of September, 2003, at 500 Park Boulevard,
23   Suite 600, Itasca, Illinois, at 1:00 p.m., pursuant to
24   Notice.
```

**2**

```
 1      APPEARANCES BY WAY OF TELEPHONE:
 2
 3
 4   FREKING & BETZ
 5   MR. MARK NAPIER
 6     215 East 9th Street
 7     5th Floor
 8     Cincinnati, Ohio 45202
 9     (513) 721-1977
10     On behalf of the Plaintiff;
11
12
13   KEATING, MUETHING & KLEKAMT
14   MR. DAVID MONTGOMERY
15     1400 Provident Tower
16     One East Fourth Street
17     Cincinnati, Ohio 45202
18     (513) 579-6475
19     On behalf of the Defendant.
20
21
22
23
24
```

**3**

```
 1           DEPOSITION OF GREGORY W. TAZIC
 2                SEPTEMBER 5, 2003
 3                GREGORY W. TAZIC,
 4   called as a witness herein, having
 5   been first duly sworn, was examined
 6   upon oral interrogatories and
 7   testified as follows:
 8      EXAMINATION
 9   By-Mr.Napier
10        MR. NAPIER: Q.  Hi,
11   Mr. Tazic.  My name is Mark Napier,
12   and I represent Doug Baillie in a
13   lawsuit that has been filed against
14   Chubb in the U.S. District Court in
15   the Southern District of Ohio here in
16   Cincinnati, and we've asked you to
17   appear today by telephone by agreement
18   in order that we may take your
19   deposition.
20        Have you ever given a
21   deposition before?
22   A.  Yes.
23   Q.  On how many occasions?
24   A.  Twice.
```

**4**

```
 1      Q.  How long ago or what years
 2   did those depositions occur?
 3      A.  I don't recall the years but
 4   they were greater than three years
 5   ago.
 6      Q.  Okay.  Well, let me begin
 7   by going over a few guidelines that
 8   may help the process go a little bit
 9   smoother, particularly the fact that
10   we are all in different locations and
11   connected here by telephone.
12        I'm going to be asking
13   you questions today of course, and I
14   would ask that you wait until I have
15   finished my question before you
16   respond.
17        Is that okay?
18   A.  Yes.
19   Q.  Also, I'm going to be asking
20   you questions, and obviously it's very
21   important that you give an oral
22   response as opposed to a non-oral or
23   nonverbal response, such as a nod or
24   a shake of the head, because, one,
```

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES



**M & M REPORTING, INC.**
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com
EXCELLENCE BUILT ON EXPERIENCE
Phone: (630) 775-1503
Fax: (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

---

5

1  obviously I can't see that and, two,
2  the court reporter needs to be clear
3  as to your response.
4         Okay?
5     A.  Okay.
6     Q.  If at any time you don't
7  understand my question, let me know
8  and I'll try to ask it or rephrase
9  -- or rephrase it so that you do
10  understand the question.
11         If you answer the
12  question, I will have assumed that
13  you understood the question.
14         Fair enough?
15     A.  Okay.
16     Q.  And finally, if at any time
17  you want to take a break for any
18  reason, we can certainly do so.
19         My purpose today is not
20  to trick you in any manner.  I'm
21  just simply trying to find out what
22  information you may have that's
23  relevant to the case.  So again, it's
24  important that you understand my

---

7

1     Q.  And what is your wife's
2  name?
3     A.  Catherine.
4     Q.  Is Catherine employed by
5  Chubb or has she ever been employed
6  by Chubb?
7     A.  No.
8     Q.  And who is your current
9  employer?
10     A.  Chubb & Son, a division of
11  Federal Insurance Company.
12     Q.  What is your current
13  position with Chubb?
14     A.  Marketing manager.
15     Q.  How long have you held that
16  position?
17     A.  Since March 2nd of 2003.
18     Q.  And what is your work
19  location?
20     A.  I'm located in Itasca,
21  Illinois.
22     Q.  And what is your business
23  address?
24     A.  500 Park Boulevard, Itasca,

---

6

1  question.
2         Why don't we start out,
3  if you would, state your full name
4  for the record.
5     A.  Sure.  It's Gregory William
6  Tazic.
7     Q.  Mr. Tazic, what is your
8  current residence address?
9     A.  ████████████
10  ███████████████████
11     Q.  And what is your current
12  home telephone number?
13     A.  Area code ███████████
14     Q.  What is your date of birth?
15     A.  ████████████
16     Q.  I'm also born on ███████.
17  That's a coincidence.
18     A.  We'll celebrate ███████
19  ██████ together.
20     Q.  That's right.  That's a
21  great day to have a birthday.
22         Are you married or
23  single?
24     A.  I am married.

---

8

1  Illinois, 60 -- 60143.
2     Q.  If you could, what is --
3  what is your date of hire with Chubb?
4     A.  It was November of 1991.
5     Q.  And what was your first
6  position with Chubb?
7     A.  I was a litigation examiner.
8     Q.  If you could start with your
9  first position and go through your
10  progression of positions with Chubb.
11     A.  I started as the litigation
12  examiner, became a senior litigation
13  examiner, claim supervisor, claim unit
14  manager, claim manager, and then
15  regional claim manager and now
16  marketing manager.
17     Q.  Okay.  When you began as a
18  litigation examiner -- examiner, what
19  was your -- where were you located?
20     A.  In the Chicago branch.
21     Q.  And who was your direct
22  supervisor?
23     A.  Robert Covington.
24     Q.  When did you become a senior

---

ATLANTA       NEW YORK       WASHINGTON, DC       CHICAGO       LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com


Redacted

EXCELLENCE BUILT ON EXPERIENCE

Phone:   (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

9

1  litigation examiner?  What year, if
2  you remember?
3     A.  Approximately one year after
4  I started or thereabouts.
5     Q.  Were you still in the
6  Chicago branch?
7     A.  Yes.
8     Q.  And did Mr. Covington still
9  serve as your supervisor?
10    A.  Yes.
11    Q.  Do you know what year you
12  became a claim supervisor?
13    A.  No.
14    Q.  Do you know approximately
15  how long you held the senior
16  litigation examiner position until you
17  moved into claim supervisor?  Just
18  approximate.
19    A.  Yeah, probably about a year
20  after.  Maybe a year, year and a
21  half after.
22    Q.  Okay.  As a claim
23  supervisor, were you still in Chicago?
24    A.  Yes.

10

1     Q.  And who was your direct
2  supervisor at that time?
3     A.  Charles Adams.
4     Q.  And do you know what year
5  you became the claim unit manager?
6     A.  Oh, probably anywhere
7  between 19 — maybe 1995, maybe '96.
8     Q.  Okay.  And were you still
9  in Chicago?
10    A.  Yes.
11    Q.  And who was your supervisor
12  when you held the claim unit manager
13  position?
14    A.  Michael Hinojosa.
15    Q.  You better spell the last
16  name.
17    A.  H-i-n-o-j-o-s-a.
18    Q.  And what year did you become
19  claim manager?
20    A.  In 1997.
21    Q.  And what location?
22    A.  The Cincinnati branch.
23    Q.  And who was your supervisor
24  when you became claim manager?

11

1     A.  At that time, there was a
2  dual accountability reporting
3  structure for claims.  So I reported
4  to the branch manager who was Bill
5  Reynolds at the time and then I also
6  reported to the zonal -- the zone
7  claim manager who was, oh, it is
8  either Bill Crowley (phonetic) or
9  Michael Stapleton.  I don't recall.
10    Q.  Okay.  And what year did
11  you become a regional claim manager?
12    A.  I actually assumed several
13  responsibilities, including the
14  oversight of Cleveland, Louisville,
15  Indianapolis, and for some time
16  Pittsburgh, so I had a regional title
17  or a regional role probably beginning
18  maybe in '99, maybe even a little bit
19  earlier.
20    Q.  Okay.  And in that role,
21  who were your supervisors?
22    A.  Actually at that time, my
23  direct supervisor was a gentleman by
24  the name of John Molar (phonetic) and

12

1  then also Mike Stapleton.
2     Q.  What was Mr. Molar's
3  position with the -- with Chubb?
4     A.  John Molar was the Mideast
5  regional claim manager.
6     Q.  And what was the position of
7  Mr. Stapleton?
8     A.  Mike Stapleton was the
9  Midwest regional claim manager.
10    Q.  And you reported to both of
11  these gentlemen?
12    A.  The claim department at that
13  time was reorganizing and changing
14  from zones to regions.  So for some
15  part of that time, I was working for
16  Mike and then we switched and my
17  territory became part of a different
18  region and I started working for
19  John.
20    Q.  Okay.  And did you continue
21  as the regional claim manager then up
22  until you became a marketing manager
23  in March of '03?
24    A.  Yes.

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com
Phone: (630) 775-1503
Fax: (630) 775-0170
EXCELLENCE BUILT ON EXPERIENCE

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

13

1    Q.  When you served as the
2    regional claim manager, was that at
3    the Cincinnati branch location?
4    A.  Yes.
5    Q.  Do you know an individual by
6    the name of Doug Baillie?
7    A.  Yes.
8    Q.  How do you know Mr. Baillie?
9    A.  Doug was the regional branch
10   manager, also located in Cincinnati.
11   Q.  Did he supervise you in some
12   manner?
13   A.  I regularly had interaction
14   with Doug in his role as the regional
15   branch manager; and in my role as the
16   -- in the claims region, there was a
17   lot of interaction between us.
18   Q.  How frequently would you and
19   Doug interact?
20   A.  It would depend.  It was
21   sometimes I would take the initiative
22   to talk to him about things that were
23   going on in the territory.  You know,
24   there were times where he wasn't here

14

1    or wasn't around.  So it was -- it
2    was sporadic.
3    Q.  Did -- were you and he --
4    were your offices located at the --
5    in the same branch?
6    A.  Yes.
7    Q.  Did you see him on a daily
8    basis, generally, or less frequently?
9    A.  Oh, early on in the first
10   -- the first -- when he first came
11   on board, I didn't see him very much
12   at all.  Later on I saw him a little
13   bit more, but again, it was -- it
14   was somewhat sporadic.
15   Q.  Would you say it would be
16   once a week, twice a week?  If you
17   can give me some sort of indication
18   of the frequency of when you and he
19   would interact.
20   A.  You know what, I can't give
21   you an -- a guess like that because
22   again sometimes I would see him a few
23   times a week and then I might not
24   see him the next week and it was --

15

1    again, it was very sporadic.
2    Q.  When you and he would
3    interact, what was the purpose of the
4    meetings?  What was discussed, if you
5    could describe?
6    A.  A variety.  From managers'
7    meetings, to production meetings, to
8    discussions about claim issues or
9    specific claims, to discussions about
10   anything relating to the claim
11   department that might have some type
12   of a impact with our agents or, you
13   know, the business, you know, the
14   Cincinnati -- you know, the Cincinnati
15   business.
16   Q.  In your role as the regional
17   claim manager, could you describe for
18   me your duties and functions in that
19   role?
20   A.  A variety.  From insuring
21   the claim department standards and
22   results were achieved, to developing
23   folks within the region, to working
24   with various branch managers,

16

1    underwriting managers, as far as what
2    things we were doing maybe in claims
3    that might have an impact on their
4    bottom line, as well as things in the
5    territory that were occurring that
6    might have an impact on results.
7         Are you both still
8    there?
9         MR. MONTGOMERY:  Yes.
10        MR. NAPIER:  Yes.
11        THE WITNESS:  Okay.
12        MR. NAPIER:  Yeah, I
13   heard some static there.
14        THE WITNESS:  Yeah.
15        MR. NAPIER:  I'm not
16   sure what that was.
17        THE WITNESS:  It also
18   included -- I mean, I played a fairly
19   active role in some of the various
20   activities in the branch from the --
21   kind of the Employee Recognition type
22   Committee to our Diversity Committee.
23        So I like to describe
24   the job that I did or the role that

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

M & M REPORTING, INC.

LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE        www.mmreporting.com

Phone:    (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

---

17

1    I played was -- I mean, I was really
2    engaged in a lot of different things,
3    including the claim department
4    functions.
5            MR. NAPIER: Q.  What
6    was your role with the Diversity
7    Committee?
8        A.  I was actually the co-chair
9    of the Diversity Committee.
10       Q.  What kind of -- what was
11   the function or purpose of the
12   Diversity Committee?
13       A.  Our job or our role was to
14   try to create or come up with
15   different ideas that we thought could
16   assist our branch in supporting, you
17   know, the corporate culture or the
18   corporate diversity initiatives.
19       Q.  What did you understand the
20   corporate diversity initiatives to be?
21       A.  There actually was several
22   that the chairman had put out, and we
23   use that a little bit as our
24   guideline.  What I think might

---

18

1    explain it better is we actually went
2    to the group into the branch and
3    asked them to give us ideas of things
4    that they thought we could do to
5    support Chubb's corporate vision of
6    diversity.
7            And from there, our
8    committee picked a few of the ideas
9    and then we ran with them and
10   implemented them in the branch.
11       Q.  What were some of the ideas
12   that you all implemented?
13       A.  One that we did was called
14   Outreach.  We partnered with the food
15   bank, the free store food bank in
16   Cincinnati.
17           The second thing that
18   we did we tried to identify a
19   minority mentoring program.
20           Another thing that we
21   did was try to partner with
22   universities that had a higher -- had
23   a significant minority or diverse
24   population of students for our

---

19

1    recruiting purposes.
2            We also tried a --
3    something fun, like a, you know, a
4    cultural potluck luncheon.
5            And then finally, I
6    think the last thing that we had
7    worked on was we created a monthly
8    diversity table in which a group
9    could pick a topic and they would,
10   you know, decorate the table and give
11   handouts and quizzes and just
12   different things to kind of celebrate
13   the whole culture of inclusion.
14       Q.  You indicated you were the
15   co-chair.  Who was the other
16   co-chair?
17       A.  Diane Haggard.
18       Q.  What led to the creation or
19   implementation of the Diversity
20   Committee?
21       A.  I actually when I started in
22   the Cincinnati branch there was a
23   Diversity Committee that existed and
24   it, best description, disappeared.

---

20

1    Several people that were on it either
2    moved to different branches.  That
3    just for a variety of reasons the
4    group kind of fell apart.
5        Q.  Is that the circumstance
6    that you found when you arrived I
7    believe it was in '97?
8        A.  Yes, that was back in 1997.
9        Q.  Okay.
10       A.  I was involved in that a
11   little bit, but again, it just kind
12   of fell apart.  So -- and I wasn't
13   very actively involved.
14           What I did was I
15   actually had a discussion with Diane
16   about trying to restart the idea of
17   having a Diversity Committee in the
18   Cincinnati branch, and we bounced a
19   few ideas off each other as far as
20   how we thought kind of the vision of
21   where we thought it might look.
22           For example, when I
23   first came to the branch in '97, it
24   involved all of Cleveland, Louisville,

---

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:    (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

21

1    and Cincinnati and that was much
2    harder to coordinate any activities.
3    So we first decided why don't we
4    start with the Cincinnati branch and
5    if -- you know, and then we can move
6    on from there.
7            And then we kind of
8    came up with the vision of what we're
9    going to try do is maybe come up
10   with, you know, one or two ideas or
11   three ideas and we'll talk to the
12   group and -- and we'll really kind of
13   make it a team thing to keep it kind
14   of active and going.
15           And so it was her and
16   I that kind of sat and kind of
17   brainstormed that idea and rolled it
18   out actually.
19   Q.   Okay.  You talked about an
20   Employee Recognition Committee.  Could
21   you describe your functions relating
22   to that committee?
23   A.   Yeah, that was actually -- I
24   forget the exact name, but it was the

22

1    committee that was in the branch to
2    roll out activities for the branch
3    from the picnic to, you know, maybe a
4    branch picnic to just social events,
5    and I forget the name, and I was
6    just a member of that for I think I
7    started in maybe '98 or '99 on that
8    committee, and I did that for a
9    couple of years.
10   Q.   Regarding the Diversity
11   Committee, it sounds like what you
12   were indicating is that they would
13   engage in more or less community
14   service activities?
15   A.   That just was one -- it was
16   -- one of the ideas was community
17   outreach.
18   Q.   I think you described some
19   of those with the -- the minority
20   mentoring programs and food bank and
21   the university partnership.
22           Did -- did Mr. Baillie
23   did he appear supportive of the
24   Diversity Committee?

23

1    A.   I don't think Doug was one
2    way or the other with respect to the
3    Diversity Committee itself.
4    Q.   Well, was he supportive of
5    the activities that you engaged in as
6    part of the Diversity Committee?  In
7    other words, was he supportive of the
8    Outreach programs?
9    A.   I would say as far as the
10   Outreach program one of the things
11   that we did for the Outreach with the
12   food bank was that we needed to take
13   -- we wanted to get the folks there
14   I think it was every Thursday, and so
15   Doug did allow folks to use some time
16   during the day to go to the food
17   bank to work.  So, yes, for the food
18   bank, he was very -- he was
19   supportive.
20   Q.   Was there also a -- I think
21   you described it as a minority
22   mentoring program?
23   A.   Uh-huh.
24   Q.   Do you recall whether or not

24

1    Mr. Baillie participated in that
2    program?
3    A.   He did.
4    Q.   Did he mentor a local
5    minority business?
6    A.   It didn't really go anywhere
7    as far as I know.  It sort of -- we
8    did the introductions and -- and then
9    it sort of -- well, then it sort of
10   disappeared, for whatever reason.
11   Q.   When you say it disappeared,
12   what are you talking about?
13   A.   Well, I didn't -- you didn't
14   hear anything else about it.
15   Q.   Okay.  But there was a
16   mentoring program at one time?
17   A.   There was, yes.
18   Q.   Okay.  There was an attempt
19   -- and is it your recollection that
20   Mr. Baillie participated in that
21   program?
22   A.   Yes, he was the branch
23   manager that I partnered with a local
24   minority business owner.

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES



# M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:   (630) 775-1503
Fax:     (630) 775-0170

7 (Pages 25 to 28)

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

25

1  Q.  Were there any other ways in
2  which Mr. Baillie participated in the
3  Outreach programs that you recall?
4  A.  Do you mean Outreach by the
5  free store food bank?
6  Q.  The food bank, minority
7  mentoring program, or any other
8  Outreach-type programs that you all
9  may have implemented as part of the
10  Diversity Committee?
11  A.  Not that I can recall, no.
12  Q.  Overall did you believe Mr.
13  Baillie was supportive of the
14  Diversity Committee?
15  A.  No.
16  Q.  How was he -- how was he
17  not supportive of the Diversity
18  Committee?
19  A.  There was a -- there was
20  one instance in which -- there was an
21  instance in which -- in which Doug
22  made a comment regarding working women
23  and that companies that typically show
24  some type of flexibility for women in

26

1  the workplace usually end up going
2  under.
3           And so when you say
4  support Diversity Committee, it's fine
5  to support a few of the items but
6  the idea behind the Diversity
7  Committee was that we were supposed
8  to be creating a culture of
9  inclusion.  So, you know, letting
10  people go and do a free store food
11  bank and then in a separate
12  discussion talk about working women
13  bringing down the workplace to me was
14  not very supportive.
15  Q.  Are you saying that he said
16  that working women are bringing down
17  the workplace or he expressed
18  opposition to flex time?
19  A.  He said that women that work
20  and that do have kind of that
21  flexible schedule or need a flexible
22  schedule companies that allow that go
23  under.
24  Q.  Did he express this opinion

27

1  regarding flexible schedules as to
2  men?
3  A.  No, he didn't mention men.
4  Q.  You described this as one
5  instance.  Is this -- is this the
6  only instance that you would base
7  your opinion on that he was not
8  supportive of the Diversity Committee?
9  A.  That's the -- that is the
10  one instance that sticks out in my
11  head.
12  Q.  Are there any other
13  instances or circumstances that cause
14  you to arrive at the opinion that he
15  was not supportive of the Diversity
16  -- Diversity Committee?
17  A.  Yes.
18  Q.  What else?
19  A.  It would have been nice if
20  Doug would have -- it would have been
21  somewhat supportive if Doug could have
22  participated in our discussions about
23  what we wanted to do for the branch
24  from a Diversity Committee standpoint.

28

1  Q.  When you say participate in
2  discussions, are you talking about
3  committee meetings?
4  A.  Attend them, want to know
5  what's going on with those meetings,
6  have a dialogue with the committee
7  co-chairs.
8  Q.  Are you saying he did not
9  discuss with you the activities of
10  the Diversity Committee?
11  A.  Other than me or Diane --
12  and Diane could speak for herself.
13  Other than myself going in and asking
14  him about specific things that I
15  would need from him, no, I don't
16  recall any instance in which, you
17  know, Doug would make, you know, the
18  -- Doug would take the initiative to
19  come and talk to us about it -- or
20  talk to me about it.
21  Q.  When you felt the need to
22  talk to him about the Diversity
23  Committee, would he listen?
24  A.  It's not when I felt the

ATLANTA     NEW YORK     WASHINGTON, DC     CHICAGO     LOS ANGELES

# M & M REPORTING, INC.

LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:  (630) 775-1503
Fax:    (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

---

29

1  need to talk to him.  It was more
2  when it was time to talk to him
3  about something we had discussed as
4  the committee and that I had to go
5  present to him as the branch manager.
6      Q.  On those occasions, did he
7  listen to what you had to say?
8      A.  I don't know if he was
9  listening to what I said.  I would
10  speak and he would look at me.  Now,
11  whether or not he was listening,
12  that's something only he could
13  probably answer.
14     Q.  But he would meet with you?
15  He wouldn't refuse to meet with you
16  on those occasions?
17     A.  No.
18     Q.  He would meet with you and
19  you would communicate to him
20  apparently some bit of information
21  regarding the Diversity Committee,
22  correct?
23          MR. MONTGOMERY:
24  Objection.  Asked and answered.

---

30

1          MR. NAPIER:  Q.  All
2  right.  Sir, what I'm trying to make
3  sure I understand is when you would
4  want to meet with him regarding the
5  Diversity Committee he did not refuse
6  to meet with you; is that correct?
7      A.  Yes.
8      Q.  Was it his role to attend
9  the Diversity Committee meetings?
10     A.  Are you asking from my
11  opinion?
12     Q.  Well, I'm asking for your
13  knowledge.  Did you understand that
14  he as the regional branch manager was
15  to attend the Cincinnati Diversity
16  Committee meetings?
17     A.  As the branch manager and as
18  the regional branch manager and I
19  would have -- I would have expected
20  as a demonstration of strong
21  leadership skills within the branch to
22  attend a Diversity Committee meeting,
23  yes.
24     Q.  Did I -- during his tenure

---

31

1  as the Cincinnati regional branch
2  manager, did he attend any of the
3  meetings?
4      A.  I don't recall if he did or
5  didn't.  I mean, I don't recall if
6  he attended any.
7      Q.  You don't recall either way?
8      A.  No, I don't recall him
9  attending any.
10     Q.  Okay.  How often would the
11  meetings be held?
12     A.  It would be any time -- it
13  could be once every three weeks, once
14  a month.
15     Q.  Was there no regular
16  schedule to the meetings?
17     A.  We did, if I recall
18  correctly, have a regular schedule set
19  up; but obviously if, you know,
20  something had come up that we needed
21  to talk about beforehand, we might
22  reschedule it and set a different
23  time.
24     Q.  How frequently were the

---

32

1  scheduled meetings?
2      A.  As I said before, they were
3  I think we tried to hit every -- it
4  was once a month or, you know, once
5  every three weeks depending.
6      Q.  Where would the meetings be
7  held?
8      A.  In the branch board room.
9      Q.  Well, what -- well, how many
10  persons were members of the committee?
11     A.  I don't recall the specific
12  number offhand.
13     Q.  Can you give me some
14  estimate -- and when I say members of
15  the committee, persons -- not
16  necessarily persons that would attend
17  the meetings but how many persons
18  were recorded as members of the
19  committee?
20     A.  Oh, actually one -- you
21  know, one of the things that we
22  rolled out is that it was expected if
23  you were going to be on that
24  committee that your attendance would

---

ATLANTA     NEW YORK     WASHINGTON, DC     CHICAGO     LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com
EXCELLENCE BUILT ON EXPERIENCE
Phone:  (630) 775-1503
Fax:    (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

---

33

1  be regular and if you were not going
2  to be able to attend the meeting, you
3  know, somebody would come with the
4  information that maybe you were going
5  to bring or share or that you would
6  have -- you would talk to somebody
7  and say I can't get there because of
8  this.
9      Q.  Okay.
10     A.  So mostly -- I mean, the
11 people that were there that would
12 attend the meetings were on the
13 committee.  I mean, that -- that was
14 the group.
15     Q.  All right.
16     A.  How many there were,
17 honestly I cannot remember the number
18 but --
19     Q.  Well, as a co-chair --
20     A.  -- probably more than ten.
21     Q.  More than 10, less than 20?
22         MR. MONTGOMERY:  I
23 think he just answered that.
24         MR. NAPIER:  I didn't

---

34

1  think he did.  He said more than
2  ten.
3      Q.  I'm trying to get an idea
4  if it's more than 10 is it also less
5  than 20?
6      A.  It was probably less than
7  20.
8      Q.  All right.  So somewhere
9  between 10 and 20; that's your best
10 recollection?
11     A.  Yes.
12     Q.  And typically approximately
13 how many persons would actually attend
14 the committee meetings?  And again,
15 I'm just asking for a range.
16     A.  No, I understand.  Anywhere
17 between the 10 and the 20.
18     Q.  Okay.  Would there be an
19 announcement that would be
20 communicated to the committee members
21 announcing the meeting?
22     A.  Yes.
23     Q.  How was the scheduling of
24 meeting communicated to the members?

---

35

1      A.  Usually beginning at the
2  meeting we would say everybody let's
3  check and see when -- when can
4  everybody meet again, are you
5  available, and that's how we would
6  initially pick the date.
7      Q.  So the date would be picked
8  sort of by consensus of those present
9  as to the next meeting date?
10     A.  It would be picked the
11 initial meeting based on the group's
12 discussion, yes.
13     Q.  So if everyone showed up on
14 September 1st for a meeting and you
15 all decided you wanted to have
16 another meeting, everybody would look
17 at their calendars and then you would
18 sort of pick it that way?
19     A.  Yes.
20     Q.  How would you then
21 communicate that to Mr. Baillie as to
22 when your next meeting was?
23     A.  Through summary of the
24 notes, number one, and then number

---

36

1  two, we would also send out a
2  reminder that the Diversity Committee
3  was meeting on the next meeting was
4  such and such date and time.
5      Q.  Was that -- how was that
6  reminder communicated?  Was it a
7  letter, a phone call, e-mail?
8      A.  Probably -- it was -- it
9  would have been electronic mail.
10     Q.  I believe you indicated
11 there was notes made from each
12 meeting?
13     A.  Yes.
14     Q.  Would it be minutes-type
15 notes in terms of a recording --
16     A.  No.
17     Q.  -- of what took place?
18     A.  It would be a kind of
19 handwritten notes that somebody might
20 put down about what we talked about,
21 what direction we were going to go,
22 things that we might want to try to
23 do in the future, and follow-up items
24 for our next meeting.

---

ATLANTA     NEW YORK     WASHINGTON, DC     CHICAGO     LOS ANGELES

# M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:   (630) 775-1503
Fax:     (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

---

37

1    Q.  Who -- was there one
2  particular person that had the task
3  of keeping notes at the meetings and
4  then passing those out to the
5  members?
6    A.  I actually did it most of
7  the time.
8    Q.  Did you retain those notes
9  from your meetings of the Cincinnati
10  Diversity Committee?
11    A.  No.  Not -- I don't have
12  them now, no.
13    Q.  Who would have those notes
14  now?
15    A.  You know what, I have no
16  idea.
17    Q.  When you left, do you have
18  any recollection of turning over the
19  notes to anyone?
20    A.  I don't recall.  I don't
21  remember giving the notes about --
22  from the Diversity Committee.  The
23  only thing I do recall is I may have
24  given information -- no, no, I

---

38

1  apologize.  Strike that.
2        No, I don't recall
3  giving notes or anything to anybody.
4    Q.  Do you recall whether Diane
5  Haggard made notes?
6    A.  She -- she may have.
7    Q.  You don't recall either way?
8    A.  If she made her own notes,
9  I don't have a specific recollection
10  of that but she could have.
11    Q.  Do you know whether these
12  notes were in a binder or some sort
13  of permanent record?
14    A.  Which notes?  Her notes or
15  my notes?
16    Q.  Your notes from these
17  meetings?
18    A.  My notes I normally would
19  keep in a folder where I would
20  transfer them to an electronic mail,
21  as I mentioned before, and I would
22  send that out.  So members of the
23  committee, they may have kept those
24  notes, and how they kept them is up

---

39

1  to them.  I would just keep an
2  electronic folder.
3    Q.  But you're not aware of
4  anyone like a recording secretary or
5  anyone who would keep these notes
6  that you prepared and send out to the
7  members in a binder or some sort of
8  permanent record?
9    A.  Not that I'm aware of, no.
10    Q.  Was there some type of file
11  or folder that was kept for the
12  committee that would contain
13  information regarding the Outreach
14  programs and the other ideas that you
15  all were implementing?
16    A.  As I mentioned, just my own
17  personal.  After I would transfer,
18  send the notes out electronically, I
19  would keep those but that folder I
20  have no idea where it is.
21    Q.  Do I understand, though,
22  there would have been a folder that
23  would have contained things like
24  correspondence, things of that nature?

---

40

1    A.  For the Diversity Committee,
2  yes, there should be.  There should
3  have -- there probably -- there was a
4  folder at some point that kept that
5  information, yes.
6    Q.  Did you continue as a
7  Diversity Committee co-chair up until
8  the time you left the Cincinnati
9  branch?
10    A.  No.
11    Q.  When did you last serve as
12  a co-chair for the Diversity
13  Committee?
14    A.  End of the first quarter in
15  2002.
16    Q.  Do you recall who took over
17  for you as a co-chair for the
18  committee?
19    A.  No.
20    Q.  To your knowledge, did
21  anyone replace you?
22    A.  Not that I'm aware of.
23    Q.  Did the Diversity Committee
24  end or did it continue after you were

---

ATLANTA          NEW YORK          WASHINGTON, DC          CHICAGO          LOS ANGELES

# M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:   (630) 775-1503
Fax:       (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

**41**

1 no longer the co-chair?
2 A. To my recollection, it still
3 exists.
4 Q. Do you know who the current
5 co-chairs would be?
6 A. I believe Diane Haggard is
7 still involved in it. Other than
8 that, I don't know.
9 Q. What was Diane Haggard's
10 role at the Cincinnati branch during
11 the time that you served as the
12 regional claim manager?
13 A. For a portion of it, she
14 was the human resource manager and I
15 -- I believe when I first arrived she
16 was an underwriting manager.
17 Q. At the time that you left
18 in March of '03, was she still
19 serving as the H.R. manager?
20 A. Yes.
21 Q. Do you recall whether or not
22 you ever complained to Diane Haggard
23 in some manner regarding Doug Baillie?
24 A. Yes.

**42**

1 Q. What do you recall?
2 A. I recall some instances in
3 which I would have spoken to Diane
4 about or possibly, you know, kind of
5 express some frustration to her about
6 how some things that I had seen were
7 what I would consider in my opinion
8 not appropriate for the branch manager
9 or regional branch manager.
10 Q. If I understand you, you're
11 saying on more than one occasion you
12 complained to Diane Haggard about Doug
13 Baillie?
14 A. Unfortunately I didn't keep
15 records of every time that I had a
16 conversation with Diane about Doug,
17 but there would have been more than
18 one occasion in which I would have
19 had a discussion with her about
20 things that occurred and my
21 perceptions of his lack of leadership
22 ability.
23 Q. Well, presuming that there's
24 more than one and why don't you start

**43**

1 with the first one that you recall
2 and tell me what complaint you made
3 to Diane Haggard regarding Doug
4 Baillie.
5 A. Well, like I said, I don't
6 -- I didn't specifically recall which
7 or what instances I had a
8 conversation with Diane about but
9 there were a couple of occasions in
10 which there were things that occurred
11 that I may have talked to Diane about
12 because there are things they just
13 kind of stick out in my head today.
14 Q. Tell me what things stick
15 out in your head.
16 A. No particular order. The
17 first time -- or one of the things
18 that just really stuck out was one of
19 the first renewal CIS meetings that
20 Dieter Korte, who was the CIS
21 regional manager I believe at the
22 time --
23 Q. I'm having a little trouble
24 hearing you. Peter who?

**44**

1 A. I'm sorry. Dieter.
2 Q. Oh, Dieter.
3 A. And he was conducting a
4 region -- a renewal meeting in his
5 department. And at that time, if I
6 recall, it was during the kind of it
7 was a big deal because they were
8 trying to -- CIS had been
9 unprofitable and they were trying to
10 turn around, get some rate, really
11 one of the first, you know, trying to
12 be the leader to move from the soft
13 market, you know, try to push rates
14 back up.
15        And during that
16 meeting, Doug walked in, in --
17 actually in the middle of conducting
18 it and had started reading a magazine
19 or a newspaper.
20        And I actually happened
21 to be sitting at one end of the
22 table where he was, and he flips
23 through the paper or the news -- and
24 on it -- it was just closes it up,

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

# M & M REPORTING, INC.

LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:   (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

45

1  gets up, walks out of the meeting.
2      That's the first time
3  -- or that's one of the ones that I
4  recall just sticking out in my head
5  as something that I probably likely I
6  might have gone into Diane's office
7  and said, I can't believe what I just
8  saw.
9      Q.  Okay.  Anything else you can
10  recall about that instance?
11      A.  Recall in what way?
12      Q.  Or just any other facts or
13  details you can recall?
14      A.  I -- I recall having a -- I
15  recall talking to Mr. Korte about it
16  and -- along the lines of I couldn't
17  believe that a big piece of this
18  guy's operation that he's supposed to
19  be leading, and this particular
20  meeting was the first big phase of
21  trying to get that all back on board,
22  that at his -- as a leader he would
23  walk in and open a newspaper and
24  completely ignore like what was --

46

1  like at least perceive ignore what
2  was going on in the room.
3      Again, I was -- I was
4  -- I was pretty amazed that somebody
5  would do that.
6      Q.  Do you know when this
7  instance occurred?
8      A.  I don't specifically
9  remember the date but it was along
10  the lines when -- it had to have
11  been -- oh, I'd be guessing if I
12  thought the date.
13      It was when we were
14  starting to get -- starting to work
15  on trying to get rate.  So it was
16  more than one of the earlier meetings
17  in the process which at that time it
18  wasn't like, you know, the last six
19  months or so where, you know, the
20  rest of the market was on board.  I
21  mean, we were trying to do some
22  things in -- in CIS that were very
23  difficult, were very, very difficult.
24  Sending a message of needing more

47

1  rate that -- and trying to keep
2  renewals and to make money.
3      And like I said, the
4  timing of that was -- it was pretty
5  critical and -- and, you know, Dieter
6  was a pretty vocal leader and a big
7  leader in the territory, and I don't
8  know.  I just -- again, to open up
9  that newspaper was just -- it kind of
10  floored me.
11      Q.  Do you know what year this
12  occurred, whether it was '99, 2000,
13  2001?
14      A.  I don't recall.  I don't
15  recall the year.
16      Q.  You've used the term CIS.
17  Just for clarity, what -- what does
18  that mean?
19      A.  Commercial insurance.
20      Q.  Okay.  The meeting was being
21  conducted by Mr. Korte?
22      A.  Yes.
23      Q.  And do you know how long
24  the meeting had been in process when

48

1  Mr. Baillie came in?
2      A.  I don't specifically recall,
3  no.
4      Q.  Was -- where was the meeting
5  held?  At the branch?
6      A.  It was in the branch in the
7  board room.
8      Q.  Do you know the actual or
9  approximate number of persons present?
10      A.  It would just be a guess
11  but there were -- there had to have
12  been more than -- there probably were
13  more than five people.  Maybe not as
14  many as ten.  But if I remember
15  correctly, at that time there was --
16  there were -- there were -- there
17  were a good number of people sitting
18  at that table.  I just can -- I
19  don't recall who specifically, but I
20  recall the table being somewhat full.
21      Q.  What was Mr. Korte's
22  position?
23      A.  You mean in the branch?
24      Q.  Yes.

ATLANTA      NEW YORK      WASHINGTON, DC      CHICAGO      LOS ANGELES

M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143

Corporate Headquarters

www.mmreporting.com

Phone:    (630) 775-1503
Fax:       (630) 775-0170

EXCELLENCE BUILT ON EXPERIENCE

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

49

1    A.  Dieter was the regional
2    manager for that department.
3    Q.  He's the regional manager
4    for commercial insurance?
5    A.  Yes.
6    Q.  Okay.  Was this a managers'
7    meeting, so to speak, for his
8    department?
9    A.  No.
10   Q.  I mean, who were the people
11   that were present?
12   A.  Myself from the service
13   department.  There would have been
14   people -- different department
15   managers possibly.  There could have
16   been underwriters there.
17          Like I said,
18   specifically I don't recall like who
19   participated exactly in that meeting
20   from the underwriting side but there
21   would have been underwriters, possibly
22   other underwriting managers.  It could
23   have had other service departments,
24   loss control. I know I was the only

50

1    claims person there.
2    Q.  If I understood you
3    correctly, you said you think about
4    five to ten people were there?
5    A.  No.  I was trying to
6    visualize.  The table itself, if I
7    recall, was pretty full and that's
8    easily more than ten people at the
9    table.  So like I said, this was one
10   of the first ones and there were
11   probably there had to have been more
12   than ten people there, but again, I
13   can't give you a specific number.  I
14   wish I could.
15   Q.  When Mr. Baillie came in,
16   you're saying he sat like at the end
17   of the table?
18   A.  He sat -- the table was
19   oval.
20   Q.  It's oval?
21   A.  Just about -- I'm trying to
22   think.  Is it oval?  I was at one
23   end.
24   Q.  Oh, you were at one end?

51

1    A.  I was at one end.
2          Doug came in, sat near
3    me, sat down.  The meeting, if I
4    recall, had already started.  Sits
5    down, flops open -- again, it was a
6    newspaper, I think.  I'm trying to
7    picture it.  And starts flipping
8    through it like as these guys are
9    talking about upcoming renewals and
10   agents and what they're trying to do
11   with clients and the strategy to do
12   it.
13          And it's -- he gets
14   through it in I forget how much time
15   but he gets done with the magazine,
16   folds it, and it's like, okay, I got
17   to go, see you.
18          Again, it was just -- I
19   don't know.  It was just a -- it was
20   unbelievable.
21   Q.  Do you know whether or not
22   Mr. Baillie was expected to make some
23   presentation at that meeting?
24   A.  He should have paid

52

1    attention.
2    Q.  That's not my question, sir.
3    I ask you to respond to the question.
4          Do you know whether or
5    not Mr. Baillie was expected to make
6    a presentation at the meeting?  Yes
7    or no?
8    A.  I can't answer that yes or
9    no.  I'm not aware of anything that
10   he was going to do at that meeting.
11   Q.  All right.  Other than Mr.
12   Korte, who else was making a
13   presentation or making comments at the
14   meeting that you recall?
15   A.  Specifically at that
16   meeting?
17   Q.  Yes.
18   A.  Specifically at that
19   meeting, there could have been --
20   during one of the renewal process
21   during the meeting, underwriters would
22   talk about various accounts that were
23   coming up for renewals.  So the
24   participation was through a lot of

ATLANTA          NEW YORK          WASHINGTON, DC          CHICAGO          LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE          www.mmreporting.com

Phone:   (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

53

1  people.
2        Like basically it was a
3  pretty open forum in which there
4  would be dialogue about an upcoming
5  event. The agent involved, you know,
6  maybe somebody else would want to
7  talk about something that they had
8  been working on with that agent in
9  the past and how -- you know, what
10  had worked well.
11        So there was a lot of
12  sharing information, and that was, you
13  know, one of the benefits of that
14  meeting is we were trying to approach
15  this almost as a team approach.
16        So there was --
17  without, you know, any sort of
18  specifics of everybody taking ten
19  minutes to do their presentation, it
20  just was created to create a lot of
21  dialogue. So a lot of people
22  participated.
23     Q.  Okay. I understand. So it
24  was -- it appeared to you to be a

54

1  meeting of which people could be free
2  to express their ideas in, as you
3  say, sort of an open dialogue?
4     A.  There -- yes, there was some
5  open -- there was open discussion,
6  yes.
7     Q.  Do you recall whether or not
8  you participated in the meeting?
9     A.  In that particular meeting?
10  I would participate in these meetings
11  from a claim perspective, yes.
12     Q.  Okay. Do you recall what
13  -- what comments you may have made at
14  that meeting?
15     A.  At that particular meeting,
16  I do not recall the comments. But
17  in those meetings, as I said, I would
18  provide some claim information,
19  including looking at an account coming
20  up on renewal to see if there were
21  any losses that were outstanding that
22  we weren't aware of, possibly checking
23  on the status of current losses to
24  see maybe where they were going, also

55

1  providing some feedback on a
2  particular account, is this good from
3  a claim perspective, what would be
4  the risk to kind of give them again
5  a different perspective and analysis
6  of -- of a particular account coming
7  up.
8        So in that particular
9  meeting, I don't specifically recall
10  everything I said; but in those
11  meetings, that's the participation
12  that I would -- that I would take.
13     Q.  All right. I understand
14  from your testimony that you thought
15  it was unprofessional or inappropriate
16  what Mr. Baillie did. Was there
17  anything that you recall, a question
18  or a comment, that you felt
19  specifically that he should have
20  responded to?
21     A.  I can't --
22     Q.  I'm asking you is there
23  something you recall? Yes or no?
24     A.  It's not a yes or no

56

1  question to me, and I apologize for
2  that, but it's hard to say was there
3  something he should have responded to
4  when he was reading a newspaper --
5     Q.  Sir, that's not my question.
6     A.  -- so is there --
7     Q.  Please listen to my
8  question. I'm asking you -- and I
9  think you can answer it yes or no
10  and then certainly explain.
11        Do you recall a comment
12  that you felt he should have
13  responded to? Yes or no?
14        MR. MONTGOMERY: Let me
15  just object; and if he says he can't
16  answer yes and no, that's a perfectly
17  legitimate response.
18        MR. NAPIER: Well, all
19  right.
20     Q.  Sir, can you -- can you
21  answer my question?
22     A.  In those -- in those
23  meetings and the discussions that were
24  typically brought up about renewals,

ATLANTA      NEW YORK      WASHINGTON, DC      CHICAGO      LOS ANGELES

 M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
EXCELLENCE BUILT ON EXPERIENCE    Corporate Headquarters    Phone:  (630) 775-1503
www.mmreporting.com    Fax:  (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

57

1    agents, then, yes, as the branch
2    manager Doug should have been free
3    and should have been in there giving
4    his two cents and advice or
5    suggestions about the best way to
6    possibly renew an account, a
7    particular account, what might work
8    better, how to work with that agent.
9    Yes, he should have been in there
10   saying some comments.
11              Specifically on an
12   account as I sit here today that he
13   -- that we specifically talked about
14   on that specific day, that's difficult
15   because I can't recall the specific
16   accounts.
17              However, he also wasn't
18   there for the whole meeting. So
19   again, it's a little bit difficult
20   for me to say was there something
21   that came up that he should have
22   responded to. You know, again, when
23   he wasn't there for the whole meeting
24   and when he was there wasn't even

58

1    paying attention, it's hard for me to
2    say -- answer that question.
3        Q. All right. You'd agree with
4    me, would you not, you didn't have
5    any knowledge of where Mr. Baillie
6    had been previously or what demands
7    he may have had that took up his
8    time prior to his arrival at the
9    meeting; isn't that correct?
10       A. I don't know where Doug was
11   prior to the meeting, no.
12       Q. Now, you've described this
13   as one instance that you then
14   complained to Miss Haggard about; is
15   that correct?
16       A. Actually I think I described
17   this as an instance that stuck out in
18   my head that it's quite possible one
19   of the instances that I had talked to
20   Diane about.
21       Q. Okay. You use the word
22   possible. Do you have a recollection
23   or memory of complaining to her about
24   this instance that you have described?

59

1        A. A specific recollection, I
2    may have. I don't -- as I said
3    before, I didn't keep records of
4    every time that I would have talked
5    to Diane.
6        Q. All right. Sir, let me
7    interrupt you. I'm going to ask you
8    not to speculate. That's what I'm
9    trying to find out.
10             Do you have a
11   recollection today of complaining to
12   Diane Haggard about this? Yes or no?
13       A. I don't recall speaking --
14   whether or not I did speak with her.
15       Q. All right. Did you complain
16   to anyone else about this instance of
17   Mr. Baillie reading a newspaper during
18   a meeting?
19       A. I am sure I mentioned to
20   Dieter. Oh, yes, I am sure I
21   mentioned something to Dieter.
22       Q. Do you have a recollection
23   of mentioning this to Dieter?
24       A. In -- yes.

60

1        Q. Okay. I believe you did
2    because I think you mentioned earlier
3    that you talked to him?
4        A. Yes.
5        Q. All right. Other than Mr.
6    Korte, was there anyone else that you
7    complained to about this instance of
8    Mr. Baillie reading a newspaper during
9    a meeting?
10             MR. MONTGOMERY: That
11   he hasn't already covered?
12             MR. NAPIER: That he
13   hasn't already covered.
14             THE WITNESS: If I did,
15   I don't have a specific recollection;
16   however, I may have mentioned it to
17   some other managers but I don't -- I
18   don't recall.
19             MR. NAPIER: Q.
20   Okay. Other than this occasion that
21   you've described, were there other
22   occasions that you specifically recall
23   where Mr. Baillie engaged in the same
24   behavior of reading a newspaper during

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

M & M REPORTING, INC.

LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com

Phone:    (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

61

1    a meeting?
2        A.   Specifically reading a
3    newspaper, no, but other instances
4    that demonstrated to me this same
5    lack of leadership, yes.
6            MR. MONTGOMERY: Hey,
7    Greg, he's not asking you that right
8    now. You might -- you better try to
9    focus more on the exact question.
10   He's just asking about the newspaper
11   right now.
12           THE WITNESS: Okay.
13           MR. NAPIER: Q.  All
14   right. What other instances other
15   than -- I think what you've said then
16   is you don't recall any other
17   occasions where he read a newspaper
18   at a meeting; is that correct?
19       A.   That's correct.
20       Q.   All right. What other
21   instances do you recall that you
22   concluded he displayed a lack of
23   leadership?
24       A.   One instance was during a

62

1    branch meeting in the branch training
2    room in which Doug came back, and I
3    don't recall if it was maybe a branch
4    managers' meeting or it was some sort
5    of off site meeting, and he came back
6    with a Power Point presentation about
7    things that they had talked about.
8            And in the middle --
9    and during the meeting while standing
10   in front of the group -- and the
11   group, by the way, was the entire
12   branch -- went through a slide show
13   presentation, a Power Point
14   presentation, and during like in the
15   middle of it a slide came up and
16   Doug looked at it and had no idea
17   what it was and said out loud, you
18   know, words to the effect of I have
19   no idea what this means, let's just
20   go to the next one.
21           And then another one
22   came up, and he just looked as if he
23   had never looked at this thing before
24   he was standing in front of the

63

1    branch to do a presentation.
2            That was another
3    instance of which it seemed as if he
4    had gone to this managers' meeting
5    and came back with the canned
6    presentation and either had no idea
7    what they talked about at the meeting
8    or had no idea what he was presenting
9    on these slides. And that was in
10   front of the entire branch.
11       Q.   Anything else you recall
12   about that instance?
13       A.   Of that particular instance,
14   no.
15       Q.   Do you recall what year that
16   occurred?
17       A.   No, that was only -- it had
18   to have been maybe -- I don't recall.
19   It might have been 2001 or 2002.
20       Q.   You indicated this was a
21   Power Point presentation. Was this a
22   presentation -- or did you understand
23   this to be a presentation that he had
24   prepared or that he had been supplied

64

1    by -- by someone in Chubb?
2        A.   When he began the
3    presentation, he presented it as if
4    this was information that he had
5    gathered and was going to be sharing.
6    So I --
7        Q.   What was your understanding
8    as to where he gathered the
9    information? I thought you said
10   something about maybe he had come
11   from a managers' meeting?
12       A.   That's -- yes, I thought
13   this was information -- if I recall,
14   I think it was a managers' meeting
15   that he had been to and that this
16   was information that he was going to
17   share with the branch about things
18   that the branch managers as a group
19   had talked about.
20       Q.   So you understood this to be
21   his relating information that he had
22   gained from a branch managers'
23   meeting?
24       A.   Yes.

ATLANTA    NEW YORK    WASHINGTON, DC    CHICAGO    LOS ANGELES

 M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com    Phone:  (630) 775-1503    Fax:  (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

65

1          MR. MONTGOMERY:
2    Objection, asked and answered.
3          MR. NAPIER:  All right.
4    I'm just trying to get clarification.
5          MR. MONTGOMERY:  Well,
6    just -- hey, and I don't mean to do
7    this on the record; but if you're
8    going to keep going over the same
9    stuff over and over again, you're
10   going to quickly run out of time.
11         MR. NAPIER:  Well, I
12   don't know what you're talking about,
13   David, but let's just keep going.
14     Q.  What did you understand the
15   Power -- did you understand that the
16   Power Point presentation was something
17   that he also gained -- or was
18   supplied at this branch managers'
19   meeting?
20     A.  As I said, I don't know if
21   he was supplied with it or he
22   prepared it, but what he did with the
23   information in front of the meeting
24   was what I was surprised at.  It was

66

1    as if he had no idea what he was
2    actually presenting.
3      Q.  You indicated that what
4    occurred was he came to a slide I
5    believe you said in the middle of the
6    presentation and he expressed he had
7    no idea what that slide meant?
8      A.  It was that and I think
9    there were maybe one or two other
10   slides afterwards.
11     Q.  Where he basically made the
12   same comment?
13     A.  Yes.
14     Q.  Do you remember what those
15   slides were about, what the topic
16   was?
17     A.  You know what, I don't.  I
18   don't recall.  I'm sorry.
19     Q.  Approximately how many
20   slides consisted of his presentation?
21     A.  I don't recall but I don't
22   think there were that many.  There
23   were maybe -- maybe 10 to 15.
24   That's not many, if that.

67

1      Q.  Well, let me ask it this
2    way.  What percentage roughly of his
3    presentation did he make this comment
4    he didn't know what the slide meant?
5      A.  Percentage-wise?  I don't --
6    I don't know.
7      Q.  Was it a small -- was this
8    just a few slides in a large
9    presentation or was this half of the
10   presentation?  I'm just trying to get
11   an idea of --
12     A.  I would --
13     Q.  -- of what -- how much or
14   -- or -- or to what extent these
15   slides made up his presentation?
16     A.  You know, I don't know from
17   a percent standpoint how many -- how
18   much -- how many of these slides made
19   up the entire presentation.  What I
20   do know is that in front of the
21   group he's giving a presentation as a
22   leader and as the branch manager and
23   he gets to a part a couple of slides
24   on a Power Point and has no idea

68

1    what these things mean.
2      Q.  Okay.  You've expressed
3    that.
4      A.  I know but that's -- you
5    asked me why -- to talk about it,
6    and that to me is along that same
7    theme of standing up as a branch
8    manager with Doug and he -- you know,
9    whether it was 10 percent or 100
10   percent, you know what, to stand in
11   front of a group and not be prepared
12   at his level, in his role in the
13   branch, that's to me -- whether or
14   not it was whatever percent, to me
15   that wasn't relevant.
16         It was a couple of
17   slides in the presentation that he
18   looked lost.  And to me, whatever
19   percent it is it doesn't matter.
20     Q.  Was it your perception as a
21   branch manager that he should be
22   fully informed of any and all topics
23   that would come up in the branch?
24     A.  Could you say that question

ATLANTA          NEW YORK          WASHINGTON, DC          CHICAGO          LOS ANGELES

M & M REPORTING, INC.

LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE          www.mmreporting.com

Phone:     (630) 775-1503
Fax:         (630) 775-0170

**DEPOSITION OF GREGORY W. TAZIC - September 5, 2003**

---

69

1  again, please?
2      Q.  Yeah.  What I'm trying to
3  understand are you telling me it's
4  your -- your understanding or your
5  perception that as the branch manager
6  he was to be fully informed of any
7  and all topics that could come up
8  regarding matters dealt with in the
9  branch?
10     A.  I believe as the branch
11 manager he should know if he's going
12 to do the present -- a presentation
13 in front of the group whatever topics
14 that presentation covers, yes.
15     Q.  All right.  Well, I
16 understand that.  Still you didn't
17 answer my question, sir.
18         Is it your -- are you
19 indicating that -- that you understood
20 that he was to know -- for instance,
21 he was to know as much about -- as
22 much about your department as you?
23     A.  No.
24     Q.  You would not expect him to

---

70

1  be -- to know the -- to have the
2  same level of knowledge and expertise
3  regarding your department as yourself?
4          MR. MONTGOMERY:  That's
5  just a question you just asked.
6          MR. NAPIER:  Okay.  Is
7  that an objection, Dave?
8          MR. MONTGOMERY:  It is.
9          MR. NAPIER:  Okay.
10 Then fine.  State the objection.
11         MR. MONTGOMERY:  Mark,
12 we need to take a -- and you can --
13 if you want to ask it again and have
14 him answer again, go ahead but we do
15 need to take a break and I do need
16 to talk with you off the record.
17         MR. NAPIER:  Okay.  All
18 right.  Do you want to -- how do you
19 want to do this then?
20         MR. MONTGOMERY:  Well,
21 my thought would be I've got to
22 switch rooms anyway, so why don't we
23 take about a ten minute break.  I
24 will call you in just a few minutes

---

71

1  and then I'll hook everybody back in.
2  But as far as on the task aside,
3  just plan on us calling you back in
4  ten minutes.
5          THE WITNESS:  Okay.
6          MR. MONTGOMERY:  Okay?
7          THE WITNESS:  That's
8  fine.  All right.  We'll hang up.
9          MR. MONTGOMERY:  Great.
10 Thanks.
11         MR. NAPIER:  Bye.
12         (discussion had off the
13 record)
14         MR. NAPIER:  Q.
15 Okay.  Mr. Tazic?
16     A.  Yes.
17     Q.  Let's kind of pick up where
18 we left off, if we may.
19         Regarding this -- this
20 branch meeting that you've talked
21 about where Mr. Baillie made the
22 Power Point presentation, can you tell
23 me approximately how many people were
24 there?

---

72

1      A.  Approximately 50.
2      Q.  All right.  When he
3  indicated that there was a problem or
4  he didn't know what that slide meant,
5  did anyone volunteer or offer any
6  information, an explanation for the
7  slide?
8      A.  No.
9      Q.  Do you recall whether or not
10 you ever complained to Diane Haggard
11 about this instance that you've
12 described?
13     A.  I may have but I
14 specifically don't recall if I did or
15 did not.
16     Q.  Are there any other
17 instances that you recall where you
18 felt that Mr. Baillie engaged in
19 inappropriate behavior or showed a
20 lack of leadership?
21     A.  Yes.
22     Q.  Tell me about it.
23     A.  One time -- excuse me.
24 There was a contract with a

---

ATLANTA          NEW YORK          WASHINGTON, DC          CHICAGO          LOS ANGELES



# M & M REPORTING, INC.

**LEGAL SERVICES**
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters                    Phone:    (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE    www.mmreporting.com        Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

73

1  third-party administrator for -- that
2  was owned by one of our agents that
3  existed in the Cincinnati branch for
4  maybe 15 years, and that contract was
5  agreed to by a prior branch manager.
6          And what -- when I
7  found out about it, the purpose that
8  the -- the intent from information
9  that I was able to gather was that
10  this contract had been put in place
11  in order to help generate some
12  additional revenue from that
13  particular agency.
14          However, this TPA, this
15  third-party administrator that they
16  were using, there were some reporting
17  issues. They were sending us like
18  notification on claims, they were not
19  looping us in on claims that were
20  exceeding their authority, and there
21  were a few other issues that we tried
22  to correct.
23          And I had a
24  conversation with Doug that we need

74

1  to figure out what we want to do
2  with this contract. That if we want
3  to terminate it, which I think we
4  should, we need to do that; or if
5  you want to use this to try to
6  generate some additional revenue, I
7  can work with these guys to try and
8  -- excuse me, to try and, you know,
9  you know, correct some of the things
10  that were wrong.
11          In our discussions, we
12  agreed that this was probably the
13  time to terminate that particular
14  third-party administrative agreement,
15  and so Doug and I agreed to go down
16  to visit with that agent.
17          And prior to our
18  meeting, we discussed how we were
19  going to do this. And my comments
20  to Doug and my understanding of how
21  it was going to work was that this
22  agreement, since it had been put into
23  place by a branch manager and that it
24  was to generate revenue from an

75

1  agent, that the actual message that
2  this would need to be terminated
3  should come from Doug, and that I
4  would be happy, you know, to be there
5  and I could support and I could go
6  through detail -- I could do
7  whatever, but the message had to be,
8  you know, from Doug to the principal
9  of this agency. And that was what
10  we agreed to and talked about.
11          And we drive down to
12  this meeting, and Doug and I sit
13  across from the principal, and they
14  say, I know you want to talk about
15  this third-party administrative
16  contract, what's the deal?
17          And Doug turns to me
18  and goes, Greg, it's your show, go
19  ahead. Just kind of turned to me,
20  as if everything we had talked about
21  and how we were going to send this
22  message and that I thought it was
23  important and we agreed that the
24  message to send to this agent that

76

1  they were terminating this contract
2  should come from someone at Doug's
3  level since someone at Doug's level
4  had agreed to it in the first place.
5          We sat across there and
6  it was as if, you know, he just kind
7  of threw it to me and said it's your
8  responsibility but again just kind of
9  turned to me and just said, you know,
10  Greg, and that was it and just stared
11  blankly at me.
12          And that was an
13  instance of which again going back to
14  what I thought which was the
15  leadership issue.
16   Q.   Were you able then to
17  fulfill Doug's expectations and go
18  ahead and explain I guess to the
19  principal that the contract was being
20  terminated?
21   A.   I tried to explain it as
22  best I could.
23   Q.   Did Doug reprimand you or
24  anything of that nature following the

ATLANTA          NEW YORK          WASHINGTON, DC          CHICAGO          LOS ANGELES

# M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143

Corporate Headquarters          Phone:   (630) 775-1503

EXCELLENCE BUILT ON EXPERIENCE          www.mmreporting.com          Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

77

1    meeting about the manner in which you
2    performed that task?
3      A.  No.
4      Q.  Okay.  Did you report this
5    instance to Diane Haggard?
6      A.  Again, I don't specifically
7    recall but it could be one that I
8    did talk to her about and mention to
9    her.
10     Q.  But you have no recollection
11   of doing so?
12     A.  I don't specifically recall
13   if I did or did not.
14     Q.  Were there any other
15   instances involving Doug Baillie where
16   you felt that his conduct was
17   inappropriate or showed a lack of
18   leadership?
19           MR. MONTGOMERY:  We're
20   talking about specific instances?
21           MR. NAPIER:  Yes.
22           THE WITNESS:  Yes,
23   there were.
24           MR. NAPIER:  Q.  All

78

1    right.  What's the next one?
2      A.  Another one had to do with
3    all of the issues that occurred with
4    Ohio UM and the Scott-Pontzer
5    decision.  He -- when this happened,
6    he -- and I'll try to describe it.
7    He was -- he was not very engaged in
8    the underwriting piece of it or the
9    claims piece of it as much as I
10   think we tried to keep him informed
11   about what was going on.
12           When I would talk to
13   him, I ended up -- I felt like I was
14   constantly telling him the same
15   things, had to kind of keep
16   reinventing the wheel and keep
17   explaining, but he seemed to not be
18   very engaged in this entire process
19   for the first, you know, for probably
20   the first year, year and whatever of
21   when this rolled out.
22     Q.  When you use the term not
23   very engaged, what do you mean by not
24   engaged?

79

1      A.  He -- basically when this
2    occurred --
3      Q.  You're talking about the
4    Scott-Pontzer decision?
5      A.  The Scott-Pontzer decision.
6    I kind of ran with it from a claims
7    side of things that we would need to
8    do.
9           Underwriting, Dieter
10   Korte ran with it from an
11   underwriting perspective about things
12   that were important and he looked at
13   his book and was looking at the
14   region.
15           Gary DaLong (phonetic),
16   the branch manager up in Cleveland,
17   was constantly asking us about it,
18   what are we going to do, what's your
19   plan, let's talk about it, let's get
20   the strategy going, let's figure out
21   what we were going to do.
22           And Doug like just
23   again was not -- seemed very
24   disinterested or -- or didn't

80

1    understand it or just he seemed to
2    distance himself from any involvement
3    of what we were trying to do as a
4    region to maybe correct the issue or
5    see what we can do internally to try
6    to, you know, make sure that we can
7    kind of keep the boat going in the
8    right direction.
9      Q.  Now, you say DaLong would
10   contact you.  You were the regional
11   claim manager, correct?
12     A.  Yes.
13     Q.  And was he the claim manager
14   in Cleveland?
15     A.  Gary is the branch manager
16   in Cleveland.
17     Q.  Branch manager.
18           Do you know whether he
19   was contacting Doug regarding the same
20   matter?
21     A.  I'm not sure.
22     Q.  Was there something called a
23   home office strategy session on the
24   Ohio UM crisis?

ATLANTA        NEW YORK      WASHINGTON, DC        CHICAGO        LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters                     Phone:   (630) 775-1503
EXCELLENCE BUILT ON EXPERIENCE   www.mmreporting.com    Fax:     (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

81

1   A.  Yes.
2   Q.  What was that?
3   A.  That actually was -- as I
4   said, that occurred a little bit
5   later on.  That -- it was actually
6   -- there were several meetings leading
7   up to that with some folks from home
8   office about from an underwriting
9   perspective, what Pontzer meant,
10  things that they can do.
11          This was the -- kind of
12  the A meeting after a few initial
13  ones that they had in home office
14  with several of the underwriting
15  folks.  I think -- I'm trying to
16  remember who else went.  Doug went to
17  that meeting.
18  Q.  You're talking about this
19  home office strategy session?
20  A.  If that was -- yes.  I
21  don't know what the meeting was
22  called but there was a meeting at
23  home office in which I know that like
24  some of the underwriters went, Doug

82

1   went --
2   Q.  Did you go?
3   A.  No, I didn't go to that
4   one.  I had actually been in home
5   office like two prior meetings on --
6   or actually I had been to home office
7   once before on this with several
8   world-wide underwriting managers and
9   then -- and claims folks and then we
10  also had some of the underwriting
11  managers out in the Ohio Valley and
12  had done kind of an update and things
13  that were going on.
14          So at this particular
15  meeting, I had a discussion with my
16  -- or a discussion with one of the
17  managers in home office and claims
18  and the idea was, you know, it
19  probably wasn't necessary for me to
20  go at that point.
21  Q.  Did Doug -- did Mr. Baillie
22  interact with you during the
23  development of an Ohio uninsured
24  motorist strategy, so to speak?

83

1   A.  There were some discussions
2   with Doug about what was going on
3   with Scott-Pontzer and the things that
4   underwriting was doing, yes, were
5   doing.
6   Q.  You described him as not
7   being fully engaged -- or not very
8   engaged I believe was the word you
9   used, but you did have some
10  interaction with Mr. Baillie regarding
11  the Scott-Pontzer and the Ohio UM
12  issue?
13          MR. MONTGOMERY:
14  Objection, asked and answered.
15          MR. NAPIER:  Q.  Was
16  that correct?
17  A.  Yes, I did have interaction
18  with Doug about that, yes.
19  Q.  All right.  Other than this
20  Scott-Pontzer issue, were there any
21  other instances in which you felt Mr.
22  Baillie -- Mr. Baillie showed a lack
23  of leadership or engaged in
24  inappropriate behavior as a regional

84

1   or branch manager?
2   A.  Other than the other
3   instances that I've listed?
4   Q.  Correct.
5   A.  Those were the ones that
6   stand out in my -- in my head.
7   Q.  Regarding the Scott-Pontzer
8   matter and how you viewed Mr. Baillie
9   as not being very engaged, did you
10  ever complain to Diane Haggard about
11  that?
12  A.  I specifically do not
13  recall; although, I may have.
14  Q.  Do you recall whether or not
15  you ever complained to Tim Szerlong
16  about Doug Baillie?
17  A.  I don't recall complaining
18  to Tim Szerlong about Doug Baillie.
19  Q.  Do you know whether you ever
20  complained to Jim Ekdahl regarding
21  Doug Baillie?
22  A.  I don't recall a
23  conversation with Jim; although -- I
24  -- I don't think I would have said

ATLANTA       NEW YORK       WASHINGTON, DC       CHICAGO       LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE       www.mmreporting.com
Phone:  (630) 775-1503
Fax:    (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

85

1 anything to Jim but I don't recall if
2 I did or did not.
3    Q.  But you have no recollection
4 today of having done so?
5    A.  Yeah, I don't specifically
6 recall, no.
7    Q.  Would Mr. Szerlong and Mr.
8 Ekdahl on occasion come to the
9 branch?
10    A.  Yes.
11    Q.  And on those occasions,
12 would you have an opportunity to meet
13 with them?
14    A.  Sometimes.
15    Q.  When you say sometimes, how
16 frequently would you have an
17 opportunity to meet with Mr. Szerlong
18 at the branch?
19    A.  They -- when Tim would come
20 through -- I don't know specifically
21 how many times he did, but I would
22 see him almost every time, 80 percent
23 of the time.  I would say hello or,
24 you know, spend a few minutes with

86

1 him.
2    Q.  During the course of a year,
3 how many times would he come to the
4 branch, if you recall?
5    A.  I cannot recall the number.
6    Q.  And would it be once a
7 year, six times a year? I'm just
8 trying to get a sense of what you
9 recall.
10    A.  Honestly I don't recall if
11 it was less -- less than ten or once
12 -- maybe less than ten.  I don't
13 know the answer.  I'm sorry.
14    Q.  And how about Mr. Ekdahl,
15 how often would he visit the branch?
16    A.  Again, I can't recall the
17 number of times that Jim visited the
18 -- the branch.
19    Q.  Without knowing the actual
20 number of times, you just don't have
21 any recollection of an approximate,
22 whether it was quarterly, monthly,
23 annually?
24    A.  No, I don't have any

87

1 estimate as far as whether it was
2 monthly, weekly, quarterly, annually.
3 I just recall seeing him in the
4 branch on more than one occasion but
5 I don't know specifically how many
6 that would be.
7    Q.  And you recall no
8 conversations with either Mr. Szerlong
9 or Mr. Ekdahl pertaining to Mr.
10 Baillie?
11    A.  None that I can recall.
12    Q.  Do you recall other than a
13 conversation any time in which you
14 sent any kind of communication to Mr.
15 Szerlong or to Mr. Ekdahl, such as an
16 e-mail or correspondence, when you
17 complained about Mr. Baillie?
18    A.  None that I can recall.
19    Q.  Was it your estimation or
20 your evaluation that Mr. Baillie had
21 some strengths as a branch manager?
22    A.  My evaluation is that -- of
23 Doug as a branch manager is I would
24 say he probably -- I would say he

88

1 had one strength.
2    Q.  What was that?
3    A.  For a limited number of
4 agents, he was fairly sociable with
5 them and that's a pretty small piece
6 of the job.
7    Q.  Any other strengths that you
8 observed in Mr. Baillie as a branch
9 manager?
10    A.  No.
11    Q.  Are you familiar with the
12 Chubb Code of Conduct?
13    A.  Yes.
14    Q.  Were there any occasions
15 where you felt Mr. Baillie violated
16 the Chubb Code of Conduct?
17    A.  Well, there was one instance
18 in which I thought at a golf outing
19 that I was with Doug that his
20 behavior towards the end of the round
21 seemed a little unusual, and he had
22 had a couple of beers or had been
23 drinking basically the entire round,
24 and we were with an agent and an

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES



M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
EXCELLENCE BUILT ON EXPERIENCE        www.mmreporting.com

Phone:    (630) 775-1503
Fax:       (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

89

1    attorney. So, yes, one instance.
2        Q.  What do you recall about his
3    behavior that you felt was
4    inappropriate?
5        A.  It appeared to me that
6    towards the end of the round, the
7    last couple of holes, he was acting
8    in a way that indicated to me that
9    he may have had a couple of drinks
10   too many.
11           For example, you know,
12   he was lining up a putt and was
13   basically like instead of how most
14   people do it where you maybe bend
15   down, bend your knees, he was kind of
16   laying on the ground on his belly
17   kind of cupping his hands over his --
18   the bill of his baseball hat. It
19   was just odd, and he hadn't done that
20   when he was lining up putts earlier.
21           So he just seemed to --
22   his behavior just got a little bit, I
23   don't know, a little bit looser.
24       Q.  Other than that circumstance

90

1    you described where he was lying down
2    I guess to line up a putt, anything
3    else that caused you to believe that
4    his behavior was inappropriate?
5        A.  Or -- on that occasion or
6    overall?
7        Q.  On that occasion?
8        A.  No, that was about it.
9        Q.  Do you have a recollection
10   of -- or did you know how much
11   alcohol he had consumed?
12       A.  I did not keep track of the
13   number of beers Mr. Baillie had that
14   day.
15       Q.  Were you part of his
16   foursome?
17       A.  Yes.
18       Q.  This was toward the end of
19   18 holes?
20       A.  Yes.
21       Q.  Was this the only round that
22   was played that day or were you all
23   playing a second round of 18?
24       A.  That was the only round that

91

1    I was aware of.
2        Q.  Were there any other
3    occasions, such as golf outings,
4    social functions, marketing functions,
5    where you felt Mr. Baillie engaged in
6    inappropriate behavior?
7        A.  Other than the instances
8    that I had listed before like those
9    ones that we had talked about, those
10   individual instances, I can't recall
11   any other ones.
12       Q.  All right. You indicated
13   earlier in your testimony that Mr.
14   Baillie had made a comment I believe
15   regarding working women that you felt
16   was inappropriate. Were there any
17   other occasions you recall when he
18   made comments that you felt were
19   sexist or demeaning to women?
20       A.  Not that I can recall.
21           You guys there?
22       Q.  Yeah, we're here.
23           Give me a few moments.
24   I'm looking over my notes. I think

92

1    we're -- we're getting towards the
2    end.
3            Did you feel that Mr.
4    Baillie supported your claims
5    operations?
6        A.  No.
7        Q.  Why do you -- what's the
8    basis of your opinion that he did not
9    support your claims operations?
10       A.  He didn't really get
11   involved in any of my operation so I
12   don't think he either -- I don't
13   think he supported it at all. I --
14   I -- he wasn't engaged in the claim
15   piece.
16       Q.  He left that up to you?
17       A.  Yes, I managed that piece,
18   yes.
19       Q.  If you -- and again, I want
20   to make sure I understand this. If
21   you had a question or -- or a matter
22   that you needed to discuss with Mr.
23   Baillie, did he ever refuse to meet
24   with you?

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES



M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

EXCELLENCE BUILT ON EXPERIENCE

Phone:    (630) 775-1503
Fax:       (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

93

1    A.  Is this in -- just in
2  general or claims related?
3    Q.  We'll say claims related.
4    A.  Could you answer -- ask that
5  question again, please?
6    Q.  Sure.  In operating claims,
7  did you ever have a question or a
8  topic that you wanted to discuss with
9  Mr. Baillie in which he refused to
10  meet with you?
11    A.  No.
12    Q.  All right.  Just a few
13  moments, gentlemen.
14        Sir, how were -- how
15  did you first learn that Mr.
16  Baillie's employment with Chubb was
17  terminated?
18    A.  I received a phone call at
19  home from Dieter Korte I believe it
20  was Friday night.
21    Q.  Was this -- did you
22  understand this to be the same day
23  that Mr. Baillie was terminated?
24    A.  Yes.

94

1    Q.  What do you recall Mr. Korte
2  saying?
3    A.  Just that Doug had been --
4  he -- Doug called me -- Dieter said
5  that Doug called him and that he was
6  -- he was fired.
7    Q.  Do you recall Mr. Korte
8  saying anything else?
9    A.  No.
10    Q.  Do you recall what your
11  reaction was?
12    A.  I felt sorry for Doug.
13    Q.  Why was that?
14    A.  I worked with Doug in the
15  same branch for a number of years,
16  and you never like to hear that
17  somebody is sort of fired.  I mean,
18  you never want to hear about anybody
19  losing their job.  It's human nature.
20    Q.  Anything else you can recall
21  that either you or Mr. Korte may have
22  said in that phone conversation?
23    A.  We talked a little bit
24  about, you know, just -- you know, I

95

1  said -- you know, a question was like
2  whether or not I was surprised, and
3  you know, my comment to Dieter was
4  all of the things that, you know, and
5  all of the comments and all of the
6  things that we had talked about with
7  respect to lack of leadership and we
8  didn't think Doug was -- had the
9  skills that it took to be a good
10  regional manager or a branch manager.
11        You feel sorry for him,
12  but you know what, it was -- you
13  feel sorry for him but not surprised.
14    Q.  Had you and Mr. Korte had
15  discussions in which you both
16  expressed that you did not feel that
17  Mr. Baillie had the leadership skills
18  to run the region or the branch?
19    A.  Along the same lines of
20  maybe some discussions I would have
21  had with Diane and some other
22  managers.
23        I don't specifically
24  recall; but over the course of Doug's

96

1  role, there were -- you know, we
2  would talk, for example, like the
3  newspaper incident.  You know, Dieter
4  and I, as I mentioned before,
5  probably had, you know, some dialogue
6  about that, and there were those
7  things that had occurred.
8        So when Doug was let
9  go, like I said, I felt sorry for
10  him and sad but not necessarily
11  surprised.
12    Q.  Other than the instances
13  that you've testified about today, are
14  there any other instances that you
15  recall that you and Mr. Korte
16  discussed which served as a basis for
17  your belief that Mr. Baillie did not
18  hold the skills to lead the region or
19  the branch?
20    A.  I can't recall specific
21  examples other than the ones that
22  I've shared with you.  As I
23  mentioned, those are the ones that
24  stick out in my head.

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES

M & M REPORTING, INC.
LEGAL SERVICES
One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com
EXCELLENCE BUILT ON EXPERIENCE
Phone:    (630) 775-1503
Fax:      (630) 775-0170

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

97

1    Q.  In preparing for your
2  deposition today, did you review any
3  documents?
4    A.  No.
5    Q.  In preparing for your
6  deposition today, did you talk to
7  anyone other than counsel?
8    A.  No.
9    Q.  You indicated previously you
10  had given two prior depositions.  Do
11  you recall the circumstances of those
12  depositions?
13    A.  Yes.
14    Q.  What were they?
15    A.  Both involved coverage
16  disputes with insureds when I worked
17  in the claim department.
18    Q.  Have you had any
19  communications with Doug Baillie since
20  he was terminated?
21    A.  Yes.
22    Q.  What communications have you
23  had with Doug?
24    A.  After Doug was terminated,

98

1  there was a training seminar on, if I
2  recall correctly, I think it had to
3  do with Pontzer as well and it was
4  from a plaintiff attorney perspective.
5        And Doug was there at
6  that seminar, and I forget who it was
7  hosted by, but it was in downtown
8  Cincinnati, and I went to this
9  session, and I saw Doug there.
10    Q.  When you say a training --
11  a training seminar, this was some
12  seminar that -- that was apart from
13  Chubb?
14    A.  Correct.
15    Q.  It was like an industry
16  seminar?
17    A.  Yes.
18    Q.  Did you have some
19  discussions or conversation with Doug
20  at that training seminar?
21    A.  Yes.
22    Q.  What do you recall about
23  your conversations with Doug?
24    A.  He asked about how the

99

1  branch was doing and then mentioned
2  to me that, you know, still he didn't
3  understand why, you know, why he was
4  terminated, and that while he's, you
5  know, been looking for a job, that's
6  -- that's been the biggest challenge,
7  is trying to explain why he's no
8  longer with Chubb, and that was the
9  extent of it.
10    Q.  Anything else that he said
11  that you can recall?
12    A.  That was the only thing that
13  Doug and I mentioned in small talk.
14    Q.  What was your response, if
15  you can recall, when he made these
16  comments?
17    A.  I actually didn't say
18  anything.  I just kind of, you know,
19  kind of stood there and, you know,
20  let him say it, and I didn't -- you
21  know, I didn't comment one way or the
22  other.
23    Q.  Other than that conversation
24  that you and he had at the training

100

1  seminar, were there any other times
2  where you had some communication or
3  interaction with Doug Baillie since
4  his termination?
5    A.  No.
6        MR. NAPIER:  All right.
7  Mr. Tazic, thank you very much.  I
8  appreciate you appearing today.  I
9  have no further questions.
10        MR. MONTGOMERY:  Thanks
11  a lot.  That's it.
12        THE WITNESS:  All done?
13        MR. NAPIER:  Yeah.
14        All right.  Lisa?
15        MS. COURT REPORTER:
16  Yes.
17        MR. NAPIER:  Yeah, if
18  you could go ahead and we'll go ahead
19  and take a copy -- or take the
20  transcript.
21        MS. COURT REPORTER:
22  Okay.  Are you ordering the original
23  then?
24        MR. NAPIER:  Yeah,

ATLANTA        NEW YORK        WASHINGTON, DC        CHICAGO        LOS ANGELES



M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

Phone:    (630) 775-1503
Fax:      (630) 775-0170

EXCELLENCE BUILT ON EXPERIENCE

DEPOSITION OF GREGORY W. TAZIC - September 5, 2003

101

1    we'll order the original.  There is
2    no rush on it.
3            MS. COURT REPORTER:
4    Okay.
5            MR. MONTGOMERY:  I just
6    want it expedited.
7            MR. NAPIER:  Oh, you
8    did?
9            MR. MONTGOMERY:  Yep.
10           MR. NAPIER:  Okay.
11           All right.
12           MR. MONTGOMERY:  Thank
13   you.
14           MR. NAPIER:  Thank you.
15           THE WITNESS:  Thanks,
16   guys.
17
18
19
20
21
22
23
24

102

1                INDEX
2    WITNESS              EXAMINATION
3
4    GREGORY W. TAZIC
5     EX-BY MR. NAPIER          3
6
7
8            EXHIBITS
9    NUMBER           MARKED FOR ID
10    NO EXHIBITS MARKED
11
12
13
14
15
16
17
18
19
20
21
22
23
24        * * *

ATLANTA      NEW YORK      WASHINGTON, DC      CHICAGO      LOS ANGELES



M & M REPORTING, INC.

LEGAL SERVICES

One Pierce, Suite 295-E, Itasca, IL 60143
Corporate Headquarters
www.mmreporting.com

Phone:    (630) 775-1503
Fax:      (630) 775-0170

EXCELLENCE BUILT ON EXPERIENCE