Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---

DOUGLAS W. BAILLIE,          :
                             :
         Plaintiff,          :
                             :
    vs.                      :   CASE NO.
                             :   C-1-02-062
CHUBB & SON INSURANCE,       :
                             :
         Defendant.          :
                             :

---

DEPOSITION OF: MICHAEL ZDINAK

TAKEN:     By the Plaintiff

DATE:      August 20, 2003

TIME:      Commencing at 1:05 p.m.

PLACE:     Offices of:
           Keating Muething & Klekamp PLL
           1400 Provident Tower
           One East Fourth Street
           Cincinnati, Ohio 45202

BEFORE:    RAYMOND E. SIMONSON
           Registered Merit Reporter
           Notary Public - State of Ohio

Page 2

APPEARANCES:

On behalf of the Plaintiff:

    MARK W. NAPIER, ESQ.
       of
    Freking & Betz
    215 East Ninth Street
    Fifth Floor
    Cincinnati, Ohio 45202

On behalf of the Defendant:

    DAVID K. MONTGOMERY, ESQ.
       of
    Keating Muething & Klekamp PLL
    1400 Provident Tower
    One East Fourth Street
    Cincinnati, Ohio 45202

                - - -

           STIPULATIONS

    It is stipulated by and between counsel for the respective parties that the deposition of MICHAEL ZDINAK, a witness herein, may be taken at this time by Counsel for the Plaintiff as upon cross-examination pursuant to the Federal Rules of Civil Procedure; that the deposition may be taken in stenotypy by the notary public-court reporter and transcribed by him out of the presence of the witness; that the transcribed deposition is to be submitted to the witness for his examination and signature; and that signature may be affixed out of the presence of the notary public-court reporter.

                - - -

Page 3

        I N D E X

MICHAEL ZDINAK                                          PAGE

    CROSS-EXAMINATION BY MR. NAPIER                       4

    EXAMINATION BY MR. MONTGOMERY                         -


        E X H I B I T S

    (No exhibits were marked for identification.)


                    COMPUTER
                    DISK

Page 4

1           MICHAEL ZDINAK
2 of lawful age, a witness herein, being first duly sworn as
3 hereinafter certified, was examined and testified as
4 follows:
5           CROSS-EXAMINATION
6 BY MR. NAPIER:
7     Q.  Sir, would you state your name for the
8 record?
9     A.  Michael Zdinak.
10    Q.  How do you spell that?
11    A.  Z-D-I-N-A-K.
12    Q.  All right. Mr. Zdinak, my name is Mark
13 Napier. We briefly met before the deposition began.
14        Have you ever been deposed before?
15    A.  No, I haven't.
16    Q.  Let me go over a few rules, so to speak, or
17 suggestions that may make the process go a little bit
18 easier.
19        One thing you need to remember to do is to
20 try to make a verbal response to any questions I may ask so
21 the court reporter, Ray, may take it down more easily. The
22 other thing to keep in mind is to wait until I've finished
23 my question before you respond. That way we're not talking
24 on top of each other, and I'll try to give you the same

Page 5

1 courtesy.
2  If at any time I should ask you a question
3 that you don't understand, let me know, and I'll try to ask
4 it or rephrase it until you do understand it.
5  You understand today, of course, that you're
6 under oath?
7  A. Yes.
8  Q. You understand that that oath has the same
9 significance as if you were testifying in court before a
10 judge and jury?
11  A. Yes.
12  Q. What is your current address?
13  A. ▬▬▬▬▬▬▬▬▬▬▬▬▬
14  Q. And what is your current home telephone
15 number?
16  A. ▬▬▬▬▬▬▬
17  Q. And your date of birth?
18  A. ▬▬▬▬▬▬▬
19  Q. And your marital status?
20  A. Married.
21  Q. And your wife's name?
22  A. Janice.
23  Q. Does your wife have anything to do with Chubb
24 in terms of she's employed by Chubb --

Page 6

1  A. No.
2  Q. -- or ever been employed by Chubb?
3  All right. Do you have any children?
4  A. Yes.
5  Q. What are the ages of your children?
6  A. 25, 22, 21, and 17.
7  Q. Have any of your children ever been employed
8 by Chubb?
9  A. No.
10  Q. Who is your current employer?
11  A. Chubb Group of Insurance Companies.
12  Q. How long have you been employed by Chubb?
13  A. 16 years.
14  Q. Do you know your date of hire?
15  A. It was November 1986.
16  Q. What's your current position with Chubb?
17  A. I am the Northern Zone Risk Consultant
18 Manager.
19  Q. What are your duties and who are the people
20 that you service, so to speak?
21  A. I'm responsible for the 17 Risk
22 Consultants currently in the Northern Zone over 11 offices.
23 I have responsibility technically for those people, and I
24 have responsibility to work in conjunction with the local

Page 7

1 Loss Control Managers and the management of those
2 individuals.
3  Q. What does a risk consultant do for Chubb?
4  A. A risk consultant is involved in what we call
5 machinery breakdown. They do mandated state inspections of
6 boilers and pressure vessels. They do pre-underwriting
7 surveys. They do accident investigations. Some of them
8 are qualified do infrared thermographic surveys and general
9 service inspections.
10  Q. Generally, do they try to assess risk, or at
11 least obtain data to assess risk?
12  A. They -- they assess exposure, controls.
13  Q. And you are the Northern Zone Risk Consultant
14 Manager?
15  A. Yes.
16  Q. So I think you've indicated there are 17 Risk
17 Consultants in the Northern Zone, correct?
18  A. Yes.
19  Q. And these 17 Risk Consultants operate out of
20 11 branch offices?
21  A. Yes.
22  Q. And they directly report to you for the
23 technical side of what they do?
24  A. No. I won't say they directly -- they

Page 8

1 directly report to the local Loss Control Managers.
2  Q. Okay.
3  A. I am their indirect report for technical
4 assistance.
5  Q. How long have you served in your current
6 capacity?
7  A. In my current capacity, since January of
8 2002.
9  Q. Where are you physically located for your
10 office?
11  A. My office is physically located in
12 Cincinnati, in the Scripps Center.
13  Q. What's the address there?
14  A. 312 Walnut Street, Eighteenth Floor,
15 Cincinnati, Ohio, 45202.
16  Q. Who do you directly report to?
17  A. I directly report to Steve Hernandez.
18  Q. And what is his title or position?
19  A. He is the Zone Loss Control Manager.
20  Q. And where is he located?
21  A. He's located in Chicago.
22  Q. Do you report to anyone in the local
23 Cincinnati branch?
24  A. No.

Page 9

1  Q. Why are you in Cincinnati as opposed to being
2  in Chicago?
3  A. I transferred to Cincinnati in November of
4  1999, and held a position as the Regional Loss Control
5  Manager until January of 2002.
6  Q. You just remained in Cincinnati even though
7  you've become --
8  A. Yes.
9  Q. -- now the Zone Manager, or Northern Zone
10 Risk Consultant Manager?
11 A. Yes.
12 Q. What was your position prior to coming to
13 Cincinnati in November of '99?
14 A. I was the Zone Risk Consultant Manager for
15 the Northern Zone.
16 Q. Same position you hold now?
17 A. Yes.
18 Q. Why don't you just briefly, if you could,
19 kind of go through your history? Give me the rundown of
20 your history with Chubb, the positions you've held,
21 beginning with your first position in November of '86. I'm
22 not looking for a lot of detail, but just sort of the
23 positions you've held.
24 A. November of '98, I was hired as the -- they

Page 10

1  called it at that time Boiler Machinery Department
2  Supervisor in Pittsburgh.
3      I was then promoted to the Zone Boiler
4  Machinery Manager in the Boiler Machinery Department. I
5  don't recall what year that was.
6  Q. Okay. Still Pittsburgh?
7  A. Still Pittsburgh, right. About nine to ten
8  years ago, we combined the risk consultants into Loss
9  Control from the Boiler Machinery Department. At that time
10 I was then attached to Loss Control as the Northern Zone
11 Risk Consultant Manager, still in Pittsburgh.
12 Q. All right. And that took us up, then, to
13 '99?
14 A. Right.
15 Q. In '99, you came to Cincinnati as the
16 Regional Loss Control Manager?
17 A. That's correct.
18 Q. What was the reason for your change from the
19 Northern Zone Manager to the Regional Manager in November
20 of '99?
21 A. The current Regional Manager had resigned,
22 and I applied for the position as a career change.
23 Q. Would that have been considered a lateral
24 move, a demotion, or promotion?

Page 11

1  A. I would say lateral.
2  Q. Was there any change in pay when you made
3  that move?
4  A. Yes.
5  Q. More pay? Less pay?
6  A. More.
7  Q. Correct me if I'm wrong. My understanding of
8  kind of the hierarchy is Zone, Region, Branch, and
9  Production Offices for Chubb. Is that incorrect?
10 A. There's -- I don't -- I wouldn't say there's
11 a regional office. There's a zone, yes.
12 Q. Why don't you give it to me?
13 A. Okay. There is zone; there are regions.
14 Q. Okay.
15 A. Okay. And within that region, there are
16 branches. I don't know that any one office is designated
17 the regional office.
18 Q. Okay.
19 A. Okay. And there are production offices
20 versus branch offices, yes.
21 Q. Okay. Thanks. That helps clear it up. When
22 you came to Cincinnati in November of '99, who was your
23 direct report at that time?
24 A. Doug Baillie.

Page 12

1  Q. And what was his position at that time?
2  A. At that time he was the Regional Branch
3  Manager for the Ohio Valley Region.
4  Q. Did you also have a dual reporting
5  relationship at that time?
6  A. Yes.
7  Q. Who was your other report?
8  A. In '99, when I assumed the position, it was
9  Kevin Neary.
10 Q. How do you spell Mr. Neary's last name?
11 A. N-E-A-R-Y.
12 Q. What was his position and where was he
13 located?
14 A. He is the zone -- he was the Zone Loss
15 Control Manager, and he was located in Chicago.
16 Q. For how long did you report to Doug Baillie?
17 A. Until January -- well, January of 2002, or
18 when he left. I don't know what date that was.
19 Q. Whenever it was, until Baillie left?
20 A. Until Baillie left, right.
21 Q. And did you and he work in the same office?
22 A. Yes.
23 Q. Did you each have your own individual office
24 rooms?

### Page 13

1  A. Yes.
2  Q. Okay. Where was your office room in relation
3  to his? Same floor?
4  A. It was on the same floor, on the -- on the
5  other side of the office, if you will.
6  Q. How would you describe your interaction with
7  Doug? Was it day to day?
8      MR. MONTGOMERY: Are you talking about
9      frequency, Mark?
10     MR. NAPIER: Yeah, frequency.
11 A. We saw each other every day that I was in the
12 office.
13 Q. Okay. How would you describe Mr. Baillie as
14 a boss?
15 A. I would say different than other managers
16 I've had. Okay.
17 Q. How would you describe him as being
18 different?
19 A. I saw him more. There was a lot more
20 interaction.
21 Q. Meaning that he was more accessible to you
22 than perhaps other managers?
23 A. He made -- that he made himself accessible,
24 and at times was just there.

### Page 14

1  Q. Just by his physical presence in the office?
2  A. Or physical presence in the area where I sat.
3  Q. Did you consider that to be a positive thing
4  or a negative thing?
5  A. I would say both. There were times it was
6  positive and times it was negative.
7  Q. How was it positive? In what manner?
8  A. Positive in that, if there were current
9  branch issues that needed to be discussed, he was there and
10 we could do that. Actually, we could do that either in my
11 office or in his.
12 Q. If you had a problem or an issue to discuss,
13 did you find him to be quite accessible?
14 A. Yeah.
15 Q. You also -- was there a negative way in which
16 his accessibility -- or that you found his accessibility to
17 be negative?
18 A. Yes.
19 Q. In what way?
20 A. Doug had the same background as I of being in
21 Loss Control. I found it negative from the standpoint that
22 at times he was an overriding factor, and I felt that he
23 was directing the staff. There were times that I did not
24 feel that I was the manager.

### Page 15

1  Q. Are you saying that at times you felt that he
2  interfered in your duties?
3  A. He interfered and overrode.
4  Q. Can you give an example?
5  A. I would -- if I had problems with a staff
6  person as far as maybe reports and needing to get reports a
7  certain way and I was trying to have them understand the
8  current outstanding instructions on how we did reports,
9  Doug would say, "Well, I need you to bring me some of those
10 reports so I can look at them."
11     He would critique them and he would say, "No,
12 they need to do it this way or that way."
13     And I would say, "Doug, no, that's not the
14 current outstanding instructions."
15     And he would say, "Well, back when I was in
16 Loss Control, this is how we did it."
17     And I would try to explain to him that that's
18 not the way we do it now. So at times that was
19 interfering. And at other times staff members would come
20 to me and say, "Doug was over and talked to me and told me
21 he wanted me to do this, and I should do this this way or
22 that way," and they would come to me because they knew that
23 was not the current way we were doing things.
24 Q. Did it appear to you that his intentions were

### Page 16

1  good?
2  A. His -- his intentions were to get the job
3  done.
4  Q. And he apparently had a loss control
5  background?
6  A. Yes.
7  Q. And it appeared to you that he felt that
8  could be useful in trying to help you accomplish your
9  goals?
10 A. He felt that he -- I could use him as a
11 sounding board.
12 Q. As a resource?
13 A. As a resource.
14 Q. When you would bring to his attention, then,
15 that processes or the way we do things in Loss Control had
16 changed, would he appear generally to be open to your
17 suggestions and your corrections?
18 A. Not always.
19 Q. Sometimes?
20 A. Sometimes.
21 Q. But there was other times where he apparently
22 used his own judgment and went with his judgment?
23 A. What he did was, he went back to his
24 experience and said, "When I was in Loss Control, we did it

Page 17

1 this way, and I think that's the way it still should be
2 done. So that's the way I want it done." Not necessarily
3 saying -- in my opinion, he was telling me, even though we
4 changed, we were still doing it wrong.
5    Q.  Now, was your -- you were in charge, of
6 course, of loss control, correct?
7    A.  That's correct.
8    Q.  Were you a profit center, so to speak, for
9 the branch?
10   A.  No.
11   Q.  If you had technical questions, who would you
12 typically go to?
13   A.  I would go to my peers, other regional
14 managers. I would go to my zone manager.
15   Q.  And your zone manager was who?
16   A.  Kevin Neary.
17   Q.  Okay.
18   A.  And that changed after a period of time. And
19 we also have zone specialists that specialize in different
20 types of things, such as property, Workers' Comp products.
21 And our procedure in Loss Control is that, if I locally had
22 a technical question, I was to go to the specialists within
23 Loss Control.
24   Q.  And you typically would do that?

Page 18

1    A.  Yes, I would.
2    Q.  What obligations did you have then to Mr.
3 Baillie as the Cincinnati Branch Office Manager?
4    A.  My obligations to Doug Baillie were to make
5 sure that the Loss Control Department operated efficiently,
6 effectively, and performed surveys and inspections as
7 requested by underwriting departments, both in our branch
8 and outside our branch.
9    Q.  How would your department, Loss Control,
10 be measured, or the performance be measured during the
11 time Mr. Baillie served as your manager or the branch
12 manager?
13   A.  (No response.)
14   Q.  Do you understand the question?
15       That was a little convoluted. Let me ask it
16 again. During the time Mr. Baillie served as the Regional
17 Branch Manager in Cincinnati, how was the Loss Control
18 Department that you were the manager of -- how were they
19 measured in terms of performance?
20   A.  We were measured by productivity. We were
21 measured by quality of our written reports. We were
22 measured by involvement in branch activities. We were
23 measured by involvement in underwriting activities.
24   Q.  When you came to the branch in November of

Page 19

1 '99 --
2    A.  Um-hmm (nodding head affirmatively).
3    Q.  -- how would you describe the state of the
4 Loss Control Department at that time?
5    A.  I would say that it was in somewhat disarray.
6    Q.  Who had been the Loss Control Manager prior
7 to you coming on the scene?
8    A.  Kevin Neal.
9    Q.  Kevin Neal?
10   A.  Neal.
11   Q.  Not Kevin Neary?
12   A.  No.
13   Q.  Different person?
14   A.  (Nodding head affirmatively).
15   Q.  Do you know why Mr. Neal left as the Loss
16 Control Manager?
17   A.  No, I don't. All I know is he was pursuing a
18 career in wine.
19   Q.  So he left the company?
20   A.  Yes.
21   Q.  When you describe the conditions being
22 somewhat in disarray, what do you mean? Can you be more
23 specific?
24   A.  There were questions of quality of reports.

Page 20

1 There were questions on product. There were questions on
2 productivity. There were questions on relationships with
3 the underwriting departments.
4    Q.  Those relationships being poor, apparently?
5    A.  Yes.
6    Q.  During the period that you served under Mr.
7 Baillie, would you say that productivity of your department
8 improved?
9    A.  Yes.
10   Q.  Would you say that the quality of reports
11 improved?
12   A.  Yes.
13   Q.  Would you say the involvement in branch
14 activities improved?
15   A.  Yes.
16   Q.  And would you say that the relationships with
17 underwriting activities or underwriting improved?
18   A.  Yes.
19   Q.  You described earlier that Mr. Baillie was
20 different than other managers. And you talked about this
21 issue of him being accessible, sometimes that was good,
22 sometimes not so good, because you felt he maybe
23 interfered. Did his interference as you've described it in
24 your opinion ever impact the -- ever impact productivity?

Page 21

1  A. Yeah.
2  Q. In what way?
3  A. He would change schedules or ask people to do
4  something different than what they were already scheduled
5  unbeknownst to me. There were instances where he actually
6  told me he did the loss control while he was on the visit,
7  yet never wrote the report. So that affected the
8  productivity, because I was trying to manage those -- those
9  survey requests that came in, and I was giving them to
10 other members of the staff. So I had to say, "Okay, if you
11 made this appointment, you need to cancel it now." So it
12 did affect me, yes.
13 Q  Somebody might have an appointment?
14 A. Somebody may have already set something up.
15 Q. And he said he took care of it, to save
16 someone making an extra trip to that location?
17 A. I wouldn't say -- no. I won't say not
18 because of making an extra trip; it was -- I'm not sure why
19 he did it.
20 Q. But he may have performed the loss control
21 function instead of someone having to do it in place of his
22 completing that task?
23 A. I would say he felt he fulfilled the loss
24 control function.

Page 22

1  Q. You had some disagreement with that?
2  A. Yes.
3  Q. And the impact on productivity was someone
4  may have had an appointment and now they had to cancel?
5       MR. MONTGOMERY: Objection. Asked and
6   answered.
7  Q. Is that correct?
8  A. Yes.
9  Q. Other than accessibility, how else was he
10 different than other managers?
11 A. I guess a good example would be: The number
12 of branch managers and managers that I worked for over the
13 years were people that assessed my -- when I would have my
14 performance review, they would assess my performance, we
15 would go over what my goals were and what I needed to
16 achieve, and that was, you know, the discussion during
17 performance review time.
18      With Doug, you wrote your own performance
19 review, you wrote your own goals, you went over them, and
20 he edited them or would add or delete from them, which a
21 lot of the other people did also. But at the end of my
22 performance review -- and this had never happened to me
23 before -- Doug said to me, "Okay, now it's your turn to
24 review me."

Page 23

1  Q. Okay.
2  A. "Tell me what I'm doing right, what I'm doing
3  wrong," et cetera, et cetera.
4  Q. You didn't disagree with that, did you?
5  A. I felt very uncomfortable. I didn't --
6  Q. You didn't like giving feedback to your own
7  superior?
8  A. Not in the context that he was asking for it,
9  or at least my perception he was asking.
10 Q. You felt it should be anonymous?
11 A. No. I just don't believe that I was in a
12 position to assess his performance.
13 Q. Well, did you take that opportunity to
14 express to him your concerns about his impacting
15 productivity?
16 A. Yes, I did.
17 Q. Okay.
18 A. I did take that opportunity to tell him that
19 I felt that at times he was interfering.
20 Q. Okay.
21 A. And that at times he assumed the position of
22 the manager and made me a subordinate to my own staff.
23 Q. Did he seem to listen to your comments and
24 feedback?

Page 24

1  A. Yeah.
2  Q. You don't -- did that make you uncomfortable,
3  expressing those things, to the extent that you wish he
4  hadn't asked?
5  A. Yes.
6  Q. How would you otherwise have expressed to him
7  your concerns about the way he, as you say, at times may
8  have interfered?
9  A. Before he ever asked me that, if something
10 like that would happen, I would go into his office and say,
11 "I understand this is going on." And he'd say, "Yeah."
12      And I'd say, "Well, can we discuss it?" And
13 I'd explain to him what I was trying to accomplish. But I
14 would never say to him, "Well, I think you're interfering
15 with what I do," et cetera.
16 Q. You wouldn't be that direct, but you would
17 express to him your concerns?
18 A. Yeah.
19 Q. And he would listen?
20 A. He would listen, and then he would explain
21 why he did what he did, and, again, he would explain -- a
22 number of times he would say, "When I was in Loss Control,
23 this is how we did it."
24      There was quite a bit of interference as to

Page 25

1 his days in Loss Control, which were probably 10, 15 years
2 prior. We had a totally different way of doing things. We
3 were electronic. When Doug was in Loss Control, everything
4 was handwritten. We changed coverages. We changed
5 reports. We changed the way we did things.
6     Doug readily voiced that he didn't agree with
7 that, and he didn't -- you know, in my opinion, he voiced
8 that he did not agree with the way Loss Control was being
9 run at that time; not just me, but in general, and what I
10 was doing, as a person that had a dual accountability,
11 trying to understand what Doug needed as the Regional
12 Branch Manager versus what I needed to do from the Loss
13 Control standpoint; a balance, if you will.
14   Q.   Did you ever go to anyone, such as Mr. Neary,
15 with what you complained about, what you described as
16 Doug's interference?
17   A.   Yes.
18   Q.   Who did you explain that to?
19   A.   I mentioned it to Kevin Neary, and I had
20 discussions with Diane Haggard, the HR manager, and also
21 with Steve Hernandez, who replaced Kevin Neary.
22   Q.   Did you ever talk to Tim Szerlong?
23   A.   No, I didn't.
24   Q.   When did you have discussions with Kevin

Page 26

1 Neary regarding Doug Baillie or your concerns about his
2 interference as you've described?
3   A.   I'd say within the first six months of my
4 tenure as the Regional Loss Control Manager.
5   Q.   Where did that conversation occur?
6   A.   I don't recall the physical location. It may
7 have been on the phone. It may have been when Kevin made a
8 trip to Cincinnati. But I only remember Kevin coming to
9 Cincinnati once after I assumed the position.
10   Q.   Well, within those first six months, do you
11 think there was only one conversation you had with
12 Mr. Neary regarding your concerns over Doug Baillie? Or
13 was there more than one?
14   A.   I don't recall.
15   Q.   But you believe at least one?
16   A.   Um-hmm (nodding head affirmatively).
17   Q.   Tell me the substance of the conversation as
18 best as you can recall.
19   A.   You know, I don't recall the exact words at
20 all. It was -- when I would discuss it, it would be just
21 the fact that Doug was, in my perception, assuming the
22 position of the Loss Control Manager and trying to the
23 direct the Loss Control operations in the direction he felt
24 they should go based on his previous knowledge and

Page 27

1 involvement in Loss Control.
2   Q.   What was Mr. Neary's reaction to your
3 comments?
4   A.   He tried to counsel me on how to deal with
5 that and how to deal with Doug and manage that, if you
6 will, manage my manager.
7   Q.   What counsel did he give you?
8   A.   To do kind of what I did, to explain to Doug,
9 "This is kind of the way we do things now." And in some
10 cases, I think he counseled me to avoid Doug.
11   Q.   Just do it the way you thought you should do
12 it?
13   A.   (Nodding head affirmatively). Or contact
14 him.
15   Q.   Do you know whether he ever contacted Mr.
16 Baillie on your behalf?
17   A.   I believe he did.
18   Q.   What are you basing that belief on?
19   A.   I recall at least on one occasion Doug coming
20 in to me and saying, "I talked to Kevin."
21   Q.   And what did Doug say beyond that he talked
22 -- about talking to Kevin?
23   A.   I really don't recall the conversation. I
24 recall him coming in and telling me that.

Page 28

1   Q.   Did you keep any notes or record of your
2 conversation with Mr. Neary?
3   A.   No, I didn't.
4   Q.   Do you recall whether you kept any notes or
5 records of any of your conversations with Mr. Baillie in
6 which you expressed concerns about how you felt he may be
7 interfering in your duties as Loss Control Manager?
8   A.   No, I don't.
9   Q.   Other than what you've described, are there
10 any other times that you spoke to Mr. Neary regarding Mr.
11 Baillie's and your perception that he was interfering in
12 your duties as Loss Control Manager?
13       MR. MONTGOMERY: Objection. Asked and
14   answered.
15   Q.   Go ahead.
16   A.   Other than what I said to you before, no.
17   Q.   And that was within about the first six
18 months?
19   A.   That's my recollection, yes.
20   Q.   All right. Now, Mr. Baillie served as your
21 Region Branch Manager for over two years, correct?
22   A.   Yeah, from the time I got there until he
23 left, whatever that time period was.
24   Q.   So, other than that first six months, to the

### Page 29

1 best of your recollection, there was no other times you
2 talked with Mr. Neary about your concerns regarding Mr.
3 Baillie?
4    A.  To the best of my knowledge.
5    Q.  And during this period of time, the
6 performance indicators for your department improved?
7    A.  Yes.
8    Q.  You also indicated that you mentioned this to
9 Diane Haggard. For the record, who is Diane Haggard?
10    A.  Diane Haggard is the Human Resources Manager
11 in the Cincinnati branch.
12    Q.  Was she in that capacity or position when you
13 arrived in November of '99?
14    A.  Yes.
15    Q.  Do you know when you first mentioned to Diane
16 Haggard your concerns regarding Doug Baillie?
17    A.  I would say in the same time frame, early in
18 that first six months.
19    Q.  Other than that first six months, is that the
20 last time, then, that you would have mentioned anything to
21 Ms. Haggard regarding your concerns of Doug Baillie?
22    A.  No.
23    Q.  There were other times?
24    A.  There were other times.

### Page 30

1    Q.  Let's talk about that first six months. What
2 did you and Ms. Haggard discuss about Mr. Baillie during
3 that first six months?
4    A.  Again, my frustrations that Doug was
5 interfering with my ability to manage the group and
6 countermanding things that I had done with individuals and
7 was directing things. I would have some of the staff come
8 to me and say, "Well, Doug called me in his office and told
9 me he wanted to do this."
10       My experience in the past has always been, if
11 someone within a manager's staff -- if someone within my
12 staff, the branch manager or superior of mine, wanted them
13 to do something, that they would come through me as the
14 manager and say, "Here's what I'd like to do. Who do you
15 suggest? Or, "Can we use so and so to do this?" Doug
16 didn't do that. He went directly to them and bypassed me,
17 and I voiced that to Diane.
18    Q.  What was her reaction to what you told her?
19    A.  She would, again, kind of counsel me as to,
20 you know, making sure that I -- that I, you know, took care
21 of that with my staff myself. And I know, on a number of
22 occasions, she talked to Doug about voicing my concerns to
23 her.
24    Q.  Did things seem to improve after you spoke

### Page 31

1 with Ms. Haggard?
2    A.  I would say they stayed the same. I wouldn't
3 say they improved.
4    Q.  No worse?
5    A.  No.
6    Q.  How frequently would you -- how frequently
7 would you assess that Mr. Baillie somehow interfered in
8 your duties as Loss Control manager? Once a month? Twice
9 a month?
10    A.  I think it varied. There would be times that
11 it would be more often than not. I couldn't say, "Oh, it's
12 once a month or twice a month." There were times when, for
13 weeks at a time, it was very frustrating, and then I can
14 tell you there were times that, for a month, there was
15 nothing.
16    Q.  Okay.
17    A.  So there's not a frequency that you can say
18 it happened every other week or something.
19    Q.  There's no average that you could state?
20    A.  Oh, sure. I'll say -- at least every other
21 week, I would say. It would depend on the activity.
22    Q.  Was that during -- was that throughout the
23 entire period of time that Doug served as your regional
24 branch manager?

### Page 32

1    A.  Yes, I would say so.
2    Q.  You indicated you talked to Ms. Haggard
3 during this first six months. How many conversations did
4 you have with her during the first six months regarding
5 your concerns over Doug Baillie?
6    A.  I don't recall the specific number.
7    Q.  After the six months, did you have further
8 conversations with Ms. Haggard regarding concerns you had
9 about Doug Baillie?
10    A.  Yes.
11    Q.  Tell me when those occurred.
12    A.  Again, periodically, when a frustration
13 reached, or Doug had done something that was just, you
14 know, in my mind totally off base and I didn't know who to
15 go to, I would always look at Human Resources as a
16 resource, again, to go to explain these things and get
17 counsel, et cetera.
18    Q.  Give me some specific complaints that you
19 made to Ms. Haggard about Doug Baillie.
20    A.  I went to Diane about an incident where he,
21 Doug, had gone to an insured meeting with an underwriter
22 and made commitments for me and my staff that we couldn't
23 keep because they were -- they weren't what we were
24 currently doing in Loss Control. And I found out after the

Page 33

1  fact, not through Doug, that he had made those commitments,
2  and I went to Diane about that.
3      Q.  What were the commitments?
4      A.  Commitments for service. To be honest with
5  you, I can't remember the specific account or what those
6  commitments were today. It's been awhile, but they were
7  specific commitments for service and --
8      Q.  Were you present during the meeting?
9      A.  No.
10     Q.  So you're saying that Mr. Baillie made some
11 commitments or made -- gave the customer expectation that
12 your department could not meet?
13     A.  Yes.
14     Q.  How did you learn of this?
15     A.  One time I learned of it through the
16 underwriter.
17     Q.  I'm talking about this time. I'm talking
18 about this --
19     A.  This one I learned from the underwriter.
20     Q.  From the underwriter?
21     A.  Yeah.
22     Q.  Who was the underwriter?
23     A.  I don't recall which underwriter it was, I'll
24 be honest with you.

Page 34

1      Q.  Do you recall what the underwriter told you?
2      A.  Yeah. They came over and told me that Doug
3  had, or that we -- they went to this meeting with this
4  insured, and that commitments were made for -- again, I
5  don't know the specific services, that we had to perform
6  these specific services, and they wanted to know who was
7  going to do it and when we were going to do it.
8          And I looked at them and said, "I have no
9  idea what you're talking about. What happened? What are
10 you talking about? And they said, "Well, we were at the
11 meeting and Doug told so and so," again, whoever it was,
12 "that you guys would do this, this, and this."
13         And I said, "I'm going to have to go ask
14 Doug," I said, "because I don't know anything about it.
15 Oh, by the way, no, we didn't do that."
16     Q.  Did you go talk to Doug?
17     A.  I did.
18     Q.  What was his -- what was the comments he
19 made? What was your discussions?
20     A.  I told him that the underwriter had come to
21 me and mentioned that at this meeting this was discussed
22 and these were things that were committed to, and he said
23 yes. And I said, "Doug, we don't do that," and I explained
24 to him why and what to do, again what the rules and

Page 35

1  outstanding procedures were in Loss Control.
2          And he said, "Well, back when I was in Loss
3  Control, we did those kind of things." He would always go
4  back to, "When I was in Loss Control," and, "That's what's
5  wrong with Loss Control today."
6          And I'd say, "Doug, I hear you, but -- I did
7  say to him a couple of times, "Doug, Loss Control is
8  different today than when you were in Loss Control and we
9  can't do everything that way. It's changed and I have
10 obligations and commitments and requirements to Kevin Neary
11 or Steve Hernandez or other people," or, "I don't have the
12 resources or the people to be able to do those things, and
13 we don't do those things anymore."
14         I never felt that I got a -- he never -- I
15 don't recall him ever saying to me, "Okay, Mike, I
16 understand." It was always, "Well, that's what's wrong
17 with Loss Control."
18     Q.  Did he require that you make these
19 commitments or fulfill the commitments anyway?
20     A.  He wanted us to do the best we can --
21     Q.  Okay.
22     A.  -- to try and do some of it. I think --
23     Q.  Were you able to accomplish some of the -- or
24 meet some of the customer's expectations?

Page 36

1      A.  Again, not knowing the specifics of what they
2  were, I couldn't tell you specifically, yeah, we did, or,
3  no, we didn't. I just --
4      Q.  When did this incident occur, if you recall?
5      A.  I don't know a specific date or time.
6      Q.  Do you know if this was a new customer, or
7  was it an existing customer?
8      A.  I believe it was an existing.
9      Q.  But you yourself were not at the meeting?
10     A.  No.
11     Q.  I think I asked you about what complaints did
12 you make to Ms. Haggard about Mr. Baillie, and you've
13 described this one incident. What was her reaction to what
14 you told her?
15     A.  I believe she -- she listened, she
16 understood, and tried to understand better what was going
17 on and what we were doing and why things were wrong. I
18 don't know that she ever -- I mean, she didn't give me any
19 feelings and say, "Oh, yeah, there he goes again," or
20 something. I never got that. You know, she listened. I
21 know she recorded a lot of different things, and, again,
22 she would counsel me to, you know, "Well, do the best you
23 can," or, "Have this conversation with Doug," or, "I'll
24 have a conversation with Doug about it." But she never --

### Page 37

1 you know, I don't recall anything specific.
2   Q.   You don't recall her ever coming back to you
3 and giving you any feedback about what she may have done?
4   A.   I don't recall, no.
5   Q.   Okay. Other than this one complaint, were
6 there any other complaints that you made to Ms. Haggard
7 about Mr. Baillie?
8   A.   Again, I think over the two-year period,
9 whatever it was, I would say probably on a quarterly basis
10 I would go in, yeah, and voice my frustrations on Doug's
11 what I perceived as interference and my being able to do my
12 day-to-day work.
13   Q.   Do you remember any specific complaints or
14 incidents, other than just this kind of general frustration
15 you've expressed?
16   A.   Yeah. I mean, frustration with him coming
17 over and coming to one of my staff members and saying,
18 "Okay, I want you to do this and you do this survey at such
19 and such time," or asking a staff person to do a project or
20 get him some information, unbeknownst to me. Yeah, those
21 are some of the specific things I went to her about."
22   Q.   So he utilized your staff on occasions when
23 you felt he should have gone through you?
24   A.   Yes.

### Page 38

1   Q.   Do you know when he approached those staff if
2 you were there in the office, if you were available at the
3 moment?
4   A.   Yes, sometimes I was. There might have been
5 a time that I wasn't. I don't recall each incident, but
6 there were -- yes, there were times when I was in the
7 office, because the staff member would come to me after the
8 fact and say, "I just saw Doug and he pulled me in his
9 office and told me to do so and so."
10   Q.   Were these staff persons who worked only for
11 you?
12   A.   Yes.
13   Q.   Okay. So they were staff persons within the
14 Loss Control Department?
15   A.   Yes.
16   Q.   And they reported directly to you?
17   A.   Yes.
18   Q.   Did they ever perform functions that were
19 outside of your department?
20   A.   No.
21   Q.   Did you find that unusual, that Doug would on
22 occasion ask the staff person in your department to perform
23 some task?
24   A.   Tasks that had to do with Loss Control, yes.

### Page 39

1 I never had Doug ask a staff member to perform a task
2 outside of the Loss Control Department. So they were
3 performing tasks that had a loss control function.
4   Q.   Your objection was he went directly to them
5 instead of to you?
6   A.   In my education, in my experience, all of
7 those things that he was asking were always directed and
8 managed by the local Loss Control Manager, not the Branch
9 Manager.
10   Q.   Other than what you've described as this one
11 incident with the meeting with the insured and an
12 underwriter, and you've expressed on a few occasions,
13 apparently, that he would go directly to a staff person and
14 ask them to do something without going through you first,
15 are there any other incidents or complaints that you can
16 recall you made to Diane Haggard regarding Mr. Baillie's
17 interference?
18       MR. MONTGOMERY: Objection. I think you did
19   misstate the record. There were other topics that
20   he did bring up. I'm not going to repeat them. I'm
21   not trying to coach him, but I think there were
22   other topics brought up that are on the record.
23   Q.   Let me put it a different way. Other than
24 what you already described on the record, are there any

### Page 40

1 other incidents or complaints that you made regarding Mr.
2 Baillie?
3   A.   I don't recall anything specific that I
4 considered -- there's only one incident that I can recall
5 as being on an agency call with another manager,
6 underwriting manager.
7   Q.   You were on an agency call?
8   A.   With another underwriting manager.
9   Q.   Okay.
10   A.   Doug was not with us.
11   Q.   Okay.
12   A.   And this particular agent, unsolicited, had
13 mentioned about what a good party person Doug was and about
14 his drinking prowess. Neither of us commented or said
15 anything. When we left, I recall that manager saying to me
16 that he felt embarrassed to go to an agency and the thing
17 that they recall most about the branch manager is how he
18 partied. I don't recall if I ever discussed that with
19 Diane or not. That's an incident I remember happening.
20   Q.   This was an agent --
21   A.   Yes.
22   Q.   -- who expressed this?
23   A.   Um-hmm (nodding head affirmatively).
24   Q.   Male or female?

Page 41

1   A. Male.
2   Q. Do you remember who the agent was?
3   A. No, I do not.
4   Q. Do you remember the name of the agency?
5   A. No, I don't.
6   Q. Do you know when this incident occurred? '99? 2000? 2001?
8   A. I'm going to say 2000.
9   Q. Who was the underwriting manager that you were with?
11  A. Dave Corry.
12  Q. Corry?
13  A. Yes.
14  Q. How does Mr. Corry spell his name?
15  A. C-O-R-R-Y.
16  Q. Did the agent express where he had observed Doug's partying?
18  A. He was not specific about an incident or a time or where or what they were doing or whatever.
20  Q. Was this at some type of social function that Chubb would hold for the agents?
22  A. That we were at?
23  Q. Right.
24  A. No. We were just on a call.

Page 42

1   Q. You were on a call?
2   A. Yes.
3   Q. I'm talking about the agent. Did he express the context in which he expressed his opinion that Doug seemed to be a partier?
6   A. No, he didn't.
7   Q. Did he say anything like at a golf outing or a business dinner?
9   A. He wasn't specific at all. He just made that comment in passing, and again unsolicited.
11  Q. Did he express any other -- did he express any other concerns at that time about Doug Baillie's performance?
14  A. Just made the comment.
15  Q. Just made the comment?
16  A. Um-hmm (nodding head affirmatively).
17  Q. Did that -- do you recall whether you all lost any business from that agent as a result?
19  A. I don't recall. I wouldn't know.
20  Q. You're not aware of any negative impact that that agent's perception may have had on the agent's dealings with Chubb?
23  A. I don't know of that, no.
24  Q. Anything else that you haven't already put

Page 43

1   into the record --
2   A. Not that I can recall.
3   Q. Let me finish the question.
4   A. I'm sorry. I thought you were done.
5   Q. I think you knew what I was going to ask, but let me just put it in the record. Are there any other incidents that you can recall, other than what you've already stated for the record, in which you may have complained to Diane Haggard regarding concerns you had about Doug Baillie?
11  A. Not that I can recall.
12  Q. You also indicated Steve Hernandez, that you may have mentioned concerns you had about Doug Baillie to Mr. Hernandez. Is that correct?
15  A. That's correct.
16  Q. And Mr. Hernandez was the Northern Zone Loss Control Manager after Kevin Neary?
18  A. That's correct.
19  Q. What concerns or incidents did you express to Mr. Hernandez regarding Doug Baillie?
21  A. The same concerns that I did to Kevin, that he was interfering, and at times I felt that he was controlling the department and not me.
24  Q. What was Mr. Hernandez' reaction to your

Page 44

1   comments?
2   A. He listened. He said that -- again, he gave me some ideas of doing things and making sure that -- how to keep Doug out of there and said that he would discuss with Doug my concerns, which he did.
6   Q. Did you notice any change after what you understood -- after you understood that Mr. Hernandez had talked to Mr. Baillie?
9   A. Not really.
10  Q. Didn't get worse?
11  A. Didn't get worse. Didn't get better. My opinion is that Doug listened, and then Doug continued to do what Doug did.
14  Q. Doug would listen, but apparently continued to use his own judgment?
16  A. Yes.
17  Q. Are there any incidents or complaints specifically that you haven't already expressed that you can recall that you made to Mr. Hernandez, other than this kind of general complaint about interference?
21  A. Not that I can recall.
22  Q. I think I asked you this earlier. You never had any discussions or expressed any concerns about Doug Baillie to Mr. Szerlong, did you?

Page 45

1 A. No.
2 Q. Do you know whether or not Diane Haggard ever
3 expressed or relayed any of your concerns about Doug
4 Baillie to Tim Szerlong?
5 A. I do not know.
6 Q. Do you know whether or not Kevin Neary or
7 Steve Hernandez related any of your concerns about Doug
8 Baillie to Tim Szerlong?
9 A. No, I do not.
10 Q. You expressed that, during performance
11 reviews, he would ask you for feedback on how he was doing,
12 and that that made you somewhat uncomfortable. Correct?
13 A. Correct.
14 Q. But you would use those opportunities, would
15 you not, to give him some feedback about how you felt he
16 was interfering at times with your duties?
17   MR. MONTGOMERY: Objection. Asked and
18   answered.
19 A. I -- as I -- I think I indicated before I
20 would tell him that things were different from when he was
21 in Loss Control and that there were times that I felt that
22 he was running the Department and not me, yes, I did.
23 Q. Okay. Other than this feedback component of
24 your performance reviews, how did you feel he was regarding

Page 46

1 your performance reviews? Was he fair?
2 A. Yeah.
3 Q. Did you have any particular criticism as to
4 how he conducted performance reviews, other than this
5 feedback component?
6 A. No.
7 Q. What's your educational background?
8 A. I have a high school education and some
9 college.
10 Q. How much college?
11 A. About a year.
12 Q. Where did you attend college?
13 A. Local community college.
14 Q. What's the name of it?
15 A. Community -- Community College of Allegheny
16 County, in Pennsylvania.
17 Q. Community College of Allegheny --
18 A. Allegheny County.
19 Q. -- County?
20 A. Um-hmm (nodding head affirmatively).
21 Q. Pennsylvania?
22 A. Um-hmm (nodding head affirmatively).
23 Q. What city is that?
24 A. Pittsburgh.

Page 47

1 Q. What year or quarter, or semester or year did
2 you attend?
3 A. That was back in the '80s. It was awhile
4 ago.
5 Q. Was it after high school?
6 A. No. After high school, I went into the Navy.
7 I spent 12 and a half years in the Navy and was educated in
8 nuclear power in the Navy.
9 Q. What was your last rank in the Navy?
10 A. Chief Petty Officer, E7.
11 Q. Did you receive an honorable discharge?
12 A. Yes.
13 Q. What year were you discharged?
14 A. 1979.
15 Q. Taking you back, can you recall what year you
16 would have attended college?
17 A. No. In the '80s.
18 Q. In the '80s is the best you can remember?
19 A. Yes.
20 Q. Okay. And you started with Chubb in November
21 of '86?
22 A. Yes.
23 Q. Did you ever have an occasion to attend any
24 social functions with Mr. Baillie?

Page 48

1 A. I attended a couple of March Madness
2 functions that we had during the NCA Tournament, at the
3 beginning of the NCA Tournament.
4 Q. And was this something at which agents would
5 be invited?
6 A. Agents would be there, underwriting managers,
7 underwriters.
8 Q. So it was a Chubb function?
9 A. It was a Chubb function, yes.
10 Q. And you were there to socialize with agents?
11 A. Correct.
12 Q. And persons in the marketplace?
13 A. Yes.
14 Q. How did Mr. Baillie conduct himself during
15 these March Madness functions?
16 A. I would have to say professionally. He went
17 around, he talked to different people, held conversations.
18 We had it in a local pool hall/bar situation, and we played
19 pool.
20 Q. Was he a pretty sociable guy?
21 A. Yes.
22 Q. Customers seemed to like him?
23 A. To the best of my knowledge.
24 Q. Other than these March Madness functions,

Page 49

1 were there any other social functions that you can recall
2 involving Mr. Baillie?
3   A.  We had a branch -- what did we call it?  It
4 wasn't a marketing thing.  It was a -- oh, gees, I can't
5 remember the word now.  It was a branch function where all
6 the departments presented their services, and agents would
7 come in and they could go from department to department and
8 see the different services that we had in products -- a
9 product fair is exactly what we called it.
10  Q.  Product fair?
11  A.  Yeah, one that I know of over the tenure that
12 I had.
13  Q.  How did Mr. Baillie conduct himself during
14 that product fair?
15  A.  To my knowledge, professionally.  I didn't
16 see him a lot during that process.  He was pretty much
17 traveling all around.
18  Q.  Did you ever observe any unprofessional
19 conduct by Mr. Baillie or when he did something that you
20 did not feel was in the best interest of Chubb?
21  A.  In my opinion, the unprofessional conduct
22 that I would relate to would my being -- there were a
23 couple of meetings that I was with him in with agents when
24 we were with clients where, again, he would interfere with

Page 50

1 what I was trying to do in selling loss control, and he
2 would interrupt me or say things that we could do.  And, to
3 me, that was unprofessional.
4   Q.  I understand.  Other than what you've already
5 described?
6   A.  In a social -- in a social situation?
7   Q.  Yes.
8   A.  I have not observed anything.
9   Q.  Okay.  How did you learn that Mr. Baillie's
10 employment was terminated by Chubb?
11  A.  The day that he was terminated, he came over
12 and said that he was leaving and said good-bye.
13  Q.  Where did this occur?  In the office?
14  A.  Yes.
15  Q.  Tell me what you recall about that, him
16 coming over and telling you he was leaving.  Was this a
17 meeting with the entire office?
18  A.  No.  He came to my individual office
19 personally, came in, just said that he was leaving Chubb
20 and said good-bye, and that was really the whole thing.
21  Q.  Did he say why he was leaving Chubb?
22  A.  No.
23  Q.  Did he say he had been fired or terminated?
24  A.  No.

Page 51

1   Q.  Did you ask him?
2   A.  No.
3   Q.  How long was the conversation?
4   A.  Maybe a minute or two.
5   Q.  Were you surprised at that time that he was
6 leaving Chubb?
7   A.  No, I wasn't surprised he was leaving.
8   Q.  Why not?
9   A.  I knew -- I think there was a sense
10 throughout the branch that there was tension or problems.
11 I think everybody -- even today, people look around and
12 say, "Oh, it looks like so and so might be in trouble," or
13 whatever, and it's a typical office gossip type of thing.
14 So I wasn't surprised that there were things going on.  I
15 was surprised that he got terminated, yes.
16  Q.  Okay.  Why would you say you were not
17 surprised things were going on?  What do you mean by that?
18  A.  I'm not surprised that there might have been
19 discussions with him and senior management, because we had
20 changed some of our functions.  Again, when we first --
21 when I first got there, we had a true regional setup.  Doug
22 was the regional branch manager, and there were other
23 branches or branch managers that reported to him.
24      During my tenure, we changed that

Page 52

1 arrangement, and we no longer had a true regional setup.
2 Doug was no longer, in essence, the true regional manager.
3 These other branch managers who at one time reported to him
4 were now reporting directly to the zone manager.
5   Q.  To Mr. Szerlong?
6   A.  Yes.
7   Q.  Do you know why that change was made?
8   A.  That was made corporate-wide.  I have no
9 idea.  That was a corporate decision by senior management.
10 And, to be honest with you, they didn't ask for my
11 approval.
12  Q.  Do you know if that was a corporate decision,
13 or if that was Mr. Szerlong's decision?
14  A.  That was a corporate decision.  That happened
15 on a Nationwide basis.
16  Q.  Who were the persons that would have made
17 that decision?  The CEO?
18  A.  Yeah, senior management.
19  Q.  Does that mean that all of the regions, the
20 former region managers, no longer had branch managers
21 reporting to them?
22  A.  That was my understanding, yes.
23  Q.  Not just the Northern Zone or the Ohio Valley
24 Region, but other regions?

Page 53

1   A.  That was my understanding, yes.
2   Q.  Other than what you've just described, were
3 there any other things that were going on at the time that
4 caused you to not be totally surprised when Mr. Baillie was
5 let go?
6   A.  No. I'll tell you, I didn't focus -- I tried
7 not to focus on other people's problems or ups or downs,
8 whether they be the managers, the branch managers or
9 others. I really tried to focus on what I had to do in my
10 job and trying to do it the best I can.
11   Q.  That's where your attention was directed?
12   A.  Yes.
13   Q.  Okay. Before Mr. Baillie was terminated, had
14 Ms. Haggard contacted you and asked you any questions
15 regarding Mr. Baillie's performance?
16   A.  Not that I recall.
17   Q.  Do you know if Mr. Szerlong ever contacted
18 you prior to Mr. Baillie's termination and asked you any
19 questions regarding Mr. Baillie's performance?
20   A.  No, he did not.
21   Q.  Okay. For that matter, did anyone prior to
22 Mr. Baillie's termination contact you and ask you any
23 questions concerning Mr. Baillie's performance?
24   A.  No, they did not.

Page 54

1   Q.  Since his termination, have you been involved
2 in any discussions relating to his termination?
3   A.  Not really.
4   Q.  Has there been any scuttlebutt around the
5 office about why Doug was terminated?
6   A.  Not that I can recall. I mean, there were --
7 groups of managers got together and discussed things, but I
8 don't recall ever being involved in that. To be honest
9 with you, no, I really didn't. I, again, focused on what I
10 had to do. I really didn't (did not finish).
11   Q.  As we sit here today, do you have any
12 understanding as to the reasons why Mr. Baillie was
13 terminated?
14   A.  No, I really don't.
15   Q.  Since his termination, have you had any
16 discussions with Diane Haggard regarding Mr. Baillie's
17 termination?
18   A.  No.
19   Q.  Any discussions since his termination with
20 Mr. Szerlong about Mr. Baillie's termination?
21   A.  No.
22   Q.  Have you had any conversations with Doug
23 Baillie since he was terminated?
24   A.  No.

Page 55

1   Q.  Other than the one office -- or the one
2 meeting in your office where he informed you --
3   A.  No.
4   Q.  -- have you had any communications with him
5 whatsoever?
6   A.  No.
7   Q.  Correspondence? E-mails? Telephone
8 messages?
9   A.  Nothing that I can recall.
10   Q.  So the last day you talked to Doug Baillie
11 was when he was in your office?
12   A.  That's the last thing I remember.
13   Q.  Other than Chubb's counsel, has anyone from
14 Chubb come, since his termination, and interviewed you
15 about Mr. Baillie?
16   A.  No.
17   Q.  Can you describe a little bit about the Loss
18 Control Department? And this would have been during the
19 period of time that Mr. Baillie served as the region branch
20 manager. How many direct reports did you have?
21   A.  Oh, man. I had one, two, three in
22 Cincinnati; one, two, three, four -- seven direct reports;
23 three in Cincinnati and four in Indianapolis.
24   Q.  Who were the three in Cincinnati?

Page 56

1   A.  I'm sorry. I'll correct that. There were
2 also two others in Louisville. So that would be nine.
3   Q.  Who were the three in Cincinnati?
4   A.  At that time?
5   Q.  Their positions.
6   A.  The first time when I first got there, there
7 were Tom Silbernagel, and he was a loss control rep.
8       Okay. Now I can't remember the risk
9 consultant -- Dave Dorsey. And Mark Lario, who was a loss
10 control rep. That's when I first got there. Now, this
11 staff changed over time. Okay.
12   Q.  Who were the staff persons that you felt he
13 interfered with when he would ask them to do certain tasks
14 without first coming to you?
15   A.  The two loss control reps.
16   Q.  And their names?
17   A.  Tom Silbernagel and Mark Lario.
18   Q.  Other than those two persons, were there any
19 other persons who were direct reports to you that you felt
20 he interfered with?
21   A.  No.
22   Q.  During the period that Mr. Baillie served as
23 the region branch manager, did the profitability for Loss
24 Control improve?

Page 57

1  A. We weren't a profit center.
2  Q. Fair enough.
3     MR. MONTGOMERY: So the answer is no.
4     MR. NAPIER: I think the answer is no, right.
5  Q. All right. I think before Mr. Baillie, the
6  region branch manager, was it a Mr. Reynolds?
7  A. Yeah. Bill Reynolds was his name, yes.
8  Q. Was there any time that you reported to
9  Mr. Reynolds?
10 A. No.
11 Q. Did you ever hear any criticisms regarding
12 Mr. Reynolds?
13 A. No.
14 Q. Have you heard or been told any reasons as to
15 why Mr. Baillie has brought a lawsuit?
16 A. No.
17 Q. What's your understanding as to why he's
18 brought a lawsuit?
19 A. I really don't know. I never -- it's never
20 really crossed my mind. To be honest with you, when Doug
21 left, again, I continued to concentrate on my job, worked
22 for my new managers, and really didn't concern myself with
23 any of that that was going on.
24    The first I realized there was anything going

Page 58

1  on is, when the lawsuit first came, we were all pulled in
2  the executive conference room and were told about the
3  lawsuit by Chubb's general counsel. And after that, we
4  were told not to talk to anyone. I left. I went about my
5  business. The next time I heard anything is when I got
6  called for this.
7  Q. Okay. Other than the comments made by
8  general counsel, which I'm not asking you about, no one
9  else ever came up to you and wanted to discuss the lawsuit?
10 A. No.
11 Q. Ms. Haggard never discussed the lawsuit with
12 you?
13 A. No.
14 Q. Mr. Szerlong never discussed the lawsuit with
15 you?
16 A. No.
17 Q. Who is the current region branch manager?
18 A. Jerry.
19 Q. Butler?
20 A. Butler.
21 Q. All right. A lot of names.
22 A. Yeah.
23 Q. How is Mr. Butler as a boss?
24 A. I don't work for Jerry. I see Jerry in the

Page 59

1  office in passing, and I really --
2  Q. Less interaction than you and Mr. Baillie
3  had?
4  A. Yeah. I guess the biggest difference that's
5  noticeable is that Doug was always there. Sometimes when
6  you didn't want him there, he was there.
7  Q. There, meaning physically?
8  A. Physically there.
9  Q. In the office?
10 A. In your office, involved in something or
11 whatever. Let me put it this way. Jerry -- what I see
12 Jerry doing is typical of what I've seen other branch
13 managers do in the 16 years that I have been with Chubb,
14 which is consistent. Doug's was inconsistent with what I
15 was used to.
16 Q. And that's in terms of his interference, as
17 you perceived --
18 A. Yes.
19 Q. -- in your loss control function?
20 A. Right.
21    MR. NAPIER: Why don't we take a few minutes
22 break. I think I'm about done.
23    (At which time a brief recess was taken from
24    2:26 p.m. until 2:30 p.m.)

Page 60

1     MR. NAPIER: All right. Why don't we go back
2  on the record.
3  Q. We talked earlier about whether or not you
4  made any complaints or expressed any concerns about Doug
5  Baillie, and you mentioned Mr. Neary, Ms. Haggard,
6  Mr. Hernandez, never to Mr. Szerlong. Did you also
7  complain or express concerns to Mr. Ekdahl?
8  A. Yeah. I recall talking to Jim Ekdahl.
9  Q. Who is Jim Ekdahl?
10 A. Jim Ekdahl is the Zone Human Resources
11 Manager.
12 Q. When did you talk to Mr. Ekdahl regarding
13 Doug Baillie?
14 A. When he made a branch visit. Periodically,
15 he would make branch visits to the branches in the zone.
16 And I don't recall the specific month or time, but I know
17 it was during one of his branch visits to the zone. He
18 would come to each manager and discuss with each manager
19 what was going on, did they have any, you know, problems,
20 complaints, anything they needed to talk to him about,
21 whatever. And I believe what I expressed to him was that I
22 had been talking to Diane about my concerns with Doug.
23 Q. Did you elaborate on what those concerns
24 were?

Page 61

1   A.  I don't recall.
2   Q.  Where did that conversation take place?
3   A.  I believe in my office.
4   Q.  And this was -- you mentioned this just
5   during a conversation with him when he solicited from you
6   any concerns that you had?
7   A.  Yes.
8   Q.  But you didn't go into any details?
9   A.  Not to my recollection.
10  Q.  Do you know when that branch visit occurred?
11  A.  No, I don't.
12  Q.  Do you know what year?
13  A.  I would say it's -- he came -- he came in
14  2000 and 2001. He would visit each year.
15  Q.  Do you recall whether this was in the first
16  half of Doug Baillie's tenure or the second half?
17  A.  I don't recall.
18  Q.  Was anyone else present during that
19  conversation?
20  A.  No.
21  Q.  Anything else about the conversation that you
22  can recall sitting here today, other than what you've
23  already expressed?
24  A.  No.

Page 62

1   Q.  Did Mr. Ekdahl ever get back to you in
2   response to any comments you may have made to Mr. Baillie?
3   A.  No.
4   Q.  Did Ms. Haggard ever follow up or say to you
5   that she had talked to Mr. Ekdahl regarding Doug Baillie?
6   A.  Not to my knowledge.
7   Q.  Other than those persons, including
8   Mr. Ekdahl, was there anyone else that you ever expressed
9   concerns or complaints to regarding Doug Baillie?
10  A.  Not to my recollection.
11  Q.  Other than these branch visits by Mr. Ekdahl,
12  were there other occasions when you would come in contact
13  with him?
14  A.  If I made a trip to Chicago. But when I was
15  in a regional position I never went to Chicago. The only
16  other time I would see him is -- and in a zone position,
17  I'd go to Chicago, and I'd see him then, but (did not
18  finish) --
19  Q.  When you worked for Mr. Baillie, or Mr.
20  Baillie was the manager of the Cincinnati branch, did you
21  ever go to Chicago to speak with Ekdahl?
22  A.  Not to my knowledge.
23  Q.  Are you aware that Chubb has a severance
24  policy?

Page 63

1   A.  Yes.
2   Q.  Have you ever been involved in offering
3   severance agreements to any employees?
4   A.  No.
5       MR. NAPIER: All right. Thank you. I don't
6   think I have any other questions. Thanks for
7   coming.
8       MR. MONTGOMERY: We would like the
9   opportunity to review and sign.
10
11
12              MICHAEL ZDINAK
13
14                  - - -
15      DEPOSITION CONCLUDED AT 2:37 P.M.
16                  - - -

Page 64

1
2                C E R T I F I C A T E
    STATE OF OHIO    :
3                    : ss
4   COUNTY OF HAMILTON :
5       I, Raymond E. Simonson, RMR, CRR, the
6   undersigned, a duly qualified and commissioned notary
7   public within and for the State of Ohio, do hereby certify
8   that, before the giving of his aforesaid deposition,
9   MICHAEL ZDINAK was by me first duly sworn to depose the
10  truth, the whole truth, and nothing but the truth; that the
11  foregoing is the deposition given at said time and place by
12  MICHAEL ZDINAK; that said deposition was taken in all
13  respects pursuant to stipulations of counsel hereinbefore
14  set forth; that I am neither a relative of nor employee of
15  any of their counsel, and have no interest whatever in the
16  result of the action.
17      IN WITNESS WHEREOF, I hereunto set my hand
18  and official seal of office at Cincinnati, Ohio, this
19          day of              2003.
20
21
    My commission expires:    Raymond E. Simonson, RMR, CRR
22  June 22, 2008             Notary Public - State of Ohio
23
24