Page 1

```
1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                    WESTERN DIVISION

4

5    ------------------------------

6    DOUGLAS W. BAILLIE,              :

7              Plaintiff,            :
          vs.                        :    CASE NO.
8                                    :    C-1-02-062
     CHUBB & SON INSURANCE,          :
9                                    :
              Defendant.             :
10   ------------------------------

11

12

13

14   DEPOSITION OF:   DIANE R. HAGGARD

15   TAKEN:           By The Plaintiff

16   DATE:            June 20, 2003

17   TIME:            Commencing at 1:59 p.m.

18   PLACE:           Offices of:
                      Freking & Betz
19                    215 East Ninth Street
                      Fifth Floor
20                    Cincinnati, Ohio  45202

21   BEFORE:          Theresa Lynn Westfelt
                      Court Reporter
22                    Notary Public - State of Ohio

23

24
```

**COMPUTER DISK**

Page 2

```
1    APPEARANCES:

2

3         On behalf of the Plaintiff:

4              RANDOLPH H. FREKING, ESQ.
                    and
5              MARK W. NAPIER, ESQ.
                    of
6              Freking & Betz
               215 East Ninth Street
7              Fifth Floor
               Cincinnati, Ohio  45202
8

9         On behalf of the Defendant:

10             DAVID K. MONTGOMERY, ESQ.
                    of
11             Keating, Muething & Klekamp PLL
               1400 Provident Tower
12             One East Fourth Street
               Cincinnati, Ohio  45202
13

14        Also Present:  Jane Hughes, Law Clerk

15

16                  - - -

17

18          S T I P U L A T I O N S

19        It is stipulated by and between counsel for

20   the respective parties that the deposition of DIANE R.

21   HAGGARD, a witness herein, may be taken at this time by

22   Counsel for the Plaintiff as upon cross-examination

23   pursuant to the Federal Rules of Civil Procedure; that the

24   deposition may be taken in stenotypy by the notary
```

Page 3

```
1    public-court reporter and transcribed by her out of the

2    presence of the witness; that the transcribed deposition

3    is to be submitted to the witness for her examination and

4    signature, and that signature may be affixed out of the

5    presence of the notary public-court reporter.

6

7                    I N D E X

8    DIANE R. HAGGARD                           PAGE

9    CROSS-EXAMINATION BY MR. FREKING            5

10   EXAMINATION BY MR. MONTGOMERY               -

11

12                   EXHIBITS

13   Haggard Deposition No.    Page        Referenced

14        1                    148         (See below)

15

16              DOCUMENTS REFERENCED

17   Bates Stamp No.                        Referenced

18     CIC 1348                               117

19     CIC 1351 - 1354                        118

20     CIC 1355                            123, 161

21     CIC 1329 - 1334                        140

22     CIC 1335                               142

23     CIC 1337                               145

24     CIC 1338                               145
```

Page 4

```
1         DOCUMENTS REFERENCED (Continued)

2    Bates Stamped                          Referenced

3      CIC 1339                               147

4      CIC 1341                               147

5      CIC 1342                               149

6      CIC 1388                               148

7      CIC 1345                               151

8      CIC 1350                               153

9      CIC 1356                               153

10     CIC 1372                               154

11     CIC 1373                               157

12     CIC 1376                            159, 161

13     CIC 1377                               161

14     CIC 1378                               161

15     CIC 1382                               161

16     CIC 1383                               162

17     CIC 1384                               163

18     CIC 1385                               166

19     CIC 1386                               167

20     CIC 1388                               168

21

22              COUNSEL REQUEST

23             Page 32 and 36

24
```

**Page 5**

DIANE R. HAGGARD

1 of lawful age, a witness herein, being first duly sworn as
2 hereinafter certified, was examined and deposed as
3 follows:

4 

5            CROSS-EXAMINATION

6 BY MR. FREKING:

7     Q. Diane, could you please start the deposition
8 by please stating your full name, your current home
9 address, and your current home telephone number, please?
10     A. Diane, D-I-A-N-E, Ruth, R-U-T-H, Haggard,
11 H-A-G-G-A-R-D. And my address is ████████████
12 
13     Q. Whereabouts is that?
14     A. Blue Ash.
15     Q. And what is your home telephone number in
16 case -- the only reason we ask you for your home telephone
17 number is if for some reason you would leave Chubb by the
18 time we have a trial or something, we can't get you.
19 We'll go through Mr. Montgomery otherwise.
20     A. Okay. It's ████████████
21     Q. And are you married?
22     A. Yes.
23     Q. Your spouse's name?
24     A. David.

**Page 6**

1     Q. Does he have anything to do with Chubb, does
2 he work for Chubb or anything like that?
3     A. No.
4     Q. Do you have children?
5     A. Yes.
6     Q. I assume you don't have any children that
7 are employed by --
8     A. No.
9     Q. -- Chubb?
10     A. No.
11     Q. Not quite yet?
12     A. No.
13     Q. All right. What is your date of birth?
14     A. ████████
15     Q. Oh, that's interesting. And are you still
16 employed by Chubb?
17     A. Yes.
18     Q. Okay. Well, we briefly met, but my name is
19 Randy Freking, along with Mark Napier and others, we
20 represent Doug Baillie in connection with a lawsuit that's
21 been filed here in Federal District Court in Cincinnati.
22 And we're here today to take your deposition to find out
23 -- we're going to ask you a bunch of questions today about
24 facts which may or may not be relevant to Mr. Baillie's

**Page 7**

1 lawsuit.
2     There's a few basic rules for the
3 deposition, Diane. First of all, Theresa, as good as she
4 is, will not guess what you mean if you make any nonverbal
5 responses like a head shake or something like that. All
6 your responses today have to be verbal in order to be
7 recorded; is that okay?
8     A. Uh-huh (nodding head affirmatively), yes.
9     Q. Also, it's your deposition, it's not my
10 deposition, it's not Mr. Montgomery's deposition, it's not
11 Mr. Napier's deposition, it's not Jane Hughes' deposition,
12 so if you ever want to take a break for personal comfort
13 or otherwise, just tell us, we'll be happy to accommodate
14 that. The only caveat we'll place on that is we ask that
15 you take any break when there's not a question pending on
16 the floor, answer whatever question's on the floor, unless
17 you need to consult with Mr. Montgomery.
18     A. Okay.
19     Q. Okay. And, then, if you answer a question,
20 we're going to assume that you understand all the words or
21 terms we use, so if you don't understand a question,
22 please let us know --
23     A. Okay.
24     Q. -- all right? I'll be happy to rephrase or

**Page 8**

1 reword any question if you're confused or just
2 misunderstand something, okay?
3     A. Okay.
4     Q. All right. It seems to me there's something
5 else, but we'll cross that bridge when we come to it.
6     Have you ever had your deposition taken
7 before?
8     A. Not in this sort of case, no.
9     Q. So you've had a deposition taken, but kind
10 of in a nonwork-related situation?
11     A. I was an underwriter before I was in HR and
12 it was an account that I didn't write but had a claim
13 pending and they took my deposition at that time.
14     Q. Okay. Were you working for Chubb at the
15 time?
16     A. Yes.
17     Q. And what year was this in?
18     A. I don't recall.
19     Q. Do you remember what decade it was in?
20     A. It was in the '90s.
21     Q. What is your employment history with Chubb,
22 let's start with that?
23     A. All right. I started in January of 1991 as
24 a Commercials Lines underwriter in Chicago and I moved

Redacted

Page 9

1 over to manage the Energy Department while still in
2 Chicago. Moved to Cincinnati in 1996 as a Commercials
3 Lines and Energy underwriter. Moved on to manage the
4 Energy Department for about 12 branches. And about two,
5 three years ago, took over the HR Manager role.
6    Q.  When did you become the Manager of the
7 Energy Line in Chicago, approximately?
8    A.  Approximately 1994.
9    Q.  That was a promotion?
10   A.  Uh-huh (nodding head affirmatively).
11   Q.  Did you go to Chubb straight out of college?
12   A.  No, I did not. I started with Great
13 American Insurance right out of college.
14   Q.  Okay. Have you ever had any training in EEO
15 law?
16   A.  No.
17   Q.  What was your degree in from college?
18   A.  It was a double major in marketing and
19 management.
20   Q.  Have you ever had any kind of training in
21 the subject of stereotyping people?
22   A.  Could you give me a little bit more? I
23 don't really understand.
24   Q.  Okay. Have you ever heard the term

Page 10

1 "stereotype" before?
2    A.  Sure, yes.
3    Q.  Do you have an understanding as to what that
4 means?
5    A.  Yes.
6    Q.  Okay. What does it mean to stereotype
7 someone?
8    A.  To take everyone and put them in -- or not
9 everyone, but take some specific groups of people based on
10 gender, race, that sort of thing, and assume that they're
11 all the same.
12   Q.  Like common stereotype of a woman might be a
13 woman is going to be more interested in her family than
14 her job, something like that?
15   A.  Sure.
16   Q.  Okay. Have you ever had any kind of
17 training in understanding stereotypes?
18   A.  No, not really.
19   Q.  Any training in recognizing stereotypes?
20   A.  Not that I recall.
21   Q.  Okay. When you became an HR, had you had
22 any prior HR experience --
23   A.  No.
24   Q.  -- prior to getting that job?

Page 11

1    A.  No.
2    Q.  What year was it that you came into HR in
3 Cincinnati for Chubb?
4    A.  Can I approximate?
5    Q.  Approximate.
6    A.  Is that all right?
7    Q.  Yes, that's fine.
8        MR. MONTGOMERY: Just so long as you
9    indicate that it is an approximation.
10       THE WITNESS: It is.
11   A.  This is an approximate; it's about three
12 years ago.
13   Q.  So sometime in the calendar year 2000, you
14 think?
15   A.  Yeah, early -- maybe February. I know it
16 was in February, so it would be February, 2000 -- no,
17 February, 1999. Yeah, that sounds about right.
18   Q.  Okay. Was that a promotion, a demotion, or
19 a lateral move?
20   A.  Lateral.
21   Q.  Did your pay remain the same approximately?
22   A.  I believe since it was end of February it
23 fell right within my merit time, so I did receive a merit,
24 not a promo.

Page 12

1    Q.  Based on your performance previously?
2    A.  Right.
3    Q.  Okay. Did you lose any eligibility for
4 stock options or bonus plans or incentive plans or
5 anything like that that you otherwise would had by going
6 into HR?
7    A.  No.
8    Q.  What was your title when you came in HR?
9    A.  Regional -- when I went -- the HR title?
10   Q.  Yeah, the HR title.
11   A.  Regional HR Manager.
12   Q.  So previous to becoming Regional HR Manager,
13 you had no previous HR or employee relations experience?
14   A.  That's right.
15   Q.  How long have you known Mr. Baillie, do you
16 think?
17   A.  Well, he was with Chubb about three years,
18 so when he started to his departure date I knew him.
19 Never before or after.
20   Q.  Do you know from preparing for this
21 deposition today, his departure date was around September
22 of 2001?
23   A.  Correct.
24       MR. MONTGOMERY: Just I would ask you to

Case 1:02-cv-00062-SAS    Document 44-2    Filed 09/15/2003    Page 4 of 44

Page 13

1  take out "preparing for this deposition." I think
2  it is privileged. Either she knows it or she
3  doesn't.
4      MR. FREKING: I guess you're suggesting she
5  learned that from you, otherwise it wouldn't be
6  privileged.
7      MR. MONTGOMERY: No, I'm just saying if you
8  could just change the question I wouldn't have to
9  object to it. If she knows it, she knows it. I
10  just don't want you to ask what she learned during
11  the preparation of her deposition, which was, in
12  fact, privileged.
13      MR. FREKING: Okay.
14      Q.  What did you do to prepare for the
15  deposition today?
16      A.  What did I do?
17      Q.  Uh-huh.
18      A.  I met with David Montgomery.
19      Q.  Okay. And without divulging anything Mr.
20  Montgomery told you during that preparation meeting, can
21  you tell us where the preparation meeting occurred?
22      A.  In David Montgomery's office.
23      Q.  Okay. Do you know when it was?
24      A.  Yesterday.

Page 14

1      Q.  Do you recall approximately how long the
2  meeting lasted?
3      A.  Two hours.
4      Q.  Did you do anything else to prepare for the
5  deposition?
6      A.  No.
7      Q.  No thinking about it, no review of documents
8  outside Mr. Montgomery's presence, no speaking with Mr.
9  Zerlong, or anybody else, period?
10      A.  I told Jim Ekdahl that my deposition was
11  today.
12      Q.  Okay.
13      A.  (Continued) I told Jerry Butler that my
14  deposition was today.
15      Q.  Okay.
16      A.  (Continued) That's about it.
17      Q.  That's all you did to prepare for the
18  deposition, other than your meeting with Mr. Montgomery?
19      A.  (Nodding head affirmatively). Yes.
20      Q.  There we go. There's an example of one of
21  those nonverbal -- it's too easy to do.
22          In your role as Regional HR Manager -- do
23  you still have the same title you got when you came on
24  board in February of 1999?

Page 15

1      A.  Yes.
2      Q.  And what is the region we're talking about
3  that you are the Regional VP of -- or Regional Manager of?
4      A.  Now or then?
5      Q.  Well, are they different?
6      A.  Yes.
7      Q.  Same title, but different regions?
8      A.  Yes.
9      Q.  Okay. Well, let's do them both, then and
10  now.
11      A.  Okay. Then it was Cleveland, Columbus,
12  Cincinnati, Louisville, and Indianapolis.
13      Q.  Okay. Did that region have a name?
14      A.  The Ohio Valley Region.
15      Q.  Okay. Is Ohio a big valley or something? I
16  never understood that. I don't know. How about now,
17  what's what your region now?
18      A.  Now it is Cincinnati, Columbus, and
19  Louisville, known as the Cincinnati Region.
20      Q.  And how long has that been known as the
21  Cincinnati Region? Or when did this change take place
22  from the Ohio Valley to Cincinnati Region?
23      A.  My change in responsibility?
24      Q.  Well, did the region change or did your

Page 16

1  scope of responsibility simply become more smaller?
2      A.  My scope became smaller.
3      Q.  Is there still an Ohic Valley Region?
4      A.  No.
5      Q.  Do you recall -- strike that. Is Cleveland
6  part of a different region now?
7      A.  No.
8      Q.  What region is Cleveland a part of?
9      A.  There is no more regions.
10      Q.  There's no more regions. I thought you said
11  now you're in charge of the Cincinnati Region?
12      A.  From a perspective of administrative and
13  reports, there is a Cincinnati Region. From a matter of
14  reporting structure, there is no more regions.
15      Q.  Okay. And when did your duties get
16  redefined that you were just responsible for Cincinnati,
17  Columbus, and Louisville, approximately?
18      A.  Approximately first quarter of 2002.
19      Q.  After Mr.--
20      A.  And that's an approximate.
21      Q.  After Mr. Baillie was fired?
22      A.  Yes.
23      Q.  Do you recall -- at the time Mr. Baillie was
24  fired, do you know who your boss was?

Page 17

1   A.   At the time he was fired?
2   Q.   Uh-huh.
3   A.   He was.
4   Q.   Okay. Did you have any other reporting
5 relationship other than directly to Mr. Baillie?
6   A.   A dual accountability to Jim Ekdahl, who's
7 the Northern Zone HR Manager.
8   Q.   What does that mean, "dual accountability"?
9   A.   That means that there's a dotted line, Jim
10 is involved in creating my performance evaluation, he is
11 responsible for the HR practice, and Doug was more of the
12 business side of the Cincinnati Branch and Region, that
13 sort of thing.
14   Q.   Did you have a dotted-line relationship with
15 Mr. Baillie or --
16   A.   Direct. He was my direct supervisor.
17   Q.   Okay. So not a dotted-line reporting
18 relationship to him?
19   A.   Right.
20   Q.   But a dotted line to Ekdahl?
21   A.   Right.
22   Q.   Did you have a dotted-line relationship to
23 anyone else?
24   A.   No.

Page 18

1   Q.   Now, are you familiar at all with the
2 negotiations that surrounded the severance package offered
3 to Mr. Baillie in September of 2001?
4   A.   No, I wasn't involved in that.
5   Q.   Were you at all -- were you familiar with
6 the fact -- strike that.
7       Did you know Mr. Baillie was going to get
8 fired before he got fired or after?
9   A.   Before.
10   Q.   And who told you that Mr. Baillie was going
11 to get fired?
12   A.   Jim Ekdahl.
13   Q.   And do you recall how Mr. Ekdahl
14 communicated this to you? You know, was it via e-mail,
15 phone, in person?
16   A.   Telephone.
17   Q.   How far in advance of -- were you aware of
18 the fact that Mr. Zerlong came in on a Friday afternoon, I
19 believe, and met with Mr. Baillie and terminated him on a
20 Friday afternoon?
21   A.   Yes.
22   Q.   Okay. How far in advance of Mr. Baillie
23 being told by Mr. Zerlong that he was being fired do you
24 believe you were told by Mr. Ekdahl it was going to

Page 19

1 happen?
2   A.   Approximately?
3   Q.   Uh-huh.
4   A.   A day or two.
5   Q.   Okay. Now, after Mr. Ekdahl told you Mr.
6 Baillie was going to be fired, did you have any
7 conversations with anyone else concerning that decision?
8   A.   No.
9   Q.   Did Mr. Ekdahl ever tell you that Mr.
10 Baillie was going to be offered a severance package?
11   A.   No.
12   Q.   Did you ever find out that Mr. Baillie was
13 offered a severance package?
14   A.   No. But -- no.
15   Q.   Did you ever find out that the company got
16 upset about some post-termination behavior allegedly by
17 Mr. Baillie?
18   A.   Could you define "post-termination
19 behavior"?
20   Q.   Well, are you aware of any behavior by Mr.
21 Baillie after he was fired that you were aware that the
22 company was concerned about?
23   A.   No.
24   Q.   Are you aware of any behavior after he was

Page 20

1 fired that you thought was inappropriate or improper by
2 Mr. Baillie?
3   A.   Yes.
4   Q.   Okay. Did this behavior or conduct of Mr.
5 Baillie that you thought was inappropriate or improper,
6 did you communicate it to anyone else at Chubb?
7   A.   Yes.
8   Q.   Who did you communicate that to?
9   A.   Leonard Sherer.
10   Q.   In-house lawyer?
11   A.   Uh-huh (nodding head affirmatively), yes.
12   Q.   Anyone else?
13   A.   Jim Ekdahl.
14   Q.   Anyone else?
15   A.   No.
16   Q.   Okay. Who do you believe you first told
17 about this alleged inappropriate or improper behavior?
18       MR. MONTGOMERY: Before you go, I don't
19 want you to discuss any of the substance of any
20 conversations you had with Leonard Sherer.
21       THE WITNESS: Oh, okay.
22       MR. FREKING: You're going to have to,
23 David, be consistent with that instruction that
24 that's going to be the company's position that

Page 21

1  conversations with her and Mr. Sherer is
2  privileged.
3      MR. MONTGOMERY: All right.
4  A.  Could you repeat the question?
5  Q.  Which one did you speak to first about the
6  alleged improper or inappropriate behavior, Ekdahl or
7  Sherer?
8  A.  Leonard Sherer.
9  Q.  All right. Now, is it fair to say that at
10 the time you reported this to Mr. Sheer, Mr. Sheer was not
11 your direct boss? He's never been your direct boss,
12 right?
13 A.  No.
14 Q.  Who was your direct boss at the time you
15 reported this alleged behavior by Mr. Baillie to Mr.
16 Sherer?
17 A.  Tim Zerlong was -- yeah, Tim Zerlong.
18 Q.  Tim Zerlong became your direct boss after
19 Mr. Baillie was fired?
20 A.  Right, temporarily.
21 Q.  Now, why is it that you chose to -- you knew
22 Mr. Sherer was in-house counsel for Chubb?
23 A.  Yes.
24 Q.  Why is it that you chose to contact Mr.

Page 22

1  Sherer about this alleged improper or inappropriate
2  behavior by Mr. Baillie?
3      MR. MONTGOMERY: Let me just stop for a
4      second and hopefully we can resolve this, but you
5      want to keep repeating what the substance of the
6      conversation was between her and Mr. Sherer. I
7      mean, she did, in answer to one of your questions
8      reveal what that substance was, because I didn't
9      know that was going to be the answer. But I do
10     object to the extent that you want to just keep
11     repeating that and I don't want to waive the
12     privilege.
13     MR. FREKING: Okay. No, I don't think
14     you're waiving the privilege by that, because I
15     think we're just identifying a conversation opposed
16     to talking about the substance of the conversation.
17     MR. MONTGOMERY: But you are bringing up the
18     substance of the conversation because she already
19     said what --
20     MR. FREKING: I'll rephrase the question,
21     how about that?
22     MR. MONTGOMERY: That's will be good.
23 Q.  Why do you think you first contacted Mr.
24 Sherer rather than Mr. Zerlong?

Page 23

1  A.  I was asked to contact Leonard Sherer in the
2  event of any inappropriate behavior reported to me.
3  Q.  Okay. Who asked you to do that?
4  A.  I don't recall.
5  Q.  Okay. Do you have any notes or documents
6  that you have or have access to that would refresh your
7  recollection as to who told you that?
8  A.  Yes.
9      THE WITNESS: I think he does to, doesn't
10     he?
11     MR. MONTGOMERY: It would depend on whether
12     it was a privileged document or not. He does have
13     some of your notes.
14     THE WITNESS: Okay.
15 Q.  So other than your notes --
16 A.  That's it.
17 Q.  -- that would be it, right --
18 A.  Yes.
19 Q.  -- that would refresh your recollection as
20 to who told you that?
21 A.  Uh-huh (nodding head affirmatively).
22 Q.  All right. Now, in your tenure as the HR
23 Manager, whatever your title has been since February of
24 1999, have you ever been instructed by anyone to contact

Page 24

1  Mr. Sherer or anybody else in the Legal Department in the
2  event of any inappropriate behavior by any employee or
3  former employee other than Mr. Baillie?
4  A.  Yes.
5  Q.  Okay. Who was that?
6  A.  Who told me to contact them?
7  Q.  No. Who else were you instructed to contact
8  Legal about in the event of any inappropriate or improper
9  behavior on the part of an employee or ex-employee.
10 A.  Michael Haberthy, H-A-B-E-R-T-H-Y. I can
11 picture him, but I can't think of his last name.
12 Q.  Well, can you think of his first name?
13 A.  Chris in Indianapolis in Loss Control. I
14 think there were more, but that's all I can recall right
15 now.
16 Q.  Do you have notes about the other employees
17 that you were instructed to contact Mr. Sherer or
18 someone in Legal in the event of any inappropriate
19 behavior?
20 A.  I don't know, I'd have to check.
21 Q.  Okay. Tell me a little about Michael
22 Haberthy. Who was -- first of all, is he still employed
23 by the company?
24 A.  No.

Page 25

1    Q.    Was he employed by the company or not
2  employed by company when you were instructed to contact
3  Legal?
4    A.    He was not employed with the company.
5    Q.    Was Mr. Haberthy fired by the company?
6    A.    No.
7    Q.    Had he resigned?
8    A.    Yes.
9    Q.    Who instructed you to contact Legal in the
10  event -- strike that.
11        Do you know why you were asked to report to
12  Legal about Mr. Haberthy in the event of any inappropriate
13  behavior?
14    A.    Yes.
15    Q.    Explain that, please.
16    A.    He was in Loss Control and we were notified
17  of hundreds of files that were dumped at a private
18  landfill site that contained confidential information.
19    Q.    Okay. And was there a suspicion that Mr.
20  Haberthy had something to do with the dumping of these
21  files?
22    A.    Uh-huh (nodding head affirmatively), yes.
23    Q.    Was the dumping allegedly -- was that
24  something that allegedly occurred before he resigned or

Page 26

1  after he resigned?
2    A.    I don't know, there's no way to tell when.
3    Q.    Okay. Do you know who instructed you to
4  kind of watch for anything about Michael Haberthy?
5    A.    Jim Ekdahl.
6    Q.    When was this approximately?
7    A.    Maybe nine months ago, again that's
8  approximate.
9    Q.    Okay. What about this Chris fellow, what
10  did he do that warranted this looking at?
11    A.    Downloaded pornographic material onto the
12  W-Drive, which is the public drive of the server.
13    Q.    The "public drive," meaning?
14    A.    Anyone could have access to it.
15    Q.    Anybody in the public or anybody --
16    A.    At Chubb.
17    Q.    -- employed by Chubb?
18    A.    Employed by Chubb.
19    Q.    He downloaded porn to that site?
20    A.    Yes.
21    Q.    So if you worked for Chubb and you got onto
22  the public site, you might be exposed to porn --
23    A.    Yes.
24    Q.    -- right? Was he fired for that decision --

Page 27

1  for that act?
2    A.    I'm not sure.
3    Q.    Where did he work, Indianapolis?
4    A.    Uh-huh (nodding head affirmatively).
5    Q.    Did he come within your bailiwick at that
6  time?
7    A.    No.
8    Q.    You had already assumed new responsibilities
9  for this Cincinnati Region?
10    A.    Yes.
11    Q.    Is he still employed by the company?
12    A.    No.
13    Q.    Do you know whether he was fired or whether
14  he resigned?
15    A.    I do not know.
16    Q.    Do you know who it was that advised you to
17  kind of be on the lookout for anything bad that Chris was
18  doing?
19    A.    Well --
20    Q.    Do you think it was Ekdahl again?
21    A.    Well, it was reported to me this was on the
22  website -- or the public drive, I contact Ekdahl for
23  advice, and Ekdahl told me to get in touch with Leonard
24  Sherer.

Page 28

1    Q.    Oh, I see. So it was reported to you that
2  this has been done by Chris?
3    A.    Yes.
4    Q.    And it was reported to you, why?
5    A.    In a consultative role.
6    Q.    Who reported it to you?
7    A.    The Loss Control Manager.
8    Q.    I thought you no longer had any
9  responsibility for Indianapolis at the time of this
10  report?
11    A.    The Loss Control Manager for Indianapolis
12  resides in Cincinnati and he asked advice on how to handle
13  the material.
14    Q.    And who was that?
15    A.    Jay Taylor.
16    Q.    Was that against company policy to download
17  porn --
18    A.    Yes.
19    Q.    -- onto the W-Drive? Was that a serious
20  infraction?
21    A.    Yes.
22    Q.    Was that something that would normally
23  subject someone to immediate termination under the Chubb
24  HR policies?

Page 29

1   A.   I can't say.
2   Q.   You don't know whether or not that would
3 subject someone to immediate termination if it was true?
4   A.   No.
5        MR. MONTGOMERY: Objection. Calls for
6   speculation.
7   Q.   Does Chubb have personnel policies and
8 procedures?
9   A.   Yes.
10  Q.   Does Chubb have a list of offenses that are
11 grounds for immediate termination?
12  A.   Can you give me an example of what you mean?
13  Q.   Well, do they have -- do you know -- as an
14 HR manager, do you know whether or not Chubb has any rules
15 or policies that certain offenses could result in
16 immediate termination?
17  A.   That's still kind of vague to me. Do you
18 mean is there a piece of paper that says "no bullying, no
19 cussing, no" -- or is there something that says "you must
20 respect each other in an environment that encourages
21 growth and career enhancement," and all that? Yes.
22 There's nothing that says "you can't do these 10 things."
23  Q.   There's nothing like that -- or strike that.
24 You've never seen anything like that?

Page 30

1   A.   Not specifically.
2   Q.   Have you ever seen any list of offenses that
3 would be grounds for discipline at Chubb?
4   A.   Not written in that way.
5   Q.   Written in some other way that you
6 understood to be grounds for discipline?
7   A.   Yes.
8   Q.   Okay. Can you please explain that?
9   A.   We have a Code of Conduct.
10  Q.   Okay.
11  A.   We have an Internet Electronic Communication
12 Policy.
13  Q.   Uh-huh.
14  A.   We have a Chubb and Its People Philosophy.
15 And there's probably more, but those are the biggies.
16       MR. MONTGOMERY: Can we take a two-minute
17   break, if you don't mind?
18       MR. FREKING: Sure.
19       (A recess was taken from 2:31 p.m. to
20       2:40 p.m.)
21  Q.   I'm sorry, we were talking about Chris. Do
22 you know whether, considering the Code of Conduct, the
23 Electronic Policy that you already identified, and Chubb
24 and Its People Policy (sic), and any other policies of

Page 31

1 Chubb, whether or not that conduct would normally subject
2 an employee of Chubb to possible termination?
3        MR. MONTGOMERY: Objection. Lack of
4   foundation, calls for speculation. Again, if you
5   know any answer to it, you can give it.
6   A.   I don't know.
7   Q.   You don't know. And do you know whether a
8 person that violates the company policy against sexual
9 harassment is subject to immediate termination?
10       MR. MONTGOMERY: Same objection.
11       THE WITNESS: When you do that, do I go
12   ahead and answer?
13       MR. MONTGOMERY: If you know an answer.
14  Q.   Yeah, from time to time -- you know, that's
15 the thing I forgot. From time to time Mr. Montgomery
16 might impose an objection. Since there's not a judge here
17 to rule on the objection, normal procedure is for you to
18 answer the question, unless Mr. Montgomery would direct
19 you not to answer the question on some kind of privilege
20 ground.
21  A.   Okay. Could you ask it again?
22  Q.   Sure. Does a violation of Chubb's policy
23 against sexual harassment subject someone to the
24 possibility of immediate termination?

Page 32

1   A.   The possibility? Yes.
2   Q.   And I'm sorry, I think I asked this question
3 before, but I just didn't write down your answer. You
4 believe Chris is no longer with the company?
5   A.   He is no longer with the company.
6   Q.   Okay. But you don't know whether he was
7 fired or he resigned?
8   A.   Right.
9   Q.   You would think Mr. Ekdahl would know that?
10  A.   Yes.
11  Q.   And likewise, Mr. Taylor?
12  A.   Yes.
13  Q.   Mr. Taylor was his boss?
14  A.   Yes.
15  Q.   What did you report to Mr. Sherer about the
16 Chris incident?
17       MR. MONTGOMERY: Objection and instruct the
18   witness not to answer.
19       MR. FREKING: And you're going to maintain
20   attorney-client privilege on that, right?
21       MR. MONTGOMERY: Yeah. And I don't think
22   you're really supposed to ask her to answer that
23   question.
24       MR. FREKING: I think it's within your

Page 33

1  rights to waive it. But okay.
2      MR. MONTGOMERY: I'm pointing out that I
3  don't think that an attorney is supposed to ask
4  questions that would invade the attorney-client
5  privilege, that's the point that I was making.
6  Obviously, that wouldn't be waived, there's no
7  question about that.
8      MR. FREKING: Okay.
9  Q.   So this incident with Chris, you were asked
10 to report something to Mr. Sherer -- this occurred while
11 Chris was still employed by the company?
12 A.   That's correct.
13 Q.   Okay. Now, was Michael Haberthy still
14 employed by the company when you were asked to report
15 something suspicious, for lack of a different phrase, to
16 Mr. Sherer?
17 A.   No, he was not employed with the company
18 when I reported it.
19 Q.   He had already resigned?
20 A.   Uh-huh (nodding head affirmatively), yes.
21 Q.   Oh, I'm sorry, you said that -- who asked
22 you to report -- you said Ekdahl asked you to report any
23 -- strike that.
24      Did you become aware -- did someone tell you

Page 34

1  that Mr. Haberthy has allegedly dumped these hundreds of
2  files sometime after he left employment?
3  A.   Did someone tell me that he did that?
4  Q.   Uh-huh.
5  A.   Not in those words.
6  Q.   Did someone make you aware of the allegation
7  against Mr. Haberthy?
8  A.   Yes.
9  Q.   Okay. And then you -- and who was that?
10 A.   Kathy Celie, C-E-L-I-E.
11 Q.   Okay.
12 A.   (Continued) It's "Kathy" with a K.
13 Q.   And was she employed by Chubb?
14 A.   Yes.
15 Q.   What office was she employed in?
16 A.   Indianapolis.
17 Q.   And Mr. Haberthy was employed at what
18 office?
19 A.   Indianapolis.
20 Q.   Do you know a person by the name of
21 Breiner?
22 A.   Yes.
23 Q.   B-R-E-I-N-E-R, I think.
24 A.   Yes.

Page 35

1  Q.   Who is Breiner?
2  A.   Tom Breiner is the Branch Manager in
3  Indianapolis.
4  Q.   Do you know whether Mr. Breiner was aware of
5  the allegations connected to Mr. Haberthy and to Chris?
6  A.   I know that he was aware of Chris. I don't
7  know if he was aware with Haberthy.
8  Q.   How do you know that he was aware with
9  Chris?
10 A.   I spoke with him.
11 Q.   And what did you tell him?
12 A.   I don't recall exactly what I said.
13 Q.   Do you recall approximately what you said?
14 A.   That Kathy had notified me about the
15 material found in the W-Drive and --
16 Q.   Oh, I'm sorry, Kathy notified you also about
17 Chris?
18 A.   Uh-huh (nodding head affirmatively).
19 Q.   She notified you also about Michael?
20 A.   She knew about both cases, yes.
21 Q.   Okay. I'm sorry, you told him that Kathy
22 had notified you about this pornographic material?
23 A.   Right. And that I had spoken with Leonard
24 and then what we were planning to do about it, what the

Page 36

1  next steps would be.
2  Q.   Okay. And what did you tell Mr. Breiner
3  would be the next steps?
4      MR. MONTGOMERY: Hold on a second. Is this
5  what Leonard told you?
6      THE WITNESS: What the next steps would be?
7      MR. MONTGOMERY: Yes.
8      THE WITNESS: Yeah.
9      MR. MONTGOMERY: Then I don't want you
10 reveal that.
11     MR. FREKING: Okay.
12 Q.   Did you tell what those next steps would be
13 to Mr. Breiner?
14 A.   Yes.
15 Q.   Okay. What did you tell Mr. Breiner those
16 next steps --
17     MR. MONTGOMERY: Same objection. I'll
18 instruct the witness not to answer.
19     MR. FREKING: Okay, can you put a notation
20 on this portion of the transcript? I guess, we'll
21 have to get a ruling on that.
22 Q.   And you're going to refuse to answer the
23 question based on Mr. Montgomery's instruction; is that
24 correct?

Page 37

1  MR. MONTGOMERY: That's correct.
2  A.  That's correct
3  Q.  Do you know whether or not Chris was
4  disciplined at all for downloading the pornography?
5  THE WITNESS: Wouldn't that be the same
6  thing as answering what the next steps would be?
7  MR. MONTGOMERY: If all he's asking you is
8  do know if he was terminated because of this, I
9  think you can answer that.
10  A.  I don't know if he was terminated or he
11  resigned.
12  Q.  Do you know whether or not he was
13  disciplined for that event?
14  A.  Disciplined, no. Spoken to, yes.
15  Q.  How old -- did you know Chris?
16  A.  Yes.
17  Q.  How old would you estimate Chris was?
18  A.  Mid 30s.
19  Q.  Okay. Do you know whether he -- how did you
20  know Chris?
21  A.  When I was responsible for the Indianapolis
22  territory, both from an underwriting and HR an
23  perspective, we worked together.
24  Q.  Okay. Do you know whether prior to the

Page 38

1  allegation about downloading pornography, Chris had ever
2  been disciplined during his tenure with Chubb?
3  A.  Not that I'm aware of.
4  Q.  Okay.
5  Q.  Do you recall what year this was that Chris
6  was accused of downloading pornography?
7  A.  2002.
8  Q.  How would you characterize this, just based
9  on your knowledge and experience of human resources and
10  your knowledge of Chubb policies and procedures and
11  disciplinary practices, et cetera: How serious would you
12  characterize the downloading of pornography onto the
13  company's public web page?
14  A.  How serious?
15  Q.  Uh-huh. Is it -- you know, on a scale of
16  one to ten, is it a one? Is it a ten? Is it a five?
17  A.  Which is the worst, one or ten?
18  Q.  Ten's the worst.
19  A.  Ten's the worst? I'd say it's an
20  eight-and-a-half.
21  Q.  Okay. During his tenure with the company,
22  to your knowledge, did Mr. Baillie ever commit anything
23  that was close to as serious as what you think Chris did?
24  A.  You can't compare the two.

Page 39

1  Q.  Did he ever do anything that was as close in
2  seriousness in your view given your knowledge of human
3  resources and companies' policies and procedures?
4  A.  Yes.
5  Q.  What did he do that was comparable in
6  seriousness to what Chris did?
7  A.  Well, he had approximately 14 direct reports
8  to which he was responsible for their career growth and
9  the success of implementing a strategy and that was not
10  happening.
11  Q.  Okay. Anything else?
12  A.  That's all I recall at this time.
13  Q.  Okay. And when you say all you recall at
14  this time, did you review your notes prior to coming to
15  the deposition today?
16  A.  No.
17  Q.  Did you review any kind of documents even
18  when you met with Mr. Montgomery?
19  A.  Yeah. Let me say that we talked about a few
20  things, but --
21  Q.  No, I don't want to know what you talked
22  about. What we're entitled to know is what you actually
23  reviewed in terms of documents even if you were sitting in
24  the room with Mr. Montgomery.

Page 40

1  A.  So when we had our preparation?
2  Q.  Yes.
3  A.  He asked me a few questions based on my --
4  Q.  No, I don't -- I don't -- what I'm trying to
5  say is --
6  A.  Oh.
7  Q.  -- I don't want you to tell me what the two
8  of you talked about, okay --
9  A.  Oh.
10  Q.  -- that's within his instruction.
11  A.  Okay.
12  Q.  But if you looked at any documents during
13  that meeting, you can tell me what documents you looked
14  at.
15  A.  From my notes? They were from my --
16  Q.  Any kind of document.
17  A.  Okay. They were from my notes.
18  Q.  Okay. So you looked at your notes while you
19  were meeting with Mr. Montgomery?
20  A.  Uh-huh (nodding head affirmatively).
21  Q.  Okay. Did you look at any -- and those
22  notes -- well, strike that.
23  And did you look at any other pieces of
24  paper or documents or anything tangible while you were

Page 41

1 meeting with Mr. Montgomery?
2    A.   No, I think that was all.
3    Q.   Okay.  Do you believe your notes contained
4 information about improprieties of Mr. Baillie?
5    A.   Yes.
6    Q.   And do you know of any improprieties by Mr.
7 Baillie that are somehow violations of Chubb policies that
8 are not reflected in your notes?
9    A.   Yes.
10    Q.   Okay.  What was that?  What are the things
11 that you think of that were not contained within your
12 notes that involved improprieties or violations of company
13 policy, or anything that Baillie did that was bad?
14    A.   I don't believe I have notes on what could
15 be viewed as sexist comments.
16    Q.   Uh-huh.
17    A.   (Continued)  I don't believe my notes
18 contain an incident in Jamaica, but they could, I don't
19 recall.
20         There were several issues that would come
21 up, in particular in my first maybe six months in HR,
22 where people would come in and talk to me about their
23 frustrations with Doug that I didn't record.
24    Q.   Do you recall anything specific about those

Page 42

1 frustrations?
2    A.   From a general standpoint?
3    Q.   General or specific.
4    A.   There were --
5    Q.   Anything you can possibly recall.
6    A.   Okay.  They were condescending comments,
7 inappropriate comments toward an African-American female
8 employee.  Events where he was drinking heavily, driving
9 erratically, drunk, and confusion over the strategy and
10 his instructions to them.
11    Q.   Uh-huh.
12    A.   (Continued)  That's -- (witness did not
13 complete response).
14    Q.   That's what you can remember?
15    A.   There's probably more, but that's -- yeah.
16    Q.   What do you mean, you think "there's
17 probably more"?  Are there any notes or records that you
18 have that could refresh your recollection on that?
19    A.   No.
20    Q.   Is there anybody you can talk to, do you
21 think, that could refresh you recollection on that?
22    A.   Yes.
23    Q.   Who would that be?
24    A.   Dieter Korte, Tom Gates, Mike Zdinak,

Page 43

1 Z-D-I-N-A-K, Beth Hunter, Susan Audino, A-U-D-I-N-O, Greg
2 Tazic, T-A-Z-I-C.  That's --
3    Q.   That's the list?
4    A.   Yeah, that's the capture.
5    Q.   Okay.  Are they all still employed by Chubb,
6 to your knowledge?
7    A.   To my knowledge, yes.
8    Q.   Are they all employed in Cincinnati?
9    A.   No.
10    Q.   Is Tazic still in Cincinnati?
11    A.   No.
12    Q.   Where is he?
13    A.   He's in Itasca, Illinois.
14    Q.   How about Korte?
15    A.   He is still in Cincinnati.
16    Q.   Gates?
17    A.   Cincinnati.
18    Q.   Zdinak?
19    A.   Zdinak, yes, he's in Cincinnati.
20    Q.   Hunter?
21    A.   She's in Cincinnati.
22    Q.   Audino?
23    A.   Charlotte.  Do you want more names?  I'm
24 thinking of more names.

Page 44

1    Q.   Oh, yeah.
2    A.   (Continued)  Becky Emerson, Amy Miller, Mark
3 Pennell, P-E-N-N-E-L-L.  That's good for now.
4    Q.   Well, you say "that's good for now," is that
5 all you can remember?
6    A.   That's all I can remember.
7    Q.   Pennell, is he still Cincinnati?
8    A.   Yes.
9    Q.   Miller still in Cincinnati?
10    A.   Yes.
11    Q.   And Emerson?
12    A.   Yes.
13    Q.   Okay.
14    Q.   All of them -- the Cincinnati folks are
15 normally -- they work in the office here in Cincinnati,
16 they don't travel?
17    A.   They -- some travel.  You'd need to go down
18 the list again for me to tell you which ones.
19    Q.   But they're generally available, right?
20    A.   Uh-huh (nodding head affirmatively), yes.
21    Q.   Who was responsible for the discipline of
22 Mr. Baillie during his employment, do you know?
23    A.   When he first started it would have been
24 Terry Cavanaugh as the Zone Officer.

Page 45

1    Q.   Uh-huh.
2    A.   (Continued) And when Terry Cavanaugh left
3 the position and Tim Zerlong entered in, it would have
4 been Tim Zerlong.
5    Q.   Mr. Cavanaugh is no longer with the company;
6 is that correct?
7    A.   He is with the company.
8    Q.   Is he in New Jersey?
9    A.   Yes.
10        MR. FREKING: Off the record.
11        (Off-the-discussion).
12    Q.   Were you ever asked by Terry Cavanaugh --
13 strike that.
14        Did you ever report condescending comments,
15 inappropriate comments, drinking issues, confusion over
16 strategy, or failure to help people in their career
17 growth, did you ever report anything like that by Baillie
18 to Mr. Cavanaugh?
19    A.   Not that I recall.
20    Q.   Okay.  Is that because -- strike that.  If
21 employees came to you with comments about Mr. Baillie that
22 you, in a human resources role, believe would necessitate
23 at least some conversation with Mr. Baillie or some sort
24 of investigation, is there someone who you would report

Page 46

1 that to?
2    A.   Yes.
3    Q.   In the chain of command, who would that be?
4    A.   Jim Ekdahl.
5    Q.   Okay.  And Mr. Ekdahl was your immediate --
6 or strike that -- was your dotted line HR contact
7 throughout Mr. --
8        MR. MONTGOMERY:  We've covered that, didn't
9 we?
10    Q.   -- throughout Mr. Baillie's tenure?
11    A.   Yes.
12    Q.   Tell me what concerns brought to you by
13 employees that you reported to Mr. Ekdahl that you can
14 remember.
15    A.   I talked to Mr. Ekdahl about a dinner that
16 Doug went with Tom Gates and Mapes & Company.  I talked to
17 Ekdahl about instances where I was directly involved.  I
18 talked to Ekdahl about what happened in Jamaica.  There
19 are probably more, but that's what is on top of my head.
20    Q.   Well, do you recall reporting to Mr. Ekdahl
21 the alleged condescending comments?
22    A.   Yes, that would be with Tom Gates.
23    Q.   Okay.  So that's a condescending comment
24 problem --

Page 47

1    A.   That's --
2    Q.   -- with Gates?
3    A.   Yeah, what occurred at dinner.
4    Q.   Okay.  Did you report any other
5 condescending comments to Mr. Ekdahl?
6    A.   Actually, yes, I did, one with Dana Snyder.
7 And I had heard from Dieter Korte and Greg Tazic about
8 some condescending interactions with Doug.
9    Q.   Had you reported those to Ekdahl?
10    A.   Some.
11    Q.   Okay.  Korte and who else?
12    A.   Tazic.
13    Q.   Tazic.
14    A.   (Continued)  Different events.
15    Q.   Okay.  And you reported those to Ekdahl?
16    A.   Some.
17    Q.   Because you reported whatever you thought
18 was inappropriate or improper or of concern about Baillie,
19 you would report to Ekdahl; is that correct --
20    A.   Yes.  Seeking advice --
21    Q.   -- as part of your job?
22    A.   -- in how to both approach Doug in coaching
23 and when I -- you know, when I felt that they crossed the
24 line.

Page 48

1    Q.   Okay.  Tell me about your authority as you
2 knew it to coach Doug.
3    A.   My authority?
4    Q.   Well, you said you would seek his advice on
5 how to coach Doug.
6    A.   Yeah.
7    Q.   Tell me what role you had in -- or what your
8 role was in coaching Doug on HR issues?
9    A.   Well, when I would hear things from
10 employees, I would try to filter it to determine whether I
11 thought it had validity or the person was overreacting.
12 And if I felt it was valid and/or substantiated by more
13 than one person, then I would talk to Doug about it.
14    Q.   Okay.  You would talk to him in a counseling
15 capacity?
16    A.   Right.
17    Q.   You would counsel him?
18    A.   Yes.
19    Q.   Okay.  Did you have the ability, to your
20 knowledge, to issue any kind of written discipline to Mr.
21 Baillie?
22    A.   No.
23    Q.   You were limited in your responsibility to
24 give him oral counseling?

Page 49

1   A.   Right.
2   Q.   Did you have an ability to recommend written
3 discipline?
4   A.   No.
5   Q.   Did you have the ability to recommend
6 termination?
7   A.   No.
8   Q.   Okay. So is it fair to say you never
9 recommended to anyone that Mr. Baillie be given any
10 written warning or that he be terminated?
11   A.   I did not.
12   Q.   Okay. Did you ever report to Mr. Ekdahl
13 inappropriate comments about African-Americans?
14   A.   No.
15   Q.   Why not?
16   A.   I was asked not to and I had never heard
17 anything like that before from him, so I made a judgment
18 call not to report it.
19   Q.   You didn't think it was serious enough to
20 report it?
21    MR. MONTGOMERY: Objection.
22   A.   Right.
23    MR. MONTGOMERY: Mischaracterizes the
24 testimony.

Page 50

1    MR. FREKING: Dave, listen, I'm going to put
2    up with some objections, but I'm going to object in
3    that you're clearly coaching the witness.
4   Q.   Your answer was no, you did not think it was
5 serious enough to report it to Mr. Ekdahl --
6   A.   Right.
7   Q.   -- the comment about the African-American
8 employee?
9   A.   That's correct.
10   Q.   Did you report to Mr. Ekdahl anything about
11 Mr. Baillie's drinking?
12   A.   Yes.
13   Q.   Tell me about that.
14   A.   Well, there was a picture in his desk drawer
15 of a totaled car, a Taurus, company car, and he would brag
16 to people in the office that he totalled the car after a
17 night of drinking and climbed out the window and walked --
18 it went over a cliff, he climbed out the window and walked
19 away from it, walked home.
20   Q.   Okay. Is that the extent of what you told
21 Mr. Ekdahl about his drinking?
22   A.   I don't remember the exact events, but there
23 were a few agency outings where employees would come to me
24 and report that they were uncomfortable with the amount of

Page 51

1 drinking consumed by Doug and his behavior as the evening
2 went on.
3   Q.   Okay. You reported those to Ekdahl?
4   A.   Uh-huh (nodding head affirmatively), yes.
5   Q.   Okay. Anything else about his drinking?
6   A.   That I reported to Ekdahl?
7   Q.   Uh-huh.
8   A.   Not that I can recall --
9   Q.   Okay.
10   A.   -- that I reported to him.
11   Q.   Knowing what you know about Chubb's HR
12 structure, do you believe that Mr. Ekdahl had the ability
13 to issue written reprimands or discipline to Mr. Baillie?
14   A.   To the best of my knowledge, yes.
15   Q.   Okay. Did Mr. Ekdahl ever tell you whether
16 or not he ever disciplined Mr. Baillie?
17   A.   No, he did not.
18   Q.   Do you know to this day whether Mr. Baillie
19 was ever disciplined short of being terminated?
20   A.   No, I don't.
21   Q.   Did you ever report to Mr. Ekdahl alleged
22 confusion over strategy of branch?
23   A.   Yes.
24   Q.   Would you agree or disagree with Mr. Korte's

Page 52

1 testimony that Mr. Baillie -- strike that -- that the
2 branch turned around in terms of performance between the
3 time Mr. Baillie arrived and the day he was fired?
4    MR. MONTGOMERY: Objection. I think that
5    lacks foundation. I don't think she's seen his
6    testimony.
7   A.   I don't know what he said. Could you give
8 me a little more?
9   Q.   Do you believe that Mr. Baillie -- during
10 Mr. Baillie's tenure, the financial performance of the
11 branch turned around?
12   A.   Which, just from my acknowledge, was '98 to
13 2001, correct? Yes, it did.
14   Q.   It turned around pretty significantly,
15 right, as far as you know?
16   A.   From '98 to 2000, we lost $16,000,000 and in
17 '91 (sic) we made approximately $30,000,000.
18   Q.   Did you ever hear that the branch was kind
19 of in shambles or disarray when Mr. Baillie arrived?
20   A.   I never heard those words.
21   Q.   But you heard it was pretty bad before
22 Baillie arrived; is that correct?
23   A.   I was there. I was there.
24   Q.   Okay. Were you knowledgable of the fact

Page 53

1 that the branch was not performing very well --
2    A. Yes.
3    Q. -- before Mr. Baillie arrived?
4      Okay. What do you know about the branch's
5 performance before Baillie's arrival?
6    A. Before he arrived I was Energy, so I would
7 have focused mainly on my department, which was doing very
8 well. I believe Commercial Lines was having some
9 difficulty both because of the market and the pricing that
10 would be required.
11      So the underwriting philosophy at that point
12 was retain your business at all costs and try to get the
13 growth so that you can control your expense ratio.
14    Q. You said before you weren't sure if you
15 would use the phrase of "shambles" or "disarray"?
16    A. Uh-huh (nodding head affirmatively).
17    Q. Is there an adjective that you would use to
18 describe the state of the branch prior to Mr. Baillie's
19 arrival?
20    A. An adjective? Possibly "misdirected."
21    Q. Okay. Have you ever spoken to Mr. Korte
22 regarding how he thought the branch did between '98 and
23 2001?
24    A. Yes.

Page 54

1    Q. What do you recall about your discussion
2 with Mr. Korte about how the branch did in terms of
3 performance between '98 and 2001?
4    A. Well, I don't exactly remember when he got
5 there in the Cincinnati branch.
6    Q. You mean who?
7    A. Dieter.
8    Q. Okay.
9    A. (Continued) Do you -- I don't know if you
10 have that, but right about the time that he got there we
11 nationally, or really globally, went through a huge shift
12 in underwriting philosophy and in business with a rate
13 initiative, the referral process a lot more stringent,
14 authorities were reduced. And so that, as well as his
15 coming to the branch, as opposed to the competencies of
16 the last commercial lines manager, contributed quite a bit
17 to our success.
18    Q. Korte coming to the branch contributed to
19 the success or Mr. Baillie?
20    A. Korte.
21    Q. Okay. Do you give -- in your view, given
22 your knowledge and experience and your training, do you
23 give Baillie any credit for the improvement in the
24 financial performance of the branch between '98 and 2001,

Page 55

1 or do you think it's all the result of other people
2 despite Baillie?
3      MR. MONTGOMERY: Objection, compound.
4    A. From a percentage standpoint, would that --
5 I mean, I would say that he had some involvement, Doug
6 did.
7    Q. Okay. Tell me about what you believe Mr.
8 Baillie's involvement was in the turnaround of the branch?
9    A. His relationships with the agents were very
10 good. He was a strong marketer, well-connected.
11    Q. Okay.
12    A. (Continued) Community service initiatives.
13    Q. You're aware of his community service
14 initiatives?
15    A. Yes.
16    Q. His volunteer in charitable activities?
17    A. Uh-huh (nodding head affirmatively), yes.
18    Q. Okay. That's important to Chubb?
19    A. Yes.
20    Q. Being a strong marketer is important to
21 Chubb?
22    A. Yes.
23    Q. Having a good relationship with agents is
24 important to Chubb?

Page 56

1    A. Yes.
2    Q. What are the other things that Baillie did
3 that you think contributed to the turnaround in the
4 branch?
5    A. That's all I would say at this time that he
6 did.
7    Q. Are you familiar with the fact that branch
8 managers are given performance reviews?
9    A. Yes.
10    Q. Do you know that they are evaluated in terms
11 of the financial performance of the branch?
12    A. Yes.
13    Q. Do you have an understanding as to -- well,
14 strike that.
15      Are there any other employees of a branch
16 office, like the Cincinnati Branch Office, that part of
17 their performance appraisal process is how the overall
18 branch is doing financially?
19    A. Yes. All managers have a branch goal.
20    Q. For the entire branch or their area?
21    A. For the entire branch.
22    Q. Okay. "All managers" within the branch or
23 are you talking about all branch managers?
24    A. All managers within the branch should have a

Page 57

1 branch goal.

2     Q. That would be the same goal then of somebody
3 like Doug Baillie?

4     A. To encourage them to joint travel and market
5 and work together.

6     Q. Are you familiar with the fact that on
7 Baillie's performance review he is judged in terms of
8 financial performance of the entire branch?

9     A. Yes.

10     Q. Okay. Are there other employees of the
11 branch that in their appraisals and whatnot are also
12 judged on the financial performance of the entire branch,
13 specifically in writing on their performance appraisals?

14     A. It is my understanding that all department
15 managers within their goals have a branch goal.

16     Q. Is that for the department or for the entire
17 branch?

18     A. For the entire branch, as well as their own
19 department.

20     Q. Okay. That's your understanding?

21     A. That's my understanding.

22     Q. Did you play a role in evaluating at all
23 employees of the branch as the Human Resources -- Regional
24 Human Resources Manager?

Page 58

1     A. Was I involved in their evaluation?

2     Q. Uh-huh.

3     A. Yes.

4     Q. Were you familiar with the forms that were
5 used to evaluate other branch employees besides Mr.
6 Baillie?

7     A. Yes.

8     Q. Were you familiar with the form that was
9 used to evaluate Mr. Baillie?

10     A. No.

11     Q. Now, when you talked to Mr. Ekdahl regarding
12 a dinner event with Tom Gates with Mapes & Company in
13 which Mr. Baillie allegedly made some condescending
14 remarks, did Mr. Ekdahl ask you to investigate the matter
15 further?

16     A. No.

17     Q. Did you have any further involvement in
18 reviewing the appropriateness of Mr. Baillie's conduct or
19 deciding what Chubb should do about it after you reported
20 this to Mr. Ekdahl?

21     A. No.

22     Q. Are you aware of any investigation that Mr.
23 Ekdahl did other than, I guess, receive your report about
24 this dinner meeting?

Page 59

1     A. Regarding this event?

2     Q. Yes.

3     A. No.

4     Q. All right. Now, did you counsel Mr. Baillie
5 at all regarding this dinner event?

6     A. Yes.

7     Q. Okay. When did you do that?

8     A. Approximately within a day or two of Tom
9 Gates telling me about it.

10     Q. Okay. Did you counsel Baillie before or
11 after you talked to Ekdahl?

12     A. After.

13     Q. Were you directed to do that by Ekdahl?

14     A. Yes.

15     Q. And what did you tell Baillie?

16     A. Tom's feelings of how the dinner went and
17 what position that put Tom in with his customers who were
18 also present, and the potential consequences of those
19 comments in front of customers.

20     Q. And the customers were Mapes & Company?

21     A. Uh-huh (nodding head affirmatively).

22     Q. What were the alleged remarks that were
23 problematic?

24     A. I don't remember exactly what was said.

Page 60

1     Q. Do you remember anything about what was
2 said?

3     A. I'm sorry, I don't.

4     Q. So you don't have any ability, other than
5 what might be reflected in your notes, to recall what the
6 condescending remarks were?

7     A. I would need to review.

8     Q. You would need to review what?

9     A. My notes and/or talk to Mr. Gates.

10     Q. The notes you're talking about that you
11 referenced earlier in the deposition, are those
12 typewritten --

13     A. No.

14     Q. -- or handwritten?

15     A. Handwritten.

16     Q. Do you have any typewritten notes that you
17 know of regarding Mr. Baillie?

18     A. I can only think of one.

19     Q. Okay. Which one is that?

20     A. It was with Mr. Sherer.

21     MR. MONTGOMERY: Then you don't want to --

22     THE WITNESS: Okay.

23     Q. Well, without disclosing what was in those
24 notes yet, are you saying you made some notes during a

Page 61

1 meeting with Mr. Sherer?
2    A.   Yes.
3    Q.   Do you know whether this occurred Mr.
4 Baillie's termination or after his termination?
5    A.   I believe it was after.
6    Q.   Do you recall prior to Mr. Baillie's
7 termination, did you have any meeting with Mr. Sherer?
8    A.   Prior to his termination?
9    Q.   Uh-huh.
10    A.   Not that I recall.
11    Q.   When you counseled -- do you recall what
12 year this was with Tom Gates and the Mapes & Company,
13 approximately?
14    A.   I believe it was 2001, but I can't be sure.
15    Q.   Okay.  Now, this came to your attention
16 because Tom Gates made some allegations to you; is that
17 correct?
18    A.   Right.
19    Q.   Prior to you calling Mr. Ekdahl about Tom
20 Gates' comments, did you make any effort to get Mr.
21 Baillie's side of the story?
22    A.   On that specific event, no.
23    Q.   Okay.  You decided to counsel him -- you and
24 Mr. Ekdahl decided to counsel him before you got his side

Page 62

1 of the story; is that correct?
2    A.   Well, my conversation with Ekdahl was more
3 for advice for me.
4    Q.   Okay.  Did he advise you to get Baillie's
5 side of the story before you reached a decision on
6 discipline?
7    A.   Yes.
8    Q.   Okay.  Did you do that?
9    A.   Did I get Baillie's side of the story?
10    Q.   Before you counseled him.
11    A.   Yes.
12    Q.   What was Baillie's side of the story?
13    A.   I asked him if he remembered going to dinner
14 with Tom and with Mapes, "yes, I did." "Do you remember
15 your conversation?  Do you remember Tom ever getting
16 upset.  Do you know what you guys were talking about,"
17 that sort of thing.  And then he would -- he didn't
18 realize that Tom was upset.  And so I shared with him
19 Tom's feelings and impression of the conversation and how
20 that made him feel.
21    Q.   Okay.  Did Baillie indicate to you whether
22 or not he agreed or disagreed with Tom's feelings after he
23 learned of them?
24    A.   He didn't agree.

Page 63

1    Q.   Do you know why he didn't agree?  Did he
2 express any reasons why he thought Gates was overreacting?
3    A.   He thought Tom was emotional and --
4    Q.   Is Gates still employed by the company?
5    A.   Yes.
6    Q.   So Mr. Baillie thought Gates overreacted?
7    A.   Uh-huh (nodding head affirmatively) yes.
8    Q.   Okay.  Did you make a judgment as who was
9 right or wrong --
10    A.   No.
11    Q.   -- Gates or Baillie?
12    A.   No.
13    Q.   Then why did you counsel Mr. Baillie?  Are
14 you using "counsel" in the sense of discipline or are you
15 using "counsel" in a sense of just speaking with him about
16 it?
17    A.   Just speaking with him about it.
18    Q.   Okay.  So no discipline as a result of this
19 dinner?
20    A.   Oh, no.
21    Q.   Okay.  No discipline was warranted in your
22 view?
23    A.   It's not my place to decide that.
24    Q.   Well, did Mr. Ekdahl conclude that there was

Page 64

1 any discipline warranted?
2        MR. MONTGOMERY:  Objection calls for
3    speculation.
4    A.   I wouldn't know.
5    Q.   Well, Mr. Ekdahl never instructed you to
6 discipline Mr. Baillie for this?
7    A.   I have no authority to discipline Mr.
8 Baillie.
9    Q.   Did you report back to Mr. Ekdahl the
10 results of your conversation with Mr. Baillie?
11    A.   No.
12    Q.   Did you form a belief as to who was right or
13 wrong, Baillie or Gates?
14    A.   No.
15    Q.   Okay.  Did you follow up at all with Gates
16 after Baillie told you "hey, Tom just overreacted"?
17    A.   No.
18    Q.   Okay.  How old is Mr. Gates, would you
19 estimate?
20    A.   Early 50s.
21    Q.   Now, did you report the Donna (sic) Snyder
22 incident to Mr. Ekdahl -- or Dana Snyder?
23    A.   Dana.  I don't believe I did.
24    Q.   Okay.  You did not because it was not

Page 65

1 serious enough to bring to Ekdahl's attention?
2    A. I really don't recall whether I talked to
3 Ekdahl about that or not.
4    Q. Did you ever speak to Baillie about the Dana
5 Snyder incident?
6    A. Yes.
7    Q. What did Doug Baillie tell you about the
8 Dana Snyder incident?
9    A. He didn't remember that it had happened, and
10 kind of laughed it off.
11    Q. Okay. Did you -- you don't have any
12 authority to discipline Mr. Baillie --
13    A. Right.
14    Q. -- right? Are you aware of any discipline
15 to Mr. Baillie as a result of the Dana Snyder incident?
16    A. I'm not aware of any.
17    Q. Okay. What was the -- tell us about the
18 Dana Snyder incident as you recall.
19    A. Doug was kind of teasing him --
20    Q. This is Dan (sic) Snyder?
21    A. Dana.
22    Q. Oh, "Dana" is a guy?
23    A. Yes.
24    Q. Okay, I'm sorry.

Page 66

1    A. That's all right. (Continued) -- teasing
2 him about -- you know, I don't even -- I don't remember.
3 I'd need to looks at my notes to know for sure. But it
4 was more Dana's perception of what Doug was saying to him
5 and the way that he was addressing him that made him feel
6 belittled and uncomfortable and not motivated.
7    Q. Did you ever come to a conclusion that Dana
8 Snyder should just get over it and move on and you know,
9 just --
10    A. People's perceptions are reality. It's not
11 really my place to.
12    Q. It's not your place to make a judgment call
13 as to whether or not he should just get over those or not?
14    A. Well, my advice to him was to try to work
15 with Doug to the best of your ability and get the results
16 that everyone is looking for, and then you won't have
17 interactions like that and your relationship will improve.
18    Q. Yeah, his financial results at the time that
19 Mr. Baillie allegedly belittled him were less than
20 satisfactory? This was during a meeting in which Mr.
21 Baillie --
22    A. Yeah.
23    Q. -- was talking about --
24    A. Actually --

Page 67

1    Q. -- his performance?
2    A. Interestingly enough, they were one of the
3 few departments to make money that year, so --
4    Q. But you understood that -- you said to
5 Mr. --
6    A. To Dana.
7    Q. -- to Dana, "get your results better and he
8 won't have these kind of conversations with you"?
9    A. Right.
10    Q. Did you tell him essentially to develop a
11 little thicker skin, "come on, we're in the real world,
12 this is an insurance company," anything like that?
13    A. Not in those words.
14    Q. But in substance did you tell him something
15 like that? "Come on, this is the business world, get over
16 it"?
17    A. I remember saying that -- trying to defend
18 Doug, that this is the way that he thinks he's motivating
19 employees by getting the banter back and forth --
20    Q. Uh-huh.
21    A. -- but I don't think he meant any ill will.
22    Q. Okay.
23    A. (Continued) To try to keep their loyalty
24 and connection.

Page 68

1    Q. You thought this was Baillie's judgment call
2 as to a way to kind of motivate people?
3    A. Yes.
4    Q. Okay. Do you have an opinion, right or
5 wrong, as to whether Baillie was right or wrong in that?
6    A. Whether that worked, that sort of approach?
7    Q. Uh-huh. Did it work with some people?
8    A. No one that I can think of.
9    Q. Was Mr. Baillie professional when you
10 discussed this incident with him?
11    A. Define "professional."
12    Q. Well, did he do anything that was
13 inappropriate during your conversation with him? In other
14 words, did he listen to you in your role as an HR person,
15 listen to you carefully and evaluate what you were saying
16 and give you some feedback?
17    A. No, not really.
18    Q. Well, describe Baillie's reaction to the --
19    A. It was similar to Gates, "Oh, that was
20 nothing," just kind of brushed it off.
21    Q. Now, when you defended Mr. Baillie when you
22 were talking to Dana Snyder, were you being truthful or
23 were you being disingenuous in some way?
24    MR. MONTGOMERY: Objection. Compound.

Page 69

1    Q. Were you being truthful when you spoke to
2 Dana Snyder?
3    A. I don't know if I can answer that. I was
4 hopeful. I could not say one way or the other what Doug's
5 true intent was.
6    Q. And you couldn't say one way or the other
7 what Mr. Snyder's true intent was?
8    A. Right.
9    Q. Sometimes --
10    A. All I could do --
11    Q. Sometimes in your experience in Human
12 Resources people make complaints when they're criticized
13 in their performance and those complaints are unjustified?
14    A. It's still the way they felt.
15    Q. Sometimes people make excuses about their
16 performance, right?
17    A. Yes.
18    Q. How about -- you also said you talked to
19 Ekdahl about some comments from Korte, Dieter Korte?
20    A. Yes.
21    Q. Do you know whether or not Mr. Baillie was
22 ever disciplined as a result of any interaction between
23 him and Mr. Korte?
24    A. Not that I know of.

Page 70

1    Q. What was the nature of what you spoke to Mr.
2 Ekdahl in regards to Korte's comments or complaints?
3    A. I wanted to make sure that we all looked out
4 for Dieter, because he was a valued member of our branch
5 and region, of the Commercial Lines Department and the
6 zone and he wanted to resign out of frustration over Doug
7 Baillie.
8    Q. Okay. He thought that Baillie put to much
9 emphasis on marketing?
10    MR. MONTGOMERY: Objection. Calls for
11    speculation.
12    Q. (Continued) Korte, did you know that? He
13 disagreed with Baillie's business philosophy?
14    A. Yes.
15    Q. Okay. Baillie was running the business,
16 correct?
17    A. The branch?
18    Q. Yes.
19    A. Yes.
20    Q. Normally -- and Korte reported to Baillie,
21 right?
22    A. Dual accountability, his direct report was
23 Doug Baillie.
24    Q. Right. And as far as -- and Baillie, to

Page 71

1 your knowledge had been given the responsibility by Chubb
2 to determine the management philosophy for that particular
3 branch; is that correct?
4    A. The way they worked it with the dual
5 accountability, especially in an underwriting capacity, is
6 the Northern Zone Commercial Lines Manager looks at the
7 Commercial Lines product and profit, and Doug is concerned
8 with profit and growth for that specific area.
9        So to say that Doug exclusively is
10 responsible for the business, no. There sometimes is
11 conflict.
12    Q. Okay. Did you make a judgment as to whether
13 or not Korte was correct in his disagreement with Baillie
14 or did you think that was a management difference of
15 opinion?
16    A. I agreed with Dieter.
17    Q. Oh, you agreed with Dieter. Now, what did
18 Dieter tell you that you agreed with?
19    A. The emphasis on growth and trip reports and
20 agency calls.
21    Q. Dieter thought there was too much emphasis
22 on growth?
23    A. Yes.
24    Q. He thought there was too much emphasis on

Page 72

1 trip reports?
2    A. Oh, yes.
3    Q. Too much emphasis on agency calls?
4    A. Yes.
5    Q. Now, did you get Mr. Baillie's opinion on --
6 or his explanation as to why he placed a greater emphasis
7 on growth than Korte believed he should?
8    A. Yes, to -- again, this is to the best of my
9 knowledge.
10    Q. No, did you meet with him and discuss
11 this --
12    A. Yes.
13    Q. -- or is this just speculation on your part?
14    A. I spoke with Doug about this.
15    Q. Okay.
16    A. (Continued) It was two-plus years ago,
17 so --
18    Q. Yeah, what did Doug tell you about why he
19 placed more emphasis on growth than Dieter wanted to?
20    A. To the best of my memory, it was the more
21 you're in front of the agent, he felt the more business
22 they would give you.
23    Q. Uh-huh.
24    A. (Continued) And the more you grow, the

Page 73

1 better your expense ratio -- the lower your expense
2 ratio --
3    Q.   Uh-huh.
4    A.   -- goes, which was important.
5    Q.   Uh-huh.
6    A.   (Continued) And the likelihood of you
7 getting new business to the agency over your competitors,
8 if you're not there, they're there, so stay in front of
9 them.
10    Q.   And you disagreed with those explanations?
11    A.   As an exclusive practice, yes.
12    Q.   Well, Mr. Baillie didn't say that was his
13 exclusive practice was just to emphasize growth, right?
14 He said do it in combination with other matters, or did he
15 say "I'm going to exclusively focus on" --
16    A.   No, he said -- he said that in partnership
17 with other areas.
18    Q.   Right. So what in your background with
19 Chubb gave you the ability to decide that Mr. Baillie --
20 or Mr. Korte was correct and Mr. Baillie was wrong?
21    A.   Doug would say in managers' meetings that if
22 you don't have a certain number of trip reports that he
23 was going to dock their merit increase or their bonuses.
24    Q.   No, I'm sorry, I'm talking about the

Page 74

1 emphasis on growth. How did you determine that Korte's
2 view was correct and Mr. Baillie's view was incorrect?
3    A.   Well, the Commercial Lines philosophy from
4 1999 on was "do not grow at the expense of profit," profit
5 is first and foremost, growth is secondary. So both the
6 retentions of business were lowered on the budgets and the
7 rate was significantly increased in expectation, the rate
8 initiative.
9    So while we weren't turning away from
10 growth, it became a secondary initiative.
11    Q.   Anything else?
12    A.   From a growth standpoint?
13    Q.   Yeah, that you determined Korte -- any
14 reason why you determined Korte was correct and Baillie
15 was wrong?
16    A.   No, that's -- (witness did not complete
17 response).
18    Q.   Did he maintain this emphasis on growth
19 throughout his tenure, '98 through 2001?
20    A.   Yes.
21    Q.   Would you agree with me that the primary
22 financial goal of the branch during those years was to
23 make a profit?
24    A.   Yes.

Page 75

1    Q.   And the branch became profitable in 2001; is
2 that correct?
3    A.   Still had an overall loss, but yes, we made
4 money in 2001.
5    Q.   I'm sorry, how do you have an overall loss
6 and you made money?
7    A.   1998 to 2000 we lost about --
8    Q.   I'm sorry, 2001 was profitable?
9    A.   We made money, yes.
10    Q.   All right. How was it, like, in '95, '96,
11 and '97?
12    A.   I -- when did I get to the branch? I don't
13 remember, I'd need to look at the reports.
14    Q.   Now, once you realized that the branch
15 became profitable in 2001 --
16    A.   Yes.
17    Q.   -- do you think that at all was as a result
18 of the emphasis on growth by Mr. Baillie or do you think
19 that that's due to some other circumstances?
20    A.   I would say it contributed to the profit.
21    Q.   The trip reports -- so Mr. Baillie wanted
22 people to turn in trip reports on time, right?
23    A.   And to -- yeah, to do them and to turn them
24 in in a timely manner, yes.

Page 76

1    Q.   Right. Isn't that kind of a basic -- from a
2 human resource standpoint, did you disagree with Mr.
3 Baillie's position that trip reports ought to be completed
4 and turned in on time?
5    A.   It's an inconsistent -- not every branch
6 requires trip reports. I didn't disagree with using them,
7 I disagreed with the emphasis on them.
8    Q.   Okay. Is that just a judgment call that the
9 guy -- the buck stopped with Mr. Baillie, right?
10    A.   Right.
11    Q.   And if he emphasized them or he
12 de-emphasized them, somebody would criticize him, right?
13 Or are you saying it was unanimous in the branch it ought
14 to be de-emphasized?
15    A.   My frustration was more in explaining why
16 they're so important; help the branch to understand what
17 they'll do for us. Not -- and don't just say "you have to
18 do them," "why," and then you'll get more ownership and
19 people will be more apt to them and the underwriters and
20 managers would embrace them. Just don't do it for
21 numbers.
22    Q.   Did you know why -- does the company require
23 trip reports?
24    A.   No.

Page 77

1    Q.   This is a branch-by-branch decision?
2    A.   Correct.
3    Q.   Okay.  How about the agency calls, were you
4  in a position to -- what was the problem with Baillie's
5  view on agency calls?  Wanted more agency calls than Korte
6  thought he should?
7    A.   Quantity over quality.
8    Q.   Is that how Baillie phrased it, he wants --
9  he doesn't want quality?
10   A.   He wanted you out there in front of them all
11 the time.
12   Q.   And he wanted quality visits, but more
13 quality visits?
14   A.   Right.
15   Q.   Okay.  And you somehow think Korte's view
16 that there should be less agency calls was correct?
17   A.   Well, the agents were telling Dieter that
18 they would rather set up some specific meetings rather
19 than have them come over all the time so that -- because
20 they were busy, they wanted more quality visits; that's
21 what Dieter was telling me.
22   Q.   Did you talk to Baillie about those, too?
23   A.   Yes.
24   Q.   Did he give you an explanation as to why he

Page 78

1  wanted more agency calls?  He thought it would result in
2  more business?
3    A.   Yes.
4    Q.   He thought it would make the branch more
5  profitable?
6    A.   He didn't say those words.
7    Q.   But did you understand that?
8    A.   Yeah.
9    Q.   His goal was to make the branch profitable;
10 is that correct?
11   A.   Yes.
12   Q.   All right.  Now, the picture of the totaled
13 car that he had in his desk, did you report this to Mr.
14 Ekdahl?
15   A.   I believe I did.
16   Q.   Did Ekdahl instruct you to say anything to
17 Baillie about it?
18   A.   Yes, he did.
19   Q.   Okay.  What did he tell you to say to Mr.
20 Baillie?
21   A.   I asked him if it would -- this was fairly
22 new to my tenure in HR, and I wasn't really sure what my
23 place was with Doug.  And I asked him --
24   Q.   I'm sorry, why weren't you sure what your

Page 79

1  place was with respect to Doug?
2    A.   If I should be counseling my direct
3  supervisor.  He's my boss, I'm not his boss; so where's my
4  place?  Is he going to tell me mind my own business or is
5  he going to appreciate what I can share.
6        So I called Ekdahl both to tell him what it
7  was and to ask him if it would be okay and would it be
8  appropriate for me to ask Doug not to brag about this
9  anymore, because we had some people in the branch that had
10 lost family members to drunk drivers and its impact was
11 not good.  And he said "yeah, you should talk to Doug
12 about that and let him know."
13   Q.   Okay.  Did you talk to Doug about that?
14   A.   Yes.
15   Q.   And what did Doug say?
16   A.   He was fine with it, and to the best of my
17 knowledge, didn't talk about it.
18   Q.   Okay.  So when you told him to stop doing
19 it, he listened to you and stop doing it, as far as you
20 know?
21   A.   As far as I know.
22   Q.   Would this be in like the '99 time frame?
23   A.   Right.
24   Q.   So when Mr. Baillie received his 2000

Page 80

1  performance review, it would concern matters that had been
2  reported to the company in 1999 or his performance in '99?
3        MR. MONTGOMERY:  Objection.  Calls for
4  speculation.
5    A.   I've never seen his review.
6    Q.   Okay.  Now, the agency outings that people
7  at the agency outings, they were golf outings, right?
8    A.   Some.
9    Q.   Okay.  What agency outings are you aware of
10 that Mr. Baillie allegedly drank too much or behaved
11 inappropriate other than golf outings?
12   A.   The March Madness event that we host at
13 Westminster's, Reds games, dinners.
14   Q.   Who complained to you that Mr. Baillie drank
15 too much or behaved inappropriately at your March Madness
16 event?
17   A.   I don't recall who it was off the top of my
18 head.
19   Q.   Do you think you're turned over to us all
20 your notes concerning Mr. Baillie?
21   A.   Yes.
22   Q.   Okay.  You don't have any other notes that
23 would refresh your recollection as to -- you say somebody
24 complained to you, though, about his behavior at March

Page 81

1 Madness?

2    A.  I remember the department -- I remember it
3 was Commercial Lines employee, so it mind come to me, it's
4 been a couple of years.

5    Q.  Was the substance of his complaint that Mr.
6 Baillie drank too much?

7    A.  That he drank too much, that he wanted them
8 all to stay out with him, that no one wanted to be last
9 one there because he wouldn't let them leave -- and now I
10 remember who it was.  It was Janet Probst, P-R-O-B-S-T.

11    Q.  Janet.  The company sponsored this event?

12    A.  Yes.

13    Q.  At a bar?

14    A.  For "Insuring the Children."

15    Q.  Sponsored at the bar for "Insuring the
16 Children"?

17    A.  Yes.

18    Q.  And this was during basketball games?

19    A.  Yes.

20    Q.  Do you recall whether this was an all-night
21 thing or an all-day thing?

22    A.  It was during the day.

23    Q.  Did anybody raise any concerns about the
24 fact that the company was sponsoring an event at which

Page 82

1 people would be drinking during the day and getting in
2 their cars and driving home?

3    A.  Before we would hold an event such as this
4 or a holiday party --

5    Q.  Uh-huh.

6    A.  -- any of those types of events, I would
7 send out an e-mail that said that we would confidentially
8 provide cab service to anyone who was uncomfortable
9 driving.  There was always food served throughout every
10 event.

11    Q.  And you sent out that e-mail because you
12 knew that people would drink and drive --

13    A.  In case.

14    Q.  -- potentially?

15    A.  Yeah, in case someone got carried away.

16    Q.  Now, you know -- or do you not know -- do
17 you believe that everybody who had too much to drink at
18 that March Madness event signed up confidentially to get a
19 cab, or do you think somebody got drunk and drove home in
20 their car?

21    A.  I can't answer that.

22    Q.  Whose idea was it to have the March Madness,
23 was this a Baillie idea or is it a company idea, beyond
24 Baillie?

Page 83

1    A.  It's a Cincinnati event.  I'm not sure what
2 they do in other areas, so I don't know whose idea it was
3 initially, whether it was Doug's or Jeff Barton's.  It
4 would have been one of those two.

5    Q.  Who is Jeff Barton?

6    A.  He's the Regional Marketing Manager.

7    Q.  But you can't remember anybody -- you didn't
8 send out your e-mail about the availability of cab service
9 due to somebody complaining, this was just some
10 common-sensible thing that you thought you should send
11 out?

12    A.  Right.

13    Q.  How did you respond to Janet Probst?  Did
14 you say, "Janet, listen, we sponsor a drinking event all
15 day long, it's natural for Mr. Baillie to be allowed to
16 drink like others," or did you say "you're right, Baillie
17 shouldn't drink during this event," or what did you say to
18 Probst?

19    A.  We also served water and soda, so I wouldn't
20 like that --

21    Q.  I think every bar serves nonalcoholic
22 beverages.

23    A.  Right.  There were several people who were
24 drinking club soda.

Page 84

1    Q.  What did you say to Probst?  Did you say
2 "Probst, you're exactly right"?  Did you say "Probst,
3 you're exactly wrong"?  Did you say "Probst" -- you know,
4 this is kind of like the other thing, "get on" -- you know
5 -- "this is real world," anything like that?

6    A.  I didn't really give her advice.  I took it
7 all in and --

8    Q.  What did you tell Baillie about it?  Did you
9 counsel Baillie?

10    A.  No.

11    Q.  Why not?  Didn't think it was serious enough
12 to counsel Baillie?

13    A.  Well, it was right after he and I had some
14 difficulties and I was not comfortable.

15    Q.  Did you report the March Madness thing to
16 Ekdahl?

17    A.  No, I don't think so.  Not that I recall.

18    Q.  But the Reds games -- somebody complained
19 about Baillie's behavior at Reds games?

20    A.  Just loudness, and teasing, and bantering,
21 and drinking and driving.

22    Q.  Is this another thing that the company
23 sponsored?

24    A.  No, this was an agency event.  I believe it

Page 85

1  was AON, A-O-N.
2      Q.  Do you think this was one event?  When you
3  said "Reds," I think you said "games" --
4      A.  He --
5      Q.  -- are you saying there were multiple
6  occasions at which Baillie was accused acting
7  inappropriately?
8      A.  Yeah.  We had four season tickets --
9      Q.  Uh-huh.
10     A.  -- and people would off-the-cuff tell me "I
11 can't believe he's in so early, he really tied one last
12 night," or "I didn't want to drive home with him," or that
13 sort of thing.  But this was -- there was no proof and
14 people would be amazed at how much he could drink and
15 function the next day, as well as that night.
16     Q.  As well as he did?
17     A.  Yeah.
18     Q.  He could function very well, and he could
19 function very well despite whatever happened the night
20 before?
21     A.  Yes.
22     Q.  Okay.  And multiple times at Reds games,
23 this would be reported to you as a problem of some sort?
24     A.  Most of the time it was just off-the-cuff

Page 86

1  comments.  It wasn't an official-HR type conversation
2  where they wanted their name written down.  A lot of
3  times, as you'll see in my notes, I didn't write them down
4  because people would -- they didn't want me to write it
5  down, they didn't want to report it, they wanted to just
6  talk about it with someone as a peer, and not an HR
7  manager.
8      Q.  So you viewed your role as an HR manager, if
9  you became aware of things that were bothering employees,
10 you would let the employee tell you whether or not to make
11 it official?
12     A.  No.
13     Q.  And you would agree with me as an HR person,
14 if you're aware of concerns about a person's performance,
15 or anything, really, you should take whatever appropriate
16 action?  You're the one that --
17     A.  Absolutely, yes.
18     Q.  -- who decides how to do things from a human
19 resources standpoint?
20     A.  Right.
21     Q.  You don't let the employees decide whether
22 or not it's a matter of concern?
23     A.  Right.
24     Q.  Okay.  But you were aware of all these

Page 87

1  comments, the March Madness comments, the Reds games
2  event, the agency events, the dinners, agency outings, the
3  picture of the totaled car, you were aware of all these
4  complaints about Baillie and drinking and being loud and
5  obnoxious?
6      A.  Third-party, yes.  Not --
7      Q.  I assume, as a human resources manager, you
8  investigated these things when you found out about them?
9      A.  I would talk to Ekdahl about them.  I would
10 sometimes talk to Doug about them.
11     Q.  So you would report some of these to Ekdahl?
12     A.  Yes.
13     Q.  Did Ekdahl ever take any action against
14 Baillie that you're aware of?
15     A.  Not that I'm aware of, I don't know.
16     Q.  Are you familiar with the Chubb Code of
17 Conduct?
18     A.  Yes.
19     Q.  Did Mr. Baillie ever violate the Code of
20 Conduct in regard to these matters at all?
21     A.  Yes.
22     Q.  Is it normally that violations of Code of
23 the Conduct result in some sort of discipline, or is it
24 just a piece of paper, a bunch of, you know, things that

Page 88

1  are written on paper, but not really enforced?
2          MR. MONTGOMERY:  Compound.  Argumentative.
3      Q.  Is the Code of Conduct taken seriously at
4  Chubb?
5      A.  Yes.
6      Q.  Is HR responsible for disciplining people
7  for violations of the Code of Conduct?
8      A.  Yes.
9      Q.  All right.  Do you think the Dana Snyder
10 matter was a violation of Chubb's Code of Conduct?
11     A.  It was not conclusive.
12     Q.  Did you think the dinner meeting with Tom
13 Gates was a violation of Chubb's Code of Conduct?
14     A.  Again, it's he-said-he-said.
15     Q.  Nonconclusive?
16     A.  Right.
17     Q.  Okay.  The agency -- some other agency
18 outings that Mr. Baillie allegedly was accused of drinking
19 too much was at golf outings; is that correct?
20     A.  I've heard of golf outings.
21     Q.  Were the golf outings sometimes sponsored by
22 Chubb?
23     A.  Yes.
24     Q.  Who was the host of those events?  The

Page 89

1  person that was viewed as the host of the golf outing?
2      A.  Doug.
3      Q.  And was this another event at which -- the
4  company sponsored, at which they served alcohol and they
5  knew people would drive home after drinking?
6      A.  How do you know someone's going to drive
7  home after drinking?
8      Q.  Well, do you play golf at all?
9      A.  Yes.
10     Q.  Do you have any experience from your real
11  life to know that when a company supplies alcohol on a
12  golf course, it's likely that golfers are going to drink
13  while they are golfing?  Or do you think -- were you
14  surprised to learn that people were drinking at golf
15  outings?
16     A.  If it's available, it's one thing.  If you
17  chose to drink it, is another.  I don't really chose to
18  drink when I'm golfing.
19     Q.  Do you know -- I mean, maybe you haven't
20  done any research on the subject, but are you experienced
21  enough to know that, you know, at golf outings people
22  drink beer, a number of people drink beer, it's a fun
23  occasion?
24     A.  Occasionally.

Page 90

1      Q.  Right.  Did you send out any kind of e-mails
2  in advance of the golf outings to indicate to people that
3  you could get them cabs on a confidential basis if they
4  felt like they needed a ride home?
5      A.  I don't believe we sent an e-mail before the
6  golf outing.
7      Q.  Can you think of any events in which you
8  sent e-mails other than the March Madness event?
9      A.  The holiday party.
10     Q.  You knew people would potentially drink and
11  drive at the holiday party?
12     A.  Potentially.
13     Q.  Does the March Madness event still occur?
14     A.  Yes.
15     Q.  The company still hosts people at Reds games
16  and has golf outings and holiday parties and dinners at
17  which alcohol is served?
18     A.  Yes.
19     Q.  Now, what about the -- you told -- you also
20  told Ekdahl about the Jamaica event?
21     A.  Uh-huh (nodding head affirmatively).
22     Q.  Is this the event where Mr. Baillie
23  allegedly had an argument with his wife on the beach?
24     A.  Yes.

Page 91

1      Q.  Did it violate the Chubb Code of Conduct for
2  Mr. Baillie and his wife to have an argument on the beach?
3      A.  Not directly.
4      Q.  Did you ever speak to Mr. Baillie about what
5  happened during the argument on the beach, what caused it?
6      A.  He denied the event.
7      Q.  Were you a witness to it?
8      A.  No.
9      Q.  Who was?
10     A.  Well --
11     Q.  Did someone report to you that there was an
12  argument on the beach?
13     A.  Yes.
14     Q.  Do you remember who that was?
15     A.  His wife.
16     Q.  His wife talked to you --
17     A.  Uh-huh (nodding head affirmatively).
18     Q.  -- and said they had an argument on the
19  beach?
20     A.  Yes.
21     Q.  What did she say about the argument on the
22  beach to you?
23     A.  Do you want me tell you the whole --
24     Q.  Yeah, why don't you?  This is all reported

Page 92

1  by his wife, Mrs. Baillie?
2      A.  Yes.  She said that the meetings were over
3  for the day and that Doug and she and David Walker, I
4  believe, and his wife -- it's an agent in our Louisville
5  territory --
6      Q.  Uh-huh.
7      A.  -- went down to the beach and that there was
8  some -- again, this is two years ago -- like a floating
9  island or trampoline or something out on the beach tied
10  down and that they wanted to go out and get to it.  So
11  Dori was going to set up a little area on the beach.
12  David and Doug ran out.
13         Doug didn't realize he still had all his
14  money and keys and whatnot, credit cards, so they got into
15  a disagreement.  Doug threw what was in his pocket at
16  Dori, but it was in a money clip, so it went flying
17  everywhere.
18         So Paul Crumb, other agents that were there,
19  other senior Chubb personnel that were there, everyone,
20  kind of ran down to retrieve his items, his personal items
21  that were floating all around the ocean.
22     Q.  Okay.
23     A.  (Continued)  And that's what she told me
24  happened.

Page 93

1    Q. Was she telling you this like at a cocktail
2 party or at dinner or something?
3    A. It was at our company picnic.
4    Q. Did Dori want you to report this to Human
5 Resources, Mr. Ekdahl?
6    A. No, that's not why she told me.
7    Q. But you did report it to Mr. Ekdahl?
8    A. Yes.
9    Q. Why did you report this to Mr. Ekdahl?
10    A. Mainly because our agents were involved
11 and --
12    Q. What did Mr. Baillie do wrong against
13 company policy then? First of all, was he subjected to --
14 was he subject to company policy when he was on the beach
15 with his wife and some friends?
16    A. At a Chubb-sponsored event with the senior
17 management from our company and our top tier agents,
18 there's an expectation that you behave in an appropriate,
19 professional manner.
20    Q. Had you been having problems with Mr.
21 Baillie at the time you reported this to Mr. Ekdahl?
22    A. Not that I recall, not then.
23    Q. Did Mr. Ekdahl share your view of the
24 seriousness of this event?

Page 94

1    MR. MONTGOMERY: Objection. Calls for
2 speculation.
3    Q. Did he say anything or do anything that made
4 you believe that he shared your view that this was a
5 serious violation?
6    A. He didn't really say, he was on the
7 telephone.
8    Q. He is your boss, right, and you're in HR?
9    A. Who is "he"?
10    Q. Ekdahl.
11    A. Yes.
12    Q. And you're talking to him, I mean, aren't
13 you -- you're reporting it to him because you think it's
14 seriousness enough to report to Ekdahl --
15    A. Yes.
16    Q. -- right? Like a violation of Human
17 Resource Policy or Company Policy of some sort, right?
18    A. If nothing else, when it involves our agents
19 and the behavior of our senior leader, yes. I felt that
20 that behavior was inappropriate.
21    Q. And you're saying you thought -- you
22 reported to him this because you thought it was
23 inappropriate and you can't recall whether or not Mr.
24 Ekdahl agreed or disagreed with you?

Page 95

1    MR. MONTGOMERY: Argumentative. Asked and
2 answered.
3    Q. Is that right?
4    A. Have you met Mr. Ekdahl?
5    Q. I guess I will.
6    MR. MONTGOMERY: You don't get to --
7    THE WITNESS: I don't get to ask him
8 questions?
9    MR. MONTGOMERY: Just answer to the best of
10 your ability.
11    THE WITNESS: All right.
12    Q. Okay.
13    A. (Continued) I can't -- I can't say what was
14 in his head.
15    Q. All right. And he didn't express to you
16 what was in his head?
17    A. Not that I remember.
18    Q. Okay. Now, what did Mr. Baillie say when
19 you discussed it with him?
20    A. I didn't.
21    Q. Why wouldn't you talk to -- why didn't you
22 talk to Mr. Baillie to get his side of the story?
23    A. Because part of what Dori had said was that
24 that morning Tim Zerlong had asked Doug whether it

Page 96

1 occurred and Doug said it didn't, and she was upset about
2 that, that he had lied to Tim Zerlong. So no, I wasn't
3 going to say anything to Doug about it.
4    Q. Did you go to talk to Zerlong about it?
5    A. No.
6    Q. The only persons you talked to about this
7 was with Dori, his wife, and to Jim Ekdahl?
8    A. And Lash was standing there when Dori was
9 telling the story, Jim Lash, so.
10    Q. Did you discuss it with Jim Lash at all or
11 did he just hear --
12    A. After?
13    Q. -- what Dori said?
14    A. No, we didn't talk about it after. I did
15 talk to one other person, but only when they brought it
16 up, and that was Andy Bryant.
17    Q. And what did Andy Bryant say to your
18 recollection?
19    A. He said that David Walker had approached him
20 after Doug's departure and asked if Doug was let go
21 because of what happened in Jamaica.
22    Q. So this was a conversation with Andy Bryant
23 after Baillie was terminated?
24    A. Yes.

Page 97

1   Q.   What was the response to Walker, do you
2   know?
3   A.   I believe he said "we're not aware of why
4   Doug left," and -- I don't know exactly what he said to
5   him, you'll ask have to ask Andy.
6         (A recess a taken from 4:04 p.m. to
7         4:16 p.m.)
8   Q.   Now, earlier, Diane, you mentioned that Mr.
9   Baillie had made some sexist comments during his tenure.
10  Do you recall that testimony?
11  A.   Yes.
12  Q.   What was the nature of the sexist comments
13  he made?
14  A.   On one occasion he had told Becky Emerson,
15  who was our shared assistant, that I was very selfish for
16  working while I was pregnant and it's not good for the
17  baby, that I should be home with my children.  Would you
18  like more?
19  Q.   What I'd like you to do is tell me all of
20  the sexist comments --
21  A.   Okay.
22  Q.   -- he supposedly made.
23  A.   We went to a happy hour for someone's
24  going-away party, I believe, and I was chatting with him

Page 98

1   about how he was -- how he was doing with the city, he was
2   fairly new to the city, and how his wife, Dori, was doing
3   and he said that she was very lonely and she wanted him
4   home all the time, very needy.  And I suggested that he
5   have her join the golf league at Ivy Hills or a bridge
6   club, something like that to make some friends.  And he
7   said "no, no, no, I don't like her to go out without me
8   because women are known for being taken advantage of by
9   men and before you know it, she would end up in bed with
10  some guy, and I just don't want to put her that position,
11  because men are so manipulative and women are easily
12  manipulated."
13  Q.   That was in a bar?
14  A.   Yes.
15  Q.   Did you ever wonder whether or not he was
16  yanking your chain over that comment?  Do you know what I
17  mean by --
18  A.   I don't really care if he was yanking his
19  (sic) chain.  It was inappropriate in my opinion.
20  Q.   Inappropriate even if he was kind of just
21  joking around with you?
22  A.   Yes.
23  Q.   Okay.  Anything else?
24  A.   I've had -- Beth Hunter left the company

Page 99

1   after having her second child and when I asked her if
2   she'd be willing to come back maybe on a part-time basis
3   when we really needed her, she would not come back until
4   Doug was gone because of things that he had said to her,
5   but she wouldn't elaborate.
6   Q.   What made you conclude that they were sexist
7   comments as opposed to, you know --
8   A.   That's all she would tell me was the nature.
9   She said "I don't want to go into it, I just feel that I
10  don't want to work for him directly or indirectly, that
11  he's a pig, and I don't need that."
12  Q.   Did you perform any investigation as a
13  result of Beth Hunter's comments?
14  A.   She was not an employee at the time.
15  Q.   No investigation?
16  A.   I asked the questions and she wouldn't
17  answer them.
18  Q.   I'm sorry, beyond the conversation with her,
19  did you do any investigation?
20  A.   No.
21  Q.   Did you report the comments at the happy
22  hour to anyone else?
23  A.   Yes.
24  Q.   Who to?

Page 100

1   A.   Ekdahl.
2   Q.   You would agree with me that Ekdahl is
3   responsible for enforcing company policy and procedure?
4   A.   Yes.
5   Q.   Ekdahl is responsible for enforcing the
6   company's code of conduct?
7   A.   Yes.
8   Q.   Ekdahl is responsible for enforcing the
9   company's policy against sex discrimination or being
10  sexist?
11  A.   Yes.
12  Q.   All right.  Did you report the Becky Emerson
13  comment to Ekdahl?
14  A.   Yes.
15  Q.   Okay.  What did Ekdahl tell you about the
16  happy hour incident, if can you recall?
17  A.   I believe he expressed some disappointment,
18  but that was all.
19  Q.   Okay.  Nothing else you can remember?
20  A.   No.
21  Q.   How about the Becky Emerson incident, do you
22  remember anything Ekdahl said or led you to believe?
23  A.   I believe he just wanted me to feel better
24  about working both during my pregnancy and in the hopes

Page 101

1 that I would return and he said "we really appreciate it,
2 I hope that you would tell us if you or your doctor felt
3 that you shouldn't be working for any medical reasons."
4 He wanted to clarify -- to make sure that I -- there was
5 no physical reason that I should be home and that I'm
6 being selfish. I confirmed that there was not.
7    Q. What do you think led him to ask that
8 question, to believe that you might have some sort of
9 physical problem or was he being sexist?
10    A. Well, in HR we have women who leave early
11 during their pregnancy because of complications, they go
12 on bed rest. And he wanted to make sure that I wasn't in
13 a position where I was potentially putting myself or the
14 baby at risk and once he confirmed that that was not the
15 case, he then said "okay, we do appreciate you being
16 here," and that was about the extent of it.
17    Q. Okay. But he wanted to confirm that?
18    A. Yeah.
19    Q. Did you tell him about the Beth Hunter
20 comment, Ekdahl, or did you think it was not important
21 enough or the fact that she was no longer employed made it
22 inappropriate to report it to Ekdahl?
23    A. I don't recall reporting that to Ekdahl.
24    Q. Baillie was obviously still in charge when

Page 102

1 Hunter made that comment because she said she didn't want
2 to come back to work for him?
3    A. That's right.
4    Q. Okay. You earlier referenced reporting to
5 Ekdahl instances in where you were directly involved --
6    A. Yes.
7    Q. -- in connection with problems with Baillie.
8 Other than what you've already said about these allegedly
9 sexist comments, are there other instances where you were
10 directly involved in which Baillie did something
11 inappropriate or improper or contrary to company policy or
12 the Code of Conduct?
13    A. I can remember two events. One was an
14 account review meeting that I was a participant of where
15 Doug read the newspaper during the entire meeting while
16 other people were talking and defining their accounts and
17 their strategy and that sort of thing. And the other --
18    Q. Did you -- I'm sorry to interrupt you.
19    A. That's okay.
20    Q. You said there were two things. Did you
21 report this reading a newspaper to Ekdahl or anybody else?
22    A. I believe I did.
23    Q. And do you think you called Ekdahl and said
24 "Baillie is acting up again, now he's reading a newspaper

Page 103

1 during a meeting"?
2    A. It was in conjunction with the Korte
3 conversation with wanting to make sure that both at his
4 level and with Dieter's zonal and myself, that we retain
5 Dieter. And that "Dieter's very frustrated, he wants to
6 leave, and this happened, and they have differing views on the
7 business focus." So it was in -- it was part of a larger
8 conversation. He was just as example.
9    Q. Were you sitting behind Baillie at this
10 meeting?
11    A. I was -- he would be here (indicating), and
12 I was here (indicating).
13    Q. You're saying he read the newspaper the
14 entire meeting?
15    A. Pretty much.
16    Q. What was Ekdahl's response?
17    A. One of disappointment.
18    Q. Okay. Did he tell you to do anything about
19 it?
20    A. No.
21    Q. Did you talk to Baillie about the -- did you
22 ever confront Baillie about reading the newspaper?
23    A. Yes.
24    Q. What was Doug's reaction?

Page 104

1    A. "I can listen and read the paper at the same
2 time."
3    Q. He can multitask?
4    A. Yes.
5    Q. Did you have any reason to disbelieve him?
6    A. Like I said, that's irrelevant because the
7 perception is that "this is not of interest to you or a
8 priority for you." I don't -- whether you're listening or
9 not, it gives the impression to other people that they're
10 not as important as your newspaper.
11    Q. Had other people complained to you about
12 this, or was this an impression you formed?
13    A. Other people complained about it.
14    Q. Who were they?
15    A. Dieter, Kevin Murphy, Erin Pesce, P-E-S-C-E,
16 E-R-I-N.
17    Q. What else were you involved in personally?
18 You said there were two things, I think.
19    A. Yeah, the --
20    Q. He read a newspaper and secondly --
21    A. The other was -- after I had my second child
22 and came back to work, I had, during my FMLA, come into
23 the office and met with Jim Ekdahl and Doug Baillie about
24 a reduced work schedule, 30 hours a week.

Condensed It!

Page 105

1    Q.    Ekdahl and Baillie together?

2    A.    Yeah.  He came in from Chicago and we met

3 about it. (Continued)  We were all in agreement with the

4 hours, I thought.  Doug wasn't happy about the reduced

5 schedule, but was going to try it out.

6         I -- the plan was Monday, Wednesday ten-hour

7 days, Tuesday, Thursday, five-hour day.  And I worked --

8 left at about 1:00 p.m. on Tuesday.

9         Wednesday morning when I got in, Doug called

10 from his cell phone on the speaker with Jeff Barton next

11 to him and told me that my leaving yesterday was grounds

12 for dismissal, he hadn't approved -- that if I was going

13 to leave at 1:00, I had to take a PTO day, and if I was,

14 in fact, taking a PTO day, that he hadn't approved it, and

15 that I was insubordinate by leaving.

16    Q.    Okay.  And what was wrong with Baillie's

17 statement in that regard?

18    A.    Well, first of all, that's not grounds for

19 dismissal, you have ten unscheduled PTO days that you can

20 take without prior approval from your manager as part of

21 our policy to allow for sick days and, you know,

22 emergencies.  It's not defined, it's whatever you need it

23 for.

24         And second of all, he had this conversation

Page 106

1 with me, a very personal conversation, on a speakerphone

2 with Jeff Barton sitting next to him listening to the

3 whole thing, and actually chiming in on occasion.

4    Q.    Barton should remember that --

5    A.    Yes.

6    Q.    -- well, strike that.

7         Okay.  Anything else that was wrong with

8 that conversation?

9    A.    Well, probably the fact that I had to take a

10 PTO day and was already being docked for not being there

11 by only getting paid for 30 hours a week.

12    Q.    I'm sorry, you were only getting paid for 30

13 hours per week?

14    A.    Yes.  My pay was reduced when I started the

15 schedule and --

16    Q.    How was your pay being docked if you were

17 getting paid for 30 hours of work if you worked 30 hours?

18    A.    Well, if I have to take a PTO day, a half

19 PTO day, that would assume I'm working 40 hours a week and

20 getting paid for 40.  Ten hours, Monday, Wednesday, five

21 hours, Tuesday, Thursday, to get to the 30.

22         If I have to take half-days for the

23 afternoon of Tuesday and Thursday and not get paid for

24 them on top of it, it's double -- I'm being penalized

Page 107

1 twice.

2         Does that make sense?  I'm already not being

3 made for it and I have to take a PTO day.  It's like

4 taking a PTO day on Saturday.

5    Q.    Was this policy only applied to you?

6    A.    Yes.

7    Q.    I mean, were there other people with the

8 same arrangement that were treated differently than you

9 that you knew of?

10    A.    Yes.

11    Q.    Other people that had a 30-hour workweek --

12    A.    Flexible work.

13    Q.    -- flexible work week, other women?

14    A.    Yes.

15    Q.    Were there men with flexible workweeks?

16    A.    Not that I knew of.

17    Q.    Okay.  And you're saying that Baillie or the

18 company treated you differently than other people that had

19 flexible workweeks?

20    A.    Yes.

21    Q.    And the other people with flexible workweeks

22 were female?

23    A.    I know of some that are female.

24    Q.    Do you know of any that are -- well, okay.

Page 108

1         So you realize that the different treatment

2 of you was not on account of your sex; is that correct,

3 because there were other females being treated differently

4 than you?

5    A.    Right.

6    Q.    Okay.  What do you think it was on account

7 of that you were being treated differently?

8    A.    My position.

9    Q.    Okay.  Baillie expected more of you because

10 of your position in some way?

11    A.    Yes.

12    Q.    Why had you taken that day off?

13    A.    Why did I?

14    Q.    The PTO, what was it for?

15    A.    Why did I take a PTO or why did I leave?

16    Q.    Why did you leave work?

17    A.    Well, we had an understanding that I would

18 work until noon on Tuesday and Thursday.

19    Q.    Okay.  Any other reason?

20    A.    That's enough.

21    Q.    He should have known you were going to take

22 the half-day off?

23    A.    Right.

24    Q.    Did you explain to Doug, "well, we had this

Page 109

1 understanding, Doug, and I took the day off work because
2 I'm not supposed to be working"?
3    A.   Yes.
4    Q.   And what did he say?
5    A.   He said -- I don't remember word for word,
6 of course, this is approximately what he said, okay?
7    Q.   Uh-huh.
8    A.   He said "are you still the Regional HR
9 Manager?" And I said, "yes, until you fill the position
10 otherwise." And he said, "well, as long as you are the
11 Regional and until your replacement gets here, I expect
12 you to work 40 hours minimum a week."
13    Q.   So you considered that a directive from him
14 to work 40 hours per week?
15    A.   Yes.
16    Q.   And did you work 40 hours per week
17 thereafter or did you disregard his direction?
18    A.   Well, I called Ekdahl, who was also at this
19 meeting where we all agreed to it --
20    Q.   Uh-huh.
21    A.   -- and it was his recollection that Doug did
22 agree to allow me to go to the 30 hours as well, and I
23 believe he talked to Doug and they came to an
24 understanding that Ekdahl was to post the job immediately,

Page 110

1 my job, to get a replacement, and I was allowed to
2 maintain the 30-hour workweek in the office.
3    Q.   And thereafter did you have any more
4 problems with Baillie regarding the 30-hour workweek?
5    A.   Well, it never really was 30 hours. He
6 would, in my opinion, come over and at 11:15 or 11:30 on
7 the day that he knew I needed to leave at 12:00 with a
8 project, calls on Fridays, that sort of thing. So that's
9 all right, that was the job, so I put in the hours that --
10 (witness did not complete response).
11    Q.   What year was this?
12    A.   My son was born July --
13    Q.   How old is your son?
14    A.   He was born in 2000, so it would have been
15 end of 2000, first quarter of 2001.
16    Q.   Okay. Now, in these various problems that
17 you've described to us that you talked to Ekdahl about
18 occurred throughout Baillie's tenure while you were the HR
19 Manager; is that correct?
20    A.   Uh-huh (nodding head affirmatively), yes.
21    Q.   And it seems to me like you came to a
22 conclusion and reported to Ekdahl, you know -- is a fair
23 understanding of your testimony to say that you basically
24 reported to Ekdahl that you were working for a sexist who

Page 111

1 drank too much, behaved improperly in front of agents and
2 others, who had a management philosophy that didn't make
3 any sense and otherwise didn't manage his people very
4 well?
5         MR. MONTGOMERY:   Objection.  To some extent
6    it mischaracterizes the testimony.
7         THE WITNESS:  Do I answer anyway?
8         MR. MONTGOMERY:  Yeah.
9    A.   I never said them in those words.  I
10 reported what was reported to me.
11    Q.   Okay.  Let me ask you this question --
12    A.   (Continued)  And I didn't consider it
13 reporting as much as I would consider gaining advice from
14 Ekdahl on how to manage the situation.
15    Q.   As Human Resources Manager, did you form an
16 opinion that Mr. Baillie was a sexist?
17    A.   As a person or as a human resources manager?
18    Q.   I'm asking you whether you thought that a
19 human resource manager for Chubb Insurance Company.
20    A.   Yes.
21    Q.   Okay.  Did you think in your role as Human
22 Resource Manager that you had a guy in charge of a branch
23 that drank too much?
24    A.   Yes.

Page 112

1    Q.   And you, as an HR Manager, thought he
2 violated the Chubb Code of Conduct?
3    A.   Yes.
4    Q.   He behaved improperly in front of agents,
5 employees, and others?
6    A.   Yes.
7    Q.   Did you ever --
8    A.   (Continued)  You missed one.
9    Q.   What was the other one then?
10    A.   The other one was clarity of a strategy and
11 communication.
12    Q.   I assume you weren't in all of his meetings
13 he had with his subordinates --
14    A.   That's right.
15    Q.   -- is that fair to say?
16    A.   Yes.
17    Q.   Now, you've reflected on this matter, I
18 suppose, since Baillie was terminated, right?
19    A.   Yes.
20    Q.   Would you have an opinion one way or the
21 other if you learned that Mr. Baillie was never
22 disciplined by Ekdahl or anyone else for being a sexist?
23    A.   Would I have an opinion as to whether that
24 happened or whether --

Page 113

1    Q.   No.  Assume for a second that he was not
2  disciplined by the company despite your reports of his
3  sexism --
4    A.   Okay.
5    Q.   -- female sexism.  Do you have any belief or
6  understanding as to why he would not be disciplined?
7    A.   I wouldn't know.
8    Q.   Okay.  Assuming hypothetically that Mr.
9  Baillie was never disciplined for allegedly anything to do
10 with drinking, do you have an opinion or belief as to why
11 he was not disciplined for that by Ekdahl or Zerlong or
12 anyone else?
13   A.   No.
14   Q.   How about the behavior improperly in front
15 of others, agents, employees, and others, if he was never
16 disciplined for something like that, do you have an
17 opinion or belief as to why he was not disciplined?
18   A.   No.
19   Q.   Okay.
20   A.   (Continued)  It's hypothetically, right?
21   Q.   Are you aware --
22   A.   (Continued)  I don't know whether he was or
23 not.
24   Q.   Right.

Page 114

1    A.   (Continued)  You're assuming hypothetically
2  -- or I'm assuming he was not?
3    Q.   Uh-huh.
4    A.   (Continued)  Okay.  I just want to make sure
5  I understand the question.
6    Q.   Do you know what the phrase "progressive
7  discipline" means in the human resource context?
8    A.   I could speculate, but we don't use that
9  term.
10   Q.   To your knowledge, Chubb does not have a
11 progressive discipline policy?
12   A.   Could you tell me what it means and then I
13 can tell you what --
14   Q.   Well, what's your speculation on what it
15 means?
16   A.   That progressive discipline would be that
17 you make people aware of deficiencies or areas that need
18 to improve, and you revisit it and from a progressive
19 standpoint, maybe it starts with a verbal conversation,
20 it's followed up in writing, and could include termination
21 if they don't improve within a certain amount of time.  Is
22 that --
23   Q.   Okay.  Well, given that understanding of how
24 you were speculating about progressive discipline --

Page 115

1    A.   Okay.
2    Q.   -- do you know whether or not Chubb has any
3  policy or practice of following progressive discipline?
4    A.   Yes.
5    Q.   Explain -- you're saying they do have a
6  policy or practice of following progressive discipline?
7    A.   We do have a practice, it's a performance
8  improvement plan.  An initial warning is the first stage,
9  that can be verbal or written.  It is followed in 30 days
10 with a written warning.  And if there's not sustained
11 substantial improvement in the behavior, then an employee
12 could be terminated.
13   Q.   Okay.  Is there a suspension step anywhere
14 in here that you're aware of between, like, the written
15 warning and termination or do you know?
16   A.   "Suspension" meaning the person is excused
17 for a certain amount of time from the company, or what do
18 you mean by "suspension"?
19   Q.   What you just said, suspended from work.
20   A.   Okay, still an employee --
21   Q.   Yeah.
22   A.   -- but they're removed from --
23   Q.   Right.  Is that normally part of the
24 progressive discipline practice?

Page 116

1    A.   It's not normally part.
2    Q.   Okay.  Now, do you know a person by the name
3  of Butler?
4    A.   Yes.
5    Q.   Who is Butler?
6    A.   He is the Branch Manager currently and my
7  direct supervisor.
8    Q.   Okay.  Do you remember having a conversation
9  with Butler in November of 2001 after Mr. Baillie was
10 terminated about the subject of alcoholism?
11   A.   Yes.
12   Q.   Explain to me what prompted a conversation
13 about alcoholism in November, 2001.
14   A.   Well, it wasn't exclusively on alcoholism.
15 Jerry Butler used to be the Northern Zone HR Manager, so
16 we were talking about ADA -- we had, I believe, an
17 attorney in talking to us about ADA issues and law and
18 that was one of several things that we talked about.
19       We talked about what sort of steps do we
20 need to make as a company to accommodate employees with
21 certain disabilities.  We talked about --
22       MR. MONTGOMERY:  Okay, just -- are you
23       talking about conversations you had with the
24       attorney?

**Page 117**

1     THE WITNESS: No, this is with Jerry after
2 the attorney's presentation.
3     MR. MONTGOMERY: Okay. This was a Chubb
4 attorney?
5     THE WITNESS: No. It was an outside counsel
6 that came in --
7     MR. MONTGOMERY: Okay.
8     THE WITNESS: -- to give us a presentation
9 and training.
10     MR. MONTGOMERY: Okay.
11   A. (Continued) I'm done.
12   Q. Do you know -- well, let me hand you a
13 document Page 1348 of what's been produced, is that a --
14     MR. FREKING: I'm not going to make it an
15 exhibit.
16     (Off-the-record discussion.)
17   Q. Is that correct, that's your handwriting?
18   A. Yes.
19   Q. And it's November 18th --
20   A. 19th.
21   Q. Or 19th?
22   A. Yeah, yeah.
23   Q. Is that November 19th, 2001 --
24   A. Yes.

**Page 118**

1   Q. -- do you know?
2     Do you know whether or not Baillie -- the
3 subject of alcoholism came up with respect to Doug Baillie
4 at all with Mr. Butler?
5   A. I don't believe we said Doug's name.
6     MR. MONTGOMERY: I'm sorry, I couldn't hear
7 that.
8     THE WITNESS: I don't believe we said Doug's
9 name.
10   Q. Well --
11   A. (Continued) I was asking about our
12 practice, I'd know or if we don't know whether an
13 employee is an alcoholic or a drug abuser or has a
14 disability that we can't accommodate, maybe goes blind and
15 they're an underwriter that needs to travel, what do we
16 do; so I was asking more for HR notes.
17   Q. Let me hand you some documents that start
18 with No. 1351 and go through 1354, and again ask you if
19 those are your notes?
20   A. That's my handwriting.
21   Q. And that's November 14th of 2001?
22   A. Yeah. Wait, wait, yes.
23   Q. You would agree with me that that's the
24 notes you took regarding allegations that Baillie said

**Page 119**

1 something inappropriate at some convention Downtown; is
2 that correct?
3   A. These were the notes that I crafted for
4 dictation to go to Leonard Sherer.
5   Q. So you prepared those notes for the in-house
6 counsel?
7   A. Yes.
8   Q. Okay.
9     MR. MONTGOMERY: If that's correct, then I
10 would like to have those reproduced back, I think
11 they're privileged.
12   Q. Now --
13     MR. MONTGOMERY: Can we get those back then?
14 I think you're supposed to give those back if you
15 find that they're privileged.
16     MR. FREKING: I think these were made -- I'm
17 going to investigate how they were produced.
18     MR. MONTGOMERY: They were produced by us.
19 And now we've learned that she produced them in
20 order to dictate a memo to the in-house counsel.
21     MR. FREKING: I'm just going to confirm
22 where they came -- where they were produced from.
23     MR. MONTGOMERY: Okay.
24   Q. Now, we've been produced a lot of notes in

**Page 120**

1 this case that are in your handwriting.
2   A. Yes.
3   Q. Can you explain to us what you produced in
4 the sense of -- did you only produce documents related to
5 Doug Baillie or did you produce notes that were just a
6 copy of your entire file? Explain to me exactly what you
7 turned over in connection with this matter?
8   A. When I originally met with Dave Croall and
9 Leonard Sherer --
10     MR. MONTGOMERY: Well, just -- we're going
11 to have to be careful here, because -- and if you
12 want, I'd rather just go out and talk to her about
13 the privilege and make sure we --
14   Q. You should not tell us what counsel said to
15 you, okay?
16   A. Okay.
17   Q. And my question is solely --
18   A. Where did you --
19   Q. -- can you describe for us the documents
20 that you produced in this litigation without -- it seems
21 to me you gave some documents to counsel or to Chubb?
22   A. Yeah, I'm only -- I didn't think that they
23 would ever be discoverable. These were my mental notes to
24 myself --

Page 121

1    Q.    I understand that.
2    A.    -- that I brought with me to remind me.
3 This was -- these were all from my file, personal notes.
4    Q.    Well, that's the nature of my question. Did
5 you go through your file and select out documents that
6 you thought related to Baillie or did you take the notes
7 and just turned them over regardless of whether or not
8 they --
9    A.    He had --
10    Q.    -- dealt with Baillie?
11    A.    He had his own file. So when I went for my
12 interview, I took his file with me. It was specifically
13 on him.
14    Q.    Okay. So these notes that are in your
15 handwriting, you're saying actually would have come --
16 they may have been someplace else, but when you made notes
17 about Doug Baillie, you put them in his personnel file?
18    A.    I put them in a file for myself. It's my
19 personal notes.
20    Q.    Okay. But your personal notes, did -- this
21 file on your personal notes, did they concern all your
22 human resource activities or did you construct a file just
23 with respect to Baillie? That's what I'm trying to figure
24 out.

Page 122

1       Do we have Baillie notes from you and
2 others, or do we just have -- or did you go through and
3 just give us Baillie notes?
4    A.    I just gave you Baillie notes.
5    Q.    Okay. That's what I thought.
6       Now, why do you suppose the conversation
7 with Butler about alcoholism was produced to us if it
8 wasn't about Baillie?
9       MR. MONTGOMERY: It does call for
10 speculation, she didn't --
11       MR. FREKING: Okay. Strike that.
12       MR. MONTGOMERY: She didn't produce them to
13 you, we did.
14    Q.    You said you didn't talk to -- you didn't
15 mention his name.
16    A.    Right.
17    Q.    Do you know why it would be that a note
18 about alcoholism would be produced, if it was produced,
19 from a file concerning Baillie?
20    A.    Because of the excessive amount of drinking,
21 I wondered if he was an alcoholic, but had no
22 verification, so I put a copy of those notes in my
23 personal file on Doug --
24    Q.    Okay.

Page 123

1    A.    -- just in case.
2    Q.    Let me hand you a document, 1355, and ask
3 you if you recognize that document?
4       MR. MONTGOMERY: Before you see it, I just
5       want to look at it beforehand.
6    Q.    Do you know what that document is about? Is
7 that your handwriting?
8    A.    Yes, that's my handwriting. Doug and I had
9 a disagreement about my personal cell phone and getting
10 reimbursement for the business portion of those expenses.
11 And it was my understanding that we had an agreement and
12 then when I submitted the bills, he declined to pay them.
13 And so I was upset and looked at one of his months of cell
14 phones bills and wrote down a note to myself that if my
15 number of personal calls were excessive, he had three
16 times as many that particular month, so. I didn't share
17 that with anyone, that was just for my record in case it
18 came back again.
19    Q.    You were kind of mad at Baillie?
20    A.    Well, I was disappointed and didn't feel
21 that he was being fair. "Do as I say, not as I do," is
22 kind of what I felt like.
23    Q.    And where did you find his cell phone
24 record? Did you spend time during the workday to review

Page 124

1 his use of his cell phone?
2    A.    I didn't. Becky Emerson reviews all the
3 cell phone bills and highlights the notes -- which ones
4 are personal and which ones are business, just to get an
5 idea of who's abusing their corporate cell phone. And she
6 had them out and told me how many were personal.
7    Q.    So you discussed your disappointment with
8 Mr. Baillie's decision on your cell phone with Ms.
9 Emerson?
10    A.    Yes.
11    Q.    And so she checks every month to see if
12 someone's abusing their cell phone privileges?
13    A.    Yes.
14    Q.    Did she opine as to whether or not Mr.
15 Baillie was abusing his cell phone privileges?
16    A.    She felt that on a regular basis he had a
17 number of personal calls on his cell phone.
18    Q.    Did she opine whether he was abusing his
19 cell phone privileges?
20    A.    She more stated fact.
21    Q.    Did she tell you that there are 29 personal
22 phone calls out of 30 or out of a 100 or a 1,000, or do
23 you think it makes a difference?
24    A.    I didn't think it made a difference because

Page 125

1  that is the argument what he made with me on mine.
2      Q.   And what's the note about "Beth's notes and
3  three-ring binders"?
4      A.   She thought that she had possibly -- she
5  left some stuff when she resigned at her desk and she
6  thought that she had left some notes that she'd written
7  about interactions with Doug, but I couldn't find
8  anything.
9           This was after our conversation when I asked
10  her to come back and she said she wouldn't come back when
11  Doug was there. And she couldn't elaborate on why and what
12  specific interaction she had, she said "but I think I
13  might have taken some notes and they were in a blue
14  three-ring binder on my desk and if you still have my box
15  of stuff, look in there and see if it's there," it wasn't
16  there.
17      Q.   Okay. And it looks like you went to look
18  for that stuff around the time you were having this cell
19  phone argument with Mr. Baillie?
20      A.   Yeah, possibly. I can't say for sure, I
21  didn't put dates, so. May I see that one more time --
22      Q.   Uh-huh.
23      A.   -- and see the shadows and see if it came
24  from my calendar? It did come from my calendar, then I

Page 126

1  really can't say whether it was around the same time,
2  because if I got it from my planner, I might have just had
3  a "Doug" page and been writing things down.
4      Q.   Well, it looks like there's a -- two-thirds
5  of the page is blank --
6      A.   Yeah.
7      Q.   -- there's two entries on it, so it doesn't
8  look like a Doug page -- well, strike that.
9      A.   It is.
10      Q.   It's a Doug page --
11      A.   Yes.
12      Q.   -- you think?
13      A.   That's why it says "Doug" on top. You'll
14  see lots of "Doug" pages in there.
15      Q.   That have "Doug" on top?
16      A.   I have memos for all of my branch managers
17  on things that were happening, open items, that sort of
18  thing.
19      Q.   Uh-huh.
20      THE WITNESS: May I -- you can keep asking.
21  May I get some water?
22      MR. FREKING: Sure. Oh, yeah.
23      THE WITNESS: Sorry about that.
24      Q.   Now, tell me, Diane, did you, in addition to

Page 127

1  talking to Haggard (sic) --
2      A.   To --
3      Q.   I'm sorry, in addition to talking to Ekdahl,
4  did you have conversations with Tim Zerlong regarding any
5  of these concerns you had about Mr. Baillie?
6      A.   Yes, occasionally.
7      Q.   Describe for me the nature of those
8  conversations.
9      A.   Well, as far as communicating strategy and
10  managers who would approach me for advice on possibly
11  interpreting what Doug had directed them to do or what
12  they should be focusing on, that sort of thing, I would
13  ask Tim before I would go back to the employee and give
14  advice to make sure I wasn't saying the wrong thing --
15      Q.   Do you know --
16      A.   -- that I was consistent with corporate
17  directives.
18      Q.   Did you view yourself in the chain of
19  command with respect to these employees who were coming to
20  and questioning advice, you were fulfilling some sort of
21  human resource function, right?
22      A.   Right.
23      Q.   The people that were coming to you
24  expressing concerns reported to somebody else directly; is

Page 128

1  that correct?
2      A.   Yes.
3      Q.   Is there some reason why when people said "I
4  don't like whatever Doug's doing," is there some reason
5  why the easy response wasn't "well, go talk to your
6  immediate manager or go talk to Mr. Baillie directly"?
7  Why would Human Resources get involved? It doesn't sound
8  like a human resource issue.
9      A.   Well --
10      MR. MONTGOMERY: Objection. Argumentative.
11  It's not even a question really. There's no
12  question pending, so let's just wait until he ask.
13      MR. FREKING: Do you want to read back the
14  question?
15      (The court reporter read back the previous
16      question.)
17      THE WITNESS: Can I answer that?
18      MR. MONTGOMERY: Sure.
19      A.   Well, generally the first time or second
20  time, I would ask that they clarify it with Doug.
21  Generally these were Doug's direct reports that were
22  coming to me.
23          And after a couple of times and no -- they
24  still don't understand, then I would get involved. And I

## Page 129

1 believe my role is to make sure that our business results
2 are met or exceeded. Irregardless of whether that's
3 specific to a traditional HR function or not, our job is
4 to meet or exceed our budget
5    Q. After you became the Regional Manager back
6 in '99, did you receive any training in human resources or
7 personnel by Chubb?
8    A. Informal training.
9    Q. What do you mean by "informal training"?
10    A. I went up to Chicago for a week and met with
11 the HR team up there.
12    Q. Anything besides that?
13    A. An internal investigation seminar. A global
14 HR meeting.
15    Q. Any other conversation you remember having
16 with Zerlong specifically about Baillie other than these
17 complaints from subordinates?
18    A. He would ask for what employees are in
19 trouble or, you know, who's struggling in their job and
20 what we're doing about it. So we would talk about those
21 employees that were struggling in their positions and --
22 (witness did not complete response).
23    Q. And you would tell him Baillie was
24 struggling in his position?

## Page 130

1    A. No.
2    Q. Oh, I'm wondering about conversations you
3 had with him --
4    A. Other employees?
5    Q. -- about Baillie?
6    A. About -- oh. Well, he would ask me what
7 Doug is doing about those employees that are struggling,
8 but --
9    Q. And how would you know what Doug was doing
10 about those employees who were struggling?
11    A. Well, I wouldn't know everything, but I
12 should know who is struggling and Doug and I would talk
13 about his plan for certain employees and if it were a
14 performance improvement plan, then I would need to review
15 all the documents before they're submitted to the
16 employee.
17    Q. How many -- did Mr. Baillie meet
18 occasionally with subordinates to discuss their
19 performance?
20    A. Yes.
21    Q. How many meetings during the two years you
22 overlapped with Mr. Baillie, approximately, would you say
23 you sat in in which Mr. Baillie had a performance
24 discussion with his subordinate?

## Page 131

1    A. Maybe three.
2    Q. You can remember three times you sat in on
3 meetings in which --
4    A. Involving someone else --
5    Q. -- in which Baillie --
6    A. -- yeah.
7    Q. So the vast majority of the time you were
8 not present when Mr. Baillie would meet with his
9 subordinates to discuss their performance?
10    A. Right.
11    Q. Did you tell Mr. Zerlong "I don't have very
12 much knowledge of how Doug is dealing with this, because
13 I'm not in the meetings between Doug and his
14 subordinates"?
15    A. Well, and the specific employee we're
16 talking about, I was in the meetings.
17    Q. Who was that?
18    A. Michael Whitman, W-H-I-T-M-A-N.
19    Q. Are those the three meetings you were in on?
20    A. Yes.
21    Q. Okay. So you can't recall any other
22 meetings you were in in which Mr. Baillie discussed
23 performance with a particular subordinate?
24    A. Right.

## Page 132

1    Q. Any other things you recall discussing with
2 Zerlong specifically about Baillie?
3    A. No, not that I can recall.
4    Q. Do you know anything about Chubb's
5 performance under Mr. Baillie's tenure with respect to
6 diversity hiring?
7    A. Yes.
8    Q. Did you know that the company during his
9 reign met and exceeded goals as far as diversity hiring?
10    A. Yes.
11    Q. Did you know that Mr. Baillie set up a
12 diversity committee?
13    A. Mr. Baillie set up a diversity committee?
14    Q. Uh-huh.
15    A. There was a diversity committee formed. He
16 allowed us to start one, but I don't know if I'd say he
17 started it.
18    Q. There was not a diversity committee before
19 Mr. Baillie became the Branch Manager, and after he became
20 the Branch Manager there's a diversity committee formed?
21    A. Yes.
22    Q. Did the Diversity Committee and the goals
23 with respect to diversity hiring include the hiring of
24 females?

Page 133

1    A.    The hiring of females?  No.
2    Q.    Did it include anything with respect to
3 females?
4    A.    Promotion.
5    Q.    Okay.  And how was the company's performance
6 under Mr. Baillie with respect to the promotion of
7 females?  Did it meet or exceed the goals?
8    A.    I believe he met.  I would need to review
9 the results.
10    Q.    Did Mr. Baillie have anything to do with the
11 promotion of females within his branch?
12    A.    Yes.
13    Q.    How did your knowledge -- you served on the
14 Diversity Committee?
15    A.    Yes.
16    Q.    How did your knowledge of the company's
17 success in diversity, and particularly with females, under
18 Mr. Baillie's watch, impact your belief when he made
19 comments -- these isolated comments that you thought were
20 sexist?
21    A.    Could you ask it again?  I'm sorry, I missed
22 -- I didn't understand.
23    Q.    Did the company's success with respect the
24 promotion of females under Mr. Baillie's watch affect your

Page 134

1 opinion of Mr. Baillie at all with respect to his
2 attitudes toward females?
3    A.    No.
4    Q.    How was the -- would you agree or disagree
5 that the company's involvement in community service and
6 charitable activities increased under the reign of Mr.
7 Baillie?
8    A.    It's hard for me to say because I wasn't in
9 HR before Doug, so I can't really give you a really fair
10 apples-to-apples comparison.  I can tell you what, you
11 know, I personally would have experienced as an
12 underwriter manager, but not everything that we would have
13 done.
14    Q.    Did you form a perception as to whether or
15 not community service increased or decreased under Mr.
16 Baillie's watch?
17    A.    I really couldn't say.
18    Q.    Okay.  How about with respect to the
19 company's commitment to training employees under Baillie
20 as compared to previous managers?
21    A.    There was a corporate initiative for 40
22 hours per employee.
23    Q.    Are you familiar with the 360 Feedback
24 Rating Forms?

Page 135

1    A.    Yes.
2    Q.    Do you know whether or not people filled out
3 360 Degree Feedback Rating Forms on Mr. Baillie?
4    A.    I believe we did.
5    Q.    Okay.  Did you complete a 360 Degree
6 Feedback Ratings on Baillie?
7    A.    Yes.
8    Q.    Did you do so confidentially?
9    A.    Yes.
10    Q.    Did you complete your 360 Degree Feedback
11 Form honestly and in good faith?
12    A.    Not entirely.
13    Q.    Why not?
14    A.    Because "confidential" is a touchy word, it
15 -- I don't think that any of us really completely trusted
16 the confidentiality of the document.
17    Q.    Was there some way to discern from the
18 document the author of the document?
19    A.    Yeah.  The MLQ, that's the Multifactorial
20 Leader Questionnaire, it's the 360, as I remember it, it
21 has triangles, squares, circles for people who report to
22 you, peers, and people you report to, and then it would
23 track it.
24    Q.    Uh-huh.

Page 136

1    A.    (Continued)  I don't know who else filled it
2 out who reports to Doug, so as far as I would know, my
3 answers would be plotted right on that graph.
4    Q.    Well, how many people reported directly to
5 Mr. Baillie, approximately?
6    A.    Between 12 and 14.
7    Q.    Was there some way if you've got 12 to 14
8 responses from direct reports that you thought -- were
9 you thinking that somehow Baillie could figure out which
10 one was yours?
11    A.    Yeah.
12    Q.    How could he figure that out?
13    A.    What if he didn't give them to anyone else
14 who reported to him, or what if they didn't fill them
15 out?
16    Q.    When you completed it, did you turn it back
17 into him?
18    A.    No, I believe you mail it in directly to the
19 company.
20    Q.    Okay.  Any other basis not to give a
21 truthful and good faith response to your 360 Feedback
22 Form?
23    A.    No.
24    Q.    All right.  Did anyone -- do you recall any

Page 137

1 conversation with Mr. Baillie in which you told Mr.
2 Baillie that no one had ever given you more feedback in
3 your career than Mr. Baillie?
4    A.  I don't recall that specifically.
5    Q.  Do you have an opinion as to the degree of
6 feedback Mr. Baillie gave you about your performance?
7    A.  The quantity?
8    Q.  Uh-huh.
9    A.  I would say there was a greater quantity of
10 feedback and number of meetings than I'd experienced in
11 the past.
12    Q.  Do you think he gave you constructive
13 criticism during these meetings?
14    A.  Yes.
15    Q.  Would you -- how would you describe your
16 relationship with Mr. Zerlong?
17    A.  I worked for him in Chicago and now he's the
18 Zone Officer.
19    Q.  Would you describe yourself as a friend of
20 Tim Zerlong's?
21    A.  No.
22    THE WITNESS: May I take two minutes?
23    MR. FREKING: Sure.
24    THE WITNESS: I promise to be very fast.

Page 138

1    (A recess was taken from 5:11 p.m. to
2    5:14 p.m.)
3    Q.  Do you remember an employee that you were
4 involved in terminating, or sat in on a termination
5 meeting involving an employee with the last name of
6 Schlape (sic) or something like that?
7    A.  Schlarp.
8    Q.  Schlarp. Do you recall that meeting? Do
9 you recall that you were at a meeting in which --
10    A.  Yes.
11    Q.  -- he was terminated?
12    A.  She.
13    Q.  Or she?
14    A.  Jennifer Schlarp.
15    Q.  Do you recall anything in particular from
16 that meeting other than the fact that Ms. Schlarp was
17 terminated?
18    A.  No, I don't know what you're -- in what way?
19    Q.  Do you recall whether or not, you know, for
20 example, Tom Breiner did most of the talking or whether
21 you did most of the talking?
22    A.  No, Tom came -- the three of us were in
23 Tom's office.
24    Q.  Uh-huh.

Page 139

1    A.  Tom discussed her performance and that she
2 was being terminated, and then he left, and I went through
3 outstanding benefit items, and that sort of thing.
4    Q.  Do you know of anybody else in the
5 Cincinnati Region that has been terminated since Baillie
6 was terminated?
7    A.  Since? Joe Bautista, B-A-U-T-I-S-T-A. Some
8 of these I'm not sure how they overlapped.
9    This is involuntary, correct, is what you're
10 asking?
11    Q.  Yes.
12    A.  Bear with me.
13    Q.  Sure.
14    A.  Ann Seward, S-E-W-A-R-D, DFI in Cleveland,
15 A-N-N. Tom Kaylor, K-A-Y-L-O-R. That's all I can recall.
16    Q.  What was Bautista fired for?
17    A.  Performance.
18    Q.  Seward?
19    A.  Performance.
20    Q.  Kaylor?
21    A.  Performance and he threatened his manager
22 and myself during a performance review.
23    Q.  Were you involved in these termination
24 decisions?

Page 140

1    A.  Not Ann Seward's. The other two, yes.
2    Q.  Would you say you were involved in the
3 Baillie termination decision?
4    A.  No.
5    Q.  Did Zerlong ever consult with you about
6 possible discipline of Mr. Baillie at all?
7    A.  No.
8    Q.  Did Mr. Ekdahl ever consult with you that
9 you can recall prior to the decision to terminate Mr.
10 Baillie about the possibility of terminating Mr. Baillie,
11 actually coming to you and say "what do you" -- you know,
12 "what are your views regarding Baillie and whether we
13 should terminate him"? I realize you had a number of
14 conversations with him over the years.
15    A.  Not that I recall.
16    Q.  Okay. I'm going to ask you to look through
17 some documents and if you can just generally describe what
18 these documents are about. And tell me whether we've
19 covered the subject matter contained in these documents.
20 The first group I'm going to show you are documents
21 CIC1329 through 1334, it seems to be involving the same
22 event. It seems like there's just a series of pages
23 regarding the same subject. If you could just look at
24 that, first of all, confirm that it's your handwriting,

Page 141

1 and secondly, tell us whether -- you know, what the
2 general subject matter is of those series of pages?
3    A.   It is my handwriting.
4    Q.   Okay.
5         MR. MONTGOMERY: I think he just wants to
6    know the general substance of those --
7         MR. FREKING:  Right.
8         MR. MONTGOMERY: -- of those notes.
9    Q.   Have you already testified regarding the
10 subject matter of these notes, do you know?  I think these
11 notes pertain in some way to Baillie.
12    A.   A number of these notes, so can you give me
13 just a second --
14    Q.   Sure.
15    A.   -- I don't remember exactly.  (Reviewing
16 documents).
17         You want to know how these relate to
18 Baillie?
19    A.   Yes.
20         MR. MONTGOMERY: No, he just wanted to know
21    the general substance of the notes and whether or
22    not we've covered them or not.
23    A.   We haven't covered them.
24    Q.   Okay.  What do these notes generally

Page 142

1 involve?
2    A.   At a review that I had with Doug, he
3 mentioned that he received feedback from Breiner that I
4 was not as responsive as he liked, and that I wasn't
5 returning his phone calls, and that I was not consulting
6 with him before I would do certain things, like this wage
7 level.
8         So I wanted to make sure that I captured
9 everyone that I talked to and when I talked to them just
10 in case it had come back again.  So this is really for my
11 review and me than Doug specifically.
12    Q.   Okay.  This is in response to a criticism
13 Mr. Baillie said about your performance?
14    A.   Mr. Baillie was saying what he had heard
15 from Breiner.
16    Q.   Right.
17    A.   (Continued)  Yeah.
18    Q.   Okay.  You were just kind of making a record
19 for yourself --
20    A.   Yes.
21    Q.   -- in case you were accused of the same
22 thing in the future?
23    A.   Right.
24    Q.   All right.  How about 1335?

Page 143

1    A.   There were a lot of instances where people
2 would come in and talk to me about their interactions with
3 Doug or what had happened, and if I were to make notes
4 when they were standing there, they would get very nervous
5 and clam up.  So when they would leave, I would just jot
6 things down, and that's what these are.  These are part of
7 that dinner that Gates had -- Tom Gates had with Doug and
8 Mapes & Company.  And Doug was saying that according to
9 Zerlong and Tom Otimed (phonetic), Gates is damaged goods,
10 he wasn't mobile, he wouldn't move to Chicago, it's only a
11 matter of time before they kick him out, just belittling
12 and making him think that his career wasn't long for the
13 company.
14         And I wrote it down because it's just not
15 something that you want your agents to hear, because then
16 you have confidence that their underwriters and their
17 managers are in good standing with the company.
18    Q.   Okay.  So these notes relate to that Gates'
19 dinner?
20    A.   Yes.
21    Q.   Okay.
22    A.   (Continued)  And this one below was after
23 I'd heard from a couple people about this picture that he
24 had in his top drawer with the torn-up Taurus and what

Page 144

1 happened, allegedly, after he was driving home drunk.
2         And he constantly bragged about drinking and
3 driving.  He would come in and say that, you know, a cop
4 followed him all the way home and he kind of, you know, a
5 big sign of relief that he made it home or that, you know,
6 at times that he would pull over to a side street when he
7 would see that a cop was sort of tailing him and how he
8 got away with it, that kind of stuff.
9    Q.   Ill hand you an e-mail from you, this is
10 post his termination --
11    A.   Yes.
12    Q.   -- something to do with his -- is this the
13 only involvement -- you earlier testified that you didn't
14 remember any dealings with his separation package or
15 anything post-termination?
16    A.   Right.
17    Q.   Is this the extent of your involvement, just
18 talking about the effective date of his termination?
19    A.   Yeah.  Becky called me at home and said that
20 Doug had called and he wanted to make sure that the system
21 said 10/15 as his last day.  She didn't say why.  So it
22 had been my understanding up until that point that that
23 was his date.  So I said "yeah, go ahead and tell him
24 that."  But then subsequently, I think, I talked to Ekdahl

Page 145

1 and he said "you know, what's" -- "I don't even know what
2 it is anymore. Pat's dealing with Doug and his counsel
3 and you need to call him back and just say that any future
4 questions shouldn't go to you or to Becky or to me, they
5 need to go direct to Pat." So that's why I e-mailed Doug
6 that --
7    Q.   Okay.
8    a.   -- and just said that, you know, I'm not
9 involved. I don't know what's going on.
10   Q.   How about 1337, do you know what these notes
11 refer to or reflect?
12   A.   That's the EEOC document that you got in
13 there, that used to be on top of there.
14   Q.   You mean, you somehow received the EEOC
15 charge --
16   A.   Yeah.
17   Q.   -- that he filed?
18   A.   Yeah. It should be in there.
19   Q.   All right.
20   A.   (Continued) I just wanted a record of when
21 I sent it up to Employee Relations.
22   Q.   How about 1338?
23   A.   That is another one of my planner notes. Do
24 you want to know what these things mean?

Page 146

1    Q.   Yeah. Does this have anything to do with
2 Baillie?
3    A.   Yeah, they all are items that were either
4 outstanding or that I needed to talk to him about, so I
5 would just, as things come up, keep them all documented on
6 that little slip of paper and open it up when we would
7 have meetings.
8    Q.   Anything reflected there that's either -- it
9 reflects inappropriate or improper or some kind of bad
10 behavior by Baillie or anything you would have discussed
11 with Jim Ekdahl?
12   A.   I would have talked to him about this area,
13 concern over branch and manager value of L&D, that's both
14 as a result of our employee survey and feedback that I
15 received from employees.
16        Whenever we would hold training events, I
17 would have a lot of people cancel or say that they
18 couldn't come and it's because they didn't feel that Doug
19 or their manager was really allowing them the time to take
20 away from their daily tasks to go to these training
21 events.
22   Q.   What does L&D stand for?
23   A.   Learning and Development.
24   Q.   All right. Thank you.

Page 147

1    A.   (Continued) Let's hold on. (Reviewing
2 document). That's it.
3    Q.   Okay. How about 1339, same question:
4 Anything reflected on there about Baillie, and if so,
5 anything that's negative about him whatsoever?
6    A.   The Steve Eck (phonetic) and Mike Zdinak in
7 the Regional Loss Control, that's a larger issue, which
8 notes are in there somewhere about Mike Zdinak's confusion
9 and frustration over directives made by Doug versus his
10 zonal, Steve Hernandez.
11   Q.   Did you come to any kind of resolution on
12 that as who was -- there was any kind of fault on the part
13 of Baillie?
14   A.   Well, he was advising Mike Zdinak to
15 prioritize and focus on things that were contrary to
16 current Loss Control directives. He was -- it was
17 confusing for Mike Zdinak. And so I took the notes and
18 talked to Doug about it and suggested that he get with
19 Mike.
20   Q.   How about the next page 1341? Anything on
21 there about Baillie and, if so, anything that's critical
22 about Baillie to your belief?
23   A.   (Reviewing document). Not that I recall.
24 It doesn't look like it.

Page 148

1    Q.   And the next one, 1342?
2        MR. MONTGOMERY: Off the record.
3        (Off-the-record discussion).
4        (A recess was taken from 5:33 p.m. to
5        5:55 p.m.)
6        MR. FREKING: During our break here Diane
7 looked at some remaining documents. I think what we'll do
8 is make this an exhibit. It starts with CIC1342. I think
9 we better make this an exhibit, because some of the page
10 numbers are missing. I think we pulled out things that
11 were not handwritten, so 1388 --
12       (Haggard Deposition Exhibit No. 1 was marked
13       for identification.)
14   Q.   And I understand what you've done is made
15 little highlights, Diane, on matters that concerned
16 Baillie?
17       MR. MONTGOMERY: Or that were critical.
18   Q.   Or that were critical of Baillie? Is it
19 simply --
20   A.   Yes.
21   Q.   -- were critical of Baillie?
22   A.   Yes.
23   Q.   A lot of these concern Baillie, but you put
24 highlights by the ones that were critical of Baillie --

Page 149

1    A.   That's right.

2    Q.   -- is that correct?

3        All right.  Could you then just flip through

4  the pages with the highlights on it --

5    A.   Yeah.

6    Q.   -- and tell us if we've already talked about

7  that particular -- maybe identify the page number you're

8  looking at with the highlight?

9    A.   Okay.  Okay, this is CIC1342, and this on

10  John O'Mara, who at the time was the Regional EP Manager.

11  I highlighted it because Doug's assessment of his

12  competencies and abilities was very, very different from

13  others that he reported to.  That's it.

14    Q.   Okay.  Is that critical -- do you regard

15  that -- it almost sounds to me, I'm getting the

16  impression, Diane, that whenever Mr. Baillie had a

17  difference of opinion with somebody else, or often, that

18  you deferred to the other person's judgment?

19    A.   Well, in this case it was about five people.

20  If it was a one over one --

21    Q.   Uh-huh.

22    A.   -- then I generally, you'll see, wouldn't

23  report it to anyone and would try to give the benefit of

24  the doubt, it's he-said, he-said.  And in the cases where

Page 150

1  it's more than one person complaining, that's when I would

2  add more weight to it because it would be more valid.

3  Different people's opinion between --

4    Q.   But this is an example of where Baillie

5  thought this guy's performance was less than what five

6  other people thought it was?

7    A.   No, he thought he was a lot better than what

8  the other five people thought.

9    Q.   Okay.  And did you report this to anybody or

10  are you just writing this down in your notes?

11    A.   I just wrote it down.

12    Q.   Okay.

13    A.   Okay, if there's nothing on them should I

14  just --

15    Q.   Yeah, I think so.

16    A.   -- skip them over?

17    Q.   I just want to ask you about the stuff that

18  is critical.

19    A.   Okay.  CIC1344, this is speculation, I don't

20  remember the exact happenings, but to the best of my

21  knowledge, the "Palmer & Cay deal got over 500,000 for

22  doing nothing," was a comment that he made at a cocktail

23  party where there were different agents there and he was

24  bragging and it was inappropriate.

Page 151

1    Q.   In other words, you made a huge profit on

2  this particular deal without doing much work?

3    A.   Right.

4    Q.   Okay.

5    A.   (Continued) Reynolds & Reynolds

6        MR. FREKING:  Well, Dave makes that comment

7    about me all the time.

8    A.   (Continued) I don't really remember what

9  the Reynolds & Reynolds situation was.

10    Q.   Did you report either of these two matters

11  that you can recall to Ekdahl or anybody else?

12    A.   No.

13    Q.   Okay.

14    A.   (Continued) Jason Brandstetter, this one

15  says CIC1345.  This goes with the I-Day materials, this is

16  a second page that was attached at one point.

17    Q.   That's the thing down at the charity event

18  in November --

19    A.   Yeah.

20    Q.   -- 2001?

21    A.   Yeah.

22    Q.   Okay.

23        MR. MONTGOMERY:  That's one I said we'll

24    give back after we review the issue.

Page 152

1        MR. FREKING:  Right.

2        THE WITNESS:  Can I put them together?

3        MR. MONTGOMERY:  There's several of them in

4    there.

5        MR. FREKING:  They're just out of order,

6    right?

7        MR. MONTGOMERY:  Yeah.

8        MR. FREKING:  Okay.

9        THE WITNESS:  I'll put these together.

10  These two pages are the same thing.

11        MR. FREKING:  Okay.

12    Q.   Do you know while we're on that I-Day event,

13  that's the thing in November of 2001?

14    A.   Yes.

15    Q.   Did anyone tell you -- other than counsel,

16  in-house or outside counsel, did anyone tell you that

17  I-Day event had any impact on whether or not Mr. Baillie

18  received his severance package?

19    A.   No.

20    Q.   Okay.

21    A.   (Continued) This, I think I mentioned

22  before when there was a Zdinak versus Eck notation in my

23  notes and this is the backup to that, it's the

24  conversation that I had with Mike Zdinak with Doug and

Page 153

1 with Steve Hernandez.
2    Q.    Okay. Did you report this matter, to your
3 acknowledge, to Ekdahl and Zerlong or anybody else?
4    A.    To Ekdahl, yes. 1350.
5          This is the same thing, this is --
6    Q.    What's the Bates number?
7    A.    1356. This is on Tom Silbernagel,
8 S-I-L-B-E-R-N-A-G-E-L. And he's a loss control employee
9 that received some conflicting requests from Baillie
10 versus his loss control manager and expressed some concern
11 and disappointment over his interview from a position that
12 he posted for.
13    Q.    Did you report that to Ekdahl or Zerlong or
14 anyone else?
15    A.    I believe I did mention it to Ekdahl.
16    Q.    Did Ekdahl tell you to do anything as a
17 result of your report to him?
18    Q.    No.
19    Q.    Did you maintain -- it seems to me from your
20 testimony you had some kind of file on Baillie where you
21 were kind of putting notes in a file or keeping them on
22 your --
23    A.    This were from my planner.
24    Q.    -- Daytimer? Your planner.

Page 154

1          Did you have a similar practice with respect
2 to the other employees of the Cincinnati office?
3    A.    Yes.
4    Q.    Okay.
5    A.    (Continued) Some of them didn't get their
6 own page, but yes.
7    Q.    And do you keep your -- most of these are
8 coming out of your planner, right?
9    A.    Uh-huh (nodding head affirmatively).
10    Q.    Do you keep your planners from previous
11 years? Like you produced these documents in, I think,
12 2003, from your planner maybe of '99 and --
13    A.    2002.
14    Q.    -- 2001? Do you keep your planners?
15    A.    I don't know if I'd have '99. This was
16 2001, so I would have 2002.
17    Q.    Okay.
18    A.    (Continued) I don't know if I'd have 2000.
19    Q.    Okay.
20    A.    (Continued) This is 1372. And Doug and I
21 discussed Amy Miller who was the Field Technologies
22 Service Manager, IT, and she was asking for a
23 one-day-a-week remote work schedule and he had declined
24 it. So I was trying to plead the case and see if there

Page 155

1 was any way we could make an accommodation for her.
2    Q.    Do you remember the reason why he didn't
3 want to go along with it?
4    A.    He really felt that all employees should be
5 in the office and said "companies who allow these remote
6 work schedules and flexible work arrangements are going to
7 be out of business in five years, we can't let it get out
8 of control. If I let one do it, everybody's going to want
9 to do it." So he wouldn't let her do it.
10    Q.    Okay. I mean, did you have a belief that --
11 he just didn't think it was a good idea period --
12    A.    Correct.
13    Q.    -- right? So if Korte, Dieter Korte wanted
14 to do it, he probably would have declined Dieter's request
15 as well?
16          MR. MONTGOMERY: Objection. Calls for
17    speculation.
18          MR. FREKING: Strike that.
19    Q.    Did you form a belief that he limited his
20 opinion just to women who wanted to work off site,
21 anything like that, or did he just have an overall view
22 that it wasn't a good idea?
23    A.    He didn't feel it was a good idea.
24    Q.    For anybody, right?

Page 156

1    A.    Right.
2    Q.    Okay. So it wasn't a sex discrimination
3 issue --
4          MR. MONTGOMERY: Objection. Calls for
5    speculation.
6    Q.    -- as far as you thought? You just
7 disagreed with him, it sounds like?
8    A.    It is speculation, but yeah, I'd say that.
9 And this is "be sensitive to commercial underwriters," he
10 was making comments in a marketing meeting about Executive
11 Protection being the Driver Department and making
12 derogatory comments about commercial lines. 1372.
13    Q.    When you say "derogatory, remarks," do you
14 mean, like, critical comments?
15    A.    Yes.
16    Q.    Isn't that part of the function of a guy
17 who's a branch manager to make -- to be critical? You
18 know, to praise when things are going well, but to point
19 out bad things, "I think Joe Smith is lousy," that's kind
20 of his job, isn't it?
21    A.    Preferably not in the company of the rest of
22 the branch.
23    Q.    That's your view on how he ought to do it?
24    A.    Yes.

## Page 157

1    Q.    Okay. Has anybody in HR said that Mr.
2  Baillie should limit constructive criticism to, like,
3  private conversations or anything like that? Have you
4  read something in the Chubb Policy -- is he violating some
5  policy that you're aware of when he's critical in front of
6  other people --
7    A.    Well, mutual respect.
8    Q.    -- or do you think this is just a matter of
9  courtesy and good sense?
10    A.    Do you want to look to the Code of Conduct,
11  with mutual respect, an environment that enhances maximum
12  productivity, I would say that that wasn't --
13    Q.    Okay.
14    A.    -- allowing for that.
15          1373, this was during our incentive bonus
16  conversation, I had a few of the managers come over and
17  express their concern about our ranking procedure.
18          Doug would have the managers come in and we
19  would all rank by pay band the staff and they felt that it
20  was more of a popularity contest and it wasn't fair that
21  someone in one department is going to rank someone in
22  another department.
23    Q.    Okay. And you thought -- that's a comment
24  you made that's critical of Mr. Baillie?

## Page 158

1    A.    Yes.
2    Q.    And you agreed with the employees, with
3  their criticism?
4    A.    Yes.
5    Q.    Okay.
6    A.    Elinor Faulkner, F-A-U-L-K-N-E-R, she is the
7  Operations and HR Representative in Cleveland. She asked
8  to have Gary DeLong, Branch Manager in Cleveland, be her
9  direct report because of Doug's perceived lack of respect
10  for the HR function. She didn't feel she would get a fair
11  review.
12    Q.    And again you agreed with her?
13    A.    Yes.
14    Q.    Did you review either of those matters on
15  that page with Mr. Ekdahl or anyone else that you've aware
16  of?
17    A.    No.
18    Q.    Okay.
19    A.    (Continued) Because -- no. (Reviewing
20  document), okay, there's nothing on this page.
21    Q.    Was that your choice -- I'm going to
22  interrupt you for a second. Was that your choice to go
23  into HR or someone else's choice?
24    A.    I expressed interest.

## Page 159

1    Q.    Was there any particular reason -- you know,
2  some people would not view a move from the position you
3  held to the position in Human Resources as an upward move?
4    A.    It's a lateral move.
5    Q.    Is there some particular reason why you had
6  interested in human resources?
7    A.    Yes.
8    Q.    Can you explain what that interest was?
9    A.    In the Energy Department, where I was, we
10  were pretty self-contained and I had aspirations of
11  marketing or branch management and felt that this would be
12  a great opportunity to learn the strategies of all the
13  departments within the branch and work with the different
14  branch managers and department managers and learn more
15  influenced-management skills.
16    Q.    As the Human Resources Manager in the
17  branch, did you feel any kind of obligation to support Mr.
18  Baillie's position over the position of the employees?
19    A.    On occasion.
20    Q.    Okay. Why don't we continue with these
21  documents.
22    A.    Okay. This is 1376, and this was a
23  memo from Chubb.net that Doug had in his pocket and was
24  sharing at the holiday party and making speculative

## Page 160

1  comments about certain senior managers, that they were
2  fired, or whatnot.
3    Q.    I'm sorry, this is something Doug passed
4  out?
5    A.    No, he had it in his pocket and would bring
6  it out and show it to people and talk about it.
7    Q.    And there's one person, Baxter Graham, here
8  you say "per Doug 'he was fired'"?
9    A.    That's what he was telling people.
10    Q.    And you think that was inappropriate?
11    A.    Yes.
12    Q.    And these other people that he was -- was he
13  speaking about these other people as well?
14    A.    Yes, but I don't recall exactly what was
15  said.
16    Q.    Right. So the thing he said that was
17  inappropriate was about this Baxter Graham fellow?
18    A.    That was my main concern, yes.
19    Q.    Did you know who Baxter Graham was?
20    A.    Yes.
21    Q.    Did you know whether or not that was
22  truthful by Mr. Baillie?
23    A.    I don't know whether it's truthful.
24    Q.    Okay.

Page 161

1  A. (Continued) This is the cell phone, we
2  already talked about that.
3  Q. I'm sorry, did you report this incident on
4  Page 1376 to Ekdahl or Zerlong or anyone else in the
5  company that you can recall?
6  A. I don't recall.
7  Q. Okay.
8  A. This is the cell phone conversation, we
9  talked about it already. It's just --
10  Q. What document is that?
11  A. -- the backup. Oh, I'm sorry, 1377 was the
12  summary page, and then I provided itemized bills.
13  Q. Okay.
14  A. This is 1378, and this is the conversation
15  regarding my leaving on that Tuesday and not taking a PTO,
16  or taking a PTO with Barton in the car.
17  Q. Right.
18  A. So we've talked about that already.
19  Q. Right. I'm sorry, 1355, we've also talked
20  about, right?
21  A. Right.
22  Q. What's the next number?
23  A. 1382.
24  Q. Is there yellow on that?

Page 162

1  A. Uh-huh (nodding head affirmatively).
2  Q. Okay.
3  A. (Continued) This was on 4/30/01, I believe.
4  And this was -- my concern over career discussions and
5  coaching, lack of, with Doug, just my personal notes.
6  Q. Personal note that you were concerned with
7  the quality of those or quantity?
8  A. Quality.
9  Q. This is April 30th of 2001?
10  A. I believe so.
11  Q. Did you think Mr. Baillie was satisfied or
12  dissatisfied with your overall performance?
13  A. Satisfied. (Continued) This is -- an
14  employee reported -- actually this was -- Tom Gates
15  reported, this is 1383, that Tim Dietz, who at the time
16  was an Energy underwriter, went to a basketball game with
17  an agent and Doug, and that Doug was drinking excessively
18  and bragging about how much he drinks a day and pressuring
19  the agent and Tim to drink as well and they were
20  uncomfortable.
21  Q. Did you report that to Ekdahl or anyone
22  else?
23  A. Yes, I did, to Ekdahl.
24  Q. Okay. Now, when you reported things to

Page 163

1  Ekdahl, did you make notes of your conversations with
2  Ekdahl?
3  A. No.
4  Q. Is there any particular reason for that, you
5  kept notes on, you know, comments that employees came to
6  you about or conversations you had with Baillie?
7  A. I think because when I would call Ekdahl I
8  didn't feel that I was reporting as much as I was asking
9  advice on how I should handle the situation or what I
10  should be doing. So I would take his advice and go with
11  it.
12  Q. Okay.
13  A. 1384, this is on January 4th Greg Tazic's
14  frustration over Doug's comments regarding the importance
15  of a diversity committee.
16  Q. Can you elaborate on that?
17  A. Okay.
18  MR. MONTGOMERY: That's not a question.
19  Let's keep it on a question and-answer basis. All
20  he asked you to do at first was to summarize your
21  notes.
22  Q. Can you elaborate on the comment there?
23  MR. MONTGOMERY: Objection. Calls for a
24  narrative.

Page 164

1  THE WITNESS: Okay, but I answer, right?
2  MR. MONTGOMERY: Yeah.
3  A. Okay. We were going through the incentive
4  -- we were talking about the incentive bonus and what
5  should be considered both in the ranking and inclusion for
6  who gets what bonus. And I stated that Greg Tazic has
7  been running the Diversity Committee for the last
8  year-and-a-half and the results were very good, and Doug
9  didn't feel that that was worthy of being considered for
10  incentive bonus consideration.
11  Q. Okay. Were other committee leaders -- were
12  other committee positions rewarded with incentive
13  compensation to your knowledge?
14  A. The Reach Committee was considered. The
15  Reach Committee had --
16  Q. Incentive compensation. Were there some
17  committees that were considered for incentive compensation
18  and some committees that were not?
19  A. I know that the Reach Committee had, which
20  is an activities committee, did received a bonus and that
21  was included as part of the justification for a bonus, but
22  I can't tell you whether -- yeah, whether that was the
23  only reason.
24  Q. Were there a number of committees?

Page 165

1    A.   Just those two.

2    Q.   Just those two --

3    A.   Uh-huh (nodding head affirmatively).

4    Q.   -- in the Cincinnati office?  Okay.

5    A.   1/4, Mike Zdinak, he just mentioned to me

6  that he wished he had never come to Cincinnati because of

7  Doug, frustration over lack of direction or conflicting

8  direction, and he felt that he was being too critically

9  judged.

10    Q.   Did you report that to Ekdahl or Zerlong?

11    A.   I don't believe I did then, I waited and I

12  did when I had back-up information.

13         Korte -- I did report this to Ekdahl and

14  we've talked about it already.  This is when he wanted to

15  either be transferred out of Cincinnati or he was going to

16  leave.

17    Q.   Did anybody ever give you positive comments

18  about Doug Baillie during your two year overlap with him?

19    A.   I believe Corry did, Dave Corry.

20    Q.   Well, let me put it this way:  If people

21  came to you and they were complementary -- did you only

22  keep critical notes in your Franklin Planner?

23    A.   No, there's some in here -- you only asked

24  me to highlight the ones that were critical.

Page 166

1    Q.   Okay.

2    A.   (Continued)  But there are definitely notes

3  in here where he did a good job on a presentation or

4  interaction with an employee that I heard.

5    Q.   Okay.

6    A.   This is 1385, a conversation with Tom

7  Breiner.  He was frustrated with his review, lack of

8  feedback, was not given examples, Doug was critical about

9  Tom Breiner's performance and when asked to expand on that

10  by Breiner, Doug said "no, not really," "Tim felt that

11  way, not me."

12    Q.   So Tim --

13    A.   (Continued)  Tim Zerlong.

14    Q.   So Tim was not happy with Breiner's

15  performance?

16    A.   That's what Doug said to Tom.

17    Q.   Is Breiner still employed by the company?

18    A.   Yes.

19    Q.   He's an older guy, isn't he?

20    A.   I have no idea.

21    Q.   Oh, you're not responsible for that area

22  anymore, are you?

23    A.   Not directly.

24    Q.   Okay.

Page 167

1    A.   1386, okay, this is -- the first one is Doug

2  superceded Mike Zdinak's authority on prioritization of

3  service accounts that needed to be Loss Controls', and his

4  change in prioritization was contrary to the corporate

5  policy.  And there was an occasion at an Ensured Meeting,

6  where he excluded Zdinak from the meeting and spoke on

7  Loss Controls' behalf without Mike Zdinak's knowledge.

8    Q.   Did you report that to Ekdahl or Zerlong?

9    A.   Yes.  And then here's the dinner where Gates

10  came to me and was concerned about comments that were

11  made.

12         And actually in reading this, I remember

13  that at first I head from Jim Mapes, Sr. and Jr., about

14  what had happened and how they were uncomfortable.  And

15  then I went to Tom and asked him what happened and he

16  shared with me.

17    Q.   And you reported this to Ekdahl as well?

18    A.   I believe so.

19    Q.   And what's that page number?

20    A.   1386.

21    Q.   Okay.

22    A.   This is the Dana, but I don't talk about

23  what was said, with Dana Snyder.  Doug belittling Dana in

24  front of the bank customer.

Page 168

1         1388, in some of my career discussions with

2  Doug he would tell me that I really don't have future

3  opportunities as long as I'm on a flexible work

4  arrangement.

5    Q.   Again, this goes to his philosophy that

6  people should work full time?

7    A.   Right.  We talked about that already.

8  "Companies that allow teleworking and flex schedules will

9  be out of business in five years," he said that in a

10  manager's meeting.

11         And he made defamatory statements about

12  Brandi Caldwell, that's the female African-American

13  employee.  And I don't exactly remember what he said, but

14  he made references to Brandi being an animal of some sort

15  in Dieter's opinion.  I'm sorry, I can't remember exactly.

16    Q.   You mean Dieter reported to you that Doug --

17    A.   Correct.

18    Q.   -- had made some inappropriate comment?

19    A.   Yeah, inappropriate comments about Brandi.

20    Q.   And you don't recall what that was?

21    A.   No.

22    Q.   Okay.

23    A.   (Continued)  Sorry.  But it was something

24  about her being an animal.

Page 169

1   Q.   Okay. Now, you've gone through a bunch of
2 documents that were handwritten about Mr. Baillie, and
3 would you say these documents -- I'm trying to figure out
4 exactly whether these documents came from. They sound
5 like they came from pages in your Franklin Planner?
6   A.   Yes.
7   Q.   And did they also come from any other
8 source? Did you have an independent file of some sort?
9 It looks like there are some pages that were copied that I
10 can see that looks like a copy of a planner, but there are
11 other pages that maybe the copying was just bad, but I
12 don't know if -- do you maintain, like, a separate file
13 where you're just putting in sheets about Baillie or --
14   A.   Yes.
15   Q.   -- do you think these are all from your
16 Franklin Planner?
17   A.   Well, my Franklin Planner sheets would go in
18 there as well.
19   Q.   So you would take your Franklin Planner
20 sheets about Baillie --
21   A.   And it would --
22   Q.   -- and put them into a manila folder?
23   A.   Right.
24   Q.   Okay. And if you had a Franklin Planner

Page 170

1 page related to Dieter Korte, did you take those out and
2 put them in a file on Dieter?
3   A.   Yes.
4   Q.   Okay. So you had Franklin Planner documents
5 and you've got files on employees, your own personal files
6 on employees?
7   A.   My personal notes.
8   Q.   Right. You would put your personal notes on
9 employees in files with their names on them?
10   A.   Yes.
11   Q.   Okay.
12    MR. FREKING: Anything else?
13    MR. NAPIER: Let's go outside and talk.
14    MR. FREKING: Okay.
15    (A recess was taken from 6:20 p.m. to
16    6:24 p.m.)
17   Q.   Now, when Mr. Baillie was terminated were
18 you familiar at all with the selection process for his
19 replacement?
20   A.   No.
21   Q.   Did you indicate any interest to anyone that
22 you -- any interest in that position?
23   A.   No.
24   Q.   Is there any particular reason, you didn't

Page 171

1 think you were qualified yet? You indicated before that
2 one of your career aspirations was to be a branch manager?
3   A.   Right. I wasn't qualified or ready for that
4 position.
5   Q.   Now, you've testified -- strike that.
6    You said -- you've testified a number of
7 times today that when you were contacting Ekdahl, you were
8 looking for advice on how to handle the situation, do you
9 recall that testimony --
10   A.   Yes.
11   Q.   -- generally?
12   A.   Sorry, yes.
13   Q.   What were you looking for advice on, how to
14 handle Mr. Baillie or how to handle the employees who were
15 complaining?
16   A.   Both.
17   Q.   Both. And your testimony is that when you
18 would get advice from Mr. Ekdahl you would not write down
19 his directives or instructions anyplace --
20    MR. MONTGOMERY: We've covered that.
21   Q.   -- is that correct? I just want to clarify
22 that.
23   A.   In a general --
24   Q.   You would write down in your Franklin

Page 172

1 Planner the alleged complaints against Mr. Baillie or
2 other employees, you would talk to Ekdahl you said on a
3 number of occasions --
4   A.   Yes.
5   Q.   -- but if he gave you any directions,
6 advice, or instructions his directions, advice, or
7 instructions are not recorded anyplace to your knowledge?
8   A.   The only time I would record them is if they
9 were contrary to what I already intended to do. And I
10 would come to him, I'd write that up so I said it
11 properly, have my plan of what I think I should do, and he
12 would either say "yes, that's what I'd do" or "no, you
13 might want to do this too." If I didn't think I could
14 remember it, I'd write it down.
15   Q.   Is your plan of action, before you would
16 talk to Mr. Ekdahl, are those in writing anyplace?
17   A.   No.
18   Q.   So you would write down the complaint, you
19 would formulate a plan in your own mind --
20   A.   Right.
21   Q.   -- you would talk to Ekdahl, and unless he
22 disagreed with it, you would not record either your plan
23 or his advice?
24   A.   Right.

Page 173

1    Q.   Now, you also said before on your Franklin
2  Planner, you would take the pages out on employees and you
3  would put them in the files?
4    A.   When they were full.
5    Q.   When they were full?
6    A.   Uh-huh (nodding head affirmatively).
7    Q.   So do you have different pages devoted to
8  each employee?
9    A.   Not everyone had their own page.
10   Q.   Some pages would contain a few employees,
11 for example?
12   A.   Right.
13   Q.   What would you do when you would make a copy
14 of those pages, would you make three copies -- let's say
15 it involved Dieter, somebody else, and somebody else,
16 would you literally make three copies and put one in each?
17   A.   Yes.
18   Q.   Okay. And those individual files you had on
19 employees are maintained where, in your office?
20   A.   Yes.
21   Q.   Do you have any regular plan of destruction
22 of those documents or anything like that?
23   A.   No.
24   Q.   So to the best of your knowledge you

Page 174

1  maintain those documents?
2    A.    Yes.
3        MR. FREKING: Okay, great. Diane, you'll
4    have an opportunity to review this transcript once
5    it's typed up to make sure it's transcribed
6    accurately. We thank you for coming in today.
7        THE WITNESS: Sure.
8            — — —
9
10
11        _____
          DIANE R. HAGGARD
12
13            — — —
14        DEPOSITION CONCLUDED AT 6:28 P.M.
15            — — —
16
17
18
19
20
21
22
23
24

Page 175

1            C E R T I F I C A T E
2  STATE OF OHIO        :
3                : SS
4  COUNTY OF HAMILTON    :
5
6        I, Theresa Lynn Westfelt, Court Reporter,
7  the undersigned, a duly qualified and commissioned notary
8  public within and for the State of Ohio, do hereby certify
9  that before the giving of her aforesaid deposition, DIANE
10 R. HAGGARD was by me first duly sworn to depose the truth,
11 the whole truth and nothing but the truth; that the
12 foregoing is the deposition given at said time and place
13 by DIANE R. HAGGARD; that said deposition was taken in all
14 respects pursuant to stipulations of counsel hereinbefore
15 set forth; that I am neither a relative of nor employee of
16 any of their counsel, and have no interest whatever in the
17 result of the action.
18        IN WITNESS WHEREOF, I hereunto set my hand
19 and official seal of office at Cincinnati, Ohio, this
20 _____day of _____, 2003.
21
22 My Commission expires:    THERESA LYNN WESTFELT
23 January 9, 2005.        Notary Public - State of Ohio
24