**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

```
----------------------------------------
                                    :
DOUGLAS W. BAILLIE,                 :
                                    :
           Plaintiff,               :
                                    :
     vs.                            :   CASE NO.
                                    :   C-1-02-062
CHUBB & SON INSURANCE:              :
                                    :
           Defendant                :
                                    :
----------------------------------------
```

DEPOSITION OF:  DIETER WILHELM WOLFGANG KORTE

TAKEN:          By the Plaintiff

DATE:           February 27, 2003

TIME:           Commencing at 9:00 a.m.

PLACE:          Offices of:
                Freking & Betz
                215 East Ninth Street
                Fifth Floor
                Cincinnati, Ohio  45202

BEFORE:         RAYMOND E. SIMONSON
                Registered Merit Reporter
                Notary Public - State of Ohio

**Page 2**

APPEARANCES:

On behalf of the Plaintiff:

    RANDOLPH H. FREKING, ESQ.
        of
    Freking & Betz
    215 East Ninth Street
    Fifth Floor
    Cincinnati, Ohio  45202

On behalf of the Defendant:

    DAVID T. CROALL, ESQ.,
        of
    Porter, Wright, Morris & Arthur
    250 East Fifth Street, Suite 2200
    Cincinnati, ohio  45202-5117

         S T I P U L A T I O N S

         It is stipulated by and between counsel for
the respective parties that the deposition of DIETER
WILHELM WOLFGANG KORTE, a witness herein, may be taken at
this time by Counsel for the Plaintiff as upon
cross-examination pursuant to the Federal Rules of Civil
Procedure; that the deposition may be taken in stenotypy
by the notary public-court reporter and transcribed by him
out of the presence of the witness; that the transcribed
deposition is to be submitted to the witness for his
examination and signature; and that signature may be
affixed out of the presence of the notary public-court
reporter.

**Page 3**

COPY

I N D E X

DIETER WILHELM WOLFGANG KORTE                    PAGE

    CROSS-EXAMINATION BY MR. FREKING:              4

COMPUTER
DISK

**Page 4**

1      DIETER WILHELM WOLFGANG KORTE
2  of lawful age, a witness herein, being first duly sworn as
3  hereinafter certified, was examined and testified as
4  follows:
5            CROSS-EXAMINATION
6  BY MR. FREKING:
7      Q.  Hi, Dieter.
8      A.  Hi.
9      Q.  How you are you?
10     A.  Good.
11     Q.  We just met, but my name is Randy Freking,
12  and I represent Doug Baillie in connection with the matter
13  he's brought here in Federal Court in Cincinnati, and
14  we're here today to conduct your deposition.
15          Ray will take down your answers to various
16  questions.  And we just ask you to consider, you know, the
17  questions as carefully as possible and take whatever time
18  you need to answer the questions.  There's no time
19  deadline whatsoever.  I know you've got to leave by 11:20,
20  but that doesn't mean we have to finish by that time.
21     A.  Okay.
22     Q.  We can always resume on another date.  So
23  take whatever time you need to answer questions today.
24

Baillee v. Chubb                     CondenseIt!™                     Korte (2/27/03)

**Page 5**

1    Also, if I ask you any questions that you
2 don't understand, please feel free to ask for
3 clarification, a definition of terms, you know, anything
4 like that --
5    A.  Okay.
6    Q.  -- that makes it possible for you to answer
7 the question as honestly as possible.
8         Thirdly, Ray will not guess what you mean if
9 you shake your head or make some other gestures.  So all
10 your responses today have to be verbal.  Okay?
11    A.  Okay.
12    Q.  If you would like to consult with
13 Mr. Croall, I assume he's your attorney for purposes of
14 this deposition, so I think our custom and practices allow
15 you to do that, assuming, provided, there's not a question
16 on the floor.  We prefer you do that between questions
17 rather than during questions.
18    MR. CROALL:  Just so we're clear, I
19 represent the company, not Mr. Korte individually.
20 But, yeah, I'm here today to answer any questions
21 that he might have about the process.  And if he's
22 got a question, even if the question is pending, if
23 he's got a question about privilege or whether
24 there's some reason he should not answer it, he's

**Page 6**

1 certainly free to consult with me about that.
2    Q.  Okay.  And I think last, but not least, if
3 you want to take a break at any time, just let us know.
4 We're happy to accommodate that.  If you need some more
5 water, if you'd like a soft drink or coffee, let us know.
6         Would you like anything like that before we
7 start?
8    A.  No thanks.
9    Q.  All right.  Cool.  Dieter, can you basically
10 start the deposition after my diatribe there by stating
11 your full name and your current home address, your current
12 telephone number, your marital situation, your family
13 situation, et cetera, stuff like that?
14    A.  Dieter -- do you need the middle name?
15    Q.  Sure.
16    A.  Wilhelm Wolfgang Korte.
17    Q.  Okay.
18    A.  Address is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮
20    Q.  Okay.  And what's your current home
21 telephone number?
22    A.  ▮▮▮▮▮▮
23    Q.  And are you married?  Do you have any
24 children?

**Page 7**

1    A.  Married, two children.
2    Q.  Do either your wife or your children have
3 anything to do with Chubb in terms of work?
4    A.  Other than my employment?
5    Q.  Right.
6    A.  No.
7    Q.  All right.  And, Dieter, how long have you
8 worked for Chubb?
9    A.  12 years and two days.
10    Q.  Okay.  Can you just give me kind of a
11 rundown of your career with Chubb?
12    A.  I started in the Detroit office as a
13 commercial underwriting trainee; stayed in the Detroit
14 office through various positions until June of '97.
15         In June of '97, I was promoted to become the
16 underwriting manager in our suburban Illinois office.  I
17 stayed there till October of '98, at which time I was
18 promoted to my current position as regional underwriting
19 manager in Cincinnati.
20    Q.  And as the regional underwriting manager, do
21 you deal with underwriting beyond commercial underwriting,
22 or are you limited to commercial underwriting?
23    A.  No; I'm limited to commercial underwriting.
24    Q.  All right.  And you've dealt with commercial

**Page 8**

1 underwriting matters, it sounds like, your entire career
2 with Chubb?
3    A.  That's correct.
4    Q.  All right.  And, Dieter, what is your date
5 of birth?
6    A.  ▮▮▮▮▮▮▮▮▮▮
7    Q.  And did you come to Chubb straight out of
8 college or something?
9    A.  Correct.
10    Q.  All right.  Where did you go to school?
11    A.  I graduated from Western Michigan University
12 in Kalamazoo, Michigan.
13    Q.  And where were you born?
14    A.  In Germany.
15    Q.  What city?
16    A.  Iserlohn.  Let me spell that for you.
17 I-s-e-r-l-o-h-n.
18    Q.  All right.  Was that in, I assume -- let me
19 ask you this, but I assume West Germany?
20    A.  Correct.
21    Q.  Back in the old days?
22    A.  Yeah.
23    Q.  How long have you been in the States?
24    A.  On and off, I spent different time frames

Redacted

Page 9

1  here, but consistently since November of 1987.
2      Q.  How many years did you go to Western
3  Michigan?
4      A.  Two years.  I went year-round.
5      Q.  '85 to '87.  Did you graduate?
6      A.  No.  I went from eighty -- I started in '88,
7  graduated in 1990.
8      Q.  Oh, I see.  Did you come to Chubb on some
9  kind of work visa?
10     A.  No.  I had a green card when I started.  I
11  had a permanent residency green card.
12     Q.  And has anybody else in your family, to your
13  knowledge, ever worked for Chubb?
14     A.  No.
15     Q.  Now explain to me what you mean when you use
16  -- how would you describe commercial underwriting to a
17  layman?
18     A.  We assume -- it's half of the company.  We
19  solicit the risk from insurance agents, who are
20  independent contractors who represent Chubb in the
21  marketplace, and my responsibility would be to assess the
22  risk, price the risk, and then market my decision through
23  the agent and obtain accounts for my company.
24     Q.  You said to assess the risk, price the risk,

Page 10

1  and then market the risk?
2      A.  Market the risk back to the agents, correct.
3      Q.  You mean call the agent with what you think
4  was the appropriate price?
5      A.  Correct.
6      Q.  Whatever coverage is being asked about?
7      A.  Correct.
8      Q.  And this is coverage that's requested by
9  various businesses?
10     A.  That's correct.
11     Q.  All right.  And is your commercial
12  underwriting limited to any particular type of insurance?
13     A.  It's -- when you say type of insurance, can
14  you just specify?
15     Q.  Yeah.  Is it limited to, you know, terrorism
16  insurance, auto insurance, property, and casualty?
17     A.  No.  We provide property and casualty
18  coverage for what is called middle market customers.  So
19  it's property insurance, liability insurance, automobile,
20  Workers' Compensation, and excess umbrella coverages.
21     Q.  You don't provide employer practices
22  liability insurance?
23     A.  My department does not.
24     Q.  All right.  I'm sorry, you said property and

Page 11

1  casualty?
2      A.  Correct.
3      Q.  Liability, automobile, Workers' Comp, excess
4  umbrella coverage?
5      A.  Correct.
6      Q.  That's what your department does?
7      A.  Right.
8      Q.  And has done since you came to Cincinnati?
9      A.  Correct.
10     Q.  Okay.  Is that also true before you came to
11  Cincinnati?
12     A.  We did not always provide excess umbrella in
13  my department.
14     Q.  When did you -- what period of time since
15  you've been in Cincinnati have you provided excess
16  umbrella?
17     A.  In Cincinnati, all along.
18     Q.  All right.
19     A.  But we changed our structure back in the mid
20  '90s.
21     Q.  Okay.  Now, you know Doug Baillie?
22     A.  Correct.
23     Q.  Have you done anything to prepare for
24  today's deposition?

Page 12

1      A.  I've met with Mr. Croall.
2      Q.  All right.  And when was that meeting?
3      A.  Yesterday.
4      Q.  Okay.  Can you tell us --
5          MR. FREKING:  I'm sorry.
6          MR. CROALL:  Nothing.
7      Q.  Can you tell us how long the meeting was?
8          MR. CROALL:  Object and instruct not to
9  answer.  We've had this conversation before.
10  Whether I met for him five hours or ten minutes
11  tells you something about the content of the
12  conversation.  The content of the conversation is
13  privileged.  So, therefore, I'm instructing him not
14  to answer.  If I'm wrong about that, some judge
15  will tell me.
16         MR. FREKING:  Are you filing a motion?
17         MR. CROALL:  Well --
18     Q.  Okay.  You're instructed not to answer that.
19  Can you tell me where the meeting was?
20         THE WITNESS (to Mr. Croall):  Is that okay?
21         MR. CROALL:  That's okay.
22     A.  In Mr. Croall's office.
23     Q.  Did you review any documents?
24     A.  No.

Baillee v. Chubb                    CondenseIt!™                    Korte (2/27/03)

|  | Page 13 |
|---|---|
| 1 | Q. Was anybody else present? |
| 2 | A. No. |
| 3 | Q. Have you discussed your deposition with |
| 4 | anybody besides Mr. Croall? |
| 5 | THE WITNESS (to Mr. Croall): Shall I? |
| 6 | MR. CROALL: Yes. |
| 7 | A. With my wife. |
| 8 | Q. Anybody else? |
| 9 | A. No. |
| 10 | Q. Have you discussed the termination of Mr. |
| 11 | Baillie -- just as a general topic and everything that |
| 12 | goes along with it, I suppose -- with anybody since Mr. |
| 13 | Baillie has been terminated that you can recall? |
| 14 | MR. CROALL: Other than counsel. |
| 15 | Q. Other Than counsel. |
| 16 | A. I've had conversations with people in the |
| 17 | office and my wife. |
| 18 | Q. All right. What people in the office do you |
| 19 | think you've discussed this with? |
| 20 | A. My peers, other managers. |
| 21 | Q. Okay. And who would that be? |
| 22 | Q. The specific names? |
| 23 | Q. Yes, please. |
| 24 | A. Greg Tazic. |

|  | Page 14 |
|---|---|
| 1 | Q. How do you spell that? |
| 2 | A. T-a-z-i-c. |
| 3 | Q. Did you say Greg? |
| 4 | A. Yes. |
| 5 | Q. Okay. |
| 6 | A. Diane Haggard. It's H-a-g-g-a-r-d. |
| 7 | Q. Okay. |
| 8 | A. Jeff Barton. I think Jerry Butler. Tom |
| 9 | Gates. Those are the names I specifically recall having |
| 10 | had a conversation with. |
| 11 | Q. Okay. Can you describe for me a little bit |
| 12 | about how your office is set up? First of all, where is |
| 13 | your office? |
| 14 | A. It's at 312 Walnut Street, on the eighteenth |
| 15 | floor. |
| 16 | Q. All right. Have you been located at that |
| 17 | office ever since you came to Cincinnati? |
| 18 | A. Yes. |
| 19 | Q. And who else? How many employees roughly |
| 20 | work in that office? |
| 21 | A. Physically -- |
| 22 | MR. CROALL: Currently -- |
| 23 | THE WITNESS (to Mr. Croall): Currently? |
| 24 | MR. CROALL: -- you're asking? |

|  | Page 15 |
|---|---|
| 1 | A. Physically, in our office, 80, give or take |
| 2 | a few. |
| 3 | Q. Okay. Who is the most senior person in that |
| 4 | office in terms of responsibility? |
| 5 | A. When you say was -- |
| 6 | Q. No; who is? |
| 7 | A. Is? |
| 8 | Q. Who is? |
| 9 | A. Jerry Butler. |
| 10 | Q. All right. And then is there a chain of |
| 11 | people that report directly to Mr. Butler, to your |
| 12 | knowledge? |
| 13 | A. Correct. |
| 14 | Q. I assume you're one of them? |
| 15 | A. That's correct. |
| 16 | Q. Can you tell me the other people that report |
| 17 | directly to Mr. Butler, to your knowledge? |
| 18 | A. To best of my knowledge, Diane Haggard. |
| 19 | Q. Is she HR? |
| 20 | A. Yes, correct. |
| 21 | Q. Okay. |
| 22 | A. Jeff Barton. |
| 23 | Q. Tazic? |
| 24 | A. No. No. |

|  | Page 16 |
|---|---|
| 1 | Q. Where is Tazic? |
| 2 | A. He just relocated to another Chubb office, |
| 3 | Jay Taylor. That's T-a-y-l-o-r. |
| 4 | Okay. Kathleen Overlan. That's |
| 5 | O-v-e-r-l-a-n. Dave Corry, C-o-r-r-y. Andrew Emery. |
| 6 | Q. Okay. |
| 7 | A. That's E-m-e-r-y, I believe. |
| 8 | And John LaFrance. And let me think. I |
| 9 | don't want to leave anybody out for you. |
| 10 | Did I mention Jeff Barton? I think I did. |
| 11 | Q. Did you say David Corry? |
| 12 | A. David, yes. We call him Dave. |
| 13 | I think those would be the direct reports |
| 14 | physically in our office. |
| 15 | Q. Okay. Do you know whether, at the time -- |
| 16 | during Mr. Baillie's tenure, were all those people in that |
| 17 | office, to your recollection? |
| 18 | A. I don't believe so, no. |
| 19 | Q. Who do you think is new since Baillie came |
| 20 | on board? |
| 21 | A. I believe Jay Taylor is new. And Kathleen |
| 22 | Overlan is in a new role. She was located in another |
| 23 | office that reported to the Cincinnati office. |
| 24 | Q. Okay. Where did she previously work? |

Anette McKeehan Schoch, RMR (513-941-9464)                    Page 13 - Page 16

**Page 17**

1    A.  In our Louisville office.
2    Q.  Did she get a promotion, to the best of your
3 knowledge?
4    A.  Yes.
5    Q.  And do you think LaFrance, Emery, Corry,
6 Barton, Haggard, and yourself worked for Mr. Baillie?
7    A.  Yes.
8    Q.  Has anybody left other than Mr. -- how about
9 Mr. Tazik?  Did he work for Mr. Baillie?
10    A.  No.  The claims operation does not directly
11 report to the branch manager.
12    Q.  Has anybody left, to your knowledge, that
13 reported directly to Mr. Baillie?
14    A.  Well, Mr. Taylor is new.  His predecessor
15 reported to Mr. Baillie, and his predecessor is in a
16 different position now.
17    Q.  Who is Mr. Butler's predecessor?
18    A.  No; Mr. Taylor's predecessor is what I'm
19 referring to.
20    Q.  Oh, I'm sorry.  Mr. Taylor's predecessor?
21    A.  Mr. Butler's predecessor would be Mr.
22 Baillie.
23    Q.  Who is his predecessor?
24    A.  Mr. Zdinak.  And please don't ask me to

**Page 18**

1 spell it.  I believe it's Z-d-i-n-a-k.  I'll give it a
2 try.
3    Q.  Okay.  Where did Mr. Zdinak go?
4    A.  He's still physically located in our office,
5 but has a role that doesn't directly report to the branch.
6    Q.  Is he in a lower role now on the
7 organizational chart?
8    A.  It's a different role.  It doesn't really
9 fit into the current organizational chart.  It's removed
10 from the branch.  It's an oversight role on a larger
11 geographic area.
12    Q.  Is Mr. Zdinak older or younger than
13 Mr. Taylor, to your knowledge?
14    A.  I don't know that for a fact.  I would
15 guess.
16    Q.  What do you think?  What would you guess?
17    THE WITNESS (to Mr. Croall):  Can I?
18    MR. CROALL:  Give it a guess.
19    A.  I'll give it a guess, that Mr. Zdinak is
20 older than Mr. Taylor.
21    Q.  All right.  And do you know, did Ms. Overlan
22 replace anybody?
23    A.  I believe the position was vacant for a
24 while, but she replaced a gentleman by the name of Michael

**Page 19**

1 Whitman.  That's W-h-i-t-m-a-n.
2    Q.  Now, would you estimate that Mr. Whitman was
3 older or younger than Ms. Overlan?
4    A.  I don't want to guess that.  It's too close
5 to call for me.
6    Q.  Too close to call.  Would you estimate that
7 Mr. Butler is older or younger than Mr. Baillie?
8    A.  He is younger is my guess.  I don't know
9 that for a fact.
10    Q.  How old would you estimate Ms. Overlan is?
11    A.  I don't know.  I would guess.  That's all.
12    Q.  What would you estimate if somebody asked
13 you to guess how old she is?
14    A.  My age, mid thirties.
15    Q.  Now, are you familiar with the other direct
16 reports of Mr. Butler, regardless of whether they -- the
17 people you've already listed that physically work in
18 Cincinnati?
19    A.  That's correct.
20    Q.  All right.  Are you familiar with the other
21 direct reports of Mr. Butler?
22    A.  Yes.
23    Q.  Okay.  Can you do your best and try to tell
24 me who they are?

**Page 20**

1    A.  Sure.
2    Q.  Just start with the physical location.
3    A.  Okay.  The Louisville office, we have what
4 we call a production branch leader.
5    Q.  Okay.
6    A.  That's Andy Bryant, B-r-y-a-n-t.
7    Q.  Okay.
8    A.  We have the same position in our Columbus
9 office, and that gentleman is Jeff Bezold, B-e-z-o-l-d.
10    Q.  Okay.
11    A.  And then we have two more managers who
12 reside -- yes, two more managers who reside in our
13 Cleveland office.
14       And now I also recognize I omitted one other
15 person in the Cincinnati office.  I'll get back to that,
16 though.
17    Q.  Okay.
18    A.  In Cleveland, we have a lady by the name of
19 Eleanor Faulkner, F-a-u-l-k-n-e-r, and a gentleman by the
20 name of Bob Tomko, T-o-m-k-o.
21       And then the person I omitted in Cincinnati,
22 his name is Dan Krohn, K-r-o-h-n.  I apologize for that.
23    Q.  That's okay.  Is he new since Butler
24 arrived?

Baillee v. Chubb                CondenseIt!™                Korte (2/27/03)

Page 21

1    A.   Yes.
2    Q.   Did he replace somebody?
3    A.   Yes.
4    Q.   Who did he replace?
5    A.   He replaced -- let me think who it is.  I'm
6  getting old.  What's his name now?
7         If it comes back to me, I'll --
8    Q.   Okay.
9    A.   God, it's ridiculous.
10        MR. CROALL:  You remember what you remember.
11   Q.   How old is Mr. Krohn, would you estimate?
12   A.   That's difficult for me to estimate.  He has
13  teenage children, so I can only guess that he's in his
14  forties, but that would be a guess.
15   Q.   Okay.
16        MR. CROALL: I think teenage children makes
17   you look older than you are.
18   A.   Yeah.  No offense.
19   Q.   Exactly.  You're lucky you don't have that
20  yet.
21   A.   I'm on my way.
22        I have to give up on it for now.
23   Q.   What's his job responsibilities, Mr.
24  Krohn's?

Page 22

1    A.   He's our personal lines department manager.
2    Q.   Okay.  Does anybody else report directly to
3  Mr. Butler that you're aware of other than the four people
4  -- other than the people you've identified in Cincinnati
5  and the four people outside of Cincinnati?
6    A.   No.  That would be it --
7    Q.   Is there any --
8    A.   -- to the best of my knowledge.
9    Q.   Is there anybody in Indianapolis that
10  reports to him?
11   A.   No.
12   Q.   All right.  Do you know who Mr. Butler
13  reports to?
14   A.   Yes.  He reports to a gentleman in Chicago.
15  His name is Tim Szerlong.  It's S-z-e-r-l-o-n-g.
16   Q.   Okay.  Have you ever discussed Mr. Baillie's
17  termination with Mr. Szerlong?
18   A.   No.
19   Q.   Prior to Mr. Baillie's termination, did you
20  ever discuss Mr. Baillie's performance in any way, shape,
21  or form with Mr. Szerlong?
22   A.   Did I discuss it?
23   Q.   Yes.
24   A.   No.

Page 23

1    Q.   Do you recall, have you ever had a
2  discussion with Mr. Szerlong that you can ever remember
3  having?
4         MR. CROALL:  On any topic.
5    Q.   On any topic?
6    A.   Yes.
7    Q.   Just some small talk, chat, or in connection
8  with some job-related matter?
9    A.   Both.
10   Q.   What types of job-related matters have you
11  had discussions?
12   A.   Prior or post?
13   Q.   At any time.
14   A.   I had applied for a position that would have
15  directly reported to Mr. Szerlong that was about a year
16  ago.  I have also discussed various business issues with
17  relation to our territory with Mr. Szerlong, discussed
18  staffing issues with Mr. Szerlong and had small talk.
19   Q.   Okay.  To the best of your recollection, you
20  don't recall Mr. Baillie's name coming up in all of these
21  conversations you may have had with Mr. Szerlong over the
22  years?
23   A.   No.
24   Q.   All right.  And, to your knowledge, you had

Page 24

1  no role in the decision to fire Mr. Baillie?
2    A.   No.
3    Q.   All right.  Now, when Mr. Baillie was there,
4  how much day-to-day contact would you say you had with Mr.
5  Baillie?  I mean, was it weekly?
6    A.   It varied.  It was -- when both of us were
7  in the office, it was certainly daily contact.
8    Q.   Okay.
9    A.   We were not always in the office at the same
10  time, but we would have meetings.  We would have small
11  talk.  I would stop by his office.  He would stop by my
12  office.
13   Q.   Frequent interaction?
14   A.   Yeah, I would say.
15   Q.   Kind of normal interaction of guys that work
16  in the same office?
17   A.   Well, I reported to him, so...
18   Q.   Okay.  Did Mr. Baillie and you do anything
19  socially that you can recall?
20   A.   Socially, it would have always been
21  work-related.
22   Q.   Okay.
23   A.   But it would have been after the office or
24  outside of the office, yes.

Anette McKeehan Schoch, RMR (513-941-9464)                Page 21 - Page 24

Baillee v. Chubb                  CondenseIt!™                  Korte (2/27/03)

Page 25

1   Q.  Sometimes you would have a business dinner?
2   A.  Yeah.
3   Q.  Or you would -- you might have socialized
4   together at business functions?  Conventions?
5   A.  Correct.
6   Q.  Things like that, right?
7   A.  Correct.
8   Q.  Have you ever, like, played golf with him or
9   gone to a sporting event with Mr. Baillie?
10  A.  Both, yes.
11  Q.  Okay.  But on a business-related purpose?
12  A.  Yes.  Those would have been
13  business-related.
14  Q.  Okay.  Now tell me, how did you find out Mr.
15  Baillie had been fired?
16  A.  Mr. Baillie called me at my home.
17  Q.  And what do you recall about that?
18  A.  It was a Friday evening, and I believe it
19  was the day that he had the discussions with Mr. Szerlong,
20  and he called me -- I think he was concerned just how I
21  would take, you know, his departure from the company,
22  whatever you want to call it, and he -- I'm trying to
23  recollect the entire conversation.  Give me just a second.
24  Q.  Okay.  Take whatever time.

Page 26

1   A.  He put it in the context of he had a
2   discussion with Mr. Szerlong and they agreed to disagree
3   and that he was no longer employed by Chubb.  And he said
4   it had nothing to do with anything I had ever done, my
5   business results or performance.  He said, "It's a great
6   company, that you'll have a great career with the
7   company," and, you know, he's going to -- that's pretty
8   much the extent of his conversation.
9   Q.  Okay.
10  A.  And he just said -- he re-emphasized -- he
11  wanted to make sure that I recognized that it had nothing
12  to do with anything that I had done or my performance
13  level.
14  Q.  Okay.  Sounds like a fairly professional
15  conversation.
16  A.  Yes.  It was very professional.
17  Q.  All right.  Have you ever had any
18  conversations with Mr. Baillie since that you can recall?
19  A.  Yes.
20  Q.  Can you describe in any way the number of
21  conversations you've had with Mr. Baillie since then?
22  A.  I had one conversation face to face, and I
23  received an e-mail from him since then.
24  Q.  Okay.  What was the context of your

Page 27

1   face-to-face meeting?
2   A.  It was a business convention in the late
3   fall of 2001 at the Hyatt here in Cincinnati, and he was
4   manning a booth for a charity organization that he had
5   been part of called Insuring the Children at an insurance
6   convention.
7   Q.  Okay.  And do you remember anything from
8   that face-to-face conversation, other than you engaged in
9   some small talk?
10  A.  Yes.  We had some conversations about Chubb,
11  about the state of the marketplace, conversations about
12  Mr. Szerlong, and about -- he made comments about his
13  termination.
14  Q.  Okay.  This was in the late fall?
15  A.  Yeah.  I -- my best guess was -- it was
16  getting pretty cold outside.  It probably would have been
17  early November, late October, early November of 2001.
18  Q.  Okay.
19  A.  It was -- I think it's called Big I Day,
20  which is a CPU convention.  It's a professional insurance
21  organization.
22  Q.  Big I Day, I standing for insurance?
23  A.  I believe that's what it stands for.
24  Q.  Okay.  Is that like an annual meeting of

Page 28

1   some sort?
2   A.  Annual, by -- yeah.  They bring in speakers,
3   talk about various topics.
4   Q.  All right.  Now, prior to the day he spoke
5   with you at your home -- you said he was very professional
6   the day of his termination apparently.  Had Mr. Baillie
7   ever engaged in any kind of conduct that you were aware of
8   that you thought was unprofessional or not in the interest
9   of Chubb, that you thought was wrong in some manner in
10  some way, shape, or form?
11  A.  That would be my personal judgment, right?
12  Q.  Right.
13  A.  That's what you're asking for?
14  Q.  Yeah.
15  A.  Yeah, I would say.
16  Q.  Okay.  What would you -- can you describe
17  what you're thinking of?
18  A.  Again, this is my personal judgment.  I
19  think there were events where Mr. Baillie was the only one
20  drinking alcohol.
21  Q.  Okay.
22  A.  There was at least one event where he
23  offended me personally at a meeting.
24     There was a department meeting that I held

Anette McKeehan Schoch, RMR (513-941-9464)                  Page 25 - Page 28

Page 29

1 where he started reading a newspaper in the middle of a
2 department meeting that I was conducting.
3    Q.  Okay.
4    A.  Those are the ones that come to my mind
5 immediately.
6    Q.  Well, do you have any notes or documents or
7 memos --
8    A.  No.
9    Q.  -- at home or the office that would refresh
10 your recollection some way?
11    A.  No.
12    Q.  Okay.
13    A.  That wasn't my job to do.
14    Q.  When do you think he read this newspaper
15 during one of your meetings?
16    A.  You mean the date?  The date?
17    Q.  Yeah.  Do you know the year?  Can you put it
18 somewhere in relationship to his termination?
19    A.  Probably 2000.
20    Q.  Okay.  Did you discuss this with anybody?
21    A.  Yes.
22    Q.  Who did you discuss it with?
23    A.  Mr. Tazic and Ms. Haggard, those two.
24    Q.  Okay.  What did you tell them about it?

Page 30

1    A.  In colorful language that I was upset and I
2 thought it was unacceptable.
3    Q.  Okay.  Why did you think it was
4 unacceptable?
5    A.  Because I felt it was unprofessional.
6    Q.  Okay.
7    A.  And it was demeaning the intent of our
8 meeting.
9    Q.  How many meetings did you have like that, do
10 you think, where Mr. Baillie would attend?
11    A.  We -- that type of meeting is being held on
12 a monthly basis in our office.
13    Q.  Okay.
14    A.  He attended a fair amount.  I couldn't tell
15 you the exact percentage of his attendance.
16    Q.  Okay.  Were there any other meetings that
17 you can recall in which you thought any conduct by Mr.
18 Baillie was unacceptable or unprofessional or demeaning?
19    A.  Yes.  He held a branch meeting where he
20 classified me as an overpaid employee.
21    Q.  Tell me the context of that.  How would that
22 come up?
23    A.  Let me dig deep.
24       It was -- he was trying to put it in the

Page 31

1 context of saving money, and I had suggested for customer
2 service to get in a car and make a delivery to an agent in
3 Dayton.  I believe it was a policy.  It might have been a
4 form or something they needed from us.
5       And in front of the branch he used it as an
6 example where, instead -- he said, "Instead of using
7 Dieter's overpriced salary to drive up there and deliver
8 that, we used a courier for 10 or 20 dollars," whatever
9 the price tag might have been, "instead."
10       And he did that in front of the entire
11 branch, and I was very offended by that.
12    Q.  So your interpretation of that was he was
13 saying you were paid too much, rather than it's kind of
14 silly to have -- how much do you make approximately?
15    A.  Do I have to answer that?
16       MR. CROALL:  It doesn't really have any
17    relevance.  It's personally intrusive, and I'm
18    pretty comfortable instructing him not to answer
19    that.  He makes more than a courier.  I'll
20    stipulate to that.
21    Q.  You didn't think that Mr. Baillie meant from
22 a cost standpoint, "Dieter, it's a heck of a lot cheaper
23 to get a courier to take something to Dayton than have you
24 drive it up there"?

Page 32

1    A.  I would say that would have been the
2 appropriate way to say it, yes, but he chose -- he did not
3 choose those words.
4    Q.  So your criticism -- what do you think was
5 his intent?  Do you think his --
6    A.  I don't want to speculate on that.
7    Q.  Do you think he meant to insult you?
8    A.  I don't know.  I can't read his mind.  I
9 know the words he used, and I was offended by it.
10    Q.  You were offended.  You didn't give -- you
11 were offended because you thought he was insulting you?
12    A.  I was offended because of the words that he
13 used in front of the branch, correct.
14    Q.  Okay.  Did anybody tell you as a result of
15 that meeting that they thought it was insulting to you?
16    A.  Yes.
17    Q.  Who was that?
18    A.  Both Mr. Tazik and Mr. Gates.
19    Q.  Okay.  Anybody else that you can recall
20 telling that to or discussing that with?
21    A.  Not that I can recall.
22    Q.  Okay.  Any other meetings in which you
23 thought he said something that you thought was
24 inappropriate, unprofessional, insulting, demeaning?

Baillee v. Chubb                    Condenselt!™                    Korte (2/27/03)

---

**Page 33**

1    A.   Not that I can recall right now.

2    Q.   Do you agree with me that Mr. Baillie's

3  intent could have been to say, "Dieter, it's a heck of a

4  lot cheaper to send a courier up there"?

5        MR. CROALL: Object. Speculation.

6        You can answer if you can.

7    A.   I -- like I said earlier, that would have

8  been the way to say it, right.

9    Q.   You agree with me that's one possible

10 interpretation of what he meant?

11   A.   That, yes, intellectually, yes.

12   Q.   All right. And then tell me about the --

13 why do you regard it as -- I think it was in response to

14 me saying something about, "Did he ever engage in conduct

15 that was not in the best interest of Chubb or

16 unprofessional or inappropriate"?

17       You said there were meetings or events at

18 which he was the only one drinking alcohol?

19   A.   Yes.

20   Q.   Okay. Can you explain to me why that is

21 "not in the best interests of Chubb, it was

22 unprofessional," or something like that?

23   A.   Again, it's my personal judgment, as I

24 prefaced an answer with. I just think it's not

---

**Page 34**

1  appropriate if you have meetings in the mornings that take

2  place and you have, you know, various people in attendance

3  that he was the only one drinking alcohol.

4    Q.   You're saying he was drinking alcohol at the

5  morning meeting?

6    A.   Yes. This was a morning golf outing,

7  correct.

8    Q.   Do you recall where it was?

9    A.   It was at his golf club, Ivy Hills.

10   Q.   Okay. Did this occur one time?

11   A.   I have witnessed it one time, correct.

12   Q.   All right. Is there any other -- are there

13 other events at which you would recall that he was the

14 only one drinking alcohol?

15   A.   No, I don't recall that.

16   Q.   All right. Was anybody else that you can

17 recall -- did anybody else indicate to you that you

18 thought -- that they thought it was inappropriate for him

19 to be drinking alcohol at a golf outing?

20   A.   Inappropriate? No.

21   Q.   Anybody else bothered -- you sound like you

22 think it was wrong.

23   A.   I thought it was wrong at the time, correct.

24   Q.   When you say alcohol, you mean a beer?

---

**Page 35**

1    A.   Yes.

2    Q.   Okay.

3    A.   No; more than one beer.

4    Q.   Do you golf on a regular basis?

5    A.   No, not on a regular basis.

6    Q.   Do you drink on a regular basis?

7        THE WITNESS: (to Mr. Croall): Do I have to

8  answer that?

9        MR. CROALL: Yeah. You can go ahead and

10 answer it.

11   A.   I'll have beers on weekends.

12   Q.   Any other times when you observed Mr.

13 Baillie at some event at which he was drinking alcohol in

14 some manner that you thought was inappropriate, other than

15 the one time while he was golfing?

16   A.   Again, when you say inappropriate, do you

17 mean my personal judgment?

18   Q.   Your personal judgment, right. That's all

19 we're talking about when I ask you.

20   A.   You mean the fact that he drank alcohol or

21 the quantity he drank?

22   Q.   Either one. Anything that you thought was

23 inappropriate? I'm interested in knowing what you viewed

24 as being inappropriate.

---

**Page 36**

1    A.   I viewed him drink -- I viewed him drink

2  more alcohol than other people in attendance at meetings

3  and at outings.

4    Q.   Okay.

5    A.   Was it inappropriate? I think it would have

6  been suffice (sic) to drink less. But that's my judgment.

7  That's my opinion.

8    Q.   All right. Are you saying he drank too much

9  at the golf outing at Ivy Hills or the fact he was

10 drinking?

11   A.   He was the only one drinking at the time in

12 the morning, prior to the golf outing even starting.

13   Q.   All right. Was this golf outing like an

14 event --

15   A.   Um-hmm (nodding head affirmatively).

16   Q.   -- at his club?

17   A.   Yes. It was organized for our agents.

18   Q.   And you're sure he was the only one that

19 drank alcohol that day?

20   A.   At that time, yes. Later in the day, other

21 people drank.

22   Q.   What time of day was this?

23   A.   It would have been either 10 or 11 o'clock

24 in the morning.

---

Anette McKeehan Schoch, RMR (513-941-9464)                    Page 33 - Page 36

Baillee v. Chubb | CondenseIt!™ | Korte (2/27/03)
---|---|---

**Page 37**

1  Q.  Did anybody else tell you that they thought
2  it was inappropriate as well?
3  A.  Did they use those words?  No.  Did people
4  snicker?  Yes.
5  Q.  Anybody in particular?
6  A.  I don't recall now.  It was a large group of
7  people.
8  Q.  And was Mr. Szerlong in attendance?
9  A.  No.
10  Q.  Did you ever mention this to Mr. Szerlong,
11  to your recollection?
12  A.  No.
13  Q.  Okay.  Anything else you ever you personally
14  observed during your tenure under Mr. Baillie that you
15  thought was inappropriate, unprofessional, demeaning,
16  insulting, or not in the best interest of Chubb?
17  A.  Nothing stands out right now, no.
18  Q.  Do you have any notes or records --
19  A.  You mean during his employment, right?
20  Q.  Right.
21  A.  Is that what you're asking?
22  Q.  Right.
23  A.  Nothing that I can recall.
24  Q.  And you don't have any notes or documents

**Page 38**

1  that would refresh your recollection?
2  A.  No.
3  Q.  Okay.  Great.  Tell me about the e-mail that
4  he sent you or you sent him.  You said there was some
5  e-mail; there was some correspondence between you and him.
6  A.  Oh, after his --
7  Q.  Departure.
8  A.  -- departure?  Yeah.  He sent me an e-mail.
9  It would have been after thanksgiving of 2001, and the
10  gist of the e-mail was -- I don't recall the entire
11  verbiage, but in essence, "I'm in Florida now close to
12  Disney World."
13      Basically, "If you want to stay with us," --
14  you know, he has an open invitation and, you know, "Don't
15  take the loss too hard."
16      And he was referring to Michigan having lost
17  to Ohio State the prior weekend.
18  Q.  Okay.  Were you offended --
19  A.  No.
20  Q.  -- or insulted by that?
21  A.  No.  No.  I didn't respond.
22  Q.  You thought that was a friendly e-mail?
23  A.  Yeah.  Yeah.
24  Q.  Was one of the reasons you didn't respond

**Page 39**

1  because you were instructed by Chubb not to communicate
2  with Mr. Baillie?
3  A.  No.
4  Q.  Have you ever been instructed by anybody at
5  Chubb not to communicate or talk to Mr. Baillie?
6  A.  No.
7      MR. CROALL:  Other than counsel.
8      Go ahead and answer.
9  A.  Oh, no.
10  Q.  No?  No one other than counsel told you
11  that?
12      MR. CROALL:  You're not asking about
13  conversations with counsel?
14      MR. FREKING:  No.
15      MR. CROALL:  And I'm instructing him not to
16  answer about conversations with counsel.
17      MR. FREKING:  I'm just clarifying.  He said
18  something about other than counsel, so I was
19  clarifying.
20  Q.  Tell me about how Mr. Baillie was as a boss.
21  A.  What do you mean by how he was?
22  Q.  If someone said to you, "Was Baillie a good
23  boss?" how do you think you'd answer?
24      MR. CROALL:  You're asking for his personal

**Page 40**

1  opinion?
2  Q.  As of -- you know, if you can put yourself
3  back in your shoes --
4  A.  Um-hmm (nodding head affirmatively).
5  Q.  -- of when he was your boss?
6  A.  Um-hmm (nodding head affirmatively).
7  Q.  What was your belief while he was your boss
8  of how good a boss he was?
9  A.  Well, I would classify Doug as having been a
10  nice guy, other than probably the two incidences that I
11  mentioned to you earlier.
12      I was disappointed about his lack of
13  engagement in my business issues.  I -- what would be the
14  best way to characterize it?
15      I was looking for more.  I was looking for
16  more probably leadership.  I was looking for more maybe
17  ability to listen, patience to listen.
18      There were probably times where I would have
19  probably liked a little bit more support.
20      That's probably in a nutshell the best way I
21  can summarize it.
22  Q.  Okay.  Overall, it seems pretty negative.
23  All you mentioned was negative things about him.  All I
24  asked you was how he was as a boss.

Baillee v. Chubb                    CondenseIt!™                    Korte (2/27/03)

Page 41

1    MR. CROALL: I'm going to object. I think
2 it's mischaracterized. At the outset, he said he
3 was a nice guy. You viewed it as a negative.
4 Maybe I misheard him.
5    A. My point is: I would have liked more
6 leadership. I would have liked more support.
7    Q. Your overall view of Mr. Baillie as a boss
8 was negative?
9    A. (No response.)
10    Q. Is there any reason why you're focusing on
11 the negative?
12    A. No.
13    Q. Were there any positive attributes that you
14 observed in Mr. Baillie?
15    A. Yes.
16    Q. Okay. Why don't we talk about those for a
17 second?
18    A. Okay.
19    Q. Why don't you tell me as many positive
20 attributes you can recall about Mr. Baillie, other than he
21 was a nice guy.
22    A. He was engaged in the marketplace, meaning
23 he was very visible with our agents. I think people
24 genuinely liked Doug, or Mr. Baillie.

Page 42

1    I personally perceived Mr. Baillie to be
2 intelligent.
3    I had very positive performance reviews.
4 They were conducted in a timely manner.
5    Q. Were they thorough?
6    A. Yes. All my goals were addressed. He gave
7 me time to give him feedback on himself.
8    Mr. Baillie was also visible in the branch.
9 He would walk through the branch and make a point of
10 stopping by people's desks.
11    Q. Kind of a people person?
12    A. Yeah, that's probably a good...
13    Q. Okay. Any other positive attributes that
14 you can remember?
15    A. Yeah. From a personal, he had a good knack
16 for marketing, whatever the best way would be to put that.
17 He would be focused on marketing Chubb in the marketplace
18 to our agents.
19    Q. Anything else you can think of that was
20 positive about his performance?
21    A. He would be -- I would say he would be
22 concerned, just personally, about just my family and, you
23 know, just ask if -- you know, appeared genuine in asking
24 how my family was doing, how my kids were doing. So there

Page 43

1 was a comfort level having those -- you know, that type of
2 conversation with him.
3    Q. Can you think of anything else?
4    A. No. I think that's the best of my
5 recollection right now.
6    Q. Okay. Do you think the fact that he was
7 engaged in the marketplace was shared among your
8 colleagues?
9    A. Yes. Um-hmm (nodding head affirmatively).
10    Q. How about the fact that he was very visible
11 with agents? Do you think that was shared by your peers
12 as well?
13    A. Yes.
14    Q. The fact he was likable, was that shared?
15    A. I would think so; at least by the people
16 that I have frequent contact with, yes.
17    Q. How about your view that he was intelligent?
18 Do you think that was shared by others?
19    A. I don't know that. That's my personal
20 opinion.
21    Q. Okay. Did anybody else -- did anybody, in
22 your conversation with your peers, ever talk to you about,
23 you know, what they thought of his performance reviews?
24 Did they genuinely share your feelings, do you think?

Page 44

1    A. No. We didn't discuss each other's
2 performance reviews.
3    Q. Did you ever hear any of your peers
4 criticize the way Mr. Baillie handled his or her
5 performance review?
6    A. No.
7    Q. Do you think others shared the view that he
8 was kind of visible in the branch, making a point of
9 talking to people and things like that? Do you think the
10 view -- do you think it was shared that he was kind of a
11 people person?
12    A. My guess is yes.
13    Q. Do you think other people shared your view
14 that he had a good knack for marketing?
15    A. Yeah.
16    Q. Do you think other people shared your view
17 that, you know, he was pretty focused on marketing Chubb
18 to your agents?
19    A. Yes.
20    Q. Okay. Do you know whether or not he ever
21 showed any concern, you know, for other employees'
22 families and whether that view was kind of shared?
23    A. I would think so.
24    Q. All right. You said something about having

Baillee v. Chubb                    CondenseIt!™                    Korte (2/27/03)

Page 45

1 kind of a comfort level with Mr. Baillie.
2    A.   Um-hmm (nodding head affirmatively).
3    Q.   What do you mean by that?
4    A.   I would discuss my -- you know, my family,
5 children, how the children were doing, joke occasionally.
6    Q.   Did he talk about your family?
7    A.   Yeah.
8    Q.   You'd joke around with each other?
9    A.   Yeah.
10    Q.   Those areas you were critical of Mr. Baillie
11 -- you know, the golf outing, you know, the other things
12 you talked about -- did you ever kind of confront Mr.
13 Baillie, sit down with him and say, "Doug, I think you
14 insulted me;" or, "You shouldn't have been reading that;"
15 or, "You shouldn't have been drinking that alcohol at the
16 golf outing"?
17    A.   Not about the alcohol, but about the meeting
18 and the newspaper, yes.
19    Q    You went to the source. That was kind of a
20 good idea. You said, "I had a problem with you reading
21 the newspaper"?
22    A.   Yes.
23    Q.   How did Mr. Baillie react to that, if you
24 recall?

Page 46

1    A.   I think more in the gist of, "I hear your
2 point. Thanks for bringing that to my attention."
3    Q.   Did he ever do it again after you had that
4 conversation with him? Did he ever --
5    A.   He never made a comment about my pay again,
6 no, to the branch, no.
7    Q.   So you talked to him about the newspaper
8 incident and the pay incident?
9    A.   Yes. And also when he solicited feedback, I
10 mentioned to him that I would like for him to listen more,
11 pay more attention to people, spend more time on listening
12 to people.
13    Q.   Okay.
14    A.   And he appreciated that feedback.
15    Q.   Okay. Do you think he was sincere in some
16 effort to try to get better in that area?
17    A.   It had the appearance to me.
18    Q.   All right. Did you generally view him as
19 kind of a sincere guy?
20    A.   Yeah.
21    Q.   Hard-working? Did pretty much whatever you
22 would know about his responsibilities?
23    A.   If you quantitated it about the hours, I
24 mean --

Page 47

1    Q.   I guess you wouldn't know the hours, would
2 you?
3    A.   I think Doug and I had a difference there,
4 different opinion. I think I personally don't consider
5 some of the social outings as hard work. Doug does.
6    Q.   Yeah.
7    A.   And we would discuss that openly.
8    Q.   Like some people who travel think it's
9 enjoyable and some people that travel think it's work?
10    A.   Well, let me put it to you this way. Some
11 people think playing golf is work because you're with a
12 customer. My opinion is it's a social function.
13    Q.   Yeah.
14    A.   But I can see both sides of the coin. It's
15 just my opinion.
16    Q.   Okay. How about the incidents with the pay?
17 Do you recall his reaction to that? Did he say anything
18 along the lines anything about that?
19    A.   Not that I recall specifically.
20    Q.   You don't recall him saying anything like,
21 "Hey, Dieter, it's a lot cheaper to send a courier to
22 Dayton than to send you to Dayton"?
23    A.   I really don't remember the exact
24 conversation, no.

Page 48

1    Q.   Okay. Now, I understand you entered the
2 Cincinnati branch; you came to the Cincinnati branch a
3 little bit after Mr. Baillie took over.
4    A.   Yeah.
5    Q.   Does that ring true with you?
6    A.   Yeah, that sounds right; a couple months
7 after him, probably.
8    Q.   Is there any way how you would characterize
9 how the morale was in the office at that time?
10        MR. CROALL:  When he first arrived?
11        MR. FREKING:  Yeah.
12    A.   When I first arrived, the overall office was
13 probably decent. My department was in shambles.
14    Q.   Okay. What was your perception as to why
15 your department was in shambles with respect to morale?
16    A.   I basically had one person doing the job of
17 the entire department. My predecessor had left for
18 another job with another company. Another underwriter in
19 the department had quit. So, you know, the person who was
20 holding up the fort was working very hard in a very
21 adverse marketplace. It was very tough.
22    Q.   Who was that person who was kind of holding
23 up the floor?
24    A.   Steve Ruhe, R-u-h-e.

Page 49

1    Q.   Does he still work there?
2    A.   Yes.
3    Q.   Still work in your area?
4    A.   Yes.
5    Q.   Does he work directly for you?
6    A.   Correct.
7    Q.   Okay.  So Mr. Ruhe is overworked and
8 underpaid?
9    A.   He worked very hard.
10    Q.   All right.  Now, did the -- how was the --
11 how are you judged -- how is your area judged in terms of
12 performance from a financial perspective?
13    A.   From a financial perspective?  We have a
14 myriad of measurements.  If -- would you like me to
15 prioritize them for you?
16    Q.   Sure.
17    A.   Or overall?
18    Q.   That sounds good.
19    A.   Probably the number-one goal would be to
20 achieve what we call an underwriting profit.
21    Q.   Okay.
22    A.   Which is a function of our loss ratio and
23 our expenses.
24         Secondly, over the last years would have

Page 50

1 been what we call rate increases, which is basically price
2 -- in laymen's terms, pricing increases for our policies.
3    Q.   The more you're able to increase prices, the
4 higher you're judged?
5    A.   Just don't tell anybody outside the industry
6 that.  Yeah.  Yeah.
7         MR. CROALL:  I think most people have
8         figured that out.
9    A.   Yeah, I know.  The secret is out, isn't it?
10         The other thing is retention, which
11 basically means just the premium dollars and the number of
12 customers we're able to retain versus loss to the
13 competition.
14         And then it's new business.
15         Then we have a measure that measures the
16 collectibles of our premiums.  We measure our commissions
17 that we pay.
18    Q.   Commissions paid to agents?
19    A.   Correct, um-hmm (nodding head
20 affirmatively).
21    Q.   The fewer commissions paid, the better?
22    A.   The less commission we pay, the lower our
23 expense ratio, correct.
24    Q.   Okay.

Page 51

1    A.   Those are the critical financial
2 measurements.
3    Q.   Okay.  Is it fair to say that the ones you
4 stated after the underwriting profit, you know, are all
5 kind of a subset of underwriting profit?  They're all of
6 either -- they either increase the profit or they decrease
7 the profit?
8    A.   With the exception of new business, correct.
9 New business has the potential, but it's -- it probably is
10 not an immediate effect on it, that's correct.
11    Q.   Okay.  You kind of look at new business as
12 kind of --
13    A.   Unknown growth.  It's revenue growth.
14    Q.   -- in a long-term view?
15    A.   Correct.
16    Q.   Okay.  Now, did the morale in your area
17 improve -- did the morale at all in your area improve?
18    A.   Um-hmm (nodding head affirmatively).
19    Q.   Between the time you arrived and Mr. Baillie
20 left?
21    A.   Oh, yes.
22    Q.   Okay.  Describe how that occurred.
23    A.   The staffing, adequately staffing, people
24 receiving training, people receiving performance reviews,

Page 52

1 people having measurable goals, people having guidelines,
2 and just common goals and an idea of what it is that we're
3 trying to accomplish and how we're going to try to do it.
4    Q.   Who was Mr. Baillie's predecessor?
5    A.   A gentleman by the name of Mr. Reynolds.
6    Q.   Now, when you arrived there, did you ever
7 hear any criticism of Mr. Reynolds?
8    A.   Remarks.  I had never met the man, so I -- I
9 don't know him.
10    Q.   Did you ever hear any remarks in substance
11 that were kind of like, you know, "Reynolds didn't do a
12 very good job of leading this branch," or anything like
13 that, or anything remotely close to that?
14    A.   Probably not that strong, no.  I've heard
15 people voice frustrations that he was very tight on
16 expenses, that people made the comment that he was very
17 focused on growth for the sake of growth.
18         But, again, I mean, we had a lot of turnover
19 since he left.  So a lot of people in the office now don't
20 know him.  And like I said, I never even met him.
21    Q.   Now, how would you say the level of service,
22 the condition of service was when you entered the branch?
23    A.   My perception was that it wasn't very good.
24    Q.   Okay.

Baillee v. Chubb                CondenseIt!™                Korte (2/27/03)

---

**Page 53**

1    A.  That at least in my area -- I can't speak
2  for the rest of the branch -- that, you know, we were
3  struggling to stay afloat, to keep up with agents'
4  requests, with issuing policies. And, again, that was
5  pretty much a function of staffing at the time.
6    Q.  Did you attempt to improve the service?
7    A.  Together with the operations manager, yes.
8    Q   Who was the operations manager?
9    A.  At that time a gentleman by the name of John
10  Breiner.
11    Q.  Is he still the operations manager?
12    A.  He transferred to our New York operation.
13  He was replaced by John LaFrance, who I mentioned earlier
14  when I gave you the direct report list.
15    Q.  John Breiner is now in New York?
16    A.  Yes. Did I say Breiner? It's Bryer,
17  B-r-y-e-r. Sorry about that.
18    Q.  Is there somebody also by the name of
19  Breiner?
20    A.  Yeah. That's where I got mixed up.
21    Q.  Okay. Now, what does John Breiner do -- I'm
22  sorry -- what does Tom Bryer do?
23    A.  He's our Indianapolis branch manager.
24    Q.  Did he have any dealings with Doug Baillie

---

**Page 54**

1  that you know of?
2    A.  He would have reported to Doug for a period.
3    Q.  And then that reporting changed to somebody
4  else?
5    A.  Um-hmm (nodding head affirmatively). I
6  don't recall the exact time when it changed, but it did
7  change during Doug's tenure.
8    Q.  Did you ever discuss Mr. Breiner with Mr.
9  Baillie?
10    A.  No.
11    Q.  So you and the operations manager worked to
12  improve the service of your area?
13    A.  Um-hmm (nodding head affirmatively).
14    Q.  Right?
15    A.  Yes.
16    Q.  Did Mr. Baillie support you in those
17  efforts?
18    A.  Yes. He -- I would say he did raise the
19  visibility of the need to improve our service when I first
20  came to the branch.
21    Q.  That was one of his points of emphasis?
22    A.  Yeah.
23    Q.  How did he do that?
24    A.  Visible to me, he would just highlight

---

**Page 55**

1  service goals, service standards, and our accomplishments
2  in those areas at branch meetings.
3    Q.  Okay. He would do that on a regular basis?
4    A.  I do think that we added staffing in the
5  service area.
6      I'm sorry? Your question?
7    Q.  And he would do that on a regular basis in
8  meetings?
9    A.  Yeah. Um-hmm (nodding head affirmatively).
10    Q.  Okay. And over time you were able to
11  improve the level of service?
12    A.  Um-hmm (nodding head affirmatively).
13  Correct.
14    Q.  Now, how would you -- you say you increased
15  the level of staffing within your part of the business?
16    A.  That's allocated to my area, to support my
17  area, yes.
18    Q   And Mr. Baillie was supportive of that?
19    A.  I wouldn't have directly discussed that with
20  him. That would have been the operations manager. I just
21  saw that we did have additional resources. So my
22  assumption is he would have, but I don't know that.
23    Q.  Okay. Is that true also with just the level
24  of resources that were provided with your organization

---

**Page 56**

1  that you didn't see Mr. Baillie as any kind of roadblock,
2  but that would have been more of an operations issue
3  between him and Mr. Bryer?
4    A.  At that time, yeah.
5    Q.  When did Mr. Bryer go to New York?
6    A.  (No response.)
7    Q.  Approximately. Was it before or after
8  Baillie left?
9    A.  Oh, no. It was way before. Probably early
10  2000 maybe; late '99, early 2000.
11    Q.  And who replaced him?
12    A.  John LaFrance.
13    Q.  Oh, I'm sorry. You said that. And then you
14  and Mr. LaFrance worked together to continue to improve
15  staff, resources, those kind of things?
16    A.  Enforcing, more of a work flow productivity
17  enhancement.
18    Q.  And Mr. Baillie would have worked more
19  directly with Mr. France with regard to making sure --
20  allocating the necessary resources and making the staffing
21  approvals?
22    A.  Yeah. That would not have been my job,
23  that's correct.
24    Q.  All right. Are there files maintained in

---

Anette McKeehan Schoch, RMR (513-941-9464)                Page 53 - Page 56

Page 57

1 your office?
2    A.  For?
3    Q.  In your department, underwriting files.
4    A.  Yes, um-hmm (nodding head affirmatively).
5    Q.  Would you describe the state of those
6 underwriting files as not totally desirable when you
7 arrived?
8    A.  Oh, yes.  Yes.
9    Q.  How did that -- describe that for me, first
10 of all.
11    A.  Well, there are several issues.  We actually
12 had transition to electronic files from paper files and
13 the office -- and that would have happened through '98,
14 and the office really hadn't done as good a job of doing
15 that.
16        Also, we had an inadequate level of
17 documentation of our files at the time.  I would have
18 attributed it to the staffing situation and matter of
19 prioritization by my predecessor.
20    Q.  Okay.
21    A.  So it -- the state was not very good at the
22 time.
23    Q.  How about the profitability of your
24 underwriting, commercial underwriting?  How has that

Page 58

1 changed over time since your arrival?
2    A.  For my department?
3    Q.  Um-hmm (nodding head affirmatively).
4    A.  As I arrived --
5        THE WITNESS (to Mr. Croall):  Is that okay
6 to disclose?
7        MR. CROALL:  Yeah.
8    A.  The year end '98 results were, give or take,
9 around break even.  So that was probably acceptable at
10 that time.  They were very poor in 1999 and 2000.
11    Q.  Okay.  Why was that?  You say the financial
12 results got worse under your direction?
13    A.  That's correct.
14    Q.  Describe for me the reasons why the
15 financial results got worse.
16    A.  We had very large claims.
17    Q.  Was part of the reason that you were -- that
18 you were kind of saddled with the job kind of almost like
19 a turnaround operation?
20    A.  Yes.
21    Q.  Because it was in shambles, you had to kind
22 of turn around and expend a lot of money?  Expend a lot of
23 time?  Expend a lot of time and money?
24    A.  I don't know money.  But, yeah, we had -- I

Page 59

1 mean, we had to bring in new staff.
2    Q.  Obviously, additional staff?
3    A.  Correct.
4    Q.  Okay.  Were you criticized for the poor
5 financial results?
6    A.  No.
7    Q.  Why not?  Why wouldn't you be criticized for
8 poor financial results?
9    A.  Because those results were the direct effect
10 of business decisions that my predecessor had made.
11    Q.  So that the poor financial results were
12 understood, as far as you knew?
13    A.  Expected.
14    Q.  Expected?
15    A.  Yeah.  Some were mishaps.  And we were hit
16 by the tornado of April of '99, as an example.  That cost
17 a lot of money.  That was a mishap.  But there were a lot
18 of problems with the state of -- you know, the quality of
19 underwriting and the quality of the book of business that
20 I was accountable for, that I inherited.
21    Q.  You inherited?
22    A.  Yes.  It was -- I guess, if you were to try
23 to qualify it -- it was what we would call an
24 "un-Chubb-like book," quote, unquote.

Page 60

1    Q.  Too much risk?
2    A.  We were assuming risks that personally I had
3 never seen Chubb assume in any other operation I had been
4 affiliated with.
5    Q.  Okay.  Now, you say your predecessor.  Would
6 you agree with me that Mr. Baillie arrived on the scene
7 shortly before you did?
8    A.  Yeah.  Yeah.  A couple months probably.
9    Q.  He inherited the same sort of mess?
10    A.  That would be true.
11    Q.  All right.
12    A.  Yes.  I do not even believe that my
13 predecessor and Mr. Baillie overlapped.
14    Q.  Okay.  Do you know whether Mr. Reynolds is
15 still employed by the company?
16    A.  No.  No, he's not.  He's not.
17    Q.  Do you know where he went?  In the
18 Cincinnati office, or did he go somewhere else?
19    A.  I believe he went to the Hartford Insurance
20 Company out on the East Coast.
21    Q.  You think he left Chubb?
22    A.  Oh, yeah.  Yeah.  I'm sorry.  Yes.
23    Q.  Okay.
24    A.  I think he went to work for the Hartford

Baillee v. Chubb                    Condenselt!™                    Korte (2/27/03)

Page 61

1 Insurance Company, but I believe he's no longer employed
2 there either.
3        Q.   That's just kind of scuttlebutt you heard in
4 the industry?
5        A.   Yeah.  Yeah.  Um-hmm (nodding head
6 affirmatively).
7              MR. CROALL:  Is it time for a quick rest
8 break as long as you're pondering?
9              MR. FREKING:  Oh, definitely.  Great.
10             (At which time, a brief recess was taken
11       from 9:59 a.m. until 10:03 a.m.)
12       Q.   Now describe for me a little bit about --
13 what are the other areas?  The other kind of profit
14 centers of the branch?
15             You know what I mean?  You've got commercial
16 underwriting profit, right?
17       A.   Correct.
18       Q.   Where you're in charge of profitability?
19       A.   That's mine.
20       Q.   Right.  What are the other what I would call
21 profit centers, if that's okay with you?
22       A.   We have other commercial profit centers
23 other than my own.
24       Q.   Okay.

Page 62

1        A.   We have a profit center that's called the
2 casualty department.  They do specialized casualty
3 coverages, liability, workers' compensation, excess
4 umbrella.  That would be Dave Corry's -- do you want me to
5 give you the managers at the same time to speed it up?
6        Q.   Yeah.
7        A.   It's -- David Corry is the manager.  You
8 have the property department.  Again, it's property
9 coverages only, no casualty coverages, no third-party
10 coverages.  That's led by Kathleen Overlan.
11             We have a department that's called executive
12 protection.  That would be -- it's another name I left out
13 earlier.  Again, my apologies.  That would be Jim Lash.
14 And I don't think I mentioned him earlier in Mr. Butler's
15 report list either.
16       Q.   Okay.  Was he there when Mr. Baillie was
17 there?
18       A.   Yeah.
19       Q.   What's he in charge of?  Executive
20 protection?
21       A.   Executive protection, correct.
22       Q.   What's that mean?  Bodyguards?
23       A.   It's an office -- yeah.  Yeah -- no.  It's
24 -- well, to an extent.  Financial bodyguards.  It's

Page 63

1 directors and officers liability; employment practices
2 liability; fiduciary liability; crime insurance; workplace
3 violence insurance; kidnap and ransom insurance.
4        Q.   These are all things that prudent employers
5 can do --
6        A.   Yeah.
7        Q.   -- to protect themselves?
8        A.   Yeah.
9        Q.   That's kind of neat.
10             MR. CROALL:  You should consider it.
11             The WITNESS (to Mr. Croall):  Yeah.  They'll
12 do professional liability for lawyers too.
13       Q.   Okay.
14       A.   That would be Jim Lash's area of
15 responsibility.
16             Then we have a surety operation, which I do
17 not believe reports to the branch manager.  That's why I
18 left it off earlier.  That gentleman is a gentleman by the
19 name of Mark Penell.  It's P-e-n-e-l-l.  And Lash is
20 L-a-s-h.
21       Q.   Mark Penell, you don't think, reports
22 directly?
23       A.   I don't think so.  But, again, don't --
24       Q.   What's he do?

Page 64

1        A.   Surety.  They provide bonds mostly for the
2 contractors.
3              And then we have a department called
4 financial institutions -- Andrew Emery is responsible for
5 that area -- in essence, providing the coverages my
6 department provides as well as the coverages Jim Lash's
7 area provides, but solely financial institutions, bank
8 institutions, stockbrokers, third-party administers,
9 things of that nature.
10       Q.   More specialized?
11       A.   It's a niche for it.
12       Q.   Niche.  That's a good word.
13             And Don Krohn is personal lines?
14       A.   Personal lines.
15       Q.   How about Taylor?
16       A.   Jay Taylor is what we call a loss control
17 department.  It's -- in laymen's terms, it's engineering
18 services that help underwriters make better decisions.
19       Q.   So he kind of helps the other -- your other
20 peers?
21       A.   Um-hmm (nodding head affirmatively).
22       Q.   Yeah, and other peers?
23       A.   Yeah.  Well, he helps my department.  I
24 would think we're his largest, if you want to call it that

Anette McKeehan Schoch, RMR (513-941-9464)                    Page 61 - Page 64

Baillee v. Chubb                    CondenseIt!™                    Korte (2/27/03)

Page 65

1 -- his largest customer.
2    Q. How about Barton?
3    A. He's the marketing manager.
4    Q. Haggard, we talked about?
5    A. She's human resources.
6    Q. Tazic?
7    A. Claims.
8    Q. And then Dan Krohn? Do you recall who he
9 replaced?
10    A. (No response.)
11    Q. Still not in your mind?
12    A. I told you I would get back to you.
13    Q. Well, that's all right.
14    A. Not yet. Darn it. This is really
15 irritating me, because I used to hang out with the guy.
16 Now I can't even remember his name. He actually went to
17 our Illinois office where I came from. God. This is
18 ridiculous.
19      Tim Dadik. Oh, finally. It's D-a-d-i-k.
20    Q. Okay.
21    A. I should probably mention that Mr. Dadik
22 replaced another gentleman during Mr. Baillie's tenure.
23    Q. Okay.
24    A. And his name really does escape me. He

Page 66

1 would have left at some point, I think, in '99.
2    Q. Okay. I can ask Doug. Doug will probably
3 remember.
4    A. Yeah.
5    Q. What kind of familiarity did you have with
6 respect to, you know, how the other areas of business were
7 doing when you arrived? You know, some of the operations
8 of your peers?
9    A. When I arrived?
10    Q. Yeah. When you arrived, were they all real
11 healthy in terms, you know, financially?
12    A. I honestly don't recall, no. I know I had a
13 mess on my hands. I thought that was enough work to do
14 for one person.
15    Q. Okay. You don't remember. Have they -- did
16 you have like a feeling as to whether or not they were
17 profitable?
18    A. I think it was okay.
19    Q. Did you have a feeling as to -- your
20 business eventually turned around in 2001; is that fair to
21 say?
22    A. 2001 and 2002, yes.
23    Q. Okay. And you attribute that to the changes
24 that you were able to put in place? Better decisions?

Page 67

1    A. It's a variety of things. It's -- I think
2 the quality of our staff is a lot better. I would say
3 that the marketplace has helped tremendously in terms of
4 affirming the insurance market, our ability to obtain
5 higher prices for the same coverages.
6      We did what we call the calling of our book,
7 which means we non-renewed business that was no longer
8 desirable for us; had a little bit more luck.
9    Q. Did Mr. Baillie -- you know, on the topic of
10 kind of getting rid of the bad business, did Mr. Baillie
11 support you in that regard or encourage you in that
12 regard?
13    A. We probably had more instances where we
14 argued over it than agreed on it.
15    Q. Okay.
16    A. I think Doug's preference was to find a way
17 to retain clients versus non-renewing them.
18    Q. Just correct me where I'm wrong on this.
19 Would you always try to retain customers by simply at
20 least trying -- first trying to raise their premiums?
21    A. Personally? No.
22    Q. Okay. Did Mr. Baillie think that that's
23 always kind -- that's sometimes -- rather than simply
24 non-renewing, would you agree with me that sometimes Mr.

Page 68

1 Baillie would say, "Well, let's first try to raise their
2 premium and make it a fairer risk in light of their" --
3 or, "make it a fairer price in light of their risk"?
4    A. (No response.)
5    Q. It was kind of a risk-assessment thing,
6 right?
7    A. Well, he -- his preference would have been
8 to retain customers. I would agree with that, yeah.
9    Q. And --
10    A. Him and I had conversations where he would
11 actually make the point of telling me that these are
12 paying customers and that I should look at them that way.
13    Q. Okay. Did he say things along the lines of
14 what I just suggested, that, "Dieter, let's first look at
15 just raising their premiums"?
16    A. I don't know that he used specifically those
17 terms, but he did on occasion ask me to find a way, if
18 there was a way to retain a customer, yeah.
19    Q. Okay. And you -- you two just had kind --
20 would you describe it as kind of a professional
21 disagreement?
22    A. Oh, yeah. That's -- those conversations go
23 on consistently --
24    Q. Okay.

Anette McKeehan Schoch, RMR (513-941-9464)                    Page 65 - Page 68

Baillee v. Chubb | CondenseIt!™ | Korte (2/27/03)

**Page 69**

1    A. -- between underwriting managers and branch
2  managers.
3    Q. Right, because there's almost an inherent
4  conflict, right? You're almost better off being able to
5  say you accurately predicted the risk a hundred percent of
6  the time and it's almost a cautious approach on your --
7  makes you -- I'm not saying you do this, but if somebody
8  wanted to be cautious and just make sure that they make
9  themselves look the best as an underwriter, they can be
10 pretty conservative in their view, because then there's no
11 great losses.
12   A. I -- if you ask me for my opinion, I
13 wouldn't agree with that.
14   Q. Some underwriters could be -- could make a
15 mistake that way?
16   A. Well, again, I don't know that it's a
17 mistake, if you are in the business of assuming risk, to
18 be conservative. You know, it has its pros and its cons.
19   Q. Right.
20   A. If you assume too much risk, you're going to
21 affect your revenues, but are you going to maintain profit
22 balances.
23   Q. You have to have a reasonable level --
24   A. You have to have a balance.

**Page 70**

1    Q. -- of conservatism?
2    A. You have to have a balance of assuming risk
3  and also trying to grow your business, yeah.
4    Q. Okay. And that's the -- finding that
5  delicate balance is where people --
6    A. It's not easy.
7    Q. -- can disagree?
8    A. Yeah. Oh, yeah. I mean, I can play
9  Monday-morning quarterback on every single business
10 decision an underwriter has ever taken and come back with
11 a better way to do it.
12   Q. Okay. How would you describe the manner in
13 which the effort of the marketing area assisted you in
14 turning around the profitability of your area?
15   A. During Mr. Baillee's tenure?
16   Q. Well, during, while Mr. Baillie was there.
17   A. Insufficient.
18   Q. Okay. Explain to me why you thought it was
19 insufficient.
20   A. More often than not, the perception of
21 myself and the employees in my department was that the
22 difficult messages had to be delivered by us versus the
23 marketing group.
24   Q. Okay.

**Page 71**

1    A. And we felt -- when I say we, I mean the
2  department and my -- the underwriters and myself felt
3  that, more often than not, it appeared that we had to
4  justify ourselves internally first before we could deliver
5  a message to our agents that we felt was the right
6  business decision and the right underwriting decision to
7  take.
8    Q. You had to justify things internally to
9  Chubb?
10   A. Yes, to the marketing area.
11   Q. To the marketing area?
12   A. That you were referring to, um-hmm (nodding
13 head affirmatively).
14   Q. Can you give me an example of that?
15   A (No response.)
16   Q. Just generally, maybe not a specific
17 example.
18   A. There were a lot of examples of that.
19   Q. Just give me one or two that you think are
20 fair.
21   A. Jeez. We had an account -- the name escapes
22 me -- where we had decided, because of unacceptable
23 conditions, to part ways with the risk, and we've had to
24 have several conversations in the branch explaining why we

**Page 72**

1  were doing this, and, you know, justifying our business
2  decision, and we felt second-guessed.
3    Q. Okay. How does marketing interact with a
4  decision like that? That's what I'm trying to figure out.
5    A. Well, I guess marketing at that point more
6  or less takes the agent's view that, you know, "Why do we
7  have to do this? Why can't we stay on the risk?" And our
8  -- you know, we have the underwriting view that we should.
9    Q. When you're having these professional
10 disagreements with your colleagues over marketing, okay,
11 was there any role for Mr. Baillie to play?
12   A. In my opinion?
13   Q. Yes.
14   A. Again, I don't know. I did not have access
15 to his direct goals or mandates. In my opinion, I would
16 have liked -- personally, I would have liked to have seen
17 him support us in the underwriting area more in those
18 instances.
19   Q. And the marketing people probably would have
20 preferred if he supported them more?
21   A. I can't speak for them.
22   Q. When you're having these professional
23 disagreements with your colleagues over marketing, did you
24 ever see Mr. Baillie kind of interject himself into it and

**Baillee v. Chubb**                    CondenseIt!™                    **Korte (2/27/03)**

Page 73

1 try to make a decision for the branch?
2     A.  Well, he couldn't do that, because Mr.
3 Baillie didn't have what we call underwriting authority.
4     Q.  Okay.  Explain to me how Mr. Baillie did not
5 have underwriting authority.
6     A.  Well, it's simply he didn't have any
7 authority granted by the company to make underwriting
8 decisions.  That is up to the underwriting managers and
9 the underwriters, branch managers, marketing managers.
10 Human resources managers have no underwriting authority in
11 our organization.
12     Q.  And so who does have the ultimate authority
13 on underwriting with respect to your area?
14     A.  If it is within -- falls within my area,
15 unless it is a very high hazard risk, a very large risk,
16 it would be either with myself or the underwriters.
17 Again, this is a natural progression.
18     Q.  Okay.  You're saying Mr. Baillie as the
19 branch manager did not have the right to override one of
20 your decisions?
21     A.  No, he would not be able to do that.
22     Q.  Is there anybody in the company who would
23 have the right to override one of your decisions?
24     A.  People with more underwriting authority than

Page 74

1 I would -- could -- I should say could.  I'm sorry.
2     Q.  Who would that be?
3     A.  Well, the next level up above me would be a
4 zone underwriting officer.
5     Q.  Okay.
6     A.  In my area, currently, that's a gentleman by
7 the name of John Gibson, G-i-b-s-o-n.  During Mr.
8 Baillie's tenure, that gentleman was a gentleman by the
9 name of Chip Hamann.  I'm just speaking for mirror areas.
10 We have those for every underwriting department.  It's our
11 organizational structure.
12     Q.  Okay.  I'm sorry, Dieter.  I'm kind of slow
13 sometimes here.
14         The guy higher up than you in the
15 underwriting structure, is there somebody regionally?
16     A.  It would probably be best if I described to
17 you the setup.
18     Q.  Okay.  That would be great.
19     A.  From the bottom up, we have the production
20 offices, which report into a branch.  Then the next level
21 above a branch is what is called a regional office.
22 Cincinnati is a regional office.
23         And then above the regional office is what
24 we call a zone.

Page 75

1         So, currently, Mr. Butler is the regional
2 manager.  The zone manager is Mr. Szerlong.
3         We have the same structure for the
4 underwriting departments.  So I am the regional manager
5 for what we call the Ohio Valley Region, and then I -- the
6 next level above me is the manager for the northern zone,
7 and his name is John Gibson.  During Mr. --
8     Q.  Was he also there while Mr. Baillie was
9 there?
10     A.  No.  During Mr. Baillie's tenure, the
11 gentleman was Chip Hamann, H-a-m-a-n-n.
12     Q.  Who would you describe as your immediate
13 boss?
14     A.  Mr. Baillie at the time.
15     Q.  Now what role did Mr. -- did Mr. Hamann play
16 any role in evaluating your performance?
17     A.  Yeah.  That's -- again, it's a little
18 complex, but our structure is what we call a matrix or
19 dual accountability.  I was a direct report to Mr.
20 Baillie.  So what that meant is Mr. Baillie would
21 administer my performance review because he would observe
22 me day to day.  He would observe me how I manage people,
23 how I conducted myself in the marketplace, and also my
24 results directly impacted his branch's results.

Page 76

1         I would also indirect report to at that time
2 Mr. Hamann, now Mr. Gibson.  They provide me with
3 underwriting authority.  They would give Mr. Baillie
4 feedback -- and now Mr. Butler -- as to how I rank with
5 respects to my peers and other managers in their area.
6         And at this point in time the zone managers
7 also are responsible for administering the incentive
8 compensation.  During Mr. Baillie's tenure, that was
9 administered by Mr. Baillie.  Now that's administered by
10 the zone officers through the underwriting departments.
11     Q.  Would that be Szerlong?
12     A.  No; that would be Mr. Gibson for me.
13     Q.  So while Mr. Baillie was your boss, you had
14 dual accountability?
15     A.  Correct.
16     Q.  You were accountable to Hamann and Baillie?
17     A.  Right.  But Baillie would administer all my
18 performance reviews and administer my entire compensation.
19     Q.  And he would have more day-to-day contact
20 with you, obviously?
21     A.  That's correct.
22     Q.  Hamann was located where?
23     A.  He was located in the Detroit office.  The
24 zone office is in Chicago.  But Mr. Hamann had previously

**Anette McKeehan Schoch, RMR (513-941-9464)**                    Page 73 - Page 76

Baillee v. Chubb                     CondenseIt!™                    Korte (2/27/03)

Page 77

1  been in Detroit. So they decided to leave him there and
2  not ask him to move.
3      Q.  Was Gibson in Chicago?
4      A.  Yes.
5      Q.  And Szerlong is in Chicago?
6      A.  Correct. And, again, the position has just
7  changed slightly, as I mentioned earlier. During Mr.
8  Baillie's tenure, he would have administered all of my
9  compensation. Now my incentive compensation is
10  administered by Mr. Gibson, and Mr. Butler does my
11  performance review and my raises.
12     Q.  Yeah.
13     A.  So it's a little bit different than it used
14  to be.
15     Q.  Do you know whether Mr. Baillie had
16  more overall responsibilities than you did?
17     A.  What do you mean?
18     Q.  In other words, did Mr. Baillie have a
19  broader range of responsibility than you did?
20     A.  Yes.
21     Q.  And he had more subordinates to deal with
22  than you did?
23     A.  When you say subordinates, you mean direct
24  reports or people who would have been below him overall?

Page 78

1      Q.  Direct and indirect.
2      A.  Yes. Oh, yes.
3      Q.  Okay. Did you succeed in kind of turning
4  the commercial lines around? Is that accurate to say?
5      A.  Our department did, yes, um-hmm (nodding
6  head affirmatively). Knock on wood.
7      Q.  Yeah. Do you know whether or not the branch
8  was successful in turning its financial results around?
9      A.  Um-hmm (nodding head affirmatively).
10     Q.  Yes?
11     A.  Yes. I'm sorry. Yes.
12     Q.  Do you know anything about the degree -- can
13  you -- do you have any access to the branch's
14  profitability numbers?
15     A.  Yes, I do, on -- only a mouse click away.
16     Q.  Do you recall any of the financial results
17  and how the branch itself turned around?
18     A.  Yes, I do.
19     Q.  Okay. Describe those for me as best you
20  can.
21          MR. CROALL: Yeah. Randy, I think we've at
22     least got a protective order under discussion, and
23     I'll designate a confidentiality on the assumption
24     we can ultimately reach some agreement on that.

Page 79

1          MR. FREKING: That's fine.
2          MR. CROALL: Given that designation as
3     confidential, you can go ahead and answer.
4          THE WITNESS (to Mr. Croall): I can answer?
5          MR. CROALL: Yes.
6      A.  Yes.
7      Q.  I probably got most of the stuff in, anyway,
8  someplace, but I'm looking for your knowledge. I probably
9  have a document someplace.
10     A.  Okay. The internal was pretty dramatic.
11     Q.  Okay.
12     A.  I don't know the exact numbers, but I think
13  you could describe it as a 180-degree turnaround.
14     Q.  Okay.
15     A.  And we all take great pride in that.
16     Q.  Are you saying between the time of Baillie's
17  arrival and his departure?
18     A.  Between his arrival and departure? Well,
19  year-end numbers, which is really what we measure it by,
20  we had improved after his departure.
21     Q.  Okay.
22     A.  Which would have been 2001 year-end numbers.
23  That was the big turnaround numbers compared to the 2000
24  year-end turnaround numbers.

Page 80

1      Q.  Okay. Now, is your business like some other
2  businesses, where you can't have a big turnaround
3  overnight, can you?
4      A.  No, you can't.
5      Q.  You have to lay the groundwork for a number
6  of months or years?
7      A.  That's correct.
8      Q.  So --
9      A.  For both positive and negative results?
10     Q.  Right. Right. So financial results that
11  you're achieving even now are the results of things you
12  have done in the past, be it weeks, months, or years?
13     A.  For the most part, I would agree with that.
14     Q.  Okay. Tell me how -- what do you mean by --
15  you said something -- you used some phrase like, "And we
16  took great pride in this 180-degree turnaround."
17     A.  Yeah.
18     Q.  How did you sense that people took great
19  pride in that?
20     A.  Well, I will tell you, overall, my
21  perception of our organization is that people are
22  goal-oriented. Everybody knows that profitability is our
23  number-one corporate value, and people monitor -- I mean,
24  we all monitor our progress on a monthly basis, and people

Page 81

1  discuss it in the branch and they, you know, feel good
2  about, obviously, making a profit versus losing money for
3  the organization, the shareholders.
4      Q.  And so morale -- morale just improves
5  generally --
6      A.  Yes.
7      Q.  -- when the financial results get better?
8      A.  Yes, absolutely.
9      Q.  You say 2001 was the big turnaround year?
10     A.  Uh-hmm (nodding head affirmatively).
11     Q.  Was that kind of widely known as the year
12 was going on?
13     A.  Yeah.  I would say people recognized that.
14 When I answer those things, I'm making assumptions based
15 only my observations, but yeah.
16     Q.  You get periodic financial reports?
17     A.  Oh, yeah, yeah.
18     Q.  How often are financial reports available to
19 somebody like you?
20     A.  Like I said, they're a mouse click away and
21 they're updated; the profitability reports are updated
22 monthly.  Then I will see the company reports on a
23 quarterly base basis.
24        I also have other measures that I can access

Page 82

1  on a daily basis, but those will not be profitability
2  related.  Those would be more premium growth, service
3  things.
4      Q.  And the things that you can access on a
5  daily basis give you kind of a -- maybe a sense for how
6  profitability is doing because they're components?
7      A.  No; how premium revenue growth is going more
8  than profitability.
9      Q.  Okay.
10     A.  Profitability is monthly.
11     Q.  And so your experience kind of matters.  You
12 don't have access on a daily basis; you just have to wait
13 for the month end?
14     A.  I believe that there is now a system that
15 lets you monitor it more frequently.  But the way I
16 monitor it is on a monthly basis, that's correct.
17     Q.  Were you regarded -- was there an
18 underwriting branch manager in Cincinnati?
19     A.  I -- I have never heard of a title like
20 that, no.
21     Q.  The reason I ask the question is this
22 Breiner --
23     A.  Okay.
24     Q.  Let me just get my notes on him for a

Page 83

1  second.
2      A.  Can we take a one-minute break while you
3  check your notes?
4      Q.  Oh, yeah, sure.  Definitely.  That will
5  help.
6        (At which time, a brief recess was taken
7        from 10:31 a.m. until 10:36 a.m.)
8      Q.  Okay.  Did Mr. Baillie ever provide you any
9  kind of constructive criticism that you can recall, or
10 provide you with any sort of advice as to how you should
11 operate?
12     A.  Yes.
13     Q.  Can you describe that for me?
14     A.  It was usually part of my performance
15 reviews.
16     Q.  Okay.
17     A.  Or when I -- I would solicit feedback.
18 Generally, Mr. Baillie, as best I recall, was very pleased
19 with my operation, with the way I was managing people.
20 His advice and suggestions were more in what we call
21 managing up, controlling my temper.
22     Q.  I'm sorry, did you say controlling?
23     A.  Managing up in the organization, controlling
24 my temper.  He would call it, "Don't wear your emotions on

Page 84

1  your sleeve so much."
2      Q.  Okay.  What's that?  I'm not -- I don't
3  think I've heard that phrase before, "managing up."
4      A.  Managing upwards.
5      Q.  What does that mean?
6      A.  Just the way you interact with superiors.
7      Q.  Okay.
8      A.  Kind of demonstrating your abilities
9  upwardly in the organization, you know,
10     Q.  Okay.  I think I understand.
11     A.  To position yourself maybe for future
12 opportunities, those sort of things.
13     Q.  Kind of demonstrate --
14     A.  Upward mobility maybe.
15     Q.  Upward mobility?
16     A.  Yeah.
17     Q.  Okay.  I got you.  Did you -- did you think
18 that -- none of us likes to get criticism on --
19     A.  I'm sorry, I didn't hear that.
20     Q.  None of us likes to get criticized about how
21 we perform our jobs, but did you think that Mr. Baillie
22 was -- when he did give you constructive criticism, that
23 it was -- kind of in good faith, I guess?  That he
24 honestly wasn't trying to harass you or anything like

**Page 85**

1    that?
2        A.    Oh, no no, no.  It was feedback I solicited.
3        Q.    Okay.  And you thought it was fair?
4        A.    Yeah.  It's things I recognized on my
5    shortcomings myself, yeah.
6        Q.    Okay.  How many people reported directly to
7    you, approximately?
8        A.    At this point in time?
9        Q.    No; when Baillie was the boss.
10       A.    It really did vary because we did continue
11   to have some turnover.  If I tell you at the peak, that's
12   probably the best time frame.
13       Q.    Okay.
14       A.    It would have been three in Cincinnati, two
15   in Columbus, three in Louisville -- eight -- nine -- I'm
16   sorry.  Nine.  That would have been the highest count.
17       Q.    And then did you have anybody in Cleveland
18   reporting to you?
19       A.    Not directly.  It's -- I'm technical
20   support.  My feedback is evaluating that person's
21   performance.  I'm trying to help and coach and do some
22   training, but I don't administer that person's performance
23   review.
24            And the same for Indianapolis.  I'm a

**Page 86**

1    resource.  And the people, the two managers, one in each
2    office -- I provide feedback to their bosses on their
3    performance on an annual basis, and I'll also have
4    sit-down meetings with their bosses and just discuss
5    overall what my opinion is.
6        Q.    Now, maybe this relates to the fact to your
7    dual accountability scheme, but did Baillie, Mr. Baillie,
8    have any role with respect to giving of advise as to how
9    you kind of did your underwriting job?  Or did he just not
10   have the expertise to do that?
11       A.    Not so much, not the technical piece of my
12   underwriting job; more the results that it produces.
13       Q.    Okay.
14       A.    So, I mean, I don't know how to properly --
15   his feedback was more geared towards the marketing of our
16   underwriting decisions, I guess, not so much the technical
17   approach to it.
18       Q.    Okay.
19       A.    And that's -- I think that's pretty
20   standard.  I mean, that's expected that, you know, as an
21   underwriting manager, that I know how to do that, but that
22   I'm being held accountable for the results it produces.
23       Q.    Okay.  The same way -- and Butler kind of
24   operates in the same manner?

**Page 87**

1        A.    Absolutely.
2        Q.    And you and Mr. Baillie communicated in your
3    annual performance reviews?
4        A.    Um-hmm (nodding head affirmatively).
5        Q.    Did he provide you feedback from time to
6    time throughout the calendar year?
7        A.    Not official.  There might have been a
8    comment or, you know, a quick chat, but no formal.
9        Q.    Nothing formal?
10       A.    Sit-down meetings that I can recall.  I
11   might have asked him for feedback or he might have, as a
12   coaching point might have told me something, but...
13       Q.    Now, did he sometimes -- was Mr. Baillie in
14   a position ever to provide you feedback from other people?
15   In other words, not just how he reviewed your management
16   style or anything like that, but also feedback from
17   others?
18       A.    Yes.
19       Q.    Can you explain that, to what degree you did
20   that?
21       A.    He had several ways of doing that.  He would
22   solicit my peers' feedback on me anonymously, and he would
23   do that for every manager.  So he would ask me to provide
24   him feedback on all the managers in our office, and he

**Page 88**

1    would do the same thing; he would ask them for feedback on
2    me and he would share that anonymously with me.  Without
3    saying who said what, he would say, "Here's how your peers
4    view you."
5            He would also tell me on occasion how Chip
6    Hamann at the same time would rank me in the zone with
7    respect to my peers there and share observations that both
8    Indianapolis and the Cleveland branch managers had made of
9    myself.
10       Q.    Okay.
11       A.    What they thought of me, my performance, my
12   involvement, the adequacy of that.
13       Q.    Do you think he did that on enough of a
14   regular basis to satisfy you?
15       A.    That's kind of a -- would I have preferred a
16   little bit more often?  Maybe.
17       Q.    Okay.  Is that called 360-degree feedback?
18       A.    No, I don't think officially that -- I don't
19   think my position has that.  I mean, that would have meant
20   that, 360 degrees, he would have had to ask every one of
21   my direct reports as well, and I don't believe he did
22   that.
23       Q.    Okay.  Did you get occasion to provide
24   feedback on Mr. Baillie's performance?

Baillee v. Chubb                CondenseIt!™                    Korte (2/27/03)

---

Page 89

1    A.  He had anonymous questionnaires that he
2 would circulate. I think it was on a somewhat regular
3 basis throughout the branch. I don't believe I ever
4 filled one out, but I would -- when we had sit-downs, I
5 would share with him an observation or comment or things I
6 would like him to do more or less.
7    Q.  Why did you elect not to fill out those
8 feedback forms?
9    A.  I don't even recall at the time why I
10 didn't. I didn't.
11    Q.  Do you recall, do you have any understanding
12 of your peers, your colleagues or subordinates or
13 managers, why they did or did not fill out those things
14 for him?
15    A.  No, I do not.
16    Q.  Now, did you -- he would solicit your
17 feedback on other people, right?
18    A.  Yes. He would ask me how I perceive my
19 peers in the branch, the other managers in the branch.
20    Q.  And the same way he was asking them about
21 you?
22    A.  That's correct, on an annual basis.
23    Q.  Did you find that to be kind of a valuable
24 tool?

---

Page 90

1    A.  No.
2    Q.  And why not?
3    A.  Because I don't think I personally
4 understand enough of the business issues and the people
5 management issues my peers are facing. And I would give
6 them the feedback he solicited, but I personally think
7 it's very superficial feedback, just based on observations
8 in the branch.
9         Personally, my concern with that type of
10 feedback is that it would result in a kind of like, just
11 like kind of feedback versus truly whether somebody is a
12 good or not a good employee.
13    Q.  You just don't feel like you're --
14    A.  No.
15    Q.  -- really in a position to measure how
16 they're doing their job?
17    A.  And I actually believe I shared that with
18 him at one time.
19    Q.  Is that one reason why you maybe didn't
20 provide feedback on the surveys about Mr. Baillie's
21 performance?
22    A.  No. No.
23    Q.  Okay.
24    A.  Like I said, I don't even recall why I

---

Page 91

1 didn't fill those out.
2    Q.  Now, how about the -- we've talked about --
3 and maybe you've already answered this question and I
4 don't even know it, but we talked about the profitability
5 and the 180-degree turnaround.
6    A.  Um-hmm (nodding head affirmatively).
7    Q.  Was that just in -- was that for the
8 Cincinnati office? Is that for the branch? Is that for
9 Louisville, Columbus, Cleveland, Indianapolis?
10    A.  It would definitely be for the way we --
11        THE WITNESS (to Mr. Croall):  I can answer
12 that?
13        MR. CROALL:  Yes.
14    A.  It would definitely be for the way the
15 Cincinnati branch is measured and the way our report is
16 produced. The Cincinnati branch includes Louisville and
17 Columbus.
18    Q.  Okay.
19    A.  You can also access those two branches
20 separately. The same, I think, can be said for our
21 region, which included Cleveland and Indianapolis, and I
22 think it's an overall theme in our company that the
23 corporate results and most branches' results improved in
24 those time frames.

---

Page 92

1    Q.  Okay. So the region includes Indianapolis,
2 Cleveland?
3    A.  Correct.
4    Q.  Louisville, Columbus, Cincinnati?
5    A.  Correct.
6    Q.  The branch is Louisville, Columbus,
7 Cincinnati?
8    A.  Correct.
9    Q.  And Indianapolis has since left the region?
10    A.  No. It's still part of the region.
11    Q.  It is still part of the region?
12    A.  Yes.
13    Q.  Just Mr. Breiner left?
14    A.  No. Mr. Breiner is still there. He just
15 doesn't report to the Cincinnati branch manager.
16    Q.  Okay.
17    A.  Same for the Cleveland branch manager. They
18 used to, but the structure has changed slightly. They
19 still participate in our region. We still provide the
20 technical support. I still provide the feedback on the
21 managers, but the branch managers no longer report,
22 directly report to the Cincinnati branch manager.
23    Q.  Okay.
24    A.  And I believe that changed during Mr.

---

Anette McKeehan Schoch, RMR (513-941-9464)

**Baillee v. Chubb**                    CondenseIt!™                    **Korte (2/27/03)**

---

Page 93

1  Baillie's tenure. I'm pretty sure it did.
2      Q.   Now, you have somebody named -- I think his
3  name is -- strike that. How would you describe the zone
4  Mr. Szerlong is in charge of?
5      A.   When you say how would I describe it --
6      Q.   What geographical area does it encompass?
7      A.   It's pretty large. It's the northern
8  Midwestern states. I could attempt to list all the
9  offices. It would be Cleveland; Cincinnati; Indianapolis;
10  Detroit; Chicago; the Illinois branch, which is in the
11  Chicago suburbs; Milwaukee; Kansas City; St. Louis;
12  Des Moines; and then obviously we have the Louisville and
13  Columbus production branch as part of Cincinnati; and then
14  there is a production branch in Grand Rapids, Michigan,
15  that is part of the Detroit office.
16      Q.   And do each of these offices have a branch
17  manager, to your knowledge?
18      A.   All but the three production offices, and
19  the three production offices have what we call a
20  production leader. I don't think I left any out. I think
21  I caught them all.
22      Q.   Okay. And now within this northern zone,
23  Cleveland, Cincinnati, and Indianapolis are part of a
24  region together?

---

Page 94

1      A.   Yes. They're the Ohio Valley region.
2      Q.   Okay. Are there other regions?
3      A.   Yeah. There's the -- I think it's called
4  the Midwest region. That would be Detroit, Milwaukee, and
5  Minneapolis. And then there's the Chicago region, which
6  would be the remaining offices.
7      Q.   So Chicago, the suburbs of Chicago,
8  Illinois?
9      A.   Illinois office, Des Moines, Kansas City,
10  and St. Louis.
11      Q.   Three regions?
12      A.   Um-hmm (nodding head affirmatively).
13      Q.   Okay. And who was the regional manager of
14  -- is this called the Detroit region?
15      A.   Yeah -- well, the Midwest.
16      Q.   Midwest?
17      A.   Midwest, I believe is the name.
18      Q.   Okay.
19      A.   But it's out of Detroit, correct.
20      Q.   Who is -- who was in charge of that?
21          MR. CROALL:   Is it all right to answer?
22          MR. CROALL:   Sure.
23      A.   Tim Shannahan. It's S-h-a-n-n-a-h-a-n.
24      Q.   And how about the Chicago?

---

Page 95

1      A.   That would have been Mr. Szerlong.
2      Q.   So Szerlong had a -- wore two hats?
3      A.   Um-hmm (nodding head affirmatively). That's
4  pretty much common practice in the company.
5      Q.   So he has responsibility for his region, but
6  also the zone?
7      A.   Um-hmm (nodding head affirmatively).
8      Q.   Was Mr. Shannahan the regional manager of
9  the Midwest during Mr. Baillie's tenure?
10      A.   Yes.
11      Q.   Now, do you know where Mr. Butler worked
12  previous to becoming the regional manager?
13      A.   Yes. He worked in Harrisburg, our
14  Harrisburg office.
15      Q.   Do you know what role he performed?
16      A.   He was the branch manager.
17      Q.   And what zone is that in, if you know?
18      A.   I believe that's the Mid Atlantic zone.
19      Q.   Now, do you know of any other -- have you
20  heard -- and I'm not saying whether you know this to be
21  true, but have you heard anything about any other branch
22  managers who have been let go by Chubb other than Mr.
23  Baillie?
24      A.   I mean, I've seen branch managers leave.

---

Page 96

1      Q.   Who are some of the branch managers you've
2  seen leave over the last few years? Obviously, there were
3  two people in Cincinnati who have left, Reynolds and
4  Baillie.
5      A.   Well, then, prior to Mr. Reynolds, there was
6  another gentleman. His name escapes me now.
7          Again, I've never met these people. I don't
8  know the reason for their departures.
9      Q.   Okay.
10      A.   There was a gentleman in the Illinois office
11  who left prior to me going to Illinois. It's -- it
12  happens. We have turnover.
13      Q.   In the last few years, can you think of
14  anybody since like calendar year 2001 other than Mr.
15  Baillie?
16      A.   I don't know.
17      Q.   Okay.
18      A.   No.
19      Q.   How would you describe the level of
20  profitability of the Cincinnati branch in 2001 in terms of
21  dollars and cents?
22          MR. CROALL:   Again, that's confidential, but
23      you can answer if you know.
24      A.   I don't know the exact amount. I would

---

**Anette McKeehan Schoch, RMR (513-941-9464)**                    Page 93 - Page 96

Page 97

1  guess. Is that all right to do?
2       Q.  We don't need the exact.
3       MR. CROALL: A guess is all right.
4       A.  20, 25 million dollars maybe.
5       Q.  Okay.
6       A.  Somewhere in that neighborhood.
7       Q.  And how about in 2002?
8       A.  A little less, but pretty close to that
9  amount.
10      Q.  And in 2003, do you know anything yet as to
11 how you're doing?
12      A.  It's only been a month so far.
13      Q.  Are there any trends indicating -- do you
14 have a sense it's going to be an up year?
15      A.  Yeah. I think it's going to be a pretty
16 good year.
17      Q.  You think that -- you think the level of
18 profit is going to increase like over 2001 or do you think
19 it's going to --
20      A.  I'd like for it to increase. I think
21 there's a chance of that happening.
22      Q.  Now, is there a difference between the
23 branch profitability and underwriting profitability?
24      A.  No. I mean, it's the same measurement.

Page 98

1  It's, you know, our earned premiums, and you subtract the
2  expenses we pay and our losses we pay, and the remainder
3  is all the remaining profit. That's the same formula for
4  each department and the overall branch.
5       Q.  Would the numbers be the same, though?
6       A.  No.
7       Q.  Is there --
8       A.  I mean, they're obviously different.
9       Q.  Okay.
10      A.  I mean, my department's numbers are
11 different than the branch's numbers.
12      Q.  What was the underwriting profit in like
13 2001, ball park?
14      A.  All right. I don't think I'm in sync with
15 you right now.
16      Q.  Can you give me the branch profitability in
17 2001?
18      A.  Yes.
19      MR. CROALL: Are you asking just for his
20 department?
21      MR. FREKING: Yes. The underwriting.
22      A.  I'm sorry.
23      Q.  If someone said what is the underwriting
24 department?

Page 99

1       A.  Yes. For my department?
2       Q.  Yes.
3       A.  That would have been three or four million
4  dollars.
5       Q.  Did that improve in 2002 also?
6       A.  A little bit, yeah, light improvement.
7       Q.  And, 2003, you're hoping for another
8  improvement?
9       A.  Um-hmm (nodding head affirmatively). I
10 expect one.
11      Q.  Do you recall something called the uninsured
12 crisis?
13      A.  Oh, yes.
14      Q.  How would you describe what the uninsured
15 crisis was to a lay person?
16      A.  I could be a smart alec, but I'm not going
17 to be. It was a crisis that developed out of a Supreme
18 Court decision.
19      Q.  Okay.
20      A.  Actually, a series of Supreme Court
21 decisions that made it extremely difficult to profitably
22 underwrite automobile coverages in the State of Ohio.
23      Q.  Okay. Do you know, did you have any
24 familiarity with what role Mr. Baillie made in connection

Page 100

1  with that crisis? In other words, what his role was in
2  helping to deal with this problem?
3       A.  I don't know what the company specifically
4  asked him to do. I know that Mr. Tazik and I, together
5  with our home office, worked on implementing -- you know,
6  coming up with underwriting policy language, pricing
7  techniques to, I guess, quote, unquote, "combat the
8  problem."
9       Q.  Okay.
10      A.  I believe Mr. Baillie had been asked to
11 pursue with others the political area, through, you know,
12 various associations, to influence, maybe bring some sense
13 to people in Columbus.
14      Q.  Bring some sense to people from the
15 insurance company's perspective?
16      A.  Yeah. I apologize. I'm pretty partial on
17 that issue.
18      Q.  Yeah, you probably are, which is
19 understandable.
20      You said you and Mr. Tazik played a role in
21 making underwriting suggestions?
22      A.  Claims suggestions, underwriting
23 suggestions, tracking results, trying to assess the
24 exposure to the company, yes.

Page 101

1    Q    Did Mr. Baillie play a role with like
2  working with you in that regard, or is that something you
3  would have done with Hamann or someone else?
4    A    I mean, Hamann was obviously involved as
5  well. It's something that the idea is that it should have
6  been done at all levels, you know, in concert, yes.
7    Q    Do you know anything about what Mr. Baillie
8  did on the medical level?
9    A    No, I don't.
10   Q    So you don't know whether --
11   A    Other than, I believe, some of that was
12 delegated to Mr. DeLong in Cleveland -- that's D-e-L-o-n-g
13 -- but I don't know how much of that.
14   Q    Now, was Mr. DeLong -- what was his role?
15   A    He's the Cleveland branch manager.
16   Q    Okay. Now tell me about, in the fall of
17 2001, this meeting or conversation you had with Mr.
18 Baillie at the convention in Cincinnati.
19   A    Okay.
20   Q    This is obviously after, long after -- well,
21 a few months after --
22   A    Right.
23   Q    -- he's been terminated, right?
24   A    Right.

Page 102

1    Q    Okay. Tell me what you recall about this
2  charity event that Mr. Baillie was volunteering his time
3  at.
4    A    He was manning a booth in front of the
5  convention room, and I walked up with one of my
6  underwriters. And we more or less ran into him and
7  exchanged pleasantries: How are you? How are things
8  going?
9         Mr. Baillie asked me a lot about the
10 branch's results. You know, he made a comment to me that
11 -- you know, I described to him the state of the
12 marketplace, which was a lot more favorable in 2001 than
13 it had been in previous years, and we were pretty
14 successful in increasing our prices; we stand to see some
15 nice new business opportunities.
16        And I mentioned that to him and, you know,
17 mentioned to him that our profit picture was improving.
18        And he made a comment to me to the effect:
19 "Yeah, I laid all the groundwork and then they kicked me
20 out the door."
21        And, you know, just these things and just
22 the perception he appeared to me to be pretty bitter.
23        We also had a conversation about an
24 interview that he had with another insurance company, and

Page 103

1  he had interviewed together -- I believe he ran into a
2  former branch manager of mine who was also interviewing
3  with that company at the time, and I kind of jokingly made
4  the comment to him about that must have been "a love
5  fest," quote, unquote, about Chubb.
6         And the conversation continued, and he made
7  a comment to me to the effect that, because I had worked
8  for that branch manager, Mr. Szerlong didn't like me,
9  because Mr. Szerlong and that branch manager apparently
10 didn't see eye to eye while both of them worked at Chubb.
11        So the gentleman's name is Simmons. And he
12 said, "You're one of Simmon's people, so you know
13 Szerlong," something to the effect, "Szerlong doesn't like
14 you."
15   Q    So you had previously worked for Simmons?
16   A    Yes. In the Detroit office, he was my first
17 branch manager.
18   Q    Oh, I see.
19   A    And at the same time Mr. Szerlong would have
20 been the Chicago branch manager.
21   Q    Okay. Anything else you remember him saying
22 about Chubb?
23   A    Yeah.
24   Q    He talked about Chubb?

Page 104

1    A    He kept bringing up the point he felt he got
2  kicked out the door; he had turned around the results and
3  Chubb had kicked him out the door, and he made that
4  comment.
5         He asked me how certain people in the office
6  were, and I mentioned to him that Mike Zdinak had taken a
7  different position.
8         He said, "Yeah, I had started to lay the
9  groundwork for all of that."
10        And that was probably the -- probably that
11 summarizes the key elements.
12   Q    Okay. And you said --
13   A    I tell you this, just, subjectively, it was
14 pretty uncomfortable for me at the time.
15   Q    It was uncomfortable --
16   A    Yes.
17   Q    -- for you because he was obviously bitter
18 and he was critical of Chubb?
19   A    In front of a junior employee who reported
20 to me, correct.
21   Q    But the junior -- but the person you were
22 with was also a Chubb employee?
23   A    That's correct. She reported to me.
24   Q    Okay. And what was her name?

Page 105

1    A.  Erin Pesce, P-e-s-c-e.
2    Q.  What did Erin -- what was Erin's reaction to
3 this that you recall?
4    A.  She blushed and she was fidgety, nervous.
5    Q.  She got over it?
6    A.  I don't know that.
7    Q.  Any comments?
8    A.  We decided not to talk about that.
9    Q.  Okay.
10    A.  So you just haven't talked about it since?
11    Q.  Okay.
12    A.  Not to her.
13    Q.  Okay.  And did you talk to somebody else
14 about this?
15    A.  Yes.
16    Q.  Have you told me about all the important
17 things you remember about that conversation?
18    A.  Yeah.
19    Q.  Okay.
20    A.  The key elements.  I mean, I don't recall
21 all the pleasantries, you know:  "How are you?  How are
22 things going?  How are the family?"
23         We did exchange that as well, and the
24 conversation evolved into the things I mentioned to you.

Page 106

1    Q.  Did he mention to you anything about the
2 severance Chubb had offered to him and Chubb's response,
3 or Chubb's -- anything about whether he was still kind of
4 negotiating with Chubb or anything like that?
5    A.  No.
6    Q.  Okay.  You reported this conversation to
7 someone else?
8    A.  Yes.  I shared it with Ms. Haggard because I
9 knew other employees were going to be at that meeting
10 later on in the day.
11    Q.  And you told -- you obviously don't have any
12 notes from this?
13    A.  No.
14    Q.  To the best of your knowledge, you probably
15 told Haggard essentially what you've told us this morning?
16    A.  Yes.
17    Q.  Okay.
18    A.  And my -- just my lack of comfort.
19    Q.  Okay.  It made you uncomfortable?
20    A.  Yeah.
21    Q.  Because it was -- it was something that you
22 didn't anticipate running into that day?
23    A.  No.  It made me uncomfortable because the
24 comments were made in front of, you know, a young employee

Page 107

1 of mine, and I didn't think it was appropriate.
2         And these were the exact words I shared with
3 Ms. Haggard afterwards:  "I don't think it's appropriate,
4 whether it's true or not, for a younger employee who
5 reports to me to get the impression that my zone manager,
6 the zone manager who is responsible for our area, doesn't
7 like me.  I don't think that's appropriate."
8         And I shared that with her.
9    Q.  Okay.  Now, did you share it with anybody
10 else?
11    A.  I might have.
12    Q.  I mean, some peers?
13    A.  I might have talked to -- yeah.  I think I
14 might have mentioned the fact we ran into him.  I might
15 have even mentioned some of the comments he made to the
16 extent that, you know, "Baillie's pretty p'd off, yeah."
17    Q.  You mean to some of your colleagues?
18    A.  Yeah.
19    Q.  Did anybody from Chubb in any kind of
20 official role come to you and interview you about this?
21         MR. CROALL:  Other than counsel.
22    Q.  Other than counsel.
23    A.  No.  Other than my comment to Ms. Haggard.
24    Q.  To Haggard?

Page 108

1    A.  Right.
2    Q.  How long would you estimate you talked to
3 Ms. Haggard about this event?
4    A.  A few minutes.
5    Q.  Okay.  But after you mentioned it to
6 Ms. Haggard -- I just want to make sure -- Szerlong didn't
7 come to you.
8    A.  No.
9    Q.  Patricia Hurley?
10    A.  No.
11    Q.  Nobody in Chubb that you can recall?
12    A.  No.
13    Q.  Outside of maybe counsel?
14    A.  That's correct, other than having a
15 conversation with a peer of mine in the branch, kind of
16 half joking.
17    Q.  Yeah.
18    A.  Yeah.  That's it.
19    Q.  Let me ask you a hypothetical question and
20 see if you can answer the question.  Let's take Ms. Pesce
21 out of the picture.  Let's remove her from that
22 conversation completely, just act like she wasn't there.
23         Do you think you would have had the same
24 reaction?

Baillee v. Chubb | CondenseIt!™ | Korte (2/27/03)

---

Page 109

1    MR. CROALL: Object on the speculation and
2  hypothetical.
3    But you can answer if you can.
4  A.  No.
5  Q.  It sounds like your discomfort was caused by
6  the fact Pesce was there.
7  A.  Right.
8  Q.  Now let me ask you: Did he say anything --
9  first of all, did you take --
10  A.  Can I just add to that last?
11  Q.  Sure.
12  A.  I was not comfortable sharing financial
13  results with him because he no longer worked for the
14  organization, but I felt that --
15  Q.  Oh, I see.
16  A.  -- in vague terms I could probably relate to
17  him what was going on.
18  Q.  That's fair. Do you disagree -- do you
19  think his statement, or in substance his statement that "I
20  laid the groundwork" -- do you think that was
21  fundamentally false?
22    THE WITNESS (to Mr. Croall): Do I answer
23  that?
24    MR. CROALL: If you can.

---

Page 110

1  Q.  Do you agree or disagree with that?
2  A.  It wasn't completely false. I mean, he was
3  the branch manager. We performed a cleanup of the book
4  while he was a branch manager.
5  Q.  So it's probably a fair statement?
6  A.  It's -- yeah. I mean, he was in charge of
7  the branch at the time.
8  Q.  Okay.
9  A.  The cleanup of the book was performed, so...
10  Q.  Now, how would you characterize the
11  statement that "they kicked me out the door"?
12    Do you think that's true or false?
13  A.  I -- I would tell you that I didn't know
14  these -- you know, the reasons surrounding his departure,
15  so I couldn't tell that they kicked him out the door or
16  not. That was his comment to me.
17  Q.  You just knew he was out the door?
18  A.  That's correct.
19  Q.  And you said he was very bitter?
20  A.  Yeah.
21  Q.  Okay.
22  A.  He was upset, very -- I would characterize
23  it -- if I can do that, I would characterize it as very
24  unusual for the way I had perceived Doug.

---

Page 111

1  Q.  Okay.
2  A.  Pretty much out of character.
3  Q.  Pretty much out of character?
4  A.  Yes.
5  Q.  Okay.
6  A.  The way I had observed Doug in the past,
7  interacted with him.
8  Q.  His personality seemed different?
9  A.  Yeah.
10  Q.  How long do you think this conversation was?
11  A.  Five, ten minutes.
12  Q.  Was he like animated during this
13  conversation? Like how people get when they get upset?
14  Kind of arms going more than usual?
15  A.  No. I don't think he used his arms.
16  Q.  Any other ways that you could tell that he
17  was like just upset or uncomfortable?
18  A.  It was probably the tone of his voice and
19  kind of just the way he made the comment, but I'm
20  speculating on that. I mean, to me it appeared that he
21  was upset.
22  Q.  Were you surprised about that, given that it
23  was maybe two, three months after the fact and he was
24  still upset or bitter?

---

Page 112

1  A.  Was I surprised at the time?
2  Q.  Were you kind of surprised at his tone?
3  Were you expecting --
4  A.  Well, I mean, given the phone call that I
5  had received the last day of his employment and that
6  reaction, yeah, it was surprising. Like I said, I mean,
7  it appeared out of character.
8  Q.  Anything else you recall from that
9  conversation in the sense that he appeared to be upset in
10  any other manner? Was he -- you know, could you just --
11  could you kind of tell by facial expression?
12  A.  I could tell from probably the tone of his
13  voice more than anything else.
14  Q.  You could tell --
15  A.  And just the way he described like, "I got
16  kicked out the door." I mean, that to me symbolizes
17  somebody upset rather than somebody who is happy with his
18  current state.
19  Q.  You could tell he was hurt?
20  A.  I could tell he was upset, yeah.
21  Q.  Okay. Anything else you remember about
22  that? Anything about his -- the way he looked? The way
23  he acted?
24  A.  I mean, he was wearing a suit.

---

Baillee v. Chubb                 CondenseIt!™                  Korte (2/27/03)

---

Page 113

1   Q.  Yeah.
2   A.  But, no.
3   Q.  Any --
4   A.  I will tell you this.  It did appear to me
5 as we were talking he was getting more -- and, again, this
6 is perception, but it seemed like he was piling on.  He
7 started with his comments just about how things were
8 improving.  Then he made the comment about Szerlong not
9 liking me.  And I thought it was kind of like, "Okay, what
10 are you going to say next?"
11        And that kind of prompted my lack of comfort
12 with the conversation.
13   Q.  He was getting more agitated the more and
14 more he talked about Chubb?
15   A.  well, he was -- yeah, I guess.
16   Q.  Then you said you got an e-mail from him?
17   A.  Um-hmm (nodding head affirmatively.)
18   Q.  It was a friendly e-mail --
19   A.  Right.
20   Q.  -- inviting you to stay at his residence?
21   A.  Yeah.  I forget if it's a condo or house,
22 "If you're ever in the Florida area," right.
23        He actually made -- I think he made the
24 comment about Disney World, "If you want to take the kids

---

Page 114

1 to Disney."
2   Q.  Maybe I asked you this before, but why
3 didn't you respond to that?
4   A.  Just didn't -- didn't respond.  I don't
5 know.  I don't recall why I didn't respond to it.  I might
6 have wanted to at one point in time, things got in the
7 way, and then I forgot.
8   Q.  Did you ever learn -- were you ever told any
9 reasons why, other than from counsel -- okay.  Have you
10 ever been told from anybody other than counsel that Chubb
11 allegedly withdrew its severance offer to Mr. Baillie?
12   A.  No.
13   Q.  Or the reasons why they allegedly did that?
14   A.  Uh-huh (nodding head negatively).
15   Q.  And since Mr. Baillie's termination, has
16 anybody else in your office that you can recall, or any
17 other person, really, on the face of the earth that you
18 can recall -- has anybody else ever disclosed to you that
19 they had any kind of meeting with Mr. Baillie or a chance
20 occurrence and he said things that were either
21 inappropriate or unfair about Chubb or false about Chubb?
22   A.  Since his departure?
23   Q.  Yes.  Since his departure, has anybody said,
24 "I had a similar meeting with Baillie"?

---

Page 115

1   A.  The only thing I know, it is my
2 understanding other people met with him on that Big I day
3 and he -- rumor is he made some other comments.
4   Q.  Okay.
5   A.  But I don't know what the comments are.
6   Q.  Okay.  You don't know anything about those
7 rumors at all?
8   A.  No.  No.  I don't know the details, no.
9   Q.  Do you know in general anything more than he
10 made similar comments?
11   A.  No.  Sorry.
12   Q.  Okay.  Do you know any of the people who
13 allegedly saw him that day?
14   A.  I believe Mr. Tazik did, and I believe
15 Mr. Gates did, and a former employee of mine by the name
16 of Brandi Caldwell.  That's C-a-l-d-w-e-l-l.
17   Q.  Brandi Caldwell?
18   A.  A former employee of mine.
19   Q.  Okay.
20   A.  There might have been one other person.  I
21 don't recall for sure.
22   Q.  And you just don't remember what Tazik,
23 Gates, or Caldwell relayed about those conversations?
24   A.  No, I don't.

---

Page 116

1   Q.  Do you remember in general that they -- they
2 shared your view he appeared to be kind of bitter or
3 upset?
4   A.  Well, I would -- I mentioned to both Gates
5 and Tazik that I thought he was pretty upset, and I -- I
6 honestly don't recall what their response to that was.  I
7 mean, I mentioned to them, that, you know, "Oh, gee, he
8 was" -- I think I might have said "on fire" or something
9 like that.
10   Q.  Yeah.  Were you -- when you got that phone
11 call from him that night --
12   A.  Um-hmm (nodding head affirmatively).
13   Q.  -- where he told you he had been let go,
14 what do you recall your reaction being like when you hung
15 up the phone or talked to your wife about it?  Is it fair
16 to say that you were surprised?
17   A.  No, I wasn't surprised.
18   Q.  Okay.  Now, why weren't you surprised?
19   A.  He had made a comment to me on the way back
20 from a business meeting in New Jersey that was actually
21 given dealing with the uninsured motorist topic.  He was
22 on the cell phone to his wife and made a comment to the
23 effect that, "Yeah, the meeting went okay.  I guess I kept
24 my job for another month."

---

Anette McKeehan Schoch, RMR (513-941-9464)          Page 113 - Page 116

Baillee v. Chubb | CondenseIt!™ | Korte (2/27/03)

Page 117

1  And then I just looked at him, and he said,
2  "Well, things are the way they are," something to that
3  effect.
4  And I kind of thought to myself something
5  must not be going so well. And I recognized we weren't
6  making a lot of profit for a number of years, so I wasn't
7  entirely shocked, no. I thought it was very unusual for
8  Mr. Szerlong to come to the branch unannounced on a Friday
9  afternoon.
10  Q. You said you were entirely shocked?
11  A. No, I was not entirely shocked.
12  Q. Okay.
13  A. And I thought for Mr. Szerlong to kind of
14  come to the branch on a Friday afternoon without
15  announcement, I mean --
16  Q. Okay.
17  A. I guess my gut instinct was telling me
18  something was going on. And when he called and my wife
19  told me that Mr. Baillie was on the phone, it's like -- I
20  kind of whispered to her -- I said, "Boy, this isn't good
21  news."
22  And then he explained to me what happened on
23  the phone. And I think my reaction was to him, "It just
24  doesn't seem right, Doug."

Page 118

1  And he said, "Well, Tim Szerlong and I
2  agreed to disagree and I'm no longer employed by Chubb."
3  And I might have said again, "That just
4  doesn't seem right, Doug."
5  He said, "It is what it is. It's a good
6  company. You'll have a good career," you know.
7  Q. Okay. Did you relay that conversation to
8  anybody that you can recall?
9  MR. CROALL: Other than counsel.
10  Q. Other than counsel.
11  A. I might have. I don't remember.
12  Q. Okay.
13  A. I might have shared the whole summary in the
14  office.
15  Q. Like Haggard or anybody like that?
16  A. Either Haggard or Tazik. I'm pretty close
17  to both of them, so I might have mentioned it to either
18  one of them.
19  Q. Okay. Now, prior to his termination date,
20  in this telephone call at night and Szerlong showing up in
21  the afternoon and other than your conversation you said on
22  the way back from New Jersey, had he ever said anything
23  else that gave you some impression that maybe he was under
24  the gun or not long for the Chubb world or anything like

Page 119

1  that?
2  A. He made a comment -- I was standing outside
3  of his office, and I don't know exactly what the phone
4  call was about, but he just came out of his office. He
5  had his door closed. He came out of his office, and he
6  said something to the effect like, "Holy cow, this just
7  went on and on forever."
8  And he had talked to Mr. Szerlong and he
9  actually mentioned that it was some performance-related
10  matter, but no more than that.
11  Q. Do you have any ability to place a time
12  frame on that?
13  A. No, I don't.
14  Q. In relation -- do you think it was in 2000
15  or 2001?
16  A. It might have been 2000.
17  Q. Okay.
18  A. But that's -- that's probably the extent of
19  it.
20  Q. How about Szerlong showing up on that Friday
21  afternoon? Were you surprised -- is it fair to say you
22  were surprised by his appearance that day?
23  A. Yeah.
24  Q. And that kind of laid the groundwork for

Page 120

1  your lack of surprise when you got the phone call?
2  A. That's correct.
3  Q. Right?
4  A. Yes.
5  Q. It's fair to say, if you would not have seen
6  Szerlong in the office on that Friday and then you would
7  have gotten that call from Baillie, your surprise level
8  might have gone up?
9  A. Yeah.
10  Q. Okay. Now, when you have spoken -- how
11  about -- you've spoken regarding Mr. Baillie's departure
12  with other people you mentioned before.
13  A. Um-hmm (nodding head affirmatively).
14  Q. What can you tell me about any conversations
15  you've had with Greg Tazik? Describe as much as you can
16  about those conversations with Mr. Tazik.
17  MR. CROALL: About Baillie's departure?
18  MR. FREKING: About Baillie's departure or
19  performance, but since his departure, yeah.
20  A. About his performance since his departure?
21  Q. Yeah.
22  A. Just so I understand this.
23  Q. About his performance and his termination,
24  but conversations you've had with Mr. Tazik since Mr.

**Baillee v. Chubb**    CondenseIt!™    **Korte (2/27/03)**

### Page 121

1 Baillie's departure.
2    A. I think it was in terms of my frustration
3 with -- my frustration with Doug at times and --
4    Q. That you told us about earlier?
5    A. Yeah. And Mr. Tazik, in his never-ending
6 cynical fashion, telling me: "Yeah, just remember him
7 reading the paper in your meeting," reminding me of that,
8 and conversations of that matter.
9    Again, I mean, him and I would go out to
10 lunch on a daily basis. We'd talk about God and the
11 world, so this conversation obviously has come up, but,
12 you know...
13    Q. Have you two talked at all about the fact
14 that Baillie has claimed age discrimination against the
15 company?
16    A. No; not about the fact that Mr. Baillie
17 claimed it, no.
18    Q. Have you talked about anybody else claiming
19 age discrimination or any kind of belief about age
20 discrimination at Chubb?
21    A. I think Mr. Tazik might have made a comment
22 to me before that he feels that he has seen his fair share
23 of older people disappear. I personally didn't share that
24 belief with him.

### Page 122

1    Q. Okay. Anything else that you two have
2 talked about in the nature of or related to the subject of
3 age discrimination?
4    A. No.
5    Q. Now, when you said something about his
6 never-ending cynical fashion, you were talking about
7 Tazik?
8    A. Yes.
9    Q. That's certainly not a Baillie trait?
10    A. No, it's not, no.
11    Q. And then, when you said Tazik said something
12 to effect to you that he has seen his fair share of older
13 people disappear, he's referencing Chubb?
14    A. Oh, yes. I'm sorry. Yes. He felt that he
15 had seen older people disappear in this company.
16    Q. Okay. How about Jeff Barton? What do you
17 recall about your conversations along the same lines?
18    A. It was more about -- you know, I know that
19 Jeff -- in my perception, Jeff and Doug got along really
20 well, and it was more like, you know, "Have you stayed in
21 touch with him? Have you talked to him since?" That's --
22 nothing, you know, in detail.
23    Q. Have you learned anything about what Mr.
24 Baillie is now doing or has been doing?

### Page 123

1    A. Yeah. Mr. Barton shared with me that he
2 works for a small insurance company in Florida. I believe
3 he's a marketing manager. I'm not entirely sure of that.
4    Q. Has Mr. Barton expressed any view to you
5 whether Baillie appears to be happier, madder, more
6 bitter, more happy?
7    A. I think he made the comment jokingly to me
8 that, you know, he is where he wants to be, in Florida, on
9 a golf course, and nice weather.
10    Q. Okay.
11    A. That's about the extent of it.
12    Q. That's about the subject of your
13 conversations with him? Nothing else sticks out?
14    A. No.
15    Q. How about Jerry Butler?
16    A. Just, you know, I shared with him just kind
17 of my feedback on how I felt some things worked well and
18 didn't work well with Doug and that I felt maybe Doug
19 wasn't supportive enough in some of the tougher business
20 decisions we had to make.
21    And he shared some of his observations from
22 the Harrisburg office with me, which Doug Baillie used to
23 manage prior to managing Cincinnati.
24    Q. What was that? What did Mr. Butler say

### Page 124

1 about Mr. Baillie's performance in the Harrisburg office?
2    A. The gist -- summarizing his -- basically his
3 focus in Harrisburg was marketing-driven and the book
4 wasn't in that good of shape and there was a lot of keying
5 up that had to be done, a couple -- I think he mentioned a
6 few programs, insurance programs that weren't working well
7 and so...
8    Q. Can you tell me when these conversations
9 with Mr. Butler have taken place in relation to calendar
10 years?
11    A. Over the course of the last year and a half.
12    Q. Okay. Anything else that you can recall?
13 And I realize we've got a time crunch here. I'm trying to
14 rush through this.
15    A. Okay.
16    Q. Anything else you can recall from Mr. -- and
17 I don't want to rush you.
18    MR. CROALL: Well, Mr. Korte and I have
19 talked. He'd rather go -- you know, if he has to
20 go ten minutes later to get it done, if we can
21 avoid coming back.
22    MR. FREKING: Yeah. I don't have a lot.
23    MR. CROALL: I get the sense you're getting
24 close to the end of the road.

Anette McKeehan Schoch, RMR (513-941-9464)    Page 121 - Page 124

Page 125

1      MR. FREKING: Pretty close, yeah. But if we
2   get to point where you have to leave, just say so.
3      A.   One of the stories that kind of jokingly
4   came up was, I think, you know, a golf story that I heard
5   about Mr. Baillie, that Mr. Baillie had shared with me
6   from his Harrisburg days, where apparently he was playing
7   golf and had blood running down his leg, and it was a
8   result of an accident, car accident the prior day, where
9   he had driven a car off a ravine or into a ravine and had
10  climbed out and hadn't called the police. And while he
11  climbed out, he cut himself, and the next day the blood
12  was running down his leg while he was playing golf. He
13  kind of jokingly told me about this story.
14     Q.   Butler told you this story?
15     A.   No; Baillie did. And I related that story
16  to Butler.
17     Q.   I see.
18     A.   And Butler told me a story about where
19  Baillie was on a golf trip and they had consumed quite a
20  bit of beer and had fallen down just face first in the
21  parking lot.
22     Q.   Did Mr. Butler indicate whether or not he
23  had heard the story about the blood and the auto accident
24  before or whether this was kind of a new thing to him?

Page 126

1      A.   I don't remember now if he had heard it
2   before or not.
3      Q.   Okay. You had not heard, but Butler told
4   you that Baillie had been on a golf trip and he got so
5   drunk that he fell down in the parking lot?
6      A.   Right.
7      Q.   Kind of like (indicating)?
8      A.   And Baillie pretty much had shared that
9   story with us too, because he was in the branch. When he
10  returned from the trip, he was still our branch manager.
11  I think he might have even had a concussion from that
12  incident.
13     Q.   Oh, you think this incident where he fell
14  down in the parking lot allegedly occurred while he was
15  Cincinnati branch manager?
16     A.   That's correct, yes, and while Mr. Butler
17  was Harrisburg branch manager.
18     Q.   But it occurred up in Harrisburg?
19     A.   It occurred, actually, on a -- kind of a
20  vacation --
21     Q.   Okay.
22     A.   -- that a group of people take every year,
23  and they had decided to invite Mr. Baillie on that trip.
24     Q.   Okay. Now, when he told you comments about

Page 127

1   how the book of business was and it was not in good shape
2   in Harrisburg while Baillie was in charge of Harrisburg --
3      A.   Um-hmm (nodding head affirmatively).
4      Q.   -- did that -- did that have any impact on
5   you?
6      A.   No.
7      Q.   Do you know whether it was true or false?
8      A.   I would assume it's true. I didn't monitor
9   the Harrisburg results, so I couldn't tell you.
10     Q.   Does that make you think more or less of
11  Baillie?
12     A.   No. I mean, I don't think anybody's -- at
13  the time the switch occurred, you know, a lot of people
14  had challenges in the business, so it was common in a lot
15  of branches that were having problems with the quality of
16  our underwriting decisions and the book of business.
17     Q.   Butler was not saying this about Baillie in
18  any kind of positive or complimentary fashion, right? He
19  was saying it in kind of a negative fashion?
20     A.   Well, we had just talked about Doug in
21  general and I -- I might have mentioned to Mr. Butler that
22  Doug prided himself that the Harrisburg branch was
23  performing well, and his comment back to me was it wasn't
24  all that it appeared to be because we had a lot of

Page 128

1   cleaning up to do on that book of business. So those
2   might not have been the exact words, but --
3      Q.   So he was basically telling you that Baillie
4   had kind of exaggerated what he had done at Harrisburg?
5      A.   Yeah, exaggerated, or at least might not
6   have been as good as it appeared on the surface.
7      Q.   What about -- we talked about Tazik, Barton,
8   Butler. I think you also said Tom Gates. You had some
9   discussions about Baillie?
10     A.   Just brief comments. I mean, not in-depth
11  discussions.
12     Q.   Nothing of substance, either positive or
13  negative --
14     A.   No.
15     Q.   -- about Baillie?
16     A.   No.
17     Q.   Did you ever talk to anybody besides Tazik
18  about the subject of age discrimination, either against
19  Baillie --
20     A.   No.
21     Q.   -- or Chubb or generally?
22     A.   No, ugh-huh (nodding head negatively).
23  And I would tell you I did not agree with Tazik's comments
24  personally.

Baillee v. Chubb                 CondenseIt!™                 Korte (2/27/03)

---

Page 129

1  Q.  You've worked at Chubb your entire career?
2  A.  Yes.
3  Q.  In the United States; is that correct?
4  A.  That's correct.
5  Q.  It's fair to say that you intend to stay at
6  Chubb as long as you possibly can?
7  A.  Yes.
8  Q.  You would describe yourself as a pretty
9  loyal guy to Chubb?
10  A.  I -- yeah. I think so, yeah. That's a fair
11  statement.
12  Q.  From an underwriting perspective or any
13  other perspective, do you have any knowledge or
14  information as to how a judgment against Chubb, if Baillie
15  was successful in his lawsuit, would be recorded on your
16  books?
17  A.  Do I know how we financially would account
18  for that?
19  Q.  Yes.
20  MR. CROALL:  I'm going to object.
21  But you can answer if you know.
22  A.  I don't know. No. I mean, I assume it's an
23  expense somewhere.
24  Q.  But you don't know whether --

---

Page 130

1  A.  I mean, we're a publicly traded company.
2  It's an expense item would be my guess. Maybe we even
3  have insurance for it. I don't know. I'm guessing.
4  Q.  You don't know whether you have insurance or
5  not?
6  A.  I don't.
7  Q.  And you don't know whether it would be
8  recorded on the branch's books, the zone's books?
9  A.  No.
10  Q.  Or region's books?
11  A.  I have no knowledge of that.
12  Q.  Okay. How about Diane Haggard? You've had
13  conversations about Baillie with Diane Haggard. You think
14  you may have relayed the termination-night conversation to
15  her?
16  A.  I believe I did that.
17  Q.  Okay. You went back to her after that fall
18  convention --
19  A.  Yes.
20  Q.  -- discussion? And I think you've told me
21  as much as you can remember about your conversation with
22  Haggard in that regard; is that correct?
23  A.  Um-hmm (nodding head affirmatively).
24  Q.  Okay. Anything else you can recall

---

Page 131

1  discussing with Ms. Haggard about Doug Baillie at all
2  since his termination?
3  A.  Well, I can tell you that I shared with her
4  the fact that I wasn't looking forward to this event, that
5  I'm a little bit frustrated that this is going on. And I
6  had over the years shared with her as a friend, as well as
7  an HR manager, when I had frustrating moments with Doug.
8  Q.  Tell me -- explain to me why you're
9  frustrated that this is going on.
10  A.  I think it's disruptive to what I do day to
11  day, selfishly speaking. You know, again, I mean, to me,
12  as a personal opinion, I think Doug has a job now. I
13  think -- I shouldn't speculate on his state of affairs,
14  but I think Doug has a job. Doug is, you know, in
15  Florida. He always made the comment he liked the South,
16  and he has a marketing job, which I know he liked to do.
17  And I just -- I personally -- my personal opinion would be
18  just to move on. I just --
19  Q.  Has Ms. Haggard ever shared with you the
20  company's conduct in regard to the severance offer it made
21  to Mr. Baillie?
22  A.  No. I had heard that there was an offer
23  made, but that's the extent of it.
24  Q.  You have not heard as to whether that offer

---

Page 132

1  was withdrawn?
2  A.  I don't -- I had heard an offer was made and
3  that the offer is not on the table anymore -- why that is,
4  I don't know -- and that's why we're proceeding, because I
5  think it was a result of me asking why we're proceeding
6  with this.
7  Q.  Do you think --
8  A.  This legal matter.
9  Q.  You think you got that information from
10  Ms. Haggard?
11  A.  I think so.
12  Q.  But she didn't tell you why it was not on
13  the table anymore?
14  A.  No, uh-huh (nodding head negatively).
15  Q.  Did she ever suggest, imply, or state that
16  somehow Mr. Baillie caused it to be taken off of the
17  table?
18  A.  No.
19  Q.  In other words, it's off the table. Do you
20  have any belief -- do you have a believe one way or the
21  other as to who took it off the table?
22  A.  I -- I mean, my assumption is, if somebody
23  puts an offer on the table and it's no longer on the
24  table, that means the other party rejected the offer would

---

Page 133

1 be my guess. Do I know that? No. That's an assumption
2 I'm making.
3      Q.  And you think that Baillie -- the assumption
4 you're making is that Baillie, by the fact he's got a job
5 now, that he's not acting appropriately by --
6      A.  I didn't say appropriately, no.
7      Q.  You think in some way he's wrong because you
8 believe that he's got a job now, and your belief is that
9 he's the one that rejected the offer?
10     A.  No. But my point is I wished this wouldn't
11 continue. I wish, you know, it wouldn't cause the
12 disruption in my life and the life of my peers and just
13 all focus on what we need to do, which is our job, for the
14 company.
15     Q.  Have you ever been aware of anybody else in
16 the company that has ever received a severance offer?
17     A.  Yeah. I've made severance offers to people.
18     Q.  Okay. Tell me about severance offers you've
19 made and how you determined the size of the severance
20 offers.
21     A.  Actually, it was made in conjunction with
22 human resources and it went through an approval system.
23     THE WITNESS (to Mr. Croall): That's okay to
24 share?

Page 134

1      MR. CROALL: Designated as confidential, but
2 you can answer.
3      THE WITNESS (to Mr. Croall): Okay. I'm
4 sorry.
5      A.  No. It's something that, you know, goes
6 through our human resources department and we suggest it
7 and we either get approval of our suggestion or not.
8      Q.  Is there a policy or practice, if you know,
9 as to how much severance to offer an individual?
10     A.  Yes. We have an employee handbook that's on
11 line and acknowledged by every employee that clearly
12 spells out the procedures, the amounts, what determines
13 the pay, yes.
14     Q.  And you think that that handbook would be
15 able to reveal to you what Mr. Baillie, for example, would
16 be offered? It would be applicable to him?
17     A.  I know that, based on the termination
18 procedures that are outlined in the book, this is what I
19 could expect. I know the circumstances where you can
20 possibly negotiate with the company.
21     Q.  Now, why -- what -- explain to me what you
22 know about the circumstances about being able to
23 negotiate.
24     THE WITNESS (to Mr. Croall): Do I need to

Page 135

1 answer that?
2      MR. CROALL: Go ahead and answer.
3      THE WITNESS: I mean, it's my opinion.
4      MR. CROALL: Whatever you think you did.
5      A.  I would assume companies will negotiate to
6 avoid lawsuits.
7      Q.  Okay.
8      A.  I mean, I think that's being -- in the field
9 I'm in, I know this is something that goes on.
10     Q.  Okay.
11     A.  And that might mean you get a bigger package
12 than what's spelled out.
13     Q.  Right. Have you ever learned that you were
14 involved in some sort of severance process and through the
15 negotiations someone was able to achieve more than they
16 had been offered?
17     A.  No. It was pretty amicable, the amounts
18 that we had reached in those two instances.
19     Q.  Okay. You only have been involved in two
20 instances --
21     A.  Yes.
22     Q.  -- in which severances have been made?
23     A.  Um-hmm (nodding head affirmatively).
24     Q.  In neither instance did the person get an

Page 136

1 attorney?
2      A.  No.
3      Q.  Who were those individuals?
4      A.  Brandi Caldwell and Rick O'Brien. That's
5 O'Brien, O-'-B-r-i-e-n.
6      Q.  Rick O'Brien?
7      A.  Um-hmm (nodding head affirmatively).
8      Q.  These were people that reported directly to
9 you?
10     A.  Correct.
11     Q.  And as far as you know, they accepted
12 whatever package was offered?
13     A.  Yeah. As far as I know, that's correct.
14     Q.  Now we've been talking awhile. Maybe this
15 will help refresh your recollection a little bit.
16 Earlier, I think you identified people you have talked to
17 about Baillie and this matter and his termination as being
18 your wife, Tazik, Haggard, Gates, Barton, and Butler?
19     A.  Um-hmm (nodding head affirmatively).
20     Q.  As we've kind of talked about it some more,
21 do you think you can remember anybody else associated with
22 Chubb that you've discussed this matter with other than
23 counsel?
24     A.  Yeah. I would have discussed it, now that

**Page 137**

1 you say that -- and I apologize for missing it. I would
2 have discussed it with Erin Pesce, because she was very
3 concerned.
4     Q.  Okay.  Tell me about the substance or nature
5 of your conversation with Erin Pesce.
6         THE WITNESS (to Mr. Croall):  Well, part of
7     that involved relationship with your firm.
8         MR. CROALL:  Okay.  Nothing about
9     conversations with counsel.
10        MR. FREKING:  Nothing about conversations
11     you've had with Mr. Croall.
12        MR. CROALL:  The conversations you had with
13     Pesce is okay.
14    Q.  So if you and Pesce talked about lawyers,
15 for example --
16    A.  Yes.
17    Q.  -- you can reveal that.
18    A.  Yes.
19    Q.  You just cannot reveal any conversations
20 you've had with Mr. Croall or other counsel.
21    A.  I don't know what conversations Ms. Pesce
22 had with him, but she came to me concerned because she was
23 being asked to relay her experience at the Big I day, and
24 she was very upset about the fact she had to share that

**Page 138**

1 with other people.
2         And so that's kind of -- she had asked me
3 what was going on.  And I had to explain to her that, you
4 know, Mr. Baillie had been let go and that he's pursuing
5 legal -- you know, a legal course of action against Chubb
6 and this is part of that; you know, her having to meet
7 with attorneys is part of that whole legal action.
8     Q.  And this conversation you had with Ms. Pesce
9 and her level of concern about having to discuss this Big
10 I day would have occurred shortly around that date?
11    A.  I would say probably early -- late in '01,
12 early '02.
13    Q.  You told her he's pursuing some sort of
14 legal course of action?
15    A.  Right.
16    Q.  Now, did Ms. Haggard tell that you?  How
17 were you aware that he was pursuing a legal course of
18 action?
19    A.  I don't remember.  I was -- it was -- I was
20 not brought officially into it.  It was probably
21 Ms. Haggard, because we knew we would have to meet with
22 attorneys on the matter, so...
23    Q.  Now, during this conversation with Mr.
24 Baillie at the Big I day, this was kind of a happenstance,

**Page 139**

1 a chance meeting with him, right?  You were walking down
2 the aisleway and happened to run into him?
3     A.  Yeah.  I didn't know he was going to be
4 there, that's correct.
5     Q.  Right.  And as uncomfortable as it may have
6 been, okay, you could have chosen to withdraw from that
7 conversation?
8     A.  I guess, yeah.
9     Q.  I mean, he wasn't forcibly keeping you there
10 or anything like that?
11    A.  Oh, no.  No, no, no.
12    Q.  Okay.  And you could have said to him,
13 "Doug, I really don't want to hear any of this," and you
14 chose to listen rather than confront him --
15    A.  Yeah.  That's --
16    Q.  -- or stop him?
17    A.  That's a fair statement.
18    Q.  And, to your knowledge, he didn't say
19 anything to you that was false on this Big I Day?
20    A.  I don't know if Mr. Szerlong likes me or
21 not.
22    Q.  Okay.  But that would be the statement that
23 would -- may or may not be true or false in your mind?
24    A.  I also can't tell whether Chubb kicked him

**Page 140**

1 out the door or not.
2     Q.  Right.
3     A.  Again, you know...
4     Q.  Right.  Okay.  And when you were told by Mr.
5 Baillie on the evening that he was fired, you testified
6 you said something to him like, "Doug, it shouldn't be
7 this way"?
8     A.  No; I said, "It doesn't feel right."
9     Q.  It doesn't feel right?
10    A.  That's correct.
11    Q.  You were being truthful and sincere at that
12 time?
13    A.  Yeah.  I felt bad for him.  I mean, you
14 know, he was a nice guy to me and part of me, I think,
15 wanted to make him -- I don't know -- I just felt maybe
16 that would comfort him a little bit too, being a little
17 bit supportive for him.  He was a nice man.
18    Q.  Did it feel right to you?
19    A.  Deep down in my gut, yes.  But, I mean, I'm
20 not cold-blooded enough to say that that was a good thing.
21 You know, he's a human being.  He was a nice guy.  I felt
22 bad for him.
23    Q.  You're saying that, deep down, you felt it
24 was the right decision, even though -- let me finish this

Page 141

1  -- even though, from your earlier testimony, you know, the
2  number-one priority of Chubb is profitability, and even
3  though Mr. Baillie had turned around that branch in terms
4  of profitability?
5      A.  He was leading the branch when the
6  profitability turned over, that's correct.  He was the
7  branch manager at the time.
8      Q.  Knowing that --
9      A.  Um-hmm (nodding head affirmatively).
10     Q.  -- you still are testifying now that, deep
11  down, you thought on the evening of his termination it was
12  the right decision?
13     A.  Yeah.  I --
14     Q.  Is that --
15     A.  Not in an enjoyable way.  Don't
16  misunderstand me.  I felt bad for him.
17     Q.  And that was for the reasons before --
18     A.  Yeah.
19     Q.  -- when we talked about the negative
20  feelings of Mr. Baillee?
21     A.  Yeah.  I didn't feel he was the most
22  effective branch manager we could have had during a very
23  difficult business climate during that period of time for
24  us.  That's my personal opinion, so...

Page 142

1          It's a difficult thing to say for me.  It
2  doesn't come easy to say it when somebody loses their job
3  that that was good, but I'm not sure how else to put that.
4      Q.  Have you had any other conversations with
5  Erin Pesce about this matter?
6      A.  No, I don't believe so.
7      Q.  Okay.  What about Baillie or anything like
8  that?
9      A.  No.
10     Q.  She just told you she was uncomfortable
11  about the fact that she had to relay what happened that
12  day?
13     A.  Yeah.  She was very concerned about that,
14  and she -- actually, I believe, I was on a business trip.
15  She called me on my cell phone and said, "I have to meet
16  with attorneys.  What is this all about?"
17          And she's just a little panicky about it.
18  She was a young -- you know, a young person, and not that
19  I had ever been involved in anything like this either, but
20  she was very uncomfortable with that.
21     Q.  And, to the best of your knowledge, you
22  think that -- I'm sorry, I don't want to put words in your
23  mouth.  When do you think that that conversation -- when
24  she said, "I have to meet with attorneys," do you have any

Page 143

1  -- knowing that that Big I Day was probably like November
2  of '01, in relation to November of '01, do you have any
3  ability to place that conversation with when you're on a
4  business trip either in November, December, or January?
5      A.  It was probably more January -- it was
6  probably more 2002, but it's --
7      Q.  Okay.
8      A.  I'm speculating.
9      Q.  Do you know where you were when you received
10  that call?
11     A.  No.
12     Q.  You just know you were on some business
13  trip?
14     A.  I know I was in my car.  I was rushing back
15  to the office because I felt I had to sit down with her
16  because she seemed pretty upset.
17     Q.  You were driving around Cincinnati
18  someplace?
19     A.  Either Cincinnati or Louisville.  Chubb -- I
20  don't really recall where I was at the time.  But when I
21  got the call, I believe I was in my car on the way back to
22  the office.  I was just concerned because she seemed
23  pretty upset.
24     Q.  Okay.  Do you think you have any ability to

Page 144

1  find documents that would help you identify when that
2  occurred?
3      A.  No, I don't.  Probably not.
4      Q.  Because you would -- you might have -- do
5  you keep records of when you're on the road --
6      A.  Yeah.
7      Q.  -- when you're traveling?
8      A.  Yeah, but they don't specify phone
9  conversations.  I mean, I go to Columbus and Louisville,
10  for example, on a very frequent basis.  So, it could have
11  been January; it could have been February; it could have
12  been December.  It's hard to tell.
13     Q.  Do you have copies of those kind of
14  calendars still today someplace?
15     A.  I believe I do.
16     Q.  Do you have your, you know, like December
17  '01 calendar someplace probably?  Or January or February?
18     A.  I think I do, yes.
19     Q.  Okay.  I just have -- that may -- we're
20  going to ask for those calendars.  We're going to ask
21  Mr. Croall formally.
22     A.  Okay.
23     Q.  -- for those calendars to the extent --
24         MR. CROALL:  Don't throw them away.

Baillee v. Chubb                    CondenseIt!™                    Korte (2/27/03)

Page 145

1    A.    Okay.

2    Q.    -- they might give rise to a need to further

3  ask questions. So we're going -- we're going to keep the

4  deposition open for that purpose only.

5    A.    Okay.

6        MR. CROALL: Okay. Reserving any

7  objections. But, yeah, it's a quarter to 12, and

8  we've gone a little longer than we expected to.

9        MR. FREKING: Yeah, we did.

10        Okay. Thank you very much, Dieter. I'll

11  tell Mr. Baillie you said hello.

12

13

14        Dieter Wilhelm Wolfgang Korte

15

16            - - -

17        DEPOSITION CONCLUDED AT 11:50 A.M.

18            - - -

19

20

21

22

23

24

Page 146

1        C E R T I F I C A T E

2  STATE OF OHIO    :
            : ss

3  COUNTY OF HAMILTON  :

4        I, Raymond E. Simonson, RMR, CRR, the

5  undersigned, a duly qualified and commissioned notary

6  public within and for the State of Ohio, do hereby certify

7  that, before the giving of his aforesaid deposition,

8  DIETER WILHELM WOLFGANG KORTE was by me first duly sworn

9  to depose the truth, the whole truth, and nothing but the

10  truth; that the foregoing is the deposition given at said

11  time and place by DIETER WILHELM WOLFGANG KORTE; that said

12  deposition was taken in all respects pursuant to

13  stipulations of counsel hereinbefore set forth; that I am

14  neither a relative of nor employee of any of their

15  counsel, and have no interest whatever in the result of

16  the action.

17        IN WITNESS WHEREOF, I hereunto set my hand

18  and official seal of office at Cincinnati, Ohio, this

19        day of        2003.

20

21

22  My commission expires:    Raymond E. Simonson, RMR, CRR
   June 23, 2003        Notary Public - State of Ohio

23

24