1

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF OHIO
 3              WESTERN DIVISION
 4   ------------------------------
 5   DOUGLAS W. BAILLE,                :
 6          Plaintiff,                 :
 7   vs.                               :   CASE NO.
 8   CHUBB & SON INSURANCE,            :   C-1-02-062
 9          Defendant.                 :
10   ------------------------------
11
12   DEPOSITION OF:    DOUGLAS W. BAILLIE
13   TAKEN:            By the Defendant
                       Pursuant to Agreement
14   DATE:             May 9, 2002
15   TIME:             Commencing at 9:35 a.m.
16   PLACE:            Frost Brown Todd LLC
                       2200 PNC Center
17                     201 East Fifth Street
                       Cincinnati, Ohio  45202
18
19   BEFORE:           Karen Volk, CSR, RPR
                       Notary Public - State of Ohio
20
21
22
23
24
```

2

```
 1   APPEARANCES:
 2
 3   On behalf of the plaintiff:
 4      Randolph H. Freking, Esq.
                and
 5      Mark W. Napier, Esq.
                of
 6      Freking & Betz
        215 East Ninth Street
 7      Fifth Floor
        Cincinnati, Ohio  45202
 8
 9   On behalf of the defendant:
10      David T. Croall, Esq.
                of
11      Frost Brown Todd LLC
        2200 PNC Center
12      201 East Fifth Street
        Cincinnati, Ohio  45202-4182
13
14   Also present:
15      Tim Szerlong
        Leonard C. Sherer
16
17               - - -
18
19
20
21
22
23
24
```

3

```
 1                  I N D E X
 2   DOUGLAS W. BAILLIE                        PAGE
 3      Cross-Examination by Mr. Croall          4
 4
     EXHIBITS                    MARKED    REFERENCED
 5
        Baillie Exhibit  1          61         61
 6      Baillie Exhibit  2          78         78
        Baillie Exhibit  3          78         78
 7      Baillie Exhibit  4         134        134
        Baillie Exhibit  5         136        137
 8      Baillie Exhibit  6         141        141
        Baillie Exhibit  7         142        142
 9      Baillie Exhibit  8         147        147
        Baillie Exhibit  9         153        153
10      Baillie Exhibit 10         153        153
11      Baillie Exhibit 11         159        160
        Baillie Exhibit 12         164        164
12      Baillie Exhibit 13         167        167
        Baillie Exhibit 14         168        168
13      Baillie Exhibit 15         169        169
        Baillie Exhibit 16         172        172
14      Baillie Exhibit 17         173        174
        Baillie Exhibit 18         173        174
15      Baillie Exhibit 19         177        177
        Baillie Exhibit 20         177        177
16
17      Baillie Exhibit 21         179        179
        Baillie Exhibit 22         190        190
18      Baillie Exhibit 23         190        190
        Baillie Exhibit 24         194        194
19      Baillie Exhibit 25         194        195
        Baillie Exhibit 26         197        197
20      Baillie Exhibit 27         197        197
        Baillie Exhibit 28         200        200
21      Baillie Exhibit 29         201        201
        Baillie Exhibit 30         202        202
22
23      Baillie Exhibit 31         212        212
        Baillie Exhibit 32         213        213
24      Baillie Exhibit 33         216        216
                              - - -
```

4

```
 1                DOUGLAS W. BAILLIE
 2   of lawful age, a witness herein, being first duly sworn as
 3   hereinafter certified, was examined and deposed as follows:
 4                    CROSS-EXAMINATION
 5   BY MR. CROALL:
 6      Q.    Good morning, Mr. Baillie.
 7      A.    Good morning.
 8      Q.    We just met a minute ago.  My name is David
 9   Croall and I'm one of the attorneys working on the lawsuit
10   that you filed against Chubb.
11            The reason we're together this morning is so
12   that I can ask you some questions about what led up to the
13   filing of that lawsuit.
14            If you would answer those questions to the best
15   you can.  It's not my purpose to try to trick you, to get
16   you to say things you don't mean to say.
17            I want you to be comfortable that you
18   understand my questions.  If you don't understand my
19   question, I want you to tell me that and I'll try to restate
20   it.
21            Any time you want to take a break, just say so.
22   Although, if there's a question, I'll ask you to answer the
23   question before you take a break.
24            Any time you want to consult with Mr. Freking
```

ORIGINAL

**5**

1  or Napier, you're free to do so.  If there's a question
2  pending, I might ask you to answer the question.
3           If you have a question about attorney-client
4  privilege, you're certainly free to consult with your
5  attorney any time, even if there's a question, okay?
6       A.  Uh-huh.
7       Q.  It's important that you and I try to
8  communicate with words since the court reporter is taking
9  down everything we say.
10          The normal conversational uh-huh or uh-uh is
11  much harder for her than a yes or no.  You will be the only
12  witness in history to make it through a deposition if you
13  don't do that.
14      A.  Okay.
15      Q.  It is important that you try to let me finish
16  my question, I'll try to let you finish your answer, and the
17  court reporter will get everything down, okay?
18      A.  Uh-huh.
19      Q.  Will you state your full name?
20      A.  Douglas William Baillie.
21      Q.  What's your current address?
22      A.  It's a tough one.  ███████████████████
23  ██████████████████████
24      Q.  How long have you lived at that address, sir?

**6**

1       A.  About a week.
2       Q.  Did you buy that home in Jacksonville?
3       A.  Correct.
4       Q.  Have you sold the home in Cincinnati?
5       A.  Yes.
6       Q.  You're married?
7       A.  Uh-huh.
8       Q.  Yes?
9       A.  Yes.
10      Q.  See, I told you you wouldn't make it.  What's
11  your wife's name?
12      A.  Dorie (phonetic).
13      Q.  How long have you been married to her?
14      A.  25 years.
15      Q.  You have some children?
16      A.  Three boys.
17      Q.  They're all grown, living away from home?
18      A.  They were living with me in Cincinnati.  Since
19  we've moved to Jacksonville, they have -- they live in --
20  one lives in Philadelphia, the other one is not sure where
21  he's going to live.
22      Q.  What are their names and what do they do for a
23  living or are they still in school?
24      A.  Douglas is potentially going to Japan for a

**7**

1  couple years to study -- to teach English.
2           Michael lives in Harrisburg.  He's works for
3  EarthLink.
4           And Scott is going to school now in Tampa.  He
5  was going to school at the University of Cincinnati.
6       Q.  How much more college does he have to go?
7       A.  About two more years.
8       Q.  Do you have a good relationship with your
9  spouse?
10      A.  Uh-huh.
11      Q.  Yes?
12      A.  Yes.
13      Q.  Always have?
14      A.  Yes.
15      Q.  Good relationship with your sons?
16      A.  Yes.
17      Q.  Always have?
18      A.  Yes.  Well, teen-agers were a little more
19  challenging.
20      Q.  I understand.  What's your educational
21  background?
22      A.  Four years of college at Lafayette College,
23  bachelor of science in metallurgical engineering.
24      Q.  When did you get that?

**8**

1       A.  1972.
2       Q.  Any education past your bachelor's degree?
3       A.  No certificate, just continuing education
4  courses of that nature.
5       Q.  Mostly insurance industry related?
6       A.  Mostly insurance industry related, management
7  related.
8       Q.  Either of your parents still living?
9       A.  My mother is still alive.
10      Q.  Where does she live?
11      A.  She lives in Westfield, New Jersey.
12      Q.  Do you get to see her very often?
13      A.  Three times a year.
14      Q.  How is her health?
15      A.  Good.
16      Q.  Good.  Have you ever been involved in
17  litigation before?  Have you ever filed a lawsuit against
18  anybody before this one?
19      A.  I don't believe so.  I had an automobile
20  accident about 25 years ago but we settled out of court.  I
21  don't think anything was filed.
22      Q.  Has anybody ever sued you?
23      A.  No.
24      Q.  Ever had any criminal convictions?

Redacted

9

1    A.    No.
2    Q.    Are you currently employed?
3    A.    Yes.
4    Q.    What company and what job?
5    A.    Company is Main Street America, director of
6  marketing.
7    Q.    That's down in Jacksonville?
8    A.    Yes.
9    Q.    What are the duties associated with that job,
10  sir?
11    A.    Duties would be in charge of distribution
12  management or agency management for the organization,
13  developing, implementing and evaluating strategies.
14    Q.    How big a company is Main Street?  I don't know
15  how you measure, premiums, employees?
16    A.    Be about 585 million at the end of this year.
17    Q.    Jacksonville is headquarters?
18    A.    The headquarters was in Keene, New Hampshire.
19  They're starting to move a lot of the headquarters to
20  Jacksonville, so right now there's two headquarters.
21    Q.    What's your current compensation?
22    A.    $140,000 per year.
23    Q.    Base salary?
24    A.    Base.

10

1    Q.    Is there bonus opportunity?
2    A.    There is.
3    Q.    How does that work?
4    A.    There's targets, the maximum is 20 percent, I
5  believe.  I could get that data for you.
6    Q.    I think you may have already produced a
7  letter --
8    A.    I think I did.
9    Q.    -- that has that in there.  What's your date of
10  birth?
11    A.    6/18/50.
12    Q.    Social security number?
13    A.    ▮▮▮▮▮▮▮▮▮
14    Q.    Who do you report to in your current job?
15    A.    Kelly Stacy, vice president of marketing.
16    Q.    Is that who hired you into the position?
17    A.    Yes.
18    Q.    Good working relationship so far?
19    A.    Very good.
20    Q.    Have you had any kind of performance reviews or
21  90 day review?
22    A.    Just a sit-down, yeah, 30 day -- 40 day gut
23  shuck (phonetic).
24    Q.    Positive feedback?

11

1    A.    Positive, yeah.
2    Q.    Is there a formal agreement other than the
3  letter agreement that you've produced?  Is there a formal
4  written employment contract, Main Street?
5    A.    Not that I recall.
6    Q.    When did you start that, January 2nd?
7    A.    Correct.
8    Q.    After your separation from Chubb, did you have
9  any other offers --
10    A.    No.
11    Q.    -- of employment?
12    A.    No.
13    Q.    Other interviews?
14    A.    Yes.
15    Q.    Tell me about your job search process after
16  your separation from Chubb.
17    A.    We had an outplacement service and I would
18  show up there.
19    Q.    Who was that?
20    A.    That's Lee Hecht & Harrison in town here,
21  Holbrook Avenue, I believe.
22    Q.    Did you work with somebody in particular there?
23    A.    Yeah, Joe Harrison.
24    Q.    Sorry.  Tell me how that process worked.

12

1    A.    You would come in and they'd give you this
2  little cubicle and then you'd make phone calls and write
3  your letters and do your job search.
4         They help put together the resume.  And they
5  basically gave you a book to read to tell you how to do the
6  job search.
7    Q.    Provide some secretarial support?
8    A.    Yes.
9    Q.    Some phone answering service when you were
10  either not there or on the phone?
11    A.    Yes.
12    Q.    Is that how you found the Main Street America
13  job, was through that outplacement process?
14    A.    Replay back.  They didn't really have phone
15  answering service when I wasn't there.
16    Q.    Okay.  Did you make the connection with Main
17  Street America through the outplacement service?
18    A.    No.  I had had an offer from Main Street
19  America about three years ago, so I had a relationship with
20  their CEO.
21    Q.    How did it happen that you had an offer from
22  them three years ago, did they approach you?
23    A.    Yeah.  Some headhunter called and it was -- I
24  guess it was 1998, and they were talking about making

Redacted

13

1  smaller offices, production offices.
2       I never had taken an interview before, so I
3  thought I might as well take one.  It went off very, very
4  well and I got a job offer.
5       Q.   Were you already in Cincinnati?
6       A.   No.  I was in Harrisburg.
7       Q.   Was the interview up in New Hampshire?
8       A.   Yes.
9       Q.   With whom?
10      A.   Tom Van Berkel would be one person, Susan Hayes
11  was another, Larry Accord (phonetic) was another, Joe
12  Groweller (phonetic) was another.  I mean, it was a whole
13  litany of people.
14      Q.   What was the offer for, what kind of position?
15      A.   It was for a position as a regional director,
16  regional manager.
17      Q.   Do you recall what the -- how the compensation
18  offer compared with your compensation in Harrisburg with
19  Chubb at that point?
20      A.   Yeah.  It was better.  It was $150,000.  There
21  were two opportunities to make sizable bonuses.  There was a
22  sign-in bonus involved, you know, company car.
23       It was a better job than I have now, the
24  opening was at the time.

14

1       Q.   Who made you the offer?
2       A.   I guess human resources.
3       Q.   Do you remember which individual?
4       A.   Well, it was made through the headhunter to me.
5       Q.   Do you remember who the headhunter was?
6       A.   Gill Crystal (phonetic) is his last name.  I
7  can get that for you.  I still have the business card.
8       Q.   Why did you turn it down?
9       A.   Couple reasons.  One, you know, I talked to my
10  superior about it.  I said I wanted to let you know I had
11  been looking but I didn't approach them, they approached
12  me.  I just figured I'd take the offer -- I'd take the
13  interview.
14       And he says, well, you know -- I said one thing
15  I wanted to do was run a region.  He said, well, you're on
16  the list.  I can't promise you anything.  I said, that's
17  fine.
18       And I also had some, what do you call it,
19  restricted stock which Chubb doesn't give out very freely.
20  So I thought that was a good -- a good indication that Chubb
21  was looking after my future.
22      Q.   Was your superior at that point Mr. Cavanaugh?
23      A.   Correct.
24      Q.   So that's the conversation you just described

15

1  with him?
2       A.   Right.
3       Q.   Did you have any other interviews during the
4  outplacement process after your separation from Chubb?
5       A.   Yes.  I interviewed with CNA, Royal.
6       Q.   Where was the CNA interview?
7       A.   Chicago.  Royal was in Charlotte.
8       Q.   Royal & Sun Alliance?
9       A.   Uh-huh.
10      Q.   Yes?
11      A.   Yes.
12       MR. FREKING:  Excuse me.
13       (Off the record.)
14      Q.   Is there anything else before Mr. Freking
15  interrupted us?
16      A.   No.
17      Q.   The only interviews you had were Main Street,
18  CNA, and Royal & Sun?
19      A.   I also interviewed with a building supply
20  place.  One of our agents thought it might be a good fit.  I
21  just took the interview.
22      Q.   Who was that?
23      A.   I can't remember the name of it.  It was a
24  local -- Cincinnati based.  I believe I supplied that to

16

1  you, though, so that would be in there.
2       And I had interviews with companies that
3  weren't really interviews but sort of brainstorming sessions
4  with Midland and also Ward Financial.
5       Q.   How did those come about?
6       A.   I just initiated them.  I, through the people,
7  I said, listen, I'm looking for work, would you mind if I
8  just run some ideas by you.
9       That was sort of a technique that the
10  outplacement service said you ought to try.
11      Q.   Am I right that Chubb provided the outplacement
12  services to you?
13      A.   Yes.
14      Q.   How long did you use those, I mean right up
15  through the --
16      A.   Until I got employed.
17      Q.   The end of 2001 or mid December, whenever it
18  was?
19      A.   Mid December, yeah.
20      Q.   I think you signed on December 17, 18,
21  something like that?
22      A.   Right.
23      Q.   Any other interviews during the job search
24  process that we haven't covered?

17

1     A.     None that I can think of.  I did interview with
2  some agents but, again, that was just what I would call, you
3  know, networking type.
4     Q.     No offers from any agencies?
5     A.     Well, wait a minute.  I did interview with
6  Acordia for a job in Harrisburg, that is correct.
7     Q.     But no offer?
8     A.     No, no offer.  I did a telephone interview with
9  a Columbus agent for a potential job if it came up, but it
10 didn't come up.
11    Q.     Which Columbus agent?
12    A.     BOA in Columbus.
13    Q.     Mr. Baillie, how would you say your current
14 health is?
15    A.     I'd say it's pretty good.
16    Q.     Are you -- in the past five years would you say
17 you've had any serious health condition?
18    A.     No.
19    Q.     Any hospitalizations in the last five years?
20    A.     No.
21    Q.     Any ongoing treatment by a physician or other
22 health care provider for any health condition in the last
23 five years?
24         MR. FREKING:  What do you mean by treatment?

18

1     A.     Yeah, what do you mean by that?
2     Q.     An issue where a doctor has had to see you more
3  than once, more than just the flu or cold or sore throat,
4  any continuing course of care by any health care provider?
5     A.     In the last month I've been seeing a doctor for
6  stress, anxiety and depression.
7     Q.     Who is that?
8     A.     Dr. Samir Array, S-a-m-i-r, A-r-r-a-y.
9     Q.     Spell it again, sorry.
10    A.     S-a-m-i-r, A-r-r-a-y.
11    Q.     That's first and last names or is that all one?
12    A.     No, first and last name.
13    Q.     First name is Samir?
14    A.     Right.
15    Q.     Last name is Array.  He or she?
16    A.     He.
17    Q.     Is he in Jacksonville?
18    A.     Correct.
19    Q.     Why did you start seeing Dr. Array?
20    A.     Just the stress, the anxiety, the depression
21 was just getting so deep that I had to see him.  He has
22 prescribed Paxil.
23    Q.     How long have you been taking that?
24    A.     About six weeks.

19

1     Q.     Are you taking any other medications?
2     A.     No.
3     Q.     Was it your idea to see Dr. Array?
4     A.     Yes.
5     Q.     Nobody else suggested to you you should see a
6  doctor?
7     A.     No.
8     Q.     Your wife didn't suggest it?
9     A.     No, but she had been treated for depression in
10 the fall and she used it.
11    Q.     Fall of 2001?
12    A.     Yeah.  So she -- I watched.  I was pleased with
13 the results she got.
14    Q.     Is she still being treated?
15    A.     Yes.
16    Q.     Same doctor?
17    A.     No.
18    Q.     Is she still seeing a doctor back here?
19    A.     She was, yeah.  She won't be seeing him
20 anymore, we just moved.
21    Q.     When did she make the move to Jacksonville?
22    A.     Last week.
23    Q.     When did you close on the sale of the house up
24 here?

20

1     A.     4/30.
2     Q.     Any other doctors you have been treated by down
3  in Jacksonville?
4     A.     No.
5     Q.     Don't have a regular internal medicine doctor,
6  family practice doc that are --
7     A.     That would be my family practice.
8     Q.     Dr. Array is a family practice doc?
9     A.     Right.
10    Q.     Have you ever been treated by any psychiatrist,
11 psychologist, or other mental health care provider?
12    A.     No.
13    Q.     Ever had any counseling?
14    A.     No.
15         MR. FREKING:  You mean other than what he's
16 talking about with Dr. Array?
17         MR. CROALL:  Well, medical treatment as opposed
18 to -- I'm talking about non-physician counseling in
19 any context.
20    A.     We used a counselor when the boys were going
21 through their teen-age years.
22    Q.     Somebody here in Cincinnati or Harrisburg?
23    A.     Harrisburg, parental counseling.
24    Q.     Do you remember who that was?

21

```
1    A.    No.
2    Q.    Give me a time frame, roughly.
3          MR. FREKING:  Objection to relevance.  You can
4    go ahead and answer.
5    A.    Time frame?
6    Q.    Ten years ago?
7    A.    Oh, okay.  Between '95 and '98.
8    Q.    You moved to Cincinnati in '98; is that right?
9    A.    Uh-huh.
10   Q.    Yes?
11   A.    Yes.
12   Q.    Do you smoke cigarettes?
13   A.    No.
14   Q.    Have you ever?
15   A.    Never.
16   Q.    Do you drink alcohol?
17   A.    Yes.
18   Q.    How often?
19   A.    Maybe five times a week, four times a week.
20   Q.    How much?
21   A.    Maybe twice -- two of those times a couple
22   beers or one beer.  Another two times maybe five, six.
23   Q.    Mostly beer?
24   A.    Mostly beer.
```

22

```
1    Q.    Ever been treated for any kind of substance
2    abuse?
3    A.    No.
4    Q.    Say in the last three years how often would you
5    say you drank enough that you're impaired?
6    A.    Three years.
7          MR. FREKING:  Objection as to relevance.  Can
8    you explain to me the relevance of this, Dave?
9          MR. CROALL:  He can go ahead and answer.
10         MR. FREKING:  No, he won't answer unless I get
11   some explanation.  I think it's harassing.
12         MR. CROALL:  I'm asking him about his general
13   health condition.
14         MR. FREKING:  That has nothing to do with this
15   case.
16         MR. CROALL:  Are you instructing him not to
17   answer?
18         MR. FREKING:  Yep.
19   Q.    Mr. Baillie, are you going to answer the
20   question or are you following your attorney's instruction
21   not to?
22   A.    I'll follow my attorney's instruction.
23   Q.    Okay.  Have you ever been involved in an
24   automobile accident that you were impaired by alcohol?
```

23

```
1    A.    No.
2    Q.    You had an automobile accident in Harrisburg,
3    right?
4    A.    Yes.
5    Q.    When was that?
6          MR. FREKING:  You mean the one 25 years ago?
7          MR. CROALL:  I don't think it was that long ago
8    but I could be wrong.  Why don't we let the witness
9    answer.
10   A.    19 -- sometime between 1996 and '98.
11   Q.    So that would be a little less than 25 years
12   ago, right?
13   A.    Yes.
14   Q.    Can you tell me how that happened?
15   A.    Yes.  I was coming home from -- I was out with
16   a home office rep and I was coming home and came around a
17   sharp turn, there was a deer in the road, and I went off the
18   road.
19   Q.    Okay.  Over an embankment?
20   A.    Yeah, that's correct.
21   Q.    Car pretty much totaled?
22   A.    Yes.
23   Q.    What did you do?  You were able to get out of
24   the car?
```

24

```
1    A.    Yes.
2    Q.    Walked home?
3    A.    Yes.
4    Q.    Did you report the accident?
5    A.    The police came.
6    Q.    How quickly?
7    A.    Almost immediately.
8    Q.    They found you through your license plates?
9    A.    Yes.  I believe, yeah.
10   Q.    Did you ever tell anybody else that you had
11   been drinking before that accident?
12   A.    Yeah, I told the officer.
13   Q.    Did they test you?
14   A.    No.  He said it was obvious I wasn't impaired.
15   Q.    Any charges as a result of the accident?
16   A.    No.
17   Q.    When you were in Cincinnati, did you have a
18   picture of the car in your desk drawer sometimes?
19   A.    Yeah.  I had it.
20   Q.    Why?
21   A.    Just kept it.
22   Q.    Did you talk to people about it?
23   A.    Yeah.
24   Q.    Your co-workers in Cincinnati?
```

25

1    A.    Yeah.
2    Q.    What would you tell them?
3    A.    Tell them I had an accident.
4    Q.    Show them the picture?
5    A.    Yes.
6    Q.    Help me out with the context in which you would
7 show them the picture of the wrecked car.
8    A.    Just conversation.
9    Q.    Do you remember showing it to anybody in
10 particular?
11    A.    No.
12    Q.    Some of your subordinates in Cincinnati?
13    A.    No, I don't remember.
14    Q.    Mr. Baillie, tell me a little bit about your
15 employment after college. Where did you first go to work?
16    A.    Aetna Life & Casualty.
17    Q.    What did you do there?
18    A.    I was a loss control rep or engineering rep for
19 the firm.
20    Q.    Where was that?
21    A.    That was in Newark, New Jersey.
22    Q.    How long did you work for Aetna?
23    A.    About two years.
24    Q.    Same job when you left as when you started?

26

1    A.    Yes.
2    Q.    Same job. And why did you leave?
3    A.    I left to travel around the country.
4    Q.    So you didn't leave for another job, you took
5 some time off?
6    A.    Right.
7    Q.    How long did you travel?
8    A.    About five months.
9    Q.    Where did you go?
10    A.    All over the country. Canada. I went to
11 Mexico, also.
12    Q.    Driving?
13    A.    Yes.
14    Q.    With anybody else?
15    A.    Yes, two others.
16    Q.    Who did you travel with?
17    A.    Joe Campanella and John Dietrich.
18    Q.    Who were they, just friends?
19    A.    Boyhood friends, yeah.
20    Q.    What was your next job after the traveling?
21    A.    Chubb.
22    Q.    When did you start at Chubb?
23    A.    9/30, 1975.
24    Q.    At what job?

27

1    A.    I was a loss control rep.
2    Q.    Where?
3    A.    New York City.
4    Q.    Were you living in the city or in Jersey?
5    A.    In New Jersey.
6    Q.    When did you get married?
7    A.    1977.
8    Q.    That was to Dorie?
9    A.    Uh-huh.
10    Q.    No other marriages?
11    A.    No.
12    Q.    How did it happen you went to work for Chubb?
13 How did you find out about it?
14    A.    I went through a headhunter.
15    Q.    Who did you work for when you started at Chubb,
16 who was your supervisor?
17    A.    Bob Radusco (phonetic). Dan Radoltic
18 (phonetic) was my supervisor. Bob Radusco was the manager
19 of the office.
20    Q.    How long did you stay in loss control?
21    A.    Till 1988.
22    Q.    There was some geographic moves in there and
23 responsibility increases?
24    A.    Yes.

28

1    Q.    Walk me through the progression.
2    A.    I went from New York to our New Jersey office.
3 I was, six months later, promoted to supervisor. In 1980 I
4 was promoted to manager of the New Jersey office. In 1983 I
5 was promoted to regional manager of loss control. In 1984 I
6 was promoted to the zone officer for the eastern and
7 Canadian zone.
8    Q.    You held that job until '88?
9    A.    Yes.
10    Q.    What did you do in loss control? I mean just
11 generally tell me what that is.
12    A.    It's basically servicing our largest customers
13 for aspects of fire prevention and safety and also producing
14 surveys for underwriting, evaluation surveys.
15    Q.    When you were at the eastern zone loss control
16 position, who did you report to?
17    A.    I reported to Joe Morsell (phonetic) and then
18 Jimmy Dederic.
19    Q.    Where did you move -- from the eastern zone
20 loss control position, is that when you went to Harrisburg?
21    A.    No. From there I went to marketing of the New
22 Jersey office, marketing department.
23    Q.    Where was that?
24    A.    In our Murray Hill office in New Jersey.

29

1    Q.    What were your responsibilities in that
2 position?
3        A.    In charge of the marketing organization of
4 north Jersey.
5    Q.    How big a group is that?
6        A.    It was the largest branch at the time. We had
7 about 150 agents. I think it was up to about 150 million
8 but I wouldn't quote me on that.
9    Q.    Who did you report to in the marketing job?
10        A.    Terry Cavanaugh.
11    Q.    What was his title at that point?
12        A.    He was branch manager.
13    Q.    How long were you in the marketing position?
14        A.    Three years about.
15    Q.    Then was it moved to Harrisburg or are we not
16 there?
17        A.    Yes, then we moved to Harrisburg.
18    Q.    How did it happen that you got that position?
19 Who hired you for it?
20        A.    Ed Dunlop.
21    Q.    What was his title?
22        A.    He was the zone manager.
23    Q.    Eastern zone?
24        A.    Uh-huh.

30

1    Q.    Yes?
2        A.    Yes.
3    Q.    Tell me what -- your job in Harrisburg was
4 branch manager?
5        A.    Yes.
6    Q.    What were the responsibilities for that
7 position?
8        A.    Managing the underwriting, marketing, claims,
9 loss control, all the departments that comprise the Chubb
10 system for that territory. The job was to start a new
11 office and grow the territory.
12    Q.    So there was not a Harrisburg office before
13 that?
14        A.    No.
15    Q.    So were you responsible for hiring staff from
16 the ground up?
17        A.    From the ground up.
18    Q.    How big an office did it start out as?
19        A.    25 people, it started off at about 14 million.
20    Q.    We're in 1991?
21        A.    Yes.
22    Q.    '91, '92?
23        A.    '91.
24    Q.    How long were you in the Harrisburg job, until

31

1 '98; is that right?
2        A.    Until 1998.
3    Q.    I take it the basic job responsibilities stayed
4 the same, the office grew?
5        A.    Yes.
6    Q.    How much did it grow during the --
7        A.    Grew to about 50 million.
8    Q.    How many employees?
9        A.    We still kept it at 25.
10    Q.    Was the Harrisburg branch profitable during the
11 years you were there?
12        A.    They were profitable five of the seven, yeah.
13    Q.    Do you remember which two years weren't
14 profitable?
15        A.    Yes. '96, there was a huge snowstorm that came
16 through where we had huge cat losses.
17    Q.    Cat losses?
18        A.    Catastrophe losses. Then '98, we had the
19 residual -- some umbrella losses as a result of the snow and
20 some other umbrella losses, and that wasn't profitable. But
21 the other years were extremely profitable.
22    Q.    You said '96 and '98?
23        A.    I believe.
24    Q.    You're not talking to an insurance guy. Help

32

1 me out with the umbrella losses.
2        A.    The umbrella was --
3            MR. FREKING: You should get some, Dave.
4            MR. CROALL: I may have one, that doesn't mean
5        I know what it is.
6        A.    I think you do. The umbrella would be over a
7 million dollars. So if you --
8    Q.    So --
9        A.    When you get a loss over a million, the
10 umbrella kicks in, so they tend to be bigger losses.
11    Q.    So you've got the excess loss over either --
12        A.    Right.
13    Q.    -- another Chubb policy or some other insurance
14 policy --
15        A.    Right.
16    Q.    -- which has reached its limit of liability?
17 When you were the Harrisburg branch manager, say the last
18 couple of years, who were your direct reports? What kinds
19 of positions reported to you?
20        A.    Personal lines manager, commercial lines
21 manager, loss control manager, claims manager, operations
22 manager, executive protection manager, and umbrella manager.
23    Q.    How big a territory was covered by Harrisburg?
24 Is it pretty much central and eastern Pennsylvania or --

**PAGE 8 (29-32)**

33

1    A.    Yeah, it was Scranton and Wilkes-Barre, Lehigh
2  Valley and the entire central core from, I guess, the
3  Appalachia mountains over to Lancaster.
4      Q.    During that whole stretch in Harrisburg were
5  you reporting to, is it Mr. Dunlop?
6      A.    I reported to Ed Dunlop and I reported to Terry
7  Cavanaugh and I reported to Sy Green, and I also reported to
8  John Swords (phonetic).
9      Q.    Were all those folks in the eastern zone
10 manager --
11     A.    No, John Swords was a regional manager. When
12 we went regional, I reported to him.
13     Q.    Where was he based?
14     A.    Philadelphia.
15     Q.    How did it happen that you got the opportunity
16 in Cincinnati?
17     A.    I was offered the opportunity when Bill
18 Reynolds left the company.
19     Q.    Do you know why Mr. Reynolds left the company?
20     A.    Yes.  He took a bigger job with Hartford and a
21 better geographic job for him.
22     Q.    Was that job -- was the regional job posted on
23 the Chubb system and you expressed interest in it or did
24 somebody call you?  How did that connection get made?

34

1      A.    Terry mentioned that Bill had left and I said I
2  would be interested in the job.
3      Q.    Was Mr. Cavanaugh your immediate superior at
4  that point or --
5      A.    I think so.  I think Harrisburg was part of the
6  northern zone then.
7      Q.    Did you have to go through an interview process
8  for the Cincinnati job?
9      A.    No.
10     Q.    Do you know whether other candidates were
11 considered at that point, did Mr. Cavanaugh say?
12     A.    For a job like that, that would go to a level
13 beyond Terry.  Terry said, I probably won't be making that
14 call, so that would have been made at a high level.
15     Q.    Did you talk to anybody other than Mr.
16 Cavanaugh about it, about that job?
17     A.    Not to my recollection.
18     Q.    Who offered you the position, was it Mr.
19 Cavanaugh?
20     A.    Yes.
21     Q.    Did you talk to anybody else at Chubb about
22 whether that was a good opportunity for you?
23     A.    I believe I did, yes.
24     Q.    Do you remember who you talked to?

35

1      A.    I believe I talked to Doug Batting (phonetic).
2      Q.    Who was he?
3      A.    He was in charge of either U.S. ops or World
4  ops at the time.
5      Q.    What do you remember about your conversation
6  with him?
7      A.    Not very much, even if I had one.
8      Q.    Did you talk to Mr. Reynolds about the
9  position?
10     A.    No.
11     Q.    Did you talk to any of the Chubb staff that was
12 already in place in Cincinnati before you took the job?
13     A.    I might have talked to Tom Gates but it might
14 have been after I took the job.
15           When I came to Cincinnati I had dinner with Tom
16 Gates, he was the senior person who talked to me about what
17 the lay of the land was.
18           But I probably accepted it before I talked to
19 him.
20     Q.    Mr. Baillie, what sorts of things do you do in
21 your leisure time?  Do you have hobbies?  Do you belong to
22 outside organizations?
23     A.    Yeah.  I do a lot of charity work.  I belong to
24 a lot of charity boards.  I golf.

36

1      Q.    How often?
2      A.    Twice a week.
3      Q.    When you lived in Cincinnati you belonged to
4  Ivy Hills?
5      A.    Yes.
6      Q.    Is your new house in Jacksonville associated
7  with a golf course?
8      A.    Yes.
9      Q.    You belong to that course?
10     A.    Yes.
11     Q.    What charitable activities are you currently
12 involved in?
13     A.    None right now.
14     Q.    Because of the geographic move?
15     A.    Right.
16     Q.    When you were in Cincinnati what were you
17 involved in?
18     A.    I was vice president of Insuring the Children,
19 in charge of fundraising.
20     Q.    How long did you do that?
21     A.    About 2 1/2 years, most of the time I was in
22 Cincinnati.  I also was involved in coordinating the
23 branch's activities towards charitable endeavors, but
24 Insuring the Children was, you know, what I spent the most

37

1  time on.
2      Q.    Any other organizations you're a member of?
3  Are you a member of a church?
4      A.    No.  I belong to Mensa, but only, really, as a
5  paying member.
6      Q.    No activities?  No meetings?
7      A.    I didn't get involved.  I used to read the
8  newsletter, look for things, but I didn't really get
9  involved.
10     Q.    How long have you been a member of Mensa?
11     A.    1990.
12     Q.    Any professional organizations you're active
13 in?  Any insurance industry groups?
14     A.    Yeah.  I was active in the technology local
15 group here.  I would attend the meetings.
16     Q.    What's the name of the group?
17     A.    Boy, they changed it.  It was the software
18 association.  I was also active in RIMS, which is Risk
19 Insurance Management Service, up in the Columbus office,
20 attended some of the meetings down in Cincinnati, also.
21           And spoke at and attended the Risk Insurance
22 Services Organization.  That may be wrong, the name I gave
23 you.  It's a local group that puts on educational --
24     Q.    Here in Cincinnati?

38

1      A.    Here in Cincinnati.
2      Q.    Once you get settled in Jacksonville you'll
3  look for some opportunities --
4      A.    Yes.
5      Q.    -- to get similarly involved in those kinds of
6  groups?
7      A.    I'll try.
8      Q.    How much travel is there in connection with
9  your new job?
10     A.    Substantial.
11     Q.    Can you put a percentage on it?  Is it
12 half-time travel?
13     A.    I would say 40 percent would be a good
14 percentage.  It's early yet but that seems to be what it is,
15 yeah.
16     Q.    Nationwide or eastern?
17     A.    East companies.
18     Q.    Eastern Mississippi?
19     A.    East companies.
20     Q.    Tell me about the Cincinnati regional job when
21 you started, say the first six months, what was your take on
22 the Cincinnati regional job?
23     A.    Well, they had some real morale problems.  They
24 just lost three of their big executives, their branch

39

1  manager, marketing manager and the commercial lines manager.
2      Q.    Reynolds was the branch manager?
3      A.    Yes.
4      Q.    Who were the other two?
5      A.    Joe Beneducci was the marketing manager and
6  Jeff Kapp was the commercial lines manager.  They had all
7  left the company for other jobs.
8            At the same time they had just deregionalized
9  or I should say they regionalized Louisville and Columbus,
10 collapsed those branches, took away the infrastructure of
11 those branches and moved it all into Cincinnati.  There
12 was --
13     Q.    When did that happen, before you got here?
14     A.    Just before I got there.
15     Q.    So those had been separate branches before?
16     A.    Right.
17     Q.    Now they were sort of satellites of the
18 Cincinnati --
19     A.    Yeah, and there was some displacement of people
20 and layoffs there.  The tone was pretty negative.  The
21 service was awful.  There was about 1300 outstanding
22 endorsements and we were just not servicing the book, our
23 customers.
24           We also had -- I was amazed that less than 30

40

1  percent of the employees had performance appraisals in
2  place.
3      Q.    How many employees were there that you were
4  ultimately responsible for in the regional job?
5      A.    There was approximately 80 in Cincinnati,
6  Columbus and Louisville.  And there was maybe another 70 in
7  Cleveland and Indianapolis.
8      Q.    Cleveland and Indianapolis also were part of
9  the Cincinnati region?
10     A.    Yeah.
11     Q.    They were kind of a notch up from Columbus and
12 Louisville?
13     A.    They were full service branches.  Columbus and
14 Louisville were part of the Cincinnati branch now.
15     Q.    So there were branch managers in Cleveland and
16 Indianapolis?
17     A.    Right.
18     Q.    Not in Louisville and Columbus.  Who is the top
19 guy in Louisville or Columbus, what job title is that?
20     A.    Andy Bryant would be the top guy, he would be
21 called the production branch leader.  And at the time it
22 was -- Anthony Washington was the production branch manager
23 of Columbus.
24     Q.    How was the Cincinnati job different than the

**PAGE 10 (37-40)**

41

1  Harrisburg job?
2      A.    It was much wider in scope.  You know, same
3  basic principles but you just have more people.  You also
4  had -- you were managing branch managers at the time.
5      Q.    You were managing guys who were in the position
6  you had held in Harrisburg?
7      A.    That's correct, in addition to managing my own
8  branch.
9      Q.    When you started in Cincinnati, who was your
10 immediate report?
11     A.    Terry Cavanaugh.
12     Q.    What was his position?
13     A.    Northern zone manager.
14     Q.    So he had moved from eastern zone at some point
15 to northern zone?
16     A.    Uh-huh.
17     Q.    Yes?
18     A.    Yes.
19     Q.    I take it you had a good working relationship
20 with Mr. Cavanaugh --
21     A.    Yes.
22     Q.    -- throughout your career?
23     A.    Yes.
24     Q.    Again, within that first kind of six month time

42

1  frame after you took the Cincinnati regional job, what was
2  your assessment of the people who were in place?
3      A.    I thought we had good people but no systems in
4  place to implement the profit and growth that we would need.
5            There were, like I said, no performance
6  appraisal processes.  There was no documentation of the
7  files.  There was poor service.  There was basically no
8  marketing systems in place at the time.  It was kind of
9  catch-as-catch-can, go out and get the business and bring it
10 in.
11           And we were writing in all three branches some
12 very very unusual business that Chubb normally doesn't
13 write.
14     Q.    Why was that happening, do you know?
15     A.    I don't know.  Louisville, I think the reason
16 was they started writing a lot of truckers because they had
17 tapped out the market.  That was a full service branch
18 starting in about 1990.
19     Q.    Did you have to hire a marketing manager and a
20 commercial lines manager right away in the Cincinnati job or
21 had those jobs filled before you got there?
22     A.    The marketing role had been filled.  I had to
23 hire a commercial lines manager.
24     Q.    Who was in the marketing manager job?

43

1      A.    Jeff Barton.
2      Q.    Had you known Jeff before?
3      A.    No.
4      Q.    And you hired the commercial lines manager?
5      A.    Yes.
6      Q.    Who did you hire?
7      A.    Dieter Korte.
8      Q.    Was he from somewhere else in the Chubb
9  organization or did he come from outside?
10     A.    He was from the Illinois branch, that is what
11 they called it back then.
12     Q.    How many direct reports did you have in the
13 Cincinnati regional job?
14     A.    About 18, and then that was cut down to 16
15 later when we deregionalized.
16     Q.    When did that happen?
17     A.    January of 2001.
18     Q.    How did the deregionalization affect your
19 responsibilities?
20     A.    I no longer had the branch managers in
21 Indianapolis and Cleveland reporting to me, and my
22 performance was based upon the Cincinnati results.
23     Q.    Cincinnati, but including Louisville and
24 Columbus?

44

1      A.    Correct.
2      Q.    So the Indianapolis and Cleveland branch
3  managers at that point --
4      A.    Reported to from time to time --
5      Q.    Direct reports to zone?
6      A.    Right.
7      Q.    When did Mr. Szerlong become your immediate
8  superior?
9      A.    I'm going to get on this but --
10     Q.    As best you can remember.
11           MR. FREKING:  Don't guess.  If you don't know,
12     say you don't guess.
13           MR. CROALL:  I was waiting for Mr. Freking to
14     say, don't guess.
15           MR. FREKING:  That's all right.
16     Q.    If you don't remember, that's fine.  If you can
17 put a parameter on it, that's fine.
18           MR. FREKING:  Objection.  Dave, I've got a
19     feeling your client probably already knows the answer
20     to these questions.
21           MR. CROALL:  He probably does.
22           MR. FREKING:  Probably not really appropriate
23     discovery.  This is kind of a device for you to
24     obtain stuff you don't already know.  It's kind of a

45

1  waste of time to sit here and talk about things you
2  already know.
3          MR. CROALL:  I can ask Mr. Baillie what his
4  recollection is.  If you want to waste time making
5  speeches about it --
6      A.   I reported to Tim for about two years, I guess.
7      Q.   Okay.  Your employment ended in late August of
8  '01, so roughly two years back from that, fall of '99?
9      A.   Give or take, yeah.
10     Q.   Had you known Mr. Szerlong before that?
11     A.   Yes.
12     Q.   How had you known him?
13     A.   I knew him through a position at the home
14 office that he had as sort of the body broker back then.  So
15 I had interface with him then.
16          And I knew Tim from just branch manager
17 meetings.  You know, most branch managers knew who each
18 other were and would say hi.
19     Q.   Did you have any opportunity to work closely
20 with Mr. Szerlong before he became your --
21     A.   No.
22     Q.   -- boss in the zone job?
23     A.   No.
24     Q.   So you didn't have really a working

46

1  relationship with him before then?
2      A.   No.
3      Q.   Within the first, say six months or so after he
4  was in the zone manager job, what kind of working
5  relationship did you establish with Mr. Szerlong?
6      A.   I think a very good one.
7      Q.   How often would you interact with him either on
8  the phone or face to face?
9      A.   I would try to give Tim a call every six
10 weeks.  I would jot down notes of things that maybe I just
11 wanted to run by him, you know, basically to stay in touch
12 with him.
13          He's pretty busy and so just to make sure that
14 I initiated something every six weeks about.  That was the
15 goal.
16     Q.   You usually would do that by phone?
17     A.   Yes.
18     Q.   He was based in Chicago?
19     A.   Yes.
20     Q.   Would you go up to Chicago periodically to have
21 a face to face with him?
22     A.   Occasionally.
23     Q.   Was that an annual thing?  Couple times a year?
24     A.   If we had a meeting -- if he held a meeting

47

1  we'd go up there, or I would go up to see some zone
2  managers.  I would touch base with them maybe twice a year.
3  Tim would come down to see me once a year.
4      Q.   You said before Mr. Szerlong was your zone
5  manager it would have been Mr. Cavanaugh?
6      A.   Yes.
7      Q.   Would he also come down once a year to visit
8  the Cincinnati branch?
9      A.   Yes.  He would come maybe twice a year, maybe a
10 little more.
11     Q.   Did you go up to Chicago to see him?
12     A.   Yes.
13     Q.   Again, periodically?
14     A.   Under the same circumstances.
15     Q.   If there was a meeting.  Would you ever make a
16 special trip to go meet with the zone manager in Chicago?
17     A.   When you say "special," what do you mean?
18     Q.   Just to go up to have a face to face with a
19 zone manager, not in conjunction with some other already
20 scheduled meeting?
21     A.   Yes, I think.
22     Q.   Is there anything specific?
23     A.   Probably a performance, you know, review, or a
24 periodic thing of that nature.

48

1      Q.   Again, during the first six months or so that
2  Mr. Szerlong was your zone manager, any problems, concerns
3  about that relationship?
4      A.   No, none.
5      Q.   You didn't have any reason to think Mr.
6  Szerlong was a detractor of yours or was out to get you?
7      A.   No.
8      Q.   Was '99 your first full year as the Cincinnati
9  regional manager?
10     A.   Yes.
11     Q.   How was the region's performance in '99?
12     A.   Not good from a profitability standpoint.
13     Q.   Is one measure that you guys use the ratio?
14     A.   Yeah, loss ratio.  Loss ratio was horrible.
15     Q.   Is that for like every dollar in premium you
16 take in is how much you pay out?
17     A.   Right.
18     Q.   Do you remember how much it was in '99?
19     A.   It was over 100.
20     Q.   Which is bad?
21     A.   Which is bad, right.
22     Q.   You were losing money?
23     A.   Yes.
24     Q.   You and Mr. Szerlong had conversations about

**PAGE 12 (45-48)**

49

1 the need to improve the profitability of the region?
2       A.     Oh, yes.
3       Q.     Presumably one of the zone manager's
4 responsibilities is to make the zone profitable, right?
5       A.     Yes.
6       Q.     The only way to make the zone profitable is to
7 have regions within the zone profitable?
8       A.     Yes.
9       Q.     What did you do to try to improve the zone's
10 profitability during 2000?
11      A.     Like I said, we had a lot of business that was
12 very depressed, so we were very aggressive at getting off of
13 the commercial business and we were also very aggressive in
14 raising rates.
15      Q.     Help me out again remembering.  You're not
16 talking to an insurance guy.
17             When you say you're aggressive about getting
18 business off the books, you don't renew policies?
19      A.     We don't renew policies, correct.
20      Q.     So you go to that customer and say, we're just
21 not going to provide you with insurance for next year, or
22 you give them a price that's so high that you expect them to
23 change companies, or some of both?  Can you tell me how that
24 works?

50

1       A.     Most of it was non-renewal of depressed
2 business.
3       Q.     Which means you just go to them and say, we're
4 not going to provide you insurance anymore?
5       A.     Right.  We go to them about three months prior
6 and let the agent know.  We don't go to the customer but we
7 let the agent know we really would like to get off of this
8 account.
9       Q.     So the agent then has to go to the customer?
10      A.     Correct.
11      Q.     Say Chubb is not going to renew?
12      A.     Right.
13      Q.     We're going to need to find some alternative?
14      A.     Right.  There's some cases where you raise the
15 rates, the -- a rate where think you can make money, but the
16 marketplace may make it go, sure.
17      Q.     How big was the Cincinnati branch in terms of
18 premiums?  Did it -- how did it go during your three years?
19      A.     We grew by I believe 8 percent in 2000 and 9
20 percent -- 10 percent, 10 or 9 percent in 2001.
21      Q.     So at the same time you're getting rid of what
22 you think is the bad business?
23      A.     Writing new.
24      Q.     Folks out there trying to get new better

51

1 business?
2       A.     Exactly, getting new better business and also
3 raising rates and changing terms and conditions.
4       Q.     Help me out with kind of the responsibilities
5 within the Cincinnati region.
6             You've got overall responsibility for managing
7 the region.  What do the people at the level just underneath
8 you have responsibility for?  I mean, what does -- did you
9 have Barton and Dieter Kortes of the world have
10 responsibility for --
11      A.     Yeah.  The immediate people under me before we
12 deregionalized was the branch managers had responsibility
13 for managing their branch and producing a profit there.
14             Also the production branch managers had
15 responsibility for managing their production offices and the
16 results there.
17             The other direct reports had responsibility for
18 managing their individual practices.
19      Q.     Okay.  That would include marketing for Barton,
20 commercial lines for Korte?  Take two minutes?
21      A.     I'm fine.
22      Q.     You can go ahead.
23      A.     Sorry, Dave, what's the question?
24      Q.     What do those guys at the level below you have

52

1 responsibility for?  I mean, what does the marketing manager
2 generally have responsibilities for?
3       A.     He would have responsibilities for the
4 marketing of the region.
5       Q.     I guess I'm looking for a little more than --
6 you know, what does that mean?
7       A.     Predominantly agency management.
8       Q.     So dealing directly with the agents who, as I
9 understand it, are primarily responsible for selling Chubb
10 products to customers?
11      A.     Uh-huh.
12      Q.     Jeff Barton's responsibilities would be
13 regionwide, not just Cincinnati, Columbus and Louisville,
14 but at least during 2000, as I understood your testimony,
15 would have included Cleveland and Indianapolis
16 responsibilities as well?
17      A.     Yeah.  Not as direct as they had -- Cleveland
18 had their own marketing manager for a while.  Most of the
19 marketing responsibilities are the responsibilities of the
20 branch managers.  But the marketing manager would supplement
21 that.
22      Q.     The regional marketing manager?
23      A.     Right.
24      Q.     That was Jeff?

**PAGE 13 (49-52)**

53

1    A.    Yes.

2    Q.    Would the same be true for Dieter Korte, would
3 he have regionwide responsibilities within the commercial
4 lines?

5    A.    Yes.

6    Q.    And, again, help me out, what does that mean in
7 terms a lawyer can understand?

8    A.    That would mean overseeing his managers and
9 other branches to make sure that they're doing -- make sure
10 that they're writing the type of business that Chubb can
11 make a profit on. Mainly it would be authority levels.

12    Q.    Okay.

13    A.    And act again as the consultant for them.

14    Q.    So he's got to set the levels at which people
15 below him can approve business?

16    A.    Right.

17    Q.    Certain levels it would have to go to him?

18    A.    That's right.

19    Q.    Or up to you? I mean, were there certain --

20    A.    No, branch managers don't have underwriting
21 responsibility. If it gets above Dieter, it would have to
22 go to Tim's zone manager in that capacity.

23    Q.    So there's some commercial lines guy at the
24 zonal level --

54

1    A.    Right.

2    Q.    -- that could sign off on something that's too
3 big for Dieter to approve?

4    A.    That's right.

5    Q.    And you said there were other direct reports.
6 Help me out with who those folks and what those functions
7 would be.

8    A.    They would be the other underwriting office.
9 Not the claims, they didn't report to me, but the service
10 departments, loss control departments. And that's probably
11 it. Mostly underwriting departments.

12    Q.    How did the region do in 2000? You said you
13 think there was like 8 or 9 percent growth?

14    A.    Yeah. They did very well, you know, in all the
15 marketing and growth initiatives, but the loss ratio was
16 just awful.

17    Q.    Do you remember what it was?

18    A.    No. But I think we lost about 37 million in
19 the branch and the region wasn't great either.

20    Q.    Loss ratio in the 135, 137 range?

21    A.    I could provide you with that. It wasn't good.
22 We were still hit with the tail of the business and we were
23 running off quite a bit of distress business still and
24 trying to also get more rate.

55

1    Q.    During 2000 how was your relationship with Mr.
2 Szerlong?

3    A.    Very good.

4    Q.    You continued to have the kind of every six
5 week target for touching base with him?

6    A.    Yeah. Yeah. It's kind of a rule of thumb that
7 I used.

8    Q.    Did he come down and visit once or twice?

9    A.    I think he came down once.

10    Q.    Any particular problems or issues that led to
11 the lack of profitability in 2000?

12    A.    Oh, yes. You know, just bad business,
13 depressed.

14        MR. FREKING: Objection to the extent the
15        question has already been asked before.

16        MR. CROALL: I thought we talked about
17        before --

18        MR. FREKING: Same stuff.

19    Q.    Was there a major issue about uninsured
20 motorists coverage in Ohio at that point?

21    A.    Yes.

22    Q.    Explain to me what that issue was.

23    A.    What happened was that the Supreme Court of
24 Ohio made a ruling that if somebody got hurt in an

56

1 automobile accident that was uninsured, that they could go
2 against their employer, their employer's commercial
3 liability policy, to recover damages.

4    Q.    How did that affect Chubb's business?

5    A.    It affected it significantly because -- it
6 affected the entire insurance industry significantly because
7 basically what they had, now, was exposure that they did not
8 collect premium for.

9    Q.    What, if anything, did you do to try and deal
10 with that problem?

11    A.    I worked with the home office auto --
12 commercial auto folks. We put together a solution that we
13 thought would work for the uninsured motorists. Also worked
14 very closely with claims on how we're going to manage this.
15 Worked closely with underwriting on how we would manage it.

16        And actually put together a strategy session in
17 the home office where we had claims, underwriting, and legal
18 together where we came up with a strategy on how we're going
19 to manage Ohio UM, and worked closely with our legal
20 counsel.

21    Q.    Legal counsel in the home office in New Jersey?

22    A.    Correct.

23    Q.    Would you say were you the leader in dealing
24 with that uninsured motorists issue or somebody else?

**PAGE 14 (53-56)**

57

1    A.    I would say I was the leader in conjunction
2 with the home office automobile. I didn't have the
3 technical -- I was sort of the coordinator more than
4 anything else.
5    Q.    Who at the home office was primarily
6 responsible --
7    A.    That would be Michelle Middleton. Before her
8 was Kathy Langner. They had the ultimate responsibility for
9 making a profit.
10    Q.    At the start of 2001 you had a performance
11 review meeting with Mr. Szerlong?
12    A.    Yes.
13    Q.    Tell me what you remember about that meeting.
14    A.    I remember I was surprised of his evaluation on
15 some of my characteristics and sort of shocked and surprised
16 at some of the examples that he used.
17    Q.    Do you remember any of the specifics of it? I
18 know there's a memo that follows up on it, formal review
19 document.
20    A.    Yeah. He mentioned the financials which, you
21 know, were not good.
22        But, you know, as I explained to him and Tim
23 knew, it takes a long time to screw up a bulk of business,
24 it takes an awful long time to correct it, too. Can't come

58

1 in in '99, take some action, expect you to have a profit in
2 2000.
3        The zone didn't do it, Chicago didn't do it,
4 many, many other branches didn't do it either. So that was
5 one piece.
6        But, you know, I understood that we needed to
7 make a profit but actuarially it would have been impossible.
8        The second piece was, he talked about the
9 leadership style and he mentioned -- said that it was black
10 and white, and that he also mentioned an incident where I
11 did not properly explain to the staff.
12    Q.    Do you remember what incidents those were?
13    A.    Yeah, I do. There was conversation that we had
14 in -- I believe it was -- oh, come to me, it wasn't
15 Cleveland. Toledo. It was a conversation we had in Toledo.
16        I had it with Tim, Jeff Barton, and Gary
17 DeLong. He mentioned that my comments there were -- did not
18 serve me well. That was the quote that he made.
19    Q.    Do you remember what the conversation was
20 about?
21    A.    Tim didn't remember the conversation at all.
22 But the only thing I remember about it was the discussion
23 about that human resources and marketing are every manager's
24 responsibility, basically Marketing 101. I mean Management

59

1 101 type stuff. But Tim didn't remember the specifics.
2    Q.    What about the black and white? He said you
3 were a black and white thinker, you didn't appreciate
4 subtlety and didn't convey to your subordinates.
5    A.    Tim had no examples or any specifics on that.
6    Q.    Did you disagree with him on that? Did you
7 tell him you didn't think that was true?
8    A.    Yeah. I mean, I told him I think one of my
9 strengths was my ability to see both sides of an argument.
10    Q.    I think his overall rating -- I think this
11 meeting is in February of 2001?
12    A.    Right.
13    Q.    Was met most?
14    A.    Yes.
15    Q.    Right?
16    A.    Yes.
17    Q.    Chubb rating system, as I understand it, which
18 may not be correct, met most is just below met all?
19    A.    That is correct.
20    Q.    The next one up is exceeds some?
21    A.    Right.
22    Q.    Then clearly exceeds, I think?
23    A.    Uh-huh.
24    Q.    I forget what the very bottom one is. Not met?

60

1    A.    Right.
2    Q.    You recognize that met most was not a very good
3 rating for somebody in a regional manager position?
4    A.    Right.
5    Q.    You understood that Mr. Szerlong was conveying
6 to you a lack of satisfaction with your performance in that
7 regional manager role?
8    A.    Well, I did ask the question. I said, does this
9 mean that I'm failing in the job?
10    Q.    What did he say?
11    A.    He said no, no, you're not failing. Let's just
12 get through this and we'll all play golf.
13    Q.    How long was the meeting with Mr. Szerlong when
14 he went over your performance?
15    A.    I'd say it was about an hour and a half, two
16 hours.
17    Q.    Where was it?
18    A.    It was in Chicago.
19    Q.    So you went up there?
20    A.    Yes.
21    Q.    Specifically for the performance review?
22    A.    Specifically for that but also to see some
23 regional -- some zone managers.
24    Q.    Some of the product line zonal managers?

61

```
 1     A.    Yes.
 2     Q.    Were any of your regional managers with you,
 3 any of your product line regional guys?
 4     A.    No.
 5     Q.    Who else did you meet with on that trip, do you
 6 recall?
 7     A.    I know I met with Dave Brosnan and I can't
 8 recall the others but I do have it written down,
 9 chicken-scratched down.
10           (Baillie Exhibit 1 was marked for
11           identification.)
12     Q.    Mr. Baillie, the court reporter has handed you
13 Exhibit 1 for your deposition. I ask you -- before I ask
14 you to look at that specifically, let me ask you a broader
15 question.
16           In order to prepare for today, other than
17 consulting with Mr. Freking and Mr. Napier, did you do
18 anything? Did you look at any documents, talk to anybody
19 else?
20     A.    I looked at documents such as these, yes.
21     Q.    You looked at the documents you produced to us
22 in discovery?
23     A.    Right.
24     Q.    Looked at that whole stack of 650 pages,
```

62

```
 1 whatever it was?
 2     A.    Not all of it, no.
 3     Q.    Just some of the performance-related stuff?
 4     A.    Yes.
 5     Q.    Did you look at Exhibit 1?
 6     A.    Uh-huh.
 7     Q.    That's a copy of a memo that Mr. Szerlong sent
 8 you shortly after your February performance review, correct?
 9     A.    Right.
10     Q.    Did it accurately summarize the discussion that
11 Mr. Szerlong had had with you ten days earlier or so?
12           (The record was read.)
13     A.    It had a much harsher tone to it.
14     Q.    The memo had a harsher tone --
15     A.    Yes.
16     Q.    -- than the conversation did?
17     A.    Yes.
18     Q.    Can you give me any examples of where you think
19 the memo was harsher than the face-to-face conversation?
20     A.    It was just I came out of the meeting, you
21 know, again, asking him, well, you're giving me met most,
22 are you telling me I'm clearly failing? His reply back was
23 no.
24           And he said, you know, you just need to work on
```

63

```
 1 some things. You're doing a great job in marketing and
 2 you're doing a great job in growing the branch. These are
 3 some things to work on. Then this memo was much harsher.
 4     Q.    Okay. Well, during the conversation, did he
 5 tell you, like he says in the second paragraph of the memo,
 6 in the regional job as a senior vice president, you are
 7 measured against a different and tougher standard than in
 8 your prior positions?
 9     A.    Uh-huh.
10     Q.    Yes?
11     A.    Yes.
12           MR. FREKING: Meaning did he say that in the
13           memo or the meeting?
14     Q.    Did he say that in the meeting?
15     A.    I think so.
16     Q.    Did he say to you in the meeting, as he did in
17 this same paragraph, that everybody is being measured
18 against a tougher standard and future expectations were only
19 going to increase?
20     A.    I believe so.
21     Q.    The four bullet points that are kind of at the
22 bottom of the first page, carried over onto the second page,
23 are all of those things that he covered with you in the
24 face-to-face meeting as well?
```

64

```
 1     A.    Yes.
 2     Q.    As a specific example, that very first bullet
 3 point, "Performance Management/Standards, I would rate the
 4 professional staff in the Ohio Valley Region as the weakest
 5 in the Zone." Is that something he told you in your
 6 face-to-face meeting?
 7     A.    Yes.
 8     Q.    Is that something that you agreed with him
 9 about? Disagreed?
10     A.    I told him I had no way of measuring because I
11 don't know the staff of the other two regions, but if they
12 were the weakest, I must be a great manager to be able to
13 get the type of performance I get out of them.
14     Q.    Is that what you said to Mr. Szerlong?
15     A.    Yeah.
16     Q.    Did he respond to that?
17     A.    I can't recall.
18     Q.    Talk to me a little bit about -- the memo talks
19 about performance issues with a Michael Whitman. Who is he?
20     A.    Michael Whitman was my property marine manager.
21     Q.    He had a performance problem?
22     A.    Yes.
23     Q.    Inadequate performance?
24     A.    Yeah. He was unprofitable and growth was
```

65

1 lacking and really didn't show a lot of good signs of
2 leadership.
3     Q.    What had you done at the point of the February
4 meeting with Mr. Szerlong?
5     A.    I had put him, prior to the meeting, on a
6 performance appraisal -- I mean a performance improvement
7 plan for the year 2000.
8     Q.    As a result of his performance in the year 2000
9 or --
10    A.    As a result of his performance in the year
11 1999.
12    Q.    How had he done in the performance improvement
13 plan for 2000?
14    A.    He had double digit growth and made a profit. I
15 believe probably the only property marine manager in the
16 whole zone that both made a profit and grew.
17    Q.    Did you feel like he had turned it around?
18    A.    Yeah.  He certainly turned it around, the
19 results, in Cincinnati.
20        The managers in Cleveland and Indianapolis were
21 more pleased with his performance but we were very leery
22 because he had problems with performance, because it would
23 go up and down.
24        So he worked him off the performance review

66

1 process and -- but basically by about April or May of 2001,
2 while he was doing well in the branch, he was again
3 neglecting his duties on the regional front, so I had to
4 take him out of the job.
5     Q.    So you moved him out of the regional job and
6 effectively demoted him?
7     A.    Yeah, put him in a technical job.
8     Q.    So within a few months of this memo where Mr.
9 Szerlong says Whitman is currently unable to perform the
10 regional aspect of his job, you reached that same
11 conclusion?
12    A.    Yes.
13    Q.    Says in -- the memo says in that same
14 paragraph, Mr. Szerlong reviewed with you a handful of
15 managers through the region that we simply must get a higher
16 level of performance from.
17        Do you remember him reviewing with you others
18 who he felt should be performing at a higher level?
19    A.    He mentioned a commercial manager up in
20 Cleveland.
21    Q.    Who was that?
22    A.    It will come to me.  I can't recall at this
23 time but a commercial manager up in Cleveland.
24    Q.    Is he the only one you remember or were there

67

1 others?
2     A.    He's the only one I remember.
3     Q.    Were there others you just don't remember or
4 you think there was only one you and Mr. Szerlong discussed
5 in addition to Mr. Whitman?
6     A.    I don't recall.
7     Q.    I think you mentioned that Mr. Szerlong covered
8 with you in your face-to-face meeting your role as a
9 regional leader?
10    A.    Correct.
11    Q.    Not just a branch manager, right?
12    A.    Uh-huh.
13    Q.    Yes?
14    A.    Yes.
15    Q.    These issues about leadership, did he say to
16 you in the face-to-face meeting like he said in the memo,
17 that while leadership is difficult to measure it's critical
18 to your success?
19    A.    Yes.
20    Q.    Did he cover with you in the face-to-face
21 meeting his view that you had a tendency to argue an extreme
22 position on a point and that was perceived as inflexible?
23    A.    No, not to my recollection.
24    Q.    The next paragraph of the memo he says the

68

1 feedback he received on your management meetings in
2 Cincinnati has also sometimes been unfavorable.
3        Did he tell you that in the face-to-face
4 meeting?
5     A.    No.  He did mention one meeting after our
6 national meeting that he thought I should have expounded
7 upon more.
8     Q.    Do you recall what meeting that was?
9     A.    Yes.
10    Q.    What was it?
11    A.    It was a meeting -- we had a national meeting
12 and they indicated that they were going to reregionalize the
13 branch, the regional managers' jobs, but they didn't know
14 what they were going to do with the regional managers'
15 positions at this time.
16    Q.    What did Mr. Szerlong say he thought you should
17 have done?
18    A.    He thought I should have discussed it more with
19 the group.
20    Q.    That would have affected a lot of your direct
21 reports, right?
22    A.    Right.
23    Q.    Did you agree with Mr. Szerlong, maybe you
24 should have talked about that more to --

69

1    A.  No. I actually didn't. They didn't tell me
2  anything. So we just discussed it. We told them what was
3  going on.
4         We asked for any questions, but there was
5  really nothing I could tell them because we didn't have any
6  information to go on.
7         I did go back and double-check with
8  approximately six of my direct reports whether they thought
9  there was anything -- you know, because maybe Tim had
10 something there. I went back and checked with them, no,
11 what could you say, you didn't know anything.
12      Q.  Who did you go back and check with?
13      A.  I can't recall exactly but I think the people
14 would be -- well, Diane Haggard, Dieter Korte, Jeff Barton,
15 Jim Lash, Andrew Emery, I believe Tom Gates.
16      Q.  Are all those people Cincinnati based?
17      A.  Yes, sir.
18      Q.  All with some regional responsibilities?
19      A.  Yes.
20      Q.  Next paragraph refers to discussion about HR
21 needs in Cincinnati.
22         And that discussion, Mr. Szerlong's memo says,
23 took place in the audience of several of your lieutenants
24 that served you poorly.

70

1    A.  Yes.
2    Q.  Is that the discussion in Toledo?
3    A.  Yes.
4    Q.  So it was about your HR needs, at least that's
5  what the memo says?
6    A.  Tim didn't recall what it was.
7    Q.  When he wrote the memo he said it was about
8  your HR needs in Cincinnati?
9    A.  I don't remember that being part of the
10 discussion. I had asked the two lieutenants if they had any
11 recollection of it or whether anything was off base. They
12 said, no, they didn't remember it.
13      Q.  After you got the memo you went and asked?
14      A.  After my discussion with him and I got the
15 memo, yes.
16      Q.  You said that was Barton and Lash? (phonetic)
17      A.  DeLong.
18      Q.  Barton and DeLong. What, if anything -- other
19 than what you've already said, you went and talked to some
20 people to get their read on it, what did you do after you
21 got this memo from Mr. Szerlong?
22      A.  Well, I continued with the profitability items
23 that we were working on. I revisited with the two branch
24 managers to do a needs analysis, which I normally do every

71

1  year.
2         We sit down and determine what kind of services
3  they're looking for from the regional managers, and then I
4  met with the regional managers and discussed that with them.
5    Q.  I'm still trying to get the players straight.
6  When you say the branch managers, are you talking about Mr.
7  DeLong and Mr. Breiner?
8    A.  Correct.
9    Q.  So at this point in 2001 they're still
10 reporting to you?
11      A.  No.
12      Q.  No. They're still part of your region?
13      A.  Right.
14      Q.  Okay. So they still get regional services from
15 your regional managers?
16      A.  Correct.
17      Q.  But at this point they're reporting directly to
18 Mr. Szerlong?
19      A.  Right.
20      Q.  The last paragraph in Exhibit 1, was that
21 consistent with what Mr. Szerlong had told you in your
22 face-to-face meeting in Chicago?
23      A.  Yeah. I mean we talked about, you know, all
24 the positive things that were done also. But, yeah.

72

1    Q.  In Chicago?
2    A.  In Chicago. We covered them.
3    Q.  He told you the marketing he thought you were
4  doing well at, your customer focus he thought was --
5    A.  I think if you look at my performance appraisal
6  that Tim and I did, most of the categories were either met
7  all or exceeds some.
8    Q.  Profitability wasn't --
9    A.  No.
10      Q.  -- right?
11      A.  No.
12      Q.  The attachment that's the third and fourth
13 pages of Exhibit 1 is something that Chubb calls a
14 Competency Assessment?
15      A.  Right.
16      Q.  I think the handwritten notes on it are Mr.
17 Szerlong's?
18      A.  They're not mine.
19      Q.  Did you and Mr. Szerlong sit down and go over
20 this form as part of the February conversation?
21      A.  Yes, we did.
22      Q.  He told you what he would rate you in each of
23 these categories --
24      A.  Uh-huh.

73

1    Q.    -- is that correct?

2    A.    That's correct.

3    Q.    Customer focus, which is the second one, I

4  guess, did you do the original draft of this?  Is the

5  typewritten stuff yours?

6    A.    Possibly.  Might have been last year's.

7    Q.    So -- but the employee rating there is a 4, Mr.

8  Szerlong scratched, put a 4.5?

9    A.    Right.

10    Q.    If I'm reading the note right, says, very

11  outside focused, "very O/S focused."  See where I'm looking?

12    A.    Uh-huh.

13    Q.    He thought you did that well, right?

14    A.    Yes.

15    Q.    He told you that, right?

16    A.    Yes.

17    Q.    But then under leadership, where the

18  typewritten rating had been a 4, he crossed out and put a

19  2.5?

20    A.    Right.

21    Q.    If I'm reading the note right, it says,

22  "critical area for growth," underlined.  "There are issues

23  here.  Sometimes short changes.  Dialogue/message delivery

24  on key issues."  Is that consistent with what he told you?

74

1    A.    Yeah.  I would say yes.

2    Q.    Communication, the same thing.  I can't tell

3  you what the original rating was but it looks like 2.5 and

4  the comment, if I'm reading correctly, "Looking for our

5  nuance/audience awareness and communication."  Again,

6  consistent with what he told you about communication, the

7  comment about the discussion in Toledo in front of your

8  direct reports?

9    A.    Yes.

10    Q.    Did he give you a copy of the competency

11  assessment --

12    A.    Yes.

13    Q.    -- as well as the memo?

14    A.    Yes.

15    Q.    Did he set a time frame for the two of you to

16  sit down and talk again about your performance after the

17  February meeting and the follow-up March memo?

18    A.    No.

19    Q.    Did he come down again to the branch or within

20  a couple of months?

21    A.    Yes.

22    Q.    Tell me about that.  I think he came down in

23  early May?

24    A.    He came down May 2nd.

75

1    Q.    What was the reason, as you understood it, for

2  him coming down?

3    A.    Annual branch visit.

4    Q.    How did that go?  What did he do?  What contact

5  did you have with him?

6    A.    He basically went around the branch and talked

7  to people.  I think the meeting went well.  He -- we had

8  dinner and he discussed some other items.

9    Q.    Just you and him at dinner?

10    A.    Yes.

11    Q.    Where did you eat?

12    A.    Nicholson's Tavern.

13    Q.    Did you ask for a follow-up on how Mr. Szerlong

14  thought you were doing or did he volunteer it?

15    A.    I can't recall.

16    Q.    Tell me what you remember about the

17  conversation relating to your performance.

18    A.    Again, you know, talked in vague platitudes

19  about more input, more leadership, but no real specifics.

20    Q.    Did you ask him whether he thought you had made

21  improvements in addressing the issues that he talked about

22  with you back in February?

23    A.    I can't recall.  I can't recall.  I mean, we

24  discussed the improvement area.  I discussed the improvement

76

1  areas that, you know, we did with them.  Discussed that we

2  were, you know, focusing in on regional service, and

3  obviously became more aware that I would have more

4  conversation with folks, since that seemed to be a hot

5  button on the issue.

6    Q.    During his May visit, did he meet with your

7  regional managers?

8    A.    Yes.

9    Q.    After Mr. Szerlong left you asked them how the

10  meetings went with him?

11    A.    Yeah.

12    Q.    What did they tell you?

13    A.    Went well.

14    Q.    Would Mr. Szerlong sit down in May with all of

15  your regional folks or some of them?

16    A.    He would generally pick ones he wanted to see.

17  He would try to get most of them.

18    Q.    Do you remember who he talked to on that visit?

19    A.    No.

20    Q.    What else, if anything, do you remember about

21  the May branch visit?

22    A.    Well, he did mention in -- something that kind

23  of went back to February, so he did mention in February, he

24  said, what's your relationship with Tom Motamed, who was the

77

1 COO. I told him it was good.

2          He's had two visits to Cincinnati. Both times

3 I've asked him, anything I could be doing more of less of.

4 Both times he said, no, you're doing well, keep doing what

5 you're doing.

6          You know, I knew Tom from way back. I said,

7 why? He said, well, Tom is not a fan of yours.

8          So I said, well, you know, what's the problem?

9 He said, well, I don't know, but when I was having my

10 problems with the home office, Jack Hicks, his old boss,

11 didn't let him know about that, so he was going to get with

12 Tom and find out what the issues were and get back to me.

13     Q.     That's what Mr. Szerlong told you?

14     A.     Correct.

15     Q.     This, again, is during --

16     A.     The February meeting. It was brought up again

17 in February -- in the May meeting.

18          Then subsequent to that I had asked him a

19 couple of times, have you talked to Tom? Got any specifics

20 on what issue he was talking about? And he did not.

21          In May he mentioned -- he asked me again, he

22 said, what's your relationship to Tom Motamed? I said,

23 well, it's always been good. He's been here twice, said

24 good things. What was going on? I've known him for a

78

1 while, always liked him, always got along with him.

2          He said, he's not in your corner. I said, Tom

3 -- I've got to talk to Tom about this. I've got to find out

4 what's the situation.

5     Q.     Did you contact Mr. Motamed?

6     A.     No. Tim said Tom wouldn't like that. I said,

7 Tim, I like to hit things head on. So, I mean, if you're

8 telling me, as my immediate superior, that I shouldn't do

9 this, I'll respect what you say. He said yes.

10     Q.     So you didn't do it?

11     A.     No.

12     Q.     Anything else you remember about the May visit

13 and the May conversations with Mr. Szerlong?

14     A.     Not that I recall, no.

15     Q.     Again, you followed up with a memo?

16     A.     Yes.

17          (Baillie Exhibits 2 and 3 were marked for

18          identification.)

19     Q.     Mr. Baillie, the court reporter has handed you

20 Exhibits 2 and 3. Let's look at number 2, first. That's a

21 follow-up memo --

22     A.     Right.

23     Q.     -- from Mr. Szerlong after the May meeting,

24 right?

79

1     A.     Uh-huh.

2     Q.     Yes?

3     A.     Yes.

4     Q.     And he attached to it a list of developmental

5 priorities. And the memo says, "progress, against these is

6 key to your success," right, number 2 there?

7     A.     I don't see it.

8     Q.     Number 2 on the cover memo, "Priorities -

9 Attached is a" --

10     A.     Yes.

11     Q.     "Progress, against these is key to your

12 success." Is that what he told you when you met in May?

13     A.     I don't believe so.

14     Q.     You got a copy of this?

15     A.     Yes.

16     Q.     Shortly after the visit?

17     A.     Yes.

18     Q.     You got a copy of Exhibit 1 --

19     A.     Absolutely.

20     Q.     -- shortly after the February conversation,

21 right? In the memo Mr. Szerlong expresses concerns about

22 Louisville?

23     A.     Yes.

24     Q.     Did he do that in your face-to-face discussion?

80

1     A.     Yes.

2     Q.     Did you agree with him that there were problems

3 in terms of the marketing and sales effort in the Louisville

4 office?

5     A.     No, not the marketing and sales effort. They

6 were very engaged in the market, very aggressive with their

7 travel, probably higher than 90 percent of the rest of the

8 zone.

9          The issues that we had there were the agency

10 plans were just not crisp and put together well. That was

11 not a skill base that Andy Bryant had had, but he had a

12 great ability, he was -- he had a great ability to get out

13 with the client and generate business. But he was not

14 putting it together in a more documented form.

15          So that was a skill base developmental area

16 that we had for Andy.

17     Q.     You directed Jeff Barton to spend some more

18 energy and effort down there --

19     A.     Yes.

20     Q.     -- to help Mr. Bryant?

21     A.     Yes.

22     Q.     As far as you know had Jeff done that?

23     A.     Yes.

24     Q.     Did you see any improvement as a result of Jeff

81

1  helping out?
2      A.    Yes.  They were starting to get a little
3  better, a little crisper.  Still had work to do.
4      Q.    Did you tell Mr. Szerlong that you made some
5  efforts in that regard?
6      A.    I can't recall.
7      Q.    In that same paragraph in the memo, Mr.
8  Szerlong expresses disappointment in Tom's impression from
9  his recent visit to Columbus.  Is that Mr. Motamed --
10     A.    That's correct.
11     Q.    -- as you understood it?
12     A.    That's correct.
13     Q.    Had you participated or attended when Mr.
14  Motamed visited the Columbus office?
15     A.    No.  They scheduled it when I was out of town.
16     Q.    What, if anything, had you heard about the
17  visit to Columbus?
18     A.    The only thing that I had heard from Tim was
19  that Tom was disappointed in a comment that Jeff Bezold
20  said, where -- the comment seemed harmless.  Said if we
21  didn't have so much underwriting to do we would be able to
22  do more marketing.
23           And I called Jeff.  I said, Jeff, did you say
24  that?  He said no, he didn't.

82

1           But Jeff Bezold was very active in the
2  marketplace, averaging about 15 visits per month.
3      Q.    What was his job?
4      A.    He was the production branch manager.
5      Q.    So he was the person in Columbus who directly
6  reported to you?
7      A.    Correct.
8      Q.    Did you get any direct feedback from Mr.
9  Motamed about the Columbus visit?
10     A.    No.
11     Q.    Is that something that you and Mr. Szerlong
12  had discussed when he visited in May?
13     A.    The only discussion was what I just told you.
14     Q.    Did you do what Mr. Szerlong suggested in this
15  memo and direct Jeff Barton to increase his role in managing
16  the Columbus --
17     A.    Yes.
18     Q.    -- office?
19     A.    Yes.  Both branches, Louisville and Columbus,
20  were growing at 10 percent that year.
21     Q.    Was it your understanding that Mr. Szerlong was
22  concerned about growth in those offices or other issues?
23     A.    I didn't know what he was concerned about.
24     Q.    Did you ask him for clarification after you got

83

1  this memo?
2      A.    Uh-huh.
3      Q.    Yes?
4      A.    Yes.
5      Q.    Did you ask him -- pick up the phone and call
6  him?
7      A.    Yes.
8      Q.    What did he tell you?
9      A.    Just a lot of platitudes and, well, they need
10  to be more focused.
11     Q.    Were you --
12     A.    Nothing specific.
13     Q.    Were you satisfied at the time you got this
14  memo with the Louisville and Columbus office performance?
15     A.    When you say "satisfied," what do you mean?
16     Q.    Happy?  Content?
17     A.    I don't think I'm ever happy or content with
18  the performance of myself or my subordinates.  So I'm always
19  looking for continual improvement.
20     Q.    Do you think you and Mr. Szerlong shared the
21  same kinds of concerns about those two offices based on your
22  conversation with him and the memo that's Exhibit 2?
23     A.    No, because I certainly wasn't overly concerned
24  with the lack of sales coordination.

84

1      Q.    In Louisville?
2      A.    In Louisville.  Their sales were up.  Their
3  growth was up.
4           Did I think they could do better?  Yes.  But
5  their involvement in the marketplace and their documentation
6  of what they were doing with poll reports and travel was
7  exceeding expectations.
8      Q.    At some point I think you said one of the
9  things that you recognized as a shortcoming in the
10  Louisville office was their marketing plans or business
11  plans.
12     A.    Yes.
13     Q.    Agency plans is maybe the right phrase.
14     A.    That is correct.
15     Q.    At some point did somebody from the zone review
16  or audit, help out with some of the agency plans down there?
17  I'm not sure what the time frame is?
18     A.    Nobody from the zone did.
19     Q.    Was it somebody from your -- somebody from the
20  region?
21     A.    Both Jeff and I helped with some agency plans
22  down there.
23     Q.    Were you satisfied that those were on track to
24  being improved, the processes were being put in place to

**PAGE 21 (81-84)**

85

1  upgrade the quality of the agency plans in Louisville?
2      A.     At the time of this memo, no. I would say that
3  is correct. Louisville had to upgrade it.
4      Q.     So did you make efforts after you got this memo
5  to upgrade?
6      A.     Made efforts before and after.
7      Q.     Okay. Help me out with what those efforts
8  were. Just getting Jeff and you involved?
9      A.     Yeah. Basically I went down, did a couple
10 myself of them over the years, reviewed the ones that they
11 did, gave them feedback on the performance review, basically
12 explained to them that this was a development area that he
13 had to do, and tried to coach him in how to do it. He was
14 struggling with it, though, I would say that.
15             And, you know, also on a semiannual review,
16 documented that was the area he had to concentrate the most
17 on.
18     Q.     Page 2 of Exhibit 2 is kind of a separate
19 memo. But as I understand, it was attached to the first
20 page, "Development/performance Priorities" that Mr. Szerlong
21 gave you.
22             Again, were those five items consistent with
23 what he told you in your face-to-face meeting in early May?
24     A.     The first three.

86

1      Q.     He covered each of the first three in your
2  face-to-face on May 2nd --
3      A.     Yes.
4      Q.     Not 4 and 5, is that your testimony?
5      A.     I can't recall.
6      Q.     But, again, you got a copy of this, correct?
7      A.     Yes. Yes, I did.
8      Q.     Okay. Do you remember following up with Mr.
9  Szerlong, other than what you've already said about asking
10 him about clarification with the Louisville and Columbus
11 issues after you got Exhibit 2?
12     A.     Yeah. I usually -- I can't recall if I did it
13 after this memo, but I usually would call him after I got
14 these two memos. Pretty sure I called him and asked for
15 clarification.
16     Q.     Do you recall anything specific about those
17 discussions?
18     A.     No. It was a lot more of, you know, this type
19 of communication, just verbally.
20     Q.     Paragraph 3 in Exhibit 2 references a brief
21 memo further discussing regional roles and I think that's
22 Exhibit 3?
23     A.     Exhibit 3.
24     Q.     Would you take a look at that?

87

1      A.     Sure.
2      Q.     Tell me if you got that around this same time.
3      A.     Yes, I did.
4      Q.     Did you have any discussion with Mr. Szerlong
5  about what his view was of the regional role?
6      A.     Yes. Yes, several.
7      Q.     Do you recall anything specific about those
8  follow-up discussions?
9      A.     No.
10     Q.     Do you recall anything, in general, about --
11 just generally talked about the same topics that are on this
12 memo?
13     A.     I would think, yeah.
14             (A recess was taken from 11:27 to 11:39.)
15     Q.     In May 2001, was there a national meeting of
16 some kind in Bermuda?
17     A.     Yeah, captivated meeting.
18     Q.     MVI meeting?
19     A.     Yes.
20     Q.     Where was it?
21     A.     Jamaica.
22     Q.     One of those islands. You attended that?
23     A.     Yes.
24     Q.     Was there some incident on the beach with you

88

1  getting in a shouting match with your wife?
2          MR. FREKING: Objection.
3      A.     Tim did mention that to me. The only thing I
4  can think of is I threw my money clip to her to catch in the
5  ocean. She dropped it, it fell in the ocean. We were
6  scrambling around to get it. As far as a shouting match --
7      Q.     Did you yell at her over that?
8          MR. FREKING: Objection to relevance again.
9  We'll object to this entire line of questioning.
10     Q.     You can go ahead and answer.
11         MR. FREKING: You can go ahead and answer.
12     A.     There was -- what was that?
13         MR. CROALL: You can answer. He's making his
14 objection for the record. There's no judge here to
15 rule on the objection.
16     A.     Sure, I'll answer. I told my wife, Tim called
17 and said there was a shouting match in the ocean. She said,
18 what? She said, it's kind of funny. I was blaming her for
19 it, it was obviously my fault.
20     Q.     My question to you --
21     A.     No.
22     Q.     -- was, did you shout at her?
23     A.     No.
24     Q.     So if there are other people that said you

**PAGE 22 (85-88)**

89

1  shouted, they're just wrong?

2      A.    Well, shouting is a relative term. What does
3  shout mean?

4      Q.    Do you feel like you raised your voice --

5      A.    No.

6      Q.    -- over this incident?

7      A.    No, I don't think so. Possible but, you know,
8  what is a decimal? I mean --

9      Q.    Was it the end of -- was it after the meeting
10 was over you stayed for an extra day?

11     A.    No, I don't recall. No, it was in the middle,
12 because that night we were joking about it in the meeting
13 with our local agents. We were saying, who do you think is
14 wrong in this situation. I threw her the money clip, she
15 dropped it, and they all voted. I lost. So it was kind of
16 just a funny thing.

17     Q.    What agents were there?

18     A.    We had CAI. We had SKS. We had Palmer Kay.
19 We had Hylant. We had, oh, God, who else? Those are the
20 ones I recall.

21     Q.    Before the incident with the money clip getting
22 tossed into the ocean, had you been drinking alcohol?

23     A.    Oh, I'm sure we were. I can't recall if I was.
24 Probably not -- because I was out -- we were out in the

90

1  water quite a bit so --

2      Q.    Do you recall what time of day that happened?

3      A.    It was in the middle of the day.

4      Q.    Do you recall if you had been drinking before
5  that or not?

6      A.    No, I don't. I know I was in the water for
7  quite some time before that. I was in the water maybe an
8  hour, discovered the money clip was in my pocket. That's
9  when I came to the beach and threw it to her.

10     Q.    Did you lose any credit cards or cash --

11     A.    Yeah.

12     Q.    -- or anything because of that?

13     A.    Yeah, we did. No cash, just one or two credit
14 cards.

15     Q.    Had to get them replaced?

16     A.    Yeah.

17     Q.    Did they wash up and get returned to you later?

18     A.    I don't remember if I lost it. Maybe I lost my
19 health card or something.

20           We found most everything else, all of the
21 money, most of the credit cards.

22     Q.    I think you testified just a minute ago at some
23 point Mr. Szerlong asked you about that?

24     A.    Yes.

91

1      Q.    What did he ask you about it?

2      A.    I can't recall. It was sometime afterwards.

3      Q.    Was it face to face or over the phone?

4      A.    Over the phone.

5      Q.    Tell me what he asked you about.

6      A.    He said, did you have a shouting incident on
7  the beach? Did you and your wife have a fight on the beach?
8  I said, absolutely not.

9      Q.    Was that the entire conversation between you
10 and Mr. Szerlong or did you tell him the story?

11     A.    No, that was pretty much the entire
12 conversation. Then I went home. I might have said, we
13 had, you know -- there was something we were talking about
14 but I don't recall exactly what I said to him. I went home,
15 talked to my wife about it. She was incensed.

16     Q.    Why?

17     A.    She said, what's going on? I said, maybe it
18 was that incident with the money clip. She said that was
19 nothing, that was just a fun thing. We were just kidding
20 around.

21     Q.    Can you put in any kind of time frame when Mr.
22 Szerlong asked you about that?

23     A.    No, couldn't do that.

24     Q.    Sometime after the meeting obviously?

92

1      A.    Yeah.

2      Q.    Other than what we've already covered, I don't
3  want to replow old ground, did you do anything else after
4  you got the May follow-up memos that we just looked at,
5  Exhibits 2 and 3, to address the issues that were raised in
6  those memos in the meeting with Mr. Szerlong?

7      A.    Sure.

8      Q.    What did you do?

9      A.    You know, continued to focus on the sales
10 efforts in Columbus and Louisville, since his concern --
11 continued to have discussions with my regional manager on
12 their activities.

13           I put together a documented plan on changing
14 the focus of the production offices and followed up with
15 Jeff on what he needed to do there.

16     Q.    Did you feel like Jeff Barton's follow-through
17 on the items that you charged him with was appropriate and
18 acceptable?

19     A.    Yeah. Yeah. He was, you know, much more
20 involved in Cleveland and Indianapolis and he had spent
21 additional time down there with Andy Bryant to work on the
22 agency plans.

23           And certainly Barton's role as marketing
24 manager directly reflected on the sales growth and new

**PAGE 23 (89-92)**

93

1  business growth which was outstanding.
2      Q.    What contact did you have with Mr. Szerlong
3  between the conversations you already testified about when
4  you called him about these memos and his meeting with you
5  when you were terminated?
6      A.    I don't recall any specific conversations.
7      Q.    Any face-to-face meetings between the May 2nd
8  meeting and the late August meeting?
9      A.    Not that I recall.
10     Q.    Just phone contact periodically?
11     A.    Yeah. Basically we talked a couple times. He
12  set up the August meeting, so he called prior to the August
13  meeting.
14     Q.    How long before?
15     A.    Anywhere from two weeks to a month. I couldn't
16  tell you for sure.
17     Q.    He scheduled that, I think it's August 24th?
18     A.    That is correct.
19     Q.    He came to Cincinnati?
20     A.    Yes.
21     Q.    Met with you in the Cincinnati office?  Yes?
22     A.    Yes.
23     Q.    Tell me what happened at that meeting.
24     A.    At the meeting in the Cincinnati office?

94

1      Q.    Yes.
2      A.    Or the meeting for the day?
3      Q.    Well, tell me for the day.
4      A.    We met with a couple agents for breakfast.
5  Then we met with a couple other agents for lunch. And then
6  he went to some of the various departments.
7            And then about maybe 2:30 -- well, I don't know
8  when it was, maybe 1:30, 2:00, came into the office and
9  said, your financials are great, you're one of the best guys
10  we have with agents and customers, but I need to make a
11  change.
12     Q.    What else did he say or what did you say?
13     A.    He said, I'm looking for better leadership. I
14  said, how is it possible that I'm not being an outstanding
15  leader given the financials that we have, given the fact
16  that all my goals and the balance scorecard are being
17  carried out superiorly, and feedback I've always gotten
18  from my folks have been 360, feedback has always been high,
19  and it's inconsistent with my evaluations over the last 26
20  years and my performance.
21     Q.    What did he say?
22     A.    Well, it's just my opinion.
23     Q.    Okay.
24     A.    I said, I guess I'm not going to talk you out

95

1  of this then. He said, no. Get a cab for him.
2      Q.    How long was the meeting?
3      A.    I would say it was about 20 minutes. Oh, I do
4  recall some other things he said.
5      Q.    What?
6      A.    He said, I am recommending the most aggressive
7  package for you because you deserve it, which he said, I
8  know that doesn't seem like a big thing right now in view of
9  being terminated.
10     Q.    You understood him to be talking about a
11  severance package?
12     A.    Right.
13     Q.    Anything else you remember about the
14  conversation with Mr. Szerlong in August?
15     A.    Not that I recall at this time.
16     Q.    Okay. He was professional and businesslike?
17     A.    Yes. Yes, he was.
18     Q.    And you were professional and businesslike as
19  well?
20     A.    Yes. We shook hands afterwards.
21     Q.    How long were you in the office after you
22  finished talking to Mr. Szerlong?
23     A.    I don't know, maybe half hour, hour.
24     Q.    You talked to a couple of your direct reports?

96

1      A.    Yes. I talked to --
2      Q.    Jeff Barton? Jim Lash?
3      A.    No. I talked to Diane Haggard and Becky
4  Emerson and Tim Dadik, I believe. Those would be the three.
5      Q.    What did you tell them?
6      A.    I had been terminated.
7      Q.    Did you give any explanation?
8      A.    Yeah. I gave the same explanation Tim said. I
9  discussed it a little with Diane Haggard. I said, he's -- I
10  said, I guess you know. I figured she knew. I guess you
11  know I've been terminated. She goes, no, I didn't know.
12  Tim said he was going to have a serious talk with you but I
13  didn't know that. Man, he said I wasn't performing well on
14  leadership. Is that true? She said no.
15     Q.    Where was this conversation with Miss Haggard?
16     A.    In her office.
17     Q.    How long did you talk to her?
18     A.    Not long. Couple minutes. Then with --
19     Q.    Anything else you remember about the
20  conversation with Miss Haggard?
21     A.    No, not that I recall right now.
22     Q.    Did you believe her when she said she didn't
23  know?
24            MR. FREKING: At that time?

97

1   A.    At that time, I don't think so, no. No I
2 probably didn't.
3   Q.    You say you talked to Ms. Emerson?
4   A.    Becky.
5   Q.    She was your administrative assistant?
6   A.    Right.
7   Q.    Where did you talk to her?
8   A.    Right in front of her desk there.
9   Q.    Told her you'd been terminated?
10  A.    Right.
11  Q.    Did you give any explanation to her?
12  A.    Just -- I can't recall if I had any explanation
13 for her.
14  Q.    What did she say?
15  A.    She said, what's going on with this company?
16  Q.    What did you say, if anything?
17  A.    I said, I don't know.
18  Q.    Just a couple-minute conversation with her?
19  A.    Yes.
20  Q.    Then you said Mr. Dadik?
21  A.    Dadik.
22  Q.    Where did you talk to him?
23  A.    I think he had come down to see me. I was
24 getting ready to leave. I think -- it was either somewhere

98

1 between my office and the elevator, could have been in my
2 office, could have been the elevator, I can't recall.
3   Q.    What was the conversation with him?
4   A.    Just said, I've been terminated.
5   Q.    Any reaction from him?
6   A.    No. Just -- no real reaction, just -- that I
7 recall. Just a look of surprise.
8   Q.    Did you talk to anybody else before you left
9 the office?
10  A.    I don't think so but I might have.
11  Q.    How did you get home?
12  A.    Met with my wife.
13  Q.    She came down to pick you up? Yeah?
14  A.    Yeah, and son, and they must have drove me home
15 or I drove them home.
16  Q.    Did you call your wife before you left the
17 office?
18  A.    Yes.
19  Q.    Told her what had happened?
20  A.    Yeah.
21  Q.    Did that from your office?
22  A.    Yes.
23  Q.    Where did you meet her and your son?
24  A.    At a place called Ogden's.

99

1   Q.    Where is that?
2   A.    That's around the corner from the office.
3   Q.    Then you went home?
4   A.    Probably went to dinner with my son and wife.
5 I couldn't tell you where. Didn't eat there. I'll tell you
6 that.
7   Q.    After dinner you went home?
8   A.    I can't recall.
9   Q.    Did you talk to anybody else that day, that
10 night?
11  A.    Yes. I talked to -- yeah, I must have went
12 home because I went home about 7:00 and talked to -- or
13 sometime that night, talked to, on the advice of Diane, she
14 said, you better call Jeff and Jim and Dieter because
15 they're going to be very upset at this. So I called all
16 three of them.
17  Q.    Called them at home or at the office?
18  A.    Called them at home. At home.
19  Q.    Tell me what you remember about those
20 conversations with those guys.
21  A.    I explained to them, you know, what had
22 happened. You want the details?
23  Q.    If you remember them.
24  A.    Okay. On Dieter, I let him know. And I said,

100

1 Dieter, I just want you to know I don't think this had
2 anything to do with you. He just had an audit that wasn't
3 very good. I want you to know I don't think it had anything
4 to do with that. This is just one of those things, you
5 know.
6        Dieter's comment back was, that's not right,
7 it's just not right. I don't know if this is the type of
8 company I want to work for. I said, Dieter, you have got a
9 great career at Chubb here. Chubb is a great company, you
10 know, hang in there.
11       Then I had a similar conversation with Jeff
12 Barton and a similar conversation with Jim Lash.
13  Q.    Tell me, with either Lash or Barton, there
14 wasn't this issue about an audit, right?
15  A.    No.
16  Q.    This was specific to Dieter?
17  A.    That's right.
18  Q.    With the other guys it was just, my employment
19 has been terminated. Did they express surprise?
20  A.    Oh, yes. Yes.
21  Q.    Did they express any negative feelings about
22 the company?
23  A.    Yeah. Yes, they did.
24  Q.    Both? Both?

**PAGE 25 (97-100)**

101

1    A.    I told them, you know, you can't go by one
2    isolated incident on the aggregate. The company is a great
3    company and you've got a great future there.
4    Q.    Words to that effect to both Barton and Lash?
5    A.    Right. Right.
6    Q.    Did you talk to anybody else that night,
7    anybody else from Chubb?
8    A.    No, not that I recall.
9    Q.    Anybody else at all? Did you talk to either
10   one of your other sons?
11   A.    Oh, yeah, I talked to all my sons.
12   Q.    Just to let them know that it happened?
13   A.    Right.
14   Q.    They were supportive, sympathetic?
15   A.    Yeah. Let them know that financially we
16   wouldn't be bankrupt but would be able to still pay for
17   their college.
18   Q.    Two of them in college at that point or all
19   three?
20   A.    Just one.
21   Q.    Just the one who is still local?
22   A.    Uh-huh.
23   Q.    Yes?
24   A.    Yes.

102

1    Q.    Anything else you recall about that afternoon,
2    evening?
3    A.    No. I mean, I discussed it with some agent
4    friends of mine from Schiff Kreidler-Shell.
5    Q.    That day?
6    A.    Yeah, that day.
7    Q.    Did you play golf that night?
8    A.    No, I don't think so. No.
9    Q.    There wasn't an event at Ivy Hills?
10   A.    No.
11   Q.    Had you talked to the Schiff Kreidler-Shell
12   people?
13   A.    I talked to them at Ogden's down there where I
14   met my wife.
15   Q.    Before you went home you talked to them?
16   A.    Right.
17   Q.    Who was it?
18   A.    Tom Melnick.
19   Q.    What do you remember about the discussion with
20   him?
21   A.    I don't remember much. Just they were shocked.
22   Just, you know, had the best profit in the zone and second
23   best growth and it didn't seem to matter.
24   Q.    That's what you told them?

103

1    A.    Yeah.
2    Q.    In between the meeting in May with Mr. Szerlong
3    but before the termination meeting, had you done anything to
4    try to find out what the issue, if any, was with Tom
5    Motamed?
6    A.    No. I was advised by Tim not to do that.
7    Q.    Well, as I understood your testimony, it was he
8    advised you not to call Tom. But my question is broader
9    than that.
10        Did you call anybody who you perceived to be a
11   supporter in higher level management at Chubb to try to feel
12   out if there was some issue they knew about with Mr.
13   Motamed?
14   A.    No.
15   Q.    Was Terry Cavanaugh still working for Chubb at
16   that point?
17   A.    Yes.
18   Q.    Did you talk to Terry Cavanaugh during any of
19   this process, since the February 2001 meeting with Mr.
20   Szerlong up until your termination?
21   A.    No, not that I recall.
22   Q.    What position was he in after Mr. Szerlong
23   became northern zone manager?
24   A.    Marketing manager of the -- global marketing

104

1    manager.
2    Q.    Is that purely an international position or
3    does it --
4    A.    No, totally global.
5    Q.    So it includes U.S. responsibilities as well?
6    A.    Correct.
7    Q.    Once he was in that position, did you really
8    have any contact with him?
9    A.    Oh, yes.
10   Q.    What context?
11   A.    Ask a question here or there, see him at
12   meetings. He had a field ops manager that really took care
13   of the field.
14   Q.    In your position as the Cincinnati regional
15   manager, how much contact would you have with Mr. Motamed?
16   A.    Basically just his visits every other year and
17   occasional discussion with him.
18   Q.    So while you were Cincinnati regional manager
19   did he make two branch visits?
20   A.    Yes.
21   Q.    Tell me about that, whatever you remember about
22   them.
23   A.    The first one he came in and, you know,
24   interviewed with the staff and gave a presentation to the

105

1  group.  Then him and I went out to dinner.
2      Q.    Do you recall anything about your discussion
3  with him?
4      A.    The only thing I can recall -- you know, we
5  discussed a wide myriad of things over the night, but as my
6  custom, I always ask, anything you think I can be doing
7  better or should be doing differently.
8      Q.    What did he say?
9      A.    No, keep doing what you're doing, you got it on
10  track.
11      Q.    His first visit had you been --
12      A.    Wasn't that long.
13      Q.    -- Cincinnati manager for a year yet?
14      A.    No.
15      Q.    Less than a year?
16      A.    Yes, less than a year.  Much less than a year.
17      Q.    '98?
18      A.    Yeah.
19      Q.    Then did he make another visit in 2000?
20      A.    Yeah, that would be about right.
21      Q.    Do you remember anything about the 2000 visit?
22      A.    Yeah.  The only thing I remember about that is
23  we went to dinner with a client and an agent.
24      Q.    Who was that?

106

1      A.    Went with folks from Schiff Kreidler-Shell and
2  with a customer from Monarch Construction, outstanding
3  meeting.  And Tom referred to it in subsequent presentations
4  he gave to the zone.
5      Q.    Referring to it in a positive way?
6      A.    Yes.
7      Q.    Did you ever hear Mr. Motamed say anything
8  negative about you?
9      A.    Never.
10      Q.    Other than the conversations you've already
11  testified about with Mr. Szerlong, did you ever hear
12  secondhand from anybody that Mr. Motamed had said anything
13  negative about you?
14      A.    Never.
15      Q.    Did you ever hear Mr. Szerlong say anything
16  negative about your age?
17      A.    No.
18      Q.    Did you ever see any document that had anything
19  negative or derogatory about your age?
20      A.    No.
21      Q.    Did you ever see any document at Chubb that had
22  anything negative or derogatory about any employee's age or
23  ages in general?
24      A.    No.

107

1      Q.    Did you ever hear anybody in upper level
2  management at Chubb, which I would define as anybody above
3  you, say anything negative, either hear it yourself or hear
4  secondhand, that somebody at that level in the company had
5  said anything negative about any employee's age or
6  employees' ages in general?
7      A.    Not that I recall.
8      Q.    Do you think your separation had something to
9  do with your age?
10      A.    Yes.
11      MR. FREKING:  Objection.
12      MR. CROALL:  I assume you're going to let him
13  answer anyway.
14      MR. FREKING:  Uh-huh.
15      Q.    Why do you think that?
16      A.    I'm not a lawyer.
17      Q.    I understand.
18      A.    Having the best profit and second best growth
19  in the zone and being one of the oldest managers, having
20  performance better than the other managers, and being
21  replaced by a younger person, you know, leads me to believe.
22      Q.    When you're talking about having the best
23  profitability and growth, you're talking about 2001?
24      A.    Correct.

108

1      Q.    Up until the time of your separation?
2      A.    Right.
3      Q.    I assume those numbers were circulated monthly
4  or was it monthly or quarterly or --
5      A.    Monthly.
6      Q.    Everybody got everybody's numbers?
7      A.    Yes.
8      Q.    You could see premiums and profitability and --
9      A.    Right.
10      Q.    -- all that stuff?
11      A.    Tim would share it with us.
12      Q.    You could see it for your own office and each
13  branch within your office, your region and everybody else's
14  regions.  Would it be broken down office by office for other
15  regions or just --
16      A.    No.  No.  Just really the zone.  I wouldn't
17  really see anybody else's.  You could look at it if you
18  wanted to.
19      I knew what the corporate numbers were.  But,
20  basically, the only thing that was given to me was the
21  zones' numbers.
22      Q.    Would it be broken down by region within the
23  zone?
24      A.    Sure.

**PAGE 27 (105-108)**

109

1    Q.    So that's how you knew you were, in your view,
2  the best in terms of profitability within the zone?
3    A.    Yeah.  Well, from a region, not a branch
4  standpoint.
5    Q.    Any other reason you think your age had
6  something to do with your separation?
7         MR. FREKING:  Objection to the extent it calls
8  for some kind of legal analysis.
9         MR. CROALL:  I'm not asking for that.
10   Q.    I'm asking why you think.
11   A.    At this time I can't recall, just the fact that
12 I was either the oldest or one of the oldest and my
13 performance, you know, as Tim admitted to me, you're
14 financials are outstanding.
15   Q.    As I understand your lawsuit, one of the claims
16 is your separation had something to do with keeping you from
17 vesting in further benefits.  Is that consistent with your
18 understanding?  I understand you're not a lawyer.
19   A.    I don't remember the exact wording.
20   Q.    Well, let me ask you this.  In connection with
21 any of your discussions relating to your performance or your
22 separation, did Mr. Szerlong ever say anything about him or
23 the company not wanting you to vest in further benefits?
24   A.    No.

110

1    Q.    Did you ever see any document that said
2  anything about the company or any individual in upper level
3  management wanting to keep you from vesting in further
4  benefits?
5    A.    No.
6    Q.    Do you think that your separation had anything
7  to do with that, with keeping you from vesting in further
8  benefits?
9         MR. FREKING:  Objection.
10   A.    I couldn't read their mind.  I wouldn't know.
11   Q.    After your separation, as I understand it, you
12 already had a vacation scheduled?
13   A.    Yes.
14   Q.    Like the next week?
15   A.    The next day.
16   Q.    You left for Scotland, Europe, somewhere?
17   A.    Scotland.
18   Q.    How long were you there?
19   A.    A week.
20   Q.    You and your wife?
21   A.    No, just myself.
22   Q.    Just you.  Golf trip?
23   A.    Golf trip and kind of to spread my father's
24 ashes in his homeland.

111

1    Q.    Anybody else travel with you or just literally
2  go by yourself?
3    A.    It was with a group of I think seven.  Eight,
4  eight in the group.
5    Q.    Eight guys?
6    A.    Uh-huh.
7    Q.    Friends?
8    A.    Some people I just met.
9    Q.    Some of them you knew better than others?
10   A.    Some I didn't know at all.
11   Q.    Was it a group from Ivy Hills?
12   A.    Yes.
13   Q.    All members at Ivy Hills?
14   A.    No.
15   Q.    Some friends of members?
16   A.    Right.
17   Q.    You took the trip?  Yes?
18   A.    Yeah.
19   Q.    Golfed every day?
20   A.    Yes.
21   Q.    Play a different course every day?
22   A.    Yes.
23   Q.    Some package put together by a travel agent?
24   A.    Correct.

112

1    Q.    Any contact with home during that week?  Did
2  you call home every day, every couple days?
3    A.    Yes.
4    Q.    Any discussion with your wife about the
5  separation --
6    A.    Yes.
7    Q.    -- from Chubb?  Tell me about those
8  discussions.
9    A.    She would just ask me how I was doing, I would
10 ask her how she's doing.
11   Q.    How were you both doing?
12   A.    Not real well.
13   Q.    Any contact with anybody from Chubb during that
14 time?  Did you call anybody, anybody call you?
15   A.    Not that I recall.
16   Q.    Do you know whether your wife had any contact
17 with anybody from Chubb while you were gone?
18   A.    She probably did but I don't know.  I think she
19 probably did, yeah.
20   Q.    Before you left, other than what you've already
21 testified about, did you have any other discussions with
22 anybody from Chubb?
23   A.    Not that I recall.
24   Q.    How about after you got back?

**PAGE 28 (109-112)**

113

1    A.    Oh, yeah.
2    Q.    Who did you talk to?
3    A.    I talked to pretty much everybody that I knew
4 at Chubb.
5    Q.    You called them, they called you, some of both?
6    A.    Some of both.
7    Q.    I don't expect you to remember details about
8 every conversation but, I mean, was there a general pattern
9 to the conversation?
10    A.    Yeah. Everybody just said, what happened.
11    Q.    What would you tell people?
12    A.    Just what Tim told me, I had the best
13 financials in the zone, one of the best people with agents
14 and customers, Tim was looking for a change.
15    Q.    Anything else?
16    A.    Probably.
17    Q.    Anything else you remember?
18    A.    No. I mean, I had so many discussions with so
19 many people.
20    Q.    Did you talk to Mr. Cavanaugh?
21    A.    Yes.
22    Q.    He called you or you called him?
23    A.    He called me.
24    Q.    Do you recall anything about that discussion

114

1 specifically?
2    A.    None other than what we talked about.
3    Q.    How about anybody else from the home office?
4    A.    Talked to Jimmy Dederic, talked to Vic
5 Sordillo, talked to Sam Lee.
6    Q.    They all called you or you called them?
7    A.    Most of them called me.
8    Q.    Do you recall any specifics from those
9 discussions?
10    A.    No. Same stuff. You know, they couldn't
11 believe it.
12    Q.    You said when Mr. Szerlong met with you in
13 August that he talked about a separation package. Did you
14 talk with him any further about that?
15    A.    No. I think that was the last discussion I had
16 with Tim.
17    Q.    What's the next you heard from Chubb about your
18 separation package?
19    A.    I talked to Pat Hurley.
20    Q.    She's a human resource person in the home
21 office?
22    A.    They instructed me to call her.
23    Q.    Did you call her?
24    A.    I did.

115

1    Q.    When was that, the week you got back?
2    A.    Yeah. Yes, right after I got back,
3 immediately.
4    Q.    Called her from home?
5    A.    Probably. Might have called her from --
6    Q.    Outplacement?
7    A.    Yeah, might have.
8    Q.    Did you start using the outplacement services
9 right away when you got back from Scotland?
10    A.    No. I wouldn't have called from the
11 outplacement service. I called them immediately but didn't
12 start using them until after -- Chubb had invested in
13 sending me to executive education at the Wharton Business
14 School, and one week after my vacation I had to finish the
15 two weeks there. It was a good chance to network.
16         I had talked to the outplacement service. They
17 said, definitely go, it's a good place to network. You'll
18 learn something, you can clear your head about this, this
19 mess.
20    Q.    Did you talk to anybody at Chubb about whether
21 they were still willing to underwrite that continuing
22 education?
23    A.    Tim just said, go ahead and go to that.
24    Q.    You talked about that in the separation

116

1 meeting?
2    A.    In the separation meeting.
3    Q.    Did you raise that? Did he know that was on
4 the schedule?
5    A.    I think he brought it up but I can't recall. I
6 think I brought it up. I said, well, what do you want me to
7 do with that? But I can't recall.
8    Q.    You do recall he said, go ahead and go?
9    A.    Absolutely.
10    Q.    You didn't feel a need to ask anybody else?
11    A.    Oh, no. No.
12    Q.    So your conversation with Ms. Hurley was after
13 you got back from Philadelphia?
14    A.    No. It was before, I believe.
15    Q.    Before you left?
16    A.    Before I left, yes.
17    Q.    What do you remember about your contact with
18 Ms. Hurley?
19    A.    I just talked to her. She said, well, you
20 know, you get -- you get your options and you get your
21 severance and we'll -- I'm sure we'll give you the
22 restricted stock.
23         I said, well, Tim told me that I was going to
24 get -- that I deserve the most aggressive package. She

**PAGE 29 (113-116)**

117

1  said, yes. Tim told us that, too.

2           I said, well, this doesn't sound like the most

3  aggressive package. I'm really getting hurt on my pension.

4  She said, well, it's not the most aggressive package but I'm

5  sure your lawyer will have other things that they want to

6  include in the package and we're certainly willing to

7  negotiate.

8       Q.   What else did you say?

9       A.   That was it. I understood they didn't want to

10  talk to me, they wanted to talk to a lawyer, so that ended

11  the conversation.

12      Q.   How long did you talk to Ms. Hurley?

13      A.   I couldn't tell you. Maybe 20 minutes, maybe

14  10 minutes, maybe 5 minutes, maybe a half an hour, I don't

15  recall.

16      Q.   Is that the only conversation you had with her?

17      A.   No. One of the things she said -- I had other

18  conversations with her.

19      Q.   Do you remember something else she said in that

20  first conversation?

21      A.   Well, I can't remember which conversation it

22  may have been. Oh, I did ask her, I said, as far as what do

23  you call it, the confidentiality statement or signing the

24  document, I said I would need more time on that because I

118

1  got a week's vacation and I got those two weeks at Wharton,

2  so could I have two extra weeks there. Then she said, well,

3  maybe we'll give you two extra weeks on your employment. I

4  said, well, that would be nice. She said, I'll okay it with

5  him. I'm sure Tim will say it's okay. We'll extend your

6  employment to October -- whatever, two weeks after October

7  1st.

8       Q.   You had understood from the beginning October

9  1st --

10      A.   Absolutely.

11      Q.   -- was going to be your last day?

12      A.   Absolutely.

13      Q.   This conversation you're testifying about with

14  Ms. Hurley would have been after you received the document

15  from her?

16      A.   I believe it was -- may have been before, may

17  have been after, I can't recall.

18      Q.   I guess my question was, if it was before, how

19  would you know you needed extra time?

20      A.   Either somebody communicated to me verbally or

21  I may have had the document. It's possible. It's possible.

22      Q.   I assume all these contacts with Ms. Hurley are

23  by telephone?

24      A.   Yes.

119

1       Q.   Never had a face-to-face?

2       A.   No.

3       Q.   How many telephone conversations did you

4  actually have with her?

5       A.   Two or three.

6       Q.   Do you recall anything else about any of the

7  phone conversations with Ms. Hurley?

8       A.   No. I was -- had some confusion because they

9  kept sending me documents that said my separation was like

10  October 15th or 18th, whatever, and some that said October

11  1st. So I needed to find out which one it was for, I guess,

12  health benefits and unemployment benefits.

13      Q.   Was she able to straighten that out?

14      A.   Yes.

15      Q.   What was --

16      A.   It was October 1st.

17      Q.   Final termination?

18      A.   There was some confusion, I guess the signals

19  got crossed. Our folks said it was two weeks later, the

20  people in the home office sent me correspondence that said

21  it was two weeks later, but I understood it was October 1st.

22      Q.   When you say "our people," you're talking about

23  Cincinnati local people?

24      A.   Cincinnati local people, yeah. Diane.

120

1       Q.   When you testified a few moments ago that

2  during your first conversation with Ms. Hurley you said it

3  doesn't sound like the most aggressive package, what basis

4  did you have for making a judgment about how aggressive the

5  package was?

6       A.   Well, I think it was pretty much known in Chubb

7  that they do some things on the side, particularly with

8  pension.

9       Q.   How did you have any knowledge of what had been

10  done with others in terms of separation packages?

11      A.   Well, a good friend, Brian Lynch, got offered a

12  separation package.

13      Q.   Did he talk to you about the details?

14      A.   No.

15      Q.   Do you know what his package was, how it

16  compared to the one you were offered?

17      A.   Yeah. I know that he got boosted up for

18  pension or something. But details, no, I wouldn't know the

19  details.

20           It was very widely known at Chubb, it wasn't a

21  secret or anything.

22      Q.   I guess I'm trying to find out how is it widely

23  known? Who had you heard it from?

24      A.   More hearsay than anything else.

**PAGE 30 (117-120)**

121

1   Q.   Do you remember who you heard it from?
2   A.   30 different people.
3   Q.   Anybody specifically that you recall?
4   A.   No.
5   Q.   Did you have any specific familiarity with
6   anybody else's separation package other than Mr. Lynch?
7   A.   Not really, no specific.
8   Q.   Had you heard hearsay from others about
9   specific individual's separation packages? What had you
10  heard?
11  A.   Specific individuals, no.
12  Q.   Or generally, other than what you've already
13  said, is that it?
14  A.   Yeah, that's pretty much it.
15  Q.   I assume what you knew about Mr. Lynch's
16  package was based on what he told you?
17  A.   I can't recall if we discussed the detail of it
18  but, yeah, probably -- he probably told me.
19  Q.   Nobody in upper level management at Chubb
20  talked to you about Mr. Lynch's package?
21  A.   No.
22  Q.   Or nobody in human resources?
23  A.   No.
24  Q.   Whatever level the detail was, it was coming

122

1   from Mr. Lynch?
2   A.   Well, now, I mean, it was pretty much known
3   throughout the organization that they do -- they do
4   extensions to the pension.
5   Q.   Do you know of anybody specifically that got
6   some extension on their pension?
7   A.   There was a whole -- a whole rif of people in,
8   I guess it was '95, that got packages that included that.
9   Q.   Is that when there was a special voluntary
10  program that if people wanted to leave they'd get some
11  incentive to leave, including some favorable pension
12  treatment?
13  A.   Yes.
14  Q.   So that was, as you understood it, people had
15  the option of either electing to take that package or not;
16  is that correct?
17  A.   Yes, that's correct.
18  Q.   Had anything like that happened as far as you
19  know since '95?
20  A.   Friend of mine by the name of Cory Depanio
21  (phonetic) told me that they gave him a package but I didn't
22  get specifics.
23  Q.   Can you put that in any kind of time frame for
24  me?

123

1   A.   No. I think he was let go after me. Might
2   have been let go about the same time.
3   Q.   So sometime in '01?
4   A.   Yeah, I would say.
5   Q.   What position was he in?
6   A.   He was in an underwriting position in
7   Philadelphia.
8   Q.   Lower level than you?
9   A.   Yes.
10  Q.   Not a regional manager?
11  A.   No. No.
12  Q.   Want to take a lunch break?
13  MR. FREKING:  I'm not hungry, are you?
14  MR. CROALL:  I am. Let's take an hour.
15  (A lunch recess was taken from 12:20 to 1:18.)
16  Q.   Mr. Baillie, I just want to ask you a couple
17  more questions about the picture of the wrecked car that you
18  testified about this morning.
19  I think you said that you did have a
20  photograph --
21  A.   I think so.
22  MR. FREKING:  I'll object to this line of
23  questions. I think it's silly.
24  Q.   You don't remember showing it to anybody?

124

1   A.   I don't remember showing it to any individual,
2   no.
3   Q.   Do you remember telling anybody in the
4   Cincinnati office when you had that accident you had been
5   drinking?
6   MR. FREKING:  Objection. Asked and answered.
7   A.   I can't remember but -- no, I can't remember
8   that.
9   Q.   Do you remember ever telling anybody in the
10  Cincinnati office that you drank and drove regularly and you
11  didn't see it as a problem?
12  A.   No.
13  Q.   Do you remember if Diane Haggard ever
14  questioned you about whether that was the message you want
15  to be giving to subordinates in the Cincinnati office?
16  A.   No.
17  Q.   Are you telling me that didn't happen or you
18  don't remember whether it did or not?
19  A.   Just don't remember. To my recollection it
20  didn't happen.
21  Q.   Do you remember ever having any conversations
22  about drinking and driving with your subordinates in the
23  Cincinnati office?
24  A.   We would talk about it whenever we had a

**PAGE 31 (121-124)**

125

1  Christmas party, where we would talk about how we should
2  handle that, let's limit it to two tickets per person.
3        Q.    Did you tell people it was not acceptable to
4  give tickets to other people or get tickets from other
5  people?
6        A.    No.
7        Q.    Did you designate anybody as having
8  responsibility for keeping an eye on if anybody got impaired
9  to make sure they didn't drive themselves?
10       A.    We made an announcement we would pay for any
11 cabs or hotel room if they think they had too much.
12       Q.    During the time you were Cincinnati regional
13 manager?
14       A.    Right.
15       Q.    Did that ever happen? Did anybody take
16 advantage of the offer to pay for a ride or a hotel room?
17       A.    Nobody took advantage of it to my knowledge.
18 They may have with the human resource manager.
19       Q.    Once you had the conversations with Ms.
20 Hurley that you testified about before lunch, did you have
21 any further contact with anybody at Chubb about the content
22 of your severance package?
23             MR. FREKING:  You mean him individually, not
24       through his lawyer?

126

1             MR. CROALL:  Correct.
2        A.    Not that I recall.
3        Q.    That's really the question.
4        A.    Yeah.
5        Q.    From that point forward were all the
6  discussions that took place on your behalf through counsel?
7        A.    I assume.
8        Q.    You didn't have any yourself?
9        A.    With?
10       Q.    With anybody at Chubb about the severance
11 package?
12       A.    Not that I recall, no.
13       Q.    You didn't instruct anybody, other than
14 somebody from Mr. Freking's office, to contact Chubb on your
15 behalf, did you?
16       A.    Contact Chubb on my behalf.  I don't understand
17 the question.
18       Q.    Did you ask your next door neighbor or your
19 wife or your best friend from college to call Chubb and talk
20 about your severance package?
21       A.    Oh, no.
22       Q.    Did you ask anybody other than --
23       A.    No.
24       Q.    -- somebody from Mr. Freking's office to talk

127

1  to Chubb about your severance package?
2        A.    No.
3        Q.    So as far as you know, from your last
4  conversation with Ms. Hurley up until now, the only
5  discussions that occurred were between either Mr. Freking or
6  somebody else from his office and counsel at Chubb?
7        A.    To the best of my recollection.
8        Q.    Okay.  During your -- during the course of your
9  employment at Chubb, you got stock options from time to
10 time, correct?
11       A.    Correct.
12       Q.    And those stock options were pursuant to some
13 plan?  There is a formal stock openings plan at Chubb; is
14 that right?
15       A.    That's correct.
16       Q.    You were awarded stock pursuant to that plan
17 and there was a vesting schedule?
18       A.    Correct.
19       Q.    And the stock options had a price attached to
20 them?
21       A.    Correct.
22       Q.    A per share option price?
23       A.    Right.
24       Q.    That would fluctuate depending on when the

128

1  options were issued?
2        A.    Correct.
3        Q.    I think you exercised your option on some
4  shares; is that right?
5        A.    Yes, over the years.
6        Q.    You had a lot of shares that you had vested
7  stock otpions that you didn't exercise, correct?
8        A.    Correct.
9        Q.    Why didn't you exercise those options before
10 your termination date?
11       A.    Didn't occur to me, with everything that was on
12 my mind.  The stock was low.
13       Q.    Do you recall what the stock price was from
14 late August to October 1?
15       A.    No.
16       Q.    Because you had those options, did you kind of
17 routinely monitor the Chubb stock price?
18       A.    Oh, yeah.
19       Q.    Did you stop doing that after your last --
20       A.    No.
21       Q.    -- day of employment?
22       A.    No.  Still do it, daily.
23       Q.    You did it daily from August until October?
24       A.    Oh, yeah.

**PAGE 32 (125-128)**

129

1    Q.    Do you know what your vested stock options were
2  worth in that September 2001 time frame?
3    A.    I could make a guess but, no, I couldn't tell
4  you exactly.
5    Q.    I'm not asking exactly. I'm kind of -- to the
6  nearest 10 or 20 thousand dollars, do you know what they're
7  worth?
8    A.    No, I couldn't tell you that close, no.
9    Q.    How close could you come, plus or minus 50?
10   A.    Plus or minus 100.
11   Q.    What was it plus or minus 100?
12         MR. FREKING:  Same objection to the extent -- I
13   mean --
14   A.    300.
15         MR. CROAL:  Same objection as what?
16   A.    400.
17         MR. FREKING:  This is stuff that the company
18   knows.
19         THE WITNESS:  Public record.
20         MR. FREKING:  Not proper for discovery when you
21   know stuff.
22         MR. CROALL:  We disagree, Randy. That's fine.
23   Q.    Did you know that those options expired on your
24   termination?

130

1    A.    No.
2    Q.    When you were in Cincinnati did you work with
3  any kind of financial planner?
4    A.    Yes.
5    Q.    Who is that?
6    A.    Ayco, A-y-c-o. It was funded by Chubb.
7    Q.    Is there a particular individual there with
8  whom you worked?
9    A.    Brian Cuneo.
10   Q.    Did you have any discussions with Mr. Cuneo
11 after your separation from Chubb?
12   A.    Sure.
13   Q.    Am I right, your last day actually in the
14 office was August 24th?
15   A.    No. My last day was the first day back --
16 first day after Labor Day, came back to clean up my stuff,
17 say good-bye to everybody.
18   Q.    You hadn't worked in between the meeting with
19 Mr. Szerlong and that day --
20   A.    No.
21   Q.    -- that you came back to clean up your stuff?
22   A.    No.
23   Q.    You came back just to get your personal
24 belongings?

131

1    A.    And say good-bye.
2    Q.    Tell me about that visit to the office. I
3  don't think we covered that before.
4    A.    Okay. I came in, packed up my stuff.
5    Q.    Did you make arrangements beforehand with Ms.
6  Haggard or somebody to come in and do that?
7    A.    Right. Packed up my stuff. People came in,
8  wished me well, walked around the office, you know, shook
9  hands, hugged some people, some tears.
10   Q.    Any specific recollections of discussions?
11   A.    No. There wasn't much discussion.
12   Q.    Just everybody wishing you luck, you wishing
13 them good luck?
14   A.    Yeah. Wasn't much to say.
15   Q.    Any discussions with anybody about what was
16 your personal stuff, what was the company's stuff, any
17 disagreements about that?
18   A.    No.
19   Q.    You got everything you think you should have
20 gotten --
21   A.    Yeah.
22   Q.    -- in terms of your office, personal items?
23   A.    I think so, yeah.
24   Q.    Okay. You didn't take anything that was Chubb

132

1  property?
2    A.    Not that I recall. I had some stuff at home
3  that could consist of Chubb property but it was really given
4  to me, You and Your Company, a couple of sales training
5  books, things of that nature.
6    Q.    Is that the stuff that's in Mr. Freking's
7  office?
8    A.    The stuff I gave you. Yeah, all the stuff I
9  have from Chubb I gave to you.
10   Q.    Some of it you gave to Mr. Freking. I haven't
11 taken the opportunity to go there and look at it.
12   A.    Okay.
13   Q.    You gave all that kind of stuff to Mr.
14 Freking's office?
15   A.    Right.
16   Q.    Who did your performance reviews when you were
17 in Harrisburg?
18   A.    I guess Terry, Ed Dunlop, Sy Green, and John
19 Swords.
20   Q.    I take it during the time you were branch
21 manager in Harrisburg you had good reviews --
22   A.    Yeah.
23   Q.    -- from each of those supervisors?
24   A.    Correct.

**PAGE 33 (129-132)**

133

1  Q.  I think I asked you this before but I'm not
2  sure I understand. I'm just going to ask you to explain to
3  me, help me out with the difference between when you're in
4  the Cincinnati regional position, a full-service office like
5  Indianapolis or Cleveland, and the satellite offices in
6  Columbus and Louisville.
7      A.  A satellite office basically has a very low
8  infrastructure. They have to rely on processing and also a
9  lot of underwriting departments from the parent branch,
10 which would be Cincinnati in this case.
11     So it's really just set up with a couple of
12 underwriters and couple of support staff to just have a
13 presence in that territory.
14     Q.  So they don't have any of the support at that
15 location, all that gets fed back to the main branch
16 office --
17     A.  Right.
18     Q.  -- as opposed to Indianapolis would have --
19     A.  Right.
20     Q.  -- the underlying support right there?
21     A.  Right. They would have the underwriters there,
22 their loss control and claims staff there.
23     Q.  You may have said but, again, I'm not sure I
24 remember.

134

1      How big an office, in terms of employees, was
2  Indianapolis?
3      A.  About 30.
4      Q.  And Louisville would be?
5      A.  Maybe 40, I'm sorry.
6      Q.  40 in Indianapolis?
7      A.  Yeah.
8      Q.  How big would a Louisville or Columbus be?
9      A.  Louisville would be four. I'm sorry, four in
10 Columbus. Louisville would be, one, two, three, four and a
11 half, and two support.
12     Q.  When you say "a half," a person who works half
13 time?
14     A.  Exactly.
15     (Baillie Exhibit 4 was marked for
16     identification.)
17     Q.  Mr. Baillie, the court reporter has handed you
18 Exhibit 4. This was among the documents produced to us
19 through your counsel.
20     As I read it it's a 1998 performance review
21 from the 1998 to 2001 time frame. I see lots of different
22 forms that were used. So I'm not sure who did this.
23     Was this a self appraisal for you, was it done
24 by Mr. Cavanaugh or can you tell?

135

1      A.  I can't tell.
2      Q.  As I read it, this is, I guess, for the year
3  when you were in Harrisburg part of the year and Cincinnati
4  part of the year?
5      A.  That is correct.
6      Q.  You don't remember who would have been your
7  boss in that time frame?
8      A.  That would have been Terry.
9      Q.  For both jobs, when you were the Harrisburg
10 branch manager and the regional job, or just after you moved
11 into the regional job?
12     A.  I'm not sure. They kept flip-flopping
13 Harrisburg back from zone to zone. But I think -- I just
14 can't recall.
15     Q.  You don't know whether you prepared this or he
16 did?
17     A.  I can't tell.
18     Q.  Do you remember whether Chubb had in place in
19 '98 the overall rating system that we talked about before,
20 from not met to clearly exceeds, five grade system?
21     A.  Yes.
22     Q.  Do you remember what you got for 1998 in terms
23 of an --
24     A.  Exceeds some.

136

1      Q.  -- overall grade? Was exceeds some. Is that
2  what you typically had received up until --
3      A.  Yes.
4      Q.  -- the February 2001 review?
5      A.  Typically received that. We had different
6  grade systems prior to that, but all was top -- top
7  performance level.
8      Q.  The top was clearly exceeds, right?
9      A.  Yeah, but --
10     Q.  Did anybody ever get those as far as you knew?
11     A.  I've never seen anybody get it, no.
12     Q.  Never heard of anybody?
13     A.  Never heard of anybody getting it.
14     Q.  Did you ever evaluate anybody as clearly
15 exceeds when you were doing the evaluating?
16     A.  No.
17     Q.  Before the February 2001 evaluation from Mr.
18 Szerlong, had you ever gotten anything less than an exceeds
19 some?
20     A.  I don't believe so.
21     (Baillie Exhibit 5 was marked for
22     identification.)
23     Q.  Mr. Baillie, can you tell me what Exhibit 5
24 is?

137

1    A.    Yes.

2    Q.    What is it?

3    A.    Future priorities of the Cincinnati branch as
4  determined by the marketing -- I mean, as by the management
5  team of Cincinnati.

6    Q.    This is shortly after you got to Cincinnati?

7    A.    Correct.

8    Q.    And how did you put this together, did you have
9  a branch meeting or something?

10    A.    Yeah, branch meeting.

11    Q.    On the second page, where you say, "Throughout
12  the fourth quarter of 1998 and 1999 you have identified
13  these areas that we will need to execute to continue to be
14  successful" --

15    A.    Correct.

16    Q.    -- what did you mean when you said, "Build
17  bench strength and infrastructure"

18    A.    We didn't have a good infrastructure in such
19  things as technology business. We had a very poor
20  infrastructure in the customer service department. Just
21  didn't have the resources to get the work out the door.

22          And we were -- we were missing employees in a
23  couple of the departments.

24    Q.    So the "building bench strength" was filling

138

1  vacant positions?

2    A.    Filling vacant positions, right, and changing
3  the infrastructure.

4          You know, we put in a technology department
5  because the Ohio Valley region didn't have any at the time,
6  so we had to build that.

7    Q.    There's some looks like handwritten notes on
8  this. Are those yours, can you tell? It's a bad copy.

9    A.    I can't tell.

10    Q.    But it's the best I can do with what I got from
11  your counsel. You don't know whose notes those are?

12    A.    Looks like they might be mine. I think what it
13  might be, but I can't be sure, is it's just making notes on
14  how we did.

15    Q.    How do you think you did on those bullet points
16  on the second page of Exhibit 5?

17    A.    Outstanding.

18    Q.    What did you mean in that eighth bullet point
19  where you said, "Clarify roles and expectation (particularly
20  for regional managers)"?

21    A.    What we did is, we had a regional manager
22  meeting in the fourth quarter. I used to hold regional
23  meetings every year. Tim used to say, you're the only one
24  that runs it like a region.

139

1          And in that meeting, particularly the first
2  one, I had Terry Cavanaugh there and we established, you
3  know, what the expectations were of the regional managers
4  and of everything in the region, senior management in the
5  region.

6          So as a team we clarified the roles and
7  expectations. There was a lot of confusion because
8  regionalization was new to people.

9    Q.    How long had the Cincinnati region existed
10  before you got there?

11    A.    I'd say about a year but I can't recall. I
12  mean, I don't really know.

13    Q.    Had Harrisburg been in the --

14    A.    Yes.

15    Q.    -- Philadelphia region?

16    A.    Yes.

17    Q.    I think you said you reported to some regional
18  manager in Philadelphia?

19    A.    That's correct.

20    Q.    Had that been for just about a year?

21    A.    Yes. Might have been two.

22    Q.    What did you mean by, "Put teeth into agency
23  plans," a couple bullet points down?

24    A.    There really was no goals. That was someone

140

1  else's suggestion.

2          I think the thing was to follow up on the plans
3  and make sure that we were holding agents accountable for
4  what goals we had set for them.

5          There really was no agency plans at the time.
6  The agency plans were basically, if you do this you get this
7  much money, as opposed to objectives and things of that
8  nature where you'd hold the agents accountable and have
9  meetings with the agents to grill the book.

10    Q.    Had you had agency plans in Harrisburg?

11    A.    Yes.

12    Q.    Were the agency plans that you had in place in
13  Harrisburg better than the ones you saw when you got to
14  Cincinnati?

15    A.    There basically was no agency plans in
16  Cincinnati, Columbus or Louisville.

17    Q.    Did they have them in place in Cleveland and
18  Indianapolis?

19    A.    Not in Cleveland and I can't recall
20  Indianapolis. May have, may not have.

21          But that was certainly a goal and wanted to get
22  it throughout the region.

23          (Baillie Exhibit 6 was marked for

24          identification.)

**PAGE 35 (137-140)**

141

1    Q.    Can you tell me what Exhibit 6 is, Mr.
2  Baillie?
3    A.    Yes.  It's a slide show that Tom Motamed put --
4    Q.    This is on his first visit to Cincinnati?
5    A.    Correct.
6    Q.    After you became regional manager?
7    A.    Correct.
8    Q.    You're just passing on what copies of the
9  bullet points that he had covered?
10   A.    Correct.
11   Q.    Do you remember anything in particular about
12 what people were asking about Mr. Motamed's --
13   A.    No.
14   Q.    -- presentation?
15   A.    Everybody just wanted, you know, a copy of it.
16   Q.    Anything else you remember about Mr. Motamed's
17 visit, seeing Exhibit 6?
18   A.    No.  I mean it was just a good -- a good look
19 at what we needed to do as a company.
20   Q.    Was his presentation to just managers or the
21 whole office?
22   A.    I think it was the whole office.
23              (Baillie Exhibit 7 was marked for
24              identification.)

142

1    Q.    Mr. Baillie, can you tell me what Exhibit 7
2  is?
3    A.    Yes.  It's a recap of the regional managers
4  meeting.
5    Q.    Is this the fourth quarter '98 meeting that you
6  talked about before?
7    A.    Yes.
8    Q.    Would you hold those meetings in Cincinnati?
9    A.    Yes.
10   Q.    You say under the DFI paragraph, the key to
11 continued growth in the region is development of new
12 products.  In that vein Dana and Andrew Emery are working on
13 new products.  Are those people that were based here and
14 reported to you?
15   A.    Yes.
16   Q.    What was their job?
17   A.    Dana was, at the time, in charge of the
18 department financial institutions, the regional manager.
19 Andrew was an underwriter.
20   Q.    Under "PMM - Loss ratio results are currently
21 poor."
22   A.    Correct.
23   Q.    Do you remember why they were particularly --
24 why they were poor or how bad they were?

143

1    A.    Took some big losses, big fire losses.
2    Q.    On the second page in the "Human Resources"
3  section, your memo says, "The feeling was that HR needs to
4  be more strategic in training, hiring, development,
5  retention and employee morale."
6              Do you remember what that was about, what your
7  thinking was at that time?
8    A.    Yes.  There really was no developmental plans
9  with our staff.  Like I said, less than 25 or 30 percent of
10 the staff even had performance plans.
11             HR was not strategic in how they were going on
12 -- what kind of training they needed in going forward.  It
13 was kind of sit and wait for somebody to ask them.
14             They needed to go out and proactively determine
15 what the exact training needs of the branches were.
16             Also, on hiring, there was not really a
17 strategic hiring plan in place and how we were going to
18 execute and the development of employees.  It was more of a
19 place to go if you had complaints.
20             That was making the department, you know, more
21 strategic.
22   Q.    Did you work with -- was Diane Haggard the HR
23 person the whole time you were in Cincinnati?
24   A.    No.  There was a lady named Cheryl and she left

144

1  in February to get married.  Her husband was in Atlanta.
2    Q.    February of?
3    A.    '99, I believe.
4    Q.    Then did Ms. Haggard take over that role?
5    A.    Correct.
6    Q.    How did you think she did in the HR function?
7    A.    Very good.  Very good.  She brought that
8  strategic focus to it.
9              Performance appraisals were almost 95 to 100
10 percent being completed and on time.  Our hiring, we had
11 strategic hiring goals and plans on how we were going to
12 accomplish it and did accomplish it.  And our retention was
13 among the best in the company, some of the lowest turnover
14 in the company.
15   Q.    Was it part of HR's function to make sure the
16 performance appraisals got done to ride herd on the managers
17 to make sure they did them?
18   A.    Yes.  But also mine.
19   Q.    At some point did you and Ms. Haggard have some
20 disagreement about her going to some part-time schedule?
21   A.    Yes.  She was working four days and she wanted
22 to work three days.
23   Q.    Was that after she had another child or --
24   A.    I believe so, yes.  The difficulty was both me

**PAGE 36 (141-144)**

145

1  and the zone HR manager recognized that she could not do the
2  regional job in three days.  It was just -- just didn't have
3  the manpower to do it.
4      Q.    She had been working four 10-hour days?
5      A.    Yes.
6      Q.    Originally she wanted to make it three.  Was it
7  three 10-hour days?
8      A.    Three 10-hour days.
9      Q.    You talked to the zone HR, Mr. -- is that Mr.
10 Hegtol?
11     A.    That's correct.
12     Q.    Is it your testimony you and he agreed she
13 couldn't do the regional job --
14     A.    In three days, correct.
15     Q.    So what was your solution to that?
16     A.    The solution that Jim Hegtol came up with, she
17 do three days but no longer does the regional job.
18           We felt that she could do the Cincinnati job in
19 three days because we were fortunate not to have too many HR
20 problems.  But the ability to do the regional job was just
21 impossible in three days.  She was really struggling to do
22 it in four just because of the time demands, not because of
23 inability issue, just time demands.
24     Q.    Is that what happened?

146

1      A.    That's what happened.
2      Q.    She became the branch HR person?
3      A.    Right.
4      Q.    How long did that arrangement stay in place?
5      A.    Till I left.  I assume it's still in place.
6      Q.    So she didn't have any regional
7  responsibilities after?
8      A.    That is correct.
9      Q.    At some point in the discussions with her about
10 the three-day-a-week schedule, did you tell her that you
11 hadn't approved it or that you weren't going to approve it?
12     A.    I don't know if I used those words but I
13 definitely told her that I didn't think she could do it in
14 three days.
15     Q.    Do the regional job or the branch job?
16     A.    The regional job.
17     Q.    Do you ever recall telling her that when she
18 left one day that that was grounds for termination because
19 the new schedule hadn't been approved?
20     A.    No.
21     Q.    You don't recall -- you don't remember calling
22 her from your car and telling her that?
23     A.    No.
24           (Baillie Exhibit 8 was marked for

147

1           identification.)
2      Q.    Mr. Baillie, Exhibit 8 is entitled "Goals,"
3  the first two pages, then "Competency Assessment" the third
4  and fourth pages.  Have you seen those before?
5      A.    Yes.
6      Q.    Is this something that you and Mr. Cavanaugh
7  worked on?
8      A.    Yes.
9      Q.    Is this something that you would put together
10 and then submit to him for feedback?
11     A.    Yes.
12     Q.    Do you think this is the first one you did for
13 the regional job in Cincinnati?
14     A.    Yes.
15     Q.    Early '99?
16     A.    Yes.
17     Q.    Under "Service," you say, "Turn around the
18 service problems in Columbus, Louisville and Cincinnati,"
19 then it identifies a number of specific things.
20           Is that the service problems that you testified
21 about before?
22     A.    Correct.
23     Q.    Did you do those action items that you
24 identified?

148

1      A.    Yes.
2      Q.    Did that solve the service problems?
3      A.    Yes.
4      Q.    How long did it take to get that turned around?
5      A.    That took, to my recollection, April of '99.
6      Q.    The second page under the general heading
7  "Collaboration with others," your first bullet there is,
8  "Provide the vision that will drive the branch to exceed
9  goals through the turn of the century."  I assume that's
10 something that you needed to do?
11     A.    Uh-huh.
12     Q.    How did you do that?
13     A.    Through similar things that -- documents that
14 you've shown, annual vision statements, held quarterly
15 meetings with the staff, set goals with all the managers,
16 had semiannual performance reviews with them, continued to
17 hold the annual regional meetings, and just
18 day-in-and-day-out communication with the staff.
19     Q.    Do you think you were effective at providing
20 vision for the region?
21     A.    Yes.  Yes, based on the accomplishments.
22     Q.    I think you testified before lunch something
23 about 360 degree feedback --
24     A.    Correct.

**PAGE 37 (145-148)**

149

1  Q.    -- talking about your conversation with Mr.
2  Szerlong. I think I understand what that means but tell me
3  how that process worked when you were the Cincinnati
4  regional manager.
5  A.    What I would do is, in one of the quarterly
6  meetings, just hand out an evaluation sheet that they, at
7  their option, could fill out and give me feedback on how I'm
8  performing, getting feedback from the group there.
9  Q.    How often did you do that?
10  A.    I did that annually.
11  Q.    Would you give those forms to everybody who was
12  in the organization, just your direct reports?
13  A.    Everybody that was in the meeting.
14  Q.    Who is that, is that just your direct --
15  A.    Everybody in the branch had an opportunity
16  to --
17  Q.    An underwriter in Louisville would be able to
18  fill one out for you?
19  A.    I don't recall if I did it in Louisville.
20  Probably sent them the forms but I don't recall.
21  Q.    Everybody in Cincinnati?
22  A.    Right.
23  Q.    And at least your direct reports out in the
24  satellites?

150

1  A.    Absolutely. Yeah. My direct reports on a
2  semiannual basis, the last question I always ask is, how am
3  I doing? What can I do to make your job easier? What can I
4  do better?
5  Q.    That was in their evaluation settings you would
6  ask that?
7  A.    Correct.
8  Q.    What kind of feedback did you get from people
9  when you asked that?
10  A.    Good. Good. Very candid feedback. Generally
11  positive, sometimes some good suggestions.
12  Q.    Do you remember anything that people said you
13  could be doing better that you thought was a good
14  suggestion?
15  A.    Not specifically, no.
16  Q.    Do you remember anyone in particular who you
17  recall was a source of a good suggestion that thought you
18  could be doing better?
19  A.    Not specifically, no.
20  Q.    Do you recall what kind of volume of return
21  you'd get on the forms, the 360 feedback forms? You mean if
22  you sent out 50 would you get back 49 or --
23  A.    Get back about half, about 50 percent, maybe a
24  little more, but that's about it.

151

1  Q.    I think among the documents you produced was
2  copies of some of those forms and a compilation.
3  Did you do the compiling the results yourself
4  or did you have your assistant do that?
5  A.    I think we both did it.
6  Q.    Did you routinely put together averages?
7  A.    Yes.
8  Q.    Would you pass that along to anybody? Would
9  you pass it on to a zone?
10  A.    I'd pass it on to the branch in the next
11  meeting, say, this is the evaluation and these are the
12  comments that you've made, communicated that to the staff.
13  I'd pass it on to Tim in the annual performance review.
14  Q.    You'd actually give him a copy of the documents
15  or just tell him?
16  A.    I think I gave him a copy but I can't recall.
17  Q.    Going back to the exhibit on the second page,
18  very second bullet, under "Collaboration with others" is
19  "Mentoring coach to reach their maximum potential."
20  How do you think you did that?
21  A.    Good. I think the staff continued to grow and
22  the branch continued to improve the performance.
23  Q.    How do you think you did coaching or mentoring
24  Eddie Bryant in Louisville?

152

1  A.    Good. I think he became more focused in the
2  marketplace. He did a terrific job of helping to drive rate
3  and he did a very good job of interfacing with his agency
4  plan.
5  He was improving in the documentation of the
6  agency management piece but needed work there. Definitely a
7  development area to continue on.
8  Q.    Was most of the mentoring of Andy Bryant from
9  Jeff Barton or was some of it from you directly?
10  A.    Oh, I think it was from both of us, yes.
11  Q.    How often did you get down to Louisville?
12  A.    Once or twice a month.
13  Q.    Then the second part of this document is
14  "Competency Assessment." Competency, I'm having trouble
15  saying that word today.
16  Again, is that something you drafted and
17  Cavanaugh had input on or he drafted and you reviewed? How
18  did that process work?
19  A.    I can't recall. I think on this one I had him
20  do it. I think he had it done when he met with me.
21  Q.    Looks like all that's filled in is just the
22  rating numbers without any comments.
23  Do you recall whether at some point comments
24  were filled in?

**PAGE 38 (149-152)**

153

1    A.    I can't recall. He certainly talked about each
2 one.
3    Q.    Did you think that was a fair review by Mr.
4 Cavanaugh?
5    A.    Yeah, I think so.
6    Q.    I guess this is on a 5 point scale, 5 being the
7 best?
8    A.    That's correct.
9    Q.    0 or 1 being the low end?
10    A.    Right.
11        (A recess was taken from 2:10 to 2:15.)
12        (Baillie Exhibits 9 and 10 were marked for
13        identification.)
14    Q.    Mr. Baillie, you've got Exhibits 9 and 10 in
15 front of you.
16    A.    Correct.
17    Q.    Exhibit 9 is a letter from Sy Green to you, it
18 looks like after a visit.
19    A.    Uh-huh. Yes.
20    Q.    How often did he come in?
21    A.    That was the only time he had come in.
22    Q.    Okay. Help me out where he fits into the
23 structure. He's not a zone guy. He's higher than a zone
24 guy?

154

1    A.    Yes. At the time I believe he was Tim's boss.
2 He was in charge of field operations.
3    Q.    If you look at that third paragraph where he
4 says, "Thanks very much for arranging productive visits for
5 me in Columbus, Cincinnati and Louisville."
6        Then he references a discussion that you and he
7 apparently had about continuing to push for very strong
8 players and need to develop more world class performers and
9 fewer average performers.
10        Did he talk with you about that?
11    A.    Not to my recollection. He was big on getting
12 maximum authority. He didn't think the field had enough
13 authority, so we need to continue to booster up the
14 technical ability of the field to get more authority at the
15 point of sale, underwriting positions.
16    Q.    When you're talking about authority --
17    A.    Underwriting.
18    Q.    The amount of dollars that somebody could
19 approve?
20    A.    That's right. Exposure in dollars.
21    Q.    Do you remember, in the last few years you were
22 with Chubb people at the highest executive levels in the
23 company talking about what Mr. Green says in this letter,
24 about pushing for getting the best people in the right

155

1 positions and getting top performance and not settling for
2 just average performance?
3    A.    Oh, sure. Yes.
4    Q.    Did you try to implement that in the Cincinnati
5 region?
6    A.    Yes.
7    Q.    Did you terminate any employees' employment in
8 the Cincinnati region during the time you were regional
9 manager?
10        MR. FREKING: Objection as to relevance. You
11    can go ahead and answer.
12    A.    Yes.
13    Q.    Do you recall how many and what the
14 circumstances were?
15    A.    We terminated a loss control rep for falsifying
16 a report.
17    Q.    Was that here in Cincinnati?
18    A.    Yes. It was termination of some of the SCRs
19 that were on profit improvement plans. And we demoted a
20 couple of people and then some people just left.
21    Q.    Voluntarily left?
22    A.    Voluntarily left.
23    Q.    Knowing they were having some performance
24 issues?

156

1    A.    Right.
2    Q.    In any of the employment decisions you made as
3 branch manager, did you ever consider age as a reason for
4 taking some adverse employment action against somebody?
5    A.    No.
6    Q.    Did anybody higher than you at Chubb ever tell
7 you to take some employment action based on somebody's age?
8    A.    No.
9    Q.    Take a look at Exhibit 10. Tell me what that
10 is.
11    A.    That's a pre-year business plan, sort of
12 summarizing what the focus would be for the year.
13    Q.    So it's in fourth quarter '99 looking forward
14 to the year 2000?
15    A.    Correct.
16    Q.    You say down there at the bottom of the first
17 page that returning to profitability is the number one
18 priority.
19    A.    Correct.
20    Q.    That's one that didn't happen, right?
21    A.    Correct. Well, it did happen but not in 2000.
22    Q.    Didn't happen till 2001?
23    A.    Well, actually it was happening at the second
24 part of the year. The numbers were starting to get real

**PAGE 39 (153-156)**

157

1  good during the second half of the year.
2      Q.    Do you remember what they were for the full
3  year?
4      A.    Yeah.  They weren't good.
5      Q.    Do you remember what they were?
6      A.    No.  I remember we lost about 40 million.
7      Q.    Looking at the second page of Exhibit 10, under
8  "Staff Development," that last sentence, you wrote this
9  right?  You wrote this document?
10     A.    Yes.  I did.
11     Q.    Input from anybody else?
12     A.    Not direct input but obviously discussions with
13 a lot of people including Tim, including corporate
14 direction.
15           It was kind of, you take the corporate
16 direction, you take the zone direction, and then you take,
17 you know, what things you need to work on.
18     Q.    Apply it to your region?
19     A.    Yeah.  That's right.
20     Q.    "Our managers' ability to develop staff will be
21 an even larger percentage of their performance rating in the
22 year 2000."
23           Is that something that came from corporate,
24 from zone, from yourself?

158

1      A.    No.  That's a personal pet peeve and focus of
2  mine, staff development, always has been.
3      Q.    Was it your understanding that emphasis was
4  consistent with corporate direction as well?
5      A.    Yes.
6      Q.    Looking down at the "Summary" paragraph at the
7  very end, you said, "We have the best infrastructure, staff,
8  agency plant and account relationships in the industry."
9           First of all, help me out.  What do you mean by
10 "agency plant"?
11     A.    Our independent agents that we do business
12 with.
13     Q.    Just the system of agents that you've got out
14 there --
15     A.    That's right.
16     Q.    -- selling Chubb product?
17     A.    Uh-huh.  We were pretty much dominating the
18 marketplace back then.
19     Q.    In this region or nationally?
20     A.    Pretty much this region.
21     Q.    Who were the big competitors in this region?
22     A.    CNA, Travelers, Royal, Cincinnati Financial.
23     Q.    Do you keep track of market shares, is that
24 something you can estimate or --

159

1      A.    We have Best reports by state.
2      Q.    That's a company that does that?
3      A.    Right.
4      Q.    You don't do any internal measurement?
5      A.    No.  Basically what you do is you take a look
6  at what the agents have and see when your penetration is
7  there and take a look at the incoming, because they pretty
8  much market their whole book, and then what you're
9  getting -- what you get -- what you want and what you get
10 based on what you want.
11     Q.    So you would ask the people you deal with at
12 Schiff Kreidler-Shell, just to take an example --
13     A.    Yeah.
14     Q.    -- of how much of your total business is Chubb
15 business?
16     A.    Right.
17     Q.    Get a sense for your market share from that?
18     A.    Yeah.  It was more -- more from a new business
19 and retention standpoint where we were dominating the market
20 as opposed to market share.  We have a very small niche.
21           (Baillie Exhibit 11 was marked for
22           identification.)
23     Q.    Mr. Baillie, take a look at Exhibit 11.
24 That's a performance review, looks like it started in

160

1  December of '99 and then the final approval is in early 2000
2  by you and Mr. Szerlong, right?
3      A.    Correct.
4      Q.    Now, is this the first performance review that
5  Mr. Szerlong would have done for you?
6      A.    Yes.
7      Q.    As I read it, the overall score is exceeds
8  some?
9      A.    Right.
10     Q.    Which I think you testified is the score you
11 usually got?
12     A.    Yes.
13     Q.    And just so I understand the process, I mean,
14 did you take the initial run at drafting this in terms of
15 the business goals and the learning goals and the
16 accomplishments and the disappointments, then Mr. Szerlong
17 would give you input and the document would get edited?
18     A.    Correct.
19     Q.    Then he did the rating section?
20     A.    Correct.
21     Q.    Then you both sign off on it, at least
22 electronically sign off on it?
23     A.    Correct.
24     Q.    Am I right that this is in the -- there's a

**PAGE 40 (157-160)**

161

1  software system at Chubb that this is in, you can get it,
2  yours, and Mr. Szerlong can get at yours, and other people
3  can't presumably, maybe the HR people can, I don't know?
4      A.    Right. That's right.
5      Q.    Did you think this was a fair review for 1999
6  for you?
7      A.    Yes.
8      Q.    Didn't have any complaint or disagreements
9  about it?
10     A.    None that I recall.
11     Q.    Did you and Mr. Szerlong have a face to face to
12 go over this like you did the following year?
13     A.    I think so.
14     Q.    You went up to Chicago and went over it with
15 him?
16     A.    I don't recall if he came down or I went to
17 Chicago.
18     Q.    But you did have some face-to-face discussion
19 about it?
20     A.    I think so. Yes, I remember face to face now.
21     Q.    Tell me what you remember about it.
22     A.    I just remember the evaluation. He said, what
23 do you think? What evaluation do you think you should get?
24 I said, I'll leave that to you.

162

1      Q.    I take it you were pleased with the exceeds
2  some rating?
3      A.    I was.
4      Q.    Do you recall whether Mr. Szerlong had any
5  particular emphasis in the face-to-face discussion with you
6  about your goals for the next year, about what was most
7  important for you to work on?
8      A.    No. I think we identified the -- we still
9  needed to get off more the distress business. There was so
10 much in the branch and I needed to get that trip report
11 system in better shape, which we did.
12     Q.    How did you address that? First of all,
13 explain to me what a trip report system does or is supposed
14 to do.
15     A.    It's supposed to communicate, you know -- when
16 we make agency visits, it's supposed to communicate what
17 went on, the agency visits, so that we can determine the
18 quality of the visit and also look for opportunities among
19 the team of people that are connected to the marketing
20 plant.
21     Q.    What was wrong with the trip record system that
22 was in place in Cincinnati?
23     A.    It just wasn't consistent enough. We needed to
24 put more emphasis on it, make sure we were using it and

163

1  continue to get better feedback on it.
2      Q.    I mean was it inconsistent within an office,
3  like just within the Cincinnati branch --
4      A.    Throughout.
5      Q.    -- itself?
6      A.    Throughout the three branches, yeah, wasn't
7  quite consistent, if I recall correctly.
8      Q.    Where this disappointment still need to get off
9  of more distressed business --
10     A.    Right.
11     Q.    -- that's getting rid of the bad business you
12 talked about before?
13     A.    We knew we still had a lot.
14     Q.    What's the turnover of minority manager in
15 Columbus?
16     A.    That was a personal disappointment of mine.
17 One of my managers didn't work out. He was starting to
18 struggle a little bit, then went and got another job.
19     Q.    A resignation?
20     A.    Yeah. That was the first minority I had ever
21 lost in the organization and, you know, just kind of
22 personally hurt me.
23     Q.    What was his other job?
24     A.    They were in charge of the Columbus branch.

164

1      Q.    Columbus branch manager, production leader?
2      A.    Production leader, correct.
3      Q.    Who was that?
4      A.    Anthony Washington.
5      Q.    Anything else you remember about your
6  discussion with Mr. Szerlong about Exhibit 11?
7      A.    No.
8            (Baillie Exhibit 12 was marked for
9            identification.)
10     Q.    Can you tell me what Exhibit 12 is, Mr.
11 Baillie?
12     A.    Yes. It's "1999 Ohio Valley Regional meeting
13 Action items."
14     Q.    Ms. Emerson is your assistant, right?
15     A.    Right.
16     Q.    Now, when she sent out an e-mail, did it have
17 this little -- looks like a torn piece of paper and tape on
18 it? Or I'm just puzzling over the copy here.
19     A.    I think that's a computer thing, computer
20 generated.
21     Q.    That's how her e-mail appeared --
22     A.    I believe.
23     Q.    -- in the regular course of business?
24     A.    Yeah.

**PAGE 41 (161-164)**

165

```
1      Q.    I take it this is something really that you had
2  worked up and then asked her to send out to this recipient
3  list?
4      A.    Right. They were all at the meeting. This is
5  what we all agreed to do.
6      Q.    The handwritten notes on it were yours?
7      A.    Yes.
8      Q.    In the margins?
9      A.    Uh-huh.
10     Q.    "For you to look over," in the upper corner,
11  is that you? Is that Ms. Emerson?
12     A.    That would be Ms. Emerson.
13     Q.    Then the third page solicits any corrections or
14  additions. Is that your text?
15     A.    Yes.
16     Q.    Did you think, as you said here in late 1999,
17  that you had the people skills and directions to be a world
18  class business unit?
19     A.    Yes.
20     Q.    You were pretty satisfied with the team you had
21  in place at that point?
22     A.    Yes. I was. I liked the team overall. All had
23  development areas but good, good core. Young, very young.
24     Q.    At that point you had been in place for over a
```

166

```
1  year?
2      A.    Uh-huh.
3      Q.    Had you had a chance to hire many people into
4  the Cincinnati regional positions?
5      A.    Five of these people.
6      Q.    You were just looking at the --
7      A.    Just counting them.
8      Q.    -- at the headings here?
9      A.    Yeah.
10     Q.    Who had you hired?
11     A.    I hired Dieter in the commercial insurance
12  division; Jim Kerns in the technology insurance division; I
13  believe, at this time, possibly Andrew Emery was in the
14  department of financial institutions; maybe, customer
15  service department, John LaFrance (phonetic); and loss
16  control, Mike Zdinak; and human resources Diane Haggard.
17     Q.    Barton was in place when you got there --
18     A.    Right.
19     Q.    -- you said before? And had Jim Lash --
20     A.    Oh, yes. I hired him, too, that's right. Very
21  good.
22     Q.    He doesn't really show up on this list.
23     A.    He's in executive protection.
24     Q.    You had worked with him in Harrisburg, right?
```

167

```
1      A.    Harrisburg, correct.
2            (Baillie Exhibit 13 was marked for
3            identification.)
4      Q.    Can you tell me what Exhibit 13 is, Mr.
5  Baillie?
6      A.    It's a memo from Tim.
7      Q.    Just from the text of it, I'm thinking it's
8  late 1999 or early 2000.
9            Do you remember getting it? Do you remember
10  the context of it?
11     A.    Just received it.
12     Q.    Did you distribute it to people or was it
13  just --
14     A.    Most likely. I generally do.
15     Q.    Was there anything in here that you disagreed
16  with or thought was wrong?
17     A.    No.
18     Q.    Do you recall ever having any follow-up
19  conversation with Mr. Szerlong about the --
20     A.    No.
21     Q.    -- the content?
22     A.    No.
23            (Baillie Exhibit 14 was marked for
24            identification.)
```

168

```
1      Q.    Can you tell me what Exhibit 14 is?
2      A.    Memo from Dave Kelso.
3      Q.    Who is he?
4      A.    He was our chief financial officer.
5      Q.    In March 2000?
6      A.    Uh-huh.
7      Q.    Help me out with what the senior vice president
8  designation means.
9      A.    It was an election to name me a senior vice
10  president.
11     Q.    Did it change your responsibilities in any way?
12     A.    No. Just more, again, reflection of the job
13  you have done for Chubb.
14     Q.    Did it change your compensation or eligibility
15  for benefits as far as you know?
16     A.    Yes, I believe so.
17     Q.    Do you know what it added to your compensation
18  package?
19     A.    I can't recall exactly. Tim explained it to
20  me.
21     Q.    You don't remember?
22     A.    I can't recall exactly what it was. I think
23  there was some additional type stock things that came up.
24     Q.    Restricted stocks? More stock options? You
```

**PAGE 42 (165-168)**

169

1  don't remember?
2      A.    I don't remember exactly what Tim told me.
3      Q.    Was there some process that you had to go
4  through to be elected senior vice president?  Did you have
5  to apply?  Did you have to fill out a bunch of forms?
6      A.    Tim would have had to fill out the forms.
7      Q.    Did he tell you he was doing that?
8      A.    I don't remember if he told me beforehand or
9  not, to tell you the truth.
10      Q.    How did you find out?
11      A.    Tim told me, I assume.  I don't recall.  That's
12  normally how it goes.
13          (Baillie Exhibit 15 was marked for
14          identification.)
15      Q.    Mr. Baillie, can you tell me what Exhibit 15
16  is?
17      A.    Yes.  This is a quarterly report that I would
18  send to Tim.
19      Q.    Looks like maybe this is a draft that's going
20  to Mr. DeLong and Mr. Breiner?
21      A.    Yeah.  What it probably was, this is going to
22  Tim but -- yeah, I sent this to those two first.
23      Q.    Looking for some input reactions?
24      A.    Yeah.  Tim wanted me to cover the whole region.

170

1      Q.    Again, the text is yours?
2      A.    Yes.
3      Q.    That last paragraph on the last page reflects
4  your view that the region is "well staffed with strong
5  people good management systems"?
6      A.    Right.
7      Q.    Makes a reference to the "Ohio's uninsured
8  motorists and stop-gap positions are deep concerns."  Is
9  that what we talked about before the change in the law?
10      A.    That is right.
11      Q.    Do you recall when that happened, the uninsured
12  motorists issue?
13      A.    Yeah, the law -- the ruling was sometime in
14  June of '99, I believe.
15      Q.    What were you doing with the Ohio Insurance
16  Institute and Chubb to try to address that legal problem?
17      A.    The problem was we had a, for lack of a better
18  word, a rogue bunch of Supreme Court judges.  So we really
19  were stymied.  While the law was in our favor and the
20  legislation was, the Supreme Court judges were not.
21          So we were working with the Ohio Insurance
22  Institute to support candidates that would be more favorable
23  to us and Chubb.  We received, I believe, 50,000 from Chubb
24  to support the campaigns.

171

1              But also go to Columbus and attend the
2  meetings, you know, and give our input as to where it's
3  going and will learn more about it.
4      Q.    Do you feel like you got involved in that issue
5  in a timely manner?  Were you slower than you should have
6  been?
7      A.    Probably as timely as I could have.  I was
8  actively involved with the Ohio Insurance Institute from the
9  beginning.
10          We were probably slow in getting a solution
11  from the home office what position we'd take.  But the
12  reasons were given to me was they had to wait for the ISO
13  form to come out first, which came out December.  Then we
14  didn't really get our form out until, I believe, March 1st.
15      Q.    Of 2000?
16      A.    Yeah.  So wished we could have done it in
17  February, maybe a month sooner, so --
18          MR. FREKING:  These legal things go slowly.
19      A.    Well, they had to run it by legal counsel.
20  They have their own procedures there.  Certainly had
21  numerous conversations pushing them.
22      Q.    Were you dealing with the automobile division
23  people at the home office you mentioned before?
24      A.    Correct.

172

1      Q.    Did you try to impress upon them the importance
2  of getting it done --
3      A.    Yes.
4      Q.    -- quickly?
5      A.    Yes.
6      Q.    Was anybody within your direct report teams
7  pushing harder on that issue than others?
8      A.    We had -- Greg Tazic was my claims manager.  He
9  was helpful.  Dieter was also pushing because it's his
10  division.  Gary DeLong was the Cleveland branch manager and
11  he was involved also because he had a vested interest.
12      Q.    Was Cleveland more affected than Columbus or
13  Cincinnati in terms of the business impact?
14      A.    Probably not, just given the mix of business.
15  But, you know, we were both affected, no question.  We
16  probably had a bigger mix of the business because they were
17  two branches as opposed to one.
18          (Baillie Exhibit 16 was marked for
19          identification.)
20      Q.    Mr. Baillie, take a look at Exhibit 16,
21  please.  It's a memo from Mr. Motamed to a group of job
22  titles that would include you, right?
23      A.    Uh-huh.
24      Q.    Yes?

**PAGE 43 (169-172)**

173

1    A.    Yes.

2    Q.    Did you get that sometime in late April 2000?

3    A.    I assume.

4    Q.    Do you remember the balance scorecard being

5    implemented --

6    A.    Yes.

7    Q.    -- as a review tool?

8    A.    Yes.

9    Q.    Do you remember, as this memo says, one of the

10   things that the balance scorecard was doing was encouraging

11   people to look beyond financial measures to assess

12   performance.

13   A.    Yes.  This was in 2000.  Yes.

14   Q.    You had to implement that system for your

15   reports, right?

16   A.    No.

17   Q.    Now, is it just at your level and above?

18   A.    Yes.

19        (A recess was taken from 2:31 to 2:47.)

20        (Baillie Exhibits 17 and 18 were marked for

21        identification.)

22   Q.    Mr. Baillie, take a look at Exhibits 17 and

23   18.  Both of those are memos from you, right?

24   A.    Correct.

174

1    Q.    The first Exhibit 17 is just Mr. Breiner and

2    Mr. DeLong, and it looks like it follows up on a regional

3    meeting; is that right?

4    A.    Yes.

5    Q.    You put this together just to confirm and

6    follow up on that meeting?

7    A.    Yes.

8    Q.    On the second page, down towards the bottom,

9    you quote a couple things about the quality and the loss

10   control function.

11   A.    Where is that?

12   Q.    Second to the last paragraph, beginning to

13   raise our expectations to the quality of our loss control.

14   What was the issue there?

15   A.    We really had a relatively, comparatively

16   weak -- weaker loss control department, although the quality

17   in Cleveland and Louisville were good.

18   Q.    Why was it not so good elsewhere?

19   A.    Just had weak management from years and years

20   of not having high expectations.

21   Q.    Who is the loss control manager in Cincinnati?

22   A.    At the time of this, obviously, it was Mike

23   Zdinak, he was new in the job.  Prior to him, Kevin Neal,

24   who left the industry to make wine.

175

1    Q.    Had you been dealing with Mr. Neal as a

2    performance issue if you weren't satisfied with the quality

3    of that function?

4    A.    Yeah.  We were trying to elevate the quality of

5    the loss control in the region.

6    Q.    That was your background, right?

7    A.    Yes.

8    Q.    You grew up in loss control?

9    A.    Uh-huh.

10   Q.    Did you feel like were you making progress with

11   that function at the time you wrote this memo in mid 2000?

12   A.    Yes.  Yes.

13   Q.    How did Mr. Zdinak do in that role?

14   A.    He struggled in the role.  He did a good job of

15   improving report quality, did a good job of improving team

16   work, and also had some real good interaction with

17   customers, but at the end of the day, really struggled with

18   trying to manage both the Cincinnati office and the

19   Indianapolis office and really didn't -- didn't like the

20   management role.

21        He's really a good technician.  But when

22   dealing with difficult people, he had trouble -- as the

23   difficulties got worse, he had trouble with that.

24   Q.    How did that play out during the time you were

176

1    there?

2    A.    We put him into a technical role.

3    Q.    Somebody replaced him as loss control manager?

4    A.    After I left.

5    Q.    You made the move with Zdinak while you were

6    still there?

7    A.    Yes.  We communicated to Mike then.

8    Q.    The reference in that next paragraph about

9    international results being behind plan and you were looking

10   for a candidate, that Tom and Gary didn't see a need, but

11   you and Dieter thought there was a --

12   A.    Yeah.

13   Q.    -- an opportunity there.  Did you end up hiring

14   a person for that role or not?

15   A.    No.  What they did was they put the role in

16   Chicago, they kind of coordinated it.  And that was kind of

17   a national strategy or might have even been a zone strategy

18   of Tim's.  They coordinated.  The representative for the

19   Ohio Valley worked out of the Chicago branch.

20   Q.    Then Exhibit 18, again is a memo from you to

21   the Ohio Valley staff in late 2000?

22   A.    Uh-huh.

23   Q.    Is this just kind of a year-end status report?

24   A.    Yes.  Status report and direction.

**PAGE 44 (173-176)**

177

```
1      Q.   By this point it was clear that profitability
2  was not going to happen in 2000?
3      A.   Right.  But it was clear we were doing the
4  right things, that we were turning the corner on this thing
5  and we really -- I thought it was very important.  I tried to
6  emphasize that, is just seeing those bad losses can be
7  debilitating, even though we know why they're occurring and
8  we know what we were doing was the right thing.
9      Q.   You sent this out to, when you say Ohio Valley
10 staff, everybody in the region that you intended to
11 distribute it to?
12     A.   Yes, I assume.
13          (Baillie Exhibits 19 and 20 were marked for
14          identification.)
15     Q.   Mr. Baillie, take a look at Exhibits 19 and 20
16 which, again, are from the documents you produced through
17 your counsel to us.  Can you tell me what those are?
18     A.   The one is a 2001 scorecard, my scorecard.
19     Q.   That's Exhibit 20, the one pager?
20     A.   Yeah.  19 could very well be the 2000 balance
21 scorecard.
22     Q.   Tell me how the scorecard process worked with
23 respect to your evaluations.  I mean, you get the basic form
24 from the system?
```

178

```
1      A.   Actually, I don't think we built the system
2  yet, so it was just kind of a sheet.
3      Q.   You got a piece of paper?
4      A.   Yeah.  Kind of clumsy the way it was done.
5      Q.   Would you take a first run at filling it out
6  the way you thought it should be filled out, then you'd pass
7  it up the line?
8      A.   Pretty much Tim would do his first, then we
9  would just kind of mirror it or mimic it, put in different
10 parameters, if possible.
11     Q.   Exhibit 19, as I'm reading it, is just kind of
12 the form, isn't it?  I mean, it's just kind of got on --
13     A.   No, because there's obviously numbers there
14 that relate to the Ohio Valley region.  So this is my review
15 or this is my goals.
16     Q.   So if you had a loss ratio of 65, you would
17 have been between exceeds some and met all?
18     A.   Right, in that category.
19     Q.   So this is just establishing the parameters by
20 which you're going to be measured?
21     A.   Correct.
22     Q.   But it's not giving you the measurement?
23     A.   The evaluation.
24     Q.   Okay.  Exhibit 20 is the same thing, setting
```

179

```
1  the parameters but not giving you the results?
2      A.   Correct.
3      Q.   Do you recall ever having any discussion with
4  Mr. Szerlong about the parameters, whether you thought they
5  should be different than he did or were they nonnegotiable?
6      A.   Pretty much nonnegotiable.
7      Q.   Do you know who set them?  Is that Mr.
8  Szerlong?  Was that corporate?
9      A.   I think Tim got them from Tom.
10          (Baillie Exhibit 21 was marked for
11          identification.)
12     Q.   Mr. Baillie, take a look at Exhibit 21,
13 please.  Now, that is your scorecard for the year 2000,
14 right?
15     A.   Yes.
16     Q.   I think the far right-hand side of the copies
17 is cut off.  But, again, I'll put responsibility for that on
18 your counsel which is where we got these copies.  I couldn't
19 find a better copy either.
20     A.   The far right of?
21     Q.   The far right-hand side of each page looks
22 like --
23     A.   That would probably be me.
24     Q.   -- it's a little cut off.
```

180

```
1      A.   That's all I had, I think.
2      Q.   I'm perfectly comfortable blaming Mr. Freking
3  but if you want to take responsibility.
4          MR. FREKING:  I was going to comment for the
5          record, I think the defendant probably has every one
6          of these documents in their possession.  So if they
7          want a clean copy, they could probably get one at
8          their convenience.
9          MR. CROALL:  I couldn't find one, Randy, I did
10         look.
11     Q.   Did you get a copy of this in early 2001?
12     A.   Yes, 3/12, 2001.
13     Q.   That's the final electronic sign off on it?
14     A.   That is right.
15     Q.   This would have been the review that you and
16 Mr. Szerlong discussed --
17     A.   That's correct.
18     Q.   -- in late February and the conversation we
19 talked about this morning, right?
20     A.   Right.
21     Q.   Do you recall in your face-to-face meeting with
22 Mr. Szerlong any particular points in this review that you
23 and he discussed or had disagreements over?
24     A.   Just the ones I've already mentioned.
```

**PAGE 45 (177-180)**

181

```
1      Q.    For example, on profitability, the loss ratio,
2  Ex-CAT, I don't know what that means.  What's the Ex?
3      A.    Ex-catastrophe.
4      Q.    Does that mean excluding catastrophe?
5      A.    Excluding catastrophe.
6      Q.    Not met because your loss ratio --
7      A.    Was bad.
8      Q.    At least this form says loss ratio was at 88
9  percent for the region.  Is that pretty good?
10     A.    No.  No.
11     Q.    What would be pretty good, something in the
12 70s?
13     A.    Yeah.  60s better.
14     Q.    The lower the number, the better, right?
15     A.    Absolutely.
16     Q.    Yours was, I think you said you didn't know,
17 but it was well over 100?
18     A.    Yeah.  That would be Ex, the Ohio Valley.  I
19 mean the Ohio UM was also.
20     Q.    Those would not be counted in your loss ratio?
21     A.    No.
22     A.    That would have been considered a catastrophe.
23 Yeah, I had no disagreement with any of the items.  Most of
24 them were all -- met all or exceeds some.
```

182

```
1      Q.    Did you and Mr. Szerlong talk about -- there
2  are a few categories where he's got -- the document, anyway,
3  has multiple ratings?
4      A.    Yeah.
5      Q.    Looking at the third page, under "Service
6  Performance," says, "New/Renewal Issuance - met most, met
7  all, exceeds some," question mark.
8            What was your understanding of what that meant?
9      A.    Well, while the --
10     Q.    Take it back, it's the fourth page, sorry.
11     A.    While we were slightly underneath the goal in
12 service, we were better than the zone average in both new
13 lines and renewals.
14           If you just took the number, we weren't -- we
15 didn't hit that number, we're slightly below it but we were
16 among the best.
17     Q.    Compared to everybody else you did pretty well?
18     A.    Yeah.  So it's kind of a goal you hit.  So I
19 didn't know how he was going to rate it.  So we probably
20 just left it that way.
21           Some of them, when it's in between, where
22 there's no question -- that's kind of in between those two.
23     Q.    Then the ratings, the last page of the exhibit
24 where it's the ratings section, all that was filled out by
```

183

```
1  Mr. Szerlong?
2      A.    That is right.
3      Q.    He went over that when you had your face to
4  face?
5      A.    Right.
6            MR. FREKING:  Dave, when you asked him before
7      whether or not he agreed or disagreed or had some
8      comments about these other ratings, do you remember
9      that question?
10           MR. CROALL:  I don't think I exactly put it
11     that way.  Something like that.
12           MR. FREKING:  Were you including the overall
13     performance score?
14           MR. CROALL:  I'm going to ask him some specific
15     things about that.  We'll get there.
16     Q.    What was your understanding, Mr. Baillie, of
17 what Mr. Szerlong wrote under where it says, "External: Very
18 engaged market.  Excellent MVI participation and results"?
19     A.    Very involved in the marketplace with the ATSI
20 plans with our customers.
21     Q.    MVI, again?
22     A.    That's our captive agents.  We had among the
23 best results in the country how we sign up captives and
24 brought them into the program.
```

184

```
1      Q.    Mr. Szerlong told you that's part of the job
2  you did very well?
3      A.    Uh-huh.
4      Q.    Yes?
5      A.    Yes.  All the items that are marked either met
6  all or exceeds some or clearly exceeds were areas he
7  indicated I had done well.
8      Q.    Under the internal section that he wrote here,
9  "Underwriting performance management activities," typo, I
10 assume it's supposed to be must, "be further tightened to
11 ensure rapid improvement"?
12     A.    Right.
13     Q.    What was your understanding of what that was
14 about?
15     A.    We needed to make sure we returned the
16 profitability, to make sure we're diligent in getting off
17 the bad risks, getting more rate, and making sure our
18 underwriting is good, that we can make a profit in 2001.
19     Q.    Those next couple of sentences, the regional
20 role and leadership of the region, what was your
21 understanding of what his concerns were there?  Is it the
22 stuff we already talked about this morning?
23     A.    That's right.
24     Q.    "Engagement from several key practice leaders,"
```

**PAGE 46 (181-184)**

185

1  what's your understanding of who he was talking about there?
2      A.    He didn't tell me.
3      Q.    Did you ask him?
4      A.    Yeah.
5      Q.    It's your testimony you asked him who he was
6  talking about, he didn't tell you?
7      A.    Yeah.
8      Q.    Did you ask him just during this face-to-face
9  evaluation meeting or did you ask him again?
10     A.    I can't recall if I asked him again.  It's
11 possible.
12     Q.    How about under "People Management," what was
13 your understanding of what Mr. Szerlong's concerns where he
14 expressed them?
15     A.    He was wondering, is the performance high
16 enough, standard high enough.
17     Q.    Did you think it was?
18     A.    Based on our results, yeah.  I mean, we
19 basically nailed everything.  We didn't get the
20 profitability but, I mean, that's a long-term track because,
21 you've got a tail on the business and you've got a lot of
22 business to get off of and get rate on.  The zone was still
23 struggling in 2001.
24     Q.    How about where Mr. Szerlong says, "Focus also

186

1  on balancing external emphasis with internal expectations
2  and needs," what did you understand that to mean?
3      A.    Balance the marketing with the staff
4  development.
5      Q.    In that same section under the leadership
6  heading?  Again, is that the same issue we discussed earlier
7  with Mr. Szerlong's discussion with you in February?
8      A.    Yes.
9      Q.    Let me ask you about this Toledo conversation
10 that I think you testified about before.
11           Do you recall Mr. Szerlong telling you that or
12 do you recall at the conversation that Mr. Szerlong said,
13 let's talk about that issue another time and you insisting
14 on talking about it then and there with your two
15 subordinates there?
16     A.    No, I don't recall that.
17     Q.    You don't remember Mr. Szerlong saying, let's
18 address that later?
19     A.    No.
20     Q.    Let's address that when it's just the two of
21 us?
22     A.    No recollection of that.
23     Q.    Did you discuss -- and maybe you said this
24 before, if you did I apologize -- the overall score with Mr.

187

1  Szerlong, the met most rating, did you tell him you
2  disagreed with it, you didn't think it was right?
3      A.    Yeah.  I mean I thought I accomplished
4  everything.  And as far as the loss ratio, that was
5  something that really could not be fixed that quickly.
6            And Tim acknowledged that it had been
7  improving, was going in the right direction.
8      Q.    Although 2000 was worse than 1999, wasn't it?
9      A.    Yeah.  Well, that's how the tail works.  It
10 just starts to come around and hit you.
11     Q.    Your testimony is second half of 2000 was
12 better than --
13     A.    Yeah, the first half.
14     Q.    The trend was good?
15     A.    Yes.  Starting to turn the corner.
16     Q.    I think you testified that in your prior
17 evaluation Mr. Szerlong had asked you, what do you think you
18 should be rated, and you said, I leave it to you?
19     A.    Right.
20     Q.    Did he ask you that this time?
21     A.    I don't recall that, no.
22     Q.    So you don't remember whether you told him what
23 you thought?
24     A.    I don't know.

188

1      Q.    During the conversation with Mr. Szerlong, did
2  you make a pitch for a met all or exceeded some rating?
3      A.    No.  I just basically, you know, thought the
4  references -- the references he made to leadership were
5  inconsistent with 360 feedback rating with where we were
6  driving the region.  And I thought, while the financials --
7  I had to admit that while the growth was great, the loss
8  ratio wasn't, but we were turning the corner on it.  And the
9  company was doing the same thing.  I was in the same boat
10 with the company and with Tim.
11     Q.    I take it from your testimony that you've got a
12 pretty high level of confidence that that 360 feedback you
13 were getting was accurate feedback?
14     A.    Yeah.
15     Q.    You don't think there's a positive bias built
16 into that system where people know that the boss is getting
17 these forms, the boss is going to feel better if he is doing
18 -- if we tell him he's doing a great job?
19     A.    I don't think so.  I think, you know, my style
20 is one of being open.  People feel pretty comfortable
21 generally taking a shot at me or criticizing.
22           And it was totally anonymous.  So if anybody
23 had any ax to grind, that was the place to do it.
24     Q.    Do you think it's possible Mr. Szerlong was

189

1 getting more accurate feedback from some of your
2 subordinates than you were?
3     A.    It would be doubtful, but if he was, he didn't
4 communicate it from who.
5     Q.    He did communicate he was getting negative
6 feedback?
7     A.    But not specifically from --
8     Q.    He didn't attribute it to --
9     A.    No.
10    Q.    -- any particular people?
11    A.    Right.
12    Q.    Did you ask him?
13    A.    Yes.
14    Q.    In the ordinary course of business, did you get
15 a hard copy of this document or did you just have access to
16 it in the system?
17        I guess at some point you got a hard copy
18 because you produced it to us.
19    A.    I think it might have been on the system. I
20 produced a hard copy.
21    Q.    Do you recall when you did that?
22    A.    As soon as I got it, which would be the general
23 procedure, I believe.
24    Q.    Did you keep a file of your performance

190

1 reviews?
2     A.    Absolutely.
3     Q.    That's what you produced to Mr. Freking?
4     A.    Right.
5         (Baillie Exhibit 22 was marked for
6         identification.)
7     Q.    It looks to me like Exhibit 22 is maybe just a
8 draft of 21. Again, it was produced --
9     A.    Yeah. Yeah. Same thing.
10    Q.    Looks like it doesn't have the overall --
11    A.    Right.
12    Q.    -- summary and rating.
13    A.    Yes.
14    Q.    Is this what you would have sent to Mr.
15 Szerlong?
16    A.    Quite possibly.
17    Q.    Are the handwritten notes yours?
18    A.    Yes, that looks like my handwriting.
19        (Baillie Exhibit 23 was marked for
20        identification.)
21    Q.    Can you tell me what Exhibit 23 is, Mr.
22 Baillie?
23    A.    This is a memo that I wrote for Tim on what the
24 priorities were for the Ohio Valley in 2001, based upon

191

1 conversations with him.
2     Q.    Okay. And it's from Ms. Emerson to you?
3     A.    She was typing it to me, then I sent it to Tim.
4     Q.    Was this, in part, a response to the February
5 discussion and the earlier March memos that you had had?
6     A.    It was prior to -- well, wait a minute. Looks
7 like it was after the February. Yes.
8     Q.    At some point, in the spring of 2001, was there
9 a meeting in New Jersey on the Ohio uninsured motorists?
10    A.    Yes.
11    Q.    Tell me about that. How did that happen? What
12 was your role?
13    A.    There was talk in the home office about closing
14 down Ohio for automobile writings because of the problems we
15 were having, and we needed to conduct a strategy to
16 determine what we were going to do going forward to control
17 this situation.
18        I put together a series of documents,
19 coordinated the meeting with underwriting, administration.
20 Tim showed up. We had legal and we had claims.
21        So it was kind of a meeting of minds, let's
22 discuss this, it's a very serious situation, how are we
23 going to manage it, how are we going to go forward. From
24 that we came up with a strategy.

192

1     Q.    I guess I'm puzzling over the timing. The
2 change in the law is mid '99 and you came up with some
3 initial response?
4     A.    Right.
5     Q.    In spring 2000, now we're a year beyond that --
6     A.    This was a strategy on -- because when we
7 started to see the claims roll in, the magnitude of it, how
8 are we going to manage this going forward.
9        The strategies prior to that is how we were
10 going to manage the policy wording and how we were going to
11 manage the nuances so that we would be better moving forward
12 from policies that we already write.
13        This was one where there was some frustration
14 that there was a couple other things that the Supreme Court
15 did and it was, is this the time to throw up our hands or is
16 this the time to tread lightly or is this the time to go
17 write a lot of business.
18        So we really wanted to get together with the
19 thoughts of claims, thoughts of legal, and thoughts of
20 underwriting and the branch world and come up with a
21 consistent strategy on how we want to manage this process,
22 do we want to reduce our exposure, expand it, et cetera.
23    Q.    Did you have a recommendation as the
24 Cincinnati regional manager --

**PAGE 48 (189-192)**

193

1    A.    Yes.
2    Q.    -- as to what direction the company ought to
3 take?
4    A.    Yes.
5    Q.    What was that recommendation?
6    A.    We thought we could control the exposure by
7 reducing the employee counts of the commercial auto exposure
8 that we had.
9         It was the employee counts that drove the
10 exposure of commercial, because those are the ones that
11 would get hit by uninsured motorists, then they would
12 possibly file a claim on our commercial policy.
13   Q.    Is that the strategy adopted?
14   A.    That's the strategy adopted.
15   Q.    What's your view of how the meeting in New
16 Jersey went?
17   A.    My view is it went great.  Both Tim DeLong and
18 Paul Krump e-mailed me, said the meeting was terrific.
19        Input I heard from claims, it was one of the
20 best meetings they've seen in coordination and having the
21 ducks lined up.
22   Q.    On the way back from that meeting did you call
23 your wife and tell her you're going to keep your job for
24 another couple months?

194

1    A.    Yeah, I think I did.
2    Q.    Why did you do that?
3    A.    I thought the meeting went well.
4    Q.    Why did you put it in those terms?
5    A.    No reason.
6    Q.    Did you feel like your job was at risk at that
7 point?
8    A.    I certainly had the suspicion, which is why I
9 asked Tim in the review that we had a month earlier, am I
10 failing in this job in your eyes.  So there was some
11 suspicion.
12        But at that time, no, I would say no. I
13 probably didn't really feel that that was the case.
14        (Baillie Exhibits 24 and 25 were marked for
15             identification.)
16   Q.    Mr. Baillie, take a look at Exhibit 24 if you
17 would.  It's a memo from you to Mr. Szerlong, right?
18   A.    Right.
19   Q.    Why did you write him this?
20   A.    I can't recall if he asked for it or Tim had a
21 feeling that we weren't tight on our underwriting, so I put
22 this together to show him what we were doing, what our game
23 plan was, how we were managing the process.
24   Q.    Do you recall getting any feedback from Mr.

195

1 Szerlong about this memo, these issues?
2    A.    Just said it was good, it was okay.  I don't
3 remember anything specific.
4    Q.    How about Exhibit 25?
5    A.    Yeah.  This was a plan I ran by Tim and he said
6 it looked good.
7    Q.    What was the idea of this structural change?
8    A.    There was some thought in the organization that
9 if we could get people in the production branches away from
10 underwriting and just do new business, that we may get a
11 better return on new business.
12        So I thought it was worth a try, even though
13 the growth in new business results were quite good in the
14 two production branches we had.  They weren't really
15 production branches, they were full service branches that
16 really we scaled back on.
17   Q.    Mr. Baillie, who is John Keena (phonetic)?
18   A.    John Keena?
19   Q.    John V. Keena, New Jersey?
20   A.    Oh, Jack Keena?
21   Q.    If you say so.
22   A.    I'm sorry.
23   Q.    It's all right.  Who is he?
24   A.    He's a retired person from Chubb.

196

1    Q.    How do you know him?
2    A.    He was my supervisor, then I was his manager
3 years later.
4    Q.    When were you supervised by Mr. Keena?
5    A.    '77 through '78.
6    Q.    When were you his manager?
7    A.    '80 through '85 -- '84.
8    Q.    Do you know when he retired?
9    A.    No.  I'd say around '90.
10   Q.    Have you stayed in touch with him since his
11 retirement?
12   A.    A little bit, yeah.
13   Q.    Who is Kenneth Congle (phonetic) at Battelle?
14   A.    Oh, he's a risk manager.
15   Q.    How do you know him, what business?
16   A.    He's a customer.
17   Q.    How much business contact did you have with him
18 when you were regional manager?
19   A.    Would meet with him four times a year maybe.
20   Q.    Who would have been his primary contact,
21 somebody from the Columbus office?
22   A.    Yeah.  Yeah, that would be his primary contact.
23   Q.    Who would that have been?
24   A.    It changed.  It was Anthony Washington, then it

**PAGE 49 (193-196)**

197

```
1    was Jim Kerns.
2              (Baillie Exhibit 26 was marked for
3              identification.)
4         Q.   Mr. Baillie, Exhibit 26 is a copy of your
5    resume that was produced, correct?
6         A.   Yes.
7         Q.   Is this what you put together with the
8    assistance of the outplacement folks?
9         A.   Yes.
10        Q.   Used in your job search in 2001?
11        A.   Yes.
12             (Baillie Exhibit 27 was marked for
13             identification.)
14        Q.   Can you tell me what Exhibit 27 is?
15        A.   Looks like a release and confidentiality
16   agreement.
17        Q.   With a cover letter from Ms. Hurley?
18        A.   Yes.
19        Q.   You got a copy of this on or around September
20   6?
21        A.   That would be correct.
22        Q.   Since it was overnight mail. Was it your
23   understanding of the document that it was consistent with
24   what -- had you talked to her before this or after this?
```

198

```
1         A.   Before. Oh, might have been after because if
2    you say -- I don't really recall. Around that time.
3    September 5th is what date?
4         Q.   I don't know.
5              (Off the record.)
6         Q.   Do you have anything else to offer --
7         A.   No.
8         Q.   -- after consulting with Mr. Freking?
9         A.   No.
10             MR. FREKING:  I was consulting between answers.
11             MR. CROALL:  That's fine.
12        Q.   Was it your understanding that the content of
13   the -- at least the confidentiality agreement was consistent
14   with what Ms. Hurley had told you?
15        A.   No.
16        Q.   What about it wasn't consistent with what you
17   had been told?
18        A.   She said that they would probably include
19   restricted stock and that they would negotiate with my
20   lawyer, they're sure he has some things he wanted to put in.
21        Q.   At this point, when you got Exhibit 27, as far
22   as you know there hadn't been any contact between your
23   lawyer and Chubb, correct?
24        A.   Right.
```

199

```
1         Q.   Do you recall when you retained Mr. Freking's
2    office?
3         A.   When I got back from vacation, he was on
4    vacation after I had talked to Pat, so I guess it was maybe
5    the week after that.
6         Q.   When did you get back from vacation?  Was it
7    right around September 5?
8         A.   Yeah. Right.
9         Q.   September 6?
10        A.   September 5th, yeah.
11        Q.   Again, I apologize if I'm repeating myself.  I
12   think you said before that once you got this document you
13   had maybe another phone conversation or two with Ms. Hurley,
14   then you didn't have any further contact with anybody at
15   Chubb about this severance package; is that right?
16        A.   Not to my recollection.
17        Q.   Nobody at Chubb ever said to you, don't get a
18   lawyer, you shouldn't get a lawyer, be a bad thing to get a
19   lawyer, anything like that, did they?
20        A.   No. No.
21        Q.   Nobody at Chubb ever said anything to you like
22   don't threaten the company with claims or don't threaten it
23   with a lawsuit?
24        A.   No.
```

200

```
1         Q.   After -- well, after Mr. Freking or somebody in
2    Mr. Freking's office had some conversation or communication
3    with Chubb, you got a revised agreement from Exhibit 27,
4    right, you probably got it through Mr. Freking's office?
5         A.   I think they sent it directly to me. I don't
6    recall, though.
7         Q.   That was sometime later in September or early
8    October?
9         A.   It was quick.
10             (Baillie Exhibit 28 was marked for
11             identification.)
12        Q.   Exhibit 28 is another release and
13   confidentiality agreement, correct, Mr. Baillie?
14        A.   Uh-huh. Yes. Yes.
15        Q.   This one you signed in October, right there on
16   the last page?
17        A.   Yes.
18        Q.   But you didn't, either directly or through
19   counsel, communicate to the company that you accepted the
20   offer, right?
21        A.   Right.
22        Q.   You tried to negotiate more through counsel --
23        A.   Right.
24        Q.   -- a better package, right?
```

**PAGE 50 (197-200)**

201

1    A.    Correct.

2    Q.    And then at some point much later, either late

3 December, early January, you authorized that this be sent to

4 the company's counsel, correct?

5    A.    In December, I believe.

6    Q.    Let me take three or four minutes. Mr.

7 Szerlong is going to have to leave shortly. I may have to

8 stop it shortly.

9         (A recess was taken from 3:33 to 3:42.)

10        (Baillie Exhibit 29 was marked for

11        identification.)

12    Q.    Mr. Baillie, Exhibit 29 is a copy of your

13 offer letter from, I guess it was then National Grange

14 Mutual, or is that the formal name of your current employer?

15    A.    We have an identity crisis. We don't know what

16 we want to call ourselves. National Grange Mutual and Main

17 Street America are sometimes used synonymously. Main Street

18 America is the --

19    Q.    Parent company or holding company?

20    A.    Yeah.

21    Q.    That's your signature on the second page of

22 that?

23    A.    Yes.

24    Q.    That accurately reflects your understanding of

202

1 the current terms of your employment?

2    A.    Yes.

3         (Baillie Exhibit 30 was marked for

4         identification.)

5    Q.    Exhibit 30 is a copy of the administrative

6 charge of discrimination that you filed with the Equal

7 Employment Opportunity Commission, correct?

8    A.    Uh-huh.

9    Q.    Yes?

10    A.    Yes.

11    Q.    That's your signature on the lower left-hand

12 part of the document?

13    A.    Yes.

14    Q.    You understood when you signed this it was a

15 sworn statement just like your testimony today?

16    A.    Yes.

17    Q.    I assume that you didn't type this up yourself,

18 that somebody in Mr. Freking's office did?

19    A.    Correct.

20    Q.    You reviewed it and signed it?

21    A.    Correct.

22    Q.    Sent it back up here to be filed with the EEOC?

23    A.    Correct.

24    Q.    You understood that it was important to explain

203

1 the reasons why you felt like you were discriminated against

2 because of your age?

3         MR. FREKING: Objection to the extent that you

4    haven't shown him the affidavit that he provided. I

5    believe it is misleading to suggest he's supposed to

6    elaborate more than very bare bones on this charge.

7    So on that ground we would object.

8    Q.    Do you understand my question, Mr. Baillie?

9    A.    Repeat it.

10    Q.    That's fine. Mr. Freking's speech was

11 distracting for both of us.

12        Did you file something else with the EEOC as

13 well, a longer affidavit?

14    A.    I don't recall.

15        MR. CROALL: I don't think that was among the

16    documents that was produced to us. Am I wrong about

17    that or are you taking the position at this point

18    it's not producible?

19        MR. FREKING: I don't know, to be honest with

20    you.

21        MR. CROALL: All right.

22        MR. FREKING: I presume you got a copy of the

23    EEOC file. So whatever is in the EEOC file is what

24    he filled out. That's all I know.

204

1    Q.    Take a look at the first paragraph there. It

2 says you're a 51 year old. Based on the birth date you

3 testified about, it's accurate. That you worked for Chubb

4 in the Cincinnati office for nearly 26 years, September of

5 '75 until your abrupt terminatation August 27, 2001. You

6 didn't work in Cincinnati for 26 years, right?

7    A.    Right.

8    Q.    You worked for Chubb for that long?

9    A.    That's right.

10    Q.    Most of that time in New Jersey or

11 Pennsylvania?

12    A.    Yes.

13    Q.    So you weren't -- you didn't read that as

14 carefully as maybe you should have?

15    A.    Correct.

16    Q.    Then in the second paragraph of the affidavit,

17 it says, "I believe the Company created a paper trail which

18 contained false allegations against me."

19        Is that a reference to the Tim Szerlong

20 documents that we saw before the lunch break?

21    A.    Correct.

22    Q.    Were there any other documents that you were

23 referring to in that section of the affidavit?

24    A.    Not that I recall at this time.

**PAGE 51 (201-204)**

205

1    Q.    Have we covered today everything that you
2  consider to be a false allegation against you concerning
3  your performance?
4            MR. FREKING:  Well, we'll object.  You can try
5        to answer that.  He's covered a lot of ground today.
6            MR. CROALL:  I understand.
7            MR. FREKING:  Whether you've asked the right
8        question or not -- I think that's unfair.  You
9        directed him to certain portions.
10           MR. CROALL:  You can think whatever you want.
11           MR. FREKING:  You directed him to certain
12       portions of memos.  If you didn't direct him to some
13       other portion, he's answered the question.  He's
14       answered your questions truthfully today and
15       honestly.
16           MR. CROALL:  Are you done?
17           MR. FREKING:  The record will reflect that.
18           MR. CROALL:  Are you done?
19           MR. FREKING:  I'm done.  I'm allowed to expect
20       a fair question.
21           MR. CROALL:  You can expect whatever you want
22       and make whatever speech you want.
23    Q.    Let me ask you another question.  Is there
24  anything that you believe Mr. Szerlong accused you of

206

1  falsely in terms of your performance that we haven't covered
2  today?
3            MR. FREKING:  Same objection.  You can go
4        ahead.
5    A.    Not that I can recall at this time.
6    Q.    Okay.  The charge affidavit goes on to say that
7  you demonstrated to the company the allegations were false.
8  Can you explain to me what you meant by that or how you
9  think you did that?
10   A.    The performance of the branch and as compared
11  to my counterparts who were younger and through discussion
12  during my performance reviews.
13   Q.    We've covered all of your recollection of those
14  discussions with Mr. Szerlong?
15           MR. FREKING:  Same objection.
16   A.    At this time.
17   Q.    You can't think of anything else?
18   A.    No.
19   Q.    Okay.  When you say in the charge affidavit
20  that your performance was superior to that of younger
21  employees who were similarly situated, who were you
22  referring to?
23   A.    All the branch managers and regional managers
24  that were in our system that had performance less than what

207

1  I had.
2    Q.    All right.  Are you using performance in the
3  financial results sense or the overall sense?
4    A.    Both.
5    Q.    You knew about the financial performance, I
6  think you testified earlier, from the numbers being
7  available generally?
8    A.    Sure.
9    Q.    How did you have any knowledge about the other
10  aspect of performance for branch managers or regional
11  managers?
12   A.    Well, there was also service standards which
13  are published.  There is performance management standards
14  that we have that I got communication from the northern zone
15  that we were by far, you know, managing that more diligently
16  than the rest.
17           There is cash flow management, which those
18  numbers are published.  There are documentation of
19  performance reviews, our diligence in filling those out, our
20  driving results.  Those are pieces of it.  And, you know,
21  feedback from zones.
22   Q.    Did you ever have discussion with zone people
23  about other branch managers' performance?
24   A.    Not other branch managers' performance, no.

208

1    Q.    Or other regional managers' performance?
2    A.    No, other than some audits that my folks went
3  out on.
4    Q.    What kinds of audits would your --
5    A.    Different people go on different audits.
6    Q.    In their particular product area?
7    A.    In their particular product area.
8    Q.    You'd get some feedback from them?
9    A.    Right.
10           (Mr. Szerlong left the deposition room.)
11   Q.    Again, a little further down in that, in the
12  charge affidavit, you state you believe you have been
13  discriminated against because of your age and to avoid
14  further vesting of valuable employee benefits.
15           I want to be sure we covered today all the
16  reasons for that belief or those beliefs.
17           MR. FREKING:  Well, same objection as before.
18       It calls for some kind of legal analysis.
19           Mr. Baillie has noted he's not a lawyer, he's
20       not familiar with all the evidence.  He's testified
21       honestly and truthfully today to the best of his
22       knowledge.
23   Q.    I'm not asking you for any kind of legal
24  conclusion.  I want to be sure we've covered today any

**PAGE 52 (205-208)**

209

1  facts that you believe provide the basis for the belief that
2  you testified about in this affidavit.
3           Have we covered why you believe, as you stated
4  in this affidavit, you've been discriminated on against age
5  and to avoid further vesting of valuable employee benefits?
6  Have we covered all the reasons that you think that --
7      A.   I'd have to defer that to my lawyers, that's
8  why I hired them.
9      Q.   I understand your lawyers are fully capable of
10 marshaling all the evidence they think will help you prove
11 that.
12          I want to make sure we've discussed today all
13 the reasons that you think that, or if there's something
14 else we haven't talked about, what it is.
15     A.   I can't recall at this time.
16     Q.   Help me out with the last line in paragraph 2
17 where your affidavit says, the Company attempted to coerce
18 you into signing a severance agreement that would have
19 required a general release of all claims.
20          How did the company attempt to coerce you to do
21 that?
22     A.   Well, they stated they hold the stock, you
23 know, the stock options which you earned, over your head,
24 and severance package and restricted stock which you earned

210

1  over your head.
2      Q.   Well, from the beginning Mr. Szerlong met with
3  you in August and he talked about a separation
4  package. He said you'll have to sign an agreement for the
5  severance package, right?
6      A.   I don't recall if we got into that. I don't
7  think we did. I don't think we did. I think he just said,
8  call Pat Hurley.
9      Q.   You understood from your conversation with Ms.
10 Hurley that there would be a formal agreement and a release,
11 right?
12     A.   Right.
13     Q.   You knew it was always your choice, either to
14 sign the deal or not sign the deal, right?
15     A.   Yes.
16     Q.   Just looking back up into that second paragraph
17 where you say your performance at the time was superior to
18 that of younger counterparts --
19     A.   Right.
20     Q.   -- was that based on what you had seen in terms
21 of the quantifiable measurements that came across your desk
22 in the ordinary course of business?
23     A.   Yes. 75 percent was financials and then there
24 were other quantifiable things outside the financials.

211

1      Q.   Stuff you talked about before?
2      A.   Stuff I talked about before. A vast majority
3  of what you were being evaluated on, my performance was
4  superior.
5      Q.   But, again, other than that, those quantifiable
6  measurements that you had access to, you didn't have any
7  knowledge of the performance of other regional managers or
8  other branch managers outside your region, right?
9      A.   Well, it's -- yeah, other than, yeah, hearsay.
10     Q.   Company rumor you might hear?
11     A.   Returns from audit.
12     Q.   The person from Illinois?
13     A.   Returns from audits, yeah.
14     Q.   Those would all be from people at lower levels,
15 right?
16     A.   Yeah.
17     Q.   You mean you never heard from somebody at Mr.
18 Szerlong's level or higher about some other branch manager
19 in some other region, right?
20     A.   No.
21     Q.   I'm right, you didn't hear anything like that?
22     A.   No.
23     Q.   No, you didn't?
24     A.   No, I did not hear anything of anybody else in

212

1  any other region.
2      Q.   I made that question harder to answer than I
3  should have. I apologize.
4      A.   That's okay.
5           (Baillie Exhibit 31 was marked for
6           identification.)
7      Q.   Mr. Baillie, Exhibit 31 was among the
8  documents produced to us through your counsel. It's a June
9  18, 2001 memo from Mr. O'Hare to all Chubb elected officers,
10 correct?
11     A.   Correct.
12     Q.   You got this because you're a senior vice
13 president?
14     A.   Correct.
15     Q.   Did you do anything with it, other than read
16 it?
17     A.   No.
18     Q.   You didn't distribute it to anybody? It
19 wasn't, as far as I can tell on the face of it, intended to
20 be distributed further down the line, right?
21     A.   No, I think it was. I can't recall if it was
22 distributed it or not. I can't recall.
23     Q.   In between your August meeting with Mr.
24 Szerlong and your October 1 termination date, did you meet

**PAGE 53 (209-212)**

213

1 with your financial planner?

2    A.    Might have.  We met periodically.  When we met,

3 I couldn't tell you.

4    Q.    When you say "periodically," does that mean a

5 couple times a year?  Quarterly?

6    A.    Quarterly.  Yeah.  Pretty much quarterly.  I

7 could look at my calendar and tell you.

8          (Baillie Exhibit 32 was marked for

9          identification.)

10    Q.    Exhibit 32 is a copy of the calendar that was

11 produced to us through your counsel.

12          My question was asking you, between the day you

13 met with Mr. Szerlong, which I think was August 24th --

14    A.    Yes.

15    Q.    -- and October 1st, did you meet with your

16 financial planner?

17    A.    According to the calendar, no.

18    Q.    Can you tell me from the calendar when you did

19 next meet with him after the August 24th meeting?

20    A.    I'm not the greatest at this.  I can't see.

21 It's possible on the 29th, I don't know what month that is,

22 but it looks like I met with Brian, that might have been

23 Brian Cuneo.  I did meet with him early in the morning.

24 That's the only time I met with him.

214

1    Q.    Page 261, is that the page you're looking at?

2    A.    Yeah, that's right.  Good chance that's it.

3    Q.    I think that's October, is --

4    A.    Yeah, I think that is.  On the second page you

5 can see it.

6    Q.    Does the calendar help you identify when you

7 retained Mr. Freking's office?  His name pops up a couple of

8 times in there.

9    A.    Yeah.  I had a meeting with him.

10    Q.    September 14th is -- I think it's a Randy,

11 1:00.  It's on page 260, I think.

12    A.    260, yeah.  No, I would not have met with him

13 then because I would have been in --

14    Q.    You were on vacation or you were in

15 Philadelphia?

16    A.    I was in Wharton Business School.

17    Q.    How about Tuesday, the 25th, on the page before

18 this?

19    A.    That looks like it, yeah.  I think I called him

20 at 1:00 because he was on vacation.

21    Q.    Go back to August, which I think is page 258,

22 and on the 24th, what is the notation, 7:30?

23    A.    We had a breakfast appointment with one of our

24 agents, Tim and I.

215

1    Q.    What's the note at the bottom?

2    A.    Says couples twilight.  It was a golf --

3    Q.    Golf event at Ivy Hills?

4    A.    No.

5    Q.    You didn't play in it?

6    A.    No, I was a little too distraught to play.

7    Q.    Did you go to the IAC meeting?

8    A.    Yes.

9    Q.    Is that the next morning?

10    A.    Yes.  That's a charity that I'm on the board.

11    Q.    That's Insuring the Children?

12    A.    That is correct.

13    Q.    Then you left for Scotland on Sunday?

14    A.    Saturday or Sunday, I can't remember which.  I

15 believe it was Saturday.  We left later at night.  I can get

16 that information for you.

17    Q.    I'm looking at the calendar.  Says, Scotland

18 with an arrow, then looks like a question mark.

19    A.    I think we left on Saturday.

20    Q.    Saturday evening, get there Sunday morning?

21    A.    Yeah.  Yeah.

22    Q.    Did you fly direct from here or change in New

23 York?

24    A.    We changed actually.

216

1    Q.    Or Atlanta?

2    A.    France.  Don't do that.

3    Q.    Randy, give me another two minutes.

4          (A recess was taken from 4:04 to 4:08.)

5          (Baillie Exhibit 33 was marked for

6          identification.)

7    Q.    Mr. Baillie, take a look at Exhibit 33.

8    A.    Yes.

9    Q.    That's an e-mail that you sent to Mr. Szerlong

10 dated August 22nd?

11    A.    Yes.

12    Q.    Why did you send him this?

13    A.    He requested it.

14    Q.    As kind of a status report --

15    A.    Yes.

16    Q.    -- where things stand in terms of your

17 scorecard?

18    A.    Yes.

19    Q.    You gave him an accurate picture of where

20 things stood?

21    A.    Yes.

22          MR. CROALL:  I think that's going to be it for

23          the day.  I understand Mr. Baillie is interested in

24          getting it done today.  I may be done.  There may be

**PAGE 54 (213-216)**

217

1   more documents that are going to be produced.  You
2   guys are telling us the EEOC charge is closed, it's
3   news to us.
4            MR. FREKING:  The notice of right to sue was
5   issued on March 28.
6            MR. CROALL:  Didn't get it.  If there's an
7   underlying affidavit, you know, I may want to
8   question about it, I may not.
9            But the bottom line is, we'll stop for now,
10  maybe we're done, we'll talk about if we need to
11  continue, make any arrangements for that in a way
12  that's agreeable to everybody and we'll go from
13  there.
14           MR. FREKING:  Yeah.  Well, you know, we'll
15  hopefully not have a dispute in the future.  Just
16  note our opposition to keeping this open.  It was
17  noticed by defendant.
18           We came here -- Mr. Baillie traveled from
19  Jacksonville at considerable expense and
20  inconvenience with his new job.  He's willing to stay
21  here tonight, tomorrow, Saturday, Sunday, Monday,
22  Tuesday, if necessary, and we're prepared to do it.
23           At most there's only an hour even allowable
24  left.  At most you can ask him questions for another

218

1   hour, 15 minutes, we're done anyway.  There's a seven
2   hour limit under the federal rules.
3            MR. CROALL:  Randy, I'm not going to argue
4   with you about any of it.  I left you a voice mail
5   telling you I had time limitations based on my
6   client's schedule.  I understand, Mr. Baillie, my
7   guys had to travel here too.
8            We also have had discussions about agreeing to
9   extend the seven hour limit for Mr. Baillie and Mr.
10  Szerlong.  There hasn't been any agreement on that
11  but, you know, if you want to stick to the seven
12  hours again, we'll deal with that when we have to
13  deal with it.
14           Right now we're adjourning and we'll go from
15  there.  Mr. Baillie, I appreciate the time today.
16           MR. FREKING:  Yes on signature.
17
18
19           _____
20                 DOUGLAS W. BAILLIE
21               - - -
22       DEPOSITION ADJOURNED AT 4:11 P.M.
23               - - -
24

219

1                C E R T I F I C A T E
2   STATE OF OHIO       :
                        : SS
3   COUNTY OF HAMILTON  :
4            I, Karen Volk, CSR, RPR, the undersigned, a duly
5   qualified and commissioned notary public within and for the
6   State of Ohio, do hereby certify that before the giving of
7   his aforesaid deposition, DOUGLAS W. BAILLIE was by me first
8   duly sworn to depose the truth, the whole truth and nothing
9   but the truth; that the foregoing is the deposition given at
10  said time and place by DOUGLAS W. BAILLIE; that said
11  deposition was taken in all respects pursuant to
12  stipulations of counsel; that I am neither a relative of nor
13  employee of any of the parties or their counsel, and have no
14  interest whatever in the result of the action.
15           IN WITNESS WHEREOF, I hereunto set my hand and
16  official seal of office at Cincinnati, Ohio, this _____ day
17  of _____, 2002.
18
19
20
21
    My commission expires:      _____
22  September 18, 2005           Karen Volk, CSR, RPR
                                 Notary Public - State of Ohio
23
24