1
2
3
4
5
6
7
8
9

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND
FOR DUVAL COUNTY, FLORIDA

CASE NO. C-1-02-062

DOUGLAS BAILLIE,

            Plaintiff,            CERTIFIED COPY

VS.

CHUBB & SON INSURANCE,
            Defendant.
-----------------------------------------------------

10  STATE OF FLORIDA  )

11  COUNTY OF DUVAL   )

12      The deposition of **DOUGLAS BAILLIE** was taken pursuant to

13  Notice of Taking Deposition, on behalf of the Defendant

14  herein, on August 27, 2003, at the office of Executive

15  Reporters, 1113 Blackstone Building, 233 East Bay Street,

16  Jacksonville, Florida; commencing at approximately 10:00

17  a.m., before Candace Fleming, Certified Court Reporter and

18  Notary Public in and for the State of Florida.

19

20

21

22

23

24

25

**EXECUTIVE REPORTERS, INC.
1113 BLACKSTONE BUILDING
233 EAST BAY STREET
JACKSONVILLE, FLORIDA  32202
(904) 355-7801**

1                          **A P P E A R A N C E S**

2

3    For the Plaintiff:

4            RANDOLPH H. FREKING
             Freking & Betz
             215 E. Ninth Street, Fifth Floor
5            Cincinnati, Ohio 45202

6

7    For the Defendant:

8            DAVID K. MONTGOMERY

9            1400 Provident Tower
             One East Fourth Street
10           Cincinnati, Ohio 45202

11   Also Present:

12           LEONARD C. SHERER
             Assistant Vice President
13           & Assistant Counsel for
             Chubb & Son

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2    DOUGLAS BAILLIE

3    EXAMINATION                                    PAGE

4            Direct ......................   4

5

6

7

8                    **N O   E X H I B I T S**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### S T I P U L A T I O N S

It was stipulated and agreed by and between counsel

for the respective parties, and the witness, that the

reading and signing of the deposition by the witness be

waived.

DOUGLAS BAILLIE,

having been produced and first duly sworn as a witness,

testified as follows:

### DIRECT EXAMINATION

BY MR. MONTGOMERY:

Q.    Mr. Baillie, you've obviously been deposed

before, and I'm not going to go through the ground rules

again.  You do understand that you're still under oath

subject to the penalty of perjury?

A.    Right.

Q.    And there's no reason why you cannot give

truthful testimony today, is there?

A.    Correct.

Q.    Okay.  Have you had any change in residence

since your last deposition, which I believe was in May

of 2002?

A.    No.  I think we moved May 1st, 2002.

Q.    What's the address?

A.

Redacted

1    Q.    The other house was not on Deer Creek, was

2    it?

3    A.    The only house I had prior to that one was in

4    Cincinnati.

5    Q.    Got you.  Has there been any change in your

6    job since your deposition was taken in May of 2002?

7    A.    No.

8    Q.    No promotion?

9    A.    No.

10    Q.    No increased job responsibilities?

11    A.    Increased job responsibilities, but not --

12    Q.    Generally, what?

13    A.    -- not -- not huge.  I'm now in charge of the

14    budget for the corporation, managing the field staff --

15    field staff budget and premium budget.

16    Q.    Okay.

17    A.    It's in charge of marketing and distribution

18    management, so the responsibilities increased naturally

19    through age.

20    Q.    Okay.

21    A.    Almost on the straight-line basis and will

22    continue to.

23    Q.    Any salary increase?

24    A.    Yes.

25    Q.    Could you recall how much?

1      A.     Yes.  I can't tell you the dollar amount, but

2  three percent.

3      Q.     Three percent since you started?

4      A.     Since I started.

5      Q.     Is that a cost of living, or is that a --

6      A.     No, it's --

7      Q.     -- merit?

8      A.     Yeah, it's merit, annual merit increases.

9      Q.     Is there any on the scale at -- it's Main

10  Street America; is that correct?

11      A.     Yes.

12      Q.     Is there any scale that you can use to

13  determine from the three percent, your supervisor's

14  perception of how you're doing?  Is that --

15      A.     Yes, yes, doing well.  Satisfactory, yes.

16      Q.     Okay.  And also during your deposition, you

17  discussed that your were eligible for bonus.  Have you

18  received a bonus since that?

19      A.     No.  There were no bonuses given out in --

20  what year is this?

21      Q.     2003.

22      A.     This is -- no.  No bonuses were given out in

23  2003.

24      Q.     Okay.  How about -- have you received any

25  stock options?

1    A.    No.    There's no stock options; it's a mutual

2 company.

3    Q.    Have you received any additional benefits or

4 any remuneration of any type that you weren't receiving

5 back in May of 2002, other than the three percent

6 increase?

7    A.    No.

8    Q.    Okay.    How about your performance reviews?

9 Have you had those since then?

10    A.    Yes.

11    Q.    How many?    One or two?

12    A.    One.

13    Q.    Who's your boss?

14    A.    Kelly Stacey.

15    Q.    And generally, how were you doing according

16 the performance reviews?

17    A.    Good.

18    Q.    What's their scale?    Do they have one to ten?

19 It is meets, exceeds?

20    A.    Yeah.    I can't tell you exactly what --

21 basically met -- meet the standards, met the

22 standards -- what exactly the terminology was.

23    Q.    Okay.    Were you satisfied with the review?

24    A.    Yes.

25    Q.    Okay.    We can go through the specifics if you

1    need to.  Obviously, your attorney drew it up, but in

2    the amended complaint, you complain about the way in

3    which settlement discussions were handled with Chubb; do

4    you recall that?

5         A.    Vaguely.

6         Q.    Let me just get you to --

7         A.    Sure.

8         Q.    -- refresh your recollection.  And I did

9    pre-mark these since I didn't have that much time.  This

10   is Exhibit 47, which is the amended complaint.  If I

11   could refer you to Count Five which is on Page 8.

12        A.    Page 8.  (Reviewing documents.)  Oh, Count

13   Five.  Got it.

14        Q.    I gave you the wrong one.  I'm sorry.  You'll

15   see my critical attorney/client highlighting.

16        A.    I'm on Page 4 now.

17        Q.    I want you to look at Page 4 --

18        A.    Uh-huh.

19        Q.    -- Paragraph 2.

20        A.    Uh-huh.  (Witness complies.)

21        Q.    Then, I want you to look at Page 8, Paragraph

22   56, which I believe are more or less the same.

23        A.    Okay.

24        Q.    And once you look at that, go ahead and look

25   at Page 8, Paragraph 56.  I believe they're identical.

1    I haven't done it word for word, but they seem to be.

2        A.    (Witness complies.)   Uh-huh.

3        Q.    Let's try in the broad way.   What is your

4    complaint about the way your settlement discussions were

5    handled?

6            MR. FREKING:   Objection to the complaints.

7        It speaks for itself.

8            Go ahead and answer.

9            MR. MONTGOMERY:   Okay.

10           THE WITNESS:   Just what it says.   Basically,

11       I was told I -- that Tim had asked for the most

12       aggressive package, and that I deserved it.   When I

13       talked to human resources, they didn't want to

14       discuss it with me.

15            They said, well, your lawyer said, you know,

16       we're certainly going to negotiate, and your lawyer

17       will have other things, probably, he wants to -- so

18       when my lawyer contacted them, there were long, long

19       periods of time before they would respond.   So,

20       those are --

21       Q.    Okay.   What settlement discussions did you

22   personally have with anybody from Chubb?

23       A.    The only person was Pat Hurley.

24       Q.    This was a telephone call?

25       A.    Correct.

1    Q.    Okay.  And I know, Doug, you're not going to

2    probably be able to tell me a specific date, but if you

3    could, kind of give me a reference of -- in relation to

4    other --

5    A.    Yeah.

6    Q.    -- events.  When did this occur?

7    A.    I think, to the best of my recollection, it

8    was in -- maybe the first or second week in September.

9    It was the week after I got back from my vacation.

10    Q.    Did she call you, or did you call her?

11    A.    I called her.

12    Q.    Tell me what you recall about the discussion.

13    A.    She said, yes, Tim did tell us to give you

14    the most aggressive package.  I'm sure we'll throw in

15    your options and your restricted stock -- that I have.

16    And then, I said -- and she said, I'm sure your lawyer

17    will have other things to talk about, which I --

18    Q.    What did you say during the conversation?

19    A.    Well, I talked about the pension.  I said,

20    You know, we're really -- we're really hurting here with

21    pension.  I can't make that up.

22         And then, she said, I'm sure your lawyer will

23    have other things.

24         So, we got our wires crossed, basically.

25    Q.    Okay.  Is that the last discussion --

1    settlement discussion you had with anybody?

2       A.    No, I had -- well, possibly from Chubb,

3    possibly.  Possibly, yeah.

4       Q.    What do you mean "possibly?"  Possibly there

5    were others or --

6       A.    I had two conversations with Pat Hurley, and

7    I -- I can't recall if that was the second, you know,

8    what -- that was the first one.  I can't recall if

9    anything further came on the second conversation.

10          She did say, you know, well, I'm going to ask

11    Tim to give you two extra weeks.

12          I said, Well, that's very nice of you.

13          Then, some paperwork came that -- that said I

14    was on the payroll for two extra weeks.  But then, it

15    didn't come through, which I was fine with.

16       Q.    Okay.  But in any event, the settlement

17    discussions that you had were with Pat Hurley.  You

18    believe it was two conversations.  You don't recall

19    specifically what was said and at which one, but you

20    have covered everything you can about it; correct?

21       A.    Yes.  Except for, you know, I said, well, the

22    package that you are offering wasn't the most aggressive

23    -- doesn't seem like the most aggressive.

24          She said, well, it was not the most

25    impressive, but it was a good one.

1     Q.    Okay.  Does most aggressive -- quote, 'most

2  aggressive', unquote -- that have some specific meaning

3  to you?

4     A.    To me, I -- I thought it was going to mean,

5  you know, doing something with the pension.

6     Q.    Okay.  That's just your -- your supposition

7  basically?

8     A.    Yeah.  I mean, they've done it to other

9  people with the pensions when they had the reduction in

10  staff back in -- several years earlier, maybe three

11  years earlier.

12     Q.    And who, specifically, are you referring to?

13     A.    There was a whole group of -- of people.

14     Q.    Can you name any?

15     A.    I could name a lot if I thought about it.

16     Q.    Well, I'm not asking you to just name people

17  who were let go.  I'm asking you to name people that

18  you're sure got this --

19     A.    Oh, all of them.

20     Q.    Okay.

21     A.    All of them.

22     Q.    Whoever it was, they all got it.

23     A.    Yeah.  That was part of it.  I forget what HR

24  term it was.

25     Q.    Okay.  Now, at the time when you had these

```
 1    discussions, were you aware of any Chubb severance
 2    policy?
 3         A.      Yeah.   Two weeks per every year.
 4         Q.      Were you aware that there was a written
 5    severance policy?
 6         A.      Yes.
 7         Q.      And that policy was in effect during the time
 8    you were the regional branch manager and branch manager
 9    in Cincinnati?
10         A.      I believe so.
11         Q.      Obviously, you don't know it word for word as
12    you sit here, correct?
13         A.      Right.
14         Q.      But you -- you did know there was a written
15    policy that you could look at to refer to?
16         A.      Yes.
17         Q.      Okay.   Let me just show you -- we marked this
18    as Exhibit 34.   And just generally, take some time to
19    look through it, but is this the employee manual?
20                 I believe, if you look down here
21    (indicating), it's got an edit date 10/00.   Does this
22    look like the policy manual that would have been in
23    effect at least some time during the -- appointed you
24    the branch manager in Cincinnati?
25         A.      I can't say for sure, but --
```

1     Q.     Okay.

2     A.     I couldn't say.

3     Q.     Take a look at -- do you see, down there at

4     the bottom, CIC?  Do you see those numbers down --

5     A.     Uh-huh.

6     Q.     -- there?  Just go ahead and open --

7     A.     Yep.

8     Q.     -- to --

9     A.     Yep.

10     Q.     Okay.  Go to 1160.

11     A.     Okay.  (Witness complies.)

12     Q.     And I don't need you to read out loud, but

13     just take a minute to look at that and tell me if that

14     looks to be the separation pay policy at Chubb during

15     that time period.

16     A.     (Reviewing documents.)  Just looks like it

17     might be what was there --

18     Q.     Okay.

19     A.     -- back then.  Has a written --

20     Q.     Okay.  Let me just show you, also,

21     Exhibits -- actually, I'm going to give you 35, which is

22     actually an identical copy of that particular policy.

23          And then, also, I'll show you 36 and also 37.

24     A.     Uh-huh.  (Reviewing documents.)  Looks like

25     36 and 37 are the same.

1      Q.    Actually, if you look down at the bottom of

2  36, you'll see a revised --

3      A.    Okay.

4      Q.    -- 2/99.

5      A.    Uh-huh.

6      Q.    And your understanding is that that means it

7  was revised in February of '99?

8      A.    Correct.

9      Q.    And in 37, it says revised 6-96?

10     A.    Correct.

11     Q.    Okay.  But in any event, looking at all of

12  those different separation pay policies, you would agree

13  with me that in all of them, Chubb did specifically

14  reserve the right to handle separation pay as it saw

15  fit, correct?  Right at the beginning of each policy?

16          MR. FREKING:  We'll stipulate to that.

17          MR. MONTGOMERY:  Okay.

18  BY MR. MONTGOMERY:

19     Q.    And you would also agree that --

20     A.    Yeah, yeah.

21     Q.    -- in each of the policies that are

22  referenced in those exhibits that the policy provided

23  that an employee would be eligible for the special

24  separation pay only if they signed a separation

25  agreement acceptable to the company?  All policies

```
 1   provided that as well, correct?
 2        A.    I'm sorry.  Whereabouts -- what page are you
 3   on?
 4        Q.    Well, if you look at 35, it says that in
 5   the --
 6        A.    35?
 7        Q.    Yeah.
 8              MR. FREKING:  Says you may be eligible.
 9              MR. MONTGOMERY:  Look at 35 on the third
10        paragraph.  If you work with Chubb for more than two
11        years --
12              THE WITNESS:  Two years, yeah.
13              MR. MONTGOMERY:  -- you may be eligible --
14        yeah.
15              THE WITNESS:  Okay.
16              MR. MONTGOMERY:  And then it says, you may
17        be --
18              THE WITNESS:  Yeah, if you sign --
19              MR. MONTGOMERY:  -- eligible.  In any
20        event --
21              MR. FREKING:  It says what it says.
22              MR. MONTGOMERY:  So, we just stipulate that
23        all of those policies do provide that to get the
24        special -- if you do get the special package, that
25        you would be required to sign a release.
```

```
 1            MR. FREKING:  Objection.  If doesn't say

 2       that.  It says what it say.

 3   BY MR. MONTGOMERY:

 4       Q.    Do you agree with that, sir?

 5       A.    No --

 6            MR. FREKING:  Dave, it says what it says.

 7            MR. MONTGOMERY:  You made your objection.

 8            THE WITNESS:  It says, you may be eligible

 9       for the following special separation pay only if you

10       sign a separation agreement acceptable to the

11       company.

12   BY MR. MONTGOMERY:

13       Q.    And each of the policies that we've looked at

14   this morning all say that, correct?

15            Take time to look through it if you need to.

16   It says that in Exhibit 35, 36, and 37.

17       A.    (Reviewing documents.)  Correct.

18            MR. MONTGOMERY:  Just let the record reflect

19       Mr. Freking is writing on the document and coaching

20       the witness.

21            Go ahead and answer when you're ready.

22            MR. FREKING:  Where is it?  36?

23            THE WITNESS:  (Reviewing documents.)  You're

24       asking -- 36.  I don't see it on 36.  Can you help

25       me?
```

```
 1              MR. FREKING:  On Page 1-19, middle of the
 2       first column --
 3              THE WITNESS:  All right.
 4              MR. FREKING:  -- I think.
 5              THE WITNESS:  37.  (Reviewing documents.)
 6       Oh, my God.  I'm sorry.  I apologize; I can't find
 7       it on the 37 one.
 8              MR. MONTGOMERY:  Let me see.  (Reviewing
 9       documents.)
10              THE WITNESS:  Okay, yes.  It says the same
11       thing on all of them.
12  BY MR. MONTGOMERY:
13       Q.     It's showing you what was marked as Exhibit
14  27 in your previous deposition.
15       A.     Okay.
16       Q.     Let me go ahead and keep those all
17  together --
18       A.     Yeah.
19       Q.     -- and give those to the court reporter.
20       A.     Yeah.  (Witness complies.)
21       Q.     I'd say a letter dated September 5th, 2001,
22  that was sent to you by overnight mail to Pat Hurley --
23  and that was the first draft settlement agreement that
24  you received, correct?
25       A.     Looks like it.
```

1      Q.    Okay.  And just briefly, if you would, look

2  at the agreement in Paragraph 3.  That's where it

3  describes the various things you're being offered,

4  correct?

5      A.    (Reviewing documents.)

6          MR. FREKING:  Again, it says what it says,

7      but --

8          MR. MONTGOMERY:  We can preserve that

9      throughout the deposition if it will help you.

10         MR. FREKING:  Well, no.  You know, the

11     original agreement was --

12         MR. MONTGOMERY:  No, no --

13         MR. FREKING:  Hold on a minute.  You asked

14     for additional time to conduct Mr. Baillie's

15     condition, and the express agreement was that you

16     would not cover what was already covered in the

17     first deposition.  And you've already shown him

18     deposition exhibits from the first deposition --

19         MR. MONTGOMERY:  I'm just setting the stage.

20         MR. FREKING -- which would seem that you're

21     covering the same ground that you covered -- that

22     Mr. Crole covered in the same deposition, you know.

23         THE WITNESS:  What's the question, Dave?

24  BY MR. MONTGOMERY:

25      Q.    The question is, would you agree with me that

1   the package that was offered to you on September 5,

2   2001, does include some things that are not provided by

3   the policies that we reviewed?  The policies that we

4   reviewed do not provide for continuation of insurance

5   coverage or out-placement assistance or extension of the

6   time to exercise stock options.

7           Would you agree with that?

8       A.    I'd have to go through the policy.

9       Q.    Just take a quick look if you would.

10      A.    Just the whole thing?

11      Q.    Yeah.  Just look --

12            MR. FREKING:  Look at each one of them.

13            MR. MONTGOMERY:  Just take a look at the one

14      that was in effect when you left.  The 2000 --

15            THE WITNESS:  Okay.  The '99?

16            MR. MONTGOMERY:  No, let me see it.

17            THE WITNESS:  100?  This --

18            MR. MONTGOMERY:  I'll get it for you.

19  BY MR. MONTGOMERY:

20      Q.    You look at Exhibit 35, which was the one

21  that was in effect in -- let's see, that's --

22      A.    10/2000.

23      Q.    10/2000.  Just go ahead and take a second and

24  see what it does provide that you can get as part of the

25  special package.

1      A.      (Reviewing documents.)   This is different

2  than page CIC 655.

3      Q.      You would agree with me that the -- what you

4  are offered in Exhibit 27 includes consideration over

5  and above what's mentioned in Exhibit 35?

6      A.      Exhibit 35 is just discussing separation pay.

7      Q.      And you were offered, in addition to

8  separation pay, you were offered continued health care

9  coverage, out-placement services, and extension of your

10  stock options; correct?

11      A.      Correct.

12      Q.      Okay.  I want to show you what we marked as

13  Exhibit 38.

14      A.      (Reviewing documents.)

15      Q.      Exhibit 38 is a letter dated September 19th,

16  2001, to Ms. Hurley from Mr. Freking.  And at that time,

17  Mr. Freking was your attorney, correct?

18      A.      Correct.

19      Q.      And have you seen this document before?

20      A.      I believe so.

21      Q.      You saw it at or about the time it was sent,

22  correct?

23      A.      I believe so.

24      Q.      Okay.  Now, Doug, from September 19th, 2001,

25  forward, was all of the contact and negotiations between

1    you and Chubb -- was it handled by Mr. Freking on your

2    side?

3        A.    Correct.

4        Q.    Did you authorize him to act on your behalf?

5        A.    I did.

6        Q.    Okay.  When did you first meet Randy?  Had

7    you met him before you were terminated?

8            MR. FREKING:  Objection.

9            THE WITNESS:  I knew him.  I had played golf

10        with him once.

11            MR. MONTGOMERY:  Okay.

12    BY MR. MONTGOMERY:

13        Q.    Well, when was the first time that you met

14    with him after your termination?

15        A.    I'd say it was pretty close to the September

16    19th date.

17        Q.    You think it was before that?

18        A.    Before September 19th?

19        Q.    Right.

20        A.    I can tell you exactly --

21        Q.    If you look at your calendar?

22        A.    Yeah.  No, it probably was not -- no, it was

23    after this.  I was training, so I'd not have been able

24    to meet with him.

25        Q.    What training?

1      A.      Warten business school.

2      Q.      When did you get back from Warten?

3      A.      I believe I got back Warten -- well, it's

4  fuzzy, but I think I started at the second week of

5  September.

6      Q.      At Warten?

7      A.      At Warten, because I had the vacation.  I had

8  a week -- second week in September, and that went for

9  two weeks.  So, the 20th maybe, if I was still on

10 training when he -- when he wrote this, then I would not

11 have, no.

12     Q.      You're thinking that the first time that you

13 ever met him before the termination would have been in

14 mid-September, after the 19th?

15     A.      To the best of my recollection.  I can't

16 recall.

17     Q.      Where did you meet him?

18     A.      I would have met him at his office.

19     Q.      How many times did you go to Randy's office?

20 Was it more than once?

21     A.      In the last -- in what timeframe?

22     Q.      In the September, October, November of '01

23 timeframe.

24     A.      I have -- I have no way of recalling, but

25 most of it was by phone.  But I would say, just a

1    ballpark guess, two or three.

2        Q.    You think you did go there two or

3    three times?

4        A.    Ballpark guess.  Anywhere from one to three,

5    let's say.

6        Q.    Okay.

7        A.    It may have only been one time.  I can't

8    recall; it's possible.

9        Q.    Okay.  Showing you what we marked as Exhibit

10   39, which is a -- it starts with a fax transmittal sheet

11   to Randy from Suzanne Johnson.  You understood that

12   Ms. Johnson was with Chubb Legal, correct?

13       A.    Yes.

14       Q.    And did you see this -- whether or not you

15   saw the fax sheet, did you see this correspondence on or

16   about October 3rd, 2001?

17       A.    I can't recall.  You and I would be able to

18   look at my notes and confirm --

19       Q.    What notes?

20       A.    Notes.  I've kept correspondence, most of it.

21       Q.    Okay.

22       A.    But --

23       Q.    Just take a second to read through it.  You

24   don't need to read every word.  Maybe just read the --

25   the cover letter there you're looking at.

```
 1        A.      (Reviewing documents.)  Okay.

 2        Q.      You did understand that on or about October

 3   3rd, 2001, that the company did agree to amend your

 4   settlement agreement to include a prorated share of the

 5   restricted stock; correct?

 6        A.      Correct.

 7        Q.      And Doug, do you -- as you sit here today, do

 8   you have an idea of how many shares that would have been

 9   and what that was worth?  Just a ballpark even.

10        A.       The number that comes to mind -- I have to,

11   you know -- I'd have to do the math, but $90,000.

12        Q.      Okay.  So, your ballpark estimation is that

13   this change would have increased your package in the

14   neighborhood of $90,000 in value?

15        A.      Correct.

16        Q.      Okay.  And that change was made to the

17   agreement after you hired Randy, correct?  Obviously,

18   from the letter.

19        A.      Well, it was discussed before --

20        Q.      Discussed before?  In writing, you mean?  The

21   change was made to the agreement after you hired Randy,

22   correct?

23        A.      I can't recall if it was made after or

24   before --

25        Q.      This --
```

1    A.    -- to be honest with you, but this --

2    Q.    The letter was definitely after --

3    A.    But I did receive the agreement also.

4    Q.    Is the agreement with this?  (Indicating.)

5    A.    Correct.

6    Q.    Okay.  Does that refresh your recollection

7  that, in fact, the --

8    A.    That's probably correct.

9    Q.    -- change was made after --

10    A.    Yeah.

11    Q.    -- after you hired Randy, correct?

12    A.    To the --

13         MR. FREKING:  You mean --

14         THE WITNESS:  -- best of my knowledge.

15         MR. MONTGOMERY:  Okay.

16         THE WITNESS:  I don't really remember now.

17  BY MR. MONTGOMERY:

18    Q.    Now, you understood whenever you did first

19  see that agreement that you could accept that package

20  and receive all of the consideration you've been offered

21  in the first package plus all restricted stock options,

22  correct?  You did --

23    A.    That was my understanding.

24    Q.    -- you had that understanding?  Okay.

25  Actually, I think it was spelled out here.

1    (Indicating.)

2        A.    True.

3        Q.    Okay.  Now, I'm going to show you Exhibit 40.

4        A.    (Reviewing documents.)

5        Q.    Exhibit 40 is a letter to Suzanne Johnson,

6    dated October 9th, 2001.  And I think, even if you look

7    at last page, you were copied on this letter, correct?

8        A.    Correct.  Yes.

9        Q.    And so, you received this -- a copy of this

10   letter on or about October 9th, 2001?

11       A.    That would be according to this, yes.

12   (Indicating.)

13       Q.    Okay.  And if you turn to the last page of

14   that letter, there's some lettered paragraphs B, C, and

15   D. Do you see those?

16       A.    Yes, sir.

17       Q.    And right after that, it says, as a result of

18   the above analysis?

19       A.    Yes.

20       Q.    Okay.  And then it says, the termination will

21   have a substantial impact on his life.  We propose that

22   the separation offer be improved as follows.  And then,

23   your attorney laid out three specific proposals.

24            One, that you would be treated as if you had

25   worked another five years for pension purposes; that you

1    would be covered under Chubb's health insurance until

2    you were eligible are for similar health insurance

3    coverage --

4         A.    Correct.

5         Q.    -- and that you would be vested in all

6    restricted stock that would vest within five years.

7              And Mr. Freking was authorized to make that

8    proposal on your behalf, correct?

9         A.    Correct.

10        Q.    And you were aware that was being proposed,

11   correct?

12        A.    Correct.

13        Q.    And then also in there, he said after that,

14   please consider these facts and circumstances in your

15   revaluation of Chubb's current proposal to Mr. Baillie.

16             And then it says, the compensation offered to

17   him is inadequate, and the further requested

18   compensation is warranted.

19             And he obviously was authorized to make that

20   statement as well, correct?

21        A.    Correct.

22        Q.    Okay.  You understood that Exhibit 40 was the

23   response by you, through your attorney, to the proposal

24   that's outlined in Exhibit 39, correct?

25        A.    Yes.

1      Q.     I'll show you we've marked Exhibit 41.

2      A.     (Reviewing documents.)

3      Q.     Take a moment to look at that.  It does have

4   some fax transmittal information at the end, but I'm

5   mainly concerned about the first page.  It's a letter

6   dated October 11th, 2001, to your attorney from Suzanne

7   Johnson.

8      A.     This from Suzanne Johnson?

9      Q.     Right.  And did you see that on or about --

10  when I say on or about, I mean within a day or two after

11  October 11th, 2001.

12     A.     I can't recall.

13     Q.     You were aware, weren't you, that Chubb had

14  implemented a deadline of October 18th, 2001, for you to

15  sign your release and settlement agreement, after which

16  the offer would be withdrawn?

17     A.     Yes.

18     Q.     And you were aware of that back in this

19  timeframe of October 11th, 2001; correct?

20     A.     I believe so.

21     Q.     Okay.  Did --

22     A.     Can I go to the restroom?

23     Q.     Absolutely.

24     A.     Thanks.

25            (Whereupon, a brief recess was had off the

```
 1        record.)

 2             MR. MONTGOMERY:  Again, we're looking at

 3        Exhibit 41, which is one that has the deadline in

 4        it.

 5   BY MR. MONTGOMERY:

 6        Q.    Now, nobody from Chubb ever communicated any

 7   extension of that deadline to you, did they?

 8        A.    To October 18th?

 9        Q.    Yeah.  You never spoke to anyone at Chubb who

10   gave you a different deadline other than on the October

11   18th deadline, did you?

12        A.    At Chubb?  No.

13        Q.    Did you speak to anyone that gave you a

14   different deadline?

15        A.    Well --

16        Q.    Yes or no?

17        A.    There was -- Chubb put me up with

18   out-placement service and as part of, you know -- they

19   obviously give you counseling, but my counselor

20   indicated that those dates aren't binding and that

21   typically they'll go beyond those dates.

22        Q.    Who's your counselor?

23        A.    Lee Hecht Harrison.

24        Q.    So, he --

25        A.    And it was Joe -- that's the company; Joe
```

1    Harrison was the company.  Joe Harrison was my

2    counselor.

3        Q.    Joe Harrison is the one that you had the

4    discussion with?

5        A.    Yeah.

6        Q.    And he told you that, generally, these types

7    of things are extended?

8        A.    Yes.  Yes.

9        Q.    Did he tell you anything else about -- by the

10   way, did you share with him this October 11th, 2001,

11   letter?

12       A.    No.

13       Q.    Okay.  You've covered everything that he told

14   you about any extension of the deadline, correct?

15       A.    Yeah.  He said that, you know, don't be

16   intimidated by the date.  It's not -- there's no legal

17   -- they can go beyond that date.

18       Q.    And obviously, at the time he told you this,

19   you understood that he was not your attorney, correct?

20       A.    Correct.

21       Q.    And, in fact, Mr. Freking was?

22       A.    Correct.

23       Q.    And Mr. Freking was the one you'd be looking

24   to for legal advice, correct?

25       A.    Correct.

```
 1        Q.      Not Mr. --

 2        A.      Harrison.

 3        Q.      -- Harrison, correct?

 4        A.      Uh-huh.

 5        Q.      That's correct?

 6        A.      Yes, sir.  In retrospect, I'd probably be

 7   looking for legal advice from anybody.

 8        Q.      Now, were you unhappy with the legal advice

 9   that you were getting?  Is that why you say that?

10        A.      No, just more is better.

11        Q.      Okay.

12        A.      Can't have too much advice.

13        Q.      Now, I'd like to now show you Exhibit 42.

14   Exhibit 42 has the fax sheet on the cover to Suzanne

15   Johnson from your attorney.  The letter is dated October

16   21st, 2001.

17        A.      (Reviewing documents.)

18        Q.      Take a moment to look through that letter and

19   please confirm that is a letter you authorized your

20   attorney to send on or about October 31st, 2001 to

21   Chubb; correct?

22        A.      (Witness complies.)  Yes.

23        Q.      As you look at the second paragraph in that

24   letter, you stated, through your attorney, Mr. Baillie,

25   acknowledges that the separation package that has been
```

1    offered to him is consistent with company policy.

2    Correct?

3         A.    Yes.

4         Q.    And you agree with that, right?

5         A.    Yes.

6         Q.    Okay.  And then, it is says, if Mr. Baillie

7    believed that the package offered was fair in light of

8    the claims that he is required to release in order to

9    receive the package, Mr. Baillie would sign the

10   agreement and move on.  Correct?

11        A.    Uh-huh.

12        Q.    Is that correct?

13        A.    Correct.

14        Q.    That's the message that you and your attorney

15   communicate to Chubb on October 31st, 2001?

16        A.    Apparently.

17        Q.    Okay.  And you understood that this letter,

18   the one to Chubb on October 31st, 2001, was after the

19   deadline referenced in Mr. Johnson's letter of October

20   11th, 2001, which is Exhibit 41?

21        A.    What was the question, Dave?

22        Q.    You made this statement -- you and your

23   attorney made this statement in Exhibit 42 after the

24   October 18th deadline referenced in 41?

25        A.    (Reviewing documents.)  Yes.

```
 1        Q.     Okay.  And as you look the -- it says Page 3

 2   up there at the top left-hand corner.  You did authorize

 3   your attorney in the third paragraph to communicate to

 4   Chubb on October 31st, that using even the most

 5   conservative settlement evaluation tools, which we are

 6   aware, we cannot in good faith value your requested

 7   release of claims at anywhere close to the proposed

 8   consideration.

 9        A.     What paragraph are you on?

10        Q.     The third paragraph.

11               MR. SHERER:  You're on the wrong page.

12               THE WITNESS:  I'm on the wrong page.  You

13          said three.

14               MR. FREKING:  Objection.  It says what it

15          says.  I'm, you know, sorry, but what is the

16          question?

17               THE WITNESS:  (Reviewing document.)  Yes.

18   BY MR. MONTGOMERY:

19        Q.     And it does say that, correct?

20        A.     Yes, it does.

21        Q.     In plain English, what you're conveying to

22   Chubb is that what you offered us is not sufficient,

23   correct?

24        A.     Is not fair.

25        Q.     Okay.  And then, if you look at the -- you
```

1    can read the paragraph in between if you want, but I

2    want to direct you to the one that starts out, Mr.

3    Baillie has authorized us.  Do you see that?

4         A.     Yes, I see it.

5         Q.     You're basically saying that the amount you

6    offered us is not fair.  If you don't offer us more,

7    we're going to sue.  Correct?

8                Isn't that what you were conveying to Chubb?

9         A.     Potential to sue, yes.

10        Q.     Okay.  And even included a -- a draft

11   complaint attached to that letter?

12        A.     (Reviewing documents.)  Yes.

13        Q.     Okay.  Doug, are you aware of any writing or

14   documents from Chubb extending the October 18th deadline

15   referenced in Exhibit 41?

16        A.     Any writings?  I can't recall any at this

17   time, no.

18        Q.     Okay.

19        A.     I'd have to go back.

20        Q.     And you covered a conversation with somebody

21   from Lee Hecht Harrison, but nobody from Chubb ever

22   directly told you that the October 18th would be

23   extended, did they?

24        A.     October 18th for signing?  Correct.

25        Q.     Nobody from Chubb --

1      A.      No.

2      Q.      Nobody from Chubb ever said anything

3  inconsistent with Exhibit 41?

4              MR. FREKING:   You're excluding the guy from

5      Lee Hecht Harrison?

6              MR. MONTGOMERY:   I specifically said anyone

7      from Chubb.

8              THE WITNESS:   No.   What you said is correct.

9  BY MR. MONTGOMERY:

10     Q.      Showing you what we marked as Exhibit 43,

11 that's a letter dated November 20, 2001, to David Croall

12 from your attorney, and it shows you being copied on

13 that; correct?

14     A.      (Reviewing documents.)   It does.

15     Q.      So, you received a copy of that shortly --

16     A.      I assume.

17     Q.      -- shortly after November 20th?

18     A.      I assume.

19     Q.      And just take a second to read that to

20 yourself.

21     A.      (Witness complies.)   Uh-huh.   I did.

22     Q.      But you understand that you, through your

23 attorney, are communicating to Chubb, again, that your

24 intention is to pursue litigation?

25     A.      Potential litigation.

1      Q.      Okay.  Now, when did you sign the -- any of

2  the Chubb settlement agreements?

3      A.      I believe it was October 18th, but I --

4  whatever the deadline they give me was.

5      Q.      And where were you when you signed it?

6      A.      I'd have to look at it.  Either in the bank

7  or at Mr. Freking's office.  Whatever the notary --

8      Q.      Well, did you sign it at Mr. Freking's office

9  or did you mail it to his office?

10      A.      Oh, no.  No.  If I signed it, I signed at his

11  office.

12      Q.      You either signed it at a bank or at his

13  office?  You said --

14      A.      Signed it in front of the notary.  I either

15  went to a notary, got it signed, and took it to Randy's

16  office, or I had it notarized there.  I think I had it

17  notarized at Mr. Freking's office, but I'd have to look

18  at the seal.

19      Q.      Well, do you recall someone notarizing it at

20  his office?

21      A.      I recall someone notarizing it.  I can't

22  recall if it was at his office or --

23      Q.      Do you sign it in a conference room?

24      A.      I really -- can't really recall where I

25  signed it.  I signed it in front of notary.

1       Q.      100 percent sure of that?

2       A.      Yes.  100 percent sure.

3       Q.      Are you 100 percent sure that you signed it

4   on October 18th?

5       A.      Yes.

6       Q.      When you signed the document, what was your

7   intention as to what would be done with it?

8       A.      At the time I signed the document, I was --

9   it clearly said it had to be signed by that date.  I

10  signed that date, and my intent was to settle pending

11  the further negotiations.

12      Q.      Did you ever, prior to -- let me show you

13  this Exhibit 44.

14      A.      (Reviewing documents.)

15      Q.      This is dated December 21, 2001.  It's a

16  letter to Croall.  You understood that at the time

17  Croall was the attorney for Chubb?

18      A.      Correct.

19      Q.      Okay.  And just take a second to read through

20  the --

21      A.      (Witness complies.)

22      Q.      Where it says, enclosed is an original of the

23  settlement agreement that was signed by Doug Baillie in

24  October, you only signed one version of this -- of the

25  settlement agreement; correct?

```
 1        A.      Boy.  I can't recall that.  I couldn't
 2   recall.
 3        Q.      But you do recall getting two different
 4   versions that --
 5        A.      Oh, one version.  I'm sorry.  I misunderstood
 6   your question.
 7        Q.      I don't mean copies.
 8        A.      Yes.  No -- yes, the one version is correct.
 9        Q.      The version you signed, and we'll get to in a
10   second, was the second version.  The one that included
11   the contract stock in the --
12        A.      Correct.
13        Q.      Okay.  Now, you'd agree from reading the
14   letter that you did receive a copy of this as well in
15   December?
16        A.      I can't recall, but I could look through my
17   notes.
18        Q.      But -- but --
19        A.      I recall the conversation though.  Yes.
20        Q.      -- you did understand that this was being
21   sent to Chubb for the first time in December 2001?
22        A.      Yes.
23        Q.      Okay.  And it was being sent to Chubb well
24   after the October 18th deadline referenced in Ms.
25   Johnson's letter, Exhibit 41 --
```

```
 1              MR. FREKING:  I'll stipulate that anything
 2         that happened in December is after October.
 3              MR. MONTGOMERY:  -- correct?
 4              THE WITNESS:  Yes, sir.
 5     BY MR. MONTGOMERY:
 6         Q.   Okay.  And there's a statement in there that
 7     says that when we talked earlier this month, that quote,
 8     it's a generous offer.  We hope he takes it, unquote.
 9     In our view, we verbally stated it on Tuesday and again
10     yesterday.
11              Now, do you know who Mr. Freking is referring
12     to when it says we talked?                          c
13         A.   We being, Dave.  I believe David Croall and
14     Randy.
15         Q.   And you were not in on those --
16         A.   No.
17         Q.   -- conversations, were you?
18         A.   No.
19         Q.   So, you don't know what was discussed between
20     the two of them?
21         A.   I do.
22         Q.   Only from what Randy has told you?
23         A.   Correct.
24         Q.   And are you going to share that with us
25     today?  Are you going to waive the attorney/client
```

```
 1    privilege between you and Randy with what was discussed

 2    with -- between you and Randy?

 3              MR. FREKING:  Well --

 4              MR. MONTGOMERY:  I'm not going to agree to a

 5         limited waiver.  I'm expressing that --

 6              MR. FREKING:  It's really pretty clear

 7         from -- if you want him to tell you whether or

 8         not --

 9              MR. MONTGOMERY:  I didn't --

10              MR. FREKING:  -- I told him about this

11         conversation --

12              MR. MONTGOMERY:  I -- I --

13              MR. FREKING:  Dave, listen --

14              MR. MONTGOMERY:  I won't ask the question.  I

15         want it answered, but --

16              MR. FREKING:  You can withdrawal your

17         question.

18    BY MR. MONTGOMERY:

19         Q.    My question is are you going to waive the

20    attorney/client privilege?  And you can discuss that

21    with -- I don't want it discussed on the record.  And

22    again, I'm expressing that I'm not going to agree to a

23    limited waiver.

24              If you're going to waive it, I need you to

25    tell me you're going to waive it, and we'll waive the
```

```
 1   whole thing.
 2        A.    I haven't discussed that with Randy yet, so
 3   --
 4        Q.    Is that --
 5        A.    -- I don't --
 6        Q.    -- is that your intention?
 7        A.    -- I don't --
 8             MR. FREKING:  Well, we should talk about it.
 9             THE WITNESS:  -- know --
10             MR. FREKING:  We should talk about it.
11             THE WITNESS:  -- what our intention is.  You
12        know, I'm not sure what it really means.
13             MR. MONTGOMERY:  Were you going to talk about
14        it now or what?
15             MR. FREKING:  You want us to?
16             MR. MONTGOMERY:  Only if it doesn't cut into
17        my time.
18             MR. FREKING:  Okay.
19             (Whereupon, a brief discussion was had off
20              the
21        record.)
22             MR. MONTGOMERY:  Okay.  The question was, are
23        you going to waive the privilege or not?
24             THE WITNESS:  The answers is --
25             MR. FREKING:  The answer is no.
```

```
 1              THE WITNESS:  -- no.

 2              MR. MONTGOMERY:  Okay.

 3    BY MR. MONTGOMERY:

 4        Q.     Again, referring to this --

 5        A.     Right.

 6        Q.     -- Exhibit 44.

 7        A.     Uh-huh.

 8        Q.     Now, these conversations that your attorney

 9    is referring to in the second paragraph --

10        A.     Correct.

11        Q.     -- your understanding is that these are

12    conversations between your attorney and Chubb's

13    attorney, correct?

14        A.     Yes, David Croall.

15        Q.     And you did not witness any of these

16    conversations?

17        A.     Correct.  Only received this letter.

18        Q.     Okay.  But let me ask you this:  So, this

19    letter was December 21st, 2001.  To your knowledge,

20    prior to that date, December 21, 2001, was anybody at

21    Chubb ever made aware that your intention was to accept

22    Chubb's settlement proposal?

23        A.     Prior to this date?

24        Q.     Right.

25        A.     I think it was prior to that date.
```

1      Q.      When do you think that somebody from Chubb

2   was first made aware that you intended to accept the

3   settlement proposal?

4      A.      Somewhere between the first week in December

5   and around this date to the best of my recollection.

6   It's in that timeframe, in there somewhere.

7      Q.      Do you have any understanding of how such

8   acceptance was communicated to Chubb?

9      A.      Through -- well, what this letter says,

10  through Randy.  A generous offer, we hope we take it,

11  and I said okay.  You know, I got to move on.  The

12  negotiations aren't going anywhere, and so --

13     Q.      So, what you're really saying is, your view

14  -- and again, I'm not asking you what you discussed with

15  Randy, but your view was that you -- that the offer was

16  verbally accepted on whatever that Tuesday and again

17  yesterday.

18             Is that your view?

19     A.      Yeah.  Yes, I believe so.

20     Q.      And --

21     A.      We discussed it as much as we could.  We made

22  the arguments; it wasn't going anywhere.  Need to move

23  on?

24     Q.      That's when sometime in December -- I mean,

25  we'd have get a calendar out to figure out what that

1    Tuesday was or -- yesterday, obviously, is December

2    20th --

3        A.    Yes.

4        Q.    But whatever that week was in December,

5    that's when you first made your decision to accept

6    Chubb's package or settlement proposal --

7        A.    I --

8        Q.    -- is that correct?

9        A.    -- I was pre-inclined to accept it before

10   that just in terms --

11       Q.    I'm not asking --

12       A.    Well, it was --

13       Q.    -- what exact time --

14           MR. FREKING:  Well, just let him answer his

15       question.  Answer -- state your answer.  Don't be

16       interrupted.

17           THE WITNESS:  I was committed emotionally and

18       mentally to accept it on October 18th, but we were

19       waiting for the negotiations to finish.

20   BY MR. MONTGOMERY:

21       Q.    What -- when you -- let me address it a

22   different way.

23       A.    Okay.

24       Q.    I want to find out when was it your intention

25   that Chubb first be notified that you were accepting

 1  this settlement offer?

 2      A.    My intent was when the -- when I thought

 3  negotiations went as far as they would go.

 4      Q.    That was in whatever week that was in

 5  December 2001; is that correct?

 6      A.    Yeah.  Yes.

 7      Q.    Okay, that is correct.  That was the --

 8  again, I just need to pin it down for the record, but it

 9  was -- December 2001 was the first time it was ever your

10  intention that Chubb be made aware that you intended to

11  accept the settlement package; is that correct?

12      A.    Yes, I believe so.

13      Q.    As you sit here today, Doug, is it your

14  belief that, in fact, a contract was formed with Chubb

15  in December 2001?

16      A.    Correct.

17      Q.    That you believe?

18      A.    Correct.

19      Q.    And that it was a verbal agreement per this

20  letter?

21      A.    Yes, verbal and signed.  Yes, it was a signed

22  document from October 18th and verbal.

23      Q.    But your understanding was that the agreement

24  with Chubb actually was verbal and that it was reached

25  in December 2001.

```
 1        A.      No, my -- say that again.  Can you repeat

 2  that sentence?

 3        Q.      Well, it worked like this.  Your testimony is

 4  that you signed that document on December 18th, 2001?

 5              MR. FREKING:  No, no.  October 18th.

 6              THE WITNESS:  October 18th.

 7              MR. MONTGOMERY:  October 18th, I'm sorry.

 8  Thank you.

 9  BY MR. MONTGOMERY:

10        Q.      Let's start over.  Your testimony is that you

11  signed the document on October 18th --

12        A.      Correct.

13        Q.      -- 2001?

14        A.      Correct.

15        Q.      But that you made a conscious decision that

16  Chubb would not be made aware of that signature while

17  you continued to negotiate further; isn't that correct?

18        A.      I believe so, yes.

19        Q.      Okay.  And then, the first time that you --

20  that you're aware of that any indication was made to

21  Chubb that you were accepting the package was in

22  December 2001; correct?

23        A.      Correct.

24        Q.      And that it -- your intention to accept the

25  package was verbal, as referred to in Exhibit 44?
```

1          A.      Verbal and written in the signed contract.

2          Q.      Well, just that it was -- the signed contract

3    was then delivered to Chubb?

4          A.      Correct.  It was in verbal and in writing.

5          Q.      Okay.  So, as you sit here today, it's your

6    belief that you had a contract with Chubb?

7          A.      Correct.

8          Q.      And that Chubb has breached the agreement by

9    not --

10         A.      Accepting.

11         Q.      And why haven't you sued for breach of

12   contract?  And again, I'm not asking Randy.  He can

13   object to a leading conclusion, but --

14         A.      I believe we have.

15         Q.      Let's take a look at the complaint.  This is

16   -- by the way, this has been --

17              MR. FREKING:  Yeah.  There's no breach of

18         contract claim; it's a retaliation claim.  A breach

19         of contract claim is essentially -- it's a

20         retaliation.  It's an element of a retaliation

21         claim, but that's fine.  We've been through this

22         before, Dave.  We --

23              MR. MONTGOMERY:  No, no.  We've been through

24         this.

25              MR. FREKING:  It says what it says.

```
 1            MR. MONTGOMERY:  We've been though it.  And
 2       you've made it clear to the judge that it's not a
 3       breach of contract.  I made that clear to the judge.
 4       He said there's not going to be any opportunity to
 5       amend and --
 6            MR. FREKING:  Right.
 7            MR. MONTGOMERY:  Okay.
 8   BY MR. MONTGOMERY:
 9       Q.    Doug, you never -- you never personally
10   witnessed any conversations between Randy and David
11   Croall, did you?
12       A.    Prior to my deposition, no.
13       Q.    Well, obviously you saw them discussing it at
14   the deposition, but --
15       A.    Right.
16       Q.    -- you've never -- like, for example, you've
17   never been in Randy's office listening to one side of
18   the conversation on the telephone with David, have you?
19       A.    That is correct.  No --
20       Q.    You never have.
21       A.    -- I have not.
22       Q.    Okay.  Was it your understanding that you
23   could sign the agreement on October 18th, 2001, not make
24   Chubb aware that you had signed it, and then, that, you
25   know -- that you could wait for an indefinite amount of
```

1    time before you made them aware of it?

2        A.      The contracts clearly said it must be signed

3    by this date.  It didn't say to be sent in, and since

4    we're still under negotiations -- yeah.  Until the

5    negotiations were played out.

6        Q.      Did anybody ever tell you you could do that?

7        A.      I believe Randy did, but I can't recall.

8                MR. FREKING:  You can't waive the attorney --

9                THE WITNESS:  I'm sorry.  I didn't --

10               Did anybody other than my lawyer?  No.

11   BY MR. MONTGOMERY:

12       Q.      But your thought is, even you could -- you

13   could have sat on it for a couple of years, sued, see

14   how you did.  Then --

15       A.      No.  According to the agreement, once you

16   sue, obviously your -- the agreement -- that would break

17   the agreement.

18       Q.      Okay.  You're not a lawyer are you?

19       A.      No.

20               MR. FREKING:  I will object to that.  The

21           document will speak to itself as to acceptance.

22   BY MR. MONTGOMERY:

23       Q.      Did you, in connection with your insurance

24   employment and employment history, did you ever get any

25   legal training in contract principles?

1     A.     Oh, no.

2     Q.     None at all?

3     A.     No.

4     Q.     Not even on insurance contracts?

5     A.     Boy, not that I recall.  If I did, if

6 there -- I couldn't, in good faith, say yes.  I'd have

7 to say no --

8     Q.     Okay.

9     A.     -- not in my recollection.

10     Q.     Have you ever heard a concept that if there's

11 a proposal by one party, and then after that, the other

12 party makes a counterproposal, that the first proposal

13 is off the table?  Have you ever heard that?

14     A.     Not -- no.

15     Q.     Not aware of that?

16     A.     No, not aware of that.

17     Q.     Okay.

18     (Whereupon, a brief discussion was held off

19     the record.)

20 BY MR. MONTGOMERY:

21     Q.     I'm showing you Exhibit 28 to your deposition

22 before.  Just turn to the last page.

23     A.     Yes.  (Witness complies.)

24     Q.     And that is your signature, correct?

25     A.     Correct.

```
 1        Q.      And again, you're 100 percent that sure you
 2   signed it on Octobers 18th.
 3        A.      100 percent.
 4        Q.      And you're 100 percent sure that it was
 5   notarized right at the time that you signed it on
 6   October 18th?
 7        A.      100 percent.
 8        Q.      And it was done by Jenna White?
 9        A.      That I couldn't be 100 percent sure, but
10   whoever the notary was that signed it.
11        Q.      Who is Jenna White or Jenna Hosk?
12        A.      I couldn't tell you.
13        Q.      Okay.
14        A.      I really don't know.
15        Q.      When you signed the document, was it at a
16   meeting with Randy?
17        A.      I can't recall, actually, if I saw him that
18   day.
19        Q.      Okay.
20        A.      I think I did.  That's why I'm having
21   trouble.  It was either -- you know, I took it; I knew
22   it was the 18th.  I went to a notary, and I took it to
23   his office.  Whether I went to a notary first or I took
24   it to his office and had it signed by his notary, I
25       don't --
```

```
 1        Q.    You don't know.

 2        A.    I just can't recall that.  It was definitely

 3   that day, because there was a sense of urgency --

 4        Q.    Okay.

 5        A.    -- obviously with that 18th deadline.

 6        Q.    Okay.  And you're aware that some time after

 7   December 2001, the company did put that settlement

 8   proposal back on the table?

 9             MR. FREKING:  Now, just for -- he can answer

10        the question, but just for the record, I'm going to

11        object to the admissibility of any of these

12        settlement discussions following 2001.

13             MR. MONTGOMERY:  Your point being some

14        settlement discussions will be in and not others.

15             MR. FREKING:  Right.  Some form the basis for

16        a legal claim, and some don't.  Some are just --

17             MR. MONTGOMERY:  Okay.

18             MR. FREKING:  Once a lawsuit is filed,

19        they're out.

20   BY MR. MONTGOMERY:

21        Q.    Are you aware of that, sir?

22        A.    Aware of that?  As much as I can -- just

23   repeat -- repeat the question please.

24        Q.    You're aware, aren't you, that some time

25   after December 2001, the settlement proposal -- Chubb's
```

1  settlement proposal that included the year's pay, the --

2  some of the group health coverage, out-placement

3  assistance, which you already had by the way, and the

4  restricted stock and the extension of the option

5  exercise deadline?  That that was put back on the table

6  some time after December 2001?

7       A.    Yes.  When the stock went considerably down,

8  yes, they did throw it back the table.  When the value

9  of the package was considerably less.

10      Q.    Right.

11      A.    Right.

12      Q.    Okay.  Do you have any recollection of when

13 that was?

14      A.    Sometime after my deposition, I believe,

15 which was --

16      Q.    That's close enough.  That's fine.

17      A.    Yeah.

18      Q.    Okay.

19      A.    Yeah, I'd be guessing.

20      Q.    In any event, for whatever reason, you

21 rejected that proposal?

22      A.    Would you like to know the reason?

23      Q.    I think you tried to mention that before --

24      A.    Okay.

25      Q.    -- when you were answering the last question.

 1       A.      Right.

 2       Q.      Doug, showing you -- it's a little bit hard

 3    to read, but that's Exhibit 32.

 4       A.      Yes.

 5       Q.      That's from your prior deposition.

 6       A.      Yes.

 7       Q.      And it's a little hard to get orientated

 8    here, but let me do it this way.

 9       A.      Sure.

10       Q.      (Reviewing documents.)  I would like you to

11    start on --

12       A.      Sure.

13       Q.      You see down there in the bottom right-hand

14    corner, there's a state stamp number that actually came

15    from Randy's office by there way.

16       A.      (Reviewing documents.)  Yes.

17       Q.      Yeah.  I think if you look at Page 260 --

18       A.      260, okay.  (Witness complied.)

19       Q.      Now, if you need to back up to confirm this

20    to yourself --

21       A.      Sure.

22       Q.      -- I believe that we are looking at

23    September, because the day before -- the page before has

24    Labor Day on it.

25       A.      Labor Day?

```
 1        Q.      See that, the 3rd --
 2        A.      Yes, yes.
 3        Q.      -- the day before --
 4        A.      Yeah.
 5        Q.      -- was Labor Day --
 6        A.      Yeah.
 7        Q.      -- showing the same page as --
 8        A.      Yeah.  Uh-huh.  (Reviewing document.)
 9        Q.      Maybe, Doug, if you could try to take me
10   through here to try to bring back your recollection --
11        A.      Sure.
12        Q.      -- here.  I can't read all of this.
13        A.      Sure.
14        Q.      Can you read what it says on the 4th?
15        A.      On the 4th?
16        Q.      Yeah, 9:00 o'clock, something, meeting.
17        A.      Boy.  (Reviewing documents.)  I mean,
18   definitely 9:00 o'clock.
19        Q.      That's all right.  Do you know what the
20   bottom is?
21        A.      I --
22        Q.      Is that John LeFrance?
23        A.      Boy.
24        Q.      Don't worry about it.
25        A.      Got me on that.
```

1      Q.    Then we get into the 10th, and it looks like

2  you have a line --

3      A.    Yes.

4      Q.    -- through that.

5      A.    Yes.  That would be, I believe -- the 10th

6  through the 21st, I was in Philadelphia.

7      Q.    Yes.

8      A.    Yes, that's why the line -- the line is

9  there.  Absolutely -- 9/11 occurred.

10     Q.    Okay.  While you were in Philadelphia?

11     A.    While I was in Philadelphia.

12     Q.    Okay.  Now, if you go down to -- well, before

13  you go down, if you'll turn back to 260, the next

14  page --

15     A.    260?

16     Q.    Uh-huh.  It looks like it says on the 14th --

17  it does say Randy, and it looks like 1:00 o'clock.

18     A.    Uh-huh.

19     Q.    What does that reflect?  Do you think that's

20  a telephone call with Mr. Freking?

21     A.    It must be.

22     Q.    Okay.

23     A.    Could have been a telephone call.

24     Q.    Then, on the 25th, go back to the previous

25  page --

1      A.     Yes.

2      Q.     You see how this works with --

3      A.     Yes, sir.

4      Q.     They are --

5      A.     Yep, yep.

6      Q.     -- side by side --

7      A.     Yep.

8      Q.     -- here.  On the 25th, which is a Tuesday, it

9   says Randy -- I think, that says Randy Freking,

10  2:30 --

11     A.     Uh-huh.

12     Q.     -- correct?

13     A.     Correct.

14     Q.     And was that a meeting at his office?

15     A.     It may have been a telephone call.  It may

16  have been in his office.

17     Q.     But you're not sure.

18     A.     It may have not occurred.

19     Q.     Okay.

20     A.     It was a long time ago.

21     Q.     What's ITC?

22     A.     Insuring The Children --

23     Q.     Okay.

24     A.     That's a charity I --

25     Q.     And then before that, it says, Charles Miller

1    on the 26th.

2         A.    Uh-huh.

3         Q.    Who is that?

4         A.    Yes.  Charles Miller is the head of AON.

5         Q.    Okay.

6         A.    One of our --

7         Q.    Job interview?

8         A.    No, he just wanted to take me to lunch.

9         Q.    Okay.  Turn to the next page.

10        A.    (Witness complies.)

11        Q.    And I think you can match it up with the,

12   you know, these other calendars that are in the left --

13        A.    Sure.

14        Q.    -- that this is October.  We're starting on

15   Monday --

16        A.    Yeah.

17        Q.    -- Columbus Day --

18        A.    Sure.

19        Q.    So, on the 15th, we have 11:30, Freking &

20   Betz?

21        A.    Right.

22        Q.    Is that a meeting or a phone call?

23        A.    I can't recall --

24        Q.    Does the fact that --

25        A.    -- I can't recall --

1   Q.  -- Freking & Betz --

2   A.  I obviously had an appointment on that day.

3   Q.  Okay.  But don't know if you went or not?

4   A.  I don't know if it was a telephone

5 appointment or whether I went or whether it even

6 occurred.

7   Q.  Okay.  So, if you turn to page -- on the

8 18th, that says call?

9   A.  Yes.

10   Q.  Who --

11   A.  Don Hertzler.

12   Q.  Who's that?

13   A.  I think he was someone in charge of Zurich in

14 reference to the job.

15   Q.  Possible job?

16   A.  I'm pretty sure it was Zurich, but I wouldn't

17 swear it.

18   Q.  Okay.  But in any event, on October 18th,

19 there's no notation of any Freking & Betz or Randy

20 Freking, correct?

21   A.  Correct.

22   Q.  Correct.  Do you have any explanation for

23 that?  I mean, why wouldn't you have put that down?

24   A.  I don't want everything down.

25   Q.  Can you think of any reason for why wouldn't

 1   you have put the deadline down?

 2       A.    It was pretty etched in my mind.

 3       Q.    Why was it etched in your mind?

 4       A.    Well, it was -- 10/18 was a deadline to sign

 5   this thing.

 6       Q.    Okay.

 7       A.    I didn't need to write that down.

 8       Q.    Okay.  But even after looking at this and

 9   seeing no indication of any meeting or appointment at

10   Freking & Betz, are you still 100 percent sure that you

11   signed the document on the 18th?

12       A.    Absolutely.

13       Q.    And if the notary is an employee of

14   Freking & Betz, then you're 100 percent sure it's on the

15   18th at Freking & Betz?

16       A.    100 percent sure.

17       Q.    Okay.

18       A.    I would be in there for that day.  I remember

19   being there that day at the reception desk.

20       Q.    And signing it?

21       A.    Yeah.  Oh, well -- I can't recall if I signed

22   it there or took it to a bank and got it signed and

23   dropped it off at the receptionist's desk.  But I

24   definitely remember being there that day.

25       Q.    Okay.  Got it.  Maybe if we just to go

1  through a couple of them, to see if it refreshes your

2  recollection.

3      A.    Sure.

4      Q.    But the next day you had Beechmont, 8:00

5  Steve.  Is that, like, Beechmont Racquet Club, or do you

6  know?

7      A.    I think that is a car.  Each month --

8      Q.    Okay.

9      A.    -- Ford --

10      Q.    Okay.  And did you meet with Midland?

11      A.    Yes, I did meet with Midland.

12      Q.    Okay.

13      A.    The CEO of Midland.

14      Q.    Possible job?

15      A.    Yeah, more of a --

16      Q.    Network?

17      A.    Yeah.

18      Q.    Okay.  Do you know what the next one says

19  under that?

20      A.    John.  (Reviewing documents.)  Next one is

21  directions, how to get there.  John is the person I met

22  with at Midland.

23      Q.    Okay.  John Hayden?

24      A.    Yes.

25      Q.    Hey, there's -- you can take a look at it in

1    the complaint if you want, but there's a claim in there

2    for defamation.  Are you aware of that?

3         A.    It's not fresh on my memory right now.

4         Q.    Well, let me just ask you this:  As you sit

5    here today, are you aware of any specific untrue

6    statements made about you by any Chubb employee?

7              MR. FREKING:  Hold.  I think I'm going to

8         instruct him not it answer.  That's way beyond --

9              MR. MONTGOMERY:  Yeah --

10             MR. FREKING:  -- what we agree to cover.

11             MR. MONTGOMERY:  -- down the line.

12             MR. FREKING:  You said you wanted to come

13        down, take a deposition for breach of contract.  I

14        think we're down here just for breach of contract

15        claim.

16             MR. MONTGOMERY:  I thought you said if it was

17        not covered in deposition, then we could cover it.

18             MR. FREKING:  No.

19             MR. MONTGOMERY:  We'll just skip --

20             MR. FREKING:  No.

21             MR. MONTGOMERY:  If you instruct him not to

22        answer --

23             MR. FREKING:  I'm going to instruct him not

24        to answer.

25             MR. MONTGOMERY:  Are you going to follow his

```
 1          instructions?
 2               THE WITNESS:  I'll follow my lawyer's
 3          instructions.
 4               MR. MONTGOMERY:  Okay.  Let's take about a
 5          five-minute break.  I may be done.  I may have a
 6          couple more question.
 7               MR. FREKING:  Sure.
 8               (Whereupon, a brief recess was had.)
 9   BY MR. MONTGOMERY:
10        Q.    Are you aware of any untrue statements made
11   by anybody at Chubb about you?
12        A.    I'm obviously getting a lot of it secondhand,
13   but, yeah, there were comments about my leadership.
14   After twenty-five years of strong grades in leadership
15   and after turning around the Cincinnati branch --
16        Q.    Doug, before we get too far down the road on
17   the substance of the comments, I'm asking specifically
18   for who and where and to whom they were made?
19        A.    Okay.  Tim would have made that to the
20   office, telling them that a change in leadership was
21   needed.
22        Q.    You're talking about the -- the announcement
23   of your departure?
24        A.    Uh-huh.
25        Q.    Is that correct?
```

1          A.      Correct.

2          Q.      And who relayed that to you?  You went there,

3     correct?

4          A.      No, I was not there.

5          Q.      So, you're saying that somebody relayed to

6     you some false statement that Tim made?  Is that -- is

7     that what you're saying?

8          A.      Yeah, but I can't remember who.

9          Q.      Do you remember specifically what they said

10    Tim said?

11         A.      Specifically, no, on that case.

12         Q.      And as you sit here today, you think it

13    related something about your -- your leadership skills

14    or the need for a change --

15         A.      Right.

16         Q.      -- but don't have any specific statement in

17    mind; is that correct?

18         A.      Correct.

19         Q.      All right.  What other untrue statements do

20    you believe were made by anyone at Chubb?

21         A.      Obviously, the statements about having a

22    shouting match with my wife and passing that on to other

23    employees.

24         Q.      Okay.  One second on that, Doug.  I want to

25    separate out here for a second.

1       A.     Okay.

2       Q.     I understand that -- your wife said this

3    today that she disputes Diana Haggard's deposition

4    testimony and believes it's false.

5       A.     Correct.

6       Q.     Okay.  I don't want to go through today what

7    you believe is false about deposition testimony --

8       A.     Okay.

9       Q.     -- okay?  All I want to know is -- I mean,

10   you filed this defamation claim back in, you know,

11   whenever your amended complaint -- and maybe before

12   that.  I really want to know what that relates to, not

13   whether you think that people said false things in

14   depositions.  Okay?

15      A.     I see what you're saying.

16          MR. FREKING:  I don't want to get hung up on

17      this thing, Dave, but she apparently admitted in her

18      deposition about statements she made prior to filing

19      this complaint.

20          MR. MONTGOMERY:  Well --

21          MR. FREKING:  I'm just telling you.  I'm just

22      putting you on notice that we're going to include in

23      the defamation claim information that we have

24      discovered in the discovery process that was false

25      about Doug.

```
1              MR. MONTGOMERY:  Well, I think it's beyond
2         the time for you to do that, but let's --
3    BY MR. MONTGOMERY:
4         Q.     Instead of addressing it in terms of what
5    false statements she made during -- you believe she made
6    during the deposition.  I want to know, as you sit here
7    today, what false statements do you believe were made by
8    people at Chubb about you?
9         A.     Well, I think the memos that certainly --
10   that Tim had given to me were often untrue.
11        Q.     Okay.
12        A.     And --
13        Q.     I don't need to go into it any further about
14   those --
15        A.     That's fine.
16        Q.     -- okay?  What other untrue statements?
17        A.     I can't recall.  I can't believe -- boy, I
18   can't recall the dates on them, but Jerry Butler made
19   some comments about being an alcoholic to, I'm going to
20   say Deter.
21        Q.     Well, let me just stop you.  You believe, as
22   you sit here today, that Jerry Butler made statements to
23   Deter to the effect that you were an alcoholic.
24        A.     Yeah.
25        Q.     And how did you find that out?
```

```
 1        A.     I can't remember if that was a deposition or
 2   hearsay.
 3        Q.     Forget about hearsay.  Who do you think you
 4   heard it from?
 5        A.     Good question.  I can't recall, Dave.  Sorry.
 6        Q.     And as you sit here today, you don't know
 7   when, where, or under what circumstances this statement
 8   was made.  All you know is that you believe that it was
 9   made and you heard it from somebody, but you don't know
10   who it is; is that correct -- all correct?
11        A.     Yeah.
12        Q.     Okay.  Any other untrue statements?
13               MR. FREKING:  And I don't want --
14               THE WITNESS:  I'm trying --
15               MR. FREKING:  -- want to --
16               THE WITNESS:  -- trying to think.
17               MR. FREKING:  You specifically --
18               THE WITNESS:  I don't want you to think --
19               MR. FREKING:  You --
20               THE WITNESS:  -- I'm trying to avoid the
21        question.  I'm trying to --
22               MR. FREKING:  You're specifically excluding
23        the things he has read or seen in depositions?
24               MR. MONTGOMERY:  I don't want him to just
25        tell me that he thought that some statement that
```

```
 1          somebody made in a deposition was false.  If he

 2          learned about -- if he thinks he learned about some

 3          untrue statement that was made outside the

 4          deposition by reading the deposition, he's more than

 5          welcome to tell me that, too.

 6               MR. FREKING:  Okay.  Is that clear to you,

 7          Doug?

 8               THE WITNESS:  I won't say it again.

 9               MR. MONTGOMERY:  No, no, no --

10               MR. FREKING:  Doug --

11               MR. MONTGOMERY:  Let me say it.  I don't need

12          you to say it for me.

13               THE WITNESS:  Okay.

14               MR. MONTGOMERY:  I'm not interested in

15          hearing every time that you disagree with a

16          statement that somebody made in a deposition.

17               THE WITNESS:  Correct.

18     BY MR. MONTGOMERY:

19          Q.    So, for example, if Fred Smith said that they

20     thought you were not a good leader --

21          A.    Right.

22          Q.    -- and you disagree with that -- you know,

23     they said that in a deposition and you agree with

24     that --

25          A.    Right.
```

```
 1        Q.      -- I'm not interested in that.

 2        A.      Right.

 3        Q.      I'm just interested in any untrue statements

 4   that you believe were made outside of depositions.

 5        A.      Okay.  You mean, outside of depositions.

 6        Q.      Yeah.

 7        A.      But it could have been discovered in

 8   depositions.

 9        Q.      Yeah, if you --

10        A.      Yeah.

11        Q.      -- learned about it in the deposition, that's

12   fine.

13        A.      Yeah.  Well, the one I just mentioned with --

14   with Jerry calling me -- calling me an alcoholic.

15        Q.      Well, on that one, you said you may have

16   learned about it in a deposition.  You're not sure,

17   correct?

18        A.      Correct, yeah.  Yeah.  Certainly the

19   leadership and the untrue about performance issues on --

20   through Tim.

21        Q.      Again, you're referring to a statement that

22   you believe Tim may have made soon after your departure,

23   but you don't know who relayed it to you, correct?

24        A.      No.  I'm talking -- I'm talking about

25   statements that he made to people within Chubb.
```

```
 1        Q.      Well, who?  Tell me who and when --

 2        A.      Well, on --

 3        Q.      -- when and where?

 4        A.      I can't -- I can't pin it down.

 5        Q.      Who did you hear it from?

 6        A.      Yeah.  That's what I'm trying to recollect.

 7   Certainly made comments to Beezal and Bryant about the

 8   lack of marketing effort -- lack of sales effort in

 9   those branches despite the fact that they were one of

10   the few branches that were on target for their sales --

11   the fact that their new business was right on target.

12   That's one.

13        Q.      I'm really interested in statements that he

14   made directly about you, your character --

15        A.      Oh, my character.

16        Q.      -- your personal habits, your -- you, Doug

17   Baillie.

18        A.      I can't recall at this time.

19        Q.      Okay.

20             MR. MONTGOMERY:  Thirty seconds.  Let me

21        speak to Leonard.  I think we're done.

22             (Whereupon, a brief recess was had off the

23        record.)

24             MR. MONTGOMERY:  Okay.  We're done.

25             (Witness excused.)
```

1            (Whereupon, the deposition concluded at

2        12:00.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2     STATE OF FLORIDA          )

3     COUNTY OF DUVAL           )

4            I, Candace Fleming, Certified Court Reporter,

5     hereby certify that I was authorized to and did

6     stenographically report the foregoing deposition; that a

7     review of the transcript was not requested; and that the

8     transcript is a true and complete record of my stenographic

9     notes.

10           I further certify that I am not a relative,

11    employee, attorney or counsel of any of the parties, nor am I

12    a relative or employee of any of the parties' attorneys or

13    counsel connected with this action, nor am I financially

14    interested in the action.

15           Dated this 4th day of September, 2003.

16

17           *Candace Fleming*

18    CANDACE FLEMING
      CERTIFIED COURT REPORTER

19    ┌─────────────────────────────────────┐
      │          CANDACE FLEMING           │
      │    MY COMMISSION # DD 209429        │
20    │      EXPIRES: May 5, 2007           │
      │   Bonded Thru Notary Public Underwriters │
      └─────────────────────────────────────┘

21

22

23

24

25

1    **CERTIFICATE OF OATH**

2

3    STATE OF FLORIDA

4    COUNTY OF DUVAL

5

6         I, the undersigned authority, certify that

7    DOUGLAS BAILLIE personally appeared before me and was duly

8    sworn on August 27th, 2003.

9

10

11

12    *Candace Fleming*
      CANDACE FLEMING
13    Notary Public - State of Florida

14

15

16

17

18

19

20

21

22

23

24

25