**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DOUGLAS W. BAILLIE | : | Case No. C-1-02-062 |
| | : | J. Spiegel |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHUBB & SON INSURANCE | : | |
| | : | |
| Defendant. | : | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Randolph H. Freking (0009158)
Mark W. Napier (0019700)
Trial Attorneys for Plaintiff
FREKING & BETZ
215 East Ninth Street, Fifth Floor
Cincinnati, OH 45202
(513) 721-1975
randy@frekingandbetz.com
Mnapier@frekingandbetz.com

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Mr. Baillie's Early Successes as an Employee of Defendant . . . . . . . . . . . . . . . 1

        1.  Defendant Hires Mr. Baillie and Promotes Him to Key Positions. . . . . . . 1

        2.  Defendant Promotes Mr. Baillie to Branch Manager. . . . . . . . . . . . . . . 1

        3.  Defendant Sends Mr. Baillie to Cincinnati to Salvage the Ohio Northern
Region. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            a.  Mr. Baillie Implements a Plan to Return the Region to
Profitability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            b.  Defendant Rewards Mr. Baillie for His Early Successes in the
Ohio Valley Region. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        4.  Timothy Szerlong Becomes Manager of the Northern Zone. . . . . . . . . . 4

    B.  Defendant Discriminates Against Mr. Baillie . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.  Szerlong Creates a Paper Trail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.  Szerlong Manipulates Mr. Baillie's Performance Review. . . . . . . . . . . . 6

            a.  Szerlong Qualitatively Manipulates Mr. Baillie's Performance
Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            b.  Szerlong Quantitatively Manipulates Mr. Baillie's Final Scorecard. . 7

        3.  Mr. Baillie Nonetheless Continues to Accomplish His Goals. . . . . . . . . . 9

        4.  Defendant Abruptly and Wrongfully Terminates Mr. Baillie. . . . . 10

    C.  Defendant Fails to Negotiate Mr. Baillie's Severance Package in Good Faith, and
Retaliates Against Defendant for Protected Action. . . . . . . . . . . . . . . . . . . . . . 12

        1.  Defendant Promises to Negotiate Severance with Mr. Baillie in Good
Faith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  Defendant Fails to Make Good Faith Efforts to Negotiate Mr. Baillie's

i

Severance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    3.    Defendant Withdraws from Negotiation Entirely. . . . . . . . . . . . . . . . . 14

    4.    Defendant Re-extends its Offer and Mr. Baillie Attempts to Accept. . . 15

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   A.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   B.    Genuine Issues of Material Fact Exist with Respect to Plaintiff's Age Discrimination Claim, Making Summary Judgment Improper. . . . . . . . . . . . . 16

       1.    Defendant Does Not Contest Mr. Baillie's Prima Facie Case of Age Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       2.    Genuine Issues of Material Fact Exist as to Whether Defendant's Asserted Reason for Terminating Mr Baillie Constitutes Mere Pretext. . . . . . . . . 17

          a.    Defendant's Stated Reason for Terminating Mr. Baillie has No Basis In Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

             (1)    Defendant's Own Reviews of Mr. Baillie's Performance Demonstrate that Defendant's Stated Reason for Terminating Mr. Baillie has No Basis In Fact. . . . . . . . 19

             (2)    Managers and Staff Under Mr. Baillie Objectively Disconfirm Defendant's Stated Reason for Terminating Mr. Baillie and Demonstrate Defendant's Stated Reason Has No Basis In Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

             (3)    Baillie's Subordinate's Sworn Testimony Contradicts Defendant's Stated Reason For Terminating Mr. Baillie. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

             (4)    Defendant's Own Statements About Mr. Baillie's Leadership Disconfirm Defendant's Stated Reason For Terminating Mr. Baillie, And Demonstrate That Defendant's Stated Reason For Terminating Mr. Baillie Has No Foundation is Fact. . . . . . . . . . . . . . . . . . . . . . . 28

          b.    Defendant's Stated Reason for Terminating Mr. Baillie is Insufficient to Justify it's Decision to Terminate Mr. Baillie And Defendant's Motion For Summary Judgment Must Be Denied. . 29

             (1)    Defendant's Own Method of Quantifying Performance Demonstrates that its Stated Reason for Terminating Mr.

Baillie is insufficient to Justify his Discharge . . . . . . . . . 29

    (2)    Defendant's Asserted Reason for Terminating Mr. Baillie is Insufficient to Justify his Discharge Because Mr. Baillie had Greater Financial Success Than All Others in the Zone, and Financials Should Have Been Weighted 75% of his Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    (3)    Defendant's Asserted Reason for Terminating Mr. Baillie is Insufficient to Justify Mr. Baillie's Discharge Because Other, Younger Managers who Actually Had People Management Problems Were Not Disciplined. . . . . . . . . 31

   c.   Defendant's Stated Reasons for Terminating Mr. Baillie Did Not Actually Motivate His Discharge. . . . . . . . . . . . . . . . . . . . . . . . . 32

C.   Demonstration of a Genuine Issue of Material Fact, as to Mr. Baillie's Promissory Estoppel and Retaliation Claims is not Barred by Federal Rule of Evidence 408. 36

D.   Genuine Issues of Material Fact Exist as to Mr. Baillie's Promissory Estoppel Claim Against Defendant Making Summary Judgment Inappropriate. . . . . . . . . 37

E.   Genuine Issues of Material Fact Exist as to Whether Defendant Retaliated Against Mr. Baillie Making Summary Judgment Inappropriate. . . . . . . . . . . . 39

F.   Genuine Issues of Material Fact Exist as to Whether Defendant Defamed Mr. Baillie Making Summary Judgment Inappropriate. . . . . . . . . . . . . . . . . . . . . . . 42

G.   Genuine Issues of Material Fact Exist as to Plaintiffs' Public Policy Claim, Making Summary Judgment Improper. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IV.   <u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## TABLE OF AUTHORITIES

Abrams v. Milliken and Fitton Law Firm, 267 F. Supp 2d 868, 877 (S.D. Ohio 2003) . . . . . . . 42

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Bancard America, Inc. v. Universal Bancard Systems, Inc., 203 F.3d 477 (7th Cir. 2000) . . . . 37

Biggins v. Hazen Paper, Co., 522 US 952 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Canitia v. Yellow Freight System, Inc., 894 F.2d 196, 199 (6th Cir. 1990) . . . . . . . . . . . . . . 16

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Collins v. Rizkana, (1995), 73 Ohio St. 3d 65, 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

DePiero v. City of Macedonia, 180 F.3d 770, 776 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 15

EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 40

Ekunsumi v. Cincinnati Restoration, Inc., 698 N.E. 2d 503 (1997) . . . . . . . . . . . . . . . . . . . . . 37

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998) . . . . . . . . . . . 17

Gall v. Quaker City Castings Inc., 874 F.Supp. 161 (N.D. Ohio 1995) . . . . . . . . . . . . . . . . . . 46

Gallo v. Prudential Residential Services L.P., 22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . 16

Gosden v. Louis, 116 Ohio App.3d 195, 206, 687 N.E. 2d 481, 487 (1996) . . . . . . . . . . . . . . 42

Greeley v. Miami Valley Maintenance Contractors, Inc., 49 Ohio St. 3d 228, 551 N.E. 2d 981,
987 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Gribcheck v. Runyon, 245 F.3d 547, 551 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Hahn v. Kotten, 43 Ohio St. 2d 237, 331 N.E.2d 713, 718 (Ohio 1975) . . . . . . . . . . . . . . . . . 42

Helmick v. Cincinnati Word Processing, Inc., 45 Ohio St.3d 131 (1989) . . . . . . . . . . . . . . . . 46

High v. Gerting/Castle, Inc., 2002 WC 31951256, a *17 (S.D. Ohio 2002) . . . . . . . . . . . . . . . 41

Hill v. Christ Hospital, 131 Ohio App. 3d 660, 673 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Jackson v. RKO Bottlers, 743 F.2d 370, 377 (6th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Kerans v. Porter Paint Co., 61 Ohio St.3d 486 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 16

Kulch v. Structural Fibers, 78 Ohio St.3d 134; 677 N.E.2d 308 (1997) . . . . . . . . . . . . . . . . . . 46

Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994) . . . . . . . . 18

McCroskey v. Ohio, 8 Ohio St.3d 29, 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . 17

McNabula v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993) . . . . . . . . . . . . . . . 18

Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 40

Nilavar J. Osborn, 127 Ohio App. 3d 1, 711 N.E.2d 726, 736 (Ohio App. 2d District 1998) . . 39

O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996) . . . . . . . . . . . . . . . . . . . . 17

Ohio Civil Rights Commission v. Ingram, 69 Ohio St.3d 89, 92 (1994) . . . . . . . . . . . . . . . . . . 17

Painter v. Graley, 70 Ohio St. 3d at 384-385 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Reeves v. Sanderson Plumbing, 530 U.S. 133, 151 (2000) . . . . . . . . . . . . . . . . . . . . . . 16, 18, 41

Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 16

Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc., 690 F.2d 88, 97 (6th Cir. 1982) . 18

St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 40

Starter Corp. v. Converse, Inc., 170 F.3d 286 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Synder v. AG Trucking, 57 F3d 484, 489 (S.D Ohio 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981) . . . . . . . . . 17

Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160 (6th Cir)., reh'g opinion on another issue, 97 F.3d 833 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tohline v. Central Trust Co., 48 Ohio App. 3d 280, 549 N.E.2d 1223, 1228 (Ohio Ct. App. 1988) 42

Uebelecker v. Cincom Systems, Inc. (1998), 48 Ohio App. 3d 268, 549 N.E.2d 1210) . . . . . . . 38

Uforma/Shelby Business Forms, Inc. v. NCRB, III F.3d 1284 (6th Cir. 1997) . . . . . . . . . . . . 36

Vision America, Inc. v. Jerrold M. Levin, M.D., Inc., 1991 Ohio  App. LEXIS 707, 4 (1st App.

Dist. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Wrenn v Gould, 808 F.2d 493, 500 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## **STATUTORY AUTHORITIES**

29 U.S.C. §623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

O.R.C. §4112.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

O.R.C. §4112.02(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## SUMMARY OF THE ARGUMENT

**I.    SUMMARY**

### A.    Genuine Issues of Material Fact Exist as to Plaintiff's Age Discrimination Claims Making Summary Judgment Improper.

Defendant's motion for summary judgment of Plaintiff's federal and state age discrimination claims must be denied. Defendant does not contest Plaintiff's *prima facie* case of age discrimination. Plaintiff has established genuine issues of material fact as to whether Defendant's stated reason for terminating Plaintiff constitutes mere pretext. Specifically, Plaintiff has come forward with evidence indicating that: (1) defendant's stated reason for terminating Plaintiff has no basis in fact; (2) defendant's stated reason for terminating Plaintiff is insufficient to justify it's decision to terminate Plaintiff; and (3) defendant's stated reason for terminating Plaintiff did not actually motivate his discharge. Defendant's stated reason for terminating Plaintiff is belied by every objective measure of Plaintiff's performance. Furthermore, the testimony of Plaintiff's subordinates contradicts Defendant's stated reason for terminating Plaintiff. Moreover, Defendant's stated reason for terminating Plaintiff itself implies discriminatory stereotyping.

### B.    Federal Rule of Evidence 408 Does Not Preclude Plaintiff's Promissory Estoppel and Retaliation Claims.

Defendant's argument that Federal Rule of Evidence 408 precludes Plaintiff's promissory estoppel and retaliation claims by rendering severance discussions inadmissible cannot prevail. FRE 408 precludes settlement discussions only to the extent that such evidence is admitted either to prove or disprove liability for the claims subject to settlement discussions or to prove or disprove the value of those claims. Plaintiff's promissory estoppel and retaliation claims did not constitute the subject of the settlement discussions in this case. Rather, Plaintiff's promissory estoppel and retaliation claims arose out Defendant's statements and actions during the course of

vii

negotiation. Therefore, Plaintiff does not seek admission of settlement discussions to prove liability or the value of the claims comprising the subject of the settlement discussions, but rather to establish that Plaintiff reasonably relied to his detriment on Defendant's statements and actions during the course of negotiations, and that Defendant retaliated against Plaintiff during the course of negotiations.

> ### 1. Genuine Issues of Material Fact Exist Making Summary Judgment of Plaintiff's Promissory Estoppel Claim Improper.

During the course of settlement discussions, Defendant made promises to Plaintiff that it would negotiate a severance package with Plaintiff in good faith. Plaintiff reasonably relied on Defendant's promises. Plaintiff's reasonable reliance was informed by promises made by Defendant in the context of its written severance policy. While Defendant asserts that its written policy reduces Plaintiff's reliance to "supposition," Plaintiff's reasonable reliance on Defendant's statements and actions during the course of severance negotiations is an issue of fact for the jury's determination.

> ### 2. Genuine Issues of Material Fact Exist Making Summary Judgment of Plaintiff's Retaliation Claim Improper.

Defendant retaliated against Plaintiff when it retracted its promise to negotiate in good faith shortly after Plaintiff's counsel indicated material inconsistencies in Defendant's proffered reason for terminating Plaintiff. Defendant asserts that Plaintiff cannot establish a causal relation between its adverse action and Plaintiff's protected activity. Defendant is wrong. Temporal proximity is probative of causation. The temporal proximity in the present case, a matter of days, clearly supports a reasonable inference of causation. Furthermore, Defendant's reliance on High v. Gerting/Castle, Inc., is misplaced. 202 WL 31951256 at *17 (S.D. Ohio 2002).

**C.     Genuine Issues of Material Fact Exist Making Summary Judgment of Plaintiff's Defamation Claim Inappropriate.**

Defendant's assertion that Plaintiff relies on privileged statements made during depositions to establish his defamation claim is incorrect.  Rather, Defendant's Human Resources Manager made *per se* defamatory statements about Plaintiff's professional reputation in her capacity as Defendant's agent.  While Defendant's Human Resources Manager testified to making these statements in her deposition, Plaintiff's defamation claim does not arise therefrom.  Defendant's Human Resources manager harbored animus for Plaintiff and she published defamatory statements about Plaintiff with malice.

**D.     Genuine Issues of Material Fact Exist Making Summary Judgment of Plaintiff's Wrongful Termination in violation of Ohio Public Policy Inappropriate.**

Plaintiff's wrongful termination claim is derivative of his age discrimination and retaliation claims.  Because Plaintiff can establish a genuine issue of material fact as to his federal and state discrimination and retaliation claims, summary judgment of Plaintiff's wrongful termination claim is improper.  Public policy clearly prohibits employment discrimination and retaliation on the basis of age.

## I.    INTRODUCTION

_____Plaintiff Doug Baillie filed this action on January 9, 2002, alleging unlawful discrimination and retaliation under federal and state law on the basis of age, wrongful discharge in violation of Ohio public policy, promissory estoppel, violation of Section 510 of the Employment Retirement Income Security Act, and defamation.[1]  The matter is now before this Court on Defendant's Motion for Summary Judgment.  For the reasons that follow, genuine issues of material fact preclude summary judgment of Plaintiff's claims, and Defendant's Motion for Summary Judgment of Counts I, II, III, IV and VI should be denied.

## II.    STATEMENT OF FACTS

### A.    Mr. Baillie's Early Successes as an Employee of Defendant

#### 1.    Defendant Hires Mr. Baillie and Promotes Him to Key Positions.

Defendant hired Mr. Baillie as a Loss Control Representative in New York City on September 30, 1975.  (Baillie Dep. Vol. I at 25-26.)  Defendant then moved Mr. Baillie to its New Jersey office and six months later promoted Mr. Baillie to the position of Supervisor.  (*Id.* at 27-28.)  In 1980, Mr. Baillie was promoted to the position of Loss Control Manager of Defendant's New Jersey office.  (*Id.*)  By 1983, Mr. Baillie earned promotion to the position of Regional Manager of Loss Control.  (*Id.*)  In 1984, Defendant further promoted Mr. Baillie to the position of Zone Officer for Defendant's Eastern and Canadian Zone, a position Mr. Baillie held through 1988.  (*Id.*)

#### 2.    Defendant Promotes Mr. Baillie to Branch Manager.

In 1991, Defendant moved Mr. Baillie to Harrisburg, Pennsylvania to build a branch office from the ground up.  (*Id.*)  As Defendant's Harrisburg Branch Manager, Mr. Baillie was

---

[1]Plaintiff does not contest Defendant's Motion for Summary Judgment of Count V (violation ERISA Section 510).

responsible for implementing and managing all of the departments comprising Defendant's system for the territory, including underwriting, marketing, claims and loss control. (*Id.*)  Under Mr. Baillie's Management, Defendant's Harrisburg branch flourished. (*Id.* at 30-31.)  In 1991, the Harrisburg Branch started with $14 million of business with just 25 employees. (*Id.*)  By the end of Mr. Baillie's tenure as Defendant's Harrisburg Branch Manager, the branch had grown its business to $50 Million, still with just 25 employees. (*Id.*)  The branch was profitable five of the seven years under Mr. Baillie's Management, suffering loss only in 1996 and 1998 as a result of a catastrophic snow storm in 1996, and subsequently resulting large umbrella losses. (*Id.*)

3.      **Defendant Sends Mr. Baillie to Cincinnati to Salvage the Ohio Northern Region**.

In 1998, recognizing Mr. Baillie's success in Harrisburg, Defendant promoted Mr. Baillie to the Regional Manager position of its Ohio Valley Region. (*Id.* at 34-38.)  The Ohio Valley region consisted of five offices, Cincinnati, Cleveland, Columbus, Indianapolis and Louisville. (*Id.* at 39- 40.)  As the Cincinnati Branch Manager, Mr. Baillie would directly manage the Cincinnati branch, including the Louisville and Columbus offices, which Defendant had just collapsed under the Cincinnati branch infrastructure.  In his capacity as Regional Manager, Mr. Baillie would also have responsibility for Defendant's full branches in Cleveland and Indianapolis. (*Id.*)

a.      **Mr. Baillie Implements a Plan to Return the Region to Profitability.**

Unlike the Harrisburg branch, in the late 1990s, Defendant's Ohio Valley Region was suffering systemically. (*Id.* at 39-42.)  Collapsing the Louisville and Columbus branches under Cincinnati's infrastructure involved displacements and lay-offs, including the loss of three executives. (*Id.*)  Morale was low and business was bad. (*Id.* at 39-48.)  There were no systems in place for marketing, growth and profit. (*Id.*)  Fewer than 30% of the employees had regular

2

performance reviews in place. (*Id.*) Files were left undocumented and customers and accounts were left unserviced, with approximately 1,300 outstanding endorsements. (*Id.*) Business on the books was unusual and unprofitable. (*Id.*) Defendant moved Mr. Baillie, one of its top performers, from Harrisburg to Cincinnati, to turn business around in the Ohio Valley Region.

Upon arrival, Mr. Baillie assessed that the problems in the Ohio Valley Region resulted from a failure of systems. (Baillie Dep. Vol. I at Ex. 5.) Defendant's employees in the region were good, but were struggling to perform without adequate structure. (*Id.*) Mr. Baillie's September 3, 1998 Memorandum to Department Managers reflects his assessment, and the plan Mr. Baillie would implement to turn the region's poor performance around. (*Id.*)

### b. Defendant Rewards Mr. Baillie for His Early Successes in the Ohio Valley Region.

Mr. Baillie's direct supervisor at the time, the Northern Zone Manager, was Terry Cavanaugh. (*Id.* at 41.) In 1998, for the results Mr. Baillie had achieved as Harrisburg Branch Manager and for his initial interventions as Ohio Valley Regional Manager, Mr. Baillie was awarded an overall performance score of "exceeded some,"[2] indicating top performance. (*Id.* at 134-136, 146-147, Ex. 8.) Defendant's assessment of Mr. Baillie's competency specifically indicates "advanced proficiency" in the areas of "Coaching/Development," "Operational Management," and "Customer Focus." In addition to excellent scores in other areas of assessment, Mr. Baillie earned scores of "4," specifically in the areas of "Leadership," "Teamwork," and "Human Resources," indicating top performance. (*Id.*) Mr. Baillie's 1998 review of his performance as the Ohio Valley Regional Manager indicates that by the end of

---

[2]Defendant utilizes a scale ranging from 1-5 to evaluate its employees' performance. The scale corresponds with goals set for employees at the beginning of the year of review and includes grades "met some," "met most," "met all," "exceeded some," and "clearly exceeded." (*Id.*).

1998, the region's premium plan was met, the Cincinnati Branch experienced growth, the region exceeded its goals for business acquisition and retention, clear vision and direction had been established to improve morale, and a system to measure and monitor employee performance had been implemented, amongst many other accomplishments. (*Id.* at Ex. 4.)

Mr. Baillie's performance caught the attention of Sylvester Green, Defendant's Executive Vice President and Managing Director. In a letter to Mr. Baillie from Mr. Green memorializing Mr. Green's June, 1999 visit to the Ohio Valley Region, Mr. Green acclaimed, "Your enthusiasm and excitement about your role in the field is quite contagious. The impact that you are having on your staff, management team, and producer plant was very apparent to me." (*Id.* at Ex. 9.)

Mr. Baillie continued implementation of his plan to lead the Ohio Valley Region to success, and by October 1999, the region had achieved significant goals. (*Id.* at Ex. 10.) The region was suffering the lingering effects of unprofitable business written prior to Mr. Baillie's tenure. (*Id.* at 48-49.) In 1999 the region was still losing money as a result. (*Id.*) For his performance under these conditions, Mr. Baillie's performance review, finalized in January 2000, summarized his accomplishments: "Significant progress has been made in bringing the Ohio Valley Region into a very effectively working structure – it has really gelled [sic]. [...] The region is well positioned to return to profitability." (*Id.* at Ex. 11.) Mr. Baillie earned an overall performance score of "exceeded some," again indicating top performance. (*Id.*)

Just two months later, on March 3, 2000, Defendant's Board unanimously elected Mr. Baillie Senior Vice President. (*Id.* at Ex. 14.) In a memorandum congratulating Mr. Baillie for this accomplishment, David Kelso, Defendant's CFO noted, "This is great news and obviously reflects the tremendous job you have done for Chubb as well as excellent future prospects. Hats off!" (*Id.*)

4

### 4.    Timothy Szerlong Becomes Manager of the Northern Zone.

Timothy Szerlong replaced Terry Cavanaugh as Defendant's Northern Zone Manager in the Fall of 1999. (Baillie Dep. Vol. I at 45.)  At the end of 1999, Szerlong memorialized three priorities for Mr. Baillie's management of the Ohio Valley Region in 2000. (*Id.* at Ex. 13.)  All of Szerlong's priorities for the region in 2000 were financial –  fixing Standard Commercial Lines, growth and profitability in "the two-thirds of our business that is doing well," and control of expenses. (*Id.*)  Szerlong closed this communication by noting Mr. Baillie's success in 1999: "Please accept my thanks for all of your efforts and accomplishments during 1999.  I encourage you to keep focused on meeting our objectives so we can continue to reap the rewards of working for a successful company."  (*Id.*)

In 2000, Mr. Baillie significantly increased growth toward profitability by moving the region out from under depressed business that had been written prior to his tenure, by raising rates aggressively, and writing profitable new business. (*Id.* at 48-50.)  In 2000, this strategy effected 8% growth for the region. (*Id.* at 54.)  Because of Mr. Baillie's success, Defendant awarded him the opportunity to attend executive training at the prestigious Wharton Business School. (Szerlong Dep. at p. 114).  This opportunity was granted to very few of Defendant's Managers, yet because of the level of his performance, level of success and responsibility, and attainment of Senior Vice President status, the opportunity was awarded to Mr. Baillie. (*Id.* at 112, 113-115)

During this period, Mr. Baillie would confer with Szerlong about every six weeks. (*Id.* at 55.)  By the end of the year 2000, it was clear that the region could not turn a profit in 2000, and it was also clear that the strategy implemented by Mr. Baillie was working, producing the growth needed for profitability. (Baillie Dep. Vol. I at 177, Ex. 18.)  Because of poor decisions made in the branch before Mr. Baillie's arrival, poor financial results were both understood and expected.

(Korte Dep. at 59.)  Other branches, including Szerlong's branch in Chicago, and the Northern

Zone on whole, were yet unable to turn a profit and were lagging in growth.  (Baillie Dep. Vol. I

at 58; Szerlong at 18-21.)

### B.      Defendant Discriminates Against Mr. Baillie

#### 1.      Szerlong Creates a Paper Trail.

Szerlong completed a competency assessment of Mr. Baillie for the year 2000 on January

1, 2001.  (Baillie Dep. Vol. I at Ex. 1.)  As already noted, Mr. Baillie had consistently earned

high ratings on previous such assessments.  However, the results of Szerlong's assessment were

startling.  (*Id.* at 57-58.)  Szerlong had rated Mr. Baillie low in the "Financials" category, though

it was understood that the region would not be able to turn a profit in 2000 and Mr. Baillie's

management was producing exceptional financial growth.  (*Id.*)  Moreover, Szerlong had down-

graded Mr. Baillie's "Leadership" score from 4 to 2.5.  (*Id.* at Ex. 1.)  Szerlong commented

under that category, "Critical area for growth.  There are issues here.  Sometimes shortchanges

dialogue/message delivery on key issues."  (*Id.*)  (emphasis in original.)  Szerlong had also

down-graded Mr. Baillie from the previous year's "advanced proficiency" rating of 4.5 in the

"Coaching/Development" category to a 2.5.  (*Id.*)

#### 2.      Szerlong Manipulates Mr. Baillie's Performance Review.

##### a.      Szerlong Qualitatively Manipulates Mr. Baillie's Performance Review.

In 2000, Defendant had implemented a "balanced scorecard" method of conducting

performance reviews.  (*Id.* at 178, Ex. 21.)  Mr. Baillie met with Szerlong in February, 2001 to

discuss his initial competency assessment and final scorecard.  (*Id.* at. 186-187.)   At this

meeting, Szerlong criticized Mr. Baillie's leadership style, alleging that Mr. Baillie was too

"black and white" in his approach.  Szerlong vaguely asserted that he developed this opinion

about Mr. Baillie during a meeting in Toledo, but could provide no specific examples of Mr.

Baillie being too "black and white." (*Id.* at 58.)

Szerlong also made reference to Michael Whitman, who was the Property Marine

Manager under Mr. Baillie. Szerlong asserted that he thought Mr. Baillie had not adequately

handled Whitman's performance problems. (*Id.* at 64-65.) Again, Mr. Baillie was shocked.

Whitman had been a poor performer in 1999, and Mr. Baillie placed Whitman on a performance

improvement plan for the year 2000. (*Id.*) As a result of the performance improvement plan,

Whitman achieved double digit growth and profited. (*Id.*) In fact, Whitman was the only

Property Marine Manager in the Northern Zone who experienced both growth and profit. (*Id.*)

Szerlong generally asserted that Mr. Baillie needed to get better performance out of a number of

managers. (*Id.* at p. 66.) Szerlong also made vague reference to a regional meeting addressing

regionalization, and asserted that Mr. Baillie should have discussed the issue more with his

direct reports. (*Id.* at 68.)

At the conclusion of Szerlong's review, Mr. Baillie asked whether Szerlong believed he

was clearly failing. (*Id.* at 60.) Szerlong stated that Mr. Baillie was not failing, and that all of

the problems addressed were merely issues in need of resolve. (*Id.*) Still puzzled, Mr. Baillie

spoke with six of his direct reports about the regionalization meeting, inquiring as to whether

they believed he neglected to communicate the issue effectively. None believed he could have

done anything better. (*Id.*) Mr. Baillie also contacted lieutenants in Toledo, to inquire as to

whether he was off base in any way at the meeting Szerlong criticized. Neither could remember

anything off base. (*Id.* at 69-70.) Szerlong "memorialized" this meeting in an admittedly "one

sided" but no less vague Memorandum to Mr. Baillie, on March 9, 2001. (*Id.* at Ex. 1.)

   **b.    Szerlong Quantitatively Manipulates Mr. Baillie's Final
          Scorecard**.

7

The scorecard method of review retained the five grades, "not met" through "clearly exceeded," utilized by Defendant in the past.  (Baillie Ex. 21.)  Mr. Baillie's scorecard for 2000 indicates that  he either "met all," "exceeded some," or "clearly exceeded" all of his financial goals in 2000 other than "Loss Ratio" under "Profitability."  (*Id.*)   Mr. Baillie either "met all" or "exceeded some" of the "External Process" goals for 2000.  (*Id.*)  Mr. Baillie either "met all" or "exceeded some" of the " Internal Process" goals that were measurable in 2000, except for "Audit Findings," for which he earned a score of "met most."  (*Id.*)  Moreover, under "People Management," Mr. Baillie either "exceeded some" or "clearly exceeded" all of his goals for 2000, except for "[e]mployees have written development plans," for which he earned a score of "met all."  (*Id.*)  In total, Mr. Baillie either "met all," "exceeded some," or "clearly exceeded" all but two of his thirty-one goals for the year 2000, "Loss Ratio" and "Audit Findings."  (*Id.*)

Nonetheless, Szerlong gave Mr. Baillie an overall performance score of "met most," two full grades below what Mr. Baillie had ever earned in the past and the second lowest score on the scale.  (*Id.* at  57-58.)  Mr. Baillie was surprised by this score when he received a copy of the scorecard on March 12, 2001, because it did not make sense, and because "met most" was obviously "not a very good rating" for a Regional Manager.  (*Id.* at  60, 180-190.)

On the final page of Mr. Baillie's performance review, Szerlong included written comments.  (Baillie Ex. 21.)  While Szerlong noted the profitability problem, Szerlong also noted, "Financial:  Solid production/[growth]."  (*Id.*)  Despite the very high scores Mr. Baillie achieved under "People Management" on his scorecard, Szerlong's written criticisms almost exclusively identified "People Management" and "Leadership" as areas for improvement.  (*Id.*)  This was startling, because even if Mr. Baillie's scores for "People Management" had been less than excellent, under the balanced scorecard approach, "People Management" should account for only 5% of the overall performance score.  (*Id.* at Ex. 20; Szerlong Dep. at Ex. 1.)  While

8

Szerlong admits that "People Management" was only supposed to account for 5% of an overall score, Szerlong maintains that by substituting and increasing the value of his subjective evaluation of Mr. Baillie's ability to manage people, he was holding Mr. Baillie equally accountable for all areas of responsibility. (Szerlong Dep. at 59.)

The calculations Szerlong made to reach Mr. Baillie's overall performance score reveal that Szerlong also reduced the weight of Mr. Baillie's financial scores, multiplying the raw score by 50%, when the raw financial score should have comprised 75% of Mr. Baillie's overall performance score. (*Id.* at 149, Exs. 1,10.) Szerlong testified that he was justified in lowering the weight of Mr. Baillie's financial scores to calculate Mr. Baillie's overall performance score because <u>poor leadership ultimately effects lower financials</u>. (*Id.* at 150-151.) Nonetheless, Szerlong admits that the recommended percentages ascribed in the left hand column of Mr. Baillie's 2001 scorecard were determined by the senior management group and not Szerlong. (*Id.* at 156.)

Mr. Baillie told Szerlong that he disagreed with the overall performance score of "met most," because he had accomplished all of the goals for 2000, except for "Loss Ratio," which simply could not be so quickly attained, and was nonetheless moving in the right direction with the region's excellent financial growth. (*Id.* at 186-188.) Furthermore, comments Szerlong made about "leadership" were inconsistent with the results of Mr. Baillie's "360 feedback," an anonymous system implemented by Mr. Baillie through which his subordinates could comment on his performance. (Baillie Dep. Vol. I p. 188; "360 Feedback 1999 and 2000," attached as "Pl. Ex. A.") In 1999 and 2000 Mr. Baillie's subordinates rated him 8.5 and 8.4 out of 10 in the area of leadership. (*Id.*)

### 3.    Mr. Baillie Nonetheless Continues to Accomplish His Goals.

After Mr. Baillie's 2000 performance review, he returned to resolving the profitability

issues in the Ohio Valley Region. (Baillie Dep. Vol. I at 70.) On May 2, 2001, Szerlong made

an annual branch visit to Cincinnati. (*Id.* at 75.) When Mr. Baillie met with Szerlong, Szerlong

did not specifically address Mr. Baillie's leadership. (*Id.*) Szerlong followed up his annual visit

with a memorandum to Mr. Baillie on May 8, 2001. (*Id.* at Ex. 2.) Szerlong attached to this

memorandum a list of five priorities, informing Mr. Baillie that progress against the priorities

would be key to Mr. Baillie's success throughout the year. (*Id.* at 2.) Mr. Baillie addressed and

responded to all of the issues in Szerlong's memoranda. (Id. at 79-92.)

### 4. Defendant Abruptly and Wrongfully Terminates Mr. Baillie.

On August 24, 2001, Szerlong came to the Cincinnati Branch office. (*Id.* at 93.)

Szerlong and Mr. Baillie had breakfast and lunch with a couple of agents. (*Id.* at 94.) Then

Szerlong visited departments in the branch. (*Id.*) Between 1:30 and 2:00 in the afternoon,

Szerlong entered Mr. Baillie's office and told Mr. Baillie that even though his financial results

were excellent and he had the best relationship with agents and customers Szerlong was

terminating Mr. Baillie, because he wanted better "leadership." (*Id.*)

At the time of his termination, Mr. Baillie had achieved a turnaround in Cincinnati's

profit that had eluded other, younger Branch Managers in the Northern Zone. (Baillie Aff. at ¶¶

2-3; Def. Ans. Pl. 2nd Set Int.) Mr. Baillie had conducted needs analyses of his managers in the

region, established goals for those managers and implemented a quarterly review of progress

toward those goals. By this time, the Ohio Northern Region was the most profitable in the

Northern Zone, and was achieving the greatest growth. (*Id.* at ¶¶ 3-4.) As a result of his

leadership, both of Mr. Baillie's production branches were exceeding their new business goals,

and turned a profit, while the rest of the Northern Zone lagged behind. (*Id.* at ¶¶ 2-4.) Mr.

Baillie had received excellent anonymous reviews of his leadership from his staff, and the

remarkable turnaround in profit, service, new business, growth and cash flow objectively

10

reflected that Mr. Baillie's leadership was indisputably outstanding.

Mr. Baillie asked Szerlong how he could believe Mr. Baillie's leadership was poor when the Cincinnati branch and the region were in such good shape financially, and when all of Mr. Baillie's goals were met or exceeded.  (Baille Dep. Vol. I at 94.)  Szerlong again vaguely responded that it was just his opinion that Mr. Baillie's leadership was poor.  (*Id.*)  Noting that Szerlong obviously intended to terminate him regardless of his extraordinary performance, Mr. Baillie did not argue his point further.  (*Id.*)  Szerlong promised Mr. Baillie that Defendant would offer Mr. Baillie the <u>most aggressive</u> <u>severance package,</u> <u>because he deserved it</u>.  (*Id.* at 95.)

On August 27, 2001, in response to Human Resources Manager Patricia Hurley's request for performance related documentation to justify Defendant's termination of Mr. Baillie, Szerlong composed a "memorandum to file" purportedly memorializing his reasons for terminating Mr. Baillie.  (Szerlong Dep. at 122-123, Exs. 7, 8.)[3]  Szerlong stated, "Bottom line, he has made little progress in closing those skill gaps, which have been previously addressed as developmental priorities, in the areas of operational management, people management and development, communication and leadership."  (*Id.* at Ex. 7.)  Moreover, Szerlong again asserted that Mr. Baillie was too "black and white," to understand Szerlong's assessment, and "[t]his lack of understanding has resulted in tolerance of a <u>lesser performance level</u> and <u>continuing weakness</u> in key positions through the branch and region."  (*Id.*) (emphasis added.)  Hurley had never

---

[3]Szerlong's memorandum includes asserted reasons for terminating Mr. Baillie that he distinguished from "leadership".  (Szerlong Dep at Ex. 7.)  Specifically, Szerlong criticized Mr. Baillie's management of his subordinates Michael Whitman, Mike Dznak, and Rick O'Brien. (Id. at 3.)  In fact, Szerlong's assertions about Mr. Baillie's management of these subordinates are simply false.  (Baillie Aff. at ¶¶ 7-10..)

before requested more performance related documentation to justify a termination.[4]  (*Id.* at 124.)

     **C.    Defendant Fails to Negotiate Mr. Baillie's Severance Package in Good Faith, and Retaliates Against Defendant for Protected Action.**

          **1.    Defendant Promises to Negotiate Severance with Mr. Baillie in Good Faith.**

Defendant's basic severance package is described in its employee handbook. (Baillie Dep. Vol. II at 3-9-16 Ex. 34.)  Defendant retains complete discretion to handle separation pay for employees who have worked for Defendant for less than two years, and who are terminated for poor performance and poor attendance.  (*Id.*)  Additionally, according to Defendant's express policy:

> Separation pay <u>is not</u> granted in cases where employment is terminated for employee misconduct, when an employee was hired into a temporary position, or when an employee resigns.  Additionally, separation pay <u>is not</u> granted when an employee is transferred to or becomes employed by a subsidiary or affiliate of Chubb or by any other employer which has assumed directly from Chubb functions previously performed by Chubb.

(*Id.*)

On the other hand, Defendant promises employees who are terminated for reasons similar to those stated by Defendant in Mr. Baillie's case, and who "sign a separation agreement acceptable to the Company," an amount of "special separation pay" determined by the number of years those employees have worked for the company:  "If you have worked for the Company more than fifteen years, you may receive two week of separation pay for each year worked, not to exceed a maximum of 52 weeks."  (*Id.*)

---

    [4]Szerlong testified that as Northern Zone Manager he utilized progressive discipline. (Szerlong Dep. at 137-138.)  Specifically, according to Szerlong, his style of progressive discipline includes communication, an opportunity to respond to concerns prior to termination, or a warning as an alternative.  (*Id.*)  Szerlong further asserts that his February 2001 performance review of Mr. Baillie constituted adequate notice of termination to Mr. Baillie pursuant to his brand of progressive discipline.  (*Id.* at 139.)

The policy further distinguishes the "special separation" conditionally promised to long-term employees from the two-weeks discretionary separation pay Defendant pays employees terminated for poor performance and poor attendance:  "If you receive special separation pay, you will not receive the two weeks' separation pay granted, at Chubb's discretion, to employees terminated for poor performance."  (*Id.*)  Defendant admits that its separation policy for long-term employees is "unequivocal."  (Def. Memo. Supp. M.S.J. at 23.)  Defendant's policy clearly defines the standard separation package long-term employees receive in return for a release of claims.  (Baillie Dep. Vol. II at 3-9-16, Ex. 34)

Hurley attached Defendant's first severance proposal to a letter she sent to Mr. Baillie on September 5, 2001.  (*Id.* at Ex. 27.)  This initial proposal was consistent with the basic package described in Defendant's employment handbook, yet by no stretch of imagination constituted the most aggressive package.  (*Id.*)  While the proposal included "outplacement services," limited COBRA payments and an extension to the expiration date on stock options earned prior to March 2, 2001, the proposal failed to address the detrimental effect Mr. Baillie's termination would have on his pension and stock options.  (*Id.*)

Mr. Baillie discussed Defendant's offer with Hurley.  (Baillie Dep. Vol. II at 9-10.)  Hurley reaffirmed Szerlong's promise to negotiate the <u>most aggressive severance package</u> with Mr. Baillie.  (*Id.* at 10.)  Hurley reassured Mr. Baillie that he could expect inclusion of  restricted stock and pension to the severance, and suggested that Mr. Baillie would likely want to negotiate additional provisions.  (*Id.* at 11.)  Mr. Baillie noted that Defendant's initial proposal was not the most aggressive package, and <u>Hurley confirmed that it was not</u>.  (*Id.*)  Hurley further indicated that Defendant would welcome future negotiations with Mr. Baillie's attorney to reach agreement as to what severance Mr. Baillie was actually due.  (*Id.*)

Mr. Baillie retained counsel, and on September 19, 2001 Mr. Baillie's counsel sent a

13

letter to Defendant requesting additional time to consider Defendant's initial proposal and inviting further good-faith negotiations. (*Id.* at Ex. 38.) On September 27, 2001, Defendant's General Counsel communicated via facsimile, confirming that "the deadline of October 1, 2001 for signing the Release and Confidentiality Agreement has been extended by our mutual agreement until we can determine if this matter can be resolved." (Facsimile from Suzanne Johnson to Randolph H. Freking attached as "Pl. Ex. B".) Defendant attached Szerlong's three May 5, 2001 memoranda to this facsimile in purported support of its decision to terminate Mr. Baillie. (*Id.*)

### 2. Defendant Fails to Make Good Faith Efforts to Negotiate Mr. Baillie's Severance.

No further discussion occurred but, on October 3, 2001, Defendant transmitted a "revised" Release and Confidentiality Agreement to Mr. Baillie's counsel, which again comported with Defendant's base severance package and initial promises. (Baillie Dep. Vol. II at Ex. 38.) This version of the Release and Confidentiality Agreement included no express deadline for acceptance. (*Id.*) Defendant attached Szerlong's three March 5, 2001 memoranda to this transmission. (*Id.*)

On October 9, 2001, counsel for Mr. Baillie transmitted a response to the memoranda attached to Defendant's September 27, 2001 facsimile. (*Id.* at Ex. 40.) Mr. Baillie's counsel informed Defendant that Mr. Baillie had exceeded or met the goals and objectives set forth in Szerlong's memoranda and expressed concern that the stated reasons for Mr. Baillie's termination were inconsistent with Mr. Baillie's performance. (*Id.*) Mr. Baillie's counsel also recommended three specific improvements to the severance package – the first recommendations expressly conveyed on Mr. Baillie's behalf. (*Id.*)

### 3. Defendant Withdraws from Negotiation Entirely.

14

On October 11, 2001, Defendant responded to the October 9, 2001 transmission, advising Mr. Baillie's counsel, "we do not wish to engage in a further discussion of the merits in this matter," imposing an October 18, 2001 deadline to "our offer." (*Id.* at Ex. 41.) Specifically, Defendant indicated that the offer would be withdrawn, "[u]nless Mr. Baillie chooses to sign his Agreement." (*Id.*)

Pursuant to Defendant's instruction, Mr. Baillie signed the revised Release and Confidentiality Agreement on October 18, 2001. (*Id.* at Ex. 28.) On October 31, 2001, Mr. Baillie's counsel transmitted yet another invitation for Defendant to negotiate in good faith. (*Id.* at Ex. 42.) Defendant failed to respond to this request.

### 4. Defendant Re-extends its Offer and Mr. Baillie Attempts to Accept.

Shortly thereafter, on November 20, 2001, Mr. Baillie's counsel transmitted yet another request of Defendant's counsel to discuss the matter of Mr. Baillie's termination and severance. (Facsimile from Randolph Freking to David Croall, attached as "Pl. Ex. C".) During subsequent negotiations, Defendant indicated through its counsel that the revised Release and Confidentiality Agreement was, "a generous offer, we hope he takes it." (Letter from Randolph Freking to David Croall, attached as "Pl. Ex. D".) On December 21, 2001, Mr. Baillie's counsel returned the revised Release and Confidentiality agreement to Defendant, signed by Mr. Baillie and notarized on October 18, 2001. (*Id.*)

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment may be granted only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating an unqualified lack of a genuine issue of material fact as to an element of the nonmoving party's claim. See, <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 324 (1986).  If the moving party satisfies its burden, the nonmoving party may

then proffer evidence indicative of a genuine issue for trial.  (*Id*).

This Court must adopt the nonmoving party's evidence as true and must accept any

reasonable conclusion favorable to the nonmoving party. <u>See</u>, <u>Anderson v. Liberty Lobby, Inc.</u>,

477 U.S. 242, 247 (1986); <u>see also</u>, <u>DePiero v. City of Macedonia</u>, 180 F.3d 770, 776 (6th Cir.

1999). When considering a Rule 56 motion, "although the court should review the record as a

whole, it must disregard all evidence favorable to the moving party that the jury is not required

to believe." <u>Reeves v. Sanderson Plumbing</u>, 530 U.S. 133, 151 (2000).  Ultimately, summary

judgment is appropriate only in cases predicated on evidence "so one-sided that one party must

prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 247.

As a grounded principle, when the motivation, intent, or state of mind of the defendant

is at issue, summary judgment is rarely appropriate, as disputes over motive should be resolved

by the trier of fact. <u>See</u>, <u>Ross v. Campbell Soup Co.</u>, 237 F.3d 701, 706 (6th Cir. 2001) ("that

question -- i.e. the employer's motive -- is one rarely susceptible to resolution at the summary

judgment stage"); <u>see also</u>, <u>Canitia v. Yellow Freight System, Inc.</u>, 894 F.2d 196, 199 (6th Cir.

1990) (courts should yield to any reasonable inference of discriminatory intent arising from

Plaintiff's version of the facts); <u>Gallo v. Prudential Residential Services L.P.</u>, 22 F.3d 1219 (2d

Cir. 1994) (summary judgment of discrimination cases entails a momentous determination and

should be granted only sparingly).

**B.    Genuine Issues of Material Fact Exist with Respect to Plaintiff's Age
       Discrimination Claim, Making Summary Judgment Improper.**

Federal and Ohio law prohibit age discrimination in employment decisions.  29 U.S.C.

§623; O.R.C. §4112.02(A).  Plaintiff may establish a claim of discrimination either by

introducing direct evidence of discrimination, or by proving circumstantial evidence which

16

would support an inference of discrimination.  Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both."  (*Id.*)

Under the circumstantial evidence approach, Plaintiff must first establish a *prima facie* case of age discrimination by proving the following elements: (1) he was over 40; (2) he was qualified for the job he held; (3) he suffered an adverse employment action; and (4) he was replaced by a substantially younger employee, or he was treated differently than similarly situated younger employees or that additional direct or circumstantial evidence exists that shows that the employer was motivated by Plaintiff's age in making its decision.  O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998); Ohio Civil Rights Commission v. Ingram, 69 Ohio St.3d 89, 92 (1994) (Ohio courts apply federal law on state discrimination claims).

### 1.    Defendant Does Not Contest Mr. Baillie's Prima Facie Case of Age Discrimination

Defendant does not contest Mr. Baillie's *prima facie* case of age discrimination:  (1) Mr. Baillie was 51 years old;  2)  Mr. Baillie was qualified for the job he held;  3) Defendant terminated Mr. Baillie; and 4)  Defendant replaced Mr. Baillie with Jerry Butler, who was only 41 years old.  (Def. Memo. Supp. M.S.J. at 19;  Def. Ans. Pl. 2nd Set Int.)

### 2.    Genuine Issues of Material Fact Exist as to Whether Defendant's Asserted Reason for Terminating Mr Baillie Constitutes Mere Pretext.

Since Plaintiff can succeed in establishing a *prima facie* case, Defendant must present some legitimate, nondiscriminatory reason for the termination.  St. Mary's Honor Center v.

Hicks, 509 U.S. 502 (1993). Once Defendant meets this burden of production, Plaintiff may then show that Defendant's articulated reason for the termination is mere pretext for age discrimination. (*Id.* at 507.) In Hicks, the Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, [n]o additional proof of discrimination is required.

(*Id.* at 511.) (emphasis in original; footnote and citation omitted).

Thus, the employee need not produce *additional* evidence of discrimination. As the Supreme Court clarified in Reeves v. Sanderson Plumbing, 530 U.S. 133, 149 (2000), a plaintiff's *prima facie* case combined with sufficient evidence to find that the employer's asserted justification lacks credibility will permit - but not require - the trier of fact to infer that the employer was motivated by unlawful discrimination. In Reeves, the Supreme Court unanimously and authoritatively rejected the pretext-plus approach that several circuits had used previously in ruling on motions for summary judgment. (*Id.* at 140-41.) The Court held that the Fifth Circuit had "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." (*Id.* at 149.)

"There are no hard and fast rules as to ... what evidence is needed in order to establish pretext." Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc., 690 F.2d 88, 97 (6th Cir. 1982). The Sixth Circuit has stated that evidence that the articulated reason did not actually motivate the discharge is sufficient to create a factual question concerning pretext. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting McNabula v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir. 1993)). .

To establish that Defendant's explanation for the termination is unworthy of belief, Mr.

18

Baillie may put forth evidence that (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his discharge, or (3) they were insufficient to motivate discharge.  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  The first method entails showing that the alleged basis for the termination never happened or is actually false.  (*Id.*)  The second method entails demonstrating that "an illegal motivation was more likely than the reasons offered by the Defendant."  (*Id.*)  The third method consists of producing evidence that other employees outside the protected class otherwise similarly situated to Plaintiff were not terminated.  (*Id.*)

According to the Sixth Circuit, the court should not accept blindly an employer's proffered reason as honest.  (*Id.*)  The Sixth Circuit has stressed that it is important to analyze all of the evidence of pretext together.  Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160 (6th Cir.), reh'g opinion on another issue, 97 F.3d 833 (6th Cir. 1996).

a.    **Defendant's Stated Reason for Terminating Mr. Baillie has No Basis In Fact.**

Defendant claims that it terminated Mr. Baillie because Mr. Baillie "lacked the leadership skills necessary to manage the Cincinnati branch."  (Def. Memo. Supp.  M.S.J. at P.19.)  Specifically, Defendant asserts that Mr. Baillie's leadership deficiencies consisted of (1) "his failure to develop and evaluate his management staff;" (2) "his tendency to be inflexible in dealing with staff;" (3) "the manner in which he conducted meetings;" (4) "the manner in which he dealt with an issue relating to Human Resources and women in the workplace."(*Id.*)[5]

---

[5]Notably, Szerlong's memorandum purportedly memorializing his reasons for terminating Mr. Baillie identifies fewer and different asserted leadership deficiencies than what Defendant now asserts in its Memorandum in Support of summary judgment.  In his memorandum, Szerlong asserts, "**Leadership**  [1] Quality of communication to staff; [2] Lack of organizational support for Doug at any level; [3] Doug's communication practices."  (Szerlong Dep at Ex. 7.)(emphasis in original)   Evidence that an employer has changed explanations for terminating an employee is itself probative of pretext.  See, Thurman v. Yellow Freight Systems,

While Defendant asserts that Szerlong's criticisms regarding Mr. Baillie's leadership were "well founded in fact," Defendant relies solely on an incomplete and strangulated analysis of the testimony of Mr. Baillie's managers and staff. Defendant wholly ignores evidence which demonstrates Mr. Baillie's management skills clearly and objectively.

      **(1)**    **Defendant's Own Reviews of Mr. Baillie's Performance Demonstrate that Defendant's Stated Reason for Terminating Mr. Baillie has No Basis In Fact.**

Mr. Baillie's performance reviews throughout his tenure as the Ohio Valley Regional Manager and Cincinnati Branch Manager indicate consistently exceptional people management skills. (Baillie Dep. Vol. I at Ex. 8.) In 1998, Mr. Baillie earned a score of "advanced proficiency," specifically in the field of "Coaching/Development," and exceptional scores of "4" in the areas of "Leadership," "Teamwork," and "Human Resources." (*Id*.) This 1998 review indicates with specificity that Mr. Baillie's outstanding performance included implementing a system to develop and evaluate his managerial staff, improving morale, and developing clear vision and directives. (*Id*.)

Such scores clearly indicate not a Regional Manager suffering "leadership" deficiencies, but rather a Regional Manager who possessed leadership skills in abundance. Moreover, throughout 1999, for turning around the Ohio Valley Region Mr. Baillie's 1999 performance review clearly confirms: "significant progress has been made in bringing the Ohio Valley Region into a <u>very effectively working structure</u>." (*Id*. at Ex. 11.) Again, Mr. Baillie earned exceptional scores in all areas relating to leadership, and as a result earned exceptional scores in those areas that Defendant admits depend on leadership. (*Id*.)

It was not until Mr. Baillie's first full year of performance under Timothy Szerlong that Defendant noted any problem with Mr. Baillie's leadership. (*Id.* at Ex. 1.) However, by that

_____

Inc., 90 F.3d 1160, 1167 96th Cir. 1996), amended on other grounds, 97 F.3d 833 (6th Cir. 1996).

time, Defendant had implemented an objective "balanced scorecard" method of measuring performance. (*Id.* at Ex. 21.) It is absolutely striking that despite Mr. Szerlong's subjective and vague criticisms of Mr. Baillie's leadership Mr. Baillie's 2000 performance review, a "[c]ritical area for growth" in Szerlong's own asserted view, Mr. Baillie's actual scores reflect that leadership was one of his greatest areas of success. (*Id.* at Ex. 21.) The scorecard reveals that Mr. Baillie "met all" of the 2000 goals with specific regard to "[e]mployees handwritten performance plans." (*Id.*) Furthermore, in every other area under "People Management," Mr. Baillie "exceeded" or "clearly exceeded" his goals for the 2000 year. (*Id.*) Moreover, Szerlong admitted that Mr. Baillie had achieved "[s]olid production/growth," and Szerlong simultaneously admitted that "leadership" is "[c]ritical [...] for growth." (*Id.* at Ex. 1.) Mr. Baillie's objective performance reviews throughout his tenure as Regional Manager demonstrate excellent people management and leadership, and objectively reveal that Defendant's asserted reasons for terminating Mr. Baillie have no basis in fact. Plaintiff has thus established pretext and Defendant's Motion for Summary Judgment must be denied.

### (2) Managers and Staff Under Mr. Baillie Objectively Disconfirm Defendant's Stated Reason for Terminating Mr. Baillie and Demonstrate Defendant's Stated Reason Has No Basis In Fact.

In 1999 and 2000, Mr. Baillie implemented a "360 feedback" method for his subordinates to evaluate him by rating multiple areas of performance on a scale from 1-10. (Pl. Ex. A.) Mr. Baillie's subordinates retained complete anonymity throughout the process and were encouraged to evaluate Mr. Baillie's's performance frankly. (*Id.*; Baillie Dep. Vol. I at 149-150, 188.) The results of Mr. Baillie's "360 feedback" in 1999 were excellent. Specifically, in the area of leadership Mr. Baillie's overall score was "8.5." (Pl. Ex. A.) Moreover, in 2000 Mr. Baillie's subordinates rated Mr. Baillie's leadership ability an "8.4" overall. (*Id.*)

Though Szerlong was aware that Mr. Baillie utilized the "360 feedback" review,

Szerlong admits that he did not consider these reviews in determining that Mr. Baillie's leadership was deficient. (Szerlong Dep. at 64-65.) Yet, Szerlong's subjective criticisms of Mr. Baillie's leadership directly <u>contradict</u> the results of this <u>objective</u> measure of performance. Thus, Defendant's stated reason for terminating Mr. Baillie has no basis in fact and Defendant's Motion for Summary Judgment must be denied.

> (3)    **Baillie's Subordinate's Sworn Testimony Contradicts Defendant's Stated Reason For Terminating Mr. Baillie.**

Defendant selectively cites testimony of Mr. Baillie's subordinates in weak support of its inference that Mr. Baillie's subordinates believed that Mr. Baillie was a poor leader. (Def. Mem. Supp. M.S.J. at 9-12.) Yet, at the summary judgment phase, all inferences are to be construed in the non-movants favor. Mr. Baillie's subordinates' testimony clearly contradicts Defendants stated reason for terminating Mr. Baillie, revealing no basis in fact Defendants proffered reason. Contrary to Defendant's assertion, Mr. Baillie's managers do not "confirm Szerlong's perceptions about Baillie's leadership deficiencies." (*Id*.) Rather, Mr. Baillie's subordinates' sworn testimony is consistent with the results of the "360 feedback."

**Dietre Korte**

Dietre Korte was the Regional Underwriting Manager. (Korte Dep. at 7.) Defendant grossly overdramatizes two incidents where Mr. Baillie read a newspaper during a presentation by Korte and was misunderstood in commenting about sending packages by courier. (Def. MSJ at 11.) Korte addressed these issues with Mr. Baillie, and according to Korte, Mr. Baillie took his comments seriously and appreciated Mr. Korte's feedback. The issues were amicably resolved long before Mr. Baillie's termination. (Korte Dep. at 45-46.)

According to Korte, Mr. Baillie was very engaged in the marketplace and visible with Defendant's agents. (Korte Dep. 41.) Mr. Baillie was visible internally and made it a practice to

stop by employees' desks. (*Id.* at 42.) Korte's colleagues shared his opinions about Mr. Baillie's marketplace engagement, marketing skills, internal visibility and relationships with agents. (*Id.* at 43-44.) Korte praised Mr. Baillie for clearly addressing goals in performance reviews and Korte never heard colleagues criticize Mr. Baillie's reviews of their performance. (*Id.* at 44.)

Korte affirms that prior to Mr. Baillie's arrival, the Cincinnati branch had been in a shambles, and that Mr. Baillie essentially turned the branch around 180 degrees. (*Id.* at 78-79.)

Morale improved in Korte's department during Mr. Baillie's tenure. (*Id.* at 51.) Moreover, the branch became adequately staffed, training was implemented, people received performance reviews, people had measurable goals and guidelines, and people had a clear vision of common goals and the means by which they could achieve those goals. (*Id.* at 51-52.) Resources flowed more freely. (*Id.* at 55-56.)

Korte indicates that the greatest financial improvement occurred in 2001. (*Id.* at 80.) Korte further affirms that business could not have turned around over night, as a groundwork must be laid months or years in advance to realize profit in the future. (*Id.* at 80.) In fact, Korte ran into Mr. Baillie after Mr. Baillie's termination at an Insurance Day convention, where Mr. Baillie was attending a booth for Insure the Children. (*Id.* at 101-102.) When Korte and Mr. Baillie discussed the financial turnaround at the Cincinnati branch, Mr. Baillie commented that he had laid the groundwork for the turnaround. (*Id.*) Korte swears this comment was accurate. (*Id.* at 109-110.)

### Greg Tazic

Greg Tazic was a Claims Manager in Cincinnati and is still employed by Defendant. Defendant cites Tazic's testimony in support of its assertion that managers under Mr. Baillie's

supervision also believed Mr. Baillie was not a good leader. (Def. Memo. Supp. M.S.J. at 9-10.) However, Tazic was not under Mr. Baillie's supervision. (Tazic Dep. at 12-13.) Tazic reported to John Mohler and Mike Stapleton. (*Id.*) Therefore, Tazic's testimony is irrelevant to the conclusion Defendant attempts to draw. Moreover, Tazic never reported his concerns about Baillie to Szerlong, and has no recollection of complaining about Mr. Baillie to Human Resources Managers Diane Haggard or James Ekdahl. (*Id.* at 85-86.)

**Jeffrey Bezold**

Jeffrey Bezold was the Columbus Production Office Manager during Mr. Baillie's tenure. (Bezold Dep. at 6-7.) Bezold felt like he grew and developed in all areas of performance under Mr. Baillie's supervision. (*Id.* at 16.) He was satisfied with Mr. Baillie's counseling, and thought Mr. Baillie's appraisals of his performance were fair. (*Id.* at 25-26.) Moreover, Bezold believed that Mr. Baillie clearly communicated and expressed strategies that the Columbus branch was to follow. (*Id.* at 30.) Mr. Baillie was supportive of Bezold as his Branch Manager and demonstrated active leadership as a Regional Manager. (*Id.*) No one reported any negative events or circumstances regarding Mr. Baillie to Bezold. (*Id.* at 30-31.)

The book of business was in bad condition at the beginning of Mr. Baillie's tenure as Regional Manager. When Bezold came on board in Columbus, they were in the process of cleaning up the book. Bezold found Mr. Baillie to be helpful in accomplishing that goal. (*Id.* at p. 11.) Bezold also found Mr. Baillie's marketing assistance to be helpful, and perceived that the agents responded positively to Mr. Baillie's marketing activities. (*Id.* at 12-14.) During Mr. Baillie's tenure, Columbus grew its business and the branch experienced overall performance improvement. (*Id.* at 15-16.)

**Michael Whitman**

Michael Whitman was the Regional Property Machine and Insurance Underwriting

Manager in Cincinnati. (Whitman Dep. at 8.) This was a new position to Defendant's

organization. (*Id.* at 10-11.) In the second half of 2000, Mr. Baillie placed Whitman on a

performance improvement plan, to improve results in both areas of Whitman's performance and

balance his responsibilities. (*Id.* at 9-10.) Whitman found that his performance in fact did

improve while he was on Mr. Baillie's plan. (*Id.* at p. 12.)

      Whitman found Mr. Baillie to be a balanced manager, and Whitman does not recall ever

complaining about Baillie's supervision. (*Id.* at 12-15.) On those occasions when Szerlong

would meet with Whitman to discuss his position, Whitman never complained to Szerlong about

Mr. Baillie. (*Id.* at 14.) Whitman can offer no criticism of Mr. Baillie's performance reviews.

(*Id.* at 20.) Whitman had a good working relationship with Baillie: "By in large, I would say that

he was a fair manager [...] based on my personal experience." (*Id.* at 26.)

      Whitman had experienced the branch before Mr. Baillie's arrival. In general the branch

was not performing up to expectations and the morale was relatively low. (*Id.* at 27.) Whitman

attributed the branch's poor performance and morale to poor management. (*Id.* at 28.) During

Mr. Baillie's tenure, the financials improved as did the performance of the branch overall. (*Id.* at

28-29.) Additionally, during Mr. Baillie's tenure, the operational capabilities and conditions of

the branch also improved. (*Id.* at 29.)

      Moreover, Whitman's own department improved under Mr. Baillie's supervision. (*Id.* at

29-30.) Whitman's personal improvement was attributable to Mr. Baillie's coaching. (*Id.* at 30.)

In general, Mr. Baillie interacted frequently with employees and provided feedback. (*Id.* at 31.)


**Andrew Emery**

      Andrew Emery was the Senior Underwriter at the Cincinnati branch and is currently the

Manager of Financial Institutions. (Emery Dep. 6.) Emery liked working with Mr. Baillie,

25

because Mr. Baillie was fair to him, Mr. Baillie went out of his way to coach him, and Mr.

Baillie gave "open" and "honest" performance feedback and constructive criticism. (*Id.* at 8.)

Emery offers no complaints about Mr. Baillie's management. (*Id.* at 10.) Emery's department

improved after Mr. Baillie came to Cincinnati, and it was Mr. Baillie's interaction that helped it

to improve. (*Id.* at 10-11.) Emery's colleagues experienced similar benefits from Mr. Baillie's

supervision. (*Id.*) Emery had a very good opinion of Mr. Baillie as a leader. (*Id.* at 12-13.)

### Jim Lash

Jim Lash was the Department Manager in charge of Executive Protection Insurance.

Lash obtained good results under Mr. Baillie's supervision. (Lash Dep. at 14.) Lash testified

that Mr. Baillie was able to offer solutions to problems quickly. (*Id.* at 15.) Lash found that Mr.

Baillie was a good communicator. (*Id.* at 17.) Furthermore, Lash testified that Mr. Baillie had

good agency relationships, effectively empowered his employees and supported their decisions,

and that Mr. Baillie was a strong advocate for his people. (*Id.* at 16.)

### Jeff Barton

Jeffrey Barton was the Regional Marketing Manager when Mr. Baillie arrived. (Barton

Dep. at 8.) Barton viewed Mr. Baillie as his mentor. (*Id.* at 16.) According to Barton, Mr.

Baillie was very personable, involved with all the staff, and was very visible internally. (*Id.*)

Mr. Barton swears that Mr. Baillie's leadership style worked for him. (*Id.* at 17.) Mr. Barton

was also unaware of any rumors or innuendos as to poor leadership from Mr. Baillie among the

people he supervised. (*Id.* at 21.)

Specifically, Mr. Baillie was very helpful with Barton's development in the marketplace.

(*Id.* at 37.) Mr. Baillie shared expertise, provided constructive feedback, was encouraging,

helped Barton to develop confidence, assisted Barton in delivering necessary results, and

encouraged Barton to support diversity by seeking minority vendors. (*Id.* at 37-38.) Ultimately,

Barton was surprised by Mr. Baillie's termination because he could not have imagined that there were issues that could have led to Mr. Baillie's termination.  (*Id.* at 33.)

**Andrew Bryant**

Andrew Bryant was the Director of Marketing for Chubb in Kentucky.  Bryant agreed with Mr. Baillie's assessment that some of the Kentucky agents were in need of improvement. (Bryant Dep. at 19.)  During Mr. Baillie's tenure, the Kentucky agents' performance was steady. (*Id.* at 20.)  Moreover, in 2001, the Kentucky territory enjoyed a "strong" profit of approximately $21 million.  (*Id.* at 33-34.)  Throughout 2002, the territory had a good year overall.  (*Id.* at 36.) This financial improvement sprung out of Mr. Baillie's tenure.  (*Id.* at 44.)  Bryant also found Mr. Baillie notably interested in both growth and profit.  (*Id.* at 49.)  While the turn around was attributable to many people, Bryant accords ultimate credit for the dramatic improvement in 2001 to Mr. Baillie.  (*Id.* at 44-45.)

**Mike Zdinak**

Zdinak was the Regional Loss Control Manager during Mr. Baillie's tenure.  (Zdinak Dep. at 10.)  Zdinak believed Mr. Baillie's style of management to be distinct because Mr. Baillie was more visible than other managers.  Mr. Baillie made himself more accessible and interacted more with his staff.  (*Id.* at 13-15.)  Zdinak enjoyed increased productivity under Mr. Baillie's management.  (*Id.* at 20.)  Zdinak also found that Mr. Baillie related well with the underwriters.  (*Id.*)  Ultimately, performance improved in Zdinak's department under Mr. Baillie's supervision.  (*Id.* at 29.)

**Timothy Dadik**

Dadik was the Personal Lines Manager during Mr. Baillie's tenure.  (Dadik Dep. at 7.) Dadik's territory grew and profited under Mr. Baillie.  (*Id.* at 12.)  By the end of 1999 Dadik's overall sales reached approximately $21 million and profit grew by approximately 10 percent per

year.  (*Id.* at 13-14.)  Dadik's department came close to meeting growth plans every year and earned underwriting profit.  (*Id.* at 31.)

Dadik found Mr. Baillie to be "supportive" in devising marketing incentives.  (*Id.* at 27-28.)  Mr. Baillie would "get involved" if asked to help retain an existing customer.  (*Id.* at 29-30.)  Dadik also appreciated Mr. Baillie's suggestions for problem-solving, Mr. Baillie would offer helpful alternatives when considering a decision.  (*Id.* at 67.)  While Dadik expressed that he would have enjoyed more time with Mr. Baillie, he acknowledged that he understood that Mr. Baillie's Regional responsibilities required that Mr. Baillie be in the field at times.  (*Id.* at 34-35.)  Dadik could always find Mr. Baillie by asking where he was.  (*Id.* at 36.)

A reasonable interpretation of the whole of Mr. Baillie's subordinates' testimony indicates that in fact Mr. Baillie possessed exceptional leadership skills.  For this reason, Defendant's asserted justification for terminating Mr. Baillie has no foundation in fact. Defendant's motion for summary judgment of Mr. Baillie's claims under the ADEA and ORC 4112.02 must be denied.

> **(4)** **Defendant's Own Statements About Mr. Baillie's Leadership Disconfirm Defendant's Stated Reason For Terminating Mr. Baillie, And Demonstrate That Defendant's Stated Reason For Terminating Mr. Baillie Has No Foundation is Fact.**

From the beginning of Mr. Baillie's tenure as Regional Manager in Cincinnati, Mr. Baillie consistently received accolades and rewards for his leadership.  Terry Cavanaugh made it clear that Baillie's greatest strength as a Manager was his ability to coach and develop his staff and management.  (Baillie Dep. Vol. I at Ex. 8.)  Defendant's Executive Vice President and Managing Director, Sylvester Green, lauded Mr. Baillie's "contagious," "enthusiasm," and "excitement" about his role as a manger.  (*Id.* at Ex. 9.)  Moreover, Green emphasized the outstanding "impact that you are having on your staff, management team, and producer plant."

(*Id.*).  Defendant's CEO lauded the "tremendous job" Mr. Baillie was doing in 2000, when Defendant unanimously elected Mr. Baillie Senior Vice President.  (*Id.* at Ex. 14.)

Moreover, at the beginning of 2000, when addressing Mr. Baillie's priorities for the coming year, Mr. Szerlong made no mention of "leadership," but rather expressed gratitude for Mr. Baillie's accomplishments as a manager and reaffirmed the goal of continued financial growth toward profitability.  (*Id.* at Ex. 13.)  Overwhelmingly, prior to Szerlong's startling and vague criticism of Mr. Baillie's leadership in 2001, Mr. Baillie's superiors rained praise on Baillie for his managerial success.  Thus, Mr. Baillie's supervisors disconfirm Defendant's stated reason for terminating Mr. Baillie, and Defendant's motion for summary judgment must be denied.

> **b.    Defendant's Stated Reason for Terminating Mr. Baillie is Insufficient to Justify it's Decision to Terminate Mr. Baillie And Defendant's Motion For Summary Judgment Must Be Denied.**

Even were this Court to find, <u>arguendo</u>, that Defendant's stated reason for terminating Mr. Baillie reflects reality, the record clearly demonstrates that Szerlong's subjective and vague criticism of Mr. Baillie's "leadership" is insufficient to justify Mr. Baillie's discharge.  This is established, (a) by Defendant's own calculus for measuring performance; (b) by the fact that Defendant's primary goal was to achieve profitability in the northern zone, a goal that Mr. Baillie's region met, while other branches with younger managers floundered; and (c) by the fact that Defendant did not terminate other younger managers criticized for leadership deficiencies.

> **(1)    Defendant's Own Method of Quantifying Performance Demonstrates that its Stated Reason for Terminating Mr. Baillie is insufficient to Justify his Discharge**

Pursuant to Defendant's "balanced scorecard" performance review, "people management" should only account for 5% of a manager's overall performance score.  (Szerlong Dep. at Ex. 11.)  A manager's "financial" score, on the other hand, should account for 75% of

the overall performance score, and "internal process" and "external process" should account for 20% of the overall score. (*Id*.). As already noted, Mr. Baillie either "met," "exceeded," or "clearly exceeded" 29 of the 31 areas in all of the above categories of performance. (Baillie Dep. Vol. I at Ex. 21.) Moreover, Mr. Baillie either "met all," "exceeded," or "clearly exceed" every area under "People Management." (*Id*.)

However, even were this Court to conclude, despite Defendant's own quantified measurement of Mr. Baillie's "People Management" skills, that Mr. Baillie suffered leadership deficiencies, Defendant's assertion that Mr. Baillie suffered "leadership deficiencies," according to the weight attributed to "People Management" under the balanced scorecard, could only have accounted for 5% of Mr. Baillie's performance score, and could not have justified his discharge. In fact, Szerlong was clearly aware of this obstacle in creating the paper trail Defendant now offers to support its adverse action. (Szerlong Dep. at 149, Exs. 1,10.) According to Szerlong's own records, Szerlong not only privileged his subjective and vague criticisms over the objective balanced scorecard measure of "People Management," but also manipulated the weight of "People Management" by lowering Mr. Baillie's overall performance score to "met most." (*Id*.) Thus, Defendant's assertion that it terminated Mr. Baillie for leadership deficiencies is insufficient to justify his discharge. Defendant's motion for summary judgment of Mr. Baillie's claims under the ADEA and ORC 4112.02 must be denied.

                **(2)**     **Defendant's Asserted Reason for Terminating Mr. Baillie is Insufficient to Justify his Discharge Because Mr. Baillie had Greater Financial Success Than All Others in the Zone, and Financials Should Have Been Weighted 75% of his Performance.**

Indeed, Szerlong was apparently concerned that Mr. Baillie's indisputable financial success would belie such a low overall score. At the time of his performance review, Mr. Baillie had achieved financial success that dwarfed the rest of the Northern Zone. In fact, Mr. Baillie

had positioned his region such that by the second half of 2001, the Ohio Valley Region would be

the <u>most profitable</u> in the Northern Zone, with the <u>second greatest growth</u>, while other branches

with younger managers in the Northern Zone were floundering.  (Baillie Aff. at ¶¶ 3-4; Def. Ans.

to Pl. 2nd Set Int.)  So, Szerlong lowered the weight of Mr. Baillie's "financial" score from 75%

to 50%.  (Szerlong Dep at Exs. 10, 11.)

Szerlong's rationale for arbitrarily overruling Defendant's policy by manipulating Mr.

Baillie's scorecard is simply absurd.  Szerlong asserts that he manipulated Mr. Baillie's

scorecard because poor leadership leads to poor financial performance.  (*Id.* at 150-151.)  Of

course, without Szerlong's underhanded intervention, Mr. Baillie's scorecard would only reveal

outstanding leadership and extraordinary financial growth.  (Baillie Dep. Vol. I at Ex. 21.)

Nevertheless, had Mr. Baillie's unaltered scorecard actually indicated leadership deficiencies,

those deficiencies should otherwise have accounted for only 5% of Mr. Baillie's overall score.

Mr. Baillie's scores in more heavily weighted areas of performance, e.g. "financials" at 75%,

would have balanced the deficiency.  Thus, Defendant's assertion that it terminated Mr. Baillie

for leadership deficiencies is insufficient to justify Mr. Baillie's discharge, and Defendant's

Motion for Summary Judgment must be denied.

> **(3)    Defendant's Asserted Reason for Terminating Mr.
> Baillie is Insufficient to Justify Mr. Baillie's Discharge
> Because Other, Younger Managers who Actually Had
> People Management Problems Were Not Disciplined.**

Gary Delong, a younger branch manager in Defendant's Cleveland office, also received

criticism from Szerlong about leadership deficiencies. )  In 2001, Szerlong criticized, "your

management style can discourage the appropriate amount of "pushback" from your key

lieutenants, hamper the individual execution or empowerment to drive personal growth and

sometimes stifles the advancement of solutions from your team."  (Delong Perf. Rev. attached as

CIC 001864.)  Szerlong apparently also found Mr. Delong to be too "black and white:" "you are

often poorly received - appearing territorial and unbending in your willingness to embrace the other side of an argument." (*Id*.) In 2002, Szerlong noted of Delong that, "[h]is pushback is sometimes a rub in a collaborative environment." (Delong Perf. Rev. attached as CIC 001874.) In 2003, Szerlong noted, "[p]erception of leadership ability is sometimes adversely affected by what appears to be his intolerance to another point of view or under performance." Szerlong further criticized Mr. Delong, quoting he should "[b]e consistently conscious of delivery based on audience." (Delong Perf. Rev. attached as CIC 01885.) Delong was not terminated for these leadership deficiencies. (Delong Dep. at p. 4.) Delong, born in 1961, is significantly younger than Mr. Baillie. (Def. Ans. Pl. 2nd Set Int.)

Richard Mauk was the manager of Defendant's Des Moines Branch. (See Perf. Rev. Richard Mauk attached as CIC 001977.) On Mauk's 2001 performance review, Mauk's leadership skills were rated a mere 2.5 out of 5. (Mauk Perf. Rev. attached as CIC 002604.) Comments to this area noted, "can leave an impression as inflexible and argumentative... be more aware of managing relationships ... need to reflect an ability to balance the needs of the branch or territory with larger needs of the organization." (*Id*. at CIC 002604.) Szerlong further noted, "[a]lthough I acknowledge disagreement on the issue, the branch may well benefit from Rick's greater awareness of (and adjustment in) how he responds to others and builds support withing Chubb ... the reaction to this approach can produce avoidance." (Mauk Perf. Rev. attached as CIC 002611.) Mauk is significantly younger than Mr. Baillie. (Def. Ans. Pl. 2nd Set Int.) Delong and Mauk are still employed by Defendant. Thus, even if <u>arguendo</u> Mr. Baillie suffered leadership deficiencies like DeLong and Mauk, the fact that Defendant terminated neither DeLong nor Mauk as a result of their leadership deficiencies clearly demonstrates that such deficiencies are insufficient to justify Mr. Baillie's discharge. Defendant's motion for summary judgment of Mr. Baillie's claims under the ADEA and ORC 4112.02 must therefore be

32

denied.

### c. Defendant's Stated Reasons for Terminating Mr. Baillie Did Not Actually Motivate His Discharge.

There is ample evidence on the record to raise a genuine issue of material fact as to whether Mr. Baillie's termination was the result of Szerlong's stereotypical views about older managers. In fact, Szerlong's animus toward older managers has been documented, and is apparent even in his proffered reason for terminating Mr. Baillie.

### 1. Szerlong Improperly Stereotyped Plaintiff, Indicating An Age Bias

As a matter of law, the ADEA and O.R.C. §4112.02 prohibit the consequences of subconscious, stereotypical views of protected employees as well as overt discriminatory animus. See, Biggins v. Hazen Paper, Co., 522 US 952 (1997). As established above, Szerlong's criticisms of Mr. Baillie's leadership were vague and unreflective of every objective measure of Mr. Baillie's performance. Defendant's Memorandum in Support of Summary Judgment lacks any credible, objective evidence supporting Szerlong's criticisms. When deposed, Szerlong revealed "leadership" to be an impenetratible enigma. Furthermore, Szerlong's attempts to unravel the mystery of "leadership" reveal that his determination that Mr. Baillie suffered leadership deficiencies reduced to his perception of Mr. Baillie as "inflexible," "[having a] difficult time understanding," and "out of touch." (Szerlong Dep. at 7, 8.)

In the context of Mr. Baillie's objectively demonstrated success as the Ohio Valley Regional Manager, "inflexible," "out of touch," and "lack of understanding" simply fail to refer. Yet, one must reasonably assume that in the context of Szerlong's subjective perception of Mr. Baillie, this language carries some meaning. Of course, Plaintiff cannot ask this Court to ignore the context in which Szerlong's statements, were recorded. Yet, that context includes other employees who allege agism in Defendant's employment actions. For example, a manager's statement in reference to Mr. Baillie's termination that a lot of older employee's seemed to be

disappearing is relevant to interpretation of Szerlong's vague criticisms.  (Korte Dep. at 122.)

> 2.    Szerlong Gave Age-Biased Explanations To An Older, Disinterested candidate for Baillie's Job, And Then Began To Criticize The Applicant's Leadership Abilities - The Same False Criticism He Made About Baillie

Tom Breiner began working for Defendant in 1977.  (Breiner Dep. at 10.)  Breiner earned consistently excellent performance ratings throughout his tenure.  (Breiner Dep. at 33.)  After Defendant terminated Mr. Baillie, Breiner applied for Mr Baillie's position.  Breiner was one of Defendant's oldest branch managers at the time.  He is now a disinterested witness.[6]

Szerlong met with Breiner to discuss his application, yet at the beginning of this meeting, prior to any discussion of Breiner's qualifications for the position, Szerlong informed Breiner that he was not a viable candidate for the position.  (*Id.* at 38.)  Criticizing Breiner's leadership skills, Szerlong stated that Breiner's age was a negative factor in Breiner's ability to relate to other managers and understand and develop younger managers.  (*Id.* at 47.)[7]

Shocked that Szerlong had made his age a factor in evaluating his performance, Breiner complained about Szerlong's comments to Mike Marinaro, Defendant's U.S. Human Resources Manager.  Breiner informed Marinaro that in addition to Szerlong's refusal to consider him for the Ohio Valley Regional Manager position because of his age, he was concerned that several other older employees appeared to be leaving the company.  (Breiner Dep. at 39.)  Mr. Breiner's concern was informed by the departure of older managers, Lee Topps, Harry Wallace and Linda Kortlandt.  (*Id.* at 43.)

Marinaro apparently referred Breiner's complaint to Patricia Hurley, who directed

---

[6]Indeed, Breiner refused to testify without the issuance of a subpoena by Plaintiff that compelled his testimony.  (Breiner Dep. at 7.)

[7]This evidence also constitutes direct evidence of Szerlong's bias.

Patricia Bubb, Defendant's E-Learning Manager to conduct an investigation. (CITE.) When Bubb contacted Breiner, she informed him that she would not interview other managers to determine whether Breiner's concerns were well founded. (Breiner Dep. at p. 57.) Rather, Bubb's "investigation" into Breiner's complaint involved only interviews of Breiner's supervisors, and subsequent to Szerlong's blanket denial of age bias in his criticism of Breiner, Bubb's investigation immediately focused on Breiner's performance. (Cite Investigation File.) Bubb ultimately surmised that Breiner's complaint was without merit. (Cite File.)

Shortly thereafter, Szerlong's reviews of Breiner's performance indicated leadership problems. (cite perf. reviews.) In Szerlong's review of Breiner's 2001 performance, Szerlong commented critically that Breiner had to "devote attention to staff development." (cite perf rev.) Breiner had never before received such a criticism of his leadership.

Szerlong's very next review of Breiner's performance took the form of a March 7, 2003 memorandum to Breiner. (Szerlong Dep. at Ex. 8.) In that memorandum, Szerlong noted Breiner's financial success, but harshly criticized Breiner's leadership abilities. (*Id.*) Specifically, Szerlong asserted communication problems, poor engagement and a lack of dependability. (*Id.*) Moreover, Szerlong alleged that Breiner was not meeting the goals set during Breiner's previous performance review. (*Id.*) Finally, Szerlong threatened that future failure in leadership would result in Breiner's termination. (*Id.*)

Breiner ultimately decided to resign. Breiner knew that his age was a determining factor in Szerlong's perception of his leadership ability. (*Id.* at 64, 73-75.) Moreover, Breiner's awareness of this fact founded a reasonable concern that if he did not resign he would shortly be terminated because of Szerlong's age-biased perceptions. (*Id.* at 61.) Szerlong, without reluctance, accepted Breiner's resignation. He had accomplished his goal.

Taking the above circumstances into account, a reasonable jury could find that

Szerlong's comments about Mr. Baillie's alleged inflexibility, being "out of touch" and lack of understanding manifest subconscious illegal stereotyping. Furthermore, a reasonable jury could find that Szerlong's use of these comments demonstrates that Szerlong's subconscious stereotypes influenced his decision to terminate Mr. Baillie and that age discrimination was thus likely the reason for Mr. Baillie's dismissal.

Moreover, Breiner's disinterested testimony regarding Szerlong's ageist remarks, and evidence that Szerlong created a paper trail to get rid of Breiner, clearly permit an inference of age discrimination. A reasonable jury could find that Mr. Baillie's termination was a result of this pattern and practice of discrimination. Defendant's motion for summary judgment of Mr. Baillie's claims under the ADEA and ORC 4112.02 must therefore be denied.

### C.    Demonstration of a Genuine Issue of Material Fact, as to Mr. Baillie's Promissory Estoppel and Retaliation Claims is not Barred by Federal Rule of Evidence 408.

Defendant asserts that Mr. Baillie's promissory estoppel and retaliation claims must be dismissed, as it argues that FRE 408 precludes admission of communications between Mr. Baillie's counsel and Defendant's counsel. Defendant is simply mistaken. While FRE 408 renders "conduct or statements made in compromise negotiations," it does so only to the extent that such conduct or statements are offered "to prove liability for or invalidity of the claim or its amount." FRE 408 does not exclude from admission such evidence "when the evidence is offered for another purpose."

From the time Mr. Baillie entered into negotiations with Defendant, and until the commencement of this action, Mr. Baillie's claims against Defendant and the amount of those claims did not include promissory estoppel and retaliation. Rather, Defendant's conduct during severance negotiations gave rise to Mr. Baillie's causes of action. Mr. Baillie does not seek to introduce evidence of conduct and statements made during severance negotiations to prove the

underlying liability or amount of the claims in dispute during negotiations.  Rather, Mr. Baillie

seeks only to introduce evidence demonstrating that Defendant failed to negotiate with Mr.

Baillie, in good faith, as it had promised to do.  See, Uforma/Shelby Business Forms, Inc. v.

NCRB, III F.3d 1284 (6th Cir. 1997) (FRE 408 does not shield the wrongful acts of an employer

committed during settlement negotiations); Starter Corp. v. Converse, Inc., 170 F.3d 286 (2d Cir.

1999) (settlement agreement not barred by FRE 408 where offered to prove an estoppel claim,

for a reason other than to prove or disprove the validity of the claims being settled).

　　　　Defendant further asserts that Mr. Baillie's reference to severance negotiations as

"settlement discussions" in his Complaint is somehow dispositive of the issue.  (Def. Memo

Supp. M.S.J. at 20.)  Defendant, apparently operating under the misconception that the

terminology in the Complaint, "settlement discussions," must remain in use during trial, asserts

that admitting evidence of "settlement discussions" would confuse and prejudice the jury.

Again, Defendant's argument fails.  If Defendant is concerned that the term "settlement

discussions" will prejudice or confuse the jury, the solution is not total preclusion of Defendant's

conduct and statements during negotiations from admission, but rather a simple instruction from

this Court stipulating unprejudicial terminology to reference Defendant's conduct and statements

during trial.  See Bancard America, Inc. v. Universal Bancard Systems, Inc., 203 F.3d 477 (7th

Cir. 2000) (evidence of a party's reliance on settlement agreement admissible where court

instructed attorneys not to use the terms "settlement" or "negotiations," and where court

instructed the jury as to the limited use of the evidence).

　　　　Thus, Defendant's blanket assertion that Mr. Baillie's promissory estoppel and retaliation

claims are precluded is mistaken as a matter of law.  This Court must dismiss Defendant's

Motion for Summary Judgment of Mr. Baillie's promissory estoppel and retaliation claims on

these grounds.

**D.    Genuine Issues of Material Fact Exist as to Mr. Baillie's Promissory Estoppel Claim Against Defendant Making Summary Judgment Inappropriate.**

A promissory estoppel claim can arise when there is a promise, reasonable and foreseeable reliance upon that promise by the promisee, and injury to the promisee as a result of the reliance on the promise.  Ekunsumi v. Cincinnati Restoration, Inc., 698 N.E. 2d 503 (1997), McCroskey v. Ohio, 8 Ohio St.3d 29, 30 (1983) (per curiam) (adopting the Section 90 of the Restatement of Law, Contracts II definition of promissory estoppel: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.")

Defendant asserts that Mr. Baillie's promissory estoppel claim must fail because Mr. Baillie's reliance on Defendant's statements that it would negotiate in good faith with Mr. Baillie constitute mere "supposition."  Defendant asserts that the statements of Szerlong and Hurley and the conduct and statements of Defendant's counsel cannot constitute a "promise" in light of its interpretation of Chubb's written severance policy.  (Def. Memo. Supp. M.S.J. at 23, 24.) Defendant is simply mistaken.

First, the matter of interpretation raised by Defendant in support of its motion is an issue of fact for a jury's determination:

> Generally, the import of the promise presents questions of fact for the jury.  Accordingly, what action or forbearance the promisor reasonably should have expected of the promisee, and whether the action or forbearance flowing from the promise was reasonable present questions of fact that need to be resolved by the jury.

Vision America, Inc. v. Jerrold M. Levin, M.D., Inc., 1991 Ohio  App. LEXIS 707, 4 (1st App. Dist. 1991) (citing Uebelecker v. Cincom Systems, Inc. (1998), 48 Ohio App. 3d 268, 549 N.E.2d 1210) (internal citation omitted).  Defendant's interpretation of the import of its

statements and conduct in light of its written policy are inconsistent with Mr. Baillie's, and give rise to a genuine issue of material fact.

Defendant's promises to Mr. Baillie that it would negotiate the most aggressive package is rendered unambiguous by Defendant's written policy. That policy clearly defines the most basic severance package, and thereby negatively defines Defendant's statements promising the most aggressive package. A reasonable jury could find Defendant's written policy actually informs rather than disconfirms the conclusion that Defendant made a promise on which Mr. Baillie relied reasonably. Therefore, Defendant's motion for summary judgment must be denied on these grounds.

Furthermore, Defendant's assertion that reliance on a promise to negotiate severance is by law unreasonable is mistaken. (Def. Memo. Supp. M.S.J. at p. 24.) Defendant cites several cases involving promissory estoppel and the doctrine of employment-at-will, which are obviously irrelevant to the issue at bar. (*Id.*) Mr. Baillie's claim does not involve a promise for continued employment. Rather, Mr. Baillie's claim involves a promise to negotiate in good faith. The doctrine of employment-at-will obviously does not preclude reasonable reliance in the context of severance negotiations. See Nilavar J. Osborn, 127 Ohio App. 3d 1, 711 N.E.2d 726, 736 (Ohio App. 2d District 1998) (distinguishing promise for continued employment from promise to negotiate).

Mr. Baillie has established a genuine issue of material fact as to his promissory estoppel claim. In reasonable reliance of Defendant's promises to negotiate the most aggressive package with Mr. Baillie, Mr. Baillie did not return his signed and notarized copy of the revised Release and Confidentiality Agreement. Mr. Baillie relied on Defendant's conduct and statements to his detriment, as Defendant subsequently failed to negotiate with Defendant, and Mr. Baillie was deprived of even the basic revised package. Unless this Court holds Defendant to its promises,

39

Mr. Baillie will not be made whole, as justice so requires.

**E.    Genuine Issues of Material Fact Exist as to Whether Defendant Retaliated Against Mr. Baillie Making Summary Judgment Inappropriate.**

Retaliation against an employee because he opposed unlawful discrimination is expressly prohibited by the ADEA and O.R.C. 4112.02(I).  The elements of a claim for retaliation are:  (1) that plaintiff engaged in protected activity; (2) that his exercise of his civil rights was known to the defendant; (3) that he was the subject of adverse employment action; and (4) that a causal link existed between the protected activity and the adverse action.  Wrenn v Gould, 808 F.2d 493, 500 (6th Cir. 1987).  This burden of proof presents a "low hurdle" to Plaintiff.  Gribcheck v. Runyon, 245 F.3d 547, 551 (6th Cir. 2001) (retaliation claim under the Rehabilitation Act); EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997).

To establish the causal connection required in the fourth element, Plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had he not engaged in protected activity.  Avery Dennison, 104 F.3d at 861; Jackson v. RKO Bottlers, 743 F.2d 370, 377 (6th Cir. 1984).  Although no one factor is dispositive in establishing a causal connection, evidence that Defendant treated Plaintiff differently from similarly situated employees or that the adverse action was taken shortly after Plaintiff's exercise of protected rights is relevant to causation.  Gribcheck, 245 F.3d at 551 (*citing* Wrenn, 808 F.2d at 501); Moon v. Transport Drivers, Inc., 836 F.2d 226, 230 (6th Cir. 1987). Defendant may not rely on its articulated reason for the adverse action to argue Plaintiff has not met the causal connection element of the *prima facie* test.  Gribcheck, 245 F.3d at 551.

If Plaintiff succeeds in establishing a *prima facie* case, Defendant must present some legitimate, nondiscriminatory reason for the termination.  Wrenn, 808 F.2d at 501; St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).  Once Defendant meets this burden of production, Plaintiff must then show that Defendant's articulated reason for the termination is a pretext for

40

age discrimination.  Id. at 507.  In Hicks, the Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly
> if disbelief is accompanied by a suspicion of mendacity) may, together with the
> elements of the prima facie case, suffice to show intentional discrimination.
> Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to
> infer the ultimate fact of intentional discrimination, and the Court of Appeals was
> correct when it noted that, upon such rejection, [n]o additional proof of
> discrimination is required.

Id. at 511 (emphasis in original; footnote and citation omitted).  Thus, the employee need not

produce *additional* evidence of discrimination.  As the Supreme Court clarified in Reeves v.

Sanderson Plumbing, 530 U.S. 133, 149 (2000), a plaintiff's *prima facie* case combined with

sufficient evidence to find that the employer's asserted justification lacks credibility will permit

the trier of fact to infer that the employer was motivated by unlawful discrimination.  In Reeves,

the Supreme Court unanimously and authoritatively rejected the pretext-plus approach that

several circuits had used previously in ruling on motions for summary judgment. Id. at 140-41.

The Court held that the Fifth Circuit had "erred in proceeding from the premise that a plaintiff

must always introduce additional, independent evidence of discrimination."  Id. at 149.

Defendant relies solely on High v. Gerting/Castle, Inc., 2002 WC 31951256, a *17 (S.D.

Ohio 2002) in support of its motion for summary judgment of Mr. Baillie's retaliation claim.

(Def. Memo. Supp. M.S.J. at p. 25, Ex. AA.)  Defendant asserts that the circumstances in High

are "virtually identical" to Mr. Baillie's case.  However, in High, the plaintiff's claim arose after

he accepted a check for 75% of his severance pay.  Id.  High claimed that the defendant

retaliated against him by paying him 75% of his severance subsequent to failed negotiations and

commencement of his case.  Id.

Clearly, these circumstances are dissimilar to those underlying Mr. Baillie's claim.  Mr.

Baillie does not claim that Defendant retaliated against him by making a lower settlement

payment subsequent to commencement of this action.  Rather, here Defendant retaliated against

41

Mr. Baillie by retracting its promise to negotiate with Mr. Baillie just days after Mr. Baillie's

counsel challenged the validity of Defendant's stated reason for terminating Mr. Baillie, thereby

depriving Mr. Baillie of even the minimum severance due to him under Defendant's policy.  The

temporal proximity of Defendant's adverse action clearly gives rise to a genuine issue of

material fact regarding causation.  Defendant would not have shut down negotiations had Mr.

Baillie's counsel not responded to the merits of Defendant's decision to terminate Mr. Baillie

asserted by Defendant's counsel via Szerlong's March 5, 2001 Memorandum.  Thus, Defendant

cannot prevail on its Motion for Summary Judgment.  Mr. Baillie has established causation, and

his *prima facie* case.  As argued <u>supra</u>, Mr. Baillie has demonstrated pretext.  This Court must

deny Defendant's Motion for Summary Judgment of Mr. Baillie's retaliation claims under the

ADEA and O.R.C. 4112.02.

  **F.** **Genuine Issues of Material Fact Exist as to Whether Defendant Defamed Mr.**
    **Baillie Making Summary Judgment Inappropriate.**

  Under Ohio law Mr. Baillie survives summary judgment by establishing  a genuine issue

of material fact regarding (1) the existence of a false and defamatory statement; (2) about

Plaintiff; (3) which were published without privilege; (4) with the fault of at least negligence on

the part of Defendant; and (5) that it was defamatory *per se*.  <u>Abrams v. Milliken and Fitton Law</u>

<u>Firm</u>, 267 F. Supp 2d 868, 877 (S.D. Ohio 2003) citing <u>Gosden v. Louis</u>, 116 Ohio App.3d 195,

206, 687 N.E. 2d 481, 487 (1996).  "Defamation *per se* includes 'that which reflects perniciously

on a person's character or injures one in his trade, profession or occupation.'"  <u>Tohline v. Central</u>

<u>Trust Co.</u>, 48 Ohio App. 3d 280, 549 N.E.2d 1223, 1228 (Ohio Ct. App. 1988).  <u>Synder v. AG</u>

<u>Trucking</u>, 57 F3d 484, 489 (S.D Ohio 1995) citing  <u>Hahn v. Kotten</u>, 43 Ohio St. 2d 237, 331

N.E.2d 713, 718 (Ohio 1975).

  Diane Haggard was Defendant's Human Resources Manager in Cincinnati.  (Haggard

Dep. at 11-12.)  Haggard reported directly to Mr. Baillie, and indirectly to James Eckdahl,

Defendant's Northern Zone Practice Leader for Human Resources.  (*Id.* at 17; Eckdahl Dep. at 5-6.)  Haggard harbored severe animus for Mr. Baillie during his tenure as the Ohio Valley Regional Manager.  Haggard's hatred for Mr. Baillie motivated her documented attempts to sabotage Mr. Baillie's professional reputation.  (Haggard Dep at 20-21, 41, 45-46, 50-51, 61, 64-65, 69, 78-79, 87, 91-95, 97-100, 110-111, 113, 123-124, 127.)  In fact, Haggard's hatred for Mr. Baillie persisted even after Mr. Baillie's termination.  (LaFrance Dep. at 26.)

While it appears Haggard developed hatred for Mr. Baillie from the beginning of his tenure in Cincinnati, the sources of Haggard's malice seem to include two events.  (Haggard Dep. at 97-98, 104-105, 123.)  First, Haggard believed that Defendant should reimburse her for business-related calls she would make on her personal cellular phone.  (*Id.* at 123-125.)  Haggard thought that she deserved reimbursement because Mr. Baillie would sometimes make personal calls on his business cellular phone.  (*Id.*)  When Haggard submitted her personal cellular phone bill to Mr. Baillie for reimbursement, Mr. Baillie explained that Defendant would not reimburse Haggard for calls made on her personal cellular phone.  (*Id.*)  This upset Haggard to such an extent that she mounted an investigation of Mr. Baillie's cellular phone usage.  (*Id.*)  Haggard obtained copies of Mr. Baillie's cellular phone bills from Becky Emerson, Mr. Baillie's assistant.  (*Id.*)  Haggard reviewed these bills, and surmised that Mr. Baillie was "abusing" his cellular phone privileges.  (*Id.*)  Haggard kept notes on this investigation for later use (*Id.*)

The second event that evoked Haggard's ire occurred when Haggard requested a 10 hour reduction to her work schedule to accommodate parenting responsibilities.  (*Id.* at 104.)  Haggard met with Mr. Baillie and Ekdahl about this request.  (*Id.*)  Ekdahl and Mr. Baillie agreed to grant  Haggard's request, on the condition that they would reduce Haggard's responsibilities from regional human resources to Cincinnati branch human resources only.  (*Id.* at 109-110.)  Also, Haggard would be paid for 30 hours of work per week  rather than 40.  (*Id.* at

106.)  Haggard felt like she was "being docked for not being there by only getting paid 30 hours a week."  (*Id.* at 106.)  Moreover, she wanted to work this reduced schedule before Mr. Baillie could find a replacement for her.  (*Id.* at 109-110.)  When Mr. Baillie expressed reluctance to permit Haggard to begin working reduced hours before they found a replacement to take on her regional responsibilities, Haggard became incensed.  (*Id.*)

Haggard admits that she told Ekdahl that Dory Baillie, Mr. Baillie's wife, told her that Mr. Baillie had lied to Szerlong about an alleged argument between Mr. and Mrs. Baillie at Defendant's convention in Jamaica.  (*Id.* at 93.)  The alleged "shouting match" had made its way through the rumor mill at the convention and caused some stir, reaching even Szerlong's ears. (*Id.* at 87-88.)  In fact, no such shouting match occurred between Mr. and Mrs. Baillie.  (*Id.* at 88-89.)  Rather, Mr. and Mrs. Baillie dropped a money clip into the ocean and were scrambling to retrieve it.  (*Id.*)  Apparently, this event inspired the rumor that Mr. and Mrs. Baillie engaged in an argument.  (*Id.*)  In fact, Mr. and Mrs. Baillie found humor in the event and even joked about it while socializing with agents that evening.  (*Id.* at 89.)  Nonetheless, Szerlong called Mr. Baillie, inquiring about the rumored shouting match.  (*Id.*)  Mr. Baillie informed Szerlong that no argument had occurred.  (*Id.*)  Mr. and Mrs. Baillie had managed to retrieve their money clip, and all was well.  (*Id.* at 90.)

Nonetheless, Haggard admits that she told Ekdahl that Mrs. Baillie confessed to her that she was upset because Mr. Baillie had lied to Szerlong about the argument rumored to have occurred in Jamaica.  (*Id.* at 95-95.)  Yet, Mrs. Baillie made no such statement to Haggard. (Dory Baillie Aff. at ¶¶ 1,2.)  Mr. Baillie neither engaged in an argument with his wife in Jamaica nor lied to Szerlong when he told him that no argument had occurred.  (*Id.*; Baillie Vol. I at 88.)  Haggard's statement to Ekdahl was false.  She lied.

Haggard admits that her statement to Ekdahl implicated Mr. Baillie's professional

44

reputation because, "[a]t a Chubb-sponsored event with the senior management from our company and our top tier agents, there's an expectation that you behave in an appropriate, professional manner." (*Id.* at 93.)  Thus, Haggard's statement to Ekdahl was defamatory *per se*. Haggard also admits that she made these statements in her capacity as Defendant's Human Resources Manager.  (*Id.*)  Haggard does not conceal the malice she harbors for Mr. Baillie. Genuine issues of material fact exist as to whether Defendant defamed Mr. Baillie.  Defendant's motion for summary judgment of Mr. Baillie's Defamation claim must be denied.

### G. Genuine Issues of Material Fact Exist as to Plaintiffs' Public Policy Claim, Making Summary Judgment Improper.

The Ohio Supreme Court recognizes the tort of wrongful discharge in violation of public policy.  Greeley v. Miami Valley Maintenance Contractors, Inc., 49 Ohio St. 3d 228, 551 N.E. 2d 981, 987 (1990).  In order to establish the tort of wrongful discharge in violation of public policy, the plaintiff must establish

1. a clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (clarity element);
2. dismissing an employee under circumstances such as those of the plaintiff would jeopardize the public policy (jeopardy element);
3. conduct related to the public policy motivated the plaintiff's dismissal (causation element); and
4. the employer lacked an overriding legitimate business justification for the dismissal (overriding justification element).

Painter v. Graley, 70 Ohio St. 3d at 384-385.  The clarity and jeopardy elements of the tort are questions of law for the court while the causation and overriding justification elements are questions of fact for the trier of fact.  See Id.

The causation and justification elements are questions of fact and therefore not appropriate for summary judgment.  Collins v. Rizkana, (1995), 73 Ohio St. 3d 65, 70.  (See also Hill v. Christ Hospital, 131 Ohio App. 3d 660, 673 (Hillebrandt, J., dissenting) ("However, the Supreme Court of Ohio has stated that only the clarity and jeopardy elements are to be

considered in a motion for summary judgment.") Although these elements must be determined by a jury, as argued below, Mr. Baillie has sufficient evidence to establish all the elements of his public policy claim. Accordingly, Defendant's motion should be denied.

The Ohio Supreme Court has held that the "clear public policy" sufficient to justify an exception to the employment at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitution of Ohio and the United States, administrative rules and regulations, and the common law. Painter v. Graley, 70 Ohio St. 3d 377, 639 N.E. 2d 51 (1994).

Federal, state, and common law articulate a clear public policy prohibiting employers from discriminating against employees on the basis of their age. The federal Age Discrimination in Employment Act clearly articulates a public policy against employment discrimination on the basis of age. Ohio has also clearly stated the same policy. O.R.C. §4112.02. Thus, the clarity element is undoubtedly met in this case.

When determining whether the jeopardy element is met, courts have held in the past that the public policy tort as a cause of action may not be maintained if the statute which expresses the public policy provides a remedy for the plaintiff. See e.g., Gall v. Quaker City Castings Inc., 874 F.Supp. 161 (N.D. Ohio 1995). The Supreme Court of Ohio has explained that it was no mistake that Greeley made no exception for statutes that contain remedial provisions. Kulch v. Structural Fibers, 78 Ohio St.3d 134; 677 N.E.2d 308 (1997). "Rather, Greeley and its progeny are intended to bolster the public policy of this state to advance the rights of employees who are discharged or disciplined in contravention of clear public policy." Id. Therefore, the mere existence of a statutory remedy does not render the public policy exception unavailable. Id. at 156; Collins, 73 Ohio St.3d at 73; Kerans v. Porter Paint Co., 61 Ohio St.3d 486 (1991);

46

<u>Helmick v. Cincinnati Word Processing, Inc.</u>, 45 Ohio St.3d 131 (1989).  In fact, the relief available under the tort of wrongful discharge complements the statutory remedies that may also be available.  <u>Kulch</u>, 78 Ohio St.3d at 157.  The remedies available under this tort and pursuant to the applicable statute are cumulative, but the plaintiff will not be entitled to double recovery. <u>Id.</u> at 162.

Since Mr. Baillie has succeeded in proving his discrimination claims, he has also established the third prong of his public policy claim by demonstrating that his termination was motivated by his age.  Furthermore, by establishing that Defendant's explanation for its adverse employment action is pretextual, Mr. Baillie has necessarily shown that Defendant lacked an overriding business justification for his termination.

## IV.   <u>CONCLUSION</u>

Therefore, for all the reasons contained herein, Mr. Baillie respectfully requests that Defendant's motion for summary judgment be denied.

Respectfully submitted,

<u>    /s/ Randolph H. Freking                    </u>
Randolph H. Freking (0009158)
Mark W. Napier (0019700)
Trial Attorneys for Plaintiff
FREKING & BETZ
215 East Ninth Street, Fifth Floor
Cincinnati, OH  45202
(513) 721-1975
randy@frekingandbetz.com
Mnapier@frekingandbetz.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2003 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. mail to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's System.


_____/s/ Randolph H. Freking_____