```
                                                    1
 1        UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF OHIO
 3            WESTERN DIVISION
 4   -----------------------------------
 5   DOUGLAS W. BAILLIE,                :
 6           Plaintiff,                 :
 7        vs.                           :  CASE NO.
                                           C-1-02-062
 8   CHUBB & SON INSURANCE,             :
 9           Defendant.                 :
10   -----------------------------------

11
         DEPOSITION OF:    DOUGLAS W. BAILLIE
12
         TAKEN:            By the Defendant
13                         Pursuant to Agreement

14       DATE:             May 9, 2002

15       TIME:             Commencing at 9:35 a.m.

16       PLACE:            Frost Brown Todd LLC
                           2200 PNC Center
17                         201 East Fifth Street
                           Cincinnati, Ohio 45202
18
         BEFORE:           Karen Volk, CSR, RPR
19                         Notary Public - State of Ohio
```

```
                                                    2
 1   APPEARANCES:
 2
 3       On behalf of the plaintiff:
 4           Randolph H. Freking, Esq.
                 and
 5           Mark W. Napier, Esq.
                 of
 6           Freking & Betz
             215 East Ninth Street
 7           Fifth Floor
             Cincinnati, Ohio 45202
 8
 9       On behalf of the defendant:
10           David T. Croall, Esq.
                 of
11           Frost Brown Todd LLC
             2200 PNC Center
12           201 East Fifth Street
             Cincinnati, Ohio 45202-4182
13
14       Also present:
15           Tim Szerlong
             Leonard C. Sherer
```

```
                                                    3
                        I N D E X
   DOUGLAS W. BAILLIE                          PAGE
   Cross-Examination by Mr. Croall              4

   EXHIBITS                      MARKED    REFERENCED
   Baillie Exhibit  1              61          61
   Baillie Exhibit  2              78          78
   Baillie Exhibit  3              78          78
   Baillie Exhibit  4             134         134
   Baillie Exhibit  5             136         137
   Baillie Exhibit  6             141         141
   Baillie Exhibit  7             142         142
   Baillie Exhibit  8             147         147
   Baillie Exhibit  9             153         153
   Baillie Exhibit 10             153         153
   Baillie Exhibit 11             159         160
   Baillie Exhibit 12             164         164
   Baillie Exhibit 13             167         167
   Baillie Exhibit 14             168         168
   Baillie Exhibit 15             169         169
   Baillie Exhibit 16             172         172
   Baillie Exhibit 17             173         174
   Baillie Exhibit 18             173         174
   Baillie Exhibit 19             177         177
   Baillie Exhibit 20             177         177

   Baillie Exhibit 21             179         179
   Baillie Exhibit 22             190         190
   Baillie Exhibit 23             190         190
   Baillie Exhibit 24             194         194
   Baillie Exhibit 25             194         195
   Baillie Exhibit 26             197         197
   Baillie Exhibit 27             197         197
   Baillie Exhibit 28             200         200
   Baillie Exhibit 29             201         201
   Baillie Exhibit 30             202         202

   Baillie Exhibit 31             212         212
   Baillie Exhibit 32             213         213
   Baillie Exhibit 33             216         216
```

```
                                                    4
 1              DOUGLAS W. BAILLIE
 2   of lawful age, a witness herein, being first duly sworn as
 3   hereinafter certified, was examined and deposed as follows:
 4                CROSS-EXAMINATION
 5   BY MR. CROALL:
 6       Q.   Good morning, Mr. Baillie.
 7       A.   Good morning.
 8       Q.   We just met a minute ago. My name is David
 9   Croall and I'm one of the attorneys working on the lawsuit
10   that you filed against Chubb.
11            The reason we're together this morning is so
12   that I can ask you some questions about what led up to the
13   filing of that lawsuit.
14            If you would answer those questions to the best
15   you can. It's not my purpose to try to trick you, to get
16   you to say things you don't mean to say.
17            I want you to be comfortable that you
18   understand my questions. If you don't understand my
19   question, I want you to tell me that and I'll try to restate
20   it.
21            Any time you want to take a break, just say so.
22   Although, if there's a question, I'll ask you to answer the
23   question before you take a break.
24            Any time you want to consult with Mr. Freking
```

ORIGINAL

Exhibit A

53

1  A.  Yes.
2  Q.  Would the same be true for Dieter Korte, would
3  he have regionwide responsibilities within the commercial
4  lines?
5  A.  Yes.
6  Q.  And, again, help me out, what does that mean in
7  terms a lawyer can understand?
8  A.  That would mean overseeing his managers and
9  other branches to make sure that they're doing -- make sure
10 that they're writing the type of business that Chubb can
11 make a profit on. Mainly it would be authority levels.
12 Q.  Okay.
13 A.  And act again as the consultant for them.
14 Q.  So he's got to set the levels at which people
15 below him can approve business?
16 A.  Right.
17 Q.  Certain levels it would have to go to him?
18 A.  That's right.
19 Q.  Or up to you? I mean, were there certain --
20 A.  No, branch managers don't have underwriting
21 responsibility. If it gets above Dieter, it would have to
22 go to Tim's zone manager in that capacity.
23 Q.  So there's some commercial lines guy at the
24 zonal level --

54

1  A.  Right.
2  Q.  -- that could sign off on something that's too
3  big for Dieter to approve?
4  A.  That's right.
5  Q.  And you said there were other direct reports.
6  Help me out with who those folks and what those functions
7  would be.
8  A.  They would be the other underwriting office.
9  Not the claims, they didn't report to me, but the service
10 departments, loss control departments. And that's probably
11 it. Mostly underwriting departments.
12 Q.  How did the region do in 2000? You said you
13 think there was like 8 or 9 percent growth?
14 A.  Yeah. They did very well, you know, in all the
15 marketing and growth initiatives, but the loss ratio was
16 just awful.
17 Q.  Do you remember what it was?
18 A.  No. But I think we lost about 37 million in
19 the branch and the region wasn't great either.
20 Q.  Loss ratio in the 135, 137 range?
21 A.  I could provide you with that. It wasn't good.
22 We were still hit with the tail of the business and we were
23 running off quite a bit of distress business still and
24 trying to also get more rate.

55

1  Q.  During 2000 how was your relationship with Mr.
2  Szerlong?
3  A.  Very good.
4  Q.  You continued to have the kind of every six
5  week target for touching base with him?
6  A.  Yeah. Yeah. It's kind of a rule of thumb that
7  I used.
8  Q.  Did he come down and visit once or twice?
9  A.  I think he came down once.
10 Q.  Any particular problems or issues that led to
11 the lack of profitability in 2000?
12 A.  Oh, yes. You know, just bad business,
13 depressed.
14     MR. FREKING: Objection to the extent the
15     question has already been asked before.
16     MR. CROALL: I thought we talked about
17     before --
18     MR. FREKING: Same stuff.
19 Q.  Was there a major issue about uninsured
20 motorists coverage in Ohio at that point?
21 A.  Yes.
22 Q.  Explain to me what that issue was.
23 A.  What happened was that the Supreme Court of
24 Ohio made a ruling that if somebody got hurt in an

56

1  automobile accident that was uninsured, that they could go
2  against their employer, their employer's commercial
3  liability policy, to recover damages.
4  Q.  How did that affect Chubb's business?
5  A.  It affected it significantly because -- it
6  affected the entire insurance industry significantly because
7  basically what they had, now, was exposure that they did not
8  collect premium for.
9  Q.  What, if anything, did you do to try and deal
10 with that problem?
11 A.  I worked with the home office auto --
12 commercial auto folks. We put together a solution that we
13 thought would work for the uninsured motorists. Also worked
14 very closely with claims on how we're going to manage this.
15 Worked closely with underwriting on how we would manage it.
16     And actually put together a strategy session in
17 the home office where we had claims, underwriting, and legal
18 together where we came up with a strategy on how we're going
19 to manage Ohio UM, and worked closely with our legal
20 counsel.
21 Q.  Legal counsel in the home office in New Jersey?
22 A.  Correct.
23 Q.  Would you say were you the leader in dealing
24 with that uninsured motorists issue or somebody else?

```
                                                    57
 1      A.   I would say I was the leader in conjunction
 2  with the home office automobile. I didn't have the
 3  technical -- I was sort of the coordinator more than
 4  anything else.
 5      Q.   Who at the home office was primarily
 6  responsible --
 7      A.   That would be Michelle Middleton. Before her
 8  was Kathy Langner. They had the ultimate responsibility for
 9  making a profit.
10      Q.   At the start of 2001 you had a performance
11  review meeting with Mr. Szerlong?
12      A.   Yes.
13      Q.   Tell me what you remember about that meeting.
14      A.   I remember I was surprised of his evaluation on
15  some of my characteristics and sort of shocked and surprised
16  at some of the examples that he used.
17      Q.   Do you remember any of the specifics of it? I
18  know there's a memo that follows up on it, formal review
19  document.
20      A.   Yeah. He mentioned the financials which, you
21  know, were not good.
22           But, you know, as I explained to him and Tim
23  knew, it takes a long time to screw up a bulk of business,
24  it takes an awful long time to correct it, too. Can't come
```

```
                                                    58
 1  in in '99, take some action, expect you to have a profit in
 2  2000.
 3           The zone didn't do it, Chicago didn't do it,
 4  many, many other branches didn't do it either. So that was
 5  one piece.
 6           But, you know, I understood that we needed to
 7  make a profit but actuarially it would have been impossible.
 8           The second piece was, he talked about the
 9  leadership style and he mentioned -- said that it was black
10  and white, and that he also mentioned an incident where I
11  did not properly explain to the staff.
12      Q.   Do you remember what incidents those were?
13      A.   Yeah, I do. There was conversation that we had
14  in -- I believe it was -- oh, come to me, it wasn't
15  Cleveland. Toledo. It was a conversation we had in Toledo.
16           I had it with Tim, Jeff Barton, and Gary
17  DeLong. He mentioned that my comments there were -- did not
18  serve me well. That was the quote that he made.
19      Q.   Do you remember what the conversation was
20  about?
21      A.   Tim didn't remember the conversation at all.
22  But the only thing I remember about it was the discussion
23  about that human resources and marketing are every manager's
24  responsibility, basically Marketing 101, I mean Management
```

```
                                                    59
 1  101 type stuff. But Tim didn't remember the specifics.
 2      Q.   What about the black and white? He said you
 3  were a black and white thinker, you didn't appreciate
 4  subtlety and didn't convey to your subordinates.
 5      A.   Tim had no examples or any specifics on that.
 6      Q.   Did you disagree with him on that? Did you
 7  tell him you didn't think that was true?
 8      A.   Yeah. I mean, I told him I think one of my
 9  strengths was my ability to see both sides of an argument.
10      Q.   I think his overall rating -- I think this
11  meeting is in February of 2001?
12      A.   Right.
13      Q.   Was met most?
14      A.   Yes.
15      Q.   Right?
16      A.   Yes.
17      Q.   Chubb rating system, as I understand it, which
18  may not be correct, met most is just below met all?
19      A.   That is correct.
20      Q.   The next one up is exceeds some?
21      A.   Right.
22      Q.   Then clearly exceeds, I think?
23      A.   Uh-huh.
24      Q.   I forget what the very bottom one is. Not met?
```

```
                                                    60
 1      A.   Right.
 2      Q.   You recognize that met most was not a very good
 3  rating for somebody in a regional manager position?
 4      A.   Right.
 5      Q.   You understood that Mr. Szerlong was conveying
 6  to you a lack of satisfaction with your performance in that
 7  regional manager role?
 8      A.   Well, I did ask the question, I said, does this
 9  mean that I'm failing in the job?
10      Q.   What did he say?
11      A.   He said no, no, you're not failing. Let's just
12  get through this and we'll all play golf.
13      Q.   How long was the meeting with Mr. Szerlong when
14  he went over your performance?
15      A.   I'd say it was about an hour and a half, two
16  hours.
17      Q.   Where was it?
18      A.   It was in Chicago.
19      Q.   So you went up there?
20      A.   Yes.
21      Q.   Specifically for the performance review?
22      A.   Specifically for that but also to see some
23  regional -- some zone managers.
24      Q.   Some of the product line zonal managers?
```

93

1  business growth which was outstanding.
2      Q.   What contact did you have with Mr. Szerlong
3  between the conversations you already testified about when
4  you called him about these memos and his meeting with you
5  when you were terminated?
6      A.   I don't recall any specific conversations.
7      Q.   Any face-to-face meetings between the May 2nd
8  meeting and the late August meeting?
9      A.   Not that I recall.
10     Q.   Just phone contact periodically?
11     A.   Yeah. Basically we talked a couple times. He
12 set up the August meeting, so he called prior to the August
13 meeting.
14     Q.   How long before?
15     A.   Anywhere from two weeks to a month. I couldn't
16 tell you for sure.
17     Q.   He scheduled that, I think it's August 24th?
18     A.   That is correct.
19     Q.   He came to Cincinnati?
20     A.   Yes.
21     Q.   Met with you in the Cincinnati office? Yes?
22     A.   Yes.
23     Q.   Tell me what happened at that meeting.
24     A.   At the meeting in the Cincinnati office?

94

1      Q.   Yes.
2      A.   Or the meeting for the day?
3      Q.   Well, tell me for the day.
4      A.   We met with a couple agents for breakfast.
5  Then we met with a couple other agents for lunch. And then
6  he went to some of the various departments.
7           And then about maybe 2:30 -- well, I don't know
8  when it was, maybe 1:30, 2:00, came into the office and
9  said, your financials are great, you're one of the best guys
10 we have with agents and customers, but I need to make a
11 change.
12     Q.   What else did he say or what did you say?
13     A.   He said, I'm looking for better leadership. I
14 said, how is it possible that I'm not being an outstanding
15 leader given the financials that we have, given the fact
16 that all my goals and the balance scorecard are being
17 carried out superiorally, and feedback I've always gotten
18 from my folks have been 360, feedback has always been high,
19 and it's inconsistent with my evaluations over the last 26
20 years and my performance.
21     Q.   What did he say?
22     A.   Well, it's just my opinion.
23     Q.   Okay.
24     A.   I said, I guess I'm not going to talk you out

95

1  of this then. He said, no. Get a cab for him.
2      Q.   How long was the meeting?
3      A.   I would say it was about 20 minutes. Oh, I do
4  recall some other things he said.
5      Q.   What?
6      A.   He said, I am recommending the most aggressive
7  package for you because you deserve it, which he said, I
8  know that doesn't seem like a big thing right now in view of
9  being terminated.
10     Q.   You understood him to be talking about a
11 severance package?
12     A.   Right.
13     Q.   Anything else you remember about the
14 conversation with Mr. Szerlong in August?
15     A.   Not that I recall at this time.
16     Q.   Okay. He was professional and businesslike?
17     A.   Yes. Yes, he was.
18     Q.   And you were professional and businesslike as
19 well?
20     A.   Yes. We shook hands afterwards.
21     Q.   How long were you in the office after you
22 finished talking to Mr. Szerlong?
23     A.   I don't know, maybe half hour, hour.
24     Q.   You talked to a couple of your direct reports?

96

1      A.   Yes. I talked to --
2      Q.   Jeff Barton? Jim Lash?
3      A.   No. I talked to Diane Haggard and Becky
4  Emerson and Tim Dadik, I believe. Those would be the three.
5      Q.   What did you tell them?
6      A.   I had been terminated.
7      Q.   Did you give any explanation?
8      A.   Yeah. I gave the same explanation Tim said. I
9  discussed it a little with Diane Haggard. I said, he's -- I
10 said, I guess you know. I figured she knew. I guess you
11 know I've been terminated. She goes, no, I didn't know.
12 Tim said he was going to have a serious talk with you but I
13 didn't know that. Man, he said I wasn't performing well on
14 leadership. Is that true? She said no.
15     Q.   Where was this conversation with Miss Haggard?
16     A.   In her office.
17     Q.   How long did you talk to her?
18     A.   Not long. Couple minutes. Then with --
19     Q.   Anything else you remember about the
20 conversation with Miss Haggard?
21     A.   No, not that I recall right now.
22     Q.   Did you believe her when she said she didn't
23 know?
24         MR. FREKING: At that time?

105

```
1  group. Then him and I went out to dinner.
2      Q.   Do you recall anything about your discussion
3  with him?
4      A.   The only thing I can recall -- you know, we
5  discussed a wide myriad of things over the night, but as my
6  custom, I always ask, anything you think I can be doing
7  better or should be doing differently.
8      Q.   What did he say?
9      A.   No, keep doing what you're doing, you got it on
10 track.
11     Q.   His first visit had you been --
12     A.   Wasn't that long.
13     Q.   -- Cincinnati manager for a year yet?
14     A.   No.
15     Q.   Less than a year?
16     A.   Yes, less than a year. Much less than a year.
17     Q.   '98?
18     A.   Yeah.
19     Q.   Then did he make another visit in 2000?
20     A.   Yeah, that would be about right.
21     Q.   Do you remember anything about the 2000 visit?
22     A.   Yeah. The only thing I remember about that is
23 we went to dinner with a client and an agent.
24     Q.   Who was that?
```

106

```
1      A.   Went with folks from Schiff Kreidler-Shell and
2  with a customer from Monarch Construction, outstanding
3  meeting. And Tom referred to it in subsequent presentations
4  he gave to the zone.
5      Q.   Referring to it in a positive way?
6      A.   Yes.
7      Q.   Did you ever hear Mr. Motamed say anything
8  negative about you?
9      A.   Never.
10     Q.   Other than the conversations you've already
11 testified about with Mr. Szerlong, did you ever hear
12 secondhand from anybody that Mr. Motamed had said anything
13 negative about you?
14     A.   Never.
15     Q.   Did you ever hear Mr. Szerlong say anything
16 negative about your age?
17     A.   No.
18     Q.   Did you ever see any document that had anything
19 negative or derogatory about your age?
20     A.   No.
21     Q.   Did you ever see any document at Chubb that had
22 anything negative or derogatory about any employee's age or
23 ages in general?
24     A.   No.
```

107

```
1      Q.   Did you ever hear anybody in upper level
2  management at Chubb, which I would define as anybody above
3  you, say anything negative, either hear it yourself or hear
4  secondhand, that somebody at that level in the company had
5  said anything negative about any employee's age or
6  employees' ages in general?
7      A.   Not that I recall.
8      Q.   Do you think your separation had something to
9  do with your age?
10     A.   Yes.
11          MR. FREKING: Objection.
12          MR. CROALL: I assume you're going to let him
13 answer anyway.
14          MR. FREKING: Uh-huh.
15     Q.   Why do you think that?
16     A.   I'm not a lawyer.
17     Q.   I understand.
18     A.   Having the best profit and second best growth
19 in the zone and being one of the oldest managers, having
20 performance better than the other managers, and being
21 replaced by a younger person, you know, leads me to believe.
22     Q.   When you're talking about having the best
23 profitability and growth, you're talking about 2001?
24     A.   Correct.
```

108

```
1      Q.   Up until the time of your separation?
2      A.   Right.
3      Q.   I assume those numbers were circulated monthly
4  or was it monthly or quarterly or --
5      A.   Monthly.
6      Q.   Everybody got everybody's numbers?
7      A.   Yes.
8      Q.   You could see premiums and profitability and --
9      A.   Right.
10     Q.   -- all that stuff?
11     A.   Tim would share it with us.
12     Q.   You could see it for your own office and each
13 branch within your office, your region and everybody else's
14 regions. Would it be broken down office by office for other
15 regions or just --
16     A.   No. No. Just really the zone. I wouldn't
17 really see anybody else's. You could look at it if you
18 wanted to.
19          I knew what the corporate numbers were. But,
20 basically, the only thing that was given to me was the
21 zones' numbers.
22     Q.   Would it be broken down by region within the
23 zone?
24     A.   Sure.
```

**153**

1  A. I can't recall. He certainly talked about each
2  one.
3  Q. Did you think that was a fair review by Mr.
4  Cavanaugh?
5  A. Yeah, I think so.
6  Q. I guess this is on a 5 point scale, 5 being the
7  best?
8  A. That's correct.
9  Q. 0 or 1 being the low end?
10 A. Right.
11     (A recess was taken from 2:10 to 2:15.)
12     (Baillie Exhibits 9 and 10 were marked for
13      identification.)
14 Q. Mr. Baillie, you've got Exhibits 9 and 10 in
15 front of you.
16 A. Correct.
17 Q. Exhibit 9 is a letter from Sy Green to you, it
18 looks like after a visit.
19 A. Uh-huh. Yes.
20 Q. How often did he come in?
21 A. That was the only time he had come in.
22 Q. Okay. Help me out where he fits into the
23 structure. He's not a zone guy. He's higher than a zone
24 guy?

**154**

1  A. Yes. At the time I believe he was Tim's boss.
2  He was in charge of field operations.
3  Q. If you look at that third paragraph where he
4  says, "Thanks very much for arranging productive visits for
5  me in Columbus, Cincinnati and Louisville."
6     Then he references a discussion that you and he
7  apparently had about continuing to push for very strong
8  players and need to develop more world class performers and
9  fewer average performers.
10    Did he talk with you about that?
11 A. Not to my recollection. He was big on getting
12 maximum authority. He didn't think the field had enough
13 authority, so we need to continue to booster up the
14 technical ability of the field to get more authority at the
15 point of sale, underwriting positions.
16 Q. When you're talking about authority --
17 A. Underwriting.
18 Q. The amount of dollars that somebody could
19 approve?
20 A. That's right. Exposure in dollars.
21 Q. Do you remember, in the last few years you were
22 with Chubb people at the highest executive levels in the
23 company talking about what Mr. Green says in this letter,
24 about pushing for getting the best people in the right

**155**

1  positions and getting top performance and not settling for
2  just average performance?
3  A. Oh, sure. Yes.
4  Q. Did you try to implement that in the Cincinnati
5  region?
6  A. Yes.
7  Q. Did you terminate any employees' employment in
8  the Cincinnati region during the time you were regional
9  manager?
10    MR. FREKING: Objection as to relevance. You
11    can go ahead and answer.
12 A. Yes.
13 Q. Do you recall how many and what the
14 circumstances were?
15 A. We terminated a loss control rep for falsifying
16 a report.
17 Q. Was that here in Cincinnati?
18 A. Yes. It was termination of some of the SCRs
19 that were on profit improvement plans. And we demoted a
20 couple of people and then some people just left.
21 Q. Voluntarily left?
22 A. Voluntarily left.
23 Q. Knowing they were having some performance
24 issues?

**156**

1  A. Right.
2  Q. In any of the employment decisions you made as
3  branch manager, did you ever consider age as a reason for
4  taking some adverse employment action against somebody?
5  A. No.
6  Q. Did anybody higher than you at Chubb ever tell
7  you to take some employment action based on somebody's age?
8  A. No.
9  Q. Take a look at Exhibit 10. Tell me what that
10 is.
11 A. That's a pre-year business plan, sort of
12 summarizing what the focus should be for the year.
13 Q. So it's in fourth quarter '99 looking forward
14 to the year 2000?
15 A. Correct.
16 Q. You say down there at the bottom of the first
17 page that returning to profitability is the number one
18 priority.
19 A. Correct.
20 Q. That's one that didn't happen, right?
21 A. Correct. Well, it did happen but not in 2000.
22 Q. Didn't happen till 2001?
23 A. Well, actually it was happening at the second
24 part of the year. The numbers were starting to get real

157

1  good during the second half of the year.
2      Q.   Do you remember what they were for the full
3  year?
4      A.   Yeah. They weren't good.
5      Q.   Do you remember what they were?
6      A.   No. I remember we lost about 40 million.
7      Q.   Looking at the second page of Exhibit 10, under
8  "Staff Development," that last sentence, you wrote this
9  right? You wrote this document?
10     A.   Yes, I did.
11     Q.   Input from anybody else?
12     A.   Not direct input but obviously discussions with
13 a lot of people including Tim, including corporate
14 direction.
15          It was kind of, you take the corporate
16 direction, you take the zone direction, and then you take,
17 you know, what things you need to work on.
18     Q.   Apply it to your region?
19     A.   Yeah. That's right.
20     Q.   "Our managers' ability to develop staff will be
21 an even larger percentage of their performance rating in the
22 year 2000."
23          Is that something that came from corporate,
24 from zone, from yourself?

158

1      A.   No. That's a personal pet peeve and focus of
2  mine, staff development, always has been.
3      Q.   Was it your understanding that emphasis was
4  consistent with corporate direction as well?
5      A.   Yes.
6      Q.   Looking down at the "Summary" paragraph at the
7  very end, you said, "We have the best infrastructure, staff,
8  agency plant and account relationships in the industry."
9           First of all, help me out. What do you mean by
10 "agency plant"?
11     A.   Our independent agents that we do business
12 with.
13     Q.   Just the system of agents that you've got out
14 there --
15     A.   That's right.
16     Q.   -- selling Chubb product?
17     A.   Uh-huh. We were pretty much dominating the
18 marketplace back then.
19     Q.   In this region or nationally?
20     A.   Pretty much this region.
21     Q.   Who were the big competitors in this region?
22     A.   CNA, Travelers, Royal, Cincinnati Financial.
23     Q.   Do you keep track of market shares, is that
24 something you can estimate or --

159

1      A.   We have Best reports by state.
2      Q.   That's a company that does that?
3      A.   Right.
4      Q.   You don't do any internal measurement?
5      A.   No. Basically what you do is you take a look
6  at what the agents have and see when your penetration is
7  there and take a look at the incoming, because they pretty
8  much market their whole book, and then what you're
9  getting -- what you get -- what you want and what you get
10 based on what you want.
11     Q.   So you would ask the people you deal with at
12 Schiff Kreidler-Shell, just to take an example --
13     A.   Yeah.
14     Q.   -- of how much of your total business is Chubb
15 business?
16     A.   Right.
17     Q.   Get a sense for your market share from that?
18     A.   Yeah. It was more -- more from a new business
19 and retention standpoint where we were dominating the market
20 as opposed to market share. We have a very small niche.
21          (Baillie Exhibit 11 was marked for
22          identification.)
23     Q.   Mr. Baillie, take a look at Exhibit 11.
24 That's a performance review, looks like it started in

160

1  December of '99 and then the final approval is in early 2000
2  by you and Mr. Szerlong, right?
3      A.   Correct.
4      Q.   Now, is this the first performance review that
5  Mr. Szerlong would have done for you?
6      A.   Yes.
7      Q.   As I read it, the overall score is exceeds
8  some?
9      A.   Right.
10     Q.   Which I think you testified is the score you
11 usually got?
12     A.   Yes.
13     Q.   And just so I understand the process, I mean,
14 did you take the initial run at drafting this in terms of
15 the business goals and the learning goals and the
16 accomplishments and the disappointments, then Mr. Szerlong
17 would give you input and the document would get edited?
18     A.   Correct.
19     Q.   Then he did the rating section?
20     A.   Correct.
21     Q.   Then you both sign off on it, at least
22 electronically sign off on it?
23     A.   Correct.
24     Q.   Am I right that this is in the -- there's a