```
                         IN THE CIRCUIT COURT, FOURTH
                         JUDICIAL CIRCUIT, IN AND
                         FOR DUVAL COUNTY, FLORIDA

                         CASE NO. C-1-02-062


DOUGLAS BAILLIE,

          Plaintiff,              CERTIFIED COPY

VS.

CHUBB & SON INSURANCE,
          Defendant.
-----------------------------------------------
STATE OF FLORIDA  )

COUNTY OF DUVAL   )

     The deposition of DOUGLAS BAILLIE was taken pursuant to

Notice of Taking Deposition, on behalf of the Defendant

herein, on August 27, 2003, at the office of Executive

Reporters, 1113 Blackstone Building, 233 East Bay Street,

Jacksonville, Florida; commencing at approximately 10:00

a.m., before Candace Fleming, Certified Court Reporter and

Notary Public in and for the State of Florida.




                    EXECUTIVE REPORTERS, INC.
                    1113 BLACKSTONE BUILDING
                    233 EAST BAY STREET
                    JACKSONVILLE, FLORIDA  32202
                    (904) 355-7801
```

Exhibit B

1  Q. Okay. Does most aggressive -- quote, 'most
2  aggressive', unquote -- that have some specific meaning
3  to you?
4  A. To me, I -- I thought it was going to mean,
5  you know, doing something with the pension.
6  Q. Okay. That's just your -- your supposition
7  basically?
8  A. Yeah. I mean, they've done it to other
9  people with the pensions when they had the reduction in
10 staff back in -- several years earlier, maybe three
11 years earlier.
12 Q. And who, specifically, are you referring to?
13 A. There was a whole group of -- of people.
14 Q. Can you name any?
15 A. I could name a lot if I thought about it.
16 Q. Well, I'm not asking you to just name people
17 who were let go. I'm asking you to name people that
18 you're sure got this --
19 A. Oh, all of them.
20 Q. Okay.
21 A. All of them.
22 Q. Whoever it was, they all got it.
23 A. Yeah. That was part of it. I forget what HR
24 term it was.
25 Q. Okay. Now, at the time when you had these

```
 1      A.    (Reviewing documents.)  Okay.
 2      Q.    You did understand that on or about October
 3  3rd, 2001, that the company did agree to amend your
 4  settlement agreement to include a prorated share of the
 5  restricted stock; correct?
 6      A.    Correct.
 7      Q.    And Doug, do you -- as you sit here today, do
 8  you have an idea of how many shares that would have been
 9  and what that was worth?  Just a ballpark even.
10      A.    The number that comes to mind -- I have to,
11  you know -- I'd have to do the math, but $90,000.
12      Q.    Okay.  So, your ballpark estimation is that
13  this change would have increased your package in the
14  neighborhood of $90,000 in value?
15      A.    Correct.
16      Q.    Okay.  And that change was made to the
17  agreement after you hired Randy, correct?  Obviously,
18  from the letter.
19      A.    Well, it was discussed before --
20      Q.    Discussed before?  In writing, you mean?  The
21  change was made to the agreement after you hired Randy,
22  correct?
23      A.    I can't recall if it was made after or
24  before --
25      Q.    This --
```

```
 1    A.    -- to be honest with you, but this --
 2    Q.    The letter was definitely after --
 3    A.    But I did receive the agreement also.
 4    Q.    Is the agreement with this?  (Indicating.)
 5    A.    Correct.
 6    Q.    Okay.  Does that refresh your recollection
 7  that, in fact, the --
 8    A.    That's probably correct.
 9    Q.    -- change was made after --
10    A.    Yeah.
11    Q.    -- after you hired Randy, correct?
12    A.    To the --
13          MR. FREKING:  You mean --
14          THE WITNESS:  -- best of my knowledge.
15          MR. MONTGOMERY:  Okay.
16          THE WITNESS:  I don't really remember now.
17  BY MR. MONTGOMERY:
18    Q.    Now, you understood whenever you did first
19  see that agreement that you could accept that package
20  and receive all of the consideration you've been offered
21  in the first package plus all restricted stock options,
22  correct?  You did --
23    A.    That was my understanding.
24    Q.    -- you had that understanding?  Okay.
25  Actually, I think it was spelled out here.
```

1    Q.    Okay. Now, when did you sign the -- any of
2  the Chubb settlement agreements?
3    A.    I believe it was October 18th, but I --
4  whatever the deadline they give me was.
5    Q.    And where were you when you signed it?
6    A.    I'd have to look at it. Either in the bank
7  or at Mr. Freking's office. Whatever the notary --
8    Q.    Well, did you sign it at Mr. Freking's office
9  or did you mail it to his office?
10   A.    Oh, no. No. If I signed it, I signed at his
11 office.
12   Q.    You either signed it at a bank or at his
13 office? You said --
14   A.    Signed it in front of the notary. I either
15 went to a notary, got it signed, and took it to Randy's
16 office, or I had it notarized there. I think I had it
17 notarized at Mr. Freking's office, but I'd have to look
18 at the seal.
19   Q.    Well, do you recall someone notarizing it at
20 his office?
21   A.    I recall someone notarizing it. I can't
22 recall if it was at his office or --
23   Q.    Do you sign it in a conference room?
24   A.    I really -- can't really recall where I
25 signed it. I signed it in front of notary.

```
 1      Q.    100 percent sure of that?
 2      A.    Yes.  100 percent sure.
 3      Q.    Are you 100 percent sure that you signed it
 4 on October 18th?
 5      A.    Yes.
 6      Q.    When you signed the document, what was your
 7 intention as to what would be done with it?
 8      A.    At the time I signed the document, I was --
 9 it clearly said it had to be signed by that date.  I
10 signed that date, and my intent was to settle pending
11 the further negotiations.
12      Q.    Did you ever, prior to -- let me show you
13 this Exhibit 44.
14      A.    (Reviewing documents.)
15      Q.    This is dated December 21, 2001.  It's a
16 letter to Croall.  You understood that at the time
17 Croall was the attorney for Chubb?
18      A.    Correct.
19      Q.    Okay.  And just take a second to read through
20 the --
21      A.    (Witness complies.)
22      Q.    Where it says, enclosed is an original of the
23 settlement agreement that was signed by Doug Baillie in
24 October, you only signed one version of this -- of the
25 settlement agreement; correct?
```

1    A.    Boy.  I can't recall that.  I couldn't
2  recall.
3    Q.    But you do recall getting two different
4  versions that --
5    A.    Oh, one version.  I'm sorry.  I misunderstood
6  your question.
7    Q.    I don't mean copies.
8    A.    Yes.  No -- yes, the one version is correct.
9    Q.    The version you signed, and we'll get to in a
10 second, was the second version.  The one that included
11 the contract stock in the --
12   A.    Correct.
13   Q.    Okay.  Now, you'd agree from reading the
14 letter that you did receive a copy of this as well in
15 December?
16   A.    I can't recall, but I could look through my
17 notes.
18   Q.    But -- but --
19   A.    I recall the conversation though.  Yes.
20   Q.    -- you did understand that this was being
21 sent to Chubb for the first time in December 2001?
22   A.    Yes.
23   Q.    Okay.  And it was being sent to Chubb well
24 after the October 18th deadline referenced in Ms.
25 Johnson's letter, Exhibit 41 --

```
 1        A.    No, my -- say that again.  Can you repeat
 2   that sentence?
 3        Q.    Well, it worked like this.  Your testimony is
 4   that you signed that document on December 18th, 2001?
 5              MR. FREKING:  No, no.  October 18th.
 6              THE WITNESS:  October 18th.
 7              MR. MONTGOMERY:  October 18th, I'm sorry.
 8   Thank you.
 9   BY MR. MONTGOMERY:
10        Q.    Let's start over.  Your testimony is that you
11   signed the document on October 18th --
12        A.    Correct.
13        Q.    -- 2001?
14        A.    Correct.
15        Q.    But that you made a conscious decision that
16   Chubb would not be made aware of that signature while
17   you continued to negotiate further; isn't that correct?
18        A.    I believe so, yes.
19        Q.    Okay.  And then, the first time that you --
20   that you're aware of that any indication was made to
21   Chubb that you were accepting the package was in
22   December 2001; correct?
23        A.    Correct.
24        Q.    And that it -- your intention to accept the
25   package was verbal, as referred to in Exhibit 44?
```