Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4
 5   ----------------------------------:
 6   DOUGLAS W. BAILLIE,               :
 7                Plaintiff,           :
             vs.                       :   CASE NO.
 8                                     :   C-1-02-062
     CHUBB & SON INSURANCE,            :
 9                                     :
                 Defendant.            :
10   ----------------------------------:
11
12
13
14   DEPOSITION OF:    DIANE R. HAGGARD
15   TAKEN:            By The Plaintiff
16   DATE:             June 20, 2003
17   TIME:             Commencing at 1:59 p.m.
18   PLACE:            Offices of:
                       Freking & Betz
19                     215 East Ninth Street
                       Fifth Floor
20                     Cincinnati, Ohio  45202
21   BEFORE:           Theresa Lynn Westfelt
                       Court Reporter
22                     Notary Public - State of Ohio
23
                        COMPUTER
24                        DISK
```

Page 2

```
 1   APPEARANCES:
 2
 3        On behalf of the Plaintiff:
 4             RANDOLPH H. FREKING, ESQ.
                    and
 5             MARK W. NAPIER, ESQ.
                    of
 6             Freking & Betz
               215 East Ninth Street
 7             Fifth Floor
               Cincinnati, Ohio  45202
 8
 9        On behalf of the Defendant:
10             DAVID K. MONTGOMERY, ESQ.
                    of
11             Keating, Muething & Klekamp PLL
               1400 Provident Tower
12             One East Fourth Street
               Cincinnati, Ohio  45202
13
14        Also Present:  Jane Hughes, Law Clerk
15
16                      - - -
17
18              S T I P U L A T I O N S
19            It is stipulated by and between counsel for
20   the respective parties that the deposition of DIANE R.
21   HAGGARD, a witness herein, may be taken at this time by
22   Counsel for the Plaintiff as upon cross-examination
23   pursuant to the Federal Rules of Civil Procedure; that the
24   deposition may be taken in stenotypy by the notary
```

Page 3

```
 1   public-court reporter and transcribed by her out of the
 2   presence of the witness; that the transcribed deposition
 3   is to be submitted to the witness for her examination and
 4   signature, and that signature may be affixed out of the
 5   presence of the notary public-court reporter.
 6
 7                       I N D E X
 8   DIANE R. HAGGARD                             PAGE
 9   CROSS-EXAMINATION BY MR. FREKING               5
10   EXAMINATION BY MR. MONTGOMERY                  -
11
12                       EXHIBITS
13   Haggard Deposition No.     Page      Referenced
14         1                    148       (See below)
15
16              DOCUMENTS REFERENCED
17   Bates Stamp No.                      Referenced
18   CIC 1348                             117
19   CIC 1351 - 1354                      118
20   CIC 1355                             123, 161
21   CIC 1329 - 1334                      140
22   CIC 1335                             142
23   CIC 1337                             145
24   CIC 1338                             145
```

Page 4

```
 1         DOCUMENTS REFERENCED (Continued)
 2   Bates Stamped                        Referenced
 3   CIC 1339                             147
 4   CIC 1341                             147
 5   CIC 1342                             149
 6   CIC 1388                             148
 7   CIC 1345                             151
 8   CIC 1350                             153
 9   CIC 1356                             153
10   CIC 1372                             154
11   CIC 1373                             157
12   CIC 1376                             159, 161
13   CIC 1377                             161
14   CIC 1378                             161
15   CIC 1382                             161
16   CIC 1383                             162
17   CIC 1384                             163
18   CIC 1385                             166
19   CIC 1386                             167
20   CIC 1388                             168
21
22                 COUNSEL REQUEST
23                 Page 32 and 36
24
```

Exhibit E

### Page 17

1  A.  At the time he was fired?
2  Q.  Uh-huh.
3  A.  He was.
4  Q.  Okay.  Did you have any other reporting
5  relationship other than directly to Mr. Baillie?
6  A.  A dual accountability to Jim Ekdahl, who's
7  the Northern Zone HR Manager.
8  Q.  What does that mean, "dual accountability"?
9  A.  That means that there's a dotted line, Jim
10 is involved in creating my performance evaluation, he is
11 responsible for the HR practice, and Doug was more of the
12 business side of the Cincinnati Branch and Region, that
13 sort of thing.
14  Q.  Did you have a dotted-line relationship with
15 Mr. Baillie or --
16  A.  Direct.  He was my direct supervisor.
17  Q.  Okay.  So not a dotted-line reporting
18 relationship to him?
19  A.  Right.
20  Q.  But a dotted line to Ekdahl?
21  A.  Right.
22  Q.  Did you have a dotted-line relationship to
23 anyone else?
24  A.  No.

### Page 18

1  Q.  Now, are you familiar at all with the
2  negotiations that surrounded the severance package offered
3  to Mr. Baillie in September of 2001?
4  A.  No, I wasn't involved in that.
5  Q.  Were you at all -- were you familiar with
6  the fact -- strike that.
7      Did you know Mr. Baillie was going to get
8  fired before he got fired or after?
9  A.  Before.
10  Q.  And who told you that Mr. Baillie was going
11 to get fired?
12  A.  Jim Ekdahl.
13  Q.  And do you recall how Mr. Ekdahl
14 communicated this to you?  You know, was it via e-mail,
15 phone, in person?
16  A.  Telephone.
17  Q.  How far in advance of -- were you aware of
18 the fact that Mr. Zerlong came in on a Friday afternoon, I
19 believe, and met with Mr. Baillie and terminated him on a
20 Friday afternoon?
21  A.  Yes.
22  Q.  Okay.  How far in advance of Mr. Baillie
23 being told by Mr. Zerlong that he was being fired do you
24 believe you were told by Mr. Ekdahl it was going to

### Page 19

1  happen?
2  A.  Approximately?
3  Q.  Uh-huh.
4  A.  A day or two.
5  Q.  Okay.  Now, after Mr. Ekdahl told you Mr.
6  Baillie was going to be fired, did you have any
7  conversations with anyone else concerning that decision?
8  A.  No.
9  Q.  Did Mr. Ekdahl ever tell you that Mr.
10 Baillie was going to be offered a severance package?
11  A.  No.
12  Q.  Did you ever find out that Mr. Baillie was
13 offered a severance package?
14  A.  No.  But -- no.
15  Q.  Did you ever find out that the company got
16 upset about some post-termination behavior allegedly by
17 Mr. Baillie?
18  A.  Could you define "post-termination
19 behavior"?
20  Q.  Well, are you aware of any behavior by Mr.
21 Baillie after he was fired that you were aware that the
22 company was concerned about?
23  A.  No.
24  Q.  Are you aware of any behavior after he was

### Page 20

1  fired that you thought was inappropriate or improper by
2  Mr. Baillie?
3  A.  Yes.
4  Q.  Okay.  Did this behavior or conduct of Mr.
5  Baillie that you thought was inappropriate or improper,
6  did you communicate it to anyone else at Chubb?
7  A.  Yes.
8  Q.  Who did you communicate that to?
9  A.  Leonard Sherer.
10 Q.  In-house lawyer?
11 A.  Uh-huh (nodding head affirmatively), yes.
12 Q.  Anyone else?
13 A.  Jim Ekdahl.
14 Q.  Anyone else?
15 A.  No.
16 Q.  Okay.  Who do you believe you first told
17 about this alleged inappropriate or improper behavior?
18     MR. Montgomery:  Before you go, I don't
19     want you to discuss any of the substance of any
20     conversations you had with Leonard Sherer.
21     THE WITNESS:  Oh, okay.
22     MR. FREKING:  You're going to have to,
23     David, be consistent with that instruction that
24     that's going to be the company's position that

Page 21

1  conversations with her and Mr. Sherer is
2  privileged.
3      MR. MONTGOMERY: All right.
4  A.  Could you repeat the question?
5  Q.  Which one did you speak to first about the
6  alleged improper or inappropriate behavior, Ekdahl or
7  Sherer?
8  A.  Leonard Sherer.
9  Q.  All right. Now, is it fair to say that at
10 the time you reported this to Mr. Sheer, Mr. Sheer was not
11 your direct boss? He's never been your direct boss,
12 right?
13 A.  No.
14 Q.  Who was your direct boss at the time you
15 reported this alleged behavior by Mr. Baillie to Mr.
16 Sherer?
17 A.  Tim Zerlong was -- yeah, Tim Zerlong.
18 Q.  Tim Zerlong became your direct boss after
19 Mr. Baillie was fired?
20 A.  Right, temporarily.
21 Q.  Now, why is it that you chose to -- you knew
22 Mr. Sherer was in-house counsel for Chubb?
23 A.  Yes.
24 Q.  Why is it that you chose to contact Mr.

Page 22

1  Sherer about this alleged improper or inappropriate
2  behavior by Mr. Baillie?
3      MR. MONTGOMERY: Let me just stop for a
4      second and hopefully we can resolve this, but you
5      want to keep repeating what the substance of the
6      conversation was between her and Mr. Sherer. I
7      mean, she did, in answer to one of your questions
8      reveal what that substance was, because I didn't
9      know that was going to be the answer. But I do
10     object to the extent that you want to just keep
11     repeating that and I don't want to waive the
12     privilege.
13     MR. FREKING: Okay. No, I don't think
14     you're waiving the privilege by that, because I
15     think we're just identifying a conversation opposed
16     to talking about the substance of the conversation.
17     MR. MONTGOMERY: But you are bringing up the
18     substance of the conversation because she already
19     said what --
20     MR. FREKING: I'll rephrase the question,
21     how about that?
22     MR. MONTGOMERY: That's will be good.
23 Q.  Why do you think you first contacted Mr.
24 Sherer rather than Mr. Zerlong?

Page 23

1  A.  I was asked to contact Leonard Sherer in the
2  event of any inappropriate behavior reported to me.
3  Q.  Okay. Who asked you to do that?
4  A.  I don't recall.
5  Q.  Okay. Do you have any notes or documents
6  that you have or have access to that would refresh your
7  recollection as to who told you that?
8  A.  Yes.
9      THE WITNESS: I think he does to, doesn't
10     he?
11     MR. MONTGOMERY: It would depend on whether
12     it was a privileged document or not. He does have
13     some of your notes.
14     THE WITNESS: Okay.
15 Q.  So other than your notes --
16 A.  That's it.
17 Q.  -- that would be it, right --
18 A.  Yes.
19 Q.  -- that would refresh your recollection as
20 to who told you that?
21 A.  Uh-huh (nodding head affirmatively).
22 Q.  All right. Now, in your tenure as the HR
23 Manager, whatever your title has been since February of
24 1999, have you ever been instructed by anyone to contact

Page 24

1  Mr. Sherer or anybody else in the Legal Department in the
2  event of any inappropriate behavior by any employee or
3  former employee other than Mr. Baillie?
4  A.  Yes.
5  Q.  Okay. Who was that?
6  A.  Who told me to contact them?
7  Q.  No. Who else were you instructed to contact
8  Legal about in the event of any inappropriate or improper
9  behavior on the part of an employee or ex-employee.
10 A.  Michael Haberthy, H-A-B-E-R-T-H-Y. I can
11 picture him, but I can't think of his last name.
12 Q.  Well, can you think of his first name?
13 A.  Chris in Indianapolis in Loss Control. I
14 think there were more, but that's all I can recall right
15 now.
16 Q.  Do you have notes about the other employees
17 that you were instructed to contact Mr. Sherer or
18 someone in Legal in the event of any inappropriate
19 behavior?
20 A.  I don't know, I'd have to check.
21 Q.  Okay. Tell me a little about Michael
22 Haberthy. Who was -- first of all, is he still employed
23 by the company?
24 A.  No.

### Page 41

1  meeting with Mr. Montgomery?
2      A.  No, I think that was all.
3      Q.  Okay. Do you believe your notes contained
4  information about improprieties of Mr. Baillie?
5      A.  Yes.
6      Q.  And do you know of any improprieties by Mr.
7  Baillie that are somehow violations of Chubb policies that
8  are not reflected in your notes?
9      A.  Yes.
10     Q.  Okay. What was that? What are the things
11 that you think of that were not contained within your
12 notes that involved improprieties or violations of company
13 policy, or anything that Baillie did that was bad?
14     A.  I don't believe I have notes on what could
15 be viewed as sexist comments.
16     Q.  Uh-huh.
17     A.  (Continued) I don't believe my notes
18 contain an incident in Jamaica, but they could, I don't
19 recall.
20         There were several issues that would come
21 up, in particular in my first maybe six months in HR,
22 where people would come in and talk to me about their
23 frustrations with Doug that I didn't record.
24     Q.  Do you recall anything specific about those

### Page 42

1  frustrations?
2      A.  From a general standpoint?
3      Q.  General or specific.
4      A.  There were --
5      Q.  Anything you can possibly recall.
6      A.  Okay. They were condescending comments,
7  inappropriate comments toward an African-American female
8  employee. Events where he was drinking heavily, driving
9  erratically, drunk, and confusion over the strategy and
10 his instructions to them.
11     Q.  Uh-huh.
12     A.  (Continued) That's -- (witness did not
13 complete response).
14     Q.  That's what you can remember?
15     A.  There's probably more, but that's -- yeah.
16     Q.  What do you mean, you think "there's
17 probably more"? Are there any notes or records that you
18 have that could refresh your recollection on that?
19     A.  No.
20     Q.  Is there anybody you can talk to, do you
21 think, that could refresh you recollection on that?
22     A.  Yes.
23     Q.  Who would that be?
24     A.  Dieter Korte, Tom Gates, Mike Zdinak,

### Page 43

1  Z-D-I-N-A-K, Beth Hunter, Susan Audino, A-U-D-I-N-O, Greg
2  Tazic, T-A-Z-I-C. That's --
3      Q.  That's the list?
4      A.  Yeah, that's the capture.
5      Q.  Okay. Are they all still employed by Chubb,
6  to your knowledge?
7      A.  To my knowledge, yes.
8      Q.  Are they all employed in Cincinnati?
9      A.  No.
10     Q.  Is Tazic still in Cincinnati?
11     A.  No.
12     Q.  Where is he?
13     A.  He's in Itasca, Illinois.
14     Q.  How about Korte?
15     A.  He is still in Cincinnati.
16     Q.  Gates?
17     A.  Cincinnati.
18     Q.  Zdinak?
19     A.  Zdinak, yes, he's in Cincinnati.
20     Q.  Hunter?
21     A.  She's in Cincinnati.
22     Q.  Audino?
23     A.  Charlotte. Do you want more names? I'm
24 thinking of more names.

### Page 44

1      Q.  Oh, yeah.
2      A.  (Continued) Becky Emerson, Amy Miller, Mark
3  Pennell, P-E-N-N-E-L-L. That's good for now.
4      Q.  Well, you say "that's good for now," is that
5  all you can remember?
6      A.  That's all I can remember.
7      Q.  Pennell, is he still Cincinnati?
8      A.  Yes.
9      Q.  Miller still in Cincinnati?
10     A.  Yes.
11     Q.  And Emerson?
12     A.  Yes.
13     Q.  Okay.
14     Q.  All of them -- the Cincinnati folks are
15 normally -- they work in the office here in Cincinnati,
16 they don't travel?
17     A.  They -- some travel. You'd need to go down
18 the list again for me to tell you which ones.
19     Q.  But they're generally available, right?
20     A.  Uh-huh (nodding head affirmatively), yes.
21     Q.  Who was responsible for the discipline of
22 Mr. Baillie during his employment, do you know?
23     A.  When he first started it would have been
24 Terry Cavanaugh as the Zone Officer.

| Page 45 | Page 47 |
|---|---|
| 1  Q. Uh-huh.<br>2  A. (Continued) And when Terry Cavanaugh left<br>3 the position and Tim Zerlong entered in, it would have<br>4 been Tim Zerlong.<br>5  Q. Mr. Cavanaugh is no longer with the company;<br>6 is that correct?<br>7  A. He is with the company.<br>8  Q. Is he in New Jersey?<br>9  A. Yes.<br>10   MR. FREKING: Off the record.<br>11   (Off-the-discussion).<br>12  Q. Were you ever asked by Terry Cavanaugh --<br>13 strike that.<br>14   Did you ever report condescending comments,<br>15 inappropriate comments, drinking issues, confusion over<br>16 strategy, or failure to help people in their career<br>17 growth, did you ever report anything like that by Baillie<br>18 to Mr. Cavanaugh?<br>19  A. Not that I recall.<br>20  Q. Okay. Is that because -- strike that. If<br>21 employees came to you with comments about Mr. Baillie that<br>22 you, in a human resources role, believe would necessitate<br>23 at least some conversation with Mr. Baillie or some sort<br>24 of investigation, is there someone who you would report | 1  A. That's --<br>2  Q. -- with Gates?<br>3  A. Yeah, what occurred at dinner.<br>4  Q. Okay. Did you report any other<br>5 condescending comments to Mr. Ekdahl?<br>6  A. Actually, yes, I did, one with Dana Snyder.<br>7 And I had heard from Dieter Korte and Greg Tazic about<br>8 some condescending interactions with Doug.<br>9  Q. Had you reported those to Ekdahl?<br>10  A. Some.<br>11  Q. Okay. Korte and who else?<br>12  A. Tazic.<br>13  Q. Tazic.<br>14  A. (Continued) Different events.<br>15  Q. Okay. And you reported those to Ekdahl?<br>16  A. Some.<br>17  Q. Because you reported whatever you thought<br>18 was inappropriate or improper or of concern about Baillie,<br>19 you would report to Ekdahl; is that correct --<br>20  A. Yes. Seeking advice --<br>21  Q. -- as part of your job?<br>22  A. -- in how to both approach Doug in coaching<br>23 and when I -- you know, when I felt that they crossed the<br>24 line. |

| Page 46 | Page 48 |
|---|---|
| 1 that to?<br>2  A. Yes.<br>3  Q. In the chain of command, who would that be?<br>4  A. Jim Ekdahl.<br>5  Q. Okay. And Mr. Ekdahl was your immediate --<br>6 or strike that -- was your dotted line HR contact<br>7 throughout Mr. --<br>8   MR. MONTGOMERY: We've covered that, didn't<br>9   we?<br>10  Q. -- throughout Mr. Baillie's tenure?<br>11  A. Yes.<br>12  Q. Tell me what concerns brought to you by<br>13 employees that you reported to Mr. Ekdahl that you can<br>14 remember.<br>15  A. I talked to Mr. Ekdahl about a dinner that<br>16 Doug went with Tom Gates and Mapes & Company. I talked to<br>17 Ekdahl about instances where I was directly involved. I<br>18 talked to Ekdahl about what happened in Jamaica. There<br>19 are probably more, but that's what is on top of my head.<br>20  Q. Well, do you recall reporting to Mr. Ekdahl<br>21 the alleged condescending comments?<br>22  A. Yes, that would be with Tom Gates.<br>23  Q. Okay. So that's a condescending comment<br>24 problem -- | 1  Q. Okay. Tell me about your authority as you<br>2 knew it to coach Doug.<br>3  A. My authority?<br>4  Q. Well, you said you would seek his advice on<br>5 how to coach Doug.<br>6  A. Yeah.<br>7  Q. Tell me what role you had in -- or what your<br>8 role was in coaching Doug on HR issues?<br>9  A. Well, when I would hear things from<br>10 employees, I would try to filter it to determine whether I<br>11 thought it had validity or the person was overreacting.<br>12 And if I felt it was valid and/or substantiated by more<br>13 than one person, then I would talk to Doug about it.<br>14  Q. Okay. You would talk to him in a counseling<br>15 capacity?<br>16  A. Right.<br>17  Q. You would counsel him?<br>18  A. Yes.<br>19  Q. Okay. Did you have the ability, to your<br>20 knowledge, to issue any kind of written discipline to Mr.<br>21 Baillie?<br>22  A. No.<br>23  Q. You were limited in your responsibility to<br>24 give him oral counseling? |

Page 49

1   A.  Right.
2   Q.  Did you have an ability to recommend written
3   discipline?
4   A.  No.
5   Q.  Did you have the ability to recommend
6   termination?
7   A.  No.
8   Q.  Okay. So is it fair to say you never
9   recommended to anyone that Mr. Baillie be given any
10  written warning or that he be terminated?
11  A.  I did not.
12  Q.  Okay. Did you ever report to Mr. Ekdahl
13  inappropriate comments about African-Americans?
14  A.  No.
15  Q.  Why not?
16  A.  I was asked not to and I had never heard
17  anything like that before from him, so I made a judgment
18  call not to report it.
19  Q.  You didn't think it was serious enough to
20  report it?
21      MR. MONTGOMERY: Objection.
22  A.  Right.
23      MR. MONTGOMERY: Mischaracterizes the
24      testimony.

Page 50

1       MR. FREKING: Dave, listen, I'm going to put
2       up with some objections, but I'm going to object in
3       that you're clearly coaching the witness.
4   Q.  Your answer was no, you did not think it was
5   serious enough to report it to Mr. Ekdahl --
6   A.  Right.
7   Q.  -- the comment about the African-American
8   employee?
9   A.  That's correct.
10  Q.  Did you report to Mr. Ekdahl anything about
11  Mr. Baillie's drinking?
12  A.  Yes.
13  Q.  Tell me about that.
14  A.  Well, there was a picture in his desk drawer
15  of a totaled car, a Taurus, company car, and he would brag
16  to people in the office that he totalled the car after a
17  night of drinking and climbed out the window and walked --
18  it went over a cliff, he climbed out the window and walked
19  away from it, walked home.
20  Q.  Okay. Is that the extent of what you told
21  Mr. Ekdahl about his drinking?
22  A.  I don't remember the exact events, but there
23  were a few agency outings where employees would come to me
24  and report that they were uncomfortable with the amount of

Page 51

1   drinking consumed by Doug and his behavior as the evening
2   went on.
3   Q.  Okay. You reported those to Ekdahl?
4   A.  Uh-huh (nodding head affirmatively), yes.
5   Q.  Okay. Anything else about his drinking?
6   A.  That I reported to Ekdahl?
7   Q.  Uh-huh.
8   A.  Not that I can recall --
9   Q.  Okay.
10  A.  -- that I reported to him.
11  Q.  Knowing what you know about Chubb's HR
12  structure, do you believe that Mr. Ekdahl had the ability
13  to issue written reprimands or discipline to Mr. Baillie?
14  A.  To the best of my knowledge, yes.
15  Q.  Okay. Did Mr. Ekdahl ever tell you whether
16  or not he ever disciplined Mr. Baillie?
17  A.  No, he did not.
18  Q.  Do you know to this day whether Mr. Baillie
19  was ever disciplined short of being terminated?
20  A.  No, I don't.
21  Q.  Did you ever report to Mr. Ekdahl alleged
22  confusion over strategy of branch?
23  A.  Yes.
24  Q.  Would you agree or disagree with Mr. Korte's

Page 52

1   testimony that Mr. Baillie -- strike that -- that the
2   branch turned around in terms of performance between the
3   time Mr. Baillie arrived and the day he was fired?
4       MR. MONTGOMERY: Objection. I think that
5       lacks foundation. I don't think she's seen his
6       testimony.
7   A.  I don't know what he said. Could you give
8   me a little more?
9   Q.  Do you believe that Mr. Baillie -- during
10  Mr. Baillie's tenure, the financial performance of the
11  branch turned around?
12  A.  Which, just from my acknowledge, was '98 to
13  2001, correct? Yes, it did.
14  Q.  It turned around pretty significantly,
15  right, as far as you know?
16  A.  From '98 to 2000, we lost $16,000,000 and in
17  '91 (sic) we made approximately $30,000,000.
18  Q.  Did you ever hear that the branch was kind
19  of in shambles or disarray when Mr. Baillie arrived?
20  A.  I never heard those words.
21  Q.  But you heard it was pretty bad before
22  Baillie arrived; is that correct?
23  A.  I was there. I was there.
24  Q.  Okay. Were you knowledgable of the fact

Page 61

1 meeting with Mr. Sherer?
2   A. Yes.
3   Q. Do you know whether this occurred Mr.
4 Baillie's termination or after his termination?
5   A. I believe it was after.
6   Q. Do you recall prior to Mr. Baillie's
7 termination, did you have any meeting with Mr. Sherer?
8   A. Prior to his termination?
9   Q. Uh-huh.
10  A. Not that I recall.
11  Q. When you counseled -- do you recall what
12 year this was with Tom Gates and the Mapes & Company,
13 approximately?
14  A. I believe it was 2001, but I can't be sure.
15  Q. Okay. Now, this came to your attention
16 because Tom Gates made some allegations to you; is that
17 correct?
18  A. Right.
19  Q. Prior to you calling Mr. Ekdahl about Tom
20 Gates' comments, did you make any effort to get Mr.
21 Baillie's side of the story?
22  A. On that specific event, no.
23  Q. Okay. You decided to counsel him -- you and
24 Mr. Ekdahl decided to counsel him before you got his side

Page 62

1 of the story; is that correct?
2   A. Well, my conversation with Ekdahl was more
3 for advice for me.
4   Q. Okay. Did he advise you to get Baillie's
5 side of the story before you reached a decision on
6 discipline?
7   A. Yes.
8   Q. Okay. Did you do that?
9   A. Did I get Baillie's side of the story?
10  Q. Before you counseled him.
11  A. Yes.
12  Q. What was Baillie's side of the story?
13  A. I asked him if he remembered going to dinner
14 with Tom and with Mapes, "yes, I did." "Do you remember
15 your conversation? Do you remember Tom ever getting
16 upset. Do you know what you guys were talking about,"
17 that sort of thing. And then he would -- he didn't
18 realize that Tom was upset. And so I shared with him
19 Tom's feelings and impression of the conversation and how
20 that made him feel.
21  Q. Okay. Did Baillie indicate to you whether
22 or not he agreed or disagreed with Tom's feelings after he
23 learned of them?
24  A. He didn't agree.

Page 63

1   Q. Do you know why he didn't agree? Did he
2 express any reasons why he thought Gates was overreacting?
3   A. He thought Tom was emotional and --
4   Q. Is Gates still employed by the company?
5   A. Yes.
6   Q. So Mr. Baillie thought Gates overreacted?
7   A. Uh-huh (nodding head affirmatively) yes.
8   Q. Okay. Did you make a judgment as who was
9 right or wrong --
10  A. No.
11  Q. -- Gates or Baillie?
12  A. No.
13  Q. Then why did you counsel Mr. Baillie? Are
14 you using "counsel" in the sense of discipline or are you
15 using "counsel" in a sense of just speaking with him about
16 it?
17  A. Just speaking with him about it.
18  Q. Okay. So no discipline as a result of this
19 dinner?
20  A. Oh, no.
21  Q. Okay. No discipline was warranted in your
22 view?
23  A. It's not my place to decide that.
24  Q. Well, did Mr. Ekdahl conclude that there was

Page 64

1 any discipline warranted?
2       MR. MONTGOMERY: Objection calls for
3   speculation.
4   A. I wouldn't know.
5   Q. Well, Mr. Ekdahl never instructed you to
6 discipline Mr. Baillie for this?
7   A. I have no authority to discipline Mr.
8 Baillie.
9   Q. Did you report back to Mr. Ekdahl the
10 results of your conversation with Mr. Baillie?
11  A. No.
12  Q. Did you form a belief as to who was right or
13 wrong, Baillie or Gates?
14  A. No.
15  Q. Okay. Did you follow up at all with Gates
16 after Baillie told you "hey, Tom just overreacted"?
17  A. No.
18  Q. Okay. How old is Mr. Gates, would you
19 estimate?
20  A. Early 50s.
21  Q. Now, did you report the Donna (sic) Snyder
22 incident to Mr. Ekdahl -- or Dana Snyder?
23  A. Dana. I don't believe I did.
24  Q. Okay. You did not because it was not

Page 69

1   Q.   Were you being truthful when you spoke to
2 Dana Snyder?
3   A.   I don't know if I can answer that. I was
4 hopeful. I could not say one way or the other what Doug's
5 true intent was.
6   Q.   And you couldn't say one way or the other
7 what Mr. Snyder's true intent was?
8   A.   Right.
9   Q.   Sometimes --
10   A.   All I could do --
11   Q.   Sometimes in your experience in Human
12 Resources people make complaints when they're criticized
13 in their performance and those complaints are unjustified?
14   A.   It's still the way they felt.
15   Q.   Sometimes people make excuses about their
16 performance, right?
17   A.   Yes.
18   Q.   How about -- you also said you talked to
19 Ekdahl about some comments from Korte, Dieter Korte?
20   A.   Yes.
21   Q.   Do you know whether or not Mr. Baillie was
22 ever disciplined as a result of any interaction between
23 him and Mr. Korte?
24   A.   Not that I know of.

Page 70

1   Q.   What was the nature of what you spoke to Mr.
2 Ekdahl in regards to Korte's comments or complaints?
3   A.   I wanted to make sure that we all looked out
4 for Dieter, because he was a valued member of our branch
5 and region, of the Commercial Lines Department and the
6 zone and he wanted to resign out of frustration over Doug
7 Baillie.
8   Q.   Okay. He thought that Baillie put to much
9 emphasis on marketing?
10      MR. MONTGOMERY: Objection. Calls for
11      speculation.
12   Q.   (Continued) Korte, did you know that? He
13 disagreed with Baillie's business philosophy?
14   A.   Yes.
15   Q.   Okay. Baillie was running the business,
16 correct?
17   A.   The branch?
18   Q.   Yes.
19   A.   Yes.
20   Q.   Normally -- and Korte reported to Baillie,
21 right?
22   A.   Dual accountability, his direct report was
23 Doug Baillie.
24   Q.   Right. And as far as -- and Baillie, to

Page 71

1 your knowledge had been given the responsibility by Chubb
2 to determine the management philosophy for that particular
3 branch; is that correct?
4   A.   The way they worked it with the dual
5 accountability, especially in an underwriting capacity, is
6 the Northern Zone Commercial Lines Manager looks at the
7 Commercial Lines product and profit, and Doug is concerned
8 with profit and growth for that specific area.
9      So to say that Doug exclusively is
10 responsible for the business, no. There sometimes is
11 conflict.
12   Q.   Okay. Did you make a judgment as to whether
13 or not Korte was correct in his disagreement with Baillie
14 or did you think that was a management difference of
15 opinion?
16   A.   I agreed with Dieter.
17   Q.   Oh, you agreed with Dieter. Now, what did
18 Dieter tell you that you agreed with?
19   A.   The emphasis on growth and trip reports and
20 agency calls.
21   Q.   Dieter thought there was too much emphasis
22 on growth?
23   A.   Yes.
24   Q.   He thought there was too much emphasis on

Page 72

1 trip reports?
2   A.   Oh, yes.
3   Q.   Too much emphasis on agency calls?
4   A.   Yes.
5   Q.   Now, did you get Mr. Baillie's opinion on --
6 or his explanation as to why he placed a greater emphasis
7 on growth than Korte believed he should?
8   A.   Yes, to -- again, this is to the best of my
9 knowledge.
10   Q.   No, did you meet with him and discuss
11 this --
12   A.   Yes.
13   Q.   -- or is this just speculation on your part?
14   A.   I spoke with Doug about this.
15   Q.   Okay.
16   A.   (Continued) It was two-plus years ago,
17 so --
18   Q.   Yeah, what did Doug tell you about why he
19 placed more emphasis on growth than Dieter wanted to?
20   A.   To the best of my memory, it was the more
21 you're in front of the agent, he felt the more business
22 they would give you.
23   Q.   Uh-huh.
24   A.   (Continued) And the more you grow, the

Page 77

1  Q. This is a branch-by-branch decision?
2  A. Correct.
3  Q. Okay. How about the agency calls, were you
4  in a position to -- what was the problem with Baillie's
5  view on agency calls? Wanted more agency calls than Korte
6  thought he should?
7  A. Quantity over quality.
8  Q. Is that how Baillie phrased it, he wants --
9  he doesn't want quality?
10 A. He wanted you out there in front of them all
11 the time.
12 Q. And he wanted quality visits, but more
13 quality visits?
14 A. Right.
15 Q. Okay. And you somehow think Korte's view
16 that there should be less agency calls was correct?
17 A. Well, the agents were telling Dieter that
18 they would rather set up some specific meetings rather
19 than have them come over all the time so that -- because
20 they were busy, they wanted more quality visits; that's
21 what Dieter was telling me.
22 Q. Did you talk to Baillie about those, too?
23 A. Yes.
24 Q. Did he give you an explanation as to why he

Page 78

1  wanted more agency calls? He thought it would result in
2  more business?
3  A. Yes.
4  Q. He thought it would make the branch more
5  profitable?
6  A. He didn't say those words.
7  Q. But did you understand that?
8  A. Yeah.
9  Q. His goal was to make the branch profitable;
10 is that correct?
11 A. Yes.
12 Q. All right. Now, the picture of the totaled
13 car that he had in his desk, did you report this to Mr.
14 Ekdahl?
15 A. I believe I did.
16 Q. Did Ekdahl instruct you to say anything to
17 Baillie about it?
18 A. Yes, he did.
19 Q. Okay. What did he tell you to say to Mr.
20 Baillie?
21 A. I asked him if it would -- this was fairly
22 new to my tenure in HR, and I wasn't really sure what my
23 place was with Doug. And I asked him --
24 Q. I'm sorry, why weren't you sure what your

Page 79

1  place was with respect to Doug?
2  A. If I should be counseling my direct
3  supervisor. He's my boss, I'm not his boss; so where's my
4  place? Is he going to tell me mind my own business or is
5  he going to appreciate what I can share.
6       So I called Ekdahl both to tell him what it
7  was and to ask him if it would be okay and would it be
8  appropriate for me to ask Doug not to brag about this
9  anymore, because we had some people in the branch that had
10 lost family members to drunk drivers and its impact was
11 not good. And he said "yeah, you should talk to Doug
12 about that and let him know."
13 Q. Okay. Did you talk to Doug about that?
14 A. Yes.
15 Q. And what did Doug say?
16 A. He was fine with it, and to the best of my
17 knowledge, didn't talk about it.
18 Q. Okay. So when you told him to stop doing
19 it, he listened to you and stop doing it, as far as you
20 know?
21 A. As far as I know.
22 Q. Would this be in like the '99 time frame?
23 A. Right.
24 Q. So when Mr. Baillie received his 2000

Page 80

1  performance review, it would concern matters that had been
2  reported to the company in 1999 or his performance in '99?
3       MR. MONTGOMERY: Objection. Calls for
4  speculation.
5  A. I've never seen his review.
6  Q. Okay. Now, the agency outings that people
7  at the agency outings, they were golf outings, right?
8  A. Some.
9  Q. Okay. What agency outings are you aware of
10 that Mr. Baillie allegedly drank too much or behaved
11 inappropriate other than golf outings?
12 A. The March Madness event that we host at
13 Westminster's, Reds games, dinners.
14 Q. Who complained to you that Mr. Baillie drank
15 too much or behaved inappropriately at your March Madness
16 event?
17 A. I don't recall who it was off the top of my
18 head.
19 Q. Do you think you're turned over to us all
20 your notes concerning Mr. Baillie?
21 A. Yes.
22 Q. Okay. You don't have any other notes that
23 would refresh your recollection as to -- you say somebody
24 complained to you, though, about his behavior at March

## Page 85

1  was AON, A-O-N.
2  Q.  Do you think this was one event? When you
3  said "Reds," I think you said "games" --
4  A.  He --
5  Q.  -- are you saying there were multiple
6  occasions at which Baillie was accused acting
7  inappropriately?
8  A.  Yeah. We had four season tickets --
9  Q.  Uh-huh.
10  A.  -- and people would off-the-cuff tell me "I
11  can't believe he's in so early, he really tied one on last
12  night," or "I didn't want to drive home with him," or that
13  sort of thing. But this was -- there was no proof and
14  people would be amazed at how much he could drink and
15  function the next day, as well as that night.
16  Q.  As well as he did?
17  A.  Yeah.
18  Q.  He could function very well, and he could
19  function very well despite whatever happened the night
20  before?
21  A.  Yes.
22  Q.  Okay. And multiple times at Reds games,
23  this would be reported to you as a problem of some sort?
24  A.  Most of the time it was just off-the-cuff

## Page 86

1  comments. It wasn't an official-HR type conversation
2  where they wanted their name written down. A lot of
3  times, as you'll see in my notes, I didn't write them down
4  because people would -- they didn't want me to write it
5  down, they didn't want to report it, they wanted to just
6  talk about it with someone as a peer, and not an HR
7  manager.
8  Q.  So you viewed your role as an HR manager, if
9  you became aware of things that were bothering employees,
10  you would let the employee tell you whether or not to make
11  it official?
12  A.  No.
13  Q.  And you would agree with me as an HR person,
14  if you're aware of concerns about a person's performance,
15  or anything, really, you should take whatever appropriate
16  action? You're the one that --
17  A.  Absolutely, yes.
18  Q.  -- who decides how to do things from a human
19  resources standpoint?
20  A.  Right.
21  Q.  You don't let the employees decide whether
22  or not it's a matter of concern?
23  A.  Right.
24  Q.  Okay. But you were aware of all these

## Page 87

1  comments, the March Madness comments, the Reds games
2  event, the agency events, the dinners, agency outings, the
3  picture of the totaled car, you were aware of all these
4  complaints about Baillie and drinking and being loud and
5  obnoxious?
6  A.  Third-party, yes. Not --
7  Q.  I assume, as a human resources manager, you
8  investigated these things when you found out about them?
9  A.  I would talk to Ekdahl about them. I would
10  sometimes talk to Doug about them.
11  Q.  So you would report some of these to Ekdahl?
12  A.  Yes.
13  Q.  Did Ekdahl ever take any action against
14  Baillie that you're aware of?
15  A.  Not that I'm aware of, I don't know.
16  Q.  Are you familiar with the Chubb Code of
17  Conduct?
18  A.  Yes.
19  Q.  Did Mr. Baillie ever violate the Code of
20  Conduct in regard to these matters at all?
21  A.  Yes.
22  Q.  Is it normally that violations of Code of
23  the Conduct result in some sort of discipline, or is it
24  just a piece of paper, a bunch of, you know, things that

## Page 88

1  are written on paper, but not really enforced?
2  MR. MONTGOMERY: Compound. Argumentative.
3  Q.  Is the Code of Conduct taken seriously at
4  Chubb?
5  A.  Yes.
6  Q.  Is HR responsible for disciplining people
7  for violations of the Code of Conduct?
8  A.  Yes.
9  Q.  All right. Do you think the Dana Snyder
10  matter was a violation of Chubb's Code of Conduct?
11  A.  It was not conclusive.
12  Q.  Did you think the dinner meeting with Tom
13  Gates was a violation of Chubb's Code of Conduct?
14  A.  Again, it's he-said-he-said.
15  Q.  Nonconclusive?
16  A.  Right.
17  Q.  Okay. The agency -- some other agency
18  outings that Mr. Baillie allegedly was accused of drinking
19  too much was at golf outings; is that correct?
20  A.  I've heard of golf outings.
21  Q.  Were the golf outings sometimes sponsored by
22  Chubb?
23  A.  Yes.
24  Q.  Who was the host of those events? The

Page 89

1  person that was viewed as the host of the golf outing?
2      A.  Doug.
3      Q.  And was this another event at which -- the
4  company sponsored, at which they served alcohol and they
5  knew people would drive home after drinking?
6      A.  How do you know someone's going to drive
7  home after drinking?
8      Q.  Well, do you play golf at all?
9      A.  Yes.
10     Q.  Do you have any experience from your real
11 life to know that when a company supplies alcohol on a
12 golf course, it's likely that golfers are going to drink
13 while they are golfing?  Or do you think -- were you
14 surprised to learn that people were drinking at golf
15 outings?
16     A.  If it's available, it's one thing.  If you
17 chose to drink it, is another.  I don't really chose to
18 drink when I'm golfing.
19     Q.  Do you know -- I mean, maybe you haven't
20 done any research on the subject, but are you experienced
21 enough to know that, you know, at golf outings people
22 drink beer, a number of people drink beer, it's a fun
23 occasion?
24     A.  Occasionally.

Page 90

1      Q.  Right.  Did you send out any kind of e-mails
2  in advance of the golf outings to indicate to people that
3  you could get them cabs on a confidential basis if they
4  felt like they needed a ride home?
5      A.  I don't believe we sent an e-mail before the
6  golf outing.
7      Q.  Can you think of any events in which you
8  sent e-mails other than the March Madness event?
9      A.  The holiday party.
10     Q.  You knew people would potentially drink and
11 drive at the holiday party?
12     A.  Potentially.
13     Q.  Does the March Madness event still occur?
14     A.  Yes.
15     Q.  The company still hosts people at Reds games
16 and has golf outings and holiday parties and dinners at
17 which alcohol is served?
18     A.  Yes.
19     Q.  Now, what about the -- you told -- you also
20 told Ekdahl about the Jamaica event?
21     A.  Uh-huh (nodding head affirmatively).
22     Q.  Is this the event where Mr. Baillie
23 allegedly had an argument with his wife on the beach?
24     A.  Yes.

Page 91

1      Q.  Did it violate the Chubb Code of Conduct for
2  Mr. Baillie and his wife to have an argument on the beach?
3      A.  Not directly.
4      Q.  Did you ever speak to Mr. Baillie about what
5  happened during the argument on the beach, what caused it?
6      A.  He denied the event.
7      Q.  Were you a witness to it?
8      A.  No.
9      Q.  Who was?
10     A.  Well --
11     Q.  Did someone report to you that there was an
12 argument on the beach?
13     A.  Yes.
14     Q.  Do you remember who that was?
15     A.  His wife.
16     Q.  His wife talked to you --
17     A.  Uh-huh (nodding head affirmatively).
18     Q.  -- and said they had an argument on the
19 beach?
20     A.  Yes.
21     Q.  What did she say about the argument on the
22 beach to you?
23     A.  Do you want me tell you the whole --
24     Q.  Yeah, why don't you?  This is all reported

Page 92

1  by his wife, Mrs. Baillie?
2      A.  Yes.  She said that the meetings were over
3  for the day and that Doug and she and David Walker, I
4  believe, and his wife -- it's an agent in our Louisville
5  territory --
6      Q.  Uh-huh.
7      A.  -- went down to the beach and that there was
8  some -- again, this is two years ago -- like a floating
9  island or trampoline or something out on the beach tied
10 down and that they wanted to go out and get to it.  So
11 Dori was going to set up a little area on the beach.
12 David and Doug ran out.
13         Doug didn't realize he still had all his
14 money and keys and whatnot, credit cards, so they got into
15 a disagreement.  Doug threw what was in his pocket at
16 Dori, but it was in a money clip, so it went flying
17 everywhere.
18         So Paul Crumb, other agents that were there,
19 other senior Chubb personnel that were there, everyone,
20 kind of ran down to retrieve his items, his personal items
21 that were floating all around the ocean.
22     Q.  Okay.
23     A.  (Continued) And that's what she told me
24 happened.

Page 93

1 Q. Was she telling you this like at a cocktail
2 party or at dinner or something?
3 A. It was at our company picnic.
4 Q. Did Dori want you to report this to Human
5 Resources, Mr. Ekdahl?
6 A. No, that's not why she told me.
7 Q. But you did report it to Mr. Ekdahl?
8 A. Yes.
9 Q. Why did you report this to Mr. Ekdahl?
10 A. Mainly because our agents were involved
11 and --
12 Q. What did Mr. Baillie do wrong against
13 company policy then? First of all, was he subjected to --
14 was he subject to company policy when he was on the beach
15 with his wife and some friends?
16 A. At a Chubb-sponsored event with the senior
17 management from our company and our top tier agents,
18 there's an expectation that you behave in an appropriate,
19 professional manner.
20 Q. Had you been having problems with Mr.
21 Baillie at the time you reported this to Mr. Ekdahl?
22 A. Not that I recall, not then.
23 Q. Did Mr. Ekdahl share your view of the
24 seriousness of this event?

Page 94

1     MR. MONTGOMERY: Objection. Calls for
2 speculation.
3 Q. Did he say anything or do anything that made
4 you believe that he shared your view that this was a
5 serious violation?
6 A. He didn't really say, he was on the
7 telephone.
8 Q. He is your boss, right, and you're in HR?
9 A. Who is "he"?
10 Q. Ekdahl.
11 A. Yes.
12 Q. And you're talking to him, I mean, aren't
13 you -- you're reporting it to him because you think it's
14 seriousness enough to report to Ekdahl --
15 A. Yes.
16 Q. -- right? Like a violation of Human
17 Resource Policy or Company Policy of some sort, right?
18 A. If nothing else, when it involves our agents
19 and the behavior of our senior leader, yes. I felt that
20 that behavior was inappropriate.
21 Q. And you're saying you thought -- you
22 reported to him this because you thought it was
23 inappropriate and you can't recall whether or not Mr.
24 Ekdahl agreed or disagreed with you?

Page 95

1     MR. MONTGOMERY: Argumentative. Asked and
2 answered.
3 Q. Is that right?
4 A. Have you met Mr. Ekdahl?
5 Q. I guess I will.
6     MR. MONTGOMERY: You don't get to --
7     THE WITNESS: I don't get to ask him
8 questions?
9     MR. MONTGOMERY: Just answer to the best of
10 your ability.
11     THE WITNESS: All right.
12 Q. Okay.
13 A. (Continued) I can't -- I can't say what was
14 in his head.
15 Q. All right. And he didn't express to you
16 what was in his head?
17 A. Not that I remember.
18 Q. Okay. Now, what did Mr. Baillie say when
19 you discussed it with him?
20 A. I didn't.
21 Q. Why wouldn't you talk to -- why didn't you
22 talk to Mr. Baillie to get his side of the story?
23 A. Because part of what Dori had said was that
24 that morning Tim Zerlong had asked Doug whether it

Page 96

1 occurred and Doug said it didn't, and she was upset about
2 that, that he had lied to Tim Zerlong. So no, I wasn't
3 going to say anything to Doug about it.
4 Q. Did you go to talk to Zerlong about it?
5 A. No.
6 Q. The only persons you talked to about this
7 was with Dori, his wife, and to Jim Ekdahl?
8 A. And Lash was standing there when Dori was
9 telling the story, Jim Lash, so.
10 Q. Did you discuss it with Jim Lash at all or
11 did he just hear --
12 A. After?
13 Q. -- what Dori said?
14 A. No, we didn't talk about it after. I did
15 talk to one other person, but only when they brought it
16 up, and that was Andy Bryant.
17 Q. And what did Andy Bryant say to your
18 recollection?
19 A. He said that David Walker had approached him
20 after Doug's departure and asked if Doug was let go
21 because of what happened in Jamaica.
22 Q. So this was a conversation with Andy Bryant
23 after Baillie was terminated?
24 A. Yes.

Page 97

1    Q. What was the response to Walker, do you
2 know?
3    A. I believe he said "we're not aware of why
4 Doug left," and -- I don't know exactly what he said to
5 him, you'll ask have to ask Andy.
6        (A recess a taken from 4:04 p.m. to
7        4:16 p.m.)
8    Q. Now, earlier, Diane, you mentioned that Mr.
9 Baillie had made some sexist comments during his tenure.
10 Do you recall that testimony?
11    A. Yes.
12    Q. What was the nature of the sexist comments
13 he made?
14    A. On one occasion he had told Becky Emerson,
15 who was our shared assistant, that I was very selfish for
16 working while I was pregnant and it's not good for the
17 baby, that I should be home with my children. Would you
18 like more?
19    Q. What I'd like you to do is tell me all of
20 the sexist comments --
21    A. Okay.
22    Q. -- he supposedly made.
23    A. We went to a happy hour for someone's
24 going-away party, I believe, and I was chatting with him

Page 98

1 about how he was -- how he was doing with the city, he was
2 fairly new to the city, and how his wife, Dori, was doing
3 and he said that she was very lonely and she wanted him
4 home all the time, very needy. And I suggested that he
5 have her join the golf league at Ivy Hills or a bridge
6 club, something like that to make some friends. And he
7 said "no, no, no, I don't like her to go out without me
8 because women are known for being taken advantage of by
9 men and before you know it, she would end up in bed with
10 some guy, and I just don't want to put her that position,
11 because men are so manipulative and women are easily
12 manipulated."
13    Q. That was in a bar?
14    A. Yes.
15    Q. Did you ever wonder whether or not he was
16 yanking your chain over that comment? Do you know what I
17 mean by --
18    A. I don't really care if he was yanking his
19 (sic) chain. It was inappropriate in my opinion.
20    Q. Inappropriate even if he was kind of just
21 joking around with you?
22    A. Yes.
23    Q. Okay. Anything else?
24    A. I've had -- Beth Hunter left the company

Page 99

1 after having her second child and when I asked her if
2 she'd be willing to come back maybe on a part-time basis
3 when we really needed her, she would not come back until
4 Doug was gone because of things that he had said to her,
5 but she wouldn't elaborate.
6    Q. What made you conclude that they were sexist
7 comments as opposed to, you know --
8    A. That's all she would tell me was the nature.
9 She said "I don't want to go into it, I just feel that I
10 don't want to work for him directly or indirectly, that
11 he's a pig, and I don't need that."
12    Q. Did you perform any investigation as a
13 result of Beth Hunter's comments?
14    A. She was not an employee at the time.
15    Q. No investigation?
16    A. I asked the questions and she wouldn't
17 answer them.
18    Q. I'm sorry, beyond the conversation with her,
19 did you do any investigation?
20    A. No.
21    Q. Did you report the comments at the happy
22 hour to anyone else?
23    A. Yes.
24    Q. Who to?

Page 100

1    A. Ekdahl.
2    Q. You would agree with me that Ekdahl is
3 responsible for enforcing company policy and procedure?
4    A. Yes.
5    Q. Ekdahl is responsible for enforcing the
6 company's code of conduct?
7    A. Yes.
8    Q. Ekdahl is responsible for enforcing the
9 company's policy against sex discrimination or being
10 sexist?
11    A. Yes.
12    Q. All right. Did you report the Becky Emerson
13 comment to Ekdahl?
14    A. Yes.
15    Q. Okay. What did Ekdahl tell you about the
16 happy hour incident, if can you recall?
17    A. I believe he expressed some disappointment,
18 but that was all.
19    Q. Okay. Nothing else you can remember?
20    A. No.
21    Q. How about the Becky Emerson incident, do you
22 remember anything Ekdahl said or led you to believe?
23    A. I believe he just wanted me to feel better
24 about working both during my pregnancy and in the hopes

Page 101

1 that I would return and he said "we really appreciate it,
2 I hope that you would tell us if you or your doctor felt
3 that you shouldn't be working for any medical reasons."
4 He wanted to clarify -- to make sure that I -- there was
5 no physical reason that I should be home and that I'm
6 being selfish. I confirmed that there was not.
7    Q. What do you think led him to ask that
8 question, to believe that you might have some sort of
9 physical problem or was he being sexist?
10   A. Well, in HR we have women who leave early
11 during their pregnancy because of complications, they go
12 on bed rest. And he wanted to make sure that I wasn't in
13 a position where I was potentially putting myself or the
14 baby at risk and once he confirmed that that was not the
15 case, he then said "okay, we do appreciate you being
16 here," and that was about the extent of it.
17   Q. Okay. But he wanted to confirm that?
18   A. Yeah.
19   Q. Did you tell him about the Beth Hunter
20 comment, Ekdahl, or did you think it was not important
21 enough or the fact that she was no longer employed made it
22 inappropriate to report it to Ekdahl?
23   A. I don't recall reporting that to Ekdahl.
24   Q. Baillie was obviously still in charge when

Page 102

1 Hunter made that comment because she said she didn't want
2 to come back to work for him?
3    A. That's right.
4    Q. Okay. You earlier referenced reporting to
5 Ekdahl instances in where you were directly involved --
6    A. Yes.
7    Q. -- in connection with problems with Baillie.
8 Other than what you've already said about these allegedly
9 sexist comments, are there other instances where you were
10 directly involved in which Baillie did something
11 inappropriate or improper or contrary to company policy or
12 the Code of Conduct?
13   A. I can remember two events. One was an
14 account review meeting that I was a participant of where
15 Doug read the newspaper during the entire meeting while
16 other people were talking and defining their accounts and
17 their strategy and that sort of thing. And the other --
18   Q. Did you -- I'm sorry to interrupt you.
19   A. That's okay.
20   Q. You said there were two things. Did you
21 report this reading a newspaper to Ekdahl or anybody else?
22   A. I believe I did.
23   Q. And do you think you called Ekdahl and said
24 "Baillie is acting up again, now he's reading a newspaper

Page 103

1 during a meeting"?
2    A. It was in conjunction with the Korte
3 conversation with wanting to make sure that both at his
4 level and with Dieter's zonal and myself, that we retain
5 Dieter. And that "Dieter's very frustrated, he wants to
6 leave, this happened, and they have differing views on the
7 business focus." So it was in -- it was part of a larger
8 conversation. He was just as example.
9    Q. Were you sitting behind Baillie at this
10 meeting?
11   A. I was -- he would be here (indicating), and
12 I was here (indicating).
13   Q. You're saying he read the newspaper the
14 entire meeting?
15   A. Pretty much.
16   Q. What was Ekdahl's response?
17   A. One of disappointment.
18   Q. Okay. Did he tell you to do anything about
19 it?
20   A. No.
21   Q. Did you talk to Baillie about the -- did you
22 ever confront Baillie about reading the newspaper?
23   A. Yes.
24   Q. What was Doug's reaction?

Page 104

1    A. "I can listen and read the paper at the same
2 time."
3    Q. He can multitask?
4    A. Yes.
5    Q. Did you have any reason to disbelieve him?
6    A. Like I said, that's irrelevant because the
7 perception is that "this is not of interest to you or a
8 priority for you." I don't -- whether you're listening or
9 not, it gives the impression to other people that they're
10 not as important as your newspaper.
11   Q. Had other people complained to you about
12 this, or was this an impression you formed?
13   A. Other people complained about it.
14   Q. Who were they?
15   A. Dieter, Kevin Murphy, Erin Pesce, P-E-S-C-E,
16 E-R-I-N.
17   Q. What else were you involved in personally?
18 You said there were two things, I think.
19   A. Yeah, the --
20   Q. He read a newspaper and secondly --
21   A. The other was -- after I had my second child
22 and came back to work, I had, during my FMLA, come into
23 the office and met with Jim Ekdahl and Doug Baillie about
24 a reduced work schedule, 30 hours a week.

### Page 105

1  Q.  Ekdahl and Baillie together?
2  A.  Yeah. He came in from Chicago and we met
3  about it. (Continued) We were all in agreement with the
4  hours, I thought. Doug wasn't happy about the reduced
5  schedule, but was going to try it out.
6      I -- the plan was Monday, Wednesday ten-hour
7  days, Tuesday, Thursday, five-hour day. And I worked --
8  left at about 1:00 p.m. on Tuesday.
9      Wednesday morning when I got in, Doug called
10  from his cell phone on the speaker with Jeff Barton next
11  to him and told me that my leaving yesterday was grounds
12  for dismissal, he hadn't approved -- that if I was going
13  to leave at 1:00, I had to take a PTO day, and if I was,
14  in fact, taking a PTO day, that he hadn't approved it, and
15  that I was insubordinate by leaving.
16  Q.  Okay. And what was wrong with Baillie's
17  statement in that regard?
18  A.  Well, first of all, that's not grounds for
19  dismissal, you have ten unscheduled PTO days that you can
20  take without prior approval from your manager as part of
21  our policy to allow for sick days and, you know,
22  emergencies. It's not defined, it's whatever you need it
23  for.
24      And second of all, he had this conversation

### Page 106

1  with me, a very personal conversation, on a speakerphone
2  with Jeff Barton sitting next to him listening to the
3  whole thing, and actually chiming in on occasion.
4  Q.  Barton should remember that --
5  A.  Yes.
6  Q.  -- well, strike that.
7      Okay. Anything else that was wrong with
8  that conversation?
9  A.  Well, probably the fact that I had to take a
10  PTO day and was already being docked for not being there
11  by only getting paid for 30 hours a week.
12  Q.  I'm sorry, you were only getting paid for 30
13  hours per week?
14  A.  Yes. My pay was reduced when I started the
15  schedule and --
16  Q.  How was your pay being docked if you were
17  getting paid for 30 hours of work if you worked 30 hours?
18  A.  Well, if I have to take a PTO day, a half
19  PTO day, that would assume I'm working 40 hours a week and
20  getting paid for 40. Ten hours, Monday, Wednesday, five
21  hours, Tuesday, Thursday, to get to the 30.
22      If I have to take half-days for the
23  afternoon of Tuesday and Thursday and not get paid for
24  them on top of it, it's double -- I'm being penalized

### Page 107

1  twice.
2      Does that make sense? I'm already not being
3  made for it and I have to take a PTO day. It's like
4  taking a PTO day on Saturday.
5  Q.  Was this policy only applied to you?
6  A.  Yes.
7  Q.  I mean, were there other people with the
8  same arrangement that were treated differently than you
9  that you knew of?
10  A.  Yes.
11  Q.  Other people that had a 30-hour workweek --
12  A.  Flexible work.
13  Q.  -- flexible work week, other women?
14  A.  Yes.
15  Q.  Were there men with flexible workweeks?
16  A.  Not that I knew of.
17  Q.  Okay. And you're saying that Baillie or the
18  company treated you differently than other people that had
19  flexible workweeks?
20  A.  Yes.
21  Q.  And the other people with flexible workweeks
22  were female?
23  A.  I know of some that are female.
24  Q.  Do you know of any that are -- well, okay.

### Page 108

1      So you realize that the different treatment
2  of you was not on account of your sex; is that correct,
3  because there were other females being treated differently
4  than you?
5  A.  Right.
6  Q.  Okay. What do you think it was on account
7  of that you were being treated differently?
8  A.  My position.
9  Q.  Okay. Baillie expected more of you because
10  of your position in some way?
11  A.  Yes.
12  Q.  Why had you taken that day off?
13  A.  Why did I?
14  Q.  The PTO, what was it for?
15  A.  Why did I take a PTO or why did I leave?
16  Q.  Why did you leave work?
17  A.  Well, we had an understanding that I would
18  work until noon on Tuesday and Thursday.
19  Q.  Okay. Any other reason?
20  A.  That's enough.
21  Q.  He should have known you were going to take
22  the half-day off?
23  A.  Right.
24  Q.  Did you explain to Doug, "well, we had this

### Page 109

1 understanding, Doug, and I took the day off work because
2 I'm not supposed to be working"?
3  A. Yes.
4  Q. And what did he say?
5  A. He said -- I don't remember word for word,
6 of course, this is approximately what he said, okay?
7  Q. Uh-huh.
8  A. He said "are you still the Regional HR
9 Manager?" And I said, "yes, until you fill the position
10 otherwise." And he said, "well, as long as you are the
11 Regional and until your replacement gets here, I expect
12 you to work 40 hours minimum a week."
13  Q. So you considered that a directive from him
14 to work 40 hours per week?
15  A. Yes.
16  Q. And did you work 40 hours per week
17 thereafter or did you disregard his direction?
18  A. Well, I called Ekdahl, who was also at this
19 meeting where we all agreed to it --
20  Q. Uh-huh.
21  A. -- and it was his recollection that Doug did
22 agree to allow me to go to the 30 hours as well, and I
23 believe he talked to Doug and they came to an
24 understanding that Ekdahl was to post the job immediately,

### Page 110

1 my job, to get a replacement, and I was allowed to
2 maintain the 30-hour workweek in the office.
3  Q. And thereafter did you have any more
4 problems with Baillie regarding the 30-hour workweek?
5  A. Well, it never really was 30 hours. He
6 would, in my opinion, come over and at 11:15 or 11:30 on
7 the day that he knew I needed to leave at 12:00 with a
8 project, calls on Fridays, that sort of thing. So that's
9 all right, that was the job, so I put in the hours that --
10 (witness did not complete response).
11  Q. What year was this?
12  A. My son was born July --
13  Q. How old is your son?
14  A. He was born in 2000, so it would have been
15 end of 2000, first quarter of 2001.
16  Q. Okay. Now, in these various problems that
17 you've described to us that you talked to Ekdahl about
18 occurred throughout Baillie's tenure while you were the HR
19 Manager; is that correct?
20  A. Uh-huh (nodding head affirmatively), yes.
21  Q. And it seems to me like you came to a
22 conclusion and reported to Ekdahl, you know -- is a fair
23 understanding of your testimony to say that you basically
24 reported to Ekdahl that you were working for a sexist who

### Page 111

1 drank too much, behaved improperly in front of agents and
2 others, who had a management philosophy that didn't make
3 any sense and otherwise didn't manage his people very
4 well?
5   MR. MONTGOMERY: Objection. To some extent
6  it mischaracterizes the testimony.
7   THE WITNESS: Do I answer anyway?
8   MR. MONTGOMERY: Yeah.
9  A. I never said them in those words. I
10 reported what was reported to me.
11  Q. Okay. Let me ask you this question --
12  A. (Continued) And I didn't consider it
13 reporting as much as I would consider gaining advice from
14 Ekdahl on how to manage the situation.
15  Q. As Human Resources Manager, did you form an
16 opinion that Mr. Baillie was a sexist?
17  A. As a person or as a human resources manager?
18  Q. I'm asking you whether you thought that a
19 human resource manager for Chubb Insurance Company.
20  A. Yes.
21  Q. Okay. Did you think in your role as Human
22 Resource Manager that you had a guy in charge of a branch
23 that drank too much?
24  A. Yes.

### Page 112

1  Q. And you, as an HR Manager, thought he
2 violated the Chubb Code of Conduct?
3  A. Yes.
4  Q. He behaved improperly in front of agents,
5 employees, and others?
6  A. Yes.
7  Q. Did you ever --
8  A. (Continued) You missed one.
9  Q. What was the other one then?
10  A. The other one was clarity of a strategy and
11 communication.
12  Q. I assume you weren't in all of his meetings
13 he had with his subordinates --
14  A. That's right.
15  Q. -- is that fair to say?
16  A. Yes.
17  Q. Now, you've reflected on this matter, I
18 suppose, since Baillie was terminated, right?
19  A. Yes.
20  Q. Would you have an opinion one way or the
21 other if you learned that Mr. Baillie was never
22 disciplined by Ekdahl or anyone else for being a sexist?
23  A. Would I have an opinion as to whether that
24 happened or whether --

Page 121

1   Q. I understand that.
2   A. -- that I brought with me to remind me.
3 This was -- these were all from my file, personal notes.
4   Q. Well, that's the nature of my question. Did
5 you go through your file and select out documents that
6 you thought related to Baillie or did you take the notes
7 and just turned them over regardless of whether or not
8 they --
9   A. He had --
10  Q. -- dealt with Baillie?
11  A. He had his own file. So when I went for my
12 interview, I took his file with me. It was specifically
13 on him.
14  Q. Okay. So these notes that are in your
15 handwriting, you're saying actually would have come --
16 they may have been someplace else, but when you made notes
17 about Doug Baillie, you put them in his personnel file?
18  A. I put them in a file for myself. It's my
19 personal notes.
20  Q. Okay. But your personal notes, did -- this
21 file on your personal notes, did they concern all your
22 human resource activities or did you construct a file just
23 with respect to Baillie? That's what I'm trying to figure
24 out.

Page 122

1       Do we have Baillie notes from you and
2 others, or do we just have -- or did you go through and
3 just give us Baillie notes?
4   A. I just gave you Baillie notes.
5   Q. Okay. That's what I thought.
6       Now, why do you suppose the conversation
7 with Butler about alcoholism was produced to us if it
8 wasn't about Baillie?
9       MR. MONTGOMERY: It does call for
10      speculation, she didn't --
11      MR. FREKING: Okay. Strike that.
12      MR. MONTGOMERY: She didn't produce them to
13      you, we did.
14  Q. You said you didn't talk to -- you didn't
15 mention his name.
16  A. Right.
17  Q. Do you know why it would be that a note
18 about alcoholism would be produced, if it was produced,
19 from a file concerning Baillie?
20  A. Because of the excessive amount of drinking,
21 I wondered if he was an alcoholic, but had no
22 verification, so I put a copy of those notes in my
23 personal file on Doug --
24  Q. Okay.

Page 123

1   A. -- just in case.
2   Q. Let me hand you a document, 1355, and ask
3 you if you recognize that document?
4       MR. MONTGOMERY: Before you see it, I just
5       want to look at it beforehand.
6   Q. Do you know what that document is about? Is
7 that your handwriting?
8   A. Yes, that's my handwriting. Doug and I had
9 a disagreement about my personal cell phone and getting
10 reimbursement for the business portion of those expenses.
11 And it was my understanding that we had an agreement and
12 then when I submitted the bills, he declined to pay them.
13 And so I was upset and looked at one of his months of cell
14 phones bills and wrote down a note to myself that if my
15 number of personal calls were excessive, he had three
16 times as many that particular month, so. I didn't share
17 that with anyone, that was just for my record in case it
18 came back again.
19  Q. You were kind of mad at Baillie?
20  A. Well, I was disappointed and didn't feel
21 that he was being fair. "Do as I say, not as I do," is
22 kind of what I felt like.
23  Q. And where did you find his cell phone
24 record? Did you spend time during the workday to review

Page 124

1 his use of his cell phone?
2   A. I didn't. Becky Emerson reviews all the
3 cell phone bills and highlights the notes -- which ones
4 are personal and which ones are business, just to get an
5 idea of who's abusing their corporate cell phone. And she
6 had them out and told me how many were personal.
7   Q. So you discussed your disappointment with
8 Mr. Baillie's decision on your cell phone with Ms.
9 Emerson?
10  A. Yes.
11  Q. And so she checks every month to see if
12 someone's abusing their cell phone privileges?
13  A. Yes.
14  Q. Did she opine as to whether or not Mr.
15 Baillie was abusing his cell phone privileges?
16  A. She felt that on a regular basis he had a
17 number of personal calls on his cell phone.
18  Q. Did she opine whether he was abusing his
19 cell phone privileges?
20  A. She more stated fact.
21  Q. Did she tell you that there are 29 personal
22 phone calls out of 30 or out of a 100 or a 1,000, or do
23 you think it makes a difference?
24  A. I didn't think it made a difference because

Page 125

1 that is the argument what he made with me on mine.
2    Q. And what's the note about "Beth's notes and
3 three-ring binders"?
4    A. She thought that she had possibly -- she
5 left some stuff when she resigned at her desk and she
6 thought that she had left some notes that she'd written
7 about interactions with Doug, but I couldn't find
8 anything.
9      This was after our conversation when I asked
10 her to come back and she said she wouldn't come back when
11 Doug was there. And she couldn't elaborate on why and what
12 specific interaction she had, she said "but I think I
13 might have taken some notes and they were in a blue
14 three-ring binder on my desk and if you still have my box
15 of stuff, look in there and see if it's there," it wasn't
16 there.
17    Q. Okay. And it looks like you went to look
18 for that stuff around the time you were having this cell
19 phone argument with Mr. Baillie?
20    A. Yeah, possibly. I can't say for sure, I
21 didn't put dates, so. May I see that one more time --
22    Q. Uh-huh.
23    A. -- and see the shadows and see if it came
24 from my calendar? It did come from my calendar, then I

Page 126

1 really can't say whether it was around the same time,
2 because if I got it from my planner, I might have just had
3 a "Doug" page and been writing things down.
4    Q. Well, it looks like there's a -- two-thirds
5 of the page is blank --
6    A. Yeah.
7    Q. -- there's two entries on it, so it doesn't
8 look like a Doug page -- well, strike that.
9    A. It is.
10    Q. It's a Doug page --
11    A. Yes.
12    Q. -- you think?
13    A. That's why it says "Doug" on top. You'll
14 see lots of "Doug" pages in there.
15    Q. That have "Doug" on top?
16    A. I have memos for all of my branch managers
17 on things that were happening, open items, that sort of
18 thing.
19    Q. Uh-huh.
20      THE WITNESS: May I -- you can keep asking.
21 May I get some water?
22      MR. FREKING: Sure. Oh, yeah.
23      THE WITNESS: Sorry about that.
24    Q. Now, tell me, Diane, did you, in addition to

Page 127

1 talking to Haggard (sic) --
2    A. To --
3    Q. I'm sorry, in addition to talking to Ekdahl,
4 did you have conversations with Tim Zerlong regarding any
5 of these concerns you had about Mr. Baillie?
6    A. Yes, occasionally.
7    Q. Describe for me the nature of those
8 conversations.
9    A. Well, as far as communicating strategy and
10 managers who would approach me for advice on possibly
11 interpreting what Doug had directed them to do or what
12 they should be focusing on, that sort of thing, I would
13 ask Tim before I would go back to the employee and give
14 advice to make sure I wasn't saying the wrong thing --
15    Q. Do you know --
16    A. -- that I was consistent with corporate
17 directives.
18    Q. Did you view yourself in the chain of
19 command with respect to these employees who were coming to
20 and questioning advice, you were fulfilling some sort of
21 human resource function, right?
22    A. Right.
23    Q. The people that were coming to you
24 expressing concerns reported to somebody else directly; is

Page 128

1 that correct?
2    A. Yes.
3    Q. Is there some reason why when people said "I
4 don't like whatever Doug's doing," is there some reason
5 why the easy response wasn't "well, go talk to your
6 immediate manager or go talk to Mr. Baillie directly"?
7 Why would Human Resources get involved? It doesn't sound
8 like a human resource issue.
9    A. Well --
10      MR. MONTGOMERY: Objection. Argumentative.
11 It's not even a question really. There's no
12 question pending, so let's just wait until he ask.
13      MR. FREKING: Do you want to read back the
14 question?
15      (The court reporter read back the previous
16      question.)
17      THE WITNESS: Can I answer that?
18      MR. MONTGOMERY: Sure.
19    A. Well, generally the first time or second
20 time, I would ask that they clarify it with Doug.
21 Generally these were Doug's direct reports that were
22 coming to me.
23      And after a couple of times and no -- they
24 still don't understand, then I would get involved. And I

Page 129

1 believe my role is to make sure that our business results
2 are met or exceeded. Irregardless of whether that's
3 specific to a traditional HR function or not, our job is
4 to meet or exceed our budget
5     Q.  After you became the Regional Manager back
6 in '99, did you receive any training in human resources or
7 personnel by Chubb?
8     A.  Informal training.
9     Q.  What do you mean by "informal training"?
10     A.  I went up to Chicago for a week and met with
11 the HR team up there.
12     Q.  Anything besides that?
13     A.  An internal investigation seminar. A global
14 HR meeting.
15     Q.  Any other conversation you remember having
16 with Zerlong specifically about Baillie other than these
17 complaints from subordinates?
18     A.  He would ask for what employees are in
19 trouble or, you know, who's struggling in their job and
20 what we're doing about it. So we would talk about those
21 employees that were struggling in their positions and --
22 (witness did not complete response).
23     Q.  And you would tell him Baillie was
24 struggling in his position?

Page 130

1     A.  No.
2     Q.  Oh, I'm wondering about conversations you
3 had with him --
4     A.  Other employees?
5     Q.  -- about Baillie?
6     A.  About -- oh. Well, he would ask me what
7 Doug is doing about those employees that are struggling,
8 but --
9     Q.  And how would you know what Doug was doing
10 about those employees who were struggling?
11     A.  Well, I wouldn't know everything, but I
12 should know who is struggling and Doug and I would talk
13 about his plan for certain employees and if it were a
14 performance improvement plan, then I would need to review
15 all the documents before they're submitted to the
16 employee.
17     Q.  How many -- did Mr. Baillie meet
18 occasionally with subordinates to discuss their
19 performance?
20     A.  Yes.
21     Q.  How many meetings during the two years you
22 overlapped with Mr. Baillie, approximately, would you say
23 you sat in in which Mr. Baillie had a performance
24 discussion with his subordinate?

Page 131

1     A.  Maybe three.
2     Q.  You can remember three times you sat in on
3 meetings in which --
4     A.  Involving someone else --
5     Q.  -- in which Baillie --
6     A.  -- yeah.
7     Q.  So the vast majority of the time you were
8 not present when Mr. Baillie would meet with his
9 subordinates to discuss their performance?
10     A.  Right.
11     Q.  Did you tell Mr. Zerlong "I don't have very
12 much knowledge of how Doug is dealing with this, because
13 I'm not in the meetings between Doug and his
14 subordinates"?
15     A.  Well, and the specific employee we're
16 talking about, I was in the meetings.
17     Q.  Who was that?
18     A.  Michael Whitman, W-H-I-T-M-A-N.
19     Q.  Are those the three meetings you were in on?
20     A.  Yes.
21     Q.  Okay. So you can't recall any other
22 meetings you were in in which Mr. Baillie discussed
23 performance with a particular subordinate?
24     A.  Right.

Page 132

1     Q.  Any other things you recall discussing with
2 Zerlong specifically about Baillie?
3     A.  No, not that I can recall.
4     Q.  Do you know anything about Chubb's
5 performance under Mr. Baillie's tenure with respect to
6 diversity hiring?
7     A.  Yes.
8     Q.  Did you know that the company during his
9 reign met and exceeded goals as far as diversity hiring?
10     A.  Yes.
11     Q.  Did you know that Mr. Baillie set up a
12 diversity committee?
13     A.  Mr. Baillie set up a diversity committee?
14     Q.  Uh-huh.
15     A.  There was a diversity committee formed. He
16 allowed us to start one, but I don't know if I'd say he
17 started it.
18     Q.  There was not a diversity committee before
19 Mr. Baillie became the Branch Manager, and after he became
20 the Branch Manager there's a diversity committee formed?
21     A.  Yes.
22     Q.  Did the Diversity Committee and the goals
23 with respect to diversity hiring include the hiring of
24 females?