1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

DOUGLAS W. BAILLIE,                    )

       Plaintiff,               )

  vs.                              ) No. C-1-02-062

CHUBB & SONS INSURANCE,                )

       Defendant.               )


      The deposition of TIMOTHY JAMES SZERLONG, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before ZONA B. MILLER, a Notary Public within and for the County of Lake, State of Illinois, and a Certified Shorthand Reporter of said state, at Suite 6150, 233 S. Wacker Drive, Chicago, Illinois, on the 19th day of August, A.D. 2003, at 10:17 a.m.

COPY

Exhibit F

1   Q.    Anything else?

2   A.    No.

3   Q.    Let's direct your attention to the

4   people management.  That's why you fired him was

5   because of people management?

6   A.    That's one of the reasons.

7   Q.    What were the other reasons?

8   A.    Doug was having an extremely difficult

9   time in people management differentiating

10  effectively in dealing with performance of key

11  people, dealing with effectively communicating and

12  providing leadership and balanced direction to all

13  levels of staff under his command.

14  Q.    You're talking about people management?

15  A.    No.

16  Q.    Oh.  Those are separate and apart from

17  people management --

18  A.    Yes.

19  Q.    -- what you just identified?

20  A.    Yes.

21  Q.    He's having trouble --

22  A.    I think leadership.

23  Q.    You're telling me -- in the Chubb way

24  of doing things, does the quality of leadership

1    fall under people management or someplace else?

2        A.    It falls in a variety of areas.

3        Q.    Okay.  Anything else?  Any other reason

4    why you fired Mr. Baillie other than what you've

5    already identified?

6        A.    Doug's responses to my direction and

7    coaching were unresponsive and he ultimately lost

8    my confidence and trust.

9        Q.    Anything else?

10       A.    No.

11       Q.    He lost your confidence and trust by

12   way of his responses to your attempts to coach

13   him?

14       A.    He lost my confidence and trust by a

15   combination of a failure to act on issues that we

16   had discussed that required attention and in some

17   cases the way in which he chose to act on other

18   items were incomplete or ineffective.

19       Q.    Any other way in which he lost your

20   confidence and trust?

21       A.    Only the areas that I touched on

22   earlier have an effect on that confidence level as

23   well.  In terms of the communication with staff,

24   the ability to deliver a balanced organizational



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
*Chicago:* 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1   message to the people under his charge, that

2   certainly influences that judgment.

3          Q.    What issues did he fail to act on that

4   made you lose confidence and trust in him?

5          A.    His inability to deal with issues of

6   performance with several key lieutenants that had

7   clear-cut performance problems.

8          Q.    Anything else?

9          A.    The slow and ineffective engagement in

10  managing issues in the Louisville production

11  office.

12         Q.    Anything else?

13         A.    I believe his judgment that he

14  exercised of the choices that he made in the

15  forums he would choose to given issues in the

16  presence of others.

17         Q.    Anything else?

18         A.    Doug had a very difficult time

19  sometimes interpreting and understanding strategy

20  and corporate directive and then effectively

21  executing and communicating that within his

22  branch.

23         Q.    Kind of like the corporate directive,

24  to put more emphasis on profitability rather than

1   in other areas of an employee's performance?

2        A.    I would not use that as an example.

3        Q.    Anything else?

4        A.    No.

5        Q.    What were the lieutenants that he had

6   that had these issues of performance that you say

7   he failed to act on?

8        A.    Michael Whitman, Andrew Emery,

9   Tom Gates, Andy Bryant, Rick O'Brien.  Those are

10  the primary names.

11       Q.    Are there any secondary names that you

12  know of?

13       A.    I don't recall.

14       Q.    What did you do about the performance

15  issues of Whitman when you took over the branch?

16       A.    I didn't take over the branch.

17       Q.    Who assumed the responsibility for the

18  branch when Mr. Baillie left?

19       A.    Jerry Butler.

20       Q.    Mr. Butler came in like on

21  September 1st or 2nd.

22       A.    Shortly after Doug was terminated.  I

23  don't recall the date.

24       Q.    Who was in charge of the branch in the



1    that?

2        A.    Because Doug's relationships with staff

3    I do not believe were as strong as he believed

4    they were.

5        Q.    How many of his 360-degree feedbacks

6    did you ever review?

7        A.    I don't recall.  I know we had a

8    discussion on 360-degree feedback, but I don't

9    recall if we ever reviewed any specific documents.

10        Q.    You knew he had solicited a 360-degree

11    feedback from his direct reports?

12        A.    Yes.

13        Q.    And you knew that he told you that the

14    feedback was positive?

15        A.    Yes.

16        Q.    In fact, he prepared for you a summary

17    of that feedback, do you recall that?

18        A.    No.

19        Q.    How did you reconcile -- you were

20    getting some anecdotal evidence from Ms. Haggard

21    and others that he had problems with staff, is

22    that correct?

23        A.    Yes.

24        Q.    Did you ever make any attempt to

1    reconcile the fact that Mr. Baillie was reporting

2    to you that he was getting very positive

3    360-degree feedback with the anecdotal stories you

4    were hearing from Ms. Haggard?

5        A.    Yes.

6        Q.    And did you -- in fact, what did you

7    conclude when you attempted to reconcile those

8    seemingly contradictory facts?

9        A.    I would perhaps best summarize it as a

10   consistent disagreement over the nature and

11   effectiveness of relationships between Doug and

12   his staff members.

13       Q.    Who did you trust more, Ms. Haggard's

14   reports of what other people said or what people

15   actually said about Mr. Baillie's performance?

16       MR. MONTGOMERY:  Objection, argumentative, it

17   assumes facts not in evidence.

18       MR. FREKING:  Strike that.

19   BY. MR. FREKING:

20       Q.    You knew that Mr. Baillie when he

21   referred to the 360-degree feedback was referring

22   to feedback in writing from his direct reports, is

23   that correct?

24       A.    That is not my definition of 360-degree



1          A.     It was brought to my attention by

2    Jim Ekdahl that he had been boasting about an

3    automobile accident that occurred while driving a

4    company vehicle in his former assignment in

5    Pennsylvania and that alcohol had been involved in

6    that and that he was sharing those stories with

7    staff in Cincinnati.

8          Q.     After you heard this from Ekdahl, did

9    you say anything to Baillie about it at all?

10         A.     Jim Ekdahl gave me the impression that

11   it had been dealt with by human resources locally

12   and Ms. Haggard had spoken with him about it.

13         Q.     The answer is no, you hadn't spoken to

14   him about it?

15         A.     No.

16         Q.     Any other experiences about alcohol

17   involving his judgment?

18         A.     I did address an issue with Doug upon

19   an incident that was brought to my attention that

20   occurred at an MVI meeting, I believe, in Jamaica,

21   if my memory is correct, whereby Doug was observed

22   to be arguing in a loud and belligerent state with

23   his wife on the beach in front of several of our

24   producers.

1          The incident was dramatic enough that

2    it prompted the producers to call their Chubb

3    executive representative upon return from the trip

4    to express concern about the incident.  And that

5    incident was passed on to me by my counterpart in

6    Dallas.

7          I confronted Doug on the issue

8    immediately upon hearing about this and expressed

9    my concerns about the perception.

10         Q.    Why did you confront Doug Baillie about

11   that?

12         A.    Because I was concerned about the

13   impression or impact it's created at a

14   Chubb-sponsored meeting by an executive creating

15   potentially that kind of impression.

16         Q.    And this was a performance-related

17   issue because of his position with Chubb?

18         A.    Sure.  Yes.

19         Q.    You wanted to talk to him and get his

20   side of the story, et cetera, right?

21         A.    Yes.

22         Q.    When was this alleged confrontation?

23         A.    By "the alleged confrontation," you

24   mean the incident in Jamaica?

1    BY MR. FREKING:

2        Q.    Sir, you recognize this document as a

3    document from you to Mr. Baillie dated March 9th

4    of 2001?

5        A.    Yes.

6        Q.    Let me direct your attention to page 2.

7    I want to direct your attention to the first full

8    paragraph where it says:  "The feedback I receive

9    on your management meetings in Cincinnati has also

10   been unfavorable."  Do you see that?

11       A.    Yes.

12       Q.    Can you identify the people in the

13   Cincinnati office who were elsewhere that gave you

14   feedback concerning Mr. Baillie's management

15   meeting?

16       A.    I don't recall specific people.

17       Q.    It says, "Your people are looking for

18   more discussion, understanding," et cetera.

19            Do you know, are you referring to any

20   particular people that you became aware of, you

21   know, Mr. Korte, Mr. Barton, Mr. Breiner,

22   Mr. Delong?  Anybody in particular that you can

23   identify as having these concerns about wanting

24   more from Mr. Baillie, wanting him to do something

1    better than it was?  Can you identify any single

2    individual that worked for Mr. Baillie that

3    thought he was substantially lacking in his

4    management of him?

5         A.    I think clearly the production office

6    leaders, both Bryant and Bezold, given the unique

7    nature of the jobs that they hold -- held, were

8    looking for far more direction on how to execute

9    those positions.

10        Q.    Anybody else?

11        A.    I think a number of managers in the

12   office were looking for greater interests,

13   engagement or understanding in their business to

14   help guide them in the operational issues that

15   would fall in their area.

16        Q.    Anybody that you can identify?

17        A.    I don't recall.

18        Q.    The paragraph above that it says, "You

19   are perceived as rather black and white in your

20   judgment process."  Do you see that sentence?

21        A.    Yes.

22        Q.    Who are you talking about as perceiving

23   him in that manner?

24        A.    Well, me, for one.  Clearly Delong and

1    Breiner viewed him in that way.

2        Q.    Delong and Breiner?

3        A.    Yes.

4        Q.    Anybody else?

5        A.    I think Doug was viewed that way at

6    home office level as well as in terms of his

7    interface with various operatives within the home

8    office.

9        Q.    How did you know that or how did you

10   think that?

11       A.    It would be discussions on Cincinnati

12   issues with those people.

13       Q.    Who were those people?

14       A.    I would say Paul Crump, and there are

15   others, but I don't recall them.

16       Q.    Do you have any notes that would

17   refresh your recollection on that?

18       A.    No.

19       Q.    Let me ask you a little bit about how

20   Mr. Baillie and you interacted over years and just

21   some of the opinions you formed about

22   Mr. Baillie's personality.

23              What would you say about Mr. Baillie's

24   degree of kind of flexibility?  You know what I



ESQUIRE™
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1      Q.    Would you agree or disagree that you

2    began a -- the progressive discipline practice

3    with respect to Mr. Baillie in calendar year 2001?

4      A.    I would agree that I conducted a

5    performance improvement discussion and plan with

6    Doug beginning in 2001.

7      Q.    Are there any other branch managers

8    that we talked about before, the 14 or so that you

9    have similarly implemented a performance

10   improvement discussion of a plan that you can

11   recall in the last five years?  And why don't we

12   just take them one by one.  Okay?  Tim Shannahan?

13     A.    No.

14     Q.    Lee Topps?

15     A.    No.

16     Q.    Richard Ciullo?

17     A.    No.

18     Q.    Susan Waltermire?

19     A.    No.

20     Q.    Tom Breiner?

21     A.    Yes.

22     Q.    Gary Delong?

23     A.    No.

24     Q.    Jim Darling?


ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

```
1          A.    No.

2          Q.    Mike Howey?

3          A.    No.

4          Q.    Kevin Smith?

5          A.    No.

6          Q.    Casella?

7          A.    No.  Lee Topps you missed.

8          Q.    Lee Topps?

9          A.    No.

10         Q.    Have you ever consulted with anyone in

11   HR as to what the percentages mean on the balance

12   scorecard or performance appraisals in particular

13   areas, the weightings, to get any kind of

14   description of what that means?

15         A.    I don't recall any.

16         Q.    Is there anything in writing that

17   you're aware of that describes the company's

18   scorecard system?

19         A.    I'm certain there is.

20         Q.    Are you relatively certain that you've

21   read it --

22         A.    Yes.

23         Q.    -- at some time in your career?

24         A.    Yes.
```



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1    manager is to collaborate and work within the

2    organization to advance issues in business that

3    help the branch run effectively.

4            In my dealings within the organization,

5    Doug had much lower levels of credibility with

6    people in more senior roles in home office than

7    did other branch managers, and that comes in part

8    from some of the approach issues and some of the

9    items that I've mentioned about his leadership and

10   management skills.

11        Q.    So you're saying he had lack of

12   organizational support at the home office level

13   among others?

14        A.    Yes.

15        Q.    Who at the home office level questioned

16   his abilities?

17        A.    I don't recall specifically.

18        Q.    Can you recall anybody?

19        A.    I had mentioned earlier Paul Crump.

20        Q.    What did Mr. Crump tell you?

21        A.    That Doug appears to be a good

22   tactician, relatively black and white in dealing

23   with issues as opposed to a more thoughtful

24   strategist in our business.  Something along those



ESQUIRE
DEPOSITION SERVICES

LINKING TESTIMONY, TRADITION AND TECHNOLOGY
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950