LEXSEE 2001 U.S. APP. LEXIS 459

**James W. Norbuta, Plaintiff-Appellant, v. Loctite Corporation, Defendant-Appellee**

No. 98-4162

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

1 Fed. Appx. 305; 2001 U.S. App. LEXIS 459

**January 8, 2001, Filed**

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 2001 U.S. App. LEXIS 12671.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Northern District of Ohio. 96-01642. Oliver, Jr. 9-1-98.

**DISPOSITION:** AFFIRMED.

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**COUNSEL:** For JAMES W NORBUTA, Plaintiff - Appellant: Robert S. Bauders, Law Office of Robert S. Bauders, Cleveland, OH.

For LOCTITE CORPORATION, Defendant - Appellee: Andrew A. Paisley, Thomas H. Barnard, Jr., Ulmer & Berne, Cleveland, OH.

**JUDGES:** Before: KENNEDY and RYAN, Circuit Judges; CLELAND, * District Judge.

   * Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

**OPINIONBY:** Robert H. Cleland

**OPINION:**

[*307] Cleland, District Judge. This employment discrimination case was brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623 [**2] (a)(1) ("ADEA"); and the Ohio Rev. Code Ann. § 4112.02(A) ("the Ohio statute"). Plaintiff James Norbuta sued his former employer Loctite Corporation ("Loctite"), alleging discrimination on the basis of national origin in violation of Title VII and the Ohio statute, age discrimination in violation of the ADEA, and retaliation in violation of Title VII and the ADEA. The district court granted summary judgment as to all counts, finding that Norbuta had failed (1) to produce evidence sufficient to support a finding of national origin discrimination, (2) to offer any indication of age discrimination beyond his membership in the protected class, and (3) to make out a *prima facie* case of retaliation. Norbuta appeals the summary judgment holdings as to his national origin and age discrimination claims, arguing that he has produced evidence sufficient to survive summary judgment and reach a jury. We will affirm the judgment of the district court.

I.

The material facts are undisputed. James Norbuta, age 48, was born in the United States and resided in Cleveland, Ohio during the period at issue. Loctite, a specialty chemical company, hired him in 1981 as a regional sales manager, and he [**3] progressed through the ranks; by 1992, he held the position of Vice President for Food, Drug and Special Markets.

A 1992 reorganization, however, caused much change in the company. Loctite consolidated its automotive aftermarket, consumer, and industrial groups into its North American Group. Before the reorganization, Loctite employees in the United States, such as Norbuta, worked exclusively in the U.S., while employees in Canada worked exclusively in Canada. The reorganization disregarded the borders between the U.S., Canada and Mexico. In doing so, the reorganization changed the nature of the position of an individual named Gary Steele, who had been the general manager for Loctite Canada. Steele was born in Canada and resided there

Exhibit G

his entire life. After the reorganization, Steele became the general sales manager for the industrial business in Canada and five U.S. states. Notably, Steele had objected to the reorganization, believing that Loctite's customers would be better served if he had responsibility over a Canadian sales group where salesmen could be responsible for calling on all three markets: the automotive aftermarket and consumer and industrial businesses.

This change [**4] in duties and relationships created the backdrop for Steele's subsequent dissatisfaction with Norbuta. As a result of the reorganization, Norbuta became the general sales manager for the automotive aftermarket and consumer [*308] businesses in Canada. The new position placed him at pay grade 20, the highest pay grade in the company. His office was in Warrensville Heights, Ohio. He was responsible for preparing sales presentations and performance reviews but spent the rest of his time with customers and sales persons and at trade shows. Although Norbuta lived in Ohio, over 50% of his working time was spent traveling in Canada at Loctite's expense. His visits with customers and sales persons occurred exclusively in Canada. Of the time he spent in Canada, Norbuta estimated that 50% was spent in Toronto, 15% in western Canada, and the remainder in Montreal and Quebec City. During the year preceding his termination, Loctite spent over $15,000 for Norbuta's flights to Toronto and Calgary, rental cars, and lodging expenses.

Dissatisfied with the structure of the company after the 1992 reorganization, Steele contemplated resigning, but Larry Gisondi, Executive Vice President for Loctite's North [**5] American Group talked him out of it. At this point, Steele was not Norbuta's supervisor, though Steele believed that Norbuta's functions as a manager for Canadian sales should be under Steele's control. Gisondi testified:

> Q: Did [Steele] express any views as to whether he like (sic) Jim Norbuta working in Canada.
>
> A. He didn't.
>
> Q: What did he say to you about that?
>
> A: Well, he just said that he thought it would be better served if we integrated the sales group in Canada under his responsibility and had everyone call, one salesman on all three markets which, I explained to him, did not fit with what the corporate . . . was trying to do which was really to segregate the Industrial Business, Automotive Business and the Consumer Business. . . .
>
> Q: During these discussions that you had with Gary Steele during that time frame, did he ever express any views as to whether he thought the Canadian operations should be run by Canadians?
>
> A: Every three months. This was a constant battle with him. He just didn't like the setup.
>
> Q: Every three months, you're talking about during the period of time '93 up to when you left?
>
> A: Yes.

Steele explained [**6] that he interpreted the term "Canadian" to mean "somebody from Canada or in Canada, the citizenship he holds is a Canadian citizenship."

In early 1995, as part of Steele's effort to remove Norbuta's responsibilities in Canada, Steele submitted a proposed reorganization of the Canadian operations, which included the proposed names of persons in various positions but did not list Norbuta. Steele testified that he felt that customers would benefit from integrating the sales responsibilities over the industrial and automotive aftermarket and consumer sectors because customers could deal with one salesperson for all their needs, and salespeople would not compete against one another for sales on crossover products. In addition, Steele felt that the aftermarket and consumer salespersons should be trained in a program called the Encyclopedia of Selling, a multi-module program that Loctite had already implemented to train its industrial salespeople. Norbuta was not trained in this program.

In July 1995, the president of Loctite's North American Group was replaced by Steve Merkel. Merkel decided to return the North American Group to the pre-1992 management model so that Loctite's business [**7] in Canada, Mexico and the U.S. could be run locally. As part of the reorganization, Gary Steele was reappointed to the general sales manager position for [*309] Loctite Canada that he had held until the 1992 reorganization. An announcement from Loctite's Vice President of Industrial Sales in September 1995 stated:

> In keeping with [North American Group's] goals to be more responsive to customer/distributor needs, market opportunities/changes, and giving people the responsibility and the authority to solve problems

> quickly, the following changes will be effective immediately in the North American Industrial business:
>
> Gary Steele . . . will become the General Manager for Loctite Canada. Gary will have responsibility for all functions and markets in the Canadian business (operations, finance, customer service, technical service, marketing, and sales, with the exception of Renato Foti who will continue to report to Chuck Evans). This once again unites the country allowing for a more responsive unit. All issues pertaining to Canadian business will be decided locally while being coordinated with American strategies and tactics. We believe this will be an extremely positive step toward [**8] our continued growth and profitability in Canada.

At that point, Norbuta began reporting directly to Steele for the first time.

Concurrent with the 1995 reorganization, Loctite was experiencing some financial difficulties that culminated in the elimination of 125 jobs. According to a September 1995 press release:

> The $5.5 million realignment charge related primarily to separation costs connected with the elimination of 125 jobs in our North American Manufacturing, Logistics, Administrative and Marketing Departments. As previously announced, the structure of the business was changed to focus on the marketplaces and bring management closer to our customers. At the same time, Manufacturing and Logistics functions were brought in line with our worldwide manufacturing structure.
>
> In North America our business showed a reduction of 4% on a comparable basis with last year, with both the industrial and automotive aftermarkets below last year, and the retail (consumer) business showing a small gain. We have seen a slowing in the market place as many of our customers reduced their level of business in reaction to the "soft landing" of the economy.

With Loctite looking [**9] for ways to save money in its U.S. operations, Steele suggested to Julian Colquitt (his immediate supervisor) and Merkel that he could save Loctite's U.S. operations money by eliminating Norbuta's position because Norbuta's employment expenses were paid from the U.S. operations budget. Steele estimated the expenses related to Norbuta to be approximately $200,000. As of May 1995, Norbuta was performing not only his own duties as a general sales manager, but also those of Phil Cowan, his former subordinate regional sales manager, who had not been replaced. Nonetheless, Steele decided to eliminate Norbuta's position altogether, to hire someone to fill the regional sales manager position, and to redistribute Norbuta's responsibilities to individuals already within the company.

At the time of his termination, Norbuta's performance was entirely satisfactory. In fact, Steele had the impression that Norbuta was meeting his goals and objectives. Gisondi testified that in ranking sales performance of regional managers in the North American group for 1994, Norbuta probably ranked number one for the automotive and consumer group, and among the top five for the entire North American group. [**10]

Steele chose Canadian-born Tim McManus to take the vacant regional sales position. At the time of the appointment, [*310] McManus had been serving as the regional sales manager for industrial sales for the province of Ontario, had been trained in the Encyclopedia of Selling program, and was earning $83,150 (Canadian). McManus was 37 years old and resided near Toronto. Salespeople with dual responsibilities (automotive aftermarket and consumer, as well as industrial) began reporting to McManus in May, 1997.

While most of Norbuta's duties were redistributed to McManus in the new regional sales manager position, Hermann Kraus, a German citizen who lived in Canada, assumed Norbuta's duties in western Canada, in addition to his other sales duties. Kraus resided in Calgary, Alberta and had worked with Loctite since 1981. He had experience in the automotive aftermarket and consumer fields. At the time he assumed Norbuta's duties, Kraus was 44 years old, and earning a salary of $81,938 (Canadian). Both McManus and Kraus, each of whom were already with the company when Norbuta was fired, were compensated at levels lower than Norbuta, even though his responsibilities had been added on to those [**11] they already held. Both men also lived in areas of Canada that Norbuta had serviced by traveling from Ohio, an expense that Loctite would no longer incur with resident sales representatives in those areas.

After Steele decided to terminate Norbuta, he discussed the decision with Don Atencio, Vice President of Human Resources. Atencio believed Steele's decision was sound. Atencio's notes outline the following reasons for Steele's decision:

Extra head count

1) $savings (replace at much lower salary and in Canadian $)

2) Resides in U.S. where none of his customers exist
   - must fly to see all customers
   - also need to have customers called upon more often than he currently is

3) could be an issue with Jim not paying required Canadian income tax

4) Need to have manager train sales force in the 'Encyclopedia of Selling'

5) Will fill vacancy left by Phil Cowan

6) Gary Steele is managing the AAM/Consumer

According to Norbuta, when Steele informed him of his termination around November 10, 1995, Steele stated his intention to replace Norbuta by filling the vacant regional sales manager position under Norbuta with someone "in Canada." On November 13, 1995, Norbuta [**12] asked Atencio why he had not been considered for the vacant regional sales manager position. Atencio responded that Loctite had made the decision to hire in Canada at job level 18, and that the Norbuta's lack of Encyclopedia of Selling training made him ineligible for the position.

Steele admitted in deposition that he did not know of any reason why Norbuta could not have relocated to Canada, but noted that he would have needed to satisfy Canadian immigration requirements to do so. Steele also testified that he never asked Norbuta if he could move closer to his Canadian customers. Likewise, Steele never asked Norbuta if he would be willing to work for less money, nor did he have any information to suggest otherwise. Steele did not know Norbuta's performance rating and was unaware of any unhappiness with Norbuta's sales performance.

Norbuta filed his complaint in federal district court on July 26, 1996, asserting claims under Title VII (national origin and retaliation), the ADEA, the Ohio Revised Code (national origin and age discrimination), [*311] and Ohio public policy. Loctite filed its motion for summary judgment on February 9, 1998, and Norbuta elected not to prosecute his retaliation [**13] claim. The district court entered summary judgment on all claims on August 31, 1998. The court ruled that the plaintiff had not submitted direct evidence of national origin discrimination. The court also found that Norbuta could not meet his burden under the *McDonnell Douglas* paradigm. Specifically, the court held that Norbuta failed to satisfy the third prong of his *prima facie* case of national origin discrimination because he was not qualified for the position of regional sales manager. Norbuta also failed to satisfy the fourth prong by failing to offer sufficient direct, circumstantial, or statistical evidence of discrimination which was necessary given that the case involved a reduction-in-force ("RIF"). Moreover, the court noted that in a RIF situation, the employer has no duty to transfer the employee to another position in the company. As to the age discrimination claim, the court proceeded with the RIF analysis and concluded that Norbuta failed to present a *prima facie* case of age discrimination because he merely asserted that Loctite retained younger persons in positions for which Norbuta was qualified. Norbuta timely filed his notice of appeal.

II.

We review [**14] the district court's grant of summary judgment de novo. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996). Summary judgment is appropriate if no genuine issue of material fact exists and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 597 (6th Cir. 1999).

III.

Title VII prohibits discrimination in employment based on an employee's national origin. *See* 42 U.S.C. § 2000e-2(a)(1). "National origin" refers to the country of birth, or the country from which a person's ancestors came. *See Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88-90, 38 L. Ed. 2d 287, 94 S. Ct. 334 (1973). Importantly for purposes of this litigation, Title VII does not bar discrimination based on citizenship or residency. *See id.*; 42 U.S.C. § 2000e-2(a)(1). Ohio Rev. Code Ann. § 4112.02(A) contains the same prohibition. The parties agree that Ohio courts generally apply Title VII case law in interpreting the evidentiary burdens under § 4112.02 where the relevant state statutory language emulates its [**15] federal counterpart, as it does here. *See Genaro v. Central Transp., Inc.*, 84 Ohio St. 3d 293, 703 N.E.2d 782, 786 (Ohio 1999); *Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 69 Ohio St. 3d 89, 630 N.E.2d 669, 674 (Ohio 1994); *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 575 N.E.2d 1164, 1167 (Ohio 1991). For that reason, the Court's analysis of the Title VII claim will apply equally to the claim brought under the Ohio statute. Similarly, the ADEA prohibits

an employer from discriminating against an individual on the basis of age. *See* 29 U.S.C. § 623(a)(1).

When a plaintiff can prove his case with direct evidence of discrimination, the traditional *McDonnell Douglas* burden-shifting framework is inapplicable. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348-349 (6th Cir. 1997); *Srail v. RJF Int'l Corp.*, 126 Ohio App. 3d 689, 711 N.E.2d 264, 270 (Ohio Ct. App. 1998). [**16] If a [*312] plaintiff produces credible direct evidence of discrimination, discriminatory animus may be at least part of an employer's motive, and in the absence of an alternative, non-discriminatory explanation for that evidence, there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court. *See, e.g. Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707-712 (6th Cir. 1985). Direct evidence "is evidence which if believed, would prove the existence of a fact . . . without any inferences or presumptions." *Lautner v. American Tel. and Tel. Co.*, 1997 U.S. App. LEXIS 1267, No. 95-3756, 1997 WL 26467, at *3 (6th Cir. Jan. 22, 1997). For example, racial slurs or comments constitute direct evidence that a termination may have been racially motivated. *See Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995). n1

> n1 Ohio, however, has declined to adopt this definition of "direct evidence," *see Bush*, 161 F.3d at 369-70, a distinction that both parties to this case ignored. The Ohio Supreme Court has held that "direct evidence," which obviates reliance on the *McDonnell Douglas* framework,
>
>> refers to a method of proof, not a type of evidence. It means that a plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory intent.
>
> *Mauzy v. Kelly Serv., Inc.*, 75 Ohio St. 3d 578, 664 N.E.2d 1272, 1279 (Ohio 1996). However, in light of this court's determination that no direct evidence of discrimination exists in this case, the distinction is immaterial.

[**17]

When a plaintiff cannot demonstrate discrimination through direct evidence, the *McDonnell Douglas* paradigm applies. A plaintiff bears the burden of establishing a *prima facie* case by demonstrating that he: (1) is a member of a protected class; (2) suffered from an adverse action; (3) was qualified for the position; and (4) was treated differently from similarly situated individuals outside the protected class. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 402 (6th Cir. 1999). Once the plaintiff establishes a *prima facie* case, a defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action, which the plaintiff may then rebut with evidence of pretext. *Id.* The same burden-shifting framework applies to cases under the ADEA, *see, e.g., Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990), except that the plaintiff must show in the fourth prong of the *prima facie* case that he was replaced by someone with comparable qualifications who was significantly younger. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310-13, 134 L. Ed. 2d 433, 116 S. Ct. 1307 (1996); [**18] *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999).

Whatever the basis for the alleged discrimination, where an employer can demonstrate that a plaintiff was terminated as part of a RIF, the elements of a *prima facie* case are modified to require a heightened proffer of evidence. *See, e.g., Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998); *Frantz v. Beechmont Pet Hosp.*, 117 Ohio App. 3d 351, 690 N.E.2d 897, 901 (Ohio Ct. App. 1996). Although the first three prongs of the test remain the same, to meet the fourth prong a plaintiff must submit "*additional* direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich*, 154 F.3d at 350 (quoting *Barnes*, 896 F.2d at 1465) (emphasis added). This heightened burden for establishing a *prima facie* case applies only in a "true" RIF case, which:

> [*313] occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work [**19] force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties. . . . Of course an employer could not avoid liability by chang-

ing the job title or by making minor changes to a job indicative of an attempt to avoid liability.

*Barnes*, 896 F.2d at 1465 & n. 10; *see also Godfredson*, 173 F.3d at 373 (concluding that a plaintiff is not "replaced" when one or more employees assume the plaintiff's duties while maintaining their old job titles and responsibilities). An employer's decision to retain younger persons in jobs for which the plaintiff was qualified does not satisfy this test. *See Barnes*, 896 F.2d at 1465. Moreover, an employer owes no duty to an employee to transfer him to another position when the employer reduces its workforce for economic reasons. *See Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986). [**20]

IV.

We turn first to the question of whether Norbuta has proffered direct evidence of discrimination that might allow him to avoid the *McDonnell Douglas* tripartite analysis and send his case to a jury. Norbuta characterizes several pieces of evidence as being "direct." First, Steele allegedly informed Norbuta and Atencio of his intent to hire "in Canada" for the position of regional sales manager. Second, Gisondi testified that Steele repeatedly told him that he thought the Canadian business should be run by Canadians. Third, Gisondi also said that Steele told him that he did not like Norbuta working in the Canadian operations, and that he wanted to remove Norbuta. Finally, Norbuta cites the following passage from the September 14, 1995 announcement stating that the reorganization:

> Once again unites the country allowing for a more responsive unit. All issues pertaining to Canadian business will be decided locally while being coordinated with American strategies and tactics.

Whatever the strength of this evidence, it is not "direct" evidence because it admits more than one plausible interpretation, and requires a significant inference or presumption on the part of [**21] the trier of fact to come to the conclusion that Norbuta propounds. *See Lautner*, 1997 WL 26467, at *3. That Steele wanted the Canadian business to hire Canadian management can be just as easily construed as referring to a preference for Canadian citizens or residents—which are not protected classes—as they can to those who are of Canadian national origin. That he did not like, and wanted to remove, Norbuta might suggest animus towards Norbuta, but it does not evince any underlying reason. The final piece of evidence concerning the unification of Canadian operations does not imply national origin animus against employees, but instead summarizes Loctite's position that it was electing to coordinate its internal operations on an intra-national basis. Indeed, Steele's testimony that his use of the term "Canadian" referred to "somebody from Canada or in Canada, the citizenship he holds is a Canadian citizenship," leaves open the possibility that he might have been referring to any one of three categories: citizenship, national origin, residency, or some combination thereof. The reasonableness of such interpretation [*314] is supported by Webster's New World Dictionary, Third [**22] College Edition (1989), which defines a "Canadian" as "a native or inhabitant of Canada." That a non-lawyer would think of these concepts interchangeably or in a conflated sense is hardly surprising. Moreover, even when Steele's stated preferences are taken in the light most favorable to Norbuta, the Court concludes that they do not bear the direct indicia of national origin discrimination that Norbuta attributes to them. Accordingly, Norbuta has presented no direct evidence of such discrimination, and the district court's analysis of this issue was correct.

Norbuta fares no better under the *McDonnell Douglas* framework for analyzing indirect evidence of discrimination. Because Norbuta's termination was part of a 125-employee RIF implemented in late 1995 by Loctite to reduce costs, Norbuta bears a heightened burden in his *prima facie* case to produce "*additional* direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich*, 154 F.3d at 350 (quoting *Barnes*, 896 F.2d at 1465).

It is undisputed that Norbuta was not replaced; his position [**23] was eliminated. Instead of replacing Norbuta, Loctite placed McManus in the regional sales manager position formerly subordinate to Norbuta, and Loctite also redistributed Norbuta's responsibilities to McManus and Kraus, who took on those responsibilities in addition to those they already possessed in their then-current positions. *See Godfredson*, 173 F.3d at 373. Loctite was not under any obligation to offer the lower-level positions to Norbuta, even if Norbuta was qualified to perform them. *See Godfredson*, 173 F.3d at 373. (Though an aside to this particular analysis, Norbuta, in fact, was not qualified for McManus' position because Steele had changed its requirements to include proficiency in the Encyclopedia of Selling program, which Norbuta lacked.) Similarly, Loctite was under no legal obligation to offer Norbuta a transfer to Canada or to train him in the Encyclopedia of Selling program. *See Ridenour*, 791 F.2d at 57. Put simply, because he was not replaced, the only remaining issue is whether Norbuta has proffered the additional evidence that would be necessary for a jury to conclude that he, instead of someone

else, was selected [**24] for termination under the RIF on the basis of his age or American national origin.

In part, Norbuta's circumstantial evidence of discrimination consists of the same evidence he relied on as direct evidence. His remaining evidence is comprised of challenges to Loctite's business judgment, such as the fact that Loctite did not offer him a transfer to Canada, or that the cost savings resulting from his termination were not significant. While the first point is undoubtedly true, and the second arguably so, neither supports an inference of unlawful discrimination. When an employer implements a RIF, the unfortunate fact is that someone has to go. It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized. *See, e.g., Graves v. Fleetguard, Inc.*, 198 F.3d 245 (Table), 1999 WL 993963, at *3 (6th Cir. Oct. 21, 1999) (quoting *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982) ("The ADEA was not intended as a vehicle for judicial review of business decisions." (internal quotation marks omitted))). [**25] Norbuta must provide evidence not that Loctite could have made a business decision that others might think more fair, but that [*315] Loctite made the decision to terminate him because of his membership in a protected class.

As to Norbuta's national origin claim, there is no evidence of specific anti-American animus; taken in the light most favorable to Norbuta, Steele's statements can be best described as "pro-Canadian." In other words, assuming that Steele's comments can be construed as connoting nation origin bias, they can be interpreted as preferring Canadians over non-Canadians in the operations of Loctite's Canadian operations. For purposes of the *McDonnell Douglas* analysis, we can assume here, without deciding, that Norbuta has made out a *prima facie* Title VII claim. It is undisputed that: (1) he is of American national origin and over age 40; (2) he was terminated; and (3) he was qualified—at least for the position he held at the time of his termination. We will also assume that Norbuta has met the fourth prong by proffering Steele's comments preferring Canadians for positions with Loctite Canada as evidence that Steele selected Norbuta for a RIF discharge. But even assuming [**26] that Norbuta has made out a *prima facie* case, his discrimination claims cannot succeed.

Norbuta's ADEA claim fails decisively at this point because he has no evidence indicating that Loctite singled him out for discharge based on his age. Indeed, this claim seems to be almost a whimsical afterthought to his Title VII claim, based on nothing more than the fact that Norbuta was over the age of 40 at the time of termination (and the irrelevant challenges to Loctite's business judgment in its implementation of the RIF). Of course, mere membership in a protected class does not create a viable discrimination claim, and for that reason, the district court's analysis on this point was entirely correct.

These, however, are not the only defects in Norbuta's request for relief. Although Loctite presented its grounds for Norbuta's termination in its challenge to his "qualifications" within his *prima facie* case, for ease of analysis, we will construe those justifications as Loctite's proffer of legitimate, non-discriminatory reasons for its decision. Even if Norbuta were to demonstrate a *prima facie* case, he cannot rebut Loctite's legitimate business rationales for its actions. Loctite [**27] contends that the three principal bases for Steele's decision were: (1) to replace a general manager with a regional manager (McManus) at a lower salary and with less travel expenses; (2) to increase the frequency of sales calls with McManus and Kraus since they lived where the customers were located; and (3) to enable to McManus to train the automotive aftermarket and consumer salespeople in the Encyclopedia of Selling program.

Each of these rationales is factually unassailable. McManus, who assumed most of Norbuta's responsibilities, was paid at a lower grade than Norbuta, even though his new responsibilities were in addition to the ones he already had. (There also appears to have been a cost-savings advantage under the then-prevailing exchange rates for Loctite to pay in Canadian dollars rather than American ones.) Indeed, even if McManus had been paid more than Norbuta, Loctite would still have realized a cost savings in salary so long as McManus' new salary was lower than the old salaries of Norbuta and McManus combined. Because McManus and Kraus resided in Toronto and Calgary, respectively, Loctite no longer had to pay travel expenses to service clients near those cities, an [**28] expense that was inevitable when Norbuta traveled between Cleveland and Canada. Concomitantly, the less time McManus and Kraus expended on travel, the more time they had for customer contact. [*316] Finally, it is undisputed that McManus was immediately able to train his subordinates in the Encyclopedia of Selling program, which was one of Steele's qualifications for the new regime of Loctite Canada operations, and Norbuta lacked this qualification. In sum, all of Loctite's proffered rationales for Norbuta's termination are unrebutted.

Ordinarily, our analysis of Norbuta's claims would end when he failed to meet his responsibilities under the third prong of the *McDonnell Douglas* test by failing to rebut Loctite's proffered reasons. There remains,

however, the potential argument by Norbuta that even if Loctite's reasons are accepted as true, they do not necessarily negate the possibility that national origin animus played a part in Steele's termination decision, as evidenced by his statements. That is to say, Norbuta might argue that Loctite's termination decision was based on mixed motives both legitimate and illegitimate, which would permit the case to go to a jury if Loctite cannot [**29] demonstrate that it would have made the same decision in the absence of such animus. See *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) (overturned by statute on other grounds)); *Cesaro v. Lakeville Cmty. Sch. Dist.*, 953 F.2d 252, 254 (6th Cir. 1992)); *Yellow Freight Sys., Inc. v. Reich*, 27 F.3d 1133, 1140 (6th Cir. 1994) (internal citations omitted).

But we find that Loctite has met that burden. In addition to the unrebutted evidence of the economic and organizational benefits that accrued from transferring Norbuta's job functions to Canada, Norbuta's reliance on Steele's statements is too thin a reed upon which a jury might base a finding of national origin discrimination. "When faced with a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence in order to avoid summary judgment." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 709 (6th Cir. 2000) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). [**30] In the context of the facts of this case, Steele's comments are no more than a scintilla. While remarks by a decisionmaker reflecting bias against the plaintiff on the basis of a protected category are relevant to pretext, see *Ercegovich*, 154 F.3d at 354-55, "isolated and ambiguous comments are too abstract in addition to being irrelevant and prejudicial, to support a finding of . . . discrimination." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (citations and internal quotation marks omitted). Factors affecting a statement's probative value include the nexus between the discriminatory remarks and the challenged action, "the declarant's position in the corporate hierarchy, the purpose and content of the statement, . . . the temporal connection between the statement and the challenged employment action," and whether the statement buttresses other evidence of pretext. See *Ercegovich*, 154 F.3d at 357 (quoting *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)).

While Steele was undoubtedly an individual with decisional authority to terminate Norbuta, and the statements were made in [**31] a time period proximate to Norbuta's termination, the purpose and context of Steel's comments suggest only that his preference was for subordinates who would operate under his authority in Canada, where they would be closer to Loctite's Canadian customers and other Loctite Canada personnel. Norbuta has produced no evidence suggesting that Steele's intent was otherwise, and there is no other evidence to bolster Norbuta's out-of-context interpretation of Steele's ambiguous statements. [*317] For that reason alone, Steele's statements would be insufficient to permit Norbuta's case to proceed past summary judgment. Moreover, though not required to reach our decision, the fact that Krauss, one of the two individuals to whom Steele assigned Norbuta's responsibilities, was of German national origin, tends to defeat any speculative inference that Steele was motivated by prejudice against individuals not born in Canada. Employment decisions made on the basis of citizenship or residency are not illegal; at best, this is all that Norbuta reasonably can prove.

V.

The Supreme Court recently noted that:

> An employer would be entitled to judgment as a matter of law if the record conclusively revealed [**32] some other, nondiscriminatory reason for the employer's decision, of if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120

S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (internal citations omitted). This is precisely the circumstance here. There has been no plausible showing of national origin discrimination under Title VII or Ohio Rev. Code Ann. § 4112.02(A), or of age discrimination under the ADEA. Accordingly, the judgment of the district court is AFFIRMED.