Page 1

COPY

```
 1
 2
 3              UNITED STATES DISTRICT COURT
 4              SOUTHERN DISTRICT OF OHIO
 5                   WESTERN DIVISION
 6  -------------------------------------
                                        :
 7  DOUGLAS W. BAILLIE,
                                        :
 8            Plaintiff,                :
 9        vs.                           :   CASE NO.
                                        :   C-1-02-062
10  CHUBB & SON INSURANCE:              :
11            Defendant                 :
                                        :
12  -------------------------------------
13
        DEPOSITION OF:    DIETER WILHELM WOLFGANG KORTE
14
        TAKEN:       By the Plaintiff
15
        DATE:        February 27, 2003
16
        TIME:        Commencing at 9:00 a.m.
17
        PLACE:       Offices of:
18                   Freking & Betz
                     215 East Ninth Street
19                   Fifth Floor
                     Cincinnati, Ohio  45202
20
21      BEFORE:      RAYMOND E. SIMONSON
                     Registered Merit Reporter
22                   Notary Public - State of Ohio
23
24
```

Page 2

```
 1  APPEARANCES:
 2      On behalf of the Plaintiff:
 3          RANDOLPH H. FREKING, ESQ.
                of
 4          Freking & Betz
            215 East Ninth Street
 5          Fifth Floor
            Cincinnati, Ohio  45202
 6
        On behalf of the Defendant:
 7
            DAVID T. CROALL, ESQ.,
 8              of
            Porter, Wright, Morris & Arthur
 9          250 East Fifth Street, Suite 2200
            Cincinnati, Ohio  45202-5117
10
11
12          S T I P U L A T I O N S
13          It is stipulated by and between counsel for
14  the respective parties that the deposition of DIETER
15  WILHELM WOLFGANG KORTE, a witness herein, may be taken at
16  this time by Counsel for the Plaintiff as upon
17  cross-examination pursuant to the Federal Rules of Civil
18  Procedure; that the deposition may be taken in stenotypy
19  by the notary public-court reporter and transcribed by him
20  out of the presence of the witness; that the transcribed
21  deposition is to be submitted to the witness for his
22  examination and signature; and that signature may be
23  affixed out of the presence of the notary public-court
24  reporter.
```

Page 3

```
 1
 2
 3                   I N D E X
 4
 5  DIETER WILHELM WOLFGANG KORTE              PAGE
 6      CROSS-EXAMINATION BY MR. FREKING:         4
 7
 8
 9
10
11
12
13
14
15
16
17
18
19              COMPUTER
20                DISK
21
22
23
24
```

Page 4

```
 1         DIETER WILHELM WOLFGANG KORTE
 2  of lawful age, a witness herein, being first duly sworn as
 3  hereinafter certified, was examined and testified as
 4  follows:
 5              CROSS-EXAMINATION
 6  BY MR. FREKING:
 7      Q.  Hi, Dieter.
 8      A.  Hi.
 9      Q.  How you are you?
10      A.  Good.
11      Q.  We just met, but my name is Randy Freking,
12  and I represent Doug Baillie in connection with the matter
13  he's brought here in Federal Court in Cincinnati, and
14  we're here today to conduct your deposition.
15          Ray will take down your answers to various
16  questions.  And we just ask you to consider, you know, the
17  questions as carefully as possible and take whatever time
18  you need to answer the questions.  There's no time
19  deadline whatsoever.  I know you've got to leave by 11:20,
20  but that doesn't mean we have to finish by that time.
21      A.  Okay.
22      Q.  We can always resume on another date.  So
23  take whatever time you need to answer questions today.
24
```

Exhibit J

Page 109

1      MR. CROALL: Object on the speculation and
2   hypothetical.
3      But you can answer if you can.
4   A.   No.
5   Q.   It sounds like your discomfort was caused by
6  the fact Pesce was there.
7   A.   Right.
8   Q.   Now let me ask you: Did he say anything --
9  first of all, did you take --
10  A.   Can I just add to that last?
11  Q.   Sure.
12  A.   I was not comfortable sharing financial
13  results with him because he no longer worked for the
14  organization, but I felt that --
15  Q.   Oh, I see.
16  A.   -- in vague terms I could probably relate to
17  him what was going on.
18  Q.   That's fair.  Do you disagree -- do you
19  think his statement, or in substance his statement that "I
20  laid the groundwork" -- do you think that was
21  fundamentally false?
22      THE WITNESS (to Mr. Croall):  Do I answer
23  that?
24      MR. CROALL:  If you can.

Page 110

1   Q.   Do you agree or disagree with that?
2   A.   It wasn't completely false.  I mean, he was
3  the branch manager.  We performed a cleanup of the book
4  while he was a branch manager.
5   Q.   So it's probably a fair statement?
6   A.   It's -- yeah.  I mean, he was in charge of
7  the branch at the time.
8   Q.   Okay.
9   A.   The cleanup of the book was performed, so...
10  Q.   Now, how would you characterize the
11  statement that "they kicked me out the door"?
12      Do you think that's true or false?
13  A.   I -- I would tell you that I didn't know
14  these -- you know, the reasons surrounding his departure,
15  so I couldn't tell that they kicked him out the door or
16  not.  That was his comment to me.
17  Q.   You just knew he was out the door?
18  A.   That's correct.
19  Q.   And you said he was very bitter?
20  A.   Yeah.
21  Q.   Okay.
22  A.   He was upset, very -- I would characterize
23  it -- if I can do that, I would characterize it as very
24  unusual for the way I had perceived Doug.

Page 111

1   Q.   Okay.
2   A.   Pretty much out of character.
3   Q.   Pretty much out of character?
4   A.   Yes.
5   Q.   Okay.
6   A.   The way I had observed Doug in the past,
7  interacted with him.
8   Q.   His personality seemed different?
9   A.   Yeah.
10  Q.   How long do you think this conversation was?
11  A.   Five, ten minutes.
12  Q.   Was he like animated during this
13  conversation?  Like how people get when they get upset?
14  Kind of arms going more than usual?
15  A.   No.  I don't think he used his arms.
16  Q.   Any other ways that you could tell that he
17  was like just upset or uncomfortable?
18  A.   It was probably the tone of his voice and
19  kind of just the way he made the comment, but I'm
20  speculating on that.  I mean, to me it appeared that he
21  was upset.
22  Q.   Were you surprised about that, given that it
23  was maybe two, three months after the fact and he was
24  still upset or bitter?

Page 112

1   A.   Was I surprised at the time?
2   Q.   Were you kind of surprised at his tone?
3  Were you expecting --
4   A.   Well, I mean, given the phone call that I
5  had received the last day of his employment and that
6  reaction, yeah, it was surprising.  Like I said, I mean,
7  it appeared out of character.
8   Q.   Anything else you recall from that
9  conversation in the sense that he appeared to be upset in
10  any other manner?  Was he -- you know, could you just --
11  could you kind of tell by facial expression?
12  A.   I could tell from probably the tone of his
13  voice more than anything else.
14  Q.   You could tell --
15  A.   And just the way he described like, "I got
16  kicked out the door."  I mean, that to me symbolizes
17  somebody upset rather than somebody who is happy with his
18  current state.
19  Q.   You could tell he was hurt?
20  A.   I could tell he was upset, yeah.
21  Q.   Okay.  Anything else you remember about
22  that?  Anything about his -- the way he looked?  The way
23  he acted?
24  A.   I mean, he was wearing a suit.