Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

----------------------------------------
                                        :
DOUGLAS W. BAILLIE,                     :
                                        :
          Plaintiff,                    :
                                        :
     vs.                                :    CASE NO.
                                        :    C-1-02-062
CHUBB & SON INSURANCE,                  :
                                        :
          Defendant.                    :
                                        :
----------------------------------------

DEPOSITION OF:   MICHAEL W. WHITMAN

TAKEN:        By the Plaintiff

DATE:         August 25, 2003

TIME:         Commencing at 2:30 p.m.

PLACE:        Offices of:
              Keating Muething & Klekamp PLL
              1400 Provident Tower
              One East Fourth Street
              Cincinnati, Ohio   45202

BEFORE:       RAYMOND E. SIMONSON
              Registered Merit Reporter
              Notary Public - State of Ohio

---

Page 2

APPEARANCES:

     On behalf of the Plaintiff:

          MARK W. NAPIER, ESQ.
               of
          Freking & Betz
          215 East Ninth Street
          Fifth Floor
          Cincinnati, Ohio   45202

     On behalf of the Defendant:

          DAVID K. MONTGOMERY, ESQ.
               of
          Keating Muething & Klekamp PLL
          1400 Provident Tower
          One East Fourth Street
          Cincinnati, Ohio   45202

                    - - -

          S T I P U L A T I O N S

          It is stipulated by and between counsel for
the respective parties that the deposition of MICHAEL W.
WHITMAN, a witness herein, may be taken at this time by
Counsel for the Plaintiff as upon cross-examination
pursuant to the Federal Rules of Civil Procedure; that the
deposition may be taken in stenotypy by the notary
public-court reporter and transcribed by him out of the
presence of the witness; that the transcribed deposition is
to be submitted to the witness for his examination and
signature; and that signature may be affixed out of the
presence of the notary public-court reporter.

                    - - -

---

Page 3

                 I N D E X

MICHAEL W. WHITMAN                              PAGE

     CROSS-EXAMINATION BY MR. NAPIER              4

     EXAMINATION BY MR. MONTGOMERY                _


               E X H I B I T S

     (No exhibits were marked for identification.)

**COMPUTER DISK**

---

Page 4

1          MICHAEL W. WHITMAN
2 of lawful age, a witness herein, being first duly sworn as
3 hereinafter certified, was examined and testified as
4 follows:
5          CROSS-EXAMINATION
6 BY MR. NAPIER:
7     Q.   Sir, would you state your name for the
8 record?
9     A.   It's Michael W. Whitman.
10     Q.   And, Mr. Whitman, would you spell your last
11 name?
12     A.   It's W-H-I-T-M-A-N.
13     Q.   Mr. Whitman, my name is Mark Napier. We met
14 just briefly. I represent Doug Baillie in a lawsuit that's
15 been filed against Chubb.
16     A.   Um-hmm (nodding head affirmatively).
17     Q.   And we've asked you to come here today to ask
18 you questions regarding matters that are relevant to the
19 lawsuit.
20     A.   Okay.
21     Q.   Have you ever given a deposition before?
22     A.   I've not. This is my first.
23     Q.   Let me go over a few rules that help make the
24 process go a little bit easier. I'm going to be asking you

Exhibit L

**Page 9**

1    A.   That would have been in -- in May, May
2  2001.
3    Q.   Is that your current position?
4    A.   That is correct.
5    Q.   Do you know Doug Baillie?
6    A.   I do know Doug Baillie.
7    Q.   How do you know Mr. Baillie?
8    A.   He was the Branch Manager of our office for
9  -- I won't state the number of years or months. I can't
10  remember exactly when. But I worked with him in that
11  capacity.
12    Q.   Was that in the Cincinnati office?
13    A.   In the Cincinnati office.
14    Q.   And your position at that time was the
15  Regional Property, Machinery, and Marine Insurance
16  Underwriting Manager?
17    A.   Correct.
18    Q.   All right. Did you have occasions where Mr.
19  Baillie would perform performance appraisals regarding your
20  job as a department manager?
21    A.   Yes, we did, on an annual basis, as is
22  customary at Chubb.
23    Q.   Did he ever put you on a performance
24  improvement plan?

**Page 10**

1    A.   Yes.
2    Q.   Do you know when that occurred?
3    A.   The second half of 2002.
4        MR. MONTGOMERY: Did you say 2002?
5        THE WITNESS: I'm sorry. Of the year 2000.
6  Thank you for the correction.
7    Q.   Second half of the year 2000?
8    A.   2000, yes.
9    Q.   Do you recall what were the issues or
10  concerns that he had that led to you being placed in a
11  performance improvement plan?
12    A.   Largely revolved around the balance of my
13  underwriting duties and my regional management duties,
14  trying to improve results in both areas and combine the
15  job.
16    Q.   Why don't you describe a little bit about
17  your duties in that position? I have the impression that
18  you had both branch and regional responsibilities.
19    A.   That is correct.
20    Q.   Okay. Why don't you explain that, if you
21  would.
22    A.   The regional position that I held was a new
23  position, not only here in Cincinnati, but also a new type
24  of position that had been developed within Chubb, that was

**Page 11**

1  to combine both management oversight of a particular region
2  for a particular underwriting discipline, and also involved
3  frontline underwriting of accounts within that same
4  territory.
5    Q.   All right. So you had both branch
6  underwriting responsibilities as a manager and then
7  regional?
8    A.   Correct.
9    Q.   What region was that?
10    A.   The Cincinnati or Ohio Valley Region. It's
11  been called both.
12    Q.   Do you recall what areas Mr. Baillie
13  recommended or sought improvement for you?
14    A.   I do not recall specifics at this time. It's
15  two and a half years ago.
16    Q.   Okay.
17    A.   But, in general, he was trying to help me
18  identify areas that needed to be improved and identify
19  steps for improving them.
20    Q.   Did you find that the performance improvement
21  plan did in fact help you improve your performance?
22    A.   I will say that the performance did improve
23  during that time.
24    Q.   Okay. When you say the performance improved,

**Page 12**

1  in what manner did it improve?
2    A.   I was successful in meeting the goals each
3  month that we had set out for me during the six or
4  seven-month period of the coaching program and did receive
5  official notification that I had -- I'm not sure of the
6  right term.
7    Q.   Successfully?
8    A.   Successfully completed the coaching, you
9  might say rehabilitation program.
10    Q.   And this would have been occurring, then,
11  during the year 2000, the second half?
12    A.   Yes, sir.
13    Q.   Okay. During the time you were in the
14  Cincinnati office, how frequent was your interaction with
15  Mr. Baillie?
16    A.   All the managers in our office had relatively
17  frequent interaction with Doug Baillie.
18    Q.   What was your opinion of him as a supervisor?
19    A.   I think it would depend on the particular
20  aspect of that job that he was performing. I think Doug
21  did well in certain things and maybe not quite as well in
22  others. It would perhaps be a balance.
23    Q.   Did you ever complain to any positions above
24  Doug regarding his treatment of you?