**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

------------------------------------

DOUGLAS W. BAILLIE,     :

     Plaintiff,     :

    vs.      :    CASE NO.

             :    C-1-02-062

CHUBB & SON INSURANCE:     :

     Defendant      :

------------------------------------

DEPOSITION OF:   JEFFREY ALLEN BARTON

TAKEN:     By the Plaintiff

DATE:     February 28, 2003

TIME:     Commencing at 9:00 a.m.

PLACE:     Offices of:
     Freking & Betz
     215 East Ninth Street
     Fifth Floor
     Cincinnati, Ohio 45202

BEFORE:     RAYMOND E. SIMONSON
     Registered Merit Reporter
     Notary Public - State of Ohio

**Page 2**

APPEARANCES:

    On behalf of the Plaintiff:

        RANDOLPH H. FREKING, ESQ.
            of
        Freking & Betz
        215 East Ninth Street
        Fifth Floor
        Cincinnati, Ohio 45202

    On behalf of the Defendant:

        DAVID T. CROALL, ESQ.,
            of
        Porter, Wright, Morris & Arthur
        250 East Fifth Street, Suite 2200
        Cincinnati, Ohio 45202-5117

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition of JEFFREY ALLEN BARTON, a witness herein, may be taken at this time by Counsel for the Plaintiff as upon cross-examination pursuant to the Federal Rules of Civil Procedure; that the deposition may be taken in stenotypy by the notary public-court reporter and transcribed by him out of the presence of the witness; that the transcribed deposition is to be submitted to the witness for his examination and signature; and that signature may be affixed out of the presence of the notary public-court reporter.

**Page 3**

I N D E X

JEFFREY ALLEN BARTON           PAGE

   CROSS-EXAMINATION BY MR. FREKING:      4

**Page 4**

1      JEFFREY ALLEN BARTON

2 of lawful age, a witness herein, being first duly sworn as

3 hereinafter certified, was examined and testified as

4 follows:

5      CROSS-EXAMINATION

6 BY MR. FREKING:

7    Q.   Hi, Jeff.

8    A.   Good morning.

9    Q.   We have met briefly. My name is Randy

10 Freking, and I represent Doug Baillie in connection with a

11 matter that is pending in the Federal District Court here

12 in Cincinnati, and we're here today to conduct your

13 deposition to find out what you may or may not know about

14 the facts which may or may not be relevant to Mr. Baillie's

15 case, and I apologize upfront for any inconvenience this

16 causes you, and, hopefully, this will not be too lengthy.

17 We'll certainly try to get you out of here by noon.

18      Could you start the deposition by just

19 stating your full name, your current address, and your

20 marital status, your family status, that kind of thing?

21    A.   Okay. Jeffrey Allen Barton, ▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I'm married, have four

23 children.

24    Q.   That's in Anderson?

Exhibit M

Page 29

1 orders are."
2 Q. Do you know whether or not Mr. Baillie by the
3 end of his tenure was generally viewed as a successful
4 branch manager?
5 MR. CROALL: By whom? Generally viewed?
6 Within the Cincinnati branch?
7 Q. Within the office.
8 A. Some people, probably yes; some people,
9 probably no. I think there were different opinions.
10 Q. Tell me a little bit about Jerry Butler.
11 What do you know about Mr. Butler?
12 A. As far as?
13 Q. You know, what's his background? Is he
14 coming from a marketing background? Underwriting
15 background?
16 A. He's had -- I believe he started in the
17 business in a claims role with the company, and then he was
18 in a training and education role with the company. And
19 with Chubb he's been in human resources, marketing, and
20 branch management.
21 Q. And is he still in the branch manager role
22 here locally?
23 A. Yes.
24 Q. Now, how would you describe his level of

Page 30

1 experience with the level of experience that Mr. Baillie
2 had?
3 A. His number of years?
4 Q. Yeah, however you feel comfortable.
5 A. I mean, I don't know how to answer that one.
6 Q. All right.
7 A. I mean, I -- I don't know all of Doug's
8 experiences or all of Jerry's experiences.
9 Q. And how would you describe -- is there
10 a difference in management style between the two of
11 them?
12 A. I think there is.
13 Q. How would you describe the difference in
14 management style?
15 A. I think Jerry's goals and strategies for the
16 future are much more defined and communicated. I think
17 there's probably an increased level of accountability with
18 employees and with the overall numbers in the branch and
19 people's -- you know, meeting their goals.
20 Q. Now, were you -- you obviously were not
21 consulted about Mr. -- or were you consulted at all about
22 Mr. Baillie's termination?
23 A. No.
24 Q. Were you aware of any performance concerns

Page 31

1 directed at Mr. Baillie prior to his termination?
2 A. I mean, I was surprised.
3 Q. You were surprised by his termination?
4 A. Correct.
5 Q. Now, why were you surprised by his
6 termination?
7 A. I just -- I mean, I assume there was some
8 kind of process that they went through to come to this
9 result, and Doug was a pretty good poker player, and for
10 some reason he chose not to bring me into that.
11 Q. Meaning that, prior to learning of his
12 termination, he did not --
13 A. He did not confide in me.
14 Q. That there were any kind of performance
15 issues?
16 A. That there were any kind of performance
17 issues.
18 Q. And the two of you were relatively good
19 friends; is that correct?
20 A. Um-hmm (nodding head affirmatively).
21 Q. And would you have expected him to confide in
22 you if he thought he was in serious jeopardy of losing his
23 job?
24 A. I think that's a personal decision that he

Page 32

1 would make.
2 Q. All right. Do you know now whether or not he
3 was given any kind of warnings or anything like that?
4 A. I don't know.
5 Q. All right. Because you've stayed in contact
6 with him to some degree?
7 A. I probably haven't talked to him for a year.
8 Q. Okay. Now, did you have after -- how did you
9 learn he had been terminated?
10 A. I was out of the office. Our son Peter was
11 born on the Thursday before his termination, so I was back
12 and forth at the hospital, and he called me at home that
13 night.
14 Q. And what do you recall about that
15 conversation?
16 A. I was surprised.
17 Q. Did Mr. Baillie relay to you what had
18 happened?
19 A. He said he was terminated.
20 Q. Did he -- do you recall whether he was
21 professional during that conversation?
22 A. He was very -- yes, he was professional.
23 Q. All right. So, at least prior to receiving
24 this telephone call, you had no suspicion or inkling that

## Page 33

1 he was kind of in jeopardy of losing his job?

2    A.   I knew there were probably some issues, but,

3 you know, to this extent, no.

4    Q.   How do you know there were some issues?

5    A.   You know, conversations I had with Tim asking

6 me about certain things from a marketing standpoint.

7    Q.   What kind of conversations would you have

8 with Tim that you can think of regarding that?

9    A.   I mean, a lot of it revolved around, you

10 know, what was going on in our production offices in

11 Columbus and Louisville.

12    Q.   You mean from like a financial standpoint?

13    A.   More of a strategy standpoint, you know:

14 Who's doing what? Who's responsible for what?

15    Q.   Do you recall any particular criticisms he

16 had in that regard, of either your performance or Mr.

17 Baillie's performance?

18    A.   Particular criticisms?

19    Q.   Yeah. Anything more specific than what you

20 just said, that it seemed like general?

21    A.   I think the general focus of that discussion

22 -- I don't remember particular statements -- was, you know,

23 he was trying to figure out how we were managing those

24 offices.

## Page 34

1    Q.   Okay. All right. Whose responsibility was

2 it to manage those offices?

3    A.   They reported to Doug.

4    Q.   And what type of general feedback do you

5 think you gave him on that particular subject?

6    A.   Gave Tim?

7    Q.   Yes.

8    A.   I basically told him what we were doing, how

9 it was being managed, and he had questions, and I don't

10 remember the specific questions, but I answered them.

11    Q.   Okay. Did you have a particular view about

12 how those offices were being managed that you would have

13 shared with Mr. Szerlong?

14    A.   I don't recall, you know. I mean, that's a

15 couple years ago at least. I don't recall.

16    Q.   Did you ever have occasion -- since Mr.

17 Baillie's termination, have you ever heard of anything that

18 Mr. Baillie has done since his termination that was somehow

19 viewed by whoever related it to you as being inappropriate

20 or wrong or unprofessional or not in the best interest of

21 Chubb?

22    A.   No.

23    Q.   You've never -- have you ever heard about

24 some convention at which Mr. Baillie was manning some booth

## Page 35

1 for a charity he supported and he allegedly bad-mouthed, I

2 guess, Chubb in some manner?

3    A.   I can think of -- I think I know the event.

4 It was probably a play at a charity for Insuring the

5 Children. I had a couple of children that were sick and I

6 went home before the play started.

7    Q.   Was this something called like a Big I

8 Convention? Do you remember like the Big I Convention?

9    A.   No. I wasn't at that.

10    Q.   You weren't at that. And you haven't heard

11 anything that happened there? Mr. Korte running into Doug

12 Baillie or anything like that?

13    A.   I recall people talking about that he was

14 there.

15    Q.   Okay. But no either positive or negative

16 thing?

17    A.   No. They were just surprised to see him.

18    Q.   Okay. Do you know why they would be

19 surprised to see him at some place like that?

20    A.   Well, I mean, I think just because he was no

21 longer working for Chubb and didn't have a job in the

22 insurance, the local insurance industry.

23    Q.   Do you know anything about Mr. Baillie's

24 efforts to find employment, other than the fact that he did

## Page 36

1 find employment?

2    A.   I knew he was -- I believe they set him up

3 with an out-placement service and he had a number of

4 different interviews.

5    Q.   Okay. Did he say anything -- do you recall

6 him ever saying anything to you that was particularly

7 negative about Chubb since his departure?

8    A.   No.

9    Q.   Okay. Have you been -- other than whatever

10 you've talked about with Mr. Croall, have you been -- have

11 you spoken to anybody else within Chubb about Mr. Baillie's

12 termination?

13    A.   From time to time, it will be kind of like

14 watercooler talk, and I don't know that we really discussed

15 specifics. I think the -- what it comes down to most of

16 the time, we'd just prefer that this come to some kind of

17 settlement and move on.

18    Q.   Have you heard from anybody within Chubb as

19 to Mr. Baillie's severance offer? Have you heard anything

20 about that other than from counsel?

21        MR. CROALL: And that would include inside

22       counsel in that exclusion.

23    A.   Nobody's mentioned anything about severance.

24    Q.   Okay.