## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
 5    -----------------------------------
 6    DOUGLAS W. BAILLIE,              :
 7              Plaintiff,             :
         vs.                           :   CASE NO.
 8                                     :   C-1-02-062
      CHUBB & SON INSURANCE,           :
 9                                     :
              Defendant.               :
10                                     :
      -----------------------------------
11
12
13
14    DEPOSITION OF:    ANDREW BRYANT
15    TAKEN:            By The Plaintiff
16    DATE:             March 17, 2003
17    TIME:             Commencing at 9:50 a.m.
18    PLACE:            Offices of:
                        Freking & Betz
19                      215 East Ninth Street
                        Fifth Floor
20                      Cincinnati, Ohio 45202
21    BEFORE:           Theresa Lynn Westfelt
                        Court Reporter
22                      Notary Public - State of Ohio
23
24
```

## Page 2

```
 1   APPEARANCES:
 2       On behalf of the Plaintiff:
 3           RANDOLPH H. FREKING, ESQ.
                of
 4           Freking & Betz
             215 East Ninth Street
 5           Fifth Floor
             Cincinnati, Ohio 45202
 6
 7       On behalf of the Defendant:
 8           DAVID T. CROALL, ESQ.
                of
 9           Porter, Wright Morris & Arthur LLP
             250 East Fifth Street
10           Suite 2200
             Cincinnati, Ohio 45202
11
12                     - - -
13              S T I P U L A T I O N S
14       It is stipulated by and between counsel for
15   the respective parties that the deposition of ANDREW
16   BRYANT, a witness herein, may be taken at this time by
17   Counsel for the Plaintiff as upon cross-examination
18   pursuant to the Federal Rules of Civil Procedure; that the
19   deposition may be taken in stenotypy by the notary
20   public-court reporter and transcribed by her out of the
21   presence of the witness; that the transcribed deposition
22   is to be submitted to the witness for his examination and
23   signature, and that signature may be affixed out of the
24   presence of the notary public-court reporter.
```

Annette McKeehan Schoch, RMR (513) 941-9464

## Page 3

```
                         I N D E X
 2   ANDREW BRYANT                                    PAGE
 3   CROSS-EXAMINATION BY MR. FREKING                  4
 4   EXAMINATION BY MR. CROALL                         -
 5
 6                       EXHIBITS
 7                     (No Exhibits).
 8
 9
10               CONFIDENTIAL EXCERPTS
11                    Page 14 - 15
12                    Page 23 - 26
13                    Page 32 - 39
```

## Page 4

```
                      ANDREW BRYANT
 2   of lawful age, a witness herein, being first duly sworn as
 3   hereinafter certified, was examined and deposed as
 4   follows:
 5                  CROSS-EXAMINATION
 6   BY MR FREKING:
 7       Q.  Hi, Andy. My name is Randy Freking and I
 8   represent Doug Baillie in a case that's currently pending
 9   in Federal District Court in Cincinnati against Chubb.
10   And we're here today to conduct your deposition to find
11   out what you may or may not know about matters that may or
12   may not be relevant to his case.
13           Could you please start the deposition by
14   simply stating your full name, your family status, your
15   current home address, and your current telephone number?
16       A.  Andrew Broaddus Bryant, B-R-O-A-D-D-U-S.
17   Married. I live at ████████████████████████████
18   ████████████████████████████████████████████████
19       Q.  I'm sorry, what city do you live in?
20       A.  ████████
21       Q.  Ohio?
22       A.  ████████
23       Q.  Oh. And what's your home telephone number?
24       A.  ████████
```

Redacted

Page 1 - Page 4

Exhibit N

Page 41

1 Chubb?
2    A.  Not really.
3    Q.  Okay.  Did you regard -- did you -- was this
4 a telephone conversation?
5    A.  Yes.
6    Q.  Did Mr. Baillie say anything during that
7 telephone conversation that was a surprise to you in the
8 sense of, you know, how he was saying it or anything like
9 that?
10   A.  No.
11   Q.  Was he professional to the best of your
12 recollection?
13   A.  Yes.
14   Q.  Okay.  Do you recall what reaction you had,
15 if any, to this news from Mr. Baillie?
16   A.  No.
17   Q.  Okay.  And you don't even recall whether he
18 told you whether it was his decision or Chubb's decision?
19   A.  I'm not sure it was that specific.
20   Q.  And -- okay.  Do you recall anything else
21 about that conversation that I haven't covered?
22   A.  It was brief.
23   Q.  Okay.  Now, after that brief conversation,
24 have you had any other conversations with Mr. Baillie?

Page 42

1    A.  He attended a wedding of a Chubb underwriter
2 that worked in the Louisville office.  I talked to him
3 briefly at the reception.
4    Q.  Okay.  Do you remember what calendar year
5 that was in?
6    A.  2001.
7    Q.  Okay.  Did -- were you happy to see Mr.
8 Baillie in attendance?
9    A.  No real feelings one way or the other.
10   Q.  Okay.
11   A.  (Continued)  It was a social event.
12   Q.  Okay.  Did Mr. Baillie say or do anything at
13 that wedding reception that was somehow contrary to
14 Chubb's interest?  Did he say anything bad about Chubb --
15 or bad about Chubb, or bad about --
16   A.  No.
17   Q.  -- anybody else?  He acted the way you would
18 expect a guest at a wedding to act?
19   A.  I did not interact with him that much.
20   Q.  Okay.  Have you heard any stories about Mr.
21 Baillie since his departure of from Chubb, anything along
22 the lines of Mr. Baillie allegedly saying anything bad
23 about Chubb or anything like that?
24   A.  No.

Page 43

1    Q.  Do you have any knowledge as to what Mr.
2 Baillie is doing today?
3    A.  Marketing field rep, I believe, for Grange
4 Insurance.
5    Q.  Okay.
6    A.  (Continued)  Florida.
7    Q.  Are you familiar at all with the fact --
8 well, strike that.
9        Are you familiar with Chubb's policy at all
10 with respect to providing severance pay?
11   A.  No.
12   Q.  So you've never, during your career with
13 Chubb, had occasion to know whether or not Chubb offered
14 severance pay to people that they terminate?
15   A.  It would be rumors.
16   Q.  It would just be rumors.  What sort of
17 rumors have you heard?
18   A.  I couldn't get specific, just that --
19   Q.  So-and-so got such-and-such severance?
20   A.  Not specifically like that.
21   Q.  Just --
22   A.  (Continued)  No numbers.
23   Q.  Yeah.
24   A.  (Continued)  If it's not my money, I don't

Page 44

1 care.
2    Q.  Okay.  That's probably a good philosophy.
3        How would you describe your personal
4 relationship with Mr. Baillie?
5    A.  We didn't have much of a personal
6 relationship.  It was pretty much work.
7    Q.  Okay.  How would you describe that work
8 relationship?  I mean, was it okay?
9    A.  It was okay.
10   Q.  Was Mr. Baillie generally professional in
11 his dealings?
12   A.  I wouldn't call it unprofessional.
13   Q.  Okay.  You would agree with me that the
14 financial results of the Kentucky territory improved
15 during Mr. Baillie's tenure?
16   A.  Yes.
17   Q.  Do you attribute that to anything in
18 particular?
19   A.  A lot of hard work by a lot of people; I
20 would say Dieter Korte in particular.
21   Q.  Where does the buck stop, in your opinion,
22 with respect to those financial results?
23   A.  Within a given territory for Kentucky?
24   Q.  Uh-huh.

**Page 45**

1    A.   The buck moves around a lot. I'd say the
2  first firm resting place would certainly be my plate, then
3  Doug's plate.
4    Q.   Okay. Did you ever have discussions with
5  Mr. Baillie about the fact that the financial results in
6  your territory that belonged on your plate were improving?
7    A.   Yes.
8    Q.   Did Mr. Baillie have any particular
9  reaction? Did he think that was good news? Did he think
10  this was bad news?
11    A.   He thought that was good news.
12    Q.   Okay. Did he ever express to you, you know,
13  compliments in that regard?
14    A.   On the profit piece, no.
15    Q.   How about on the premium piece?
16    A.   When it grew, yes.
17    Q.   Okay. Did it decline at some point?
18    A.   Pardon?
19    Q.   Did it decline ever?
20    A.   As part of that profit improvement piece, it
21  certainly declined.
22    Q.   Okay. And what do you recall Mr. Baillie
23  saying to you on those occasions?
24    A.   He would be frustrated.

**Page 46**

1    Q.   Okay. And was that a reaction you would
2  have expected?
3    A.   No.
4    Q.   What kind of reaction -- was that reaction
5  by Mr. Baillie frustration of the premium decreasing?
6    A.   Correct.
7    Q.   Did his frustration surprise -- it did not
8  surprise you?
9    A.   It surprised me in that the focus at that
10  point, I felt, was more profit improvement than premium
11  growth.
12    Q.   Okay. Did you ever express your frustration
13  on that subject to anyone?
14    A.   Yes.
15    Q.   To who?
16    A.   Dieter, Diane.
17    Q.   What do recall expressing to Dieter along
18  those lines?
19    A.   That we need to improve the profit before we
20  can make it bigger.
21    Q.   "We need to improve the profit before we can
22  make it bigger"?
23    A.   We need to make the book of business more
24  profitable before we can grow upon it, otherwise we're

**Page 47**

1  growing -- just growing in a nonprofitable book.
2    Q.   Right. Isn't it true that Mr. Baillie had
3  two objectives in mind; he wanted profit to grow and he
4  also want written premiums to grow?
5    A.   I would say Doug focused on growth a lot
6  more than written premium profit. My perception was
7  always more focused on the top number versus the bottom
8  number.
9    Q.   Okay. You do not think that Mr. Baillie had
10  a goal of increasing profit?
11    A.   I think Doug thought it would just happen if
12  you grew the book enough.
13    Q.   Okay. Well, regardless of the reason for
14  it, you would agree with me that he wanted profit to grow?
15    A.   Yes.
16    Q.   Okay. And he wanted premiums to grow?
17    A.   Yes.
18    Q.   And he would express frustration to you when
19  profit would grow, but premiums were not growing?
20    A.   No.
21    Q.   I thought you told me profit did grow?
22    A.   Doug focused on growth. Profit was
23  something -- my perception was Doug's feeling was profit
24  was something that just happened and that our job was to

**Page 48**

1  focus on just making it bigger, the premium volume.
2    Q.   Uh-huh. And he was not happy with the level
3  of your premium volume?
4    A.   He was frustrated.
5    Q.   Right. And he expressed that to you?
6    A.   Yes.
7    Q.   And that did not surprise you, right,
8  because one of your jobs was to make the premium grow in
9  the Kentucky territory?
10    A.   At the time -- at times where that was
11  expressed, it did surprise me in that there was a reality
12  of business we had to get off of to ultimately make it
13  more profitable that was going to be -- economic reality
14  was we would not grow given the amount of business we had
15  to get off of for underwriting reasons.
16    Q.   You had to get rid of some bad business?
17    A.   Correct.
18    Q.   Right. And Mr. Baillie wanted you to get
19  rid of that bad business?
20    A.   Mr. Baillie, in my mind, was more focused on
21  adding business then culling business.
22    Q.   Wasn't it true that Mr. Baillie wanted you
23  to do between 1998 and 2001 what you've been able to do in
24  2002, which is get new business?