173 F.3d 855 (Table)
**Unpublished Disposition**

Page 1

(Cite as: 173 F.3d 855, 1999 WL 196556 (6th Cir.(Mich.)))
<KeyCite Citations>

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Richard KAHL, Plaintiff-Appellant,
v.
THE MUELLER CO., A Tyco Intl. Ltd. Co., Defendant-Appellee.

No. 98-1176.

April 1, 1999.

On Appeal from the United States District Court for the Eastern District of Michigan.

Before SILER and GILMAN, Circuit Judges; BECKWITH, District Judge . [FN*]

 FN* The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

SILER, Circuit Judge.

**1 Plaintiff, Richard F. Kahl, sued his former employer, defendant, The Mueller Company, asserting claims of (1) age discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act, MICH. COMP. LAWS, § 37.2101, *et seq.;* (2) wrongful discharge/breach of good-cause job security representations in violation of Michigan common law; and (3) self-defamation in violation of Michigan common law. The district court granted Mueller summary judgment on all three counts. Kahl appeals only the district court's rulings on his age discrimination and wrongful discharge claims. We AFFIRM.

I. BACKGROUND

Kahl was born on February 1, 1939. He became employed by Mueller in 1962 as a sales trainee. Mueller manufacturers and distributes water and natural gas products such as valves and fittings for the utility industry. From 1963-1973, Kahl worked as a Mueller sales representative selling the full line in the western Pennsylvania territory. From 1973-1982, Kahl sold the full line in the Michigan sales territory.

In approximately 1982, Mueller divided its gas and water sales and moved Kahl to its gas division, where he worked as a Midwest sales representative until the division was eliminated in 1987 due to downsizing. From 1982-1987, Kahl received annual reviews which indicated that he performed his job satisfactorily. However, the evaluations also contained such criticisms of Kahl's performance as "must make better use of funds available for operating needs," "hesitant in speaking to groups," "needs to be more creative," and "he's a bit too laid back."

In 1987, Mueller offered Kahl a position as a product specialty representative for its "McCullough" line of products in the northeast district of eleven to twelve states. [FN1] In two letters to upper management dated July 23 and October 19, 1987, Read and Egan separately and respectively noted that Kahl's performance was sub-par and that management was considering terminating Kahl at the end of January 1988 "barring a major turnaround in Kahl's performance."

 FN1. At first, Dave Read, the district manager, was Kahl's immediate supervisor. In 1988, Randy Fox replaced Read. Then in 1991, Read returned to the scene as the district manager. Paul Kleeman replaced Read in 1995 as the district manager. Meanwhile, from 1987 to 1992 Jim Egan was the vice- president over sales and marketing and thus supervised the district managers. In 1992, Carl Ingram replaced Egan as vice-president over sales and marketing. In 1995, Dale Smith joined Mueller and Ingram's title

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



173 F.3d 855 (Table) Page 2
(Cite as: 173 F.3d 855, 1999 WL 196556, **1 (6th Cir.(Mich.)))

changed to vice-president over sales.

Later in 1987, instead of terminating Kahl, Mueller offered him the position of a water products sales representative for the lower peninsula of Michigan in the northeast district where his two primary functions were (1) to establish and maintain a distributor network and (2) to work with various municipalities or water authorities in an effort to gain product acceptance by those municipalities.

In his last five years with Mueller, Kahl never ranked as one of the top five sales representatives with respect to dollar volume. He ranked last in total sales out of the nine to ten territories in the northeast district in 1994- 1995. Moreover, his housing start performance, as compared to the other eight to ten salespersons in the northeast district, ranked near last for a number of years prior to his termination. In the rankings, Kahl placed as one of the lowest three to five salespersons for Mueller in the nation. Additionally, Kahl acknowledges that some of his reviews during his tenure as a water product sales representative report that he (1) lacked aggressiveness in making sales; (2) needed to be more creative in developing new business; and (3) needed to improve his communication skills. Despite these documented criticisms, Kahl's written evaluations for 1988-1993 show that he was performing well. His 1994- 1995 written evaluations also report satisfactory performance. Notwithstanding the satisfactory rating, Read suggests these evaluations were "average at best" and below what he would expect from an experienced sales representative. Moreover, at the bottom of Kahl's 1995 evaluation, Ingram wrote, "This evaluation does not warrant a grade of 'consistently meets requirements." ' In essence, Ingram asked that Kahl's evaluation be lowered to: "Normally meets performance expected of the experienced employee. Assignments and responsibilities are being accomplished but sometimes with less than complete effectiveness."

**2 After receiving a copy of Ingram's addendum to Kahl's 1995 evaluation, Kahl questioned Ingram about the revised review.

Kahl, paraphrasing, stated that Ingram "assured me that the reason for the memo was to give me a kick in the pants just to let me know that sometimes people my age and my tenure tend to get a little lax and he wanted to know that I can do the job, and really just [sic] he said continue what you're doing but just --- I don't know what his words were--step it up a little."

Toward the end of 1995, Ingram expressed concerns to Read regarding Kahl's job performance. Read stated that Ingram "felt Dick wasn't putting out the effort, that what I would call "doing the milk run [,] ... [m]aking calls on the customers you are comfortable with, not making the tough calls, [or] putting in the extra effort, [or] looking for new customers [or] new business." Read agreed with Ingram's assessment and spoke with Kahl about his deficient performance.

Kahl contended that in October 1995, Kleeman asked him if he would be interested in covering the Indiana sales territory for Mueller in addition to his current territory and that thereafter Kleeman informed him that Ingram wished to place a younger person in Indiana.

In March 1996, Kahl attended the annual Mueller northeast district sales meeting, and like all sales representatives, made a presentation providing an analysis of his past sales and his strategic plan for his territory. Because Kahl failed to answer questions posed by Ingram to Ingram's satisfaction, Ingram asked Kahl to prepare a detailed written business plan for his territory.

While Kahl was preparing his business plan, on April 9, 1996, Kleeman performed Kahl's annual performance evaluation and placed him on a ninety-day probation with thirty-day reviews due to Kahl's decreasing performance. Specifically, Kleeman criticized Kahl's lack of communication with the home office and customers and his lack of presence in western Michigan. By way of a letter to Kahl dated May 22, 1996, Ingram expressed his displeasure with Kahl's business plan and his performance in general.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



173 F.3d 855 (Table) Page 3
(Cite as: 173 F.3d 855, 1999 WL 196556, \*\*2 (6th Cir.(Mich.)))

On June 21, 1996, Kleeman conducted Kahl's initial probationary review, which was poor. With respect to the unsatisfactory review, Kahl attested that Kleeman basically said that "no matter what I would do to try to come out of this situation, that I was targeted for termination and ... [Kleeman] felt that there really wasn't any sense to me to go on, Carl Ingram had made a distinct target, put it on my back, and that the best thing for me to do is ask for some kind of retirement plan." Kleeman denied ever having said this. Nevertheless, Kahl requested a severance or retirement package.

On June 28, 1996, Kleeman terminated Kahl, citing Kahl's poor performance and failure to respond to the terms of his probation as Mueller's reasons for the adverse employment action. Kahl accepted the severance package, but did not sign the general release.

\*\*3 Explaining Mueller's actions, Kleeman attested that between August 1995 and June 28, 1996, he supervised Kahl and found his performance to be unsatisfactory and thus fired him for poor performance because: 1) Kahl's territory's dollars per housing start ratio were far below the district average; 2) Kahl's overall sales were the lowest within the district; 3) Kahl's telephone expenses (an indicator of sales activity) were below the district average; 4) Kahl's travel expenses (another indicator of sales activity) were below the district average; 5) in 1993-1995, Kahl ranked in the bottom two or three salespersons for the northeast district; and 6) on a nationwide basis Kahl ranked in the last three to five sales persons in 1994-1995. Agreeing with Kleeman, Ingram added that the decision to terminate Kahl was not based on his seniority or his salary, but on his poor performance.

In November 1996, five months after Kahl was terminated, Mueller hired John Hunter, 33, to replace Kahl. Kleeman testified that Hunter has increased the sales volume of Mueller products.

In support of his case, Kahl submitted the following as evidence of a pattern of discrimination on the part of Mueller: (1) between the time Mueller terminated Kahl and March 1997, Mueller hired six persons between the ages of 25 and 39 as sales representatives; [FN2] and (2) between January 1992 and March 1997, six employees were replaced by younger persons.

> FN2. Defendant noted that during the relevant time period Mueller hired and employed persons in their late-20's to persons in their mid-60's.

## II. STANDARD OF REVIEW

This court reviews an order granting summary judgment *de novo,* and hence employs the same test as used by the district court. See *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1019 (6th Cir.1995).

## III. DISCUSSION
### A. Age Discrimination

Kahl brings his age discrimination claim pursuant to Michigan's Elliot-Larsen Act, which prohibits discrimination in employment based upon age. See MICH. COMP. LAWS § 37.2202. Michigan law governs the substantive issues of Kahl's state law claim asserted in federal court against Mueller on the basis of diversity. See *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). However, in analyzing this claim, this court may apply federal substantive law developed in Title VII cases. See *Terwilliger v. GMRI, Inc.,* 952 F.Supp. 1224, 1227 (E.D.Mich.1997), *affirmed,* 142 F.3d 436 (6th Cir.1998)(table).

A plaintiff may prove his claim of age discrimination by either direct or indirect evidence. See *Town v. Michigan Bell Tele. Co.,* 568 N.W.2d 64, 67 (Mich.1997). Alternatively, a plaintiff may prove his case with circumstantial evidence by utilizing the analytical framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Id.* at 68 (adopting the three- part burden-shifting analysis of *McDonnell Douglas* ).

*1. Direct Evidence*

To establish his claim with direct evidence of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




discrimination, a plaintiff must present evidence which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor." *Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 683 (Mich.App.1997) (citing *Kresnack v. Muskegon Heights*, 956 F.Supp. 1327, 1335 (W.D.Mich.1997)).

**\*4** In mixed motive cases wherein direct evidence of discrimination is presented, "once the plaintiff has met the initial burden of proving that the illegal conduct [the discrimination] ... was more likely than not a 'substantial' or 'motivating' factor in the defendant's decision, the defendant has the opportunity to show by a preponderance of the evidence that it would have reached the same decision without consideration of the protected characteristic." *Id.* at 683-84 (quoting the § 1983 analysis in *Mt. Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977), a First Amendment case, which was extended to cases arising under Title VII by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and to cases arising under the Elliot-Larsen Act by *Harrison* ). If the defendant meets this burden, no liability arises. *Id.* (citing *Haskins v. United States Dep't of the Army*, 808 F.2d 1192, 1197-98 (6th Cir.1987)).

Kahl pointed to three specific instances which he believes constitutes direct evidence of discrimination, to wit--(1) Ingram's alleged "kick in the pants" remark made in July 1995; (2) Kleeman's alleged statement made in October 1995 concerning Ingram's alleged desire to place a "younger person" in the Indiana territory; and (3) Kleeman's alleged "target" remark made in June 1996 concerning the alleged proposal of a retirement package.

Kahl cannot prove a case of direct discrimination with that evidence. The following analysis assumes that the reconstructed remarks cited by Kahl were actually made. The first remark refers to Kahl's declining performance and is not a "slam" on his age. The remaining two remarks are "stray remarks" which are insufficient to give rise to an inference of discrimination as they are temporally and topically distant from Kahl's termination. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020 (6th Cir.1993).

*2. McDonnell Douglas Analysis*

The analysis for establishing a claim under the *McDonnell Douglas* framework is three-fold. A plaintiff must first present a *prima facie* case of discrimination. To present a *prima facie* case of discrimination, a plaintiff must prove that "(1) [ ]he was a member of the protected class; (2)[ ]he was subjected to an adverse employment action; (3)[ ]he was qualified for the position; and (4)[ ]he was discharged under circumstances that give rise to an inference of unlawful discrimination." *Lytle v. Malady*, 579 N.W.2d 906, 914 (Mich.1998) (modifying the fourth element of the *McDonnell Douglas* framework as interpreted by *Town*, as requiring proof that "others similarly situated and outside the protected class were unaffected by the employer's adverse conduct.").

Once plaintiff establishes a *prima facie* case, the burden shifts to the employer who must articulate some legitimate, nondiscriminatory reason for the employee's termination. *See Town*, 568 N.W.2d at 68. "[E]ven if that reason later turns out to be incredible, the presumption of discrimination evaporates." *Id.*

**\*5** If the employer meets this burden of production, the plaintiff must "submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that plaintiff's age was a motivating factor in the employer's decision. Thus, the employee must prove that the employer's explanation was a pretext for discrimination." *Id.* at 68-69 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993)). A plaintiff may prove pretext by showing by a preponderance of the evidence that the proffered reasons (1) had no basis in fact; (2) did not actually motivate his discharge; or (3) were insufficient to motivate discharge. *See Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir.1997).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works




173 F.3d 855 (Table) Page 5
(Cite as: 173 F.3d 855, 1999 WL 196556, **5 (6th Cir.(Mich.)))

The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that discrimination was a determining factor in the termination decision. *See Town,* 568 N.W.2d at 69 (stating, "[t]he proofs offered in support of the prima facie case may be sufficient to create a triable issue of fact that the employer's stated reason is a pretext, as long as the evidence would enable a reasonable factfinder to infer that the employer's decision has a discriminatory basis.").

The district court was incorrect to assume that Kahl could establish a *prima facie* case. It is clear that Kahl is a member of a protected class and suffered an adverse employment action. Hence, there is no doubt that he meets the first two criteria. However, it is disputed whether Kahl was qualified for his position and whether he was discharged under circumstances that give rise to an inference of unlawful discrimination.

An employee may establish that he was "qualified" by proving that he was performing the job at a level that met the employer's legitimate expectations and that "he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance." *Id.* at 69-70. In his last position at Mueller, Kahl initially performed at a satisfactory level. However, the evidence in the record evinces that Kahl's performance declined during his last few years with Mueller. Because of Kahl's poor evaluations, he cannot establish a *prima facie* case of discrimination because he was not qualified for his position.

Alternatively, assuming that Kahl was qualified, he cannot establish a *prima facie* case because he cannot show that he was discharged under circumstances that give rise to an inference of unlawful discrimination. Again, the evidence reflects that he was fired for poor job performance.

Further, assuming that Kahl satisfied all the prongs of the *prima facie* test, the district court correctly found that he cannot rebut Mueller's legitimate, nondiscriminatory reasons for terminating his employment, to wit--poor performance. That was a legitimate nondiscriminatory reason for discharge. *See Roush v. KFC Nat. Mgmt. Co.,* 10 F.3d 392, 396 (6th Cir.1993).

*B. Wrongful Discharge/Breach of Good Cause-Job Security Representations*

**\*\*6** In Michigan, all employees are assumed to be at will. *See Lynas v. Maxwell Farms,* 273 N.W. 315, 316-317 (Mich.1937). This at-will presumption may be rebutted by evidence of "either a contract provision for a definite term of employment, or one that forbids discharge absent just cause." *Lytle,* 579 N.W.2d at 911 (citing *Toussaint v. Blue Cross & Blue Shield of Michigan,* 292 N.W.2d 880 (Mich.1980)). An employee may prove such contractual terms by presenting proof of: "(1) a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee." *Id.* (internal quotations and citations omitted). It appears that Kahl relies on the third option, the legitimate expectations option, to prove that a just-cause relationship existed.

The analysis for determining whether an employee may establish his legitimate expectation claim that a just-cause relationship existed is two-fold. First, the court must decide "what, if anything, the employer has promised." *Rood v. General Dynamics Corp.,* 507 N.W.2d 591, 606-07 (Mich.1993). Second, the court must discern whether the promise was "reasonably capable of instilling a legitimate expectation of just-cause employment." *Id*.

Kahl based his contention that a good-cause relationship existed on one statement in the 1994 "Standards of Conduct" employee handbook and on one statement regarding the handbook allegedly made by Read. The handbook, which was distributed to all employees of Tyco, Mueller's parent

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



corporation, and which applies to all Tyco employees with the Company, provides that it was designed to only apply to some types of conduct:

> Tyco is committed to maintaining the highest standards of personal and business conduct by the Company and its employees. In most circumstances, your sense of what is right and wrong will be all the guidance you will need. However, due to the complexity of the rules governing commercial activities in the modern world, there are many areas which require specific standards of conduct, and the Standards of Conduct are designed to alert you to these areas.
>
> The handbook does not provide employees with rules, standards, or goals, but simply addresses wrongdoings such as bribes, kickbacks, insider trading, and antitrust issues. In reference to these wrongdoings, the handbook provides:
>
> The conduct of each employee is of vital importance to the Company. A violation of these standards of conduct by a single employee can cost the Company dearly; it undermines all of our reputations. For these reasons, violations of these standards may lead to significant penalties, up to and including termination for cause. If you have any questions concerning any of the Company's standards, policies or procedures, please contact your supervisor, the General Manager of you business unit, or any member of the Legal Department.

**7 Allegedly later handbooks Kahl received did not contain this language.

Kahl claimed that as Read went through the handbook with several employees he stated that termination for cause "meant you really had to screw up, that it was not to be taken that they were trying to get rid of people." Kahl also claimed that Read "made it very clear that you had to have a real problem or screw up before you would be terminated by the Mueller Company." Read did not specifically remember distributing the handbooks or giving Kahl his handbook and did not recollect saying what Kahl purports Read said regarding the term of employment at Tyco.

In the case at bar, the district court correctly found that neither the handbook language nor Read's alleged comments constitute clear and unequivocal statements of job security.

AFFIRMED.

173 F.3d 855 (Table), 1999 WL 196556 (6th Cir.(Mich.)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works


